

# United States Department of the Interior

## OFFICE OF HEARINGS AND APPEALS

139 East South Temple, Suite 600
Salt Lake City, Utah 84111
Phone: 801-524-5344

IN REPLY REFER TO:

October 13, 1999

|  |  |
|---|---|
| OMAR STRATMAN, | :    IBLA 96-152 |
|  | :    No. A76-0132 CV (JKS) |
| Protestant | : |
|  | :    Challenge to the eligibility of Woody |
| v. | :    Island as a Native village under Section |
|  | :    11(b)(3) of the Alaska Native Claims |
| LEISNOI, INC., | :    Settlement Act, 43 U.S.C. §1610(b)(3) |
|  | :    (1994) |
| Respondent | : |
| ———————————— | : |
| KONIAG, INC., and | : |
| BUREAU OF INDIAN AFFAIRS, | : |
|  | : |
| Intervenors | : |

## RECOMMENDED DECISION

Appearances:   Michael J. Schneider, Esq., Anchorage, Alaska
for Omar Stratman

John R. Fitzgerald, Esq., New Orleans, Louisiana, and
Robert L. Breckberg, Esq., Anchorage, Alaska
for Leisnoi, Inc.

R. Collin Middleton, Esq., Anchorage, Alaska
for Koniag, Inc.

James R. Mothershead, Esq., Anchorage, Alaska
for the Bureau of Indian Affairs

Before:    Administrative Law Judge Sweitzer

Exhibit 9

TABLE OF CONTENTS

I. Statement of the case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Procedural history and background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. Statement of facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

VI. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   A. Motions to dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   B. Is Protestant collaterally estopped from raising certain arguments or issues? . . . . . . 17

   C. Should Protestant's brief filed in state court litigation be admitted into evidence
      posthearing? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   D. Eligibility of the Native village of Woody Island . . . . . . . . . . . . . . . . . . . . . . 18

     1. Burden of proof and the prima facie case . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     2. Did the alleged Village have 25 or more Native residents as of April 1, 1970,
       and did at least 13 persons who enrolled to the alleged Village use it during
       1970 as a place where they actually lived for a period of time? . . . . . . . . . . . . 20

       a. Guidelines for determining whether at least 13 persons who enrolled to the
          alleged Village used it during 1970 as a place where they actually lived for
          a period of time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       b. Guidelines and principles for determining permanent residency . . . . . . . . . 21

       c. Did Protestant raise a substantial doubt about the validity of the presumption
          of residency? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       d. Did Protestant meet his burden of proving that the alleged Village did not
          have 25 or more Native residents as of April 1, 1970, and that less than 13
          enrollees used the alleged Village during 1970 as a place where they actually
          lived for a period of time? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     3. Was the "act of God" proviso invoked? . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

       a. Was the alleged Village known as a traditional village? . . . . . . . . . . . . . . . 85

i

Exhibit 9

b.  Did the occurrence of one or more acts of God or government authority
    between April 1, 1960 and April 1, 1970 cause a temporary unoccupancy of
    the village in 1970? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .86

4.  Did the Village, as of April 1, 1970, constitute a "Native village" and have an
    identifiable physical location evidenced by occupancy consistent with the Natives'
    own cultural patterns and life-style? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92

5.  As of April 1, 1970, were the majority of residents of the alleged Village
    Native? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

E.  Should the hearing be reopened to allow Respondents further opportunity to present
    evidence on the subjective intent of potential permanent residents of the alleged
    Village? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .98

V.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .99

ii

Exhibit 9

# I.

## Statement of the case

On November 21, 1995, the United States District Court for the District of Alaska (District Court) entered an Order in the case of <u>Stratman</u> v. <u>Babbitt</u>, No. A76-0132 CV (JKS), remanding (referring) the case to the Interior Board of Land Appeals (IBLA or Board) for consideration of Omar Stratman's protest against the eligibility of Woody Island as a Native village under section 11(b)(3) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1610(b)(3) (1994). By Order dated November 21, 1997, the Board referred the case to this office with directions to "convene a hearing for the purpose of determining whether Woody Island meets the legal requirements for eligibility for certification as a Native village * * * [and to] issue a recommended decision." <u>Omar Stratman (On Judicial Remand)</u>, IBLA 96-152, pp. 10-11.

The parties, in addition to Protestant, are (1) the Bureau of Indian Affairs (BIA), U.S. Department of the Interior, which issued an Administrative Determination finding Woody Island to be eligible as a Native village under ANCSA, (2) Leisnoi, Inc., which is the Village Corporation for the Native village of Woody Island, and (3) Koniag, Inc., which is the affected Native regional corporation. All parties and I participated in a visit to Woody Island on August 9, 1998. That visit was recorded on video and audio tape.

Commencing August 3, 1998, a hearing lasting ten days was held in the matter, in Anchorage and Kodiak, Alaska. The parties have submitted extensive posthearing briefs, the final filed March 30, 1999, and the matter is now ripe for issuance of this Recommended Decision.

# II.

## Procedural history and background

ANCSA, enacted on December 18, 1971, provides for the distribution of benefits, including approximately forty-four million acres of federal land and $962,500,000, to Alaska Natives as a settlement of all aboriginal land claims. <u>See</u> 43 U.S.C. §§ 1601(a), 1605, 1607, 1613; <u>Leisnoi, Inc.</u> v. <u>Stratman</u>, 154 F.3d 1062, 1064 (9th Cir. 1998). Section 11(b)(1) of ANCSA lists a number of Native villages which were presumed to be eligible for benefits (hereinafter "listed villages"), subject to a review by the Secretary of the Interior for compliance with the criteria set out in subsection (b)(2). 43 U.S.C. § 1610(b)(1) and (2).

Those Native villages which were not listed (hereinafter "unlisted villages") but which believed they met the criteria for eligibility could apply to the Secretary to be certified pursuant to subsection (b)(3). 43 U.S.C. § 1610(b)(3). The Native village of Woody Island

Exhibit 9

(hereinafter the "alleged Village") was not one of the listed villages, but applied for certification in 1973 (Ex. BIA-1A, p. 67). Notice of the application was published in the Federal Register. 38 Fed. Reg. 26472 (Sept. 21, 1973).

The statutory criteria for eligibility of unlisted villages are found at section 11(b)(3) of ANCSA, 43 U.S.C. § 1610(b)(3), which provides in pertinent part:

(3) Native villages not listed in subsection (b)(1) hereof shall be eligible for land and benefits under this chapter * * * if the Secretary * * * determines that--

(A) twenty-five or more Natives were residents of an established village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance; and

(B) the village is not of a modern and urban character, and a majority of the residents are Natives.

Section 3(c) of ANCSA, 43 U.S.C. § 1602(c), defines "Native village" as follows:

(c) "Native village" means any tribe, band, clan, group, village, community, or association in Alaska * * * which meets the requirements of this chapter, and which the Secretary determines was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives[.]

The implementing regulation at 43 C.F.R. § 2651.2(b) provides in pertinent part:

(b) * * * [V]illages must meet each of the following criteria to be eligible for benefits * * *:

(1) There must be 25 or more Native residents of the village on April 1, 1970, as shown by the census or other evidence satisfactory to the Secretary. A Native properly enrolled to the village shall be deemed a resident of the village.

(2) The village shall have had on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life style and at least 13 persons who enrolled thereto must have used the village during 1970 as a place where they actually lived for a period of time: *Provided*, That no village which is known as a traditional village shall be disqualified if it meets the other criteria specified in this subsection by reason of having been temporarily unoccupied in 1970 because of an act of God or government authority occurring within the

2

Exhibit 9

preceding 10 years.
    (3) The village must not be modern and urban in character. * * *
    (4) In the case of unlisted villages, a majority of the residents must be Native * * *.

    As noted by the Board in its Order of referral, an unlisted village applicant must meet each of the four criteria delineated at 43 C.F.R. § 2651.2(b) to be eligible for ANCSA benefits. Omar Stratman (On Judicial Remand), IBLA 96-152, p. 7 n.9. The Board's notation assumes that the applicant constituted, as of April 1, 1970, a "tribe, band, group, village, community, or association" within the meaning of the Section 3(c) definition of "Native village".

