indication of residency there, unoccupancy cannot legitimately be used to prove that 25 or more Natives were not residents of a village on April 1, 1970, when application of the "act of God" proviso excuses the requirement of occupancy in 1970. Natives of Afognak, Inc., supra, at 23. If the "act of God" proviso excuses the occupancy requirement, it is very difficult for the Protestant to prove that there were not 25 Native residents. Id. However, as discussed in Subpart III, D, 3 below, the proviso does not apply in this case.

Several final observations related to the determination of permanent residency must be made. First, the residence of minor Native children (under age 18 on April 1, 1970) should be determined according to the residence of their Native parents, in the absence of evidence of emancipation or guardianship by some other person. Village of Manley Hot Springs, supra, at 27. Further, the attainment of majority by a child does not ipso facto separate the child from the parent's residence; the child merely acquires the power to possess a separate residence if the child desires. Alexander Creek, Inc., supra, at 32-33, 37. Thus, the permanent residence of an unmarried child who remains living with his or her parents after attaining majority, without evidence of a bona fide intention to acquire a separate residence, is determined according to the permanent residence of the parents. Id. Finally, for each minor who has been adopted or placed in the care of others to be raised, the minor's permanent residence should be determined according to the residence of the minor's adoptive parents or person who stands in loco parentis to the minor and with whom the minor lives. See RESTATEMENT (SECOND) OF THE CONFLICT OF LAWS § 22 cmts g and i.

Second, the emphasis on intent to return to the alleged Village implies that the individual has been there at least once before. See Point Possession, Inc., supra, ALJ's Recommended Decision, at 18, 23. Third, a Native who is not enrolled to the alleged Village may nevertheless be considered a permanent resident thereof if he or she satisfies the criteria. Koniag, Inc., 405 F.Supp. at 1373-74.

c.

**Did Protestant raise a substantial doubt
about the validity of the presumption of residency?**

Applying the foregoing guidelines and principles to the evidence presented by Protestant, that evidence is clearly sufficient to raise a substantial doubt about the validity of the presumption of residency attributed to the 285 Natives listed on the certified Native Roll for the alleged Village. Such evidence consists of a variety of types.

Citing various ANCAB holdings, Respondents argue that each of several types of evidence cannot individually establish a substantial doubt. Their arguments are inapposite because it is the totality of the evidence presented by Protestant in his case-in-chief, rather than any one piece thereof, which establishes the substantial doubt.

Each of the following types of evidence contributed to the establishment of substantial

Exhibit 9

doubt.  First, no adequate investigation of the permanent residency of the Natives enrolled to the alleged Village had been made by the Department prior to the hearing in this matter.

Marie Redick Unger, one of the "enumerators" who worked under contract with the BIA to assist Natives in completing the enrollment applications, testified that the enumerators were instructed to accept the Natives' representations on the applications without challenging or investigating them (Ex. S-6L, pp. 6-7).  The Enrollment Coordinator similarly testified that, in general, the enrollment of each Native to the alleged Village was not based on any investigation into the Native's permanent residency, but was based solely on the Native's own application statement of the place of permanent residency (Ex. S-6G, pp. 29-30, 34-35).

The resulting Native Roll was then cited by the Area Director to support his finding that the alleged Village had 25 or more residents as of April 1, 1970.  He also referenced Mr. Fitzpatrick's similar finding, but that finding is not grounded upon an adequate investigation.

Mr. Fitzpatrick's report provides in pertinent part:

Woody Island village is listed in the 1970 census with a population of 41. * * *

    *          *          *          *          *          *          *

On my recent visit to Woody Island village site, I observed several Native dwellings, fish racks, smoke houses, and a storage shed.  I interviewed residents of Woody Island village, and determined that the village does exist and that more than 13 Natives actually used the village before April 1970, on a seasonal and year-round basis.

(Ex. BIA-2B, p. 162).  The 22 enrollees who submitted affidavits in support of the alleged Village's application are listed as persons who so used the alleged Village (id., p. 161).

Mr. Fitzpatrick also noted that the majority of residents were Native and that the number of non-Native residents as of April 1, 1970, was 40 (id., p. 161).  He indicated that the alleged Village was in existence, as evidenced by attached photographs and "residences, storage buildings, schoolhouse, powerhouse, cold storage, fuel tank farm, water plant, garage, office bldg., community center (library), Camp Woody, dock facilities, and marina." (Id.).  He concluded that the alleged Village had met all the eligibility requirements, including the 25-resident requirement (id., p. 162).

His 1978 deposition testimony (Ex. S-6M) shows the following:

(1) that his on-site field examination of Woody Island lasted only 3 or 4 hours (pp. 17, 100-02, 119);

(2) that, based upon the documentation that had been submitted in support of the

Exhibit 9

IBLA 96-152

alleged Village's application, he assumed that the alleged Village was eligible prior to his field examination (pp. 28-29);

(3) that his field examination focused primarily on the FAA complex and its facilities (pp. 30-31);

(4) that nearly all of the structures listed in the Village Check List as evidencing the village's physical location were the FAA's facilities (pp. 66-67);

(5) that the facilities and dwellings in the attached photographs were the FAA's facilities (pp. 60-61);

(6) that he regarded the FAA facilities and dwellings as relevant to the alleged Village's eligibility because the alleged Village was expecting to obtain use of them under a use permit (pp. 30-31, 61-65);

(7) that the statement in his report that he observed "several Native dwellings" was based upon only 1 house - Nick Pavloff's - determined to be occupied by a Native, another standing house which he saw from a distance, and the debris of several uninhabitable houses whose origins were unknown (pp. 31-33, 37-39, 52-53, 120-21);

(8) that if he had excluded the FAA facilities and dwellings, he would have reported that the alleged Village was not in existence (p. 121);

(9) that his interviews were limited to 10 to 15 enrollees of the alleged Village, each of whom stated that they camped at or otherwise used Woody Island in 1970, and that he could only identify 5 of them (pp. 54-59, 109-10, 119-20);

(10) that he interviewed only 4 of the 22 enrollees who submitted affidavits in support of the alleged Village's application and that he did not question any of them specifically about the content of their affidavits because, among other reasons, he had not seen the affidavits at the time of the interviews (pp. 71-72, 77-79, 109-10);

(11) that he only saw one Native, Nick Pavloff, on the island during his field examination (pp. 31-33, 37-39);

(12) that, consistent with his visual observations, the 1970 census figures provided to him by the BIA showed that only 1 of the 41 residents of the alleged Village was Native (pp. 67-70, 104-06); and

(13) that, in light of the census figures, it is unclear how he concluded that a majority of the residents were Native, but he apparently relied heavily upon the number of enrollees in concluding that the alleged Village met the residency requirements (see, e.g., pp. 34-37, 67-72).

Exhibit 9

IBLA 96-152

In other cases where Mr. Fitzpatrick prepared similar eligibility reports for other villages under similar circumstances, the tribunals have found his investigations cursory and his reports misleading and of little probative value. See Alaska Conservation Society v. Village of Ayakulik, ANCAB VE 74-95, VE 74-104, VE 74-108 (Sept. 26, 1974), ALJ's Recommended Decision, at 10; U.S. Forest Service v. Anton Larsen, Inc., ANCAB VE 74-20, VE 74-21, VE 74-36, VE 74-57, VE 74-62, VE 74-112 (October 3, 1974), ALJ's Recommended Decision, at 16; Village of Litnik, supra, ALJ's Recommended Decision, at 33-34; Natives of Afognak, Inc., supra, at 17-18; Alexander Creek, Inc., supra, ALJ's Recommended Decision, at 32. Likewise, in the instant case, his investigation was cursory and his report is misleading and of little probative value.

Second, based upon the testimony presented by Protestant, if Mr. Fitzpatrick had interviewed the 22 affiants and non-enrollee residents of Woody Island or Kodiak, he would have discovered that many of the statements contained in the affidavits are misleading or false, that nearly all of the Natives enrolled to Woody Island were not residents in 1970, and that, as of April 1, 1970, the island lacked a Native village, contained only a few habitable, non-FAA houses, and had far fewer than 25 Native residents. That testimony came from more than a dozen witnesses, including long-time Woody Island residents, Yule and Darrel Chaffin, and several Native residents of Kodiak (see, e.g., Exs. S-6A through S-6F, S-6I, S-6L, S-6N, S-6O; Tr. 93-106, 240-284, 291-325, 401-23, 451-573, 627-36, 643-676).

For example, the form affidavits of Woody Island enrollees Karl Armstrong, Christina Hoen, and her daughters, Chrislyn Hoen and Cien Marie Hoen, all indicate that Woody Island was their "usual place of residence as of April, 1970." They further state that Karl, Christina, Chrislyn, and Cien have lived there since 1963, 1948, 1969, and 1963, respectively. In fact, according to Christina Hoen's own testimony, the Hoen's, since 1956, merely lived there for weeks each summer, but resided in Kodiak for the vast majority of time each year, except 1964 (Ex. S-6F, pp. 15-27). Mr. Armstrong never lived or stayed overnight on Woody Island, according to the Chaffins (Exs. S-6A, p. 33; S-6B, p. 17).[2]

Similarly, the 15 identical form affidavits of Mary Chya and her family and Marie Redick and her family were shown to be false and misleading by the evidence adduced by Protestant. Each of those affidavits states the affiant lived on Woody Island for periods of time each year where "my residence consists of a 5 room house * * *." (Ex. BIA-2A, pp. 101-87, 84-82). Contrary to the content thereof, Mary Chya admitted that neither she nor her family had a house on Woody Island or lived there for periods of time each year (Ex. S-6N, pp. 13-26). In fact, they lived in Kodiak and stayed overnight on Woody Island only two or three times over the many years they visited there (id., pp. 31-32). Marie Redick likewise

---

[2] Mr. Armstrong's 1978 Deposition was admitted by stipulation. His own testimony shows that Woody Island was not his usual place of residence as of April 1, 1970, and that he did not live there since 1963. Rather, he lived in Kodiak, did not visit Woody Island from 1963 to 1967, and spent approximately 35 days there in 1970.

Exhibit 9

admitted that she and her family lived in Kodiak and did not have a house on Woody Island, but she did allege that they stayed overnight on Woody Island every summer for periods lasting up to a week or two (Ex. S-6L, pp. 13-17, 23-24).

By itself, the testimony from persons living on or frequenting Woody Island and Kodiak Island creates substantial doubt. That testimony presented by Protestant consists of the following:

Yule Chaffin, Darrell Chaffin, and Patricia Hampton

Yule and Darrell Chaffin were a married couple that lived on Woody Island full-time from 1945 until 1967, when they acquired a retirement home in California. Patricia is their daughter who lived with them from her birth in 1948 until she graduated from high school in 1966.

From 1967 onward, with the exception of 1970, Yule and Darrell lived on Woody Island each year from mid-August to early May and in California during the rest of the year. In 1970 they lived on the island the whole year, except for the period of March 2nd through May 7th, when they were vacationing in Hawaii.

From 1967 onward Patricia lived on Woody Island each summer for approximately 3 to 4 months. In 1970 she was there for the months of July, August, and possibly September. Each year from 1969 through 1971 she also visited her parents on the island at Christmas time.

Because Darrell worked at the FAA facility on Woody Island, eventually becoming the Station Manager, he and his family lived in FAA housing until 1967, when Darrel retired and he and Yule moved into a cabin they had built above Una Lake on the west side of the island. They also had a large garden near Camp Woody on the west side.

They could not see the dock from their cabin, but Darrell frequented the area near the dock to tend their garden and crab pots which he stored for crabbers for a fee. He also made daily trips to the dock while working for the FAA. He testified by deposition that he knew and had regular contact with all the Native residents of Woody Island.

Yule has researched and authored numerous books and articles regarding the history of Woody Island and the Kodiak region. Her research included interviewing Ella Chabitnoy, who was a good friend whose family regularly interacted with the Chaffins. The Chaffins were also good friends with the Simeonoffs. Beginning in the 1950's, Yule made daily entries in a diary detailing the activities on the island and the persons living there. Both Yule and Patricia testified by deposition that they regularly hiked all around the island and knew everyone who lived on Woody Island while they were living there.

Patricia testified that there was no Native village, store, or church on Woody Island,

Exhibit 9

that none of the Native homes were habitable in 1970, that she did not see Natives camping on Woody Island with any frequency in 1970, and that when she left in 1966, there were only 3 Native residents: Johnny Maliknak, Nick Pavloff, and Wilfred Pavloff. Consistent therewith, Yule testified that Johnny and Nick were the only residents left by 1967, as Wilfred drowned that year, and Darrell stated that there was only one habitable house in 1970.

For the year 1970, Yule, Darrell, and Patricia each identified only 2 Native residents of Woody Island: Johnny Maliknak and Nick Pavloff, exclusive of any FAA families. The parties stipulated that if Yule were called to testify, she would testify that none of the enrollees to Woody Island, except Johnny and Nick, were residents of Woody Island in 1970. (Exs. S-6A, S-6B, S-6C, S-6O; Tr. 148-149, 168-69, 171-72, 192-93, 220, 225, 233-36, 1925-27)

### Richard Hensel

He was on Woody Island almost daily during November and December of 1957, January of 1958, and the summer months of 1958 and 1959, conducting a study of snowshoe hares. He traveled most of the forested areas, but not the beach areas, on foot. During the 1960's he flew over Woody Island regularly each year from the end of March through November. He visited many Native villages in the Kodiak archipelago and testified that there was no Native village on Woody Island. According to Mr. Hensel, Woody Island lacked a store, church, village council, and other typical indices of a village. The reliability of his observations are called into question by the fact that he observed only two Natives and one Native house, despite the fact that Protestant's own evidence shows that there were many Native residents and homes at the end of the 1950's. (Tr. 93-95, 100-01, 103-06, 114-18, 122-23, 125-32).

### James Harold Naughton

From 1935 to 1996 he lived in Kodiak. He is of Native descent and served as the Kodiak postmaster from 1973 to 1977. Several times each year he visited his sister who lived in FAA housing on Woody Island until 1969.

He has visited the Native villages of Old Harbor and Ouzinkie and opined that there was no Native village on Woody island from 1960 through 1970. He identified a couple dozen of the Woody Island enrollees to be residents of Kodiak in 1970 and stated that he never saw them on Woody Island. (Tr. 240-54, 261-63, 284)

### Edward Naughton

He is a Native who was President of KANA from 1970 to 1973. With the exception of several years in the military and in college during the 1950's, he has lived in Kodiak since 1935. In 1970 he visited Woody Island for only 2 or 3 days and thus would not have been aware of visitors to the island that year.

Exhibit 9

IBLA 96-152

He too identified a couple dozen of the Woody Island enrollees to be residents of Kodiak, and not Woody Island, in 1970. He interpreted a person's residence to be where he or she spent the majority of their time and where he or she had a home.

He spoke to several Leisnoi shareholders, including Thelma Johnson, who stated that they did not know why they were Leisnoi shareholders. He opined that there was no village on Woody Island and that Leisnoi fabricated Woody Island as a "bogus" village to obtain more benefits under ANCSA. (Tr. 291-94, 300, 305-13, 318-19, 323-25, 333)

William Cordry

He began working for the FAA and living on Woody Island in 1968. He hiked around the entire island. In 1969 he took over as the FAA operator of the FEDAIR IV. At the end of 1969, his wife, five children, and himself moved to Kodiak, but he continued to work for the FAA on Woody Island, commuting daily by FEDAIR IV from the dock.

He did not remember seeing any Native dwellings on Woody Island and opined that there was not a Native village there. No Native children attended the school there when it closed in 1969. He too observed that numerous Woody Island enrollees were not residents of the island in 1970, but, rather, that most were residents of Kodiak.

He did not see any Natives picnicking or fishing on Woody Island nor any regular Native activity of any kind. However, he would not necessarily have been aware of island visitors who came there on their own boats. (Tr. 401-02, 405, 411, 414-23, 431, 435, 438).

Zelma Stone

Her husband was employed from 1946 until September 1970 by the American Home Baptist Mission Society as administrator of the Kodiak Baptist Mission and in that capacity was required to check regularly on the Mission's holdings on Woody Island, including a herd of cattle started in the late 1960's. They lived on Kodiak Island during that time, but Zelma regularly visited Woody Island with her husband, including staying a week or two at a time each summer during the 1960's while she worked at Camp Woody. They were good friends with Ella and Mike Chabitnoy.

She has visited the villages of Larsen Bay, Karluk, and Ouzinkie and she testified that there was no village on Woody Island from 1946 to 1970. She elaborated that Woody Island lacked employment opportunities, a Native association or tribal government, and a church. She was not aware of any regular meetings or congregation of people on the west side. She was not aware of anyone living in the Harmon house on Site 17 from 1960 through 1970, in the Fadaoff/Madsen home on Site 23 during the last half of the 1960's, or in the Chabitnoy house in 1970. She believed that only 8 to 10 Natives were living on Woody Island at the time of the 1964 earthquake and that Johnny Maliknak and Nick Pavloff were the only persons living on the west side in 1970.

Exhibit 9

IBLA 96-152

With regard to numerous Woody Island enrollees she stated that she had never seen them on Woody Island, that they never lived on Woody Island, that they were not living there in 1970, and/or that many were residents of Kodiak. (Tr. 451-59, 462-67, 480-86, 494, 498, 507. 509, 518-19, 524-26, 566-67; Ex. S-36).

<u>Terry Olivia Johnson</u>

From her birth in 1955 to 1971, she lived with her family in FAA housing on Woody Island. She does not remember any non-FAA children attending the Woody Island grade school during the early 1960's. In approximately 1966 she began commuting daily to Kodiak via FEDAIR IV to go to school. She opined that there was no Native village on the west side.

She explained that while she hiked or motorbiked all over the island in the summer, ran through vacant Native houses on the west side, and took the FEDAIR IV to school everyday, she saw only Johnny Maliknak, Nick Pavloff, and a couple of other Natives and rarely saw anyone living in the Native homes. She does not remember any Natives visiting, berrypicking, or camping there nor any skiffs tied up there, except those of Johnny, Nick, and the Chaffins. She identified several Woody Island enrollees as being residents of Kodiak.

She and her family were the 6 Negroes listed on the 1970 census for Woody Island. (Tr. 627-39, 2026).

<u>James Payne</u>

He lived in Kodiak from April 1, 1970 to 1978. He came there to work on Woody Island as an FAA electronics technician. He began working during the first or second week of April. He commuted five days a week to Woody Island via FEDAIR IV. The Natives he observed riding FEDAIR IV were limited to Johnny Maliknak, Nick Pavloff, and Nick's unidentified girlfriend.

He did not see any boats pulled up on the beach or tied up off shore, nor did he see any Natives camping, hunting, fishing, or berrypicking. He opined that there was no Native village on Woody Island. (Tr. 643-46, 648-49, 654, 664-66, 669, 672)

<u>Waldeman Johnson</u>

He lived and worked on Woody Island as the FAA's Station Administrator from November 1959 to 1971 and opined that he knew everyone that lived there. He too identified Johnny Maliknak and Nick Pavloff as the only Natives living or consistently returning to Woody Island in 1970. Of the persons submitting affidavits in support of Woody Island's application, only Johnny, Nick, and Christina Hoen ever lived on Woody Island, according to Mr. Johnson. (Ex. S-6D)

Exhibit 9

IBLA 96-152

## Tim Smith

He was born in 1953 and lived in Ouzinkie from 1956 to 1977. Each summer during that period he lived at Camp Woody on Woody Island from the first or second week in June to mid-August, as his parents were involved in the creation and operation of Camp Woody. In 1970 he filmed various locations and activities on the island and a copy of that film was admitted into evidence (Ex. S-41).

He testified that in 1970 the Chabitnoy and Fadaoff/Madsen houses were habitable but uninhabited, the condition of the Simeonoff house was poorer than that of the Chabitnoy house, the Harmon house was not standing, and no structures existed in the area of Sawmill Point. He remembered the Harmon house being abandoned and uninhabitable by the late 1950's. He identified another structure in the Garden Beach area as having a bad roof, no windows, and an open door in the early to mid-1960's. According to Mr. Smith, an open door is usually a sign of abandonment in Alaska, where wood structures deteriorate rapidly from exposure to the elements.

The only Natives he saw on a regular basis on Woody Island were Nick Pavloff, Johnny Maliknak, and Rudy Sundberg Jr. He acknowledged that he might not have noticed a small group camping and did observe other persons from time to time, picking berries and using the beaches. He further observed that there were always people fishing in skiffs offshore. However, he did not know most of the Natives purported to be permanent residents of Woody Island in the Feichtinger Report.

He stated that Nick and Johnny were the only consistent non-FAA residents and that they lived in the North Village area. The population of the South Village area was not consistent, with changing occupants and few or no occupants for many years.

Mr. Smith, having regularly traveled to other Native villages with his parents to evangelize and teach vacation bible school, opined that Woody Island was not like the other villages. They were able to identify and establish relationships with the residents of each house in the other villages because the houses were consistently occupied for long periods of time by the same people. They could not do so on Woody Island because there was no consistent population other than Nick and Johnny. (Tr. 1928-29, 1931-32, 1944-46, 1949-50, 1957-61, 1980-83, 1986, 1993-96, 1998-2000, 2003, 2009-14)

## Shirley Berns

She lived in Kodiak from May 1964 to 1976 and again from 1985 onward. As a 1970 census worker for the Government, she canvassed Woody Island in May 1970. While she listed eight persons as being "Native", the category "Native" included anyone who was not "White" or "Negro". She remembered encountering only one person who actually identified himself as being Native: Nick Pavloff.

Exhibit 9

IBLA 96-152

On the west side she observed a total of five houses, including only one inhabited house which was occupied by Nick Pavloff, the Chabitnoy house which was habitable, and three other houses which were uninhabitable. She identified numerous Woody Island enrollees to be residents of Kodiak in 1970. (Tr. 2024, 2028-30, 2032-34, 2040, 2046, 2049, 2058-61)

Bill Torsen

He operated FEDAIR IV from September 1962 to June 1966, while living in Ouzinkie. He testified that the FAA established a policy in 1963 that only FAA personnel, their families, and invited guests could ride on the FEDAIR IV. However, throughout Mr. Torsen's tenure, non-FAA persons were allowed to ride FEDAIR IV if they were residents of Woody Island or if they obtained permission from the FAA station manager.

Mr. Torsen moved to Kodiak in 1969 and lived there until 1980, when he moved to the State of Washington. Thereafter, he has resided in Kodiak each summer. He is of Native descent and is generally familiar with the Natives living in and around Kodiak.

He testified that Johnny Maliknak and Nick Pavloff were the only Natives living on Woody Island in 1970. However, he seldom disembarked from FEDAIR IV on Woody Island and never visited any of the Native homes, so he would not have known how many adults or children were living in those houses.

He identified numerous Woody Island enrollees as persons who resided in Kodiak in 1970, who resided in Kodiak from 1962 to 1966, whom he never saw on Woody Island, and/or whom he never saw on FEDAIR IV. He indicated that Woody Island had no stores, post office, or supplier of fuel in 1970. (Tr. 2062, 2064-2073, 2075-78, 2084, 2086)

Gary Ennen

He lived on Woody Island in FAA housing from 1965 to 1967 and commuted daily to Kodiak to attend high school. He hiked all over the island and did not observe any regular Native activity or Native village on Woody Island. He did not see anyone in the South Village area, but he did not pay much attention to that area. He did see weekend visitors to the island occasionally. (Tr. 2087-92, 2101, 2104).

Cyril Hoen

He is a non-Native who married Christina Simeonoff in approximately 1962. They are now divorced. His wife's extended family loves Woody Island.

Cy, Christina, and their children lived in Kodiak in the 1960's and 1970, except for approximately eight months in 1964 when they lived on Woody Island in the Simeonoff house. They moved to Woody Island after the 1964 earthquake and tidal waves because

Exhibit 9

IBLA 96-152

Kodiak was a "mess".

When they lived on Woody Island, he worked in Kodiak for Sutliffs or Kodiak Commercial and commuted daily to work in a small boat. It was difficult to commute in the winter and easier to live in Kodiak, so they moved back.

In late 1969 he opened a sporting goods store in Kodiak. Christina worked at times in a cannery and in the store.

During the 1960's and 1970 they visited Woody Island ten to twelve weekends per year and on "good" days for recreation, berrypicking, and rabbit hunting. They stayed in the Simeonoff house and did not stay for longer than a weekend.

When they lived on Woody Island after the earthquake, their only relative who may still have been living on Woody Island was James Fadaoff. On Woody Island he also saw Edson Fadaoff sometimes, Rudy Sundberg Jr. quite often, and Maurice Harmon in 1970. (Tr. 2108-11, 2112-18, 2122-23, 2127, 2130, 2134-35, 2137)

James Sandin

His testimony is inconsequential.

Lloyd Devoe Friend

He has lived in Kodiak since February 1966. From 1968 onward he has made 2 or 3 rabbit hunting trips per year to Woody Island in October/November and January/February. He never saw any Natives in the South Village and did not notice any houses there other than the Fadaoff/Madsen house. He did see other rabbit hunters and a lot of people fishing in boats off the west shore of Woody Island. (Tr. 2384-86, 2390, 2392-95)

Lenhart Goethe

He has lived in Kodiak since 1963. He lived on Woody Island in a trailer by the dock for approximately six months immediately prior to the 1964 earthquake while he cleared an area for installation of the FAA's VORTAC facilities. He returned in June 1964 to complete the project, staying 10 days at Camp Woody.

He was assisted by Nick Pavloff, John Ponchene, James Fadaoff, and Wilfred Pavloff. He testified that Nick's family was the only non-FAA Native family living on the island at that time. Both James Fadaoff and John Ponchene commuted from Kodiak, staying overnight on Woody Island only occasionally. With the exception of Rudy Sundberg Jr., Mr. Goethe saw no other Natives using the west side of the island. The several houses in the South Village were boarded up and not used, except occasionally by James Fadaoff and John Ponchene. Mr. Goethe did not visit the North Village. He opined that there was no Native

Exhibit 9

IBLA 96-152

village on Woody Island.  (Tr. 2397, 2399-2403, 2406, 2410-12, 2415, 2418, 2420)

Larry Dean Amox, Sr.

His testimony relates to the credibility of Karl Armstrong.

Edward Ward

He was born in January 1953.  He, his parents, and five siblings moved from the State of Washington to Kodiak in September 1965.  His parents moved to Anchorage in 1977 and Edward moved to Homer in the late 1980's.

His father, Harold, his siblings, and himself are Woody Island enrollees, yet he testified that none of them ever lived on Woody Island.  As of 1970, the family's home was in Kodiak, where they lived, went to school, attended church, and received their mail and where his parents were registered to vote and licensed to drive.

From 1969 to 1971 he visited Woody Island a couple of dozen times with friends to avoid chores at home, hunt rabbits, harass the cattle, and otherwise recreate.  His younger sister, Kyra, also visited the island with him or her friends.  Most of his visits were daytrips.  His longest stay was two nights and three days.

Edward is now the CEO and President of Leisnoi.  He discussed Leisnoi's attempts to repopulate Woody Island, including the expenditure of $200,000 to upgrade the FAA structures in 1977 and its shareholder homesite program begun in 1995 or 1996.  (Tr. 2454-57, 2461-68, 2476, 2490, 2496-98, 2506-29; Ex. BIA-2B, pp. 11-10)

―――――――――

Third, further doubt as to the validity of the residency presumption is cast by the enrollees' responses to questions in their enrollment applications, as assembled in the Family List for the alleged Village.  The Family List (Ex. BIA-2B, pp. 149-48) includes the names and entries of 264 of the 285 Natives listed in the certified Native Roll.  The following is a breakdown of the responses given by those 264 persons:

1)    262 persons listed Woody Island as the place of their permanent residence as of April 1, 1970, while 2 listed a place other than Woody Island;

2)    10 persons listed Woody Island as the place where they resided for 2 or more years on April 1, 1970, while 116 listed Kodiak, 79 listed some other place, and 59 persons left the column blank or stated "at large";

3)    10 persons listed Woody Island as the place where they resided for an aggregate of 10 or more years, while 130 listed Kodiak, 48 listed some other

Exhibit 9

IBLA 96-152

place, and 75 persons left the column blank or stated "at large" (1 additional entry is illegible);

4)  9 persons listed Woody Island as their birthplace, while 114 listed Kodiak, 129 listed some other place, and 11 persons left the column blank (1 additional entry is illegible);

5)  58 persons listed Woody Island as the birthplace of an ancestor, while 91 listed Kodiak, 85 listed some other place, and 26 persons left the column blank (4 additional entries are illegible).

Of the 264 enrollees listed in the Family List, only 10 persons listed it as the place where they resided for 2 or more years on April 1, 1970, and only 10 listed it as the place where they resided for an aggregate of 10 or more years. In contrast, Kodiak was listed by 116 enrollees as the place where they resided for 2 or more years on April 1, 1970; and by 130 enrollees as the place where they resided for an aggregate of 10 years. While such objective evidence is not necessarily inconsistent with individuals being permanent residents of the Village, Village of Kasaan, supra, at 23, it does cast some doubt on the validity of the presumption of residency based on the certified Native Roll.

Additional doubt is generated by the identity of the persons who listed Woody Island as the place where they resided in their responses on their enrollment applications. The ten persons who listed Woody Island as the place where they resided for 2 or more years on April 1, 1970, are:

| | |
|---|---|
| Diane Carol Conaway | (Ex. BIA-1A at 97) |
| Jonna Christine Purcell | (Ex. BIA-1A at 138) |
| Alberta Ann Tibbetts | (Ex. BIA-1A at 134) |
| Vernon Byron Holland | (Ex. BIA-1A at 133) |
| Mary Thorsheim | (Ex. BIA-1A at 90) |
| John Harren Holland, Jr. | (Ex. BIA-1A at 79) |
| Walter Otto Kraft | (Ex. BIA-1A at 74) |
| Anna Nettie Blinn | (Ex. BIA-1A at 73) |
| Mary May Mack | (Ex. BIA-1A at 73) |
| Jay James Anderson | (Ex. BIA-1A at 55) |

The ten persons who listed Woody Island as the place where they resided for an aggregate of 10 or more years are:

| | |
|---|---|
| Jonna Christine Purcell | (Ex. BIA-1A at 138 |
| Alexandra Apple | (Ex. BIA-1A at 134) |
| Vernon Byron Holland | (Ex. BIA-1A at 133) |
| George Heitman, Sr. | (Ex. BIA-1A at 127) |

38

Exhibit 9

IBLA 96-152

| Elizabeth Kirzel | (Ex. BIA-1A at 123) |
| Angeline Melaknek | (Ex. BIA-1A at 118) |
| Rayna Joyce Monroe | (Ex. BIA-1A at 95) |
| Walter Otto Kraft | (Ex. BIA-1A at 74) |
| Mary May Mack | (Ex. BIA-1A at 73) |
| John Harren Holland, Jr. | (Ex. BIA-1A at 79) |

Of those persons in the two lists above, only Angeline Melaknek (Maliknak) and Rayna Joyce Monroe were identified by any of Protestant's witnesses as having actually lived on Woody Island.

This casts doubt on the reliability of the certified Native Roll and the Native applicants' own statements of the place of their permanent residence. Significantly, as previously mentioned, these statements generally were the only evidence upon which the Enrollment Coordinator relied in determining permanent residency for the Native Roll.

Fourth, the sheer number of enrollees, 285, in relation to the actual evidence of sparse use and occupancy of the Woody Island from 1960 through 1970 strongly suggests that the roll for Woody Island is inflated with many persons who were not permanent residents of the island.

Fifth, the validity of the presumption of residency is called into question by the 1970 census data for the entire island. The data provided to Mr. Fitzpatrick by the BIA shows only 1 of 41 residents of Woody Island in 1970 to be Native.

Census data from a publication entitled "Selected 1970 Census Data for Alaska Communities" similarly shows Woody Island's population to be 41 (Ex. S-18). It indicates that only a few more residents - 8 - were Native (Ex. S-18). Shirley Berns, the 1970 census taker for Woody Island explained that she included in the category of "Native" anyone who was not categorized as "Negro" or "White" and that she included only 1 person in the category of "Native" who was identified as Native (Tr. 2049, 2059).

Sixth, many of the Village enrollees originally enrolled to another place and then applied to change their enrollment. ANCAB has held that such evidence can contribute to the establishment of substantial doubt as to the validity of the presumption of residency. Village of Litnik, supra, ALJ's Recommended Decision, at 35-36; see also Village of Council, supra, ALJ's Recommended Decision, at 14.

Seventh, two studies raise further doubt as to the validity of the presumption. "Alaska Natives and the Land" (Ex. S-1), dated October 1968, is a publication commissioned by Congress in anticipation of ANCSA and subsequently adopted as an appendix to the Senate Report issued by the Senate Committee on Interior and Insular Affairs for Senate Bill 35. See Senate Report No. 92-405, 92nd Congress, 1st Session, pp. 73-74. Leisnoi is shown on a map of historic Native places and is listed as "abandoned" (Ex. S-1, pp. 249-50). Leisnoi or

Woody Island is not included in two other maps, one of current places with Native population in the Kodiak region and one of places having a Native population of 25 or more (id., p. 251).

"Villages in Alaska and other Places Having a Native Population of 25 or More" (Ex. S-2), dated 1967, is a compilation of villages and places having 25 or more persons, half or more of whom are Natives, as well as places which are predominantly non-Native but which have a Native population of at least 25. Woody Island or Leisnoi is not listed therein.

In summary, Protestant produced ample evidence creating substantial doubt as to the validity of the presumption of residency for all of the 285 alleged Village enrollees, excepting Johnny Maliknak and Nick Pavloff. Numerous witnesses conceded that those two men were life-long residents of Woody Island. Therefore, the presumption disappears and the issue of whether the alleged Village had 25 or more residents on April 1, 1970, will be determined as if no presumption had ever been applicable for all but two of the enrollees.

d.

**Did Protestant meet his burden of proving that the alleged Village did not have 25 or more Native residents as of April 1, 1970, and that less than 13 enrollees used the alleged Village during 1970 as a place where they actually lived for a period of time?**

Resolution of the issues in this case requires an examination of the evidence regarding individual's use and occupancy of the alleged Village during the crucial time period from 1960 through 1970. Respondents argue that Protestant failed to meet his burden of proof regarding the issue of whether the alleged Village had 25 or more Native residents as of April 1, 1970, because, with respect to most of the individuals who enrolled to the alleged Village, he did not present specific evidence negating each's subjective intent to return to the alleged Village.

Contrary to Respondents' assertions, such evidence is not required to meet Protestant's burden of proof. Protestant rebutted the presumption of residency for the enrollees and met his ultimate burden of proof by showing that the alleged Village was abandoned. Where the evidence shows that only a few Natives lived in the alleged Village in 1970, that there was no frequent or consistent use of the alleged Village by others, and that the abandonment was not attributable to an act of God or governmental authority within the preceding 10 years, then the need for evidence specific to individuals arises, if at all, only to overcome any such evidence presented by the Respondents.

Respondents and their anthropological experts simply placed too much emphasis upon any tie or connection a Native may have to Woody Island and any expression of desire to return or go to Woody Island. For instance, Mr. Wooley testified that an individual was placed upon Mr. Feichtinger's list of 1970 permanent residents if he or she had an ancestor who lived on Woody Island and he or she expressed an intent to return there, or if he or she expressed an interest in or tie to Woody Island, visited the island for as little as part of one

Exhibit 9

day, and expressed an intent to return there (Tr. 2297-98, 2340).  Someone who has never been to the alleged Village or who has only used the land there for one day or a few days over a long period of time would not be a permanent resident of the alleged Village.

Dr. Davis similarly focused upon a person's ties or connections to Woody Island, stating that any descendant of a person who lived on Woody Island had sufficient ties to be classified as a permanent resident (Tr. 3631; see also Tr. 3444, 3448-49, 3490, 3506-07).  She emphasized that the Natives' society is matrilineal, in which individuals identify with the place where they were born (Tr. 3444, 3448-49).  She testified that the South Village and North Village were clearly defined by kinship, with Ella Chabitnoy serving as the matriarch of the South and Angeline Maliknak being the matriarch of the North (Tr. 3458, 3479-83).  She identified a third group or family to be those persons whose Native identity was tied to the Baptist Mission which once existed on Woody Island (Tr. 3483-85, 3508-09).  She expressed her view that each of these three groups could have qualified separately as a village (Tr. 3633-35).

When asked whether the alleged Village qualified as a Native village in 1970, she opined:

> It was a village in the sense of the continuity of identity and soul of
> shareholders * * *.  It was a village in the sense that people were going back
> * * *.
>
> *         *         *         *         *         *         *
>
> It was a village in the sense that people chose to enroll [there].  There were
> people living there.
>
> *         *         *         *         *         *         *
>
> They have strong links and good memories.

(Tr. 3488-90).

When asked if there was a sense of community among the enrollees, she referred to the many adoptions and tragic deaths of Natives who had lived on Woody Island and stated: "It, it's amazing how much [of a sense of community was elicited during my interviews], given the fact of what had happened, a sense of community in the sense of an identity of soul on Woody."  (Tr. 3506)  When asked to explain what she meant by "soul", she responded that the Natives had fond memories of the island - a connection thereto (Tr. 3506-07).  She continued:

> There wasn't a sense of community that required a physical structure the way
> you and I would think about a town — or the way that we, that the Regs. were
> initially read in terms of a village with a store and that sort of thing. * * * I
> think the village of Woody Island goes beyond the boundaries of the island.

IBLA 96-152

> * * * [I]t was the connection through family, regardless of where they were,
> that gave them the identity of Woody Islandness. * * * When I asked about
> their going to Woody, if they didn't go to Woody, they sure as hell wanted to.

(Tr. 3507-08). She further noted that enrollees "kept the village going" by living, working,
attending church, and socializing together in Kodiak or other places such as Anchorage
(Tr. 3486-88, 3495-96).

At all relevant times, the Village's location, if any, did not exceed the boundaries of
the North Village, South Village, and Garden Beach areas on Woody Island. Contrary to
Dr. Davis' testimony, Natives cannot keep a village going by communing elsewhere. Under
ANCSA, any communing in Kodiak or elsewhere by Woody Island enrollees does not support
the existence of a village at the location on Woody Island or their permanent residency at that
location, but, rather, such communing supports a finding that each Native's permanent
residence is the place of communion.

The problem with the approach of Respondents and their experts is that it deviates
from the statutory, regulatory, and precedential guidance as to what constitutes a Native
village and a permanent resident thereof. The statements or testimony of the Natives and
Dr. Davis that the Natives' have fond memories or a love of Woody Island and an intent to
return do not establish permanent residency. As previously noted, the permanent residency of
a Native cannot be established by fond memories. Many factors come into play, including the
nature and extent of a Native's activities in the various places where the Native dwells; the
factors are not limited to the Native's expressed intentions or mental attitude.

Further, many of the expressions of intent to return to Woody Island did not evidence a
continuing intent to return. The vast majority of potential permanent residents of Woody
Island experienced an erosion of their Native cultural patterns and adopted non-Native
customs, technology, and the like, including long-term residency in another place. They
abandoned the alleged village and life-style associated with "home".

The weight of the evidence shows that, prior to 1970, nearly all of the potential
permanent residents had become part of the modern cash economy, as Mr. Feichtinger
acknowledged (Tr. 1376-78). They chose to live near employment, educational, and medical
services or opportunities and intended to return to live on Woody Island, if at all, only if the
island ever developed such services and opportunities or if their need for such things
dissipated upon retirement or other happenstance.

In other cases where a village was found eligible under ANCSA, despite the impacts
of the modern cash economy upon a traditional subsistence existence, ANCAB emphasized
that the Natives' residency elsewhere for employment and educational purposes was
temporary or seasonal and that the Natives continued to return to live in the village according
to their Native family life-style on a frequent and continuous basis. See Village of Kasaan,
supra, at 24; Village of Council, supra, at 25-26. For those one or two Natives who lived

Exhibit 9

elsewhere for years at a time but were still found to be permanent residents of the village, ANCAB emphasized that they maintained homes in the village. Id.

Unlike those cases, this case involves an alleged village to which the Natives did not continue to return to live both on a frequent and continuous basis and according to their Native family life-style. Nearly all of them returned, if at all, only discontinuously and/or infrequently. Further, nearly all did not return to live but merely to use the island (and not necessarily the alleged Village) on daytrips or very brief overnight stays. That use was often recreational in nature. Many Woody Island enrollees acknowledged that their use of the island was primarily, if not exclusively, recreational. The island was identified as an easily accessible, park-like place to "goof around", "picnic", and the like, only minutes away from Kodiak where a large number of the enrollees lived on a long-term basis. While there was evidence of use for gardening, hunting rabbits, seals, and octopus, fishing, harvesting shellfish, and gathering edibles, such as berries, most of the evidence of use for traditional or subsistence purposes during the decade ending in 1970 is vague as to the amount of such use and the extent of the Natives' reliance upon such use to sustain themselves. Their daytrips or very short visits, often or exclusively for recreational purposes, was not in accordance with the traditional Native family life-style.

Nor is the evidence of home ownership or maintenance on Woody Island very supportive of the alleged permanent residency of the Natives. One of the few Natives who owned or maintained a habitable house in 1970, Ella Chabitnoy, expressed to others the previous year that she did not intend to return to Woody Island because of bad memories and the absence of loved ones. She then sold her property containing two of the habitable houses, the Chabitnoy and Simeonoff houses, to non-Natives in 1971.

With the exception of Christian Simeonoff Hoen and possibly Kelly Simeonoff, Jr., the Simeonoffs did not use the Simeonoff house with any frequency or consistency after the early 1960's, despite often living in Kodiak in close proximity to Woody Island. Several of them enrolled to Uganik and were more involved in building and maintaining a home there. While Christina did pay the taxes on the home for some period of time, she testified that, as of 1970, it was not possible for her to return to Woody Island to live because of the lack of employment opportunities. Kelly Jr. testified that in 1970 he did not visit the island and it was not the center of his Native family life.

None of the ostensible owners of the third and last habitable house in the South Village in 1970, the Fadaoffs, had stayed at the house with any frequency or continuity since 1965. Further, the house was allowed to deteriorate until it was barely habitable by 1970. A few years later they sold the house to Roy Madsen.

In the North Village, the Sundberg house remained standing in 1970, but Esther Sundberg testified that she could not say if Woody Island was considered the center of the Sundberg's family life in 1970 because the Sundberg's were all living in Kodiak. A couple of the family members enrolled to the Village of Litnik, not the alleged Village. The only family

Exhibit 9

member to visit Woody Island with any frequency in the late 1960's and 1970 was Rudy Jr., but his permanent residence must be determined in accordance with that of his parents who were his guardians. Further, the land where the house sat until it collapsed in 1986 is now owned by the Kodiak Island Borough. None of the Sundbergs asserted a claim to the land or otherwise attempted to acquire property on Woody Island. The only permanent residents of the North Village in 1970 were Johnny Maliknak and Nicholas Pavloff, who occupied various houses there over the years.

The cabin on Garden Beach used by Georgi Nekeferoff was not standing by 1970 and there is no good evidence of how often he used or maintained it. There are just vague references of his being on Woody Island or using the cabin when he was not living in the Kodiak jail.

As previously mentioned, an expressed intent to return to a place is an important factor but not the only relevant factor. Further, an expression of subjective intent may be contradicted by objective evidence, and if that objective evidence is neither rebutted nor explained, it will clearly be persuasive. Natives of Afognak, Inc., supra, at 13.

The breakdown of any significant evidence regarding individuals' use and occupancy from 1960 through 1970 is set forth below. If an individual was identified in the Feichtinger Report as being a 1960's resident and/or a 1970 resident of Woody Island, that fact is noted parenthetically following that person's name. As noted by Mr. Feichtinger, the genealogy of nearly all of these individuals can be traced to one or more of six families "whose heritage lies with Woody Island Village." (Ex. L-DOC-108, tab 3, p. 1, tab 4, p. 1) For each family, individual names are indented to reflect generational differences.

Based upon that breakdown as well as the general evidence of use and occupancy of Woody Island, a conclusion is reached for each individual named below as to whether he or she was a permanent resident of the alleged Village on April 1, 1970. For each named individual a determination is also made as to whether he or she lived for a period of time in the alleged Village in 1970.

THE PAVLOFF (a.k.a. PAVLOV) FAMILY: The Pavloff family descends from William E. Pavlov, the Vice-Governor of Alaska from 1858 to 1867. His son, Nicholai W. Pavloff, first took up residency at Woody Island in 1867 (id.). Their use and occupancy is as follows:

1. Angeline Pananarioff Pestrikoff Pavlov Maliknak (dec'd: 1972; res: 1960's)

Her first husband was Larry Pestrikoff (dec'd: 1918). Her second husband was William N. Pavloff (dec'd: 1931), son of Nicholai W. Pavloff. Her third husband, Stephan Maliknak, died in a boating accident in 1958. She was the matriarch of the Pavloff, Maliknak, Frump, Ponchene, and Sundberg families and, until her death, was the owner, by inheritance, of the North Village unperfected homestead and homesites.

She resided on Woody Island for over 50 years until she moved to a nursing home in Seward, Alaska, because of failing health. She moved in 1965 or 1966, just prior to the time that her house on the homestead burned down. Most of her family members had moved away prior to her move to Seward. She died in Seward in 1972.

There is no evidence that she ever returned to Woody Island after moving to Seward. Nor is there testimony or other statements from Angeline as to whether she had a subjective intent to return to Woody Island on April 1, 1970. Mr. Feichtinger did not identify her as a 1970 resident of the alleged Village.

She is enrolled to Woody Island and the Family List shows that she listed Woody Island as her permanent residence on April 1, 1970, and as the place where she resided for an aggregate of 10 years or more. It also lists Seward as the place where she resided for 2 or more years on April 1, 1970. (Tr. 2706, 2804; Exs. S-6Q, p. 13; S-6B, p. 12; L-DOC-96, -108, -122, -346; BIA-2B, pp. 118, 24).

Angeline's permanent residence was the alleged Village until 1965 or 1966. The objective evidence indicates that her permanent residence was Seward thereafter and that she did not live in the alleged Village for a period of time in 1970.

2. Herman Ponchene (dec'd: 1973; res: 1960's)

He lived with Angeline on Woody Island as her common law husband from approximately 1958 until she moved to the nursing home in Seward in 1965 or 1966. There is no evidence of his whereabouts thereafter, except that he died on Woody Island in approximately 1973 and that numerous witnesses did not observe him as one of the persons using Woody Island in the late 1960's and 1970. He did not enroll to Woody Island and no statement or testimony from him was introduced. The Feichtinger Report does not identify him as a 1970 resident. (Tr. 940, 944, 950, 1464-65; Ex. L-DOC-108).

Herman's permanent residence was the alleged Village from approximately 1958 until 1965 or 1966. His permanent residence was not the alleged Village thereafter and he did not live in the alleged Village for a period of time in 1970.

3. Rudolph Sundberg, Sr. (dec'd: 1984; res: 1960's, 1970)
4. Jenny Pestrikoff Sundberg (dec'd: 1972)
5. Esther Marie Sundberg Denato
6. Lillian Sundberg Miller
7. Janet Sundberg Grant
8. Rudolph Sundberg, Jr. (res: 1960's, 1970)
9. Herman Sundberg (dec'd: 1992; res: 1970)
10. Anita Sundberg Hartman (dec'd: 1998; res: 1970)

Rudolph Sr. married Angeline's daughter, Jenny Pestrikoff. Rudolph Jr., Herman,

Exhibit 9

Anita, Esther, Lillian, and Janet are six of their children. Jenny, Rudy Jr., Anita, Lillian, and Janet are the only family members enrolled to the alleged Village. The Feichtinger Report lists only Rudy Sr. and Rudy Jr. as 1960's residents and Rudy Sr., Rudy Jr., Herman, and Anita as 1970 residents.

The family had a home on Woody Island in the North Village (the Sundberg homesite) in which they resided until 1943, at which time they moved to Kodiak for better access to schools, medical facilities, and employment opportunities. They lived in Seward from 1947 to 1950. Thereafter, according to Mr. Feichtinger, and continuing through the 1960's, they resided in Kodiak but "frequented" Woody Island "periodically" or ""on a very regular basis."

After 1943 Rudy Sr. and Jenny stayed overnight on Woody Island at least twice, once in the mid-1960's when Angeline became ill and once in the summer of 1970 when bad weather forced them to stay overnight after a picnic. Jenny was enrolled to Woody Island and died in 1972. She listed Woody Island as her permanent residence on April 1, 1970, but listed Kodiak as the place where she resided for two or more years on April 1, 1970, and for an aggregate of 10 or more years. Rudy Sr. was not enrolled to Woody Island and died in 1984.

Jenny worked part-time in a cannery in Kodiak. Rudy Sr. was a fisherman and a boat builder. According to Mr. Feichtinger, Rudy Sr. went to Woody Island at "regular intervals" to fish during the 1960's. Some witnesses testified to his presence on Woody Island in the 1960's and others did not see him there, including some Natives. He kept a smokehouse there for the fish. He also fished elsewhere.

In the case of Village of Litnik, the ALJ's Recommended Decision notes numerous facts about Rudy Sr. and his daughter Esther. First, they and Esther's six children are enrolled to the Village of Litnik. Second, they each signed an Affidavit on August 14, 1973, stating that Litnik was their permanent residence, that they lived for periods of time periodically and seasonally each year in Litnik, that their residence in Litnik consisted of a tent and campsite, and that they hunted, picnicked, fished, beachcombed, and cooked and salted fish there. Third, a long-time resident of Kodiak identified them as residents of Kodiak.

According to Esther, she, Janet, Lillian, and Anita were all married and living with their families in Kodiak during the 1960's, except for a brief period when Janet lived in Louisiana. They traveled "back and forth" to Woody Island to visit, picnic, pick berries, fish, and beachcomb. Esther identified Rudy Jr. as the only immediate family member who lived on Woody Island for any period of time during the 1960's or 1970.

In 1970 both Esther and her husband were employed in Kodiak. They and their children twice visited Woody Island that year. She testified that she considers Woody Island to be "home" and would like to return there to live when she retires. When asked whether the Sundberg family considered Woody Island to be the center of its family life in 1970, Esther responded that she could not say whether they did or not, as everyone was living in Kodiak.

Prior to 1970, Janet and her family moved to Kenai, Alaska, where she lived until her death. Lillian moved to the lower-48 States in 1986. Each of them listed Woody Island as her permanent residence on April 1, 1970, but listed Kodiak as the place where she resided for two or more years on April 1, 1970, and for an aggregate of 10 or more years.

Anita was born on September 19, 1937. According to her 1995 affidavit, she considers Woody Island to be "home" and she went there "regularly" in the "past", but stopped going there in 1990 because of arthritis. She stated that she and her family went frequently to Woody Island in the 1960's to visit her grandmother Angeline Maliknak, and to reminisce about old times. Her sister Esther believed that Anita visited Woody Island in 1970 to picnic and fish, and probably stayed overnight on the family fishing boat. The Family List shows that Anita identified Woody Island as her permanent residence on April 1, 1970, but identified Kodiak as the place where she lived for two or more years on April 1, 1970, and as the place where she resided for an aggregate of ten years or more.

Rudy Jr. is developmentally disabled and his parents were his legal guardians until their deaths. From his birth in 1934 until 1941 he lived on Woody Island. He then lived in an institution in Oregon until 1960, when he returned to Alaska. Of the members of the Sundberg family, he used Woody Island the most during the 1960's. He lived with his parents at their house in Kodiak but frequented and sometimes lived on Woody Island until the early 1970's. Other than Nick Pavloff and Johnny Maliknak, he was the Native seen most often on Woody Island during the late 1960's. He was also observed frequently on Woody Island by several witnesses in 1970. However, he was hospitalized in Valdez, Alaska, at least for part of 1970, as his sister Esther testified that he was hospitalized there in 1970 and Valdez is identified on the Family List as the place where he resided for two or more years on April 1, 1970. Woody Island is identified as his place of permanent residence on April 1, 1970, and Kodiak as the place where he resided for an aggregate of 10 years or more. KANA built a small house for him on Woody Island in 1972, but he has been an inpatient at the Kodiak Mental Health Center since the early 1970's.

Herman was born April 13, 1947. According to the Feichtinger Report, Herman "was brought up frequenting Woody Island" and "spent a great deal of time on Woody Island with his father, [including] the year of 1970." Mr. Feichtinger testified that Herman "probably" lived on Woody Island in 1970. There is little evidence to support his conclusions regarding Herman's activities in 1970.

In fact, Esther testified that Herman was serving in the military in Vietnam in 1970. Upon his high school graduation in 1967 he joined the military and served for four years. Thereafter, he lived in Kodiak and then moved to Anchorage where he died. He was enrolled to the Natives of Kodiak. (Leisnoi's Answering Brief, p. 172; Exs. L-DOC-73, -96, -108, 118, -122, -176, -180, -182, -346; BIA-2B, pp. 118, 114, 112-11,14; Tr. 245, 248-54, 305-10, 417, 419, 426, 944, 949-50, 1346-47, 1458, 1464, 1587, 1638, 1683-85, 1957, 2033, 2070-71, 2712, 2724, 2731, 2808, 2810, 2813-22, 2825, 2828-52).

Exhibit 9

The objective evidence shows that none of the Sundbergs, except Rudy Jr., lived on Woody Island during the 1960's or 1970. However, Rudy Jr.'s residency must be determined in accordance with his parents' residency because they were his guardians during the decade ending in 1970.

The Sundbergs all resided in Kodiak. There are only vague statements as to the frequency and consistency of their use of Woody Island, such as they went "back and forth" from Kodiak to Woody Island or they "frequented" or "periodically" used Woody Island. Other people in the area identified them as residents of Kodiak and did not identify them, except Rudy Jr., as frequent users of Woody Island during the decade ending in 1970.

There is little to suggest that Woody Island, as opposed to Kodiak, was the center of their Native family life. Many years prior to 1960 they chose to live where opportunities for employment, schooling, and medical care existed. There is no evidence that they substantially relied upon Woody Island for subsistence needs after making that choice. There are only vague references to picking berries and fishing (which may have been recreational in nature) in addition to visiting, picnicking, and beachcombing there. Rudy Sr. apparently did catch and dry some fish for subsistence purposes, but he also did this elsewhere, including at Litnik, where he chose to enroll. Nor is there evidence of substantial social interaction on Woody Island in the 1960's, especially after Angeline Maliknak left the island. Esther referenced only two trips there with her parents during the decade ending in 1970.

Statements or testimony regarding any intent to return to Woody Island is limited to Esther's testimony that she intends to return there when she retires and Anita's statement in her affidavit that she considers Woody Island to be "home" and, if not for her health problems, she would return regularly as in the past to visit and reminisce. Esther's testimony does not evidence an intent to return on April 1, 1970. Further, both she and Rudy Sr. enrolled to Litnik, and executed statements and affidavits in support of their enrollment there. Anita's expressed intent to return to visit and reminisce is not sufficient to overcome the evidence that she was a permanent resident of Kodiak in 1970.

The record shows that none of them were permanent residents of the alleged Village on April 1, 1970. It further shows that none of them, except Rudy Jr., lived for a period of time in the alleged Village in 1970.

11. <u>Natalie Ponchene</u> (res: 1960's)
12. <u>Johnny Ponchene</u>

They are the children of Florence Ponchene, who is the sister of Herman Ponchene. Neither Natalie nor Johnny are enrolled to Woody Island and no testimony or statements from either of them were introduced into evidence.

Natalie was raised at the Kodiak Baptist Mission and the Ponchene family lived in Kodiak, not Woody Island. She cohabitated "on and off" with Johnny Maliknak on Woody

Exhibit 9

IBLA 96-152

Island for unspecified periods of time, including periods in the early 1960's and in 1995. The Feichtinger Report lists her address to be a hotel in Kodiak and does not list her as a 1970 resident of Woody Island. A couple of witnesses observed a girlfriend of Johnny Maliknak's with him on Woody Island in 1970, but none of them identified the girlfriend as being Natalie. No witness specifically identified her as having lived for a period of time on Woody Island or as having frequented it in 1970.

Johnny Ponchene lived "on and off" with Nick and Mary Pavloff for unspecified periods of time in the early 1960's. In 1963 and 1964 he commuted from Kodiak, staying overnight on Woody Island only occasionally, while he worked on clearing land for the FAA VORTAC site on Woody Island. The Feichtinger Report does not list him as a 1960's resident or a 1970 resident of Woody Island. (Exs. L-DOC-108, -124, -125, -129, -176, -346; L-CHART-32; Tr. 485, 518-19, 567, 645, 940, 1464-65, 1685, 2397-2420).

The weight of the evidence indicates that neither of them was a permanent resident of the alleged Village on April 1, 1970, and neither lived there for a period of time in 1970.

13. <u>Nicholas William Pavloff, Sr.</u> (dec'd: 1978; res: 1960's & 1970)

He was the son of Angeline and William N. Pavloff and a lifelong resident of Woody Island. He lived in the Pavloff houses, the Frump home, and a house built for him by KANA. He was married twice, first to Christine Malutin and then to Mary Ponchene. Contrary to Protestant's contentions, he is enrolled to Woody Island, as he is listed on the certified Native Roll with his last name misspelled as "Parloff" (Exs. S-6O, pp. 8-15; L-DOC-176; BIA-2B, pp. 158, 22).

His permanent residence was the alleged Village on April 1, 1970, and he did live there for a period of time in 1970.

14. <u>Nicholas A. "Andy" Pavloff Jr.</u> (Res: 1960's & 1970)
15. <u>Betty Pavloff Lind</u> (Res: 1970)

Nicholas and Betty were born on November 18, 1953, and November 29, 1952, respectively, to Nicholas William Pavloff, Sr. and Christine Malutin. Neither Nicholas nor Betty are enrolled to Woody Island and no sworn statements or testimony from them were introduced. Unlike Leisnoi, Koniag does not contend that either of them were permanent residents of Woody Island in 1970.

There is an unsworn interview of them in which Betty states that she never lived on Woody Island. Nicholas remembers living on Woody Island before his parents divorced in the late 1950's.

Thereafter, both Nicholas and Betty lived with their mother in Kodiak for approximately one year. During that year they visited their father at Woody Island on

Exhibit 9

weekends. They then moved to Karluk where they were raised by their maternal grandparents, Herman and Tanya Malutin.

Betty never returned to Woody Island. Nicholas returned to visit his father periodically through the 1960's and 1970's, including for two weeks every summer until approximately 1967. Mr. Feichtinger testified that Nicholas "was not in all likelihood there in 1970." (Ex. L-DOC-161, p. 189, 242; Ex. L-DOC-168, pp. 5-6, 13-14; Tr. 955-56).

Because they were both minors on April 1, 1970, their permanent residency shall be determined according to that of their maternal grandparents, and not according to that of their father or mother, because, during the decade ending in 1970, the minors lived with their grandparents who stood in loco parentis to the minors. The grandparents lived in Karluk. Neither their permanent residence nor that of the minors was the alleged Village on April 1, 1970. Further, neither Betty nor Nicholas lived there for a period of time in 1970.

16. <u>Mary Ponchene Fadaoff Pavloff</u> (dec'd: 1965; res: 1960's)
17. <u>William Nicholas Pavloff</u> (dec'd: 1985; res: 1960's)

Mary is the niece of Herman Ponchene and became a Woody Island resident when she married Edson Fadaoff, Sr., who was the son of Ella and Nicholas Fadeef (Fadaoff). Mary and Edson had two sons, Edson Fadaoff, Jr., and Joseph Fadaoff. After Edson Sr. disappeared and was presumed drowned in 1958, she married Nicholas William Pavloff, Sr. They had one son, William Nicholas Pavloff, born in 1961.

Mary, Nicholas, and the three boys lived on Woody Island, first in the Fadaoff/Madsen home at Site 23 and then in a home built by Nicholas near the beach in the North Village. Mary was diagnosed with cancer in approximately 1963 and she died of the disease in 1965.

Thereafter, Edson Jr. and Joseph were adopted by Ellen and Frank Pagano. William briefly lived with the Richard Hartman family before being adopted and raised by an unnamed family in Anchorage. During his adolescence William visited his father on Woody Island several times, staying approximately two weeks on one occasion.

Neither Mary nor William are enrolled to Woody Island. No statement from either of them was introduced into the record. (Exs. S-6A, p. 22; S-6B, pp. 14-15; S-6O, pp. 8-12, 16-17, 35; L-DOC-73, -79, -103, -108, -129, -346; Tr. 160-69, 218, 939, 941, 952).

Mary was a permanent resident of Woody Island until her death in 1965. By reason of her death, she was not a permanent residence of the alleged Village in 1970 and did not live there for a period of time that year.

Because William was a minor in 1970, his permanent residency shall be determined according to the permanent residence of his adoptive parents. His parents resided in Anchorage and there is no evidence that they were permanent residents of Woody Island in

Exhibit 9