resided for two or more years on April 1, 1970, and Seward as the place where he resided for an aggregate of 10 or more years and the place where he was born.

His parents lived in Seward from the 1940's until they moved the family to Kodiak in 1963. They never lived on Woody Island but recreated there, picnicking, beachcombing, and fishing. They moved back to Seward in 1976. His mother and the rest of his family enrolled to Shungnak.

George lived with his parents until sometime in 1970 when he took up separate residency in Kodiak. That year he also graduated from high school. During his high school years, including 1970, he recreated on Woody Island and other islands during the summer, beachcombing, playing, picnicking, fishing, and "goofing around." George testified at the hearing that he loved Woody Island and that he would like to live there if economics would permit it, but he continued to live in Kodiak up through the date of hearing. (Tr. 248-54, 423, 1009-10, 3171-85; Exs. BIA-2B, p. 31; L-DOC-385, p. 7,003).

George reached majority only 12 days before April 1, 1970. It is unclear whether he moved out of his parents home in Kodiak before or after he reached the age of majority, but it is clear that he continued residing in Kodiak.

His and his parents' only Woody Island ties and activities are recreational. Even the frequency of their mere recreational use was not specified, except by Mr. Feichtinger without supporting evidence. Several witnesses never saw George on Woody Island in 1970 or any other time. The alleged Village neither served as their home or the center of their Native family life at any time.

In sum, the alleged Village was not George's permanent residence, whether determined according to his parents' permanent residence (either Kodiak, Seward, or Shungnak) or otherwise. Nor did the vague testimony of "goofing around" on Woody Island establish that George lived in the alleged Village for a period of time in 1970.

87. Anna Kerr Blinn Bowers (res: 1970)

She was born in 1922 in Seldovia, Alaska. Her father is Mike Kerr, who moved his family to Kodiak in 1924. From that point forward Anna has resided in Kodiak, except for the year 1930, when she stayed at the Baptist Mission on Woody Island.

After her parents divorced, her father married Anna's stepmother, Grace Amuknuk, in approximately 1928. Grace was raised in the Woody Island Baptist Mission.

Anna married in 1942 and eventually had children. She and her family visited Woody Island "often" on daytrips to picnic, beachcomb, and pick berries during the decade ending in 1970, including two or three visits in 1970. The only time she stayed overnight was when she worked at Camp Woody prior to 1963.

Exhibit 9

During the 1960's Kodiak was the place where she was employed, registered to vote, and licensed to drive. She testified that she considered Kodiak to be her home, but that she would like to live on Woody Island if she had a chance.

She and many of her relatives are enrolled to Woody Island, although none of them lived there after 1940. She listed Woody Island as her permanent residence on April 1, 1970, and as the place where she resided for two or more years on April 1, 1970, but listed Kodiak as the place where she resided for an aggregate of 10 or more years. (Exs. L-DOC-51, -108, tab 4, p. 17; BIA-2B, p. 73; Tr. 248-54, 305-10, 423, 1009, 3211-29, 3233, 3245-48, 3250-51).

The evidence shows that Anna's home and permanent residence on April 1, 1970, was Kodiak, not the alleged Village, and that she did not live in the alleged Village for a period of time in 1970. Her testimony that she visited Woody Island "often" is vague. In 1970 she visited for only two or three daytrips, which is less than "often." Several witnesses never saw her on Woody Island and knew her to be a resident of Kodiak. She did not stay overnight and her use was primarily, if not wholly, recreational.

88. <u>Georgi Nekeferoff</u> (dec'd; res: 1960's, 1970)

Little is known about Georgi's life prior to World War II. Derivations of his family name, Nekeferoff, are found on early census records of Woody Island and the records of the Baptist Mission. Several Nekeferoff's are listed as attending the Longwood School on Woody Island during the 1930's.

Georgi, now deceased, never married and had no children. He did not enroll to Woody Island. No statements or testimony from him were introduced into evidence.

During the decade ending in 1970, the Nekeferoff family residence was in Kodiak and Georgi lived primarily in the Kodiak jail because of his alcoholism. He was kept there more for his own protection than as punishment. He cooked and served as a trustee at the jail. He had a "special" room there and a "special" arrangement with the Kodiak Police Chief. There is even evidence that the Police Chief may have been Georgi's legal guardian, managing his funds so that Georgi would not spend them all on alcohol.

Georgi also spent time on Woody Island when he was not in jail. He lived at times in an old cabin on the Garden Beach area of Woody Island. That cabin was dilapidated by the mid-1960's and had collapsed by 1970. There is conflicting, uncertain, and vague testimony as to whether he was alive in 1970 and whether, how, and when he used Woody Island in the 1960's and 1970. (Tr. 248-54, 305-10, 423, 1009, 1469-70, 1597-98, 1980-83, 2809-10, 2879-80; Exs. L-DOC-129, -173, -174, -176, -420)

The evidence does not establish that Georgi was a permanent resident of Woody Island on April 1, 1970. There is no subjective evidence of his intent to return there. The objective

Exhibit 9

evidence shows that he spent the vast majority of his time living in Kodiak. His ties to Woody Island and use thereof during the decade ending in 1970 are vague and uncertain. By 1970 the Garden Beach cabin had collapsed and the jail and family residence were in Kodiak.

89. Karl Armstrong, Jr. (dec'd: 1983; res: 1960's, 1970)

Karl was born in 1927 to Afanasiia Rysev, daughter of Sophia Pestrikov and Vasilli Rysev, all of whom lived on Woody Island. Karl and his mother left Woody Island in 1928. He testified via deposition that he did not return to live on Woody Island until 1957 or 1958. In the meantime, he lived and worked for newspapers in Kodiak and Anchorage. In 1957 he moved back to Kodiak from Anchorage and unsuccessfully attempted to acquire land, first in Kodiak and then on Near Island, under the Native Allotment Act.

During the decade ending in 1970, he resided and was employed in Kodiak. His primary occupation was writing for and managing the local newspaper. Several witnesses testified that Karl lived in Kodiak, not Woody Island, and/or that they had never seen him on Woody Island.

He stated that he lived on Woody Island for 3 months in the summer of 1957 or 1958, off and on for a total of approximately 60 days in 1968, and non-winter weekends totaling approximately 35 days per year from 1969 to 1972. From 1968 to 1972 he did not stay for more than 5 days at one time. He did not own property there, but stayed primarily in the Simeonoff house and assisted in maintaining the garden there. He falsely or misleadingly indicated in an affidavit submitted with Leisnoi's application that he lived there since 1963 and that a house (the Simeonoff house) was his house. After 1972 he did not spend much time on Woody Island.

Charles Naughton confirmed that Karl did visit Woody Island and Christina Hoen acknowledged that she gave Karl permission to use the Simeonoff house. His primary activities on Woody Island were writing for the newspaper and recreating. He also stated that he hunted rabbit for subsistence purposes, but Charles Naughton testified that Karl merely walked with him when hunting rabbits and preferred to sit on the beach.

Karl is enrolled to Woody Island. He testified that he regarded Woody Island as his "home," but the Family List shows that he listed Kodiak as his permanent residence on April 1, 1970, as the place where he resided for two or more years on April 1, 1970, and as the place where he resided for an aggregate of 10 or more years. (Tr. 296, 300, 422, 467, 946, 1009, 2034; Exs. BIA-2B, p. 146; S-6A, p. 33; S-6B, p. 17; S-6F, p. 53; S-6J, pp. 5, 30-31, 40; Armstrong Depo.).

From 1928 to 1967 Karl rarely ventured to Woody Island and it clearly was not the center of his Native family life. He established long-term employment and residency in Anchorage and Kodiak. While he began visiting the island more regularly during the 1968 to 1972 period, Karl never relied upon Woody Island for subsistence purposes. He recreated and

Exhibit 9

wrote to sustain his newspaper business in Kodiak. For many decades up through 1970 the center of his Native family life was Kodiak where he had long been part of the modern cash economy. He was not a permanent resident of the alleged Village on April 1, 1970.

However, his use of the alleged Village for multiple weekends totaling approximately 35 days in 1970 arguably qualifies him as an enrollee who lived there for a period of time in 1970.

90. <u>Roy Madsen</u>

Testimony, affidavits, and an unsworn interview of him were introduced into evidence. He was born in Kanatak, Alaska, in 1923. In approximately 1927 his family moved to Kodiak. Thereafter, he has resided in Kodiak, except for approximately 15 years during which he attended college, served in the military, and practiced law in Oregon. By approximately 1961 he had returned to Kodiak and eventually became a Superior Court Judge in Alaska.

As a child he visited his sister and cousins who were being raised at the Baptist Mission orphanage on Woody Island. He began visiting the island again in 1966 when he acquired a boat so that he was able to travel to the island. He made several daytrips there in 1970 to pick berries and fish. In 1970 he was living with his wife and children in Kodiak, where he practiced law and was a member of KANA, the Rotary Club, the Navy League, and the Elks Lodge.

During his childhood he also spent time with his aunt in Karluk. As an adolescent he spent summers with his father, a big game hunting guide, in Uganik and Eyak Bay. In 1961 he bought property in Kashuryak Bay, where Port Lions is now located. He had ancestors from Ninilchik and from Afognak.

Based upon his ties and connections to many places, he believed that he could have enrolled to any one of approximately ten Native villages. He testified that the location of his permanent place of abode intended by him to be his actual home in 1970 was Kodiak. He further stated that the center of his Native family life to which he had the intent to return when absent from that place in 1970 could have been Woody Island, Karluk, Port Lions, Uganik, Eyak, or any of several other places. He thought that any of them could have qualified as his permanent resident up until the date upon which he enrolled and chose Woody Island. However, he first enrolled to Natives of Kodiak but later changed his enrollment to Woody Island.

The Family List indicates that he listed Woody Island as his permanent residence on April 1, 1970, but listed Kodiak as the place where he resided for two or more years on April 1, 1970, and for an aggregate of 10 or more years. He is not listed in the Feichtinger Report as either a 1960's resident or a 1970 resident of Woody Island.

Exhibit 9

In the mid-1970's he began the process of acquiring the property upon which the Fadaoff/Madsen house is located. Once he acquired it, he spent the entire month of August on Woody Island for several years. (Exs. L-DOC-172, -173, -174, BIA-2B, p. 118; Tr. 2862-80, 2884-87, 2909-12, 2917, 2925)

The evidence does not show that he frequently or consistently used Woody Island during the decade ending in 1970. He did not state how often or how long he visited Woody Island other than mentioning several daytrips in 1970. Some childhood visits to the island and several daytrips 35 years later do not make the alleged Village the center of his Native family life.

Kodiak was his "home" and the place to which he initially enrolled. He had ties to many places but always returned to Kodiak. The evidence shows that Kodiak, and not the alleged Village, was his permanent residence as of April 1, 1970. Further, he did not live for a period of time in the alleged Village in 1970.

## 91. Fred Zharoff

He is not listed as a 1960's resident or a 1970 resident in the Feichtinger Report. He is enrolled to Woody Island. When he enrolled to Woody Island, he understood that he could enroll to any place where he wanted to live or where he had roots.

He listed Woody Island as his permanent residence on April 1, 1970, but listed Kodiak as the place where he resided for two or more years on April 1, 1970, and for an aggregate of 10 or more years. Statements from him were introduced via live testimony, affidavit, and unsworn interview.

He was born in 1944 and raised in Kodiak. His family owned a home in Kodiak. Except for periods of college attendance or service in the military or the State legislature, both he and his parents have lived in Kodiak all their lives.

Beginning in the early 1960's, he and his friends, both Native and non-Native, began frequenting Woody Island for recreational purposes, including camping, hiking, picking berries, and hunting rabbits. They also engaged in subsistence activities, including cutting firewood, hunting seals and ducks, and fishing. In 1970 he went there with his wife on one occasion to hunt rabbits. He thought "that if [he] ever got a chance to live permanently on Woody Island [he] would like to do so."

In approximately 1977 he, his wife, and children moved to the newly renovated housing at the old FAA site and stayed for six to eight months. They moved back to Kodiak for better access to schools and employment, as it was not safe to commute to Kodiak.

He has served on Leisnoi's Board of Directors. He referred to both the Kodiak Archipelago and Woody Island as "home." (Exs. BIA-2B, p. 115; L-DOC-437, -438;

Exhibit 9

IBLA 96-152

Tr. 3083-84, 3086-88, 3092-96, 31005-06, 3112-14)

Up through 1970, he had never lived on Woody Island but had only resided in Kodiak. His use of Woody Island was primarily recreational with adolescent friends. His only referenced use as a married adult up to that time was a single visit to hunt rabbit. This evidence shows that Kodiak, and not the alleged Village, was his permanent residence on April 1, 1970, and that he did not live for a period of time in the alleged Village in 1970.

92. Dorothy Bactad

She is not listed as a 1960's resident or 1970 resident of the alleged Village in the Feichtinger Report. Nor did Koniag list her as a 1970 permanent resident. The only statement from her introduced into evidence is a 1996 unsworn interview of her.

She is enrolled to Woody Island. The Family List shows that she listed Woody Island as her permanent residence on April 1, 1970, but listed Seattle, Washington, as her address and the place where she resided for two or more years on April 1, 1970, and Kodiak as the place where she resided for an aggregate of 10 or more years.

She was raised in the Woody Island Baptist Mission from 1924 to 1936. She left Woody Island in 1936 and never returned. She stated that she reminisces about the island and would love to go back there. (Exs. L-DOC-46; BIA-2B, p. 88)

She clearly was not a permanent resident of the alleged Village on April 1, 1970, and did not live there for a period of time in 1970. She has not set foot on Woody Island since 1936. This objective evidence outweighs her general statement that she "would love to go back there." Her statement, in light of the evidence, does not show that in 1970 she had an intent to return there or was a permanent resident.

93. Sara Chokwak

She is not listed as a 1960's resident or 1970 resident of the alleged Village in the Feichtinger Report. Nor did Koniag list her as a 1970 permanent resident. The only statement from her introduced into evidence is a 1996 unsworn interview of her.

She is enrolled to Woody Island. The Family List shows that she listed Woody Island as her permanent residence on April 1, 1970, but listed Kodiak as the place where she resided for two or more years on April 1, 1970, and Old Harbor as the place where she resided for an aggregate of 10 or more years.

She was born into the Lowell family in 1929 on Woody Island. She lived there until she was 9 years old. In 1938 she moved to Old Harbor and was still living in Old Harbor at the time of the 1964 earthquake. Up through 1970 she returned to Woody Island only twice, once in 1950 and once in 1966 to cook at Camp Woody. Referring to the 1950 visit, she

Exhibit 9

wished she could have stayed there more.  She also visited there in the summer of 1996.
(Exs. L-DOC-87; BIA-2B, p. 119)

The evidence does not show that she was a permanent resident of the alleged Village
on April 1, 1970, or that she lived there for a period of time in 1970.  She visited only twice in
the 32 years from 1938 to 1970.  This does not show that she intended to return in 1970 or that
the alleged village was the center of her Native family life.

94.  Neil Sargent

He is not listed as a 1960's resident or 1970 resident of the alleged Village in the
Feichtinger Report.  Nor did Koniag list him as a 1970 permanent resident.  The only
statement from him introduced into evidence is a 1998 unsworn interview of him.

He is enrolled to Woody Island.  The Family List shows that he listed Woody Island as
his permanent residence on April 1, 1970, but did not identify the place where he resided for
two or more years on April 1, 1970, and listed Kodiak as the place where he resided for an
aggregate of 10 or more years.  By 1972 he was living in New York.

His parents were born and lived their whole lives in Kodiak.  He too was born and
lived most of his life in Kodiak.  He was born in approximately 1920.  When he was a child,
his mother took him to Woody Island to attend the Russian Orthodox Church.  The only other
times he was on Woody Island were in 1961, when he assisted in rebuilding the dock there,
and sometime around 1970, when he merely set foot on the beach.  (Exs. L-DOC-340; BIA-
2B, p. 80; L-DOC-161, p. 280)

The record does not show that his permanent residence was the alleged Village on
April 1, 1970, or that he lived there for a period of time in 1970.  His ties and visits to Woody
Island have been minimal.  There is no evidence that the alleged Village was the center of his
Native family life, that he ever lived there, or that he intended it to be his home.

––––––––––––

Protestant clearly met his burden of proving that the alleged Village did not have 25 or
more Native permanent residents on April 1, 1970.  Other than Johnny Maliknak and Nicholas
Pavloff, who were certainly permanent residents, there are only a few more Natives (such as
Christina Hoen and her children) who even came close to meeting the standard of permanent
residency.  The record shows that there were far less than 25 Native permanent residents of
the alleged Village on April 1, 1970.

Protestant also proved by a preponderance of the evidence that the alleged Village did
not met the requirement that at least 13 enrollees to the alleged Village must have used it
during 1970 as a place where they actually lived for a period of time.  Those enrollees who
certainly lived in the alleged Village for a period of time in 1970 are Johnny Maliknak and

Exhibit 9

Nicholas Pavloff. Karl Armstrong, Rudy Sundberg Jr., Christina Hoen, Cien Weeks Hoen, and Chrislyn Hoen are enrollees who qualify more likely than not. The only other enrollees who come close to qualifying are Marie Redick Unger and three of her children, Larry, William, and Robert, who stayed there for a one week-long visit. Assuming, arguendo, that they qualify, there are, at most, 11 enrollees who lived for a period of time in the alleged Village in 1970.

3.

**Was the "act of God" proviso invoked?**

Respondents argue that any failure to meet the subsection 2651.2(b)(2) occupancy requirement of at least 13 enrollees having used the alleged Village during 1970 as a place where they actually lived for a period of time was excused under the "act of God" proviso by the following events: (1) the 1964 earthquake and tidal wave, (2) the closing of the school on Woody Island in 1969, (3) the FAA's 1963 restrictions on ferry usage, (4) the Borough's imposition of taxes on real property on Woody Island, beginning in the mid- to late-1960's, and (5) the Vietnam War. As previously mentioned, subsection 2651.2(b)(2) contains and is subject to the "act of God" proviso. Under that proviso, the occupancy requirement is excused if an act of God or government authority within the 10 years preceding April 1, 1970, results in the temporary unoccupancy of a traditional village. Natives of Afognak, Inc., supra, at 21-23.[3]

Respondents argue that Protestant has the burden of proving not only that a state of unoccupancy existed, but also that such unoccupancy was not "temporary" within the meaning of the proviso or that there is no causal connection between the fact that an act of God or government authority occurred, and the fact that the village was subsequently unoccupied in 1970. See Natives of Afognak, Inc., supra, at 21-22. However, his burden to show that any state of unoccupancy was not "temporary" or causally connected to an act of God or government authority is dependent upon whether the "act of God" proviso was invoked. See id.; Village of Kaguyak, supra, at 29.

Resolution of the issue of whether the proviso was invoked also effects evaluation of the issue of whether the alleged Village satisfies the requirement of 43 C.F.R. § 2651.2(b)(1), which provides that the alleged Village must have had 25 or more Native residents as of April 1, 1970. As previously mentioned, if the "act of God" proviso excuses the occupancy requirement, it would be very difficult for Protestant to prove that there were not 25 Native residents. See, e.g., Natives of Afognak, Inc., supra, at 23.

---

[3]The proviso does not excuse the requirement that the alleged Village must have had 25 or more Native residents as of April 1, 1970, Bureau of Sports Fisheries & Wildlife v. Village of Kaguyak, ANCAB VE 74-9 (June 10, 1974) at 31, nor does it excuse the requirement that the alleged Village must have an identifiable location. Village of Litnik, supra, at 4.

                                                    Exhibit 9

The "act of God" proviso may be invoked either in the eligibility Determination or by a prima facie showing at the hearing of the elements necessary for its invocation. See id. Leisnoi argues that the proviso was invoked in the Area Director's eligibility Determination based upon two facts.

First, Mr. Fitzpatrick's report identifies the 1964 earthquake and tidal wave and removal of the school and FAA presence in 1969 as acts of God or government authority. Second, the Area Director found in the alleged Village's Certificate of Eligibility that it "complies with the criteria set forth in 43 CFR 2651.2(b)(2)." From these facts, Leisnoi concludes that the Area Director relied upon that portion of Mr. Fitzpatrick's report, that the reference to the criteria of subsection 2651.2(b)(2) pertains to the "act of God" proviso, and that the Area Director invoked that proviso.

Leisnoi's argument cannot be sustained. The Area Director never mentioned an act of God or government authority or the "act of God" proviso in the eligibility Determination or related findings of fact. Instead, he concurred with another portion of Mr. Fitzpatrick's report in which he concluded that the alleged Village met the occupancy requirement of at least 13 enrollees having used the alleged Village during 1970 as a place where they actually lived for a period of time. This finding obviated any need to invoke or even mention an act of God or the "act of God" proviso.

The fact that the Certificate cites compliance with subsection 2651.2(b)(2) is reasonably explained as a reference to compliance with the actual requirements contained therein: that the alleged Village have an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style and that at least 13 enrollees thereto must have used the village during 1970 as a place where they actually lived for a period of time. This is precisely what the Area Director found in the eligibility Determination and related findings.

If he had meant to invoke the "act of God" provision, he presumably would have at least mentioned an act of God or government authority and the proviso in the eligibility Determination and related findings. If such were the case, one would expect the Area Director to state in the Determination, findings, and/or Certificate that compliance with the subsection 2651.2(b)(2) requirements is excused by an act of God or government authority rather than to find compliance with those requirements.

The eligibility Determination and related findings of fact did not invoke the "act of God" proviso. There was no need for its invocation because invocation is necessary only to excuse a temporary state of unoccupancy in 1970 and the Area Director found that the occupancy requirement had been met.

Because the Area Director did not invoke the "act of God" proviso in the eligibility Determination, the question then becomes whether the proviso was invoked by a prima facie showing at the hearing. ANCAB has held that the "act of God" proviso may be invoked not

only in the eligibility Determination, but also by a prima facie showing that the alleged Village was known as a "traditional" village, that an act of God or government authority occurred within the 10 years preceding April 1, 1970, that the act of God or government authority caused unoccupancy of the village, and that this unoccupancy was "temporary" within the meaning of the proviso. See Village of Kaguyak, supra, at 29. The Respondents failed to make this showing.

a.

### Was the alleged Village known as a traditional village?

While there is no dispute that a traditional village once existed on the west side of Woody Island, Protestant maintains that the village must have been, but was not, known as a traditional village at the time of the alleged acts of God or government authority. He argues that "traditional village" must be construed as meaning more than simply an "historic village" or any unoccupied place that once had been the site of a traditional village. According to Protestant, the requirement "known as a traditional village" must be construed as requiring, at the very least, that, at the time of such acts, the village must have had an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style, must have constituted a "Native village" within the meaning of Section 3(c) of ANCSA, and must have been used by at least 13 enrollees as a place where they lived for a period of time. Respondents provided no arguments that directly respond to Protestant's contentions.

Protestant's contentions cannot be sustained. The alleged requirements are used to determine whether a village is eligible as of April 1, 1970. A place may be known as a traditional village yet not meet the eligibility standards for a period immediately preceding the acts of God or governmental authority.

Subsection 2651.2(b)(2), as originally proposed, stated, "The village must have been in existence as an established village on April 1, 1970, and separate and not connected with or a part of a city, town, or other identifiable community settlement." 38 Fed. Reg. 6504, 6508. The reasons for the change in the language are not published, but a reasonable guess can be made. Both the phrase "evidenced by occupancy consistent with the Natives' own cultural patterns and life style" and the phrase "known as a traditional village" appear to be substitute language for "separate and not connected with or a part of a city, town, or other identifiable community settlement." The apparent purpose of the language is to distinguish a community defined by Native cultural patterns and life-style from other communities.

A more basic question is whether it was actually known as a community or village at the time the alleged acts of God or governmental authority occurred. The nature and extent of occupancy or unoccupancy during the period preceding such acts may be such that a place is not known or is no longer known as "traditional" or as a "village".

The evidence shows that the alleged Village was known as a traditional village at least

Exhibit 9

until the end of World War II and that by the late-1960's it was no longer known as a village. Numerous witnesses and reports dealing with Native villages in the area did not recognize the alleged Village as a Native village by that time (see Subpart 4 of this Part below). Sometime between 1945 and the late-1960's the alleged Village ceased to be known as a village. That point in time is difficult to pinpoint.

The weight of the evidence shows that it was not known as a village in 1963 when the first alleged act of God or governmental authority occurred. The alleged Village is not mentioned in a Government report "to evaluate the extent and nature of damage to the communities on Kodiak Island and the islands nearby [caused by the 1964 earthquake]." (Ex. L-BOOK-80) The authors investigated the effects in May and July of 1964 and were clearly aware of the existence of Woody Island because the island is mentioned twice. The omission of the alleged Village strongly suggests that it was no longer known as a community or village. Respondents own witness, Bruce Robertson, testified that no village existed on Woody Island in 1959 or 1960 (Tr. 1725-26). Consequently, Respondents failed to make a showing that the alleged Village was known as a traditional village.

### b.

**Did the occurrence of one or more acts of God or government authority between April 1, 1960 and April 1, 1970 cause a temporary unoccupancy of the village in 1970?**

Respondents also failed to make a showing that the occurrence of one or more acts of God or government authority during the 1960's caused the unoccupancy of the village in 1970 or that the unoccupancy was temporary. The beginnings of the depopulation of the island can be traced back at least as far as the Katmai eruption of 1912 and Spanish flu epidemic of 1918. From 1910 to 1920 the population, including Mission children, decreased from 168 to 104. In the 1920's the population stabilized before once again plummeting in the 1930's to 54 due, in large part, to the relocation of the Mission to Kodiak.

The lure of better opportunities for employment, schooling, medical services, and other amenities also contributed to the relocation of Woody Island's population to Kodiak and other places. With the initiation of construction of the Naval base near Kodiak in 1939, Kodiak experienced a boom in employment opportunities and amenities which attracted Woody Islanders there, especially with the closing of the Woody Island school in 1943. By 1944 Woody Island's population was down to 37.

Long-time residents Ella Chabitnoy and Natalie Simeonoff both acknowledged the exodus from Woody Island preceding World War II. Natalie compared the exodus to the depopulation of rural areas in the Lower 48 States in that people gradually became less dependent on the land for subsistence, buying more and more of their food, and eventually moved to the cities to earn a living.

By 1950 the population had risen to 111, but this rise coincided with the influx of

Exhibit 9

IBLA 96-152

FAA personnel and their families. By the mid-1950's there were 21 FAA families and only 4 Native families, including the Simeonoff's, Harmon's, and Chabitnoy's.

The Simeonoff's left in 1956 because Kelly Simeonoff, Sr. lost his job with the FAA on Woody Island. The Harmon's left in 1959, with most of them eventually moving to the State of Washington because Nettie's husband James Hartle got a better job there and the other family members followed them. The population was further decimated in the late-1950's by the occurrence of several tragedies, including the deaths of Mike Chabitnoy, Edison Fadaoff, Sr., Stephan Maliknak, Paul Wolkoff, and Nicolai Maliknak.

By 1960 there were, at most, 20 consistent residents of Woody Island, including Angeline Maliknak, Herman Ponchene, Nicholas Pavloff, Sr., possibly Natalie Ponchene, possibly Johnny Ponchene, Mary Ponchene Pavloff, Edison Fadaoff, Jr., Joseph Fadaoff, Johnny Maliknak, William Wilfred Pavloff, Agnes Frump, Mary Anne King, Harold King, Brenda Pajurkin a.k.a. Frump, Ella Chabitnoy, Mickey Chabitnoy, Cecil Chabitnoy, possibly Buddy Fadaoff, and James Fadaoff. Additions to the population in the early 1960's included William Pavloff, born in 1961, and some of the Simeonoffs who returned for a year or two before leaving again before the 1964 earthquake.

By the time of the earthquake more subtractions had occurred. Agnes Frump had died and her children, Mary, Harold, and Brenda, went to live elsewhere, Ella and Cecil Chabitnoy had already relocated to Kodiak, and Buddy Fadaoff had relocated to the State of Washington. No one left the island as a result of the earthquake, but, rather, Christina Hoen and her family moved back for 8 months. Nettie, Ernie, and James Hartle also returned very briefly.

From 1965 to 1967 additional tragedies or infirmaries resulted in further losses of population: Angeline Maliknak retired to a nursing home in Seward because of ill health and her partner, Herman Ponchene, left as well; Mary Ponchene Pavloff died and the children under her care, Edison Fadaoff, Jr., Joseph Fadaoff, and William Pavloff left; William Wilfred Pavloff drowned; and James Fadaoff left after killing his common law wife, Rosemary Chilliak. The only consistent residents thereafter were Nick Pavloff and Johnny Maliknak.

The argument that the alleged Village was temporary unoccupied as a result of one or more acts of God or government authority is simply not supported by the evidence. The record is replete with evidence and statements that tragedies and the lack of employment opportunities on Woody Island were the primary causes of the depopulation and abandonment of the alleged Village.

Regarding the first alleged act of government authority, the announcement of restrictions on the use of FEDAIR IV in 1963, the evidence shows that, after the announcement, the ferry was still officially available to non-FAA regular residents of Woody Island and available in practice to other non-FAA Natives. Despite the availability of the ferry service during the 1960's, the population of the alleged Village continued to dwindle.

There simply was no testimony or statements from the Natives that the alteration, if any, in the availability of the ferry service caused them to leave or discouraged them from returning to the alleged Village. Maurice Harmon, Paul Harmon, and Mitch Gregeroff all stated that the termination of the ferry service was one of the factors influencing their decisions not to return to Woody Island, but the termination of the service occurred after 1970.

Numerous Natives stated that they left or did not live on Woody Island because of the lack of employment opportunities, and it is reasonable to infer from the statements of at least some of them that re-initiation of a ferry service to provide access to employment in Kodiak might cause them to move back to Woody Island. These statements only highlight the fact that, many years prior to 1970, nearly all of the potential permanent residents of Woody Island had joined the modern cash economy and adopted non-Native life-styles of full-time residency and employment in one particular place, and that place was not Woody Island.

Lastly, any restriction on use of the ferry service is simply not an act of government authority within the meaning of the regulations. The alleged Village was a village long before the CAA/FAA began the ferry service in the late 1940's. Throughout its history the island has remained accessible and has been accessed by skiff or dory by many people, at least during good weather. The provision of the ferry service was a special service not generally available to other Native villages or part of the Natives' traditional cultural patterns and life-style. Any cutback on its availability is not akin to actions which prompted inclusion of the "act of God" proviso in the regulations: the government relocations of Natives living in areas devastated by the 1964 earthquake and tidal waves

The next alleged act of God is the 1964 earthquake and tidal waves. That event truly is an act of God, but it did not cause the unoccupancy of the alleged Village. No one left the island as a result of the earthquake, but, rather, one or two families actually returned shortly thereafter to stay for many months. At most, there is evidence that a few Natives (Maurice Harmon, Paul Harmon, and Mitch Gregeroff) may have been influenced by the effects of the earthquake in deciding not to return to Woody Island to live.

There is no doubt that the 1964 event rendered Woody Island more difficult to access. The western shoreline subsided, making it more difficult to beach boats, and the dock was destroyed and replaced by one which was more exposed to strong currents and tides, rendering it less safe for mooring boats.

However, the record does not show that these changes in the degree of difficulty of access caused the unoccupancy of the alleged Village. Throughout its history, Woody Island has lacked a safe harbor or moorage. It has always been difficult to access Woody Island in winter or bad weather, as the passage to and from Kodiak is dangerous in a small boat and there is no safe place to moor a larger boat, especially overnight. In warm or good weather it has remained accessible by boat from Kodiak or elsewhere. Small boats could be and were often pulled up on the beach both before and after the earthquake. Also, boats could be and

were moored by anchors and running lines to the beach. The change in access was simply not very substantial or significant.

More importantly, the record lacks substantial evidence that the change caused Natives to leave the alleged Village or to not return. The difficulties of traveling to and from Kodiak to access employment opportunities and other amenities available in Kodiak existed long before the earthquake. The pursuit of those opportunities and amenities led most of the Natives off of Woody Island prior to the earthquake. The incremental change in access had little effect on the Natives' decisions whether to remain on or return to the alleged Village.

The earthquake also converted the freshwater Lower Lake into a saltwater lagoon and temporarily destroyed the clam beds on the island. Respondents argue that the Natives had relied upon the Lower Lake for water and the clam beds for food. The record shows that any such reliance was unsubstantial and insignificant and that these alterations did not cause the unoccupancy of the alleged Village.

The running water system drew water from the Upper Lake, as it had better water than the Lower Lake even prior to the earthquake. Where the system was not available or functioning, either before or after its construction, the Natives relied upon the Upper Lake and wells, and not the Lower Lake, for water. No potential permanent resident of Woody Island stated that the conversion of Lower Lake into a saltwater lagoon effected the decision of whether to remain on or return to the alleged Village.

Several Natives testified that the clam beds were a seasonal and insignificant source of food (see, e.g., Tr. 1033-34, 2754-56). Further, Mitch Gregeroff testified that the clam beds recovered after a year or so (Tr. 1412). No potential permanent resident of Woody Island stated that the temporary loss of the clam beds effected the decision of whether to remain on or return to the alleged Village.

Assuming that the damage to the running water system was caused by the earthquake, the statements or testimony from the Natives does not show that the earthquake damage to the water system caused the unoccupancy of the alleged Village. Before examining that evidence, it is worth noting that the alleged Village was well-populated prior to World War II without a running water system. The Natives relied upon wells and the Upper Lake for water. Many Natives lived in the North Village at various times, including Johnny Maliknak and Nicholas Pavloff up through 1970, yet the North Village has never had running water. There is no evidence to suggest that they could not have reverted to relying upon wells and lake water.

Also, the remedy for the earthquake damage to the water system was to cap the end of the 6- to 8-inch pipeline leading to the dock (Tr. 1448). Paul and Maurice Harmon tried in some undisclosed way to plug the line but failed (Tr. 1449). There is no other evidence to show whether fixing the line would have been expensive or difficult.

Christina Hoen addressed the damaged water system in an affidavit. She and her

Exhibit 9

family returned to the alleged Village after the earthquake, but, according to Christina, they decided to leave within 8 months primarily because the Simeonoff house no longer had running water. In a deposition, however, she dismissed as "no big situation" the difficulty of living on Woody Island at that time with an "erratic" water supply, because "there are quite a few wells and springs over there that have been there for years and a good supply of fresh water."

Further, she testified that she and her family were not living on Woody Island in 1970 because of the lack of employment opportunities. Both she and her husband were concerned with the difficulty of commuting from Woody Island to work in Kodiak. She would return to Woody Island to live if the circumstances were right, i.e., if their employment and earnings were such that it was feasible and affordable to do so.

Maurice Harmon, Paul Harmon, and Mitch Gregeroff all stated that the lack of a functioning running water system was one of the reasons they had not returned to Woody Island to live, despite the fact that the Harmon house had a well. Another reason cited by all was the lack of employment opportunities. Many other Natives also referenced the lack of employment opportunities as the reason they had not returned to Woody Island, making no mention of the damaged running water system.

Respondents allege that the earthquake also reduced employment opportunities for potential permanent residents of Woody Island. Mitch Gregeroff, who had been living and working in a cannery in Kodiak in 1964, did state that he moved to the State of Washington for employment when the Kodiak Island canneries were wiped out by the earthquake and tidal waves. However, by 1966 there were 18 seafood plants in Kodiak and 8 more at other points on Kodiak Island where he could have sought employment. More importantly, from 1964 to 1969 he actually continued working in Alaska as a commercial fisherman for nine months of each year. Yet, for the other three months he returned not to Woody Island, but to Washington State, where his wife and child resided full-time. There is no substantial evidence of earthquake-caused reductions in employment opportunities inducing Natives to leave Woody Island or to refrain from returning there to live.

Another alleged act of government authority is the imposition of property taxes by the Borough of Kodiak Island, beginning in the mid- to late-1960's. Assuming that this taxation is an act of government authority within the meaning of the regulation, there is little or no evidence that the taxation caused the unoccupancy of Woody Island on April 1, 1970.

The Borough was created shortly after the 1964 earthquake, probably in the fall of 1965 (Tr. 2920; Ex. S-6I, p. 17), and the alleged Village was nearly deserted by the time that the taxation began. Wilton White, the head of the Borough for many years, testified by deposition that only two or three properties on Woody Island were being taxed and that one of them was the property of the Chaffin's (id., p. 31). Evidence of Native property being taxed is limited to the Sundberg, Fadaoff/Madsen, and Simeonoff houses. The unpaid taxes on the Fadaoff/Madsen house amounted to only $365.00 by the early 1970's.

Exhibit 9

Esther Sundberg Denato testified that the Pavloffs deeded whatever interest they had in the Sundberg homesite to her father and that she believed the Borough eventually foreclosed on that property for failure to pay taxes (Tr. 2854-55). The context of her testimony suggests that this occurred in the late-1970's. Neither she nor any other Native testified that they left the alleged Village or did not return to the alleged Village during the decade ending in 1970 because of the Borough's taxation.

The Vietnam War is another alleged act of government authority. As a result of their participation in the war, Daniel Harmon and Freddy Simeonoff were killed and have not been claimed by Respondents as permanent residents of the alleged Village. If there was evidence that they were drafted, as opposed to having enlisted, there might be a legitimate argument that the war was an act of government authority within the meaning of the regulation. There is no such evidence.

Finally, Respondents claim that the closing of the Woody Island school in 1969 was an act of government authority. They also make passing reference to the adverse effects of the related closing of the FAA facility and ferry service, alleging that the FAA's closing deprived Natives of employment opportunities.

The record shows that neither the school closing nor the closing of the FAA facility and ferry service caused the unoccupancy of Woody Island on April 1, 1970. The termination of the FAA ferry service had no bearing upon the unoccupancy on April 1, 1970, as the service did not terminate until after that date.

Nor did the FAA facility closing have any bearing, as it was not a significant source of employment for local Natives and did not close until after 1970. There were still seven or eight FAA families living and working on Woody Island on April 1, 1970 (Tr. 656). More importantly, the record shows that, throughout its existence on Woody Island, the FAA hired only one local Native for a full-time position (Tr. 2748; Ex. S-6D, pp. 19-20). That Native was Kelly Simeonoff, Sr. (Tr. 2748), who left FAA employment in 1956.[4] The only evidence of local Natives being employed by the FAA in the 1960's is the short-term, temporary hiring of a few Natives to assist in clearing land for construction of the VORTAC facilities in 1963 and 1964.

An affidavit was submitted with Leisnoi's application which was executed by numerous Natives and which states that the school closing caused the unoccupancy of Woody Island in 1970. In contradiction to this affidavit, the affiants also submitted affidavits attesting to their occupancy of Woody Island in 1970, thus discrediting all of the affidavits. One affiant, Marie Redick Unger, corrected herself in a deposition, testifying that the closing of the school was not the reason why she had not returned to Woody Island (Ex. S-6L).

_____

[4] If "local" is defined as the Kodiak Archipelago, then another local Native, Bill Torsen from Ouzinkie, worked full-time for the FAA from 1962 to 1966 (Tr. 2062-64).

Exhibit 9

IBLA 96-152

Another affiant, Karl Armstrong, testified by deposition that he was not aware of anyone who left Woody Island or who would not return because of the school closing (Armstrong Depo., pp. 64-65, 79-80).

Fred Zharoff, who was raised in Kodiak and lived on Woody Island for only a few months in 1977 during renovation of the FAA housing, testified that he moved back to Kodiak for better access to schools and employment. However, there is no indication that he or any other Native would have lived on Woody Island during the year between the closing of the Woody Island school and April 1, 1970, if the school had remained open. No non-FAA Native had attended the school since approximately 1965 and the alleged Village was nearly deserted by the time the school closed in May of 1969.

In summary, Respondents failed to make a prima facie showing that any acts of God or government authority, individually or in combination, caused the unoccupancy of Woody Island on April 1, 1970, or that the unoccupancy was temporary. Consequently, the "act of God" proviso was not invoked and does not apply. Therefore, the alleged Village must meet the occupancy requirement of 25 C.F.R. § 2651.2(b)(2) and evidence of unoccupancy during the decade ending in 1970 is material and relevant to the determination of whether there were 25 or more permanent residents of the alleged Village on April 1, 1970.

4.

### Did the Village, as of April 1, 1970, constitute a "Native village" and have an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style?

Protestant contends that the alleged Village did not meet the requirement of 43 C.F.R. § 2651.2(b)(2), that "[t]he village shall have had on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life style * * *." Protestant correctly argues that this requirement is related to another requirement: that the alleged Village must have constituted an established "Native village", i.e., a "tribe, band, clan, group, village, community, or association" within the meaning of the Section 3(c) of ANCSA, 43 U.S.C. § 1602(c), which defines "Native village". See Bureau of Sport Fisheries & Wildlife v. Village of Salamatoff, ANCAB VE 74-12 (June 9, 1974) at 5, 8-16. He contends that the alleged Village failed to meet this requirement as well.

Protestant is correct that, as of April 1, 1970, the alleged Village failed to meet the requirements of being a "Native village" and having an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style. Numerous witnesses, most familiar with the characteristics of other Native villages, including several Natives, and a Leisnoi Director, Bruce Robertson, testified that no Native village or active community existed on Woody Island in 1970 or even earlier (see, e.g., Tr. 103-06, 193, 244, 294-98, 631-32, 646, 649, 1725-26, 2013, 2091, 2403; Exs. L-DOC-132; S-6E, pp. 10, 30-31; S-6I, pp. 9-10).

Consistent with the assessment of these witnesses, several studies and reports, including studies commissioned by Congress for purposes of ANSCA, indicated that the alleged Village was not an existing Native village by 1970, and did not have 25 Native residents. "Alaska Natives and the Land", Exhibit S-1, dated October 1968, was prepared by the Federal Field Committee for Development Planning in Alaska, and was commissioned by Congress in anticipation of ANCSA. It was subsequently adopted as an appendix to the Senate Report issued by the Senate Commitee on Interior and Insular Affairs for Senate Bill 35. See Senate Report No. 92-405, 92nd Congress, 1st Session, at 73-74. The publication was prepared and used for guidance in drafting the provisions of ANCSA itself.

The publication contains a section on villages in the Kodiak region. Figure III-66, on page 249, contains a table showing the "Historic Native Places and Current Status" of places in the Kodiak Region. Leisnoi is listed in the table - along with a notation in the column labeled "*Abandoned.*" Figure III-67, on page 250, contains a map showing the location of "Historic Native Places [in the] Kodiak Region." The map shows 20 "historic" Native places in and around Kodiak Island - including Leisnoi (spelled "Leisnoi"). Figure III-68, on page 251, contains a map showing "Current Places with Native Population [in the] Kodiak Region." The map shows 8 places in and around Kodiak Island with current Native populations. Leisnoi is not included. The publication also includes a large, fold-out, map of Alaska, showing the location of Native and non-Native places having a Native population of 25 or more. The map shows 8 places in and around Kodiak Island having a population of 25 or more Natives. Again, Leisnoi is not included.

The Federal Field Committee for Development Planning in Alaska prepared another publication dated 1967 and entitled "Villages in Alaska and other Places Having a Native Population of 25 or More." (Ex. S-2) The preface states that it is a compilation of villages and places having 25 or more persons, half or more of whom are Natives, as well as places that are predominantly non-Native but which have a Native population of at least 25. The preface also states that the principal source for its Native population estimates was the Bureau of Indian Affairs, but that the estimates were also measured against figures provided by leaders of Native organizations, the Alaska Office of Economic Opportunity, VISTA, the Public Health Service's Division of Indian Health, Alaska State Community Action Program, and other agencies, as well as against Native school enrollment figures provided by the Bureau of Indian Affairs and the Alaska Department of Education. The publication's "Alphabetical Directory" lists seven villages within the Kodiak Island Borough, but does not include Woody Island or Leisnoi. The Census Directory" similarly lists Kodiak and identifies six villages in the Kodiak area, but does not include Woody Island or Leisnoi.

Woody Island is listed as an island in the Government publication "Dictionary of Alaska Place Names," dated 1967 (Ex. L-BOOK-65). However, it is not also listed as a "village," "town," or "locality," as are other villages, towns and localities listed in the publication. Similarly, in the publication "Effects of the Earthquake of March 27, 1964 on the Communities of Kodiak and Nearby Islands," prepared for use by the Department of Interior,

Exhibit 9

Geological Survey (Ex. L-BOOK-80). Woody Island is not included as a "community," nor is it listed in the tables or on the "Index map showing location of communities on Kodiak Island and nearby islands," even though the Island itself in shown on the map (id., at F3, F4).

According to the witnesses, the alleged Village, unlike most other Native villages, had no church, stores, post office, fuel supply, consistent population, or Native, tribal, or village association, government, or chief. Mr. Wooley acknowledged that other villages had such infrastructure (Tr. 2303-04).

The alleged Village merely had less than a half-dozen houses which weren't being occupied with any frequency or consistency and generally were not well-maintained by 1970. Mr. Wooley referenced the houses as evidence of the alleged Village's identifiable physical location, but the existence of several houses, without more, does not constitute the location of a community with social, economic, and cultural ties.

Mr. Wooley de-emphasized the presence of physical structures when addressing the absence of a church building on Woody Island since 1951. He testified that faith relates to a community of people and not a physical structure (Tr. 2171).

Both he and Dr. Davis stressed the importance of the Russian Orthodox Church in Native culture as a religious, social, and political institution. Yet, they did not adequately come to grips with the fact that church-related social and religious activities and ceremonies, such as masquerading and caroling, occurred infrequently, if at all, on Woody Island after World War II.

In general, there is little evidence of communal activities on Woody Island after World War II. Karl Armstrong testified as to the importance of banyas (steambaths) as a place for socializing (Armstrong Depo., pp. 124-27) and there is conflicting evidence as to whether the banyas on Woody Island were used much. Without reference to a time period, Joseph Fadaoff, born in 1954, testified, "I'm sure a lot of people used [banyas]." (Tr. 1039). On the other hand, Patricia Hampton, born in 1948, testified that the banyas on Woody Island were not used after 1958 (Ex. S-6O, pp. 37-38). Mr. Armstrong also testified as to the social significance of the practice of chipeting, but the evidence of this practice occurring after World War II is limited to his testimony that he, Charles Naughton, and Ed Hall chipetted a few times. Joseph Fadaoff also testified as to "a lot of visiting" among the extended family in the South Village area (Tr. 1046). However, most of the people living there left before the 1964 earthquake. Zelma Stone was not aware of any regular meetings or congregations of Natives in the alleged Village (Tr. 494).

Numerous witnesses testified, in effect, that there was no regular or substantial Native activity, such as occupying the Native houses, camping, picnicking, hunting, fishing, or berry picking, from the mid-1960's through 1970 (see, e.g., Exs. S-6D, pp. 37-38, 42, 51; S-6O, pp. 21-22; Tr. 414, 416, 424, 461, 633-34). While those activities did occur, the nature and extent of those occurrences was not sufficiently substantial to support a conclusion that a

Exhibit 9

community still existed there by the mid-1960's.

Dr. Davis testified in 1998 that smaller villages tend not to have churches any longer, but she did not specifically address whether this was the trend in 1970 (Tr. 3646, 3649). She did acknowledge that in the 1960's most Native villages had both a formal male chief and a lay leader connected with the church (Tr. 3608-10). The alleged Village had neither after World War II.

Dr. Davis pointed to the leadership or elder status of Ella Chabitnoy in the South Village and Angeline Maliknak in the North Village in the early 1960's, but there was no conjoining of that leadership into a clan. In fact, Dr. Davis testified that the South Villagers and North Villagers were not necessarily cognizant of the activities of each other (Tr. 3489). Further, both Ella and Angeline had moved off of Woody Island many years before 1970.

Dr. Davis acknowledged that there were dissimilarities between the alleged Village and other Native villages but she concluded that there were more similarities than dissimilarities (Tr. 3650). However, she did not support her conclusion with any enumeration of the similarities.

She did compare the alleged Village to the Village of Chitina, which, according to ANCAB, did have an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style. Holdsworth v. Village of Chitina, ANCAB VE 74-10 (June 10, 1974) at 25-26. She testified that Chitina had 237 enrollees but only 2 full-time residents (Tr. 3647). The numbers are similar for the alleged Village in 1970.

ANCAB described the Chitina Natives and their historical cultural patterns as follows:

The Chitina Natives are part of a sub-dialect culture called Ahtna which is part of the larger Athapascan Linguistic Group * * *. Historical documents show that these Natives have inhabited the Copper River valley [where the alleged village site is located] at least as early as the late 18th century * * *. Their cultural patterns and life styles reflect a migratory existence based primarily on hunting, fishing, berry picking and trapping for personal and tribal subsistence * * *. Although the Natives lived a dispersed and migratory existence, they would nevertheless come together in the spring at fishing stations along the Copper River * * *.

Village of Chitina, supra, at 25-26.

Dr. Davis testified that nearly half of the Chitina Natives were living in Anchorage, Alaska, by 1970 for reasons similar to those which motivated the alleged Village Natives to live in Kodiak and elsewhere: economics, schooling, and modern amenities (Tr. 3648). She testified that the pattern of village visitation for the Chitina Natives and the alleged Village Natives were very similar (Tr. 3648).

Exhibit 9

IBLA 96-152

However, she did not describe how they were similar other than to say that the visitors would stop to say "hello" to persons such as Nick Pavloff and Johnny Maliknak (id.) - an apparent reference to any full-time residents. In actuality, the cultural and visiting patterns were not similar.

Dr. Davis spoke of the seasonality of use of Woody Island, but historically Woody Island was the site of a village with scores of full-time or near full-time residents rather than a place, such as Chitina, where the Natives came together only seasonally. Further, once the alleged Village Natives abandoned the village site many years prior to 1970, they did not "come together" there. The record shows that there were no congregations of a substantial portion of the alleged Village Natives each year or even sporadically. Those that did visit typically came individually or in very small groups, irregularly and infrequently, and primarily for recreational rather than subsistence purposes.

The evidence shows that this use was not occupancy consistent with the alleged Village Natives' own cultural patterns and life-style. It was not consistent with the historical use of the alleged Village as a site of long-term residency by scores of Natives. While it might be consistent with those Natives' cultural patterns and life-style for the alleged Village to evolve from a sight of long-term residency into a site of seasonal occupancy for subsistence purposes, the actual use of the alleged Village site for many years preceding 1970 was not seasonal "occupancy" nor primarily for subsistence purposes.

In actuality, nearly all the alleged Village Natives simply shifted the site of their long-term residency from the alleged Village to Kodiak or other places. Their social, cultural, and economic ties became centered in Kodiak and elsewhere. The nucleus of community, group life, or association was not at the alleged Village.

When questioned whether the alleged Village had a location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style, Dr. Davis replied affirmatively, explaining that "[i]t would be consistent with the Native sense to have a place that you were born, a place that you had an identity with." (Tr. 3515) Her explanation has little to do with the character or nature of the alleged occupancy but much to do with the choice of location.

The nature of their use of the alleged Village for many years prior to 1970 may be likened to use of a favorite park or picnic spot. They went there primarily on day trips for recreation. The use was not peculiar to their Native cultural patterns and life-style but similar to the use of the island by non-Natives. The Natives had adopted a non-Native life-style and used (not occupied) the alleged Village site accordingly.

Quoting ANCAB's Decision in In re Eyak, Koniag correctly argues the concept of the "Natives' own cultural patterns and life-style"

cannot be interpreted to contemplate exclusively the cultural patterns of Alaska

Exhibit 9

Natives existing before contact with Caucasians.  Such an interpretation could possibly exclude from benefits every village listed in the act, for the patterns of life in all such villages have been modified by the influence of non-Native culture.  Accordingly, the character of occupancy of an area in terms of native cultural patterns and lifestyle must be assessed in the light of conditions existing in 1970 and the historical influences under which such conditions developed.

*          *          *          *          *          *          *

[T]raditionally Native activities and customs, such as berry picking, subsistence hunting and fishing, and the use of bonyas * * * are not rendered less Native in character merely because, in 1970, non-Natives also engaged in them.

Id. at 32-33.  On the other hand, as previously mentioned, erosion of Native cultural patterns and the gradual adoption of non-Native customs, technology, and the like, including long-term residency in another place, may be evidence of abandonment of the alleged village and life-style associated with "home".

The record shows that the Natives largely abandoned a life-style of subsistence activities and the use of bonyas as a social custom, and adopted a non-Native life-style, particularly with respect to their use of the alleged Village.  By no later than the mid-1960's, they used it primarily for recreation and did not engage in substantial subsistence or communal activities there.  The practice of the Russian Orthodox religion at the Village of Eyak was considered a distinguishing characteristic of the Native culture there.  Village of Eyak, supra, at 32-33.  No such practice occurred on Woody Island during the decade ending in 1970.

5.

**As of April 1, 1970, were the majority of residents of the alleged Village Native?**

Finally, Protestant contends that the alleged Village did not meet the requirement that "a majority of the residents must be Native."  43 C.F.R. § 2651.2(b)(4); see also 43 U.S.C. § 1610(b)(3).  He argues that only Natives who are enrolled to the alleged Village qualify in determining if a majority of the residents are Native, citing Village of Eyak, supra, at 35-36.  Whether or not that case stands for the proposition argued, it appears inconsistent with the holding in Koniag, Inc. that a Native need not be an enrollee of a village to qualify as a permanent resident thereof.  405 F.Supp. at 1373-74.  Consequently, Protestant's argument is rejected.

His contention that the alleged Village did not meet the Native majority requirement is also rejected.  While there were very few Native residents as of April 1, 1970, there were no

Exhibit 9

non-Native residents and therefore a majority of the residents were Native.

### E.

**Should the hearing be reopened to allow Respondents further opportunity to present evidence on the subjective intent of potential permanent residents of the alleged Village?**

Leisnoi, at pages 151-52 of its posthearing answering brief, states:

> [At] [p]ages 163 through 165 of his Opening Brief, Stratman argues that persons who had not lived in the Native Village of Woody Island for an extended period of time cannot be found to be permanent residents of the Village unless they gave direct testimony of their subjective intent. * * *
>
> This Court allowed only two weeks of testimony for the hearings in this case. Half of that time was given to the Protestant. Woody Island therefore only had one week of time in which to call witnesses. If the Court were to accept Stratman's theory that only persons who testified live can be deemed to be permanent residents of Woody Island, unless they had lived on the island year-round, then the hearings should be reopened to give the Native Woody Islanders a reasonable opportunity to present many more witnesses.

> *       *       *       *       *       *       *

> * * * [I]f the Court is inclined to go along with the Protestant's theory, then due process would require that the Native Woody Islanders be given a reasonable opportunity to present testimony from many more Leisnoi shareholders.

Because Leisnoi characterizes Protestant's theory in two different ways, it is impossible to determine precisely what it finds objectionable. Nevertheless, this Recommended Decision does not purport to adopt either characterization, but, rather, to assess a multitude of factors and types of evidence in determining whether there were 25 or more permanent residents of the alleged Village as of April 1, 1970. For this reason, Leisnoi's suggestion that the hearing should be reopened is denied.

It is denied for the additional reason that Leisnoi was afforded ample opportunity to present evidence at the hearing. The hearing schedule was established by the consensus of all parties. If Leisnoi felt that it needed additional time to present evidence, it should have made that request at an earlier date.

In an April 24, 1998, letter to the parties, I noted,

Based on motion, and my understanding of the consensus, the hearing will be held in Anchorage on August 4 through 7, and in Kodiak on August 10 through

Exhibit 9

IBLA 96-152

13, 1998.  Further Anchorage hearing could be held on August 14, if that
would serve a useful purpose.  If any party has serious difficulty with this
scheduling, he should notify the other parties and me **by return mail**.

In a May 13, 1998, letter to the parties, I stated:

As it stands now, we are to have hearings in Anchorage August 4 through 7,
and 14, and in Kodiak August 10 through 13 (with a viewing August 8 or 9).
At this point, it appears it may be beneficial to commence the hearing in
Anchorage on Monday, August 3, particularly if this could mean the difference
between completion of the hearing in this 2 week span or not.  Your suggestion
in this regard will be appreciated.

Pursuant to the parties' subsequent suggestions, the date for commencement of the
hearing was revised to August 3, 1998, by Order dated July 15, 1998.  With the addition of
another day for hearing and typically extended hours for hearing each day, the hearing actually
concluded several hours earlier than anticipated on August 14.  At that time the parties were
asked if they had any additional evidence to present and both Leisnoi and Koniag and
indicated that they had completed their presentation of evidence (Tr. 3658-63).

## V.

### Conclusion

Without further belaboring this Recommended Decision with additional references to
contentions of fact and law, I hereby advise that all proposed findings or conclusions
submitted by the parties have been considered and, except to the extent they have been
expressly or impliedly adopted herein, they are rejected on the ground they are, in whole or
in part, contrary to the facts and law or are immaterial.

Based upon the foregoing, it is ordered that the alleged Village be certified as not
eligible for benefits under sections 14(a) and (b) of ANCSA because:

(1) The alleged Village did not have 25 or more Native residents on April 1, 1970,
(2) The alleged Village, as of April 1, 1970, was not an established Native village and
did not have an identifiable physical location evidenced by occupancy consistent with the
Natives' own cultural patterns and life-style, and

Exhibit 9

(3) Less than 13 enrollees to the alleged Village used it during 1970 as a place where they actually lived for a period of time.


Harvey C. Sweitzer
Administrative Law Judge


## INFORMATION REGARDING FILING OF OBJECTIONS
## TO RECOMMENDED DECISION

Pursuant to Page 11 of the Board's November 21, 1997, Order, a copy of this Recommended Decision is served on each party and each shall have 30 days from receipt of the decision within which to submit briefs to the Board registering their objections to the decision. Those briefs should also address any legal issues considered by the parties to be case dispositive.

Respondents have all moved for additional time within which to submit said briefs to the Board. No ruling is made thereon because the Board established the 30-day deadline and any such motion should be directed to and decided by the Board.

See page 101 for distribution.

Exhibit 9