    Gail Fitzpatrick, a BIA realty specialist, conducted an investigation to determine whether the alleged Village satisfied the eligibility criteria (Ex. BIA-2B, p. 162). He prepared a report dated August 6, 1973, recommending that the alleged Village be certified as an eligible Native village because he concluded that it met the four criteria (id.). The BIA Juneau Area Acting Director (Area Director) agreed and issued a proposed decision finding the alleged Village to be eligible to receive ANCSA benefits (Ex. BIA-1A, pp. 71-69). Notice of that proposed decision and the opportunity to protest it within 30 days was published in the Federal Register. 38 Fed. Reg. 35028 (Dec. 21, 1973).

    Four parties, the Sierra Club, the Alaska Wildlife Federation, the Sportsmen's Council, and Philip Holdsworth, but not Mr. Stratman, protested the proposed decision (Ex. BIA-1A, pp. 110, 83). After consideration of the protests, the Area Director issued an Administrative Determination (final decision) dated February 8, 1974, finding the alleged Village to be eligible (Ex. BIA-1A, pp. 121-118). He separately issued Findings of Fact related thereto (Ex. BIA-1A, pp. 153-151). The eligibility determination was published in the Federal Register on February 21, 1974. 39 Fed. Reg. 6627.

    The protestants therein, but not Mr. Stratman, appealed the eligibility determination to the Alaska Native Claims Appeal Board (ANCAB) (Ex. BIA-1A, pp. 128-27).[1] On May 16, 1974, the Alaska Wildlife Federation, the Sportsmen's Council, and Philip Holdsworth filed a notice stating that they were "unable to continue in the appeals proceedings due to lack of available personal representation, and insufficient funds to support continued legal counsel." (Ex. BIA-1A, p. 429) They requested that ANCAB "continue to consider the various legal points presented by Appellants in the material already before them in their deliberations on these matters." (Id.) On May 24, 1974, ANCAB issued an Order dismissing them as parties and stating that their previously filed briefs and arguments would be considered filed as amici curiae (id., p. 433). On July 13, 1974, the Sierra Club withdrew its protest (id., p. 445).

---

[1] In the 1980's ANCAB was eliminated as a separate Departmental Board and its functions were merged with IBLA.

Exhibit 9

By Order dated August 28, 1974, ANCAB dismissed the protestants' appeals and directed certification of the alleged Village as eligible for ANCSA benefits (id., pp. 451-449). It noted that there were no remaining parties of record adverse to the eligibility of the alleged Village and that the legal arguments advanced by the amici curiae were without sufficient merit to justify the continuance of the proceedings (id.). That order became a final Departmental decision upon its approval by the Secretary of the Interior on September 9, 1974 (id.). 43 C.F.R. § 2651.2(a)(5). Consequently, a Certificate of Eligibility was issued by the Area Director on September 24, 1974 (id., p. 452), and published in the Federal Register on March 19, 1975. 40 Fed. Reg. 12527.

In 1974 the Department also certified Leisnoi as a Village Corporation for the alleged Village. Leisnoi thus became eligible to select over 115,000 acres of land under ANCSA, which it would hold and manage on behalf of the alleged Village. See Leisnoi, 154 F.3d at 1065 (citing 43 U.S.C. §§ 1611, 1613).

On July 2, 1976, Protestant and other plaintiffs filed the Federal court action which challenged the alleged Village's eligibility and which eventually resulted in the remand (referral) of the matter to this office. He also filed an administrative appeal of a January 17, 1977, BIA Decision determining the amount of lands to which Leisnoi was entitled under section 14(a) of ANCSA. ANCAB dismissed that appeal for lack of standing. Appeal of Omar Stratman, 2 ANCAB 329 (1978).

The Board recounted the history of the Federal court action in its order of referral, Omar Stratman (On Judicial Remand), IBLA 96-152, pp. 2-7, and it will not be repeated herein, except to note certain rulings. First, the United States Court of Appeals for the Ninth Circuit found that Protestant has standing, as a recreational user, to pursue the Federal court action, that he was entitled to actual notice of the alleged Village's application, and that because he did not receive such notice, he should not be barred by exhaustion of administrative remedies requirements. Stratman v. Watt, 656 F.2d 1321, 1325 (9th Cir. 1981).

Second, in a scheduling order dated May 10, 1995, United States District Judge von der Heydt identified five threshold issues as follows:

1.    Whether the court should dismiss this action for failure of plaintiff Omar Stratman (hereinafter "plaintiff") to exhaust his administrative remedies;

2.    Whether res judicata bars this action;

3.    Whether plaintiff's second settlement agreement with Koniag, Inc., contractually precludes Stratman from proceeding against Leisnoi, Inc;

4

Exhibit 9

4.      Whether Section 1427 of the Alaska National Interest Lands Conservation Act
        [(ANILCA), Pub. L. No. 96-487, 94 Stat. 2519-20 (1980)] constitutes
        congressional ratification of Leisnoi's eligibility thus barring plaintiff's action;
        and

5.      Whether plaintiff's lis pendens should be expunged.

    Judge von der Heydt then retired and the new presiding judge, James Singleton, found
in an Order dated September 13, 1995, that res judicata did not bar the action, that failure to
exhaust administrative remedies did not apply to the action because "the Ninth Circuit has
already determined that Stratman did not have notice of the occasion to exhaust administrative
remedies," and that Koniag's second settlement did not preclude Protestant's action.  (Order at
2.)  Referencing the concepts of ripeness and primary jurisdiction, he concluded that the case
should be sent to the Board for consideration of Protestant's challenge to the certification of
the alleged Village and the issue of ratification under section 1427 of ANILCA to give the
Court the benefit of the agency's expertise and the agency the benefit of any intervening
Congressional action.

    The Board, in turn, similarly sent the case to this office to determine in a
recommended decision "whether Woody Island meets the legal requirements for eligibility for
certification as a Native Village."  IBLA 96-152, p. 10.  In so doing, it explicitly deferred
ruling on any possible controlling legal issues, such as whether Protestant lacks standing,
whether the doctrine of administrative finality bars consideration of Protestant's challenge
because of ANCAB's ruling in Appeal of Omar Stratman, 2 ANCAB 329, whether the
Department lacks jurisdiction because of Protestant's failure to timely appeal the Area
Director's eligibility determination, and whether Congress ratified the alleged Village's status
as an eligible Native village by enactment of section 1427 of ANILCA.

### III.

### Statement of facts

    Many of the facts set forth in this Statement of facts were gleaned from an
Investigative Case Report prepared on behalf of Leisnoi by E. Frank Feichtinger, a private
investigator and former law enforcement officer (the Feichtinger Report) (Ex. L-DOC-108).
The report is based upon a fairly exhaustive investigation of the history of Woody Island
conducted by Mr. Feichtinger, including depositions, affidavits, and unsworn interviews of
Leisnoi shareholders and other voluminous exhibits adduced at hearing.

    The Feichtinger Report contains a list of Natives determined by Mr. Feichtinger to be
1960's residents of the alleged Village - individuals who physically resided in the alleged
Village and maintained a residence there sometime during the time period of 1960 to 1970.

Exhibit 9

Mr. Feichtinger also included a list of Natives who were deemed 1970 residents - "individuals of Native ancestry, who, in 1970, considered Woody Island their home and either physically resided there or frequented there to participate in activities consistent with their culture, tradition, and heritage. All of these individuals are also related by blood or marriage to families with generational historical ties to the village."

At the hearing Leisnoi maintained that each Native whose permanent residence was the alleged Village on April 1, 1970, was listed as one of the 1970 residents in the Feichtinger Report (Tr. 2330). In its posthearing briefs Leisnoi apparently has changed its position, arguing that Mr. Feichtinger's list does not include all of the permanent residents on April 1, 1970.

Contributions to the Feichtinger Report were made by several people, including Christopher B. Wooley, an anthropologist specializing in shoreline and archeological survey and cultural resource management, and Dr. Nancy Yaw Davis, an expert in the field of cultural anthropology in the area encompassing Woody Island. Both Mr. Wooley and Dr. Davis reviewed depositions and other materials collected by Mr. Feichtinger (Tr. 2290-92, 3443-44, 3454). Mr. Wooley also examined Woody Island for physical evidence of use and occupancy and interviewed two Leisnoi shareholders (2312, 2333-34). Dr. Davis conducted her own research, visited Woody Island three times, and interviewed 30 to 35 people (Tr. 3443-46, 3454-56). Mr. Wooley and Dr. Davis testified at the hearing, commended Mr. Feichtinger's work, and agreed with the lists he generated (Tr. 2299, 3454-55).

However, not all statements by Mr. Feichtinger in his report or in his testimony are accepted as reliable and probative, as some proved to be inaccurate, misleading, or so vague or unsubstantiated as to be of little probative worth. These inaccuracies may be attributable, in part, to the fact that his collection of interviews and affidavits was limited mostly to Leisnoi shareholders (Tr. 1259) and that memories of interviewees dimmed since the crucial time period of the decade ending in 1970.

Woody Island is located approximately 1 mile east of Kodiak, Alaska, which is situated on the east shore of Kodiak Island (Exs. L-CHART-26; L-DOC-A2; L-BOOK-77, p. 47). The short boat ride from Kodiak to Woody Island takes only 5 to 30 minutes (Armstrong Depo., p. 109-10; Exs. S-6D, p. 28; S-6J, p. 10; Tr. 264).

Woody Island is a heavily forested island approximately 2.8 miles long from north to south and 1.8 miles wide. The west side of Woody Island, as compared to Kodiak, receives several more hours of sunlight in the growing season because of the positions of those areas relative to mountainous terrain. Consequently, the west side of Woody Island is a better place to garden and many Natives have maintained gardens on Woody Island over the years.

There are numerous lakes on Woody Island, including Icehouse Lake and Tanignak

6

Exhibit 9

Lake, which are located near the western shore of the island (Ex. S-42). These lakes are also known, respectively, as Lower Lake and Upper Lake.

A report prepared by Mr. Wooley numbers various sites on Woody Island where Native homesites exist or once existed (Ex. L-DOC-A9a). Sites 4 through 8 are located immediately north of Lower Lake in an area sometimes referred to as the North Village area. Sites 10 and 11 are located still farther north along the northwestern shore in a location referred to as the Garden Beach area. The North Village and Garden Beach areas are now owned by the Kodiak Island Borough (Ex. S-42; Tr. 2256-63). Sites 16 through 20 and 23 are located immediately south of Lower Lake in an area often called the South Village area. Finally, site 28 is located near Sawmill Point on the northeastern shore.

Site 4 is referred to as the Pavloff homesite. It lies within U.S. Survey 1676, a 1926 survey for the homestead of Nicholai Pavloff (1846-1932) which he never perfected. Numerous people occupied the homes there at various times (see, e.g., Exs. L-DOC-96, -124, -346; Tr. 1342-45, 2682-84, 2690). One structure, referred to as the Big Pavloff house, was used by Angeline Panamariof Pavloff Maliknak and her family from approximately 1960 until it burned down in 1965 or 1966 (Ex. S-6O, pp. 8-9, 13-15).

Site 6 is called the William Pavloff/Angeline Panamariof Pavloff Maliknak homesite, as Angeline, along with her first husband, William Pavloff, her second husband, Stephan Maliknak, and her children, were the primary users of this house before they moved to the Big Pavloff house (see, e.g., Tr. 1573-73; Ex. L-DOC-346). The homesite lies immediately south of U.S. Survey 1676 (Tr. 2256; Ex. S-42). The house was no longer standing by 1960 (Tr. 1332-33).

Site 5 is referred to as the Sundberg homesite, as the Sundberg family, descendants of Nicholai Pavloff, were the principal users of the house there, at least prior to 1944 (Ex. L-DOC-73, -96, -122; Tr. 2712). The homesite lies within U.S. Survey 1676 and the house collapsed in 1986 (Exs. L-DOC-96; S-42; Tr. 2256).

Site 7 is referred to as the Frump homesite, as Agnes Pavloff Frump and her family occupied the house there from 1960 to 1963. However, Mitch Gregoroff and Kelly Simeonoff, Jr., testified that the Sundberg house and Frump house are one in the same (Tr. 1406, 2682-83). The Frump house was in disrepair but still standing and probably occupied by Johnny Maliknak and Nicholas Pavloff in 1970 (Tr. 498-99, 1332-33, 1609-10; Ex. S-6O, pp. 8-15).

On Site 8 three homes were built by the Kodiak Area Native Association (KANA) in the early 1970's, one each for Johnny Maliknak, Nicholas Pavloff and Rudy Sundberg, Jr. (Tr. 161, 1332-34).

Exhibit 9

Site 10 is referred to as the Georgi Nekeferoff homesite in recognition of the man who used the small cabin there (see, e.g. Ex. L-DOC-73). Site 11 is known as the Nicolai Maliknak/Paul Wolkoff homesite, as the named gentlemen lived in a home there until their deaths in a boating accident in the late 1950's (Ex. L-DOC-346; Tr. 1342). Although Mr. Feichtinger opined that the small cabin on Site 10 was still standing in 1970, the evidence shows that neither that cabin nor the home on Site 11 were standing by 1970 (Tr. 1335-36, 1980-83, 2879-80).

Site 28 is called the Naughton homesite because Charles Naughton sometimes camped in the small, dilapidated cabin located there. Most likely the cabin was not standing in 1970 (compare Tr. 163, 493, 1949-50 with Ex. L-DOC-385).

Site 17 is named the Harmon homesite, as the Harmon family lived in a house there in the 1950's. Mr. Feichtinger acknowledged that the house was not being used in 1970 (Tr. 1337) and, in fact, it was not even standing by 1970 (Tr. 1931-32).

Site 18 is known as the Gabe Lowell homesite, as Mr. Lowell lived in a house there in the early 1950's. It probably was not standing in 1960 and had definitely fallen down by 1970 (Tr. 1337-38).

Site 19 is called the Chabitnoy house. It derives its name from the long-time resident and owner of the house, Ella Fadaoff Chabitnoy. Nicholai Litnik (Chief Yellow Pants) gave the house to Ella and Nicholas Fadaoff in approximately 1920. After Nicholas died, Ella retained the house and married Mike Chabitnoy. The house was standing and habitable in 1970 (Tr. 1944, 1972, 2753).

Site 20 is referred to as the Simeonoff house because the Simeonoff family members were the principal users of the house there. The house is close to the Chabitnoy house and gardens were maintained by the occupants of both houses. By 1970 the Simeonoff house was more run down than the Chabitnoy house, but it was still standing and habitable (Tr. 1339, 1349-51, 1357, 1945, 1972; Ex. S-6O, p. 76).

Site 23 is named the Fadaoff/Madsen homesite, as Edson Fadaoff, Sr., built the house there in the 1950's and Roy Madsen bought the house and acquired title to the land in the 1970's (unsurveyed portion of U.S. Survey 603, Tract B). The house there was barely habitable in 1970 (compare Tr. 234; Exs. L-DOC-173, -174, with Tr. 1946, 1986), and back taxes of approximately $365.00 were owed on the house when Mr. Madsen purchased from Edison Fadaoff Jr. and Joseph Fadaoff their interests in the house in 1971 or 1972 (Tr. 2884-87).

The Harmon, Chabitnoy, and Simeonoff houses are located within U.S. Survey 3630 (Tr. 3003-04). The 8.48 acres of land described by that survey were patented to Ella

Exhibit 9

IBLA 96-152

Chabitnoy on March 11, 1964 (Exs. L-DOC-301; S-45). In May 1971 she sold the land to Fred and Ruth Brechan, who are non-Natives, for $2,500 (id.; Tr. 2888-89).

The Alutiiq people have been inhabiting and using Woody Island for thousands of years (Ex. L-DOC-A9, p. 1). Mr. Wooley's report briefly describes the history of those Natives, from a period of rich resource harvesting, to a period of whaling, fishing, wood-working, sweat-baths, extensive trade, large multi-roomed houses, and large villages with complex social ranking, including chiefs, and rich ceremonials (id.).

Then, in the late 1700's, the Russians subjugated the Native population in the region. Epidemics, forced relocations, and extermination of those who resisted, characterized the initial wave of foreign influence (id., p. 2; Tr. 2159-60).

In 1805 there was a settlement on the east side of Woody Island and the Native population numbered 54 (Exs. L-BOOK-5, -58, -65). In 1837, the region suffered a smallpox epidemic. The Russians resettled the survivors into seven amalgamation villages, one of which was on Woody Island (Exs. L-BOOK-31, L-DOC-431; Tr. 2159-60).

By 1849 a Native settlement was located on the west side of the island near a location now known as Icehouse Point (Ex. L-BOOK-5, -77). Both Icehouse Point and Icehouse Lake derive their names from an ice harvesting and warehouse operation which began on the island in 1852.

The operators, the Russian American Company and the American Russian Company, employed the Natives of Woody Island to harvest and warehouse ice from Tanignak Lake. In 1855 the Natives were resettled from scattered settlements around the island to the west side near the ice harvesting operation (Ex. L-DOC-108, pp. 14-15).

During the 1800's many of the Native inhabitants of Woody Island earned a living cutting and storing ice for these companies during the winter, and hunting sea otters during the summer for their highly prized fur. By 1890 the sea otter industry began to decline because hunting was decimating the sea otter population. In 1911 sea otter hunting was prohibited to protect the remaining population.

The Natives also seasonally used Woody Island and various outlying areas for subsistence purposes (Tr. 2264-69). It was a somewhat fluid society, with Natives sometimes living elsewhere with relatives and/or while gathering wild foodstuffs (id.). On Woody Island they gardened, fished, harvested shellfish, picked berries, gathered other edible plants, and hunted rabbits, seals, and octopus. Elsewhere they engaged in hunting deer and elk as well as the aforementioned activities.

By 1872 a Russian Orthodox Church was located on Woody Island. Throughout the region the Church came to be a central village institution (Tr. 2164-65, 3424, 3586-90). The influence of the Church over the Natives' lives was and is very strong in the region (Tr. 2150,

Exhibit 9

2156; Armstrong Depo., p. 130).

Prior to World War II, the alleged Village had a chief, but the chief had little power (Ex. L-DOC-350; Tr. 2822-23). After the war Woody Island no longer had a chief or any tribal organization or government (Tr. 494, 1246-47, 2759, 2822-23).

The Russian Orthodox Church exerted much influence over the Natives lives through peer pressure and other mechanisms (id.). A lot of Natives were members of the Church (Tr. 588). Most social functions were Church-related, including masquerading at the beginning of each new year and caroling at Christmas time (Exs. L-DOC-1, -350; Tr. 2792-93). Such activities ceased during World War II and were never resumed on Woody Island.

By 1951 or 1952 the Russian Orthodox Church building on Woody Island had become so dilapidated that it was torn down and never replaced (Tr. 3580, 3605; Exs. L-BOOK-14, -15). In contrast, the Church continued to be the main communal organization for Natives living in Kodiak through the 1960's (Tr. 1771).

By 1886 Woody Island was the center of commercial activity in the Kodiak Islands, being home to a boat yard, the ice harvesting operation, a grist mill, the operations and wharf of the Alaska Commercial Company, and the only roads in Alaska. In 1891 the North American Commercial Company, a fur trading enterprise, established operations there, including a store.

In 1893 the first Baptist Mission in Alaska was built on the west side of Woody Island, serving primarily as an orphanage. It began operation of the only school on Woody Island. In 1896 a Baptist chapel was built.

During its existence the Mission cared for hundreds of children - many orphans - who came from various locations in Alaska. Many of the children continued to reside on Woody Island as adults. They and their descendants comprise a large number of the enrollees to Woody Island.

From 1879 to 1900 the island's predominately Native population, exclusive of the Mission children, varied from 167 to 117. In 1903 the North American Commercial Company closed its operations, including the store, on Woody Island. Woody Island has not had a store since.

In approximately 1905, the Territorial Government began operating a school on Woody Island known as the Longwood School (Ex. L-DOC-74). It offered schooling for grades K-8 until 1928 when it began offering high school classes as well.

In 1911 the U.S. Navy built a wireless station on Woody Island. On February 28,

10

Exhibit 9

1931, the wireless station was decommissioned and shortly thereafter the Territory of Alaska was given permission to use the associated buildings for the Longwood School (Ex. L-DOC-A2).

In 1910 Woody Island's population, including children at the Baptist Mission, was 168. In 1912 the Katmai volcanic eruption dropped ash 18 inches thick over Woody Island, causing many families to leave the island (Tr. 2729). In 1918 at least 27 Woody Island villagers and Mission children died during the Spanish flu epidemic. By 1920 the population of Woody Island had dropped to 104.

By 1937, according to a 1971 <u>Kodiak Island Times</u> newspaper article, the bulk of the townsite on Woody Island had been abandoned as people moved to what is now the City of Kodiak (Ex. L-DOC-113). Long-time Woody Island resident Ella Chabitnoy confirmed that most of the island residents left before World War II (Ex. L-DOC-74).

The newspaper article further states that when the Baptist Mission burned down in 1937, it was relocated to a situs on Kodiak Island where more services could be provided to the Mission children (Ex. L-DOC-113). There, a new facility was constructed in 1938 (<u>id.</u>). By the time all of the Mission children were transferred to the new facility in 1939, the population of Woody Island had dropped to 54. The enrollment in Longwood School had dropped from 71 in 1937 to 20, and the school was closed (Exs. L-DOC-351, -420, -A2).

Apparently, the Bureau of Indian Affairs then operated a school on Woody Island for a few years before that school also closed in approximately 1943 (Exs. L-DOC-350, -351; Tr. 2671). Another long-time Woody Island resident, Natalie Simeonoff, stated that many people left Woody Island by the early 1940's because of the school closing and the lack of employment opportunities on the island (Ex. L-DOC-350).

By 1944 the island's Native population was down to 37 (Ex. L-DOC-421). Ms. Simeonoff compared the depopulation of Woody Island to the depopulation of rural areas in the Lower 48 States in that people gradually became less dependent on the land for subsistence, buying more and more of their food, and eventually moved to the cities to earn a living (<u>id.</u>).

She elaborated that many people moved to Kodiak, attracted by the lure of new high-paying jobs that materialized after the U.S. Navy began constructing a naval base seven miles from Kodiak in 1939 (<u>id.</u>; Ex. L-DOC-56). The concomitant appearance of a hospital, doctors, schooling beyond grade eight, electricity, and more stores and businesses also made Kodiak a more attractive place to live (Exs. L-DOC-351; L-BOOK-15). In comparison, Woody Island did not have any medical care, electricity, stores, or employment opportunities (<u>id.</u>). Electric lines were not run to Woody Island until the 1960's (Tr. 449).

In 1939 the population of Kodiak stood at approximately 450 (<u>id.</u>). During World War II, its population swelled to 4,000 before dropping down to 2,000 by 1950 (<u>id.</u>).

Exhibit 9

After the war, daily air service and regular steamship service to Kodiak were established (Ex. L-DOC-56). Also, new sewer and water systems were constructed (id.). By 1956 Kodiak's population had risen to 3,000. By 1966 there were 18 seafood plants in Kodiak and 8 more at other points on Kodiak Island (Ex. L-DOC-56). In 1967 the town's population reached 7,500 (id.).

Woody Island was also the site of Federal Government activity during the 1940's. In 1942 the Navy constructed numerous buildings on the west side, including barracks for 200 men on the south and east shores of Icehouse Lake. It also installed a running water and sewer system (Ex. S-43). Beginning in approximately 1956, the Kodiak Baptist Mission has used many of those buildings to host a youth summer camp known as Camp Woody. The Navy also built a sawmill at Sawmill Point on the northeast part of the island. It closed its operations on Woody Island in 1945. (Ex. L-DOC-A2)

In 1941 the Civil Aeronautics Administration (CAA), later known as the Federal Aviation Administration (FAA), established an airways communication station on the east side of Woody Island. It also built a dock on the west side and began a ferry service from Kodiak to Woody Island in 1948. That ferry later became known as the FEDAIR IV.

The CAA/FAA employees and their families lived in Government-constructed housing on both the west and east sides of the island. Each side had its own Government-built running water system. The west side system drew water from the Tanignak Lake and pumped it through piping to a water tank. That same piping also fed water to the buildings later used as Camp Woody. From the water tank ran two additional lines of piping, one to the dock and one to the South Village. (Ex. L-DOC-347; Tr. 1445-46, 1933-36, 2775)

Eventually, all FAA personnel were moved to the east side, where the FAA housing grew to include eight houses (Ex. L-DOC-134), a dormitory, and two 5-unit apartment buildings. In 1951 a K-8 grade school was built on the east side. Nevertheless, by the early 1950's, educational, religious, medical, and employment services or opportunities for Natives were dramatically better in Kodiak than on Woody Island, as Woody Island had no high school, church, medical service, or businesses (Tr. 2165-66, 2752).

By the mid-1950's Woody Island's population consisted of 21 FAA families living on the east side and 4 Native families living on the west side, including the Harmon's, Simeonoff's, and Chabitnoy's (Ex. L-DOC-420). Because of the lack of employment opportunities there for the non-FAA Natives, most of them earned their living as fishermen (Tr. 2732-33, 2749).

The island's population, including the CAA/FAA families, was 111 in 1950 and 78 in 1960. The population of FAA employees and dependents reached as high as 70 people (Ex. S-6D, p. 29).

Exhibit 9

By the late 1950's, the Simeonoff, Chabitnoy, Fadaoff/Madsen, and Harmon houses were all plumbed and connected to the running water line that ran down to the South Village. Prior to that time the occupants of those houses relied on several wells and springs for their water supply. The other Native households without running water continued to rely upon the wells and springs and Tanignak Lake for water. (Exs. S-6F, pp. 22, 30; L-DOC-129, -146, -176, -347; Tr. 172-73. 995-96, 1242-45, 1408-14, 1445-49, 1649, 1935-36, 2774-75, 2824).

By 1963 FEDAIR IV annually was running 2,000 times between Woody Island and Kodiak and carrying 8,000 to 9,000 passengers plus freight (Ex. L-DOC-434). Those passengers included teenagers who commuted from Woody Island to Kodiak each weekday to attend high school, as Woody Island did not have a high school.

On April 12, 1963, the Kodiak Mirror published an announcement from the FAA that the use of the FEDAIR IV would be restricted to FAA employees, their families, regular residents of Woody Island, guests invited by FAA employees, or persons with prior permission from the FAA station manager (Ex. L-DOC-433). However, this restriction was not strictly enforced, as non-FAA persons who were not regular residents were able to continue using the ferry (see, e.g., Exs. L-DOC-129, -132, -437, -438; Armstrong Depo., p. 149; Tr. 2827).

On March 27, 1964, an earthquake and several tidal waves struck the Kodiak archipelago. As a result, parts of Woody Island sunk or rose several feet, the Lower Lake became a saltwater lagoon, the clam beds on the island were temporarily lost, the FAA dock was destroyed, and the running water system may have been damaged (Exs. S-6O, pp. 65-66; L-DOC-129; Tr. 606-07, 992, 1410-12, 2754-56). However, no buildings were damaged (Tr. 173, 1939-40; Exs. S-6O, p. 66; S-6D, pp. 14, 19).

Woody Island sustained relatively little damage as compared to Kodiak, which suffered severe damage, and several villages, which were essentially wiped out (see, e.g., Tr. 3593-95, 3601-03). The Native populations of those villages were relocated (see, e.g., id.).

The FAA quickly replaced the destroyed dock on Woody Island with a narrower and shorter dock. The shortness of the dock rendered it less safe than the old dock for mooring because the currents and tidal action were stronger closer to shore. A boat tied to the dock was at risk of being smashed apart against the dock or pilings so that no one tied up to the dock overnight. (See, e.g., Ex. S-6O, p. 65; Tr. 606-07, 1361-62, 2005-07). In general, Woody Island has lacked a safe harbor or moorage throughout its history (see, e.g., Ex. L-DOC-129, -132, -173, -174).

Nevertheless, Woody Island remained accessible by boat from Kodiak or elsewhere, as it has been throughout its history. Small boats could be dragged up on the beach near the dock or elsewhere. While the earthquake caused a loss of beach area that made this process somewhat more difficult, small boats could be and were often pulled up on the beach both

Exhibit 9

before and after the earthquake. Also, boats could be moored by running lines to the beach.

However, it has always been difficult to access Woody Island in winter or bad weather, as the passage is dangerous in a small boat and there is no safe place to moor a larger boat, especially overnight. Consequently, the ferry service provided by FEDAIR VI (a larger and safer boat) was particularly valuable in inclement weather. (Exs. L-DOC-1, -129, -132, -173, -174, -344, -346, -350, -437, -438; S-6D, pp. 50-51, 54; Armstrong Depo., pp. 105-06, 108-09, 122-23, 153; Tr. 408-11, 665-66, 1762, 1774, 2112-13, 2118, 2127-29, 2787-88, 2824, 3086-87, 3128-29, 3132-34, 3215).

The earthquake may also have damaged the running water system. There are statements and testimony from Natives that the earthquake broke the endcap off the pipeline that terminated at the dock so that the water could not be retained in the water tank but drained away, rendering the system nonfunctional. However, Christina Hoen testified that the system was working when she moved to Woody Island shortly after the earthquake and that the endcap did not break until the fall of 1964 (Tr. 2971-72). James Hartle also testified that there was running water after the quake (Tr. 1649). Christina was not sure if the break was caused by an aftershock (Tr. 2972). It is possible that the break was attributable to other causes, such as the fact that the pipe, being wooden and old (Tr. 1942-43; Ex. L-DOC-129), may have worn out.

In the mid- to late-1960's, the Borough of Kodiak Island began taxing property on Woody Island (Tr. 2753, 2964; Ex. L-DOC-129). The Simeonoff's paid taxes on the Simeonoff house (id.).

In 1969 the FAA began phasing out its operations on Woody Island and moving its operations and personnel to Kodiak. On May 27, 1969, the Woody Island school was closed because of the planned and ongoing removal of FAA personnel, as there would no longer be a sufficient number of children (10) to justify operation of a school there.

No non-FAA children had attended the school since approximately 1965, when the last two non-FAA children, Edison and Joseph Fadaoff, left the island. In the 1960-61 and 1961-62 school years, Joseph Fadaoff was the only non-FAA child attending school on Woody Island. Additionally, throughout the decade ending in 1970, there were no children of high school age living on Woody Island. (Exs. L-DOC-337, -420; S-6D, pp. 20-21; Tr. 180-82, 193, 233, 403, 428, 627, 655, 1057, 1290, 1941-42).

After the school closed, FEDAIR IV ran much less frequently. In May 1971 the FAA began limiting use of FEDAIR IV to FAA personnel, their dependents, and official visitors only. By 1973 the last FAA family had vacated Woody Island. (Exs. L-DOC-107, -183, -417; S-6O, pp. 64-65; Armstrong Depo., p. 162).

In approximately 1972 KANA built three cabins in the North Village area, one each for Johnny Maliknak, Nick Pavloff, and Rudy Sundberg, Jr. In 1974 Leisnoi began seeking

Exhibit 9

acquisition of or permission to use the abandoned FAA facilities as housing for its shareholders (Ex. L-DOC-165). In 1977 and 1978 Leisnoi spent over $300,000 to renovate the former FAA housing facilities (Ex. L-DOC-164). On December 12, 1979, a fire essentially destroyed the renovated housing (Exs. L-DOC-134, -419; Tr. 3154-55). Before the fire, several people occupied the housing. Most of them were persons working on the renovation project and their family members, including Fred Zharoff and his family (Armstrong Depo., p. 162-63; Ex. L-DOC-438). Joanne Holmes, Mervin Brun and his family, and Betty and George Wallin were identified as occupants for unknown periods of time (Ex. L-DOC-438; Tr. 3080).

Richard Simeonoff is the only Native who returned to Woody Island to live subsequent to the 1979 fire (Tr. 2181). In 1996 Leisnoi again began plans to settle the east side of Woody Island but has been hampered by Kodiak Borough zoning laws and a Lis Pendens filed on the property by Protestant.

Leisnoi focused upon developing housing on the east side of the island because that was the only portion of Woody Island available and patented to Leisnoi under ANCSA. Most of the island, including the western half where the village existed into the twentieth century, was not available because of land grants to other entities or individuals. Stratman Exhibit 42 shows the land ownership of the island.

## IV.

### Discussion

It is noted, as a preliminary matter, that the parties are in dispute as to whether certain decisions issued by ANCAB may be relied upon for guidance in the instant case. Those 11 decisions found the purported Native villages of Uyak, Litnik, Salamatof, Anton Larsen Bay, Uganik, Bells Flats, Ayakulik, Port Williams, Solomon Bearing Straits, Alexander Creek, and Pauloff Harbor ineligible to take land and other benefits under ANCSA. Each of those decisions was issued after hearing and briefing before an administrative law judge (ALJ) and issuance of a recommended decision by the ALJ. However, the parties were not permitted to take exceptions to the ALJs' recommended decisions and to submit briefs thereon to ANCAB.

In Koniag, Inc. v. Kleppe 405 F.Supp. 1360 (D. D.C. 1975), aff'd in part and rev'd in part, Koniag, Inc. v. Andrus, 580 F.2d 601 (D.C. Cir. 1978), 10 of those ANCAB decisions were set aside and remanded to the Secretary to permit the parties to take exceptions to the ALJs' recommended decisions and to submit briefs thereon to ANCAB. Id. at 609. The ALJ recommended decisions themselves were not attacked and were accordingly not disturbed. Id. n.8. The remaining ANCAB decision pertaining to the alleged Village of Pauloff Harbor was reversed and that village was found eligible. While the 11 ANCAB decisions were set aside and thus lack precedential value, those decisions and the undisturbed ALJ recommended decisions have been utilized for guidance where their logic appears reasonable and applicable to the case at hand.

Exhibit 9

## A.

### Motions to Dismiss

At the close of Protestant's case-in-chief, Leisnoi and Koniag indicated that they wished to make certain motions. To conserve time for testimony, the parties agreed to delay presentation of and responses to the motions until filing of the posthearing briefs (Tr. 2664-69). It was further agreed that Leisnoi and Koniag would not waive any rights by agreeing to the delay (id.).

Pursuant to this agreement, Leisnoi, in its posthearing briefs, has moved to dismiss Protestant's challenge to the alleged Village's eligibility on the following grounds: (1) Protestant lacks standing to maintain an administrative action; (2) ANCAB determined in the case of Appeal of Omar Stratman that Protestant lacked standing to challenge the alleged Village's eligibility, that decision became final when he did not appeal it, and therefore the doctrine of administrative finality precludes his present challenge; (3) jurisdiction is lacking because Protestant failed to timely appeal the eligibility determination of the Area Director within 30 days after he acquired actual knowledge that the alleged Village had been certified as eligible; (4) Congress ratified the alleged Village's status as an eligible Native village by enactment of section 1427 of ANILCA; (5) Protestant failed to overcome the presumption that those persons on the certified Native Roll for the alleged Village are residents of the village; (6) Protestant failed to meet his burden of proof to establish that the Area Director's eligibility determination was incorrect. Koniag has similarly moved for dismissal upon the ground that Protestant failed to meet his burden of proof. BIA filed short briefs joining Leisnoi and Koniag in the contentions set forth in their briefs.

In response, Protestant correctly notes that the District Court specifically instructed the Board to determine the issues of whether the alleged Village satisfied the criteria for eligibility as a Native village and whether its eligibility was legislatively ratified by section 1427 of ANILCA. He argues that the Board, and hence this office, have a duty to comply with the District Court's instructions, regardless of whether Protestant would have been barred, based upon one or more of grounds (1) through (3) raised by Leisnoi, from pursuing this matter in an administrative appeal.

He is correct, as an agency, on remand of a matter from a court, must obey the court's mandate and directions without variation and, if the cause is remanded with specific directions, further proceedings before the agency must be in substantial compliance with such directions. See Mefford v. Gardner, 383 F.2d 748, 758-59 (6th Cir. 1967); see also Animal Protection Institute of America, 118 IBLA 63, 70 (1991) (the Board has no authority to clarify, alter, or amend orders issued by a Federal district court). This holds true even if the directions are erroneous. Mefford, 383 F.2d at 759.

Moreover, the direction to determine the eligibility of the alleged Village was reiterated by the Board, which specifically deferred ruling on any of the potentially controlling

Exhibit 9

legal issues which Leisnoi once again raises as grounds (1) through (4) for dismissal. The clear import of the Board's Order is that the scope of this Recommended Decision should be limited to determining the eligibility of the alleged Village and that the potentially dispositive legal issues, such as those raised as grounds (1) through (4), are to be addressed within the Department, if at all, by the Board and not this office. This follows from the Board's explicit deferral from ruling on those issues and its direction that the parties shall have the opportunity to file briefs registering their objections to the Recommended Decision and "address[ing] any legal issues considered by the parties to be case dispositive." IBLA 96-152, p. 11. The implication is that the Recommended Decision is not to address the potentially dispositive legal issues, but only and certainly the eligibility of the alleged Village. At the beginning of the hearing Leisnoi agreed that such was the proper course of action (Tr. 51).

This office is bound to follow the directions of both the District Court and the Board to determine the eligibility of the alleged Village, leaving to the Board and/or the District Court resolution of the potentially dispositive legal issues raised by Leisnoi in grounds (1) through (4) for dismissal. As to grounds (5) and (6) for dismissal, the issues of proof raised therein are addressed in Subparts 2 through 5 of Part D of this Section, which pertain to the issue of the alleged Village's eligibility.

### B.

### Is Protestant collaterally estopped from raising certain arguments or issues?

Respondents argue that Protestant is collaterally estopped from raising certain arguments or issues allegedly raised and rejected by ANCAB in addressing the appeals of the Area Director's February 8, 1974, Administrative Determination of the alleged Village's eligibility. Those appeals were filed by the Sierra Club, the Alaska Wildlife Federation, the Sportsmen's Council, and Philip Holdsworth. All of them subsequently withdrew their appeals and ANCAB issued an Order dismissing the appeals, noting that there were no remaining parties of record adverse to the eligibility of the alleged Village and that the legal arguments advanced by them were without sufficient merit to justify the continuance of the proceedings.

Protestant is not collaterally estopped by ANCAB's Order of dismissal for at least three reasons. First, it does not appear that ANCAB adjudicated the merits of the arguments raised in that case or that the issues raised were actually litigated and necessarily decided, after a full and fair opportunity for litigation. See Annaco, Inc. v. Office of Surface Mining Reclamation and Enforcement, 119 IBLA 158, 164-66 (1991) (collateral estoppel applies only if an issue is actually and necessarily determined after a full and fair litigation of the issue, and a dismissal without prejudice did not constitute a final judgment on the merits or a determination of any issue raised). Second, Protestant was not a party to the case before ANCAB and therefore cannot be collaterally estopped by any determinations made therein unless one of the parties to that case was a "virtual representative" of Protestant. Triple R. Coal Co. v. Office of Surface Mining Reclamation and Enforcement, 126 IBLA 310, 318 n.5

17

Exhibit 9

IBLA 96-152

(1993). This contemplates an express or implied legal relationship by which one of the parties to that case was accountable to Protestant. Id. No such relationship existed. Third, Protestant's interests were not adequately represented by the parties to that case because they withdrew their appeals. See 18 Moore's Federal Practice § 132.04[1][b][iv] at 132-149.

## C.

### Should Protestant's brief filed in state court litigation be admitted into evidence posthearing?

In its posthearing answering brief, Leisnoi moves to admit into evidence a brief filed by Protestant in state court litigation. Leisnoi so moves because the brief is allegedly relevant to the issue of Protestant's standing.

Because the standing issue is not before me, I decline to rule upon the motion. The motion is best addressed by the tribunal which will determine the standing issue, i.e., the Board.

## D.

### Eligibility of the Native village of Woody Island

### 1.

### Burden of proof and the prima facie case

In its Order of referral, the Board held:

Under the regulations at 43 C.F.R. § 2651.2(a)(9), "[a]nyone appealing a decision concerning the eligibility or ineligibility of an unlisted Native village shall have the burden of proof in establishing that the decision is incorrect." In this case, Stratman has that burden.

Therefore, the Government shall have the burden of going forward with sufficient evidence to establish a prima facie case in support of eligibility. Introduction of the BIA certification case file and the subsequent ANCAB Order should be adequate to satisfy that burden.

Stratman will then be required to establish that the eligibility Decision was incorrect [by] a preponderance of the evidence * * *.

IBLA 96-152, p. 10. Therefore, Protestant has the burden of establishing that the alleged Village fails to meet one or more of the requirements of ANCSA and its implementing regulations.

Exhibit 9

It is not clear whether the Board's allocation of the burden of proof is consistent with the following allocation which was routinely applied by ANCAB when resolving appeals of village eligibility determinations:

    a.    Villages listed in the Act are rebuttably presumed to meet the requirements of eligibility;

    b.    Persons who appear on the Roll of Alaska Natives as residents of a named village are rebuttably presumed to be residents of the village named for purposes of village eligibility determinations;

    c.    The burden is on the [protestant], if he contends that either of the above presumptions are inapplicable, to produce evidence sufficient to raise a substantial doubt about the validity of the challenged presumption;

    d.    If the [protestant] has produced evidence . . . that raises a substantial doubt about the validity of any of the above presumptions, the burden is upon the respondent to produce evidence sufficient to sustain the findings of the Area Director that the village is eligible;

    e.    After consideration of all of the evidence produced by the [protestant(s)] and the respondent(s), the Board will find in favor of the Area Director's determination unless persuaded by a preponderance of the evidence to the contrary.

U.S. Forest Service v. Village of Eyak, ANCAB VE 74-75, VE 74-81, VE 74-89 (Dec. 10, 1974) at 5. The ANCAB determination, unlike the Board's present holding, seemed to contemplate evidence being first presented by Protestant to overcome the presumption of residency prior to the Government's presentation of its prima facie case.

Following the Board's lead, I find that the introduction of the BIA certification case file and the subsequent ANCAB Order establishes a prima facie case of Woody Island's eligibility and that the presumption of residency comes into play in determining whether the evidence presented by Protestant preponderates over that presented by the BIA, Leisnoi, and Koniag (hereinafter collectively referred to as "Respondents"). The rebuttable presumption of residency derives from 43 C.F.R. § 2651.2(b)(1), which provides, "A Native properly enrolled to the village shall be deemed a resident of the village." ANCAB interpreted this regulation as creating a rebuttable presumption that persons who appear on the Roll of Alaska Natives as residents of a named village are residents of that village for purposes of village eligibility determinations. Alaska Wildlife Federation and Sportsmen's Council, Inc. v. Natives of Afgonak, Inc., ANCAB VE 74-7, VE 74-8 (June 10, 1974) at 11-12. If Protestant raises a substantial doubt as to the validity of this presumption, then the presumption disappears and Woody Island's eligibility is determined as if no presumption had ever been applicable. Bureau of Sports Fisheries & Wildlife v. Village of Pauloff Harbor (Sanak), ANCAB VE 74-

Exhibit 9

92, VE 74-93, VE 74-94 (June 9, 1974), ALJ's Recommended Decision, at 12-13.

## 2.

**Did the alleged Village have 25 or more Native residents as of April 1, 1970, and did at least 13 persons who enrolled to the alleged Village use it during 1970 as a place where they actually lived for a period of time?**

Protestant contends that the alleged Village does not meet any of the eligibility requirements, including the requirement of having had 25 or more Native residents on the 1970 census enumeration date (April 1, 1970) as shown by the census or other evidence satisfactory to the Secretary, see 43 U.S.C. §§ 1602(c), 1610(b)(3); 43 C.F.R. § 2651.2(b)(1), and the requirement that at least 13 persons who enrolled to the alleged Village used it during 1970 as a place where they actually lived for a period of time. 43 C.F.R. § 2651.2(b)(2). Whether the alleged Village met the first requirement is an issue distinct from the issue of whether it met the second requirement. Nevertheless, the issues are addressed together to avoid repetition of voluminous facts which bear upon both issues.

### a.

**Guidelines for determining whether at least 13 persons who enrolled to the alleged Village used it during 1970 as a place where they actually lived for a period of time**

Several basic principles apply in determining whether "at least 13 persons who enrolled [to the alleged Village] used the village during 1970 as a place where they actually lived for a period of time." 43 C.F.R. § 2651.2(b)(2). The first principle is obvious from the wording of the regulation: a person may qualify as one of the 13 only if that person enrolled to the alleged Village.

Protestant argues that this principle should be extended so that persons who improperly enrolled to the alleged Village cannot qualify. According to Protestant, they are properly enrolled only if it is determined that they were, in fact, permanent residents of the alleged Village on April 1, 1970.

Protestant's argument cannot be sustained. Assuming, arguendo, that "properly enrolled" means that which Protestant contends it means, the term "properly enrolled" is not used in the pertinent regulation, 43 C.F.R. § 2651.2(b)(2). The term "enrolled" is used without a qualifying adverb. Subparagraph (1) of the same regulation does use the term "properly enrolled". Its presence in subparagraph (1) and absence in subparagraph (2) is strong evidence that the promulgators of the regulation did not intend for the term "enrolled" in subparagraph (2) to mean "properly enrolled".

The second principle is that a person must have lived at the alleged Village site, and not somewhere else on the island, in order to qualify as one of the 13. See State of Alaska v.

Exhibit 9

Village of Litnik, ANCAB VE 74-25, VE 74-96, VE 74-101, VE 74-102, VE 74-106 (Sept. 25, 1974), ALJ's Recommended Decision, at 32, 35-36. That site is the North Village, South Village, and Garden Beach areas.

Third, the alleged Village is not disqualified for failure to meet the occupancy requirement of at least 13 enrollees having lived there for a period of time in 1970 if the alleged Village "is known as a traditional village" and if it was "temporarily unoccupied in 1970 because of an act of God or government authority occurring within the preceding 10 years." 43 C.F.R. § 2651.2(b)(2). As discussed in Subpart IV, D, 3 below, this "act of God" proviso does not apply and therefore the alleged Village must meet the occupancy requirement.

The determination of whether that requirement was met depends upon the meaning of the phrase "lived for a period of time". While the phrase has never been precisely defined, previous decisions provide some guidance. The decisions in State of Alaska v. Alexander Creek, Inc., ANCAB VE 74-31, VE 74-35, VE 74-54, VE 74-61 (Oct. 23, 1974) at 35, and Bureau of Sport Fisheries & Wildlife v. Village of Uyak, ANCAB VE 74-11 (June 9, 1974), ALJ's Recommended Decision, at 18-19, indicate that a visit of a couple of days or two one-day visits to a purported village does not qualify as having lived there for a period of time.

In the 1970's, the BIA Area Office in Juneau interpreted the regulation using an informal guideline of one month (Ex. S-6k, pp. 21-29). If a person spent less than a month in the purported village in 1970, then the Area Office considered the qualifications of that person to be "pretty touchy" and it would look to find additional people who would qualify in order to certify a village as eligible (id.). The BIA guideline was not used as a hard and fast rule (id.) and it is not controlling for purposes of this decision.

**b.**

**Guidelines and principles for determining permanent residency**

Resolution of the issue of whether the alleged Village had 25 or more Native residents as of April 1, 1970, and the subsidiary issue of whether Protestant established substantial doubt as to the validity of the presumption of residency afforded enrollees of the alleged Village, depends, in part, upon the meaning of the terms "resident" or "residence". The review of the residency of individuals for purposes of determining village eligibility is subject to guidelines reiterated many times by ANCAB as follows:

For determinations of village eligibility, the Board adopts the same definition of residence used by the Enrollment Coordinator, contained in 25 CFR 43h.1(k):

"Permanent residence" means the place of domicile on April 1, 1970, which is the location of the permanent place of abode intended by the

Exhibit 9

applicant to be his actual home.  It is the center of the Native family life of the applicant to which he has the intent to return when absent from the place.  A region or village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on that date, if he has continued to intend that place to be his home.

It is helpful to compare this definition of permanent residence with the concept of "home," defined in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 12, (1971) as "the place where a person dwells and which is the center of his domestic, social, and civil life." The comments indicated that when determining whether a place is a person's home, consideration should be given to its physical characteristics, the time one spends there, the things one does there, his intention when absent to return to that place, other dwelling places of the person and similar factors concerning those other dwelling places.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 12, Comment C at 50 (1971).

Other factors in the definition in 25 CFR 43h.1(k) recognize the special situation of Alaska Natives, where Native family life may be characterized by patterns of kinship and activities substantially different from non-Native family life.  In addition, the definition recognizes the frequently transient life style of Alaska Natives.  Thus, the definition emphasizes the factors of Native family life and intent to return.

While intent is obviously subjective and personal, it is frequently capable of objective proof, and where objective evidence is presented which contradicts subjective intent, and the objective evidence is neither rebutted nor explained, it will clearly be persuasive.  On the other hand, where economic, educational, or other requirements have temporarily deprived one of any real choice, and both the subjective intent and the objective evidence indicate a genuine connection with the place of enrollment, that place is considered to be the permanent residence of the individual within the meaning of 25 CFR 43h.1(k), notwithstanding that for other purposes a court or an administrative agency may find that person's residence or domicile to be some place other than his "permanent residence" as determined for purposes of the Alaska Native Claims Settlement Act.

The Respondents have cited a letter from Curt Berklund, Deputy Assistant Secretary of the Interior, dated February 27, 1973, to Morris Thompson, Area Director, Bureau of Indian Affairs, Juneau, Alaska, which interprets the definition of "permanent residence" in 25 CFR 43h.1(k). The pertinent paragraph in the letter reads:

Exhibit 9

The primary point of confusion is who now living out-of-state enrolls back to Alaska. <u>Under the above definition a person who has at one time lived in a village or other place in Alaska and considered that place to be his permanent residence on April 1, 1970, and intends to return to that place must enter that place in column 16 on the application form and be enrolled there.</u> If he considered some place outside of Alaska as his permanent residence on April 1, 1970, and intends to return there, he <u>must</u> enter that place in column 16. <u>There is no "choice" involved.</u> <u>Under no circumstances</u> may an individual who has never lived in Alaska enroll to a village in Alaska through personal choice by entering a village name in column 16 on the application form. The only way in which a person who has never lived in Alaska may be enrolled in Alaska would be by (1) showing an out-of-state permanent residence in column 16 of the application form and (2) voting "No" on the establishment of a 13th regional corporation. He would then be enrolled by the Secretary in one of the twelve regions in Alaska based upon the priorities listed in Section 5(c) of the Act. (emphasis in original)

Considered in the context of the enrollment regulations in 25 CFR 43h, and with particular reference to the problem addressed by this letter — that is, the enrollment of persons who are residents outside the state of Alaska — the letter is not inconsistent with the interpretation of "permanent residence" adopted by the board; but neither is it particularly relevant to the problem of how the place of "permanent residence" should be determined. There is no disagreement with the proposition that one should be enrolled to his "permanent residence."

<u>Natives of Afognak, Inc.</u>, <u>supra</u>, at 12-14.

According to Protestant, the focus of inquiry under these guidelines should be on the individual's place of domicile. He argues that an individual may qualify as an alleged Village resident only if he either: (a) actually resided in the alleged Village on April 1, 1970; or (b) had previously lived in the alleged Village <u>and</u> (1) had continued to regard the alleged Village as his home on April 1, 1970, <u>and</u> (2) had a present intent on April 1, 1970, to return to the alleged Village to live.

Respondents counter that the traditional legal definition of residence or domicile is not applicable but, rather, that, in light of the Natives' patterns of kinship and activities, the emphasis should be on two factors: (1) the individual's ties to the place which is considered home and (2) the intent to return to that place. Leisnoi goes so far as to argue that these two factors are the only criteria.

In support thereof, it quotes the Recommended Decision of Administrative Law Judge

Exhibit 9

Painter in the <u>Natives of Afognak, Inc.</u> case as follows: "In other words as long as a Native has some ties with the village and intends to return there, then he may be enrolled to that village as a permanent resident, irrespective of the fact that the Native may actually be living elsewhere." <u>Supra</u>, ALJ's Recommended Decision, at 5. However, ANCAB did not adopt this conclusion of Judge Painter, but, rather, provided its own analysis as to why the village of Afognak met the eligibility requirements.

As ANCAB repeatedly recognized, there are many factors which bear upon the determination of permanent residency and they include those listed under the definition of "home" found in the Restatement of Conflict of Laws. <u>See</u>, <u>e.g.</u>, <u>U.S. Forest Service</u> v. <u>Village of Kasaan</u>, ANCAB VE 74-17, VE 74-18 (June 10, 1974) at 23-24. Those factors include the important factor of "intent to return," upon which Respondents focus much attention; but they also include the physical characteristics of the place, the time spent there, the activities engaged in there, and similar factors regarding other dwelling places. <u>Id.</u>

The definition of "permanent residence" is closely linked to the definition of "home" set forth in the Restatement. The former definition twice speaks of the place which the individual intends to be his or her home. Both definitions define that place in terms of two elements: (1) where the person dwells or abides and (2) where the center of family life is located.

ANCAB has explained that the adopted definition of "permanent residence" in 25 C.F.R. § 43h.1(k) "speaks in terms of domicile, modified to fit the circumstances of Alaska Natives." <u>Dept. of Natural Resources, State of Alaska</u> v. <u>Village of Manley Hot Springs</u>, ANCAB VE 74-6, VE 74-15, VE 74-16 (June 10, 1974) at 27. The regulation, as originally proposed, consisted of only the first sentence which refers to the "place of domicile * **, which is the location of the permanent place of abode intended by the applicant to be his actual home." (Ex. BIA-1A, pp. 205-04). 37 Fed. Reg. 2679 (Feb. 4, 1972). Senator Ted Stevens commented that the proposed definition was too narrow, and should be amended to include a reference to the mental attitude of the Native (Ex. BIA-1A, p. 208). Assistant Secretary of the Interior Harrison Loesch responded to Senator's Stevens comment by noting that the Department defined residence in terms of domicile, but that the subjective intent of the applicant with respect to his actual home should be given as much weight as possible because the United States had only minimal interest in the place of enrollment of individual applicants and because the Department recognized the necessity of many Natives to move around (<u>id.</u>, pp. 205-03). The second and third sentences were subsequently added as clarification and explanation (<u>id.</u>). They refer to an "intent to return" to "the center of the Native family life" and to the fact that a Native could be absent from the place on April 1, 1970, if he "continued to intend that place to be his home." They were derived from the definition and guidelines for determining a person's domicile and "home" set forth in the Restatement of the Conflict of Laws (<u>id.</u>; Ex. S-33, p. 1).

The intent to return is emphasized to account for the special situation of Alaska Natives, including any transient life-style or deprivation of choice as to residency stemming

Exhibit 9

from economic, educational, or other requirements.  See Village of Kasaan, supra, at 24; Natives of Afognak, Inc., supra, at 13.  The influences of Caucasians and a cash economy on traditional Native subsistence life-styles cannot be ignored.  See Village of Eyak, supra, at 32.  Those influences may create educational or economic needs which can be satisfied only by long absences from an alleged village, but such absences may not destroy strong Native feelings that the village is home.  See id.; Village of Kasaan, supra, at 24; State of Alaska v. Village of Council, ANCAB VE 74-47, VE 74-41, VE 74-69 (Sept. 11, 1974) at 25.

On the other hand, erosion of Native cultural patterns and the gradual adoption of non-Native customs, technology, and the like, including long-term residency in another place, may be evidence of abandonment of the alleged village and life-style associated with "home".  Fond memories of a place are not enough to establish permanent residency there; the individual must have a continuing intent to return.  State of Alaska v. Point Possession, Inc., ANCAB VE 74-55, VE 74-59, VE 74-78, VE 74-84, VE 74-86 (____), ALJ's Recommended Decision, at 27.

ANCAB repeatedly emphasized the frequency and continuity of an individual's visits to an alleged village as objective evidence of that intent.  See, e.g., id., at 26-27; Village of Kasaan, supra, at 24.  The terms used in the definitions of "permanent residence" and "home" - "dwell", "domicile", "residence", and "home" - all contemplate an element of regularity, continuity, or longevity in the periods of occupancy of a place.  Indeed, it would be difficult to conclude that a village was the center of a Native's family life or that the Native had a continuing intent to return there when the Native has never visited there or has visited only infrequently or sporadically.  See Point Posession, Inc., supra, ALJ's Recommended Decision, at 18, 27.

Other objective, probative evidence includes evidence relating to where individuals own property or dwellings, register to vote, pay property taxes, are employed, and are registered for purposes of automobile driver's licenses, and the data in Columns 16 and 18 through 21 of the Alaska Native Enrollment Application Form for each individual, which data is compiled in the village's Family List.  Natives of Afognak, Inc., supra, at 23; Village of Manley Hot Springs, supra, at 22-24; Point Possession, Inc., supra, ALJ's Recommended Decision, at 18-25; but see Village of Kasaan, supra, at 23 (such evidence of occupancy elsewhere is not necessarily inconsistent with being a permanent resident of the village); U.S. Forest Service v. Village of Chenega, ANCAB VE 74-90, VE 74-74, VE 74-80 (Sept. 10, 1974), ALJ's Recommended Decision, at 9 (utility bills, rent receipts, and driver's license evidencing occupancy elsewhere is of no probative value where village is unoccupied due to an act of God).  The weight attributed to this evidence depends upon, among other things, whether the alleged village is temporarily unoccupied because of an act of God or governmental authority.  See id.  If such circumstances exist, evidence of unoccupancy of the alleged village or occupancy elsewhere may not necessarily be inconsistent with permanent residency in the alleged village.  See id.; Kasaan, supra, at 23.

While occupancy, or unoccupancy, of a place is normally a significant objective

Exhibit 9