THE SECRETARY OF THE INTERIOR

WASHINGTON

DEC 2 0 2006

RECEIVED

DEC 2 8 2006

MJS, PC

| | | |
|---|---|---|
| IN RE APPEAL OF LEISNOI, INC. FROM DECISION OF INTERIOR BOARD OF LAND APPEALS | ) ) ) ) ) ) | Decision<br><br>Docket No.   157-IBLA-302<br><br>Date: |

## Decision

Review of the Decision of the Interior Board of Land Appeals ("IBLA"), 157 IBLA 302 (October 29, 2002), concerning the certification of Leisnoi, Inc. ("Leisnoi") as a Village eligible for benefits under the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601-1624.

APPEARANCES:   John R. Fitzgerald, Esq., and Roy S. Jones, Esq., on behalf of Appellant Leisnoi; Michael J. Schneider, Esq., on behalf of Appellee Stratman; James R. Mothershead, Esq., on behalf of Intervenor Bureau of Indian Affairs; R. Collin Middleton, Esq., and Brennan P. Cain, Esq., on behalf of Intervenor Koniag, Inc.

I adopt the reasoning, analysis and conclusions of the Solicitor's memorandum to me (attached), and therefore disapprove the decision of the IBLA dated October 29, 2002.

DIRK KEMPTHORNE, SECRETARY

EXHIBIT
Page 1 of 43 Pages

DISTRIBUTION:

John R. Fitzgerald, Esq.  
Morrison Mahoney LLP  
260 Franklin Street  
Boston, MA 02110-1181  

Michael J. Schneider, Esq.  
880 "N" Street, Suite 202  
Anchorage, AK 99501  
On behalf of Appellee Stratman  

and

Roy Stapleton Jones, Esq.  
Stiefel Jones & Gaston Consulting, LLC  
1718 M Street, NW  
PMB 1120  
Washington, D.C. 20036  
On behalf of Appellant Leisnoi, Inc.

R. Collin Middleton, Esq., and Brennan P. Cain, Esq.  
Middleton & Timme  
421 W. 1st Avenue, Suite 250  
Anchorage, AK 99501  
On behalf of Intervenor Koniag, Inc.

James R. Mothershead, Esq.  
Office of the Regional Solicitor  
Alaska Region  
U.S. Department of the Interior  
4230 University Drive, Suite 300  
Anchorage, Alaska 99508-4626  
On behalf of Intervenor Bureau of Indian Affairs

EXHIBIT  
Page ___ of ___ Pages



# United States Department of the Interior

OFFICE OF THE SOLICITOR

Memorandum                                     DEC 1 1 2006

| | |
|---|---|
| To: | Dirk Kempthorne<br>Secretary |
| Through: | David L. Bernhardt<br>Solicitor |
| From: | Lawrence J. Jensen<br>Deputy Solicitor |
| Subject: | *Stratman v. Leisnoi* |

     This memorandum presents my analysis and recommendation in the case of *Stratman v. Leisnoi*, which was initiated 30 years ago and which has most recently been the subject of a 2002 decision by the Interior Board of Land Appeals (IBLA) following a 1995 remand from the Federal District Court for Alaska.

The case involves a challenge to a 1974 determination by the Bureau of Indian Affairs (BIA), which was then certified by the Secretary, that Woody Island is a Native village for purposes of the Alaska Native Claims Settlement Act (ANCSA) and was therefore eligible to have conveyed to its Native village corporation, Leisnoi, Inc. (Leisnoi)[1] a specified amount of public land in Alaska in satisfaction of its aboriginal land claims.

     Following the 1995 remand, an Administrative Law Judge, at the direction of IBLA, held a two week hearing on the eligibility issue at which over 40 witnesses testified. In his recommended decision, he concluded that Leisnoi was not a Native village for purposes of ANCSA. The IBLA, after reviewing the recommended decision, found no reason to alter the Administrative Law Judge's findings and conclusions. The IBLA also concluded, as a matter of law, that a statute passed subsequent to ANCSA in 1980, section 1427 of the Alaska Native Interest Lands Conservation Act (ANILCA), was not a congressional ratification of the Department's 1974 eligibility determination.

---

[1] The materials cited below lose sight of the distinction between Woody Island, as the Native village, which is the entity that is eligible for ANCSA benefits, and Leisnoi, as its Native village corporation, which is the entity which selects the lands for which the village is eligible and to which the lands are conveyed. As a result, they sometimes refer to Leisnoi even when the reference should be to Woody Island. To avoid confusion, I will use the term Leisnoi in all instances.

Leisnoi has asked that you exercise your discretion to review the IBLA's decision.

For the reasons explained below, I conclude that:

1) your review of IBLA's decision is mandatory pursuant to 43 C.F.R. § 2651.2(a)(5); and

2) section 1427 of ANILCA did ratify the Department's 1974 eligibility determination, thus mooting the case.

I therefore recommend that you disapprove the IBLA's decision. If you concur with my conclusion that section 1427 ratified the Department's 1974 eligibility determination, and thereby mooted the case, it will not be necessary for you to review the factual findings of the Administrative Law Judge that were made 25 years after the original determination.

I. Background

In 1974, the Secretary, on the basis of a determination by the BIA, certified Leisnoi as a Native village under ANCSA in the Koniag region of Alaska[2] (Tab 1) and then subsequently conveyed to Leisnoi the surface estate of approximately 160,000 acres of public lands that Leisnoi had selected in satisfaction of its aboriginal land claims. In accordance with the requirements of ANCSA, the subsurface estate of that acreage was conveyed to Koniag Regional Corporation (Koniag). In 2002, in a lawsuit separate from the one at issue here, the Ninth Circuit Court of Appeals affirmed a district court decision quieting Leisnoi's title to a portion of the lands that had been conveyed to it,[3] based on a disclaimer of any interest in the lands by the United States. *Leisnoi, Inc. v. United States*, 313 F.3d 1181 (9th Cir. 2002).

In 1976, Omar Stratman (Stratman), a rancher with grazing leases in the area from which Leisnoi was entitled to select its land, sued in Federal court challenging Leisnoi's status as a Native village eligible for ANCSA benefits.[4] Stratman had not pursued his administrative remedies. The district court dismissed his action, concluding he lacked standing. *Stratman v. Andrus*, 472 F. Supp. 1172 (D. Alaska 1979). In 1981, the Court of Appeals for the Ninth Circuit reversed the district court, finding that Stratman had

---

[2] A village was eligible if it was listed in ANCSA and found to have at least 25 residents as of April 1, 1970, was not "of a modern or urban character" and a majority of its residents were Native. 43 U.S.C. § 1610(b). If Congress did not list a village, it could still be found eligible if it petitioned the Secretary and the Secretary found it satisfied the same criteria. *Id.* Leisnoi was not listed by Congress but petitioned the Secretary for certification as an eligible village. Stratman claimed that Leisnoi did not have 25 residents as of April 1, 1970.

[3] Leisnoi brought the action to quiet title to lands that it sought to sell only. The action did not concern all of Leisnoi's lands.

[4] It is worth noting that Leisnoi ultimately selected its lands from acreage that was not encumbered by Stratman's leases.

standing based on his recreational interests, and reinstated Stratman's claim. The court also excused Stratman's failure to exhaust his administrative remedies because, as a lessor, he was entitled to, but did not, receive actual notice of Leisnoi's entitlement to the land. *Stratman v. Watt*, 656 F.2d 1321 (9th Cir. 1981). (Tab 2).

In 1982, Stratman entered an agreement with Koniag, with which Leisnoi had merged, to drop his litigation challenging Leisnoi's eligibility. The agreement failed, however, after Leisnoi's merger with Koniag was voided and Leisnoi repudiated the agreement in 1985. In 1994, the Ninth Circuit ordered Stratman's challenge to Leisnoi's eligibility reinstated. *Stratman v. Babbitt* 1994 U.S. App. LEXIS 34354 (9th Cir. Dec. 5, 1994). (Tab 3).

In 1995, the district court stayed the litigation. Noting that "this appears to be the perfect case to read ripeness and primary jurisdiction together to require that Stratman litigate his challenge to Leisnoi before the agency before he brings it here," the court sent the case to IBLA "for consideration of Stratman's challenge to Leisnoi." *Stratman v. Babbitt*, (D. Alaska 1995) A76-132 CV (JKS) at 2. (Tab 4). The court explained that "that course will permit the exhaustion of administrative remedies, albeit belated, and give the Court the benefit of the agency's expertise and the agency the benefit of any intervening action by Congress" i.e., the possible ratification by Congress in section 1427 of the 1974 eligibility determination. The district court stated:

> Sending the issue back will permit the agency to exercise its expertise. If there is a reasonable basis for the Secretary's action, taking into account the limited time Congress allowed him to make that determination, his action will be upheld. If, despite the leeway he must be given, the Secretary did certify a phantom village, the agency is the best place for the determination to be made.

*Id.*

The IBLA rendered its decision on October 29, 2002, three years after the recommended decision by the Administrative Law Judge. *Stratman v. Leisnoi*, 157 IBLA 302 (2002). (Tab 5). The IBLA concluded that it lacked subject matter jurisdiction of the case, but nonetheless reviewed and endorsed the Administrative Law Judge's recommended decision and prepared a written "analysis of the legal issues" for the benefit of the district court in obedience to its mandate.

## II. The IBLA's Jurisdiction

For the reasons explained below, IBLA erred in concluding that it lacked subject matter jurisdiction. This issue is important because it bears on the question of whether you are required to review the IBLA's decision, or need do so only as an exercise of your discretion.

The IBLA reasoned, in essence, as follows: Following its certification as an ANCSA village, Leisnoi selected the land for which it was eligible under ANCSA. The

Secretary then conveyed the selected lands to Leisnoi by patent and interim conveyance in 1986. "The effect of the issuance of a patent by the United States is to transfer the legal title from the United States and to remove from the jurisdiction of the Department the consideration of all disputed questions concerning the rights to [the patented] lands," including a challenge to the eligibility determination on the basis of which the patents were issued. *Id.* at 311. Moreover, the patents and interim conveyances to Leisnoi "were all made more than six years ago and title to that land has been quieted in Leisnoi." *Id.* at 311-312. "Such facts bring into play the limitation against the United States [of the applicable statute of limitations] and bar Departmental involvement at any level, regardless of the possible merits of Stratman's challenge." *Id.* Because "the court cannot vest IBLA with jurisdiction it does not have," the IBLA has "no authority to entertain Stratman's challenge to [Leisnoi's] elibigility" to select lands under ANCSA." *Id.*

BLM has informed me, however, that Leisnoi has not received all of the acreage for which it is eligible under ANCSA. Leisnoi has the right to select approximately 3,000 additional acres. Because Leisnoi may be eligible for additional acreage, jurisdiction to address the underlying question of Leisnoi's eligibility has not "been removed from the Department," and the statute of limitations, at least as to those lands, does not "bar Departmental involvement."

Second, the IBLA erred in concluding that its decision was not subject to 43 C.F.R. § 2651.2(a)(5), which requires that all decisions on village eligibility appeals be approved by the Secretary before becoming final. *Id.* at 320 n. 16. The IBLA reasoned, in essence, as follows: The IBLA typically decides appeals of parties adversely affected "by a decision of an agency official" other than the Secretary. *Id.* at 309. There is "no agency decision for direct review" here because "all the agency decisions in this case issued over 25 years ago," and were decided "with administrative finality in 1974" by the Secretary. *Id.* at 310. The case "has found its way to [IBLA] through a referral" from the district court, rather than by way of administrative appeal, and the IBLA is therefore not "issuing a decision on a village eligibility appeal." *Id.* at 310, 320 n. 16. As 43 C.F.R. § 2651.2(a)(5) applies only to decisions on village eligibility appeals, the IBLA's decision need not be "personally approved by the Secretary" before becoming final.

The district court, however, explicitly sent the case back to IBLA "for consideration of Stratman's challenge to Leisnoi," and to "permit exhaustion of administrative remedies, albeit belated." *Stratman v. Babbitt*, A76-132 CV (JKS) at 3. The only remedy available to Stratman in 1974 (had he chosen to seek it then) was a review by the IBLA's predecessor of the BIA's eligibility determination. While this case is in a decidedly unusual procedural posture after 30 years of litigation, it is clear that the district court expected the IBLA to review the original eligibility determination and, "taking into account the limited time Congress allowed [the Secretary] for making the determination," decide whether there was "a reasonable basis for the Secretary's action."[5] *Id.* at 2. It appears that the court, in effect, suspended the Secretary's certification of the

---

[5] Rather than review the BIA's determination to determine if it had a reasonable basis, given the time constraints imposed by ANCSA, the IBLA directed the Administrative Law Judge to hold a *de novo* hearing which lasted two weeks.

4

EXHIBIT ___
Page ___ of ___ Pages

BIA's eligibility determination pending the outcome of the IBLA's review. I thus conclude that the IBLA was, in fact, issuing a decision on a village eligibility appeal, and that you therefore have mandatory jurisdiction under 43 C.F.R. § 2651.2(a)(5).

III. Section 1427 of ANILCA (Tab 6)

In 1980, nine years after ANCSA was passed, Congress, in section 1427 of ANILCA, directed the Secretary to convey "the surface estate of all of the lands on Afognak Island," with certain exceptions, to a joint venture consisting of "the Koniag Deficiency Village Corporations, the Koniag 12(b) Village Corporations and Koniag." § 1427(c). The conveyance was to be made, among other things, "in full satisfaction" of "the right of each Koniag Deficiency Village Corporation to conveyance" under ANCSA "of the surface estate of deficiency village acreage on the Alaska peninsula." Section 1427(b)(1). Leisnoi was listed in section 1427(a)(4) as a "Koniag Deficiency Village." The "deficiency village acreage on the Alaska peninsula," Leisnoi's right to which was to be satisfied out of the conveyance of "the surface estate of ... lands on Afognak Island," was defined as "the aggregate number of acres of public land to which 'Koniag deficiency village corporations' are entitled, under section 14(a) of [ANCSA], to a conveyance of the surface estate on Kodiak Island." Section 1427(a)(2).

Because section 1427(a)(4) lists Leisnoi as a Koniag Deficiency Village Corporation and then describes such corporations in subsection (a)(2) as "entitled, under section 14(a) of [ANCSA], to a conveyance" of certain lands, and because section 1427 directs that certain lands on Afognak Island be conveyed "in full satisfaction" of Leisnoi's entitlement, Leisnoi, Koniag and the BIA have argued that section 1427 ratified Leisnoi's status as an eligible Native village under ANCSA and thus mooted Sratman's challenge to Leisnoi's eligibility.

In its 1995 remand order, the district court denied motions for summary judgment by Leisnoi and Koniag on the section 1427 issue. The court noted that this was "a difficult question that should be decided in the first instance by the agency." *Stratman v. Babbitt* at 2. On remand, the IBLA characterized "the legal issue referred to" it by the district court as "whether [Leisnoi's] status as a Native village [under ANCSA] has been ratified by Congress." *Stratman v. Leisnoi*, 157 IBLA at 312.

After reviewing the issue, the IBLA concluded that "the listing of Leisnoi in section 1427(a)(4) and its entitlement to lands on Afognak was not a ratification of its eligibility as a Native village." *Id.* at 313. However, in doing so, the IBLA failed to analyze all of the relevant language in section 1427. Moreover, none of the three reasons that IBLA did give for its conclusion is persuasive, particularly when viewed against the background of the relevant statutory language.

Before discussing the language of section 1427 and the IBLA's reasons for concluding that there was no ratification, it is necessary to review the provisions of ANCSA that prompted the enactment of section 1427 and that led to the problems it was intended to solve. Section 1427 cannot be understood outside of this ANCSA context.

5

EXHIBIT ___
Page ___ of ___ Pages

A. ANCSA

ANCSA was intended to provide "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). It was to accomplish that purpose "rapidly" and "with certainty," and "without litigation," 43 U.S.C. § 1601(b), by, among other things, conveying public lands to Native villages and Native regional corporations that had been certified or established pursuant to the Act. In settlement of their land claims, the Native villages were to receive the surface estate of a specified number of public lands selected by them, and the regional corporations were to receive, among other things, the subsurface estate lying below the acres conveyed to the Native villages that were located within their geographic boundaries. 43 U.S.C. § 1613(f).

ANCSA listed many villages which would be eligible for its benefits, provided the Secretary determined that they met certain criteria. ANCSA also provided that villages that were not listed in the Act, like Leisnoi, could petition the Secretary for a determination of eligibility. 43 U.S.C. § 1610(b)(3). Leisnoi filed such a petition and, based on a determination by the BIA, the Secretary certified it as an eligible ANCSA Native village.

By its terms, ANCSA withdrew certain public lands in the vicinity of each eligible Native village from the operations of the public land laws. 43 U.S.C. § 1610(a)(1). The Native village was then entitled to select the lands it was to receive in settlement from those withdrawn lands. In the case of Leisnoi and several other Native villages within the Koniag region, the land withdrawn for this purpose was on Kodiak Island.

ANCSA provided further that where there was not enough land in the initial withdrawal to satisfy a village's selection rights, the Secretary was to "withdraw three times the deficiency from the nearest unreserved, vacant and unappropriated public lands." 43 U.S.C. § 1610(a)(3). This land is known as "deficiency village acreage," and was to be available to satisfy the Native villages' selection rights. In the case of the Koniag villages, including Leisnoi, the deficiency village acreage that was withdrawn, and from which they were to complete their land selection, was on the Alaska Peninsula.

As ANCSA was implemented, two problems cropped up in the Koniag region that were preventing a "rapid" and "certain" settlement of the Native claims there.[6] First, for

---

[6] The complexity of ANCSA's scheme for determining the land entitlements of the regional and village corporations resulted in substantial litigation over a wide variety of issues and delayed conveying land titles to the corporations. Six years after ANCSA was enacted it was estimated that the regional corporations had received only 20 percent of their entitlement and the villages had received only 7 percent. At the time, the Department was estimating that it would take another 6 to 13 years to convey the land. Report by the Comptroller General: Land Title Should Be Conveyed To Alaska Natives Faster, 6 (B-108439; CED-78-130)(General Accounting Office, June 21, 1978). After reviewing the problem of the delays in the conveyancing and the effects of the delay on the corporations and the settlement, the Comptroller General recommended the Department analyze how to minimize litigation. *Id.* at 33-40.

reasons not important here, the deficiency village acreage available on the Alaska Peninsula was unsatisfactory to the Koniag villages, and, in addition, the federal government was anxious to add the withdrawn lands on the Alaska Peninsula to the Alaska Peninsula National Wildlife Refuge. Second, a court had overturned the Secretary's determination that seven of the villages in the Koniag region were ineligible for ANCSA benefits, and had remanded the determinations to the Department for further proceedings, thus leaving uncertain until the conclusion of those proceedings the ultimate land entitlement of the Koniag Native villages and of Koniag itself.

To address these problems, Koniag and its villages proposed a comprehensive settlement, which was enacted into law as section 1427 of ANILCA. Section 1427, which was known as the Koniag Amendment, solved the two problems as follows. First, to satisfy the rights of the villages to deficiency acreage, it directed the Secretary to convey lands on Afognak Island to a joint venture consisting, among others, of the Koniag Deficiency Village Corporations, which included Leisnoi. Second, to resolve the eligibility of the seven villages, it deemed them eligible as a matter of law for ANCSA benefits in return for a release by them of all their claims under ANCSA and the conveyance to them of a significantly smaller amount of acreage than they would have been entitled to select under ANCSA.

Against this background, it is now possible to examine the language of section 1427 and the reasoning of the IBLA with respect to the question of congressional ratification of Leisnoi's eligibility.

B. The language of section 1427

The principal defect in the IBLA's analysis of the ratification issue is its failure to closely examine all of the relevant language in section 1427. There are several parts of section 1427, other than those cited by the IBLA, that require review in an effort to determine congressional intent.

As is readily apparent from the recitation below, section 1427 constructs an elaborate scheme for the resolution of the Koniag land claims, not just of Leisnoi, but of a sizable number of other entities. In that scheme, in which Leisnoi's eligibility is clearly assumed, certainty about the eligibility of Leisnoi is a necessary predicate to the final and timely settlement of the claims of Leisnoi, the other Koniag villages, Koniag regional corporation and, to a lesser degree, all of the other Native villages and regional corporations entitled to ANCSA benefits. Viewing the scheme as a whole, it is reasonable to conclude that Congress intended to resolve all of the uncertainties and did not intend to leave the parties at risk of having their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's eligibility.

7

The relevant language in section 1427 is as follows:

Subsection (a)(7) defines "Koniag village" as "a Native village under [ANCSA] which is within the Koniag region." At the time section 1427 was passed, Leisnoi had been determined to be such a village.

Subsection (a)(8) defines "Koniag Village Corporation" as "a corporation formed under section 8 of [ANCSA] to represent the Natives of a Koniag village ...." At the time section 1427 was passed, Leisnoi was such a corporation.

Subsection (a)(4) defines Leisnoi, along with three other Native Village corporations, as a "Koniag deficiency village corporation." Leisnoi was a "deficiency village corporation" because there was not enough land in its immediate vicinity on Kodiak Island to satisfy its entitlement under ANCSA. It was therefore entitled under ANCSA to select deficiency acreage—the difference between its entitlement and the land it had selected on Kodiak Island—from acreage set aside on the Alaska Peninsula.

Subsection (a)(5) defines Leisnoi as a "Koniag 12(b) Village Corporation," provided that, "within sixty days of the effective date of this Act, Koniag, Incorporated, by a resolution duly adopted by its Board of Directors, designates [all four of the Koniag deficiency village corporations] as such as a class." 12(b) is a provision in ANCSA that requires "the difference between twenty-two million acres and the total acreage selected by Village Corporations" to "be allocated ... among the eleven Regional Corporations," and then reallocated by each such regional corporation "on an equitable basis" among the Native villages within the region. 43 U.S.C. § 1611(b). Thus, Leisnoi's status was key to a final determination of the entitlements of every entity entitled to ANCSA benefits.

Subsections (b)(1) and (c) then direct the Secretary to convey "the surface estate of all of the [specified] public lands on Afognak Island" "to a joint venture providing for the development of the [conveyed] surface estate on Afognak Island" and "consisting of the Koniag Deficiency Village Corporations, the Koniag 12(b) Village Corporations and Koniag, Incorporated."

Subsection (c) requires the joint venture to be one in which, among other things:

> the share of the Koniag Deficiency Village Corporations as a class in the costs and revenues of such joint venture is determined on the basis of a fraction, the numerator of which is the deficiency village acreage on the Alaska Peninsula and the denominator is the sum of the deficiency village acreage on the Alaska Peninsula plus the 12(b) acreage on the Alaska Peninsula plus the Koniag 14(h) acreage on the Alaska Peninsula, which fraction shall be multiplied by the number of acres on Afognak Island to be conveyed by reason of subparagraph (b)(1) of this subsection ... [and in which] each Koniag Deficiency Village Corporation shall participate in the share of the Koniag Deficiency Village Corporations as a class in the ratio that the entitlement of each to deficiency village acreage on the

Alaska Peninsula bears to the total deficiency village acreage on the Alaska Peninsula . . .

Thus, Leisnoi's status was key to the proper sharing of costs and revenues of the joint venture to which the lands on Afognak Island were to be conveyed.

Subsection (c) also requires the conveyance of Afognak Island lands to be "made as soon as practicable after there has been filed with the Secretary of the Interior a duly executed joint venture agreement with provisions for sharing of and entitlements in costs and revenues of such venture" as specified above. No provision is made for the conveyances to await the final outcome of Stratman's challenge to Leisnoi's eligibility.

Subsection (b)(1) specifies that the conveyance is to be made "in full satisfaction" of, among other things," the right of each Koniag Deficiency Village Corporation to conveyance under [ANCSA] of the surface estate of deficiency village acreage on the Alaska Peninsula" and "the right of each Koniag 12(b) Village Corporation to conveyance under [ANCSA] of surface estate of 12(b) acreage on the Alaska Peninsula."

As a "condition precedent" to the conveyance, subsection (b)(4) requires that "each Koniag Deficiency Village Corporation and each Koniag 12(b) Village Corporation . . . shall file with the Secretary of the Interior resolutions duly adopted by their respective boards of directors accepting the conveyances . . . as being in full satisfaction of their respective entitlements to conveyances of . . . deficiency village acreage on the Alaska Peninsula and of 12(b) acreage on the Alaska Peninsula."

Subsection (a)(2) defines "deficiency village acreage on the Alaska Peninsula" as "the aggregate number of acres of public land to which 'Koniag deficiency Village Corporations' are entitled, under section 14(a) of [ANCSA], to a conveyance of the surface estate on account of deficiencies in available lands on Kodiak Island."

These provisions in section 1427, while complex, are, with arguably two exceptions, quite clear. They require the Secretary, upon the completion of certain specified acts, to convey specified lands on Afognak Island to a particular joint venture that included Leisnoi in full satisfaction of the rights under ANCSA of certain of the joint venture partners, including Leisnoi, to, among other things, deficiency village acreage and 12(b) acreage on the Alaska Peninsula.

The only possible ambiguity is found in subsections (b)(1) and (a)(2). Subsection (b)(1), as noted above, provides that the conveyance of Afognak Island lands is "in full satisfaction" of, among other things, "the right of each Koniag Deficiency Village Corporation to conveyance under [ANCSA] of the surface estate of deficiency village acreage on the Alaska Peninsula." On its face, this language can be read as a congressional affirmation or declaration that Leisnoi, as a Koniag Deficiency Village Corporation, has a right to the conveyance of certain lands under ANCSA and that the conveyance of Afognak Island lands will fully satisfy that right. However, under ANCSA, the right of Leisnoi to a conveyance of lands is dependent on a determination by

the Secretary that the Native village whose natives the corporation was formed to represent is a Native village for purposes of ANCSA. As there was a pending judicial challenge with respect to Leisnoi's status as a Native village at the time section 1427 was passed, the following question arises: Did Congress in subsection (b)(1) ratify (accept as final) the Secretary's eligibility determination, thus mooting the pending judicial challenge, or was Congress simply acknowledging that, pending the outcome of the judicial challenge, Leisnoi had a right to certain acreage, based on the 1974 determination by the Secretary?

A similar question is posed by the language of subsection (a)(2). It defines Leisnoi as a corporation "entitled, under section 14(a) of [ANCSA] to a conveyance of the surface estate on account of deficiencies in available lands on Kodiak Island." On its face, this language, like the language in (b)(1), can be read as a congressional affirmation or declaration of Leisnoi's entitlement under ANCSA. However, under section 14(a) of ANCSA, the only village corporations entitled to a conveyance are corporations representing Native villages which the Secretary has found "qualified for land benefits under this chapter." 43 U.S.C. § 1613(a). Where the Secretary's finding with respect to Leisnoi was still subject to a judicial challenge at the time section 1427 was passed, the question arises: Did Congress, in defining Leisnoi as an entitled corporation under section 14(a) of ANCSA, ratify (accept as final) the Secretary's finding that Leisnoi was "qualified for land benefits," thus mooting the pending judicial challenge, or did it simply acknowledge that, pending the outcome of the challenge, Leisnoi was "entitled" under section 14(a) to a conveyance, based on the 1974 determination by the Secretary?

While I acknowledge, as did the district court, that these are "difficult question[s]," I conclude for the following reasons that the better reading of section 1427 is as a ratification of the 1974 eligibility determination that mooted Stratman's challenge.

First, to resolve the ambiguity in subsections (b)(1) and (a)(2), I rely on one of the cardinal canons of statutory construction: a statute is to be read as a whole. *Washington State Department of Social and Health Services v. Keffler*, 537 U.S. 371, 384 n. 7 (2003). When read as a whole, it is clear that section 1427 was intended to settle with finality and "as soon as practicable" the land entitlements of Koniag Regional Corporation and its villages and, to a lesser extent, the land entitlements of all of the entities entitled to ANCSA benefits. Certainty about the status of Leisnoi was a necessary predicate to achieving that finality. Without such certainty, the full entitlements of all of the parties affected by the settlement would either be incapable of calculation or, if conveyances and other distributions of benefits were made on the assumption that Leisnoi was an eligible village, they would run the risk of having to be amended or corrected at some indeterminate date depending on the outcome of Stratman's challenge. For example, Leisnoi's status was key to: 1) the amount of subsurface acreage to which Koniag regional corporation was entitled; 2) the sharing of costs and revenues by the Afognak Island joint venture partners; and 3) the 12(b) land entitlements of not just Koniag and its villages but the land entitlements of all eleven of the regional corporations and their villages.



EXHIBIT 11
Page 12 of 43 Pages

Reading section 1427 as a whole, and in the absence of any clear evidence to the contrary, I conclude that the language in subsections (b)(1) and (a)(2) is best read as ratifying the Secretary's eligibility determination with respect to Leisnoi.[7]

Second, I believe it is appropriate to apply the well-established canon of statutory construction that "remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also Atchison, T. & S.F.R. v. Buell*, 480 U.S. 557, 561-562 (1987); *Peyton v. Rowe*, 391 U.S. 54, 65 (1968). Section 1427 was designed to remediate the problem of Koniag's and its villages' entitlement to deficiency acreage. The deficiency acreage on the Alaska Peninsula, which was roughly 30 miles away across the Shelikof Strait, was inadequate for Koniag's and its villages' purposes. Congress intended section 1427 to provide a permanent solution to Koniag's and its villages' need for land. Section 1427, therefore, should be construed broadly to effectuate Congress's intent to settle Koniag's land entitlement permanently. In order to do so, it is necessary to read section 1427 as settling Leisnoi's status as an ANCSA village. As explained above, to do otherwise would not effectuate section 1427's purpose of permanently settling Koniag's land entitlement.

Finally, because section 1427 is arguably ambiguous, it is appropriate to examine its legislative history for indications of congressional intent. Such an examination reveals that Congress, when considering section 1427, was aware that questions had been raised about the eligibility of Leisnoi. Indeed, when Congress first began consideration of how to resolve the Koniag land claims, the Sierra Club testified:

> The Koniag amendment is . . . premature because of the uncertainty surrounding the amount of subsurface estate Koniag is entitled to. Its entitlement is based in part on the certification by Interior of [Leisnoi] as [an] eligible village despite clear Congressional intent to the contrary. [Leisnoi] is a former FAA installation. . . . Accordingly, we recommend that the Committee defer consideration of the Koniag amendment pending a Committee investigation of the certification of [Leisnoi] and a final determination of subsurface entitlement.

<u>Amendments to Alaska Native Claims Settlement Act: Hearing Before the Comm. On Interior and Insular Affairs U.S. Senate</u>, 94th Cong. at 392 (1975). Attached to Sierra Club's prepared statement was a copy of a letter from the President of the Kodiak – Aleutian Chapter of the Alaska Conservation Society that stated that Interior "should not have certified" Leisnoi, and that requested that the "Interior Committee direct a full and open investigation of the circumstances of the improper certification" of Leisnoi. *Id.* at 397.

Because Congress was specifically aware of concerns about Leisnoi's eligibility, and had been cautioned that settlement of the Koniag issues prior to a resolution of those

---

[7] Stratman argued before the IBLA that "nothing in section 1427 or the legislative history evidences any intent by Congress to exempt [Leisnoi] from the eligibility requirements of section 11(b)(3) of ANCSA." However, the argument is not that Congress exempted Leisnoi from the eligibility requirements, but, rather, that it accepted the Secretary's determination that those requirements had been met.

11

EXHIBIT 11
Page 13 of 15 Pages

concerns would be premature, it is reasonable to conclude that, in choosing to proceed with the settlement, Congress intended to moot the concerns about Leisnoi's eligibility.

### C. The IBLA's Reasoning

The IBLA acknowledges that Congress had the power to moot Stratman's challenge to Leisnoi's eligibility. However, for the three reasons discussed below, none of which is based on an analysis of the words of the statute itself, the IBLA concludes that "the listing of Leisnoi in section 1427(a)(4) and its entitlement to lands on Afognak Island was not a ratification of its eligibility," but "was merely reflective" of the fact that "there was extant [at the time section 1427 was passed] a final decision" of the Secretary certifying its eligibility.

<u>The lack of an immediate judicial challenge</u> – The IBLA notes that when section 1427 was passed in 1980, "Stratman's decertification litigation had been dismissed by the district court," and "was on appeal to the circuit court on procedural grounds." *Stratman v. Leisnoi*, 157 IBLA at 314. It then inexplicably concludes that because the appeal was "on procedural grounds," there was no "immediate judicial challenge" to Leisnoi's eligibility when section 1427 was passed, and that Congress could therefore not have intended to moot the challenge. *Id*. However, just because the pending appeal was "on procedural grounds" does not mean there was nothing to moot. The inescapable fact is that when section 1427 was passed there was an outstanding judicial challenge to the eligibility of Leisnoi that had the potential, depending on how it was ultimately resolved, of negatively affecting the settlement of the Koniag issues that Congress was then considering. Congress could well have intended to moot such a challenge by accepting as final the Secretary's determination that Leisnoi was eligible, so the settlement of the Koniag land claims could proceed.

<u>Seven Unlisted Villages</u> – The IBLA then states that its conclusion about Congress' intent is "reinforced by the fact that in the same section, Congress expressly provided for the resolution of disputes concerning the status of seven unlisted villages by declaring each to be 'deemed an eligible village' under" ANCSA. *Id*. According to the IBLA, Congress "could have done the same for Leisnoi, but it did not," and must therefore not have intended to moot Stratman's challenge. *Id*. The IBLA's reasoning, however, ignores the fact that the situation of Leisnoi was different than that of the seven unlisted villages, and therefore did not require the same treatment. At the time that section 1427 was passed, Leisnoi had been certified as an eligible Native village, while the status of the seven unlisted villages was uncertain—they had initially been determined ineligible, but that determination had been overturned by a court and was back before the Department on remand. To enable the Koniag settlement to go forward in a timely manner, the uncertainty about the status of the seven unlisted villages had to be resolved. Congress therefore adopted a compromise in which the villages would be deemed eligible in the statute but would forfeit some of their rights under ANCSA to receive land. No such compromise was necessary in the case of Leisnoi. To enable the Koniag settlement to go forward, Congress needed simply to accept the Secretary's

eligibility determination with respect to Leisnoi as final, which is what I have concluded section 1427 does.

Moreover, the IBLA's reasoning leaves unanswered a significant question: Why would Congress take such pains to resolve the status of the seven unlisted villages, so that the Koniag settlement could proceed, and yet leave unresolved the question that had been raised about Leisnoi's elgibility? As discussed above, leaving the status of Leisnoi unresolved ran the risk of seriously disrupting the implementation of the many interconnected provisions in section 1427.

<u>The 1995 Stratman Bill</u> – Finally, the IBLA relied on the fact that, at the time of the 1995 remand, the Senate had passed a bill that specifically "confirmed [Leisnoi] as an eligible Alaska Native Village, pursuant to Section 11(b)(3)" of ANCSA. The IBLA concludes that the provision, which ultimately did not become law, "would not have been needed if, in fact, section 1427 in 1980 had acted as ratification of Woody Island's eligibility." *Stratman v. Leisnoi*, 157 IBLA at 315. However, legislation proposed to a Congress sitting in 1995 that does not pass, is not a reliable indicator of what another Congress sitting 15 years earlier in 1980 may or may not have intended.

## IV. Conclusion

For the reasons explained above, I conclude that section 1427 ratified Leisnoi's status as a Native village eligible for ANCSA benefits, thus mooting Stratman's challenge to Leisnoi's status. I therefore recommend that you disapprove the IBLA's decision.

file an answering brief. No more than 15 days shall be allowed for the filing of additional briefs in connection with such appeals. All hearings held in connection with such appeals shall be conducted in the State of Alaska. The decision of the Ad Hoc Board shall be submitted to the Secretary of the Interior for his personal approval. The Ad Hoc Board is now known as the Alaska Native Claims Appeal Board and its address is P.O. Box 2433, Anchorage, Alaska. 99510.

CLARENCE ANTIOQUIA,
*Acting Director.*

FEBRUARY 11, 1974.

[FR Doc.74-4057 Filed 2-20-74;8:45 am]

## TENAKEE, ALASKA

### Final Decision Concerning Ineligibility as Native Village

This is a written decision on protest filed pursuant to 43 CFR, Part 2650 by John Borbridge, Jr., President, Sealaska Corporation, 127 South Franklin St., Juneau, Alaska 99801, in behalf of the Native Village of Tenakee Springs, also known as Tenakee, hereinafter referred to as protestant. The protest was dated January 15, 1974, and received on the same date by the Director, Juneau Area Office, Bureau of Indian Affairs. Protestant objects to the Native Village of Tenakee being determined to be ineligible on the ground that:

Affidavits attesting to the fact that the Native population of Tenakee Springs, as reported in the 1970 U.S. Census was in error and that as a result of this census error, the village had a majority of Native residents. Many individuals, during the enrollment process, made application to correct their original enrollment which did not show Tenakee Springs under Column 16 due to a mistake of fact or error of law. These same people appealed the denial of their request and our records indicate that many of those appeals are still pending. The importance of the final determination of appeals with regard to the Alaska Native Enrollment cannot be overstated. The December 18, 1973, enrollment printout shows 38 individuals enrolled to Tenakee (Tenakee Springs). Our records show many additional Natives have requested a correction in Column 16 and these requests are presently under appeal.

The Alaska Native Claims Settlement Act of December 18, 1971 (85 Stat. 688–716), and 43 CFR, Part 2650 provides for the settlement of certain land claims of Alaska Natives and for other purposes. Section 11(b) (3) of the Act is quoted as follows:

Native villages not listed in subsection (b)(1) hereof shall be eligible for land and benefits under this Act and lands shall be withdrawn pursuant to this section if the Secretary within two and one-half years from the date of enactment of this Act, determines that—

(a) Twenty-five or more Natives were residents of an established village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance; and

(b) The village is not of a modern and urban character, and a majority of the residents are Natives.

Part 43h of Title 25 of the Code of Federal Regulations provides for the enrollment of the Natives. A main source of "other evidence satisfactory to the Secretary of the Interior" is the official enrollment which not only contains evidence of race but of residence (on the 1970 census date) as well.

Section 2651.2 of Title 43 CFR contains the authority for the Director, Juneau Area Office, Bureau of Indian Affairs, to act for the Secretary of the Interior in the determination of the eligibility of Natives for land benefits under the Act.

As of January 21, 1974, 38 Natives had been approved for enrollment in the Native Village of Tenakee. On December 13, 1973, an investigation was completed of Tenakee and it was determined not to be modern and urban in character but it was determined not eligible as an unlisted Native village under the Act and the regulations. The non-Native population of Tenakee was 76 in 1970 according to the U.S. Census. The 1970 census shows that the non-Natives were in the majority when compared to the approved Native enrollment on January 21, 1974. There is no way to determine whether errors were made in the 1970 U.S. Census i.e., whether some Natives were listed as non-Natives. Tenakee meets all requirements of § 2651.2(b) of Title 43 CFR except it did not have a majority of Natives in 1970, nor does it have a majority at this time. The decision of the Director, Juneau Area Office, Bureau of Indian Affairs, must be based on the actual number of Natives on the approved enrollment and any additional Natives not enrolled who resided in Tenakee in 1970. The record does not show that any unenrolled Natives resided in Tenakee in 1970.

Since only 38 Natives were included in the approved enrollment in Tenakee as of January 21, 1974, which is the most recent enrollment printout, the Director must use these figures in making his decision within the thirty-day period for answering protests. The fact that appeals have been filed for Column 16 changes and such appeals are still pending in the enrollment at Tenakee, the decision of the Director cannot be based on these pending enrollment changes. The Director, Juneau Area Office, Bureau of Indian Affairs, has examined and evaluated the protest together with his record of findings of fact and decision and does hereby render a final decision determining that the Native Village of Tenakee is ineligible for land benefits under said Act.

The final decision of the Director, Juneau Area Office, Bureau of Indian Affairs, shall be published in the FEDERAL REGISTER and in one or more newspapers of general circulation in the State of Alaska and a copy of the decision and findings of fact upon which the decision is based shall be mailed to the affected village, all villages located in the region in which the affected village is located, all regional corporations within the State of Alaska, the State of Alaska, and any other party of record. Such decision shall become final unless appealed to the Secretary of the Interior by a notice filed with the Ad Hoc Board as established in § 2651.2(a) (5) of Title 43 CFR, by March 25, 1974. Appellants shall have not more than 15 days from the date of receipt of the notice of appeal within which to file an appeal brief, and the opposing parties shall have not more than 15 days from the date of receipt of the appellant's brief within which to file an answering brief. No more than 15 days shall be allowed for the filing of additional briefs in connection with such appeals. All hearings held in connection with such appeals shall be conducted in the State of Alaska. The decision of the Ad Hoc Board shall be submitted to the Secretary of the Interior for his personal approval. The Ad Hoc Board is now known as the Alaska Native Claims Appeal Board and its address is P.O. Box 2433, Anchorage, Alaska 99510.

CLARENCE ANTIOQUIA,
*Acting Director.*

FEBRUARY 11, 1974.

[FR Doc.74-4058 Filed 2-20-74;8:45 am]

## WOODY ISLAND

### Final Decision Concerning Eligibility as a Native Village

This is a written decision on protests filed pursuant to 43 CFR, Part 2650 by the Alaska Chapter, Sierra Club, P.O. Box 2025, Anchorage, Alaska 99510, and by Alaska Wildlife Federation and Sportsman Council, Inc., and Mr. Philip Holdsworth by and through their Counsel, James F. Clark of the law firm of Robertson, Monagle, Eastaugh and Bradley, P.O. Box 1211, Juneau, Alaska 99801, hereinafter referred to as Protestants.

The protest of the Alaska Chapter, Sierra Club was dated January 18, 1974, and it was received on January 18, 1974, by the Director, Juneau Area Office, Bureau of Indian Affairs.

The protests of the Alaska Wildlife Federation and Sportsman Council, Inc., and Philip Holdsworth was dated January 21, 1974, and it was received on January 21, 1974, by the Director, Juneau Area Office, Bureau of Indian Affairs.

Protestant, Alaska Chapter, Sierra Club states in part as follows: "1970 Census data showed that 25 Natives were not residents of this village as of the date of the census."

Protestants Alaska Wildlife Federation and Sportsman Council, Inc., and Philip Holdsworth state in part as follows:

*Woody Island*—The Bureau of Indian Affairs printout dated November 8, 1973, shows only 2 of the persons enrolled to Woody Island as living there at the present time.

The Alaska Native Claims Settlement Act of December 18, 1971 (85 Stat. 688–716), and 43 CFR, Part 2650 provides for the settlement of certain land claims of Alaska Natives and for other purposes. Section 11(b) (3) of the Act is quoted as follows:

Native villages not listed in subsection (b)(1) hereof shall be eligible for land and

benefits under this Act and lands shall be withdrawn pursuant to this section if the Secretary within two and one-half years from the date of enactment of this Act, determines that—

(a) Twenty-five or more Natives were residents of an established village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance; and

(b) The village is not of a modern and urban character, and a majority of the residents are Natives.

The 1970 census is not, therefore, the exclusive source of information for the determination of residency. Part 43h of Title 25 of the Code of Federal Regulations provides for the enrollment of the Natives. A main source of "other evidence satisfactory to the Secretary of the Interior" is the official enrollment which not only contains evidence of race but of residence (on the 1970 census date) as well.

Section 2651.2 of Title 43 CFR contains the authority for the Director, Juneau Area Office, Bureau of Indian Affairs, to act for the Secretary of the Interior in the determination of the eligibility of Natives for land benefits under the Act.

As of January 21, 1974, 279 Natives had been approved for enrollment in the Native Village of Woody Island. On July 18, 1973, a field investigation was completed of Woody Island and at that time 18 Natives who used the village for a period of time in 1970 were subsequently approved for enrollment on December 17, 1973. The 279 Natives who have been approved for enrollment to Woody Island, represent a majority of the residents of the village in 1970. It had on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life style and more than thirteen Natives enrolled thereto have used the village as a place where they actually lived for a period of time as required by Subpart 2651.2(b) of Title 43 of CFR.

The Director, Juneau Area Office, Bureau of Indian Affairs, has examined and evaluated the protests together with his record of findings of fact and decision, and does hereby render a final decision determining that the Native Village of Woody Island is eligible for land benefits under said Act.

The final decision of the Director, Juneau Area Office, Bureau of Indian Affairs, shall be published in the FEDERAL REGISTER and in one or more newspapers of general circulation in the State of Alaska and a copy of the final decision and findings of fact upon which the final decision is based shall be mailed to the affected village; all villages located in the region in which the affected village is located, all regional corporations within the State of Alaska, the State of Alaska, and any other party of record. Such decision shall become final unless appealed to the Secretary of the Interior by a notice filed with the Ad Hoc Board as established in § 2651.2 (a)(5) of Title 43 CFR, by March 25, 1974. Appellants shall have not more than 15 days from the date of receipt of their notices of appeal within which to file an appeal brief, and the opposing parties shall have not more than 15 days from the date of receipt of the appellant's brief within which to file an answering brief. No more than 15 days shall be allowed for the filing of additional brief in connection with such appeals. All hearings held in connection with such appeals shall be conducted in the State of Alaska. The decision of the Ad Hoc Board shall be submitted to the Secretary of the Interior for his personal approval. The Ad Hoc Board is now known as the Alaska Native Claims Appeal Board and its address is P.O. Box 2433, Anchorage, Alaska 99510.

CLARENCE ANTIOQUIA,
*Acting Director.*

FEBRUARY 8, 1974.

[FR Doc.74-4056 Filed 2-20-74;8:45 am]

---

National Park Service

NORTHEAST REGIONAL ADVISORY COMMITTEE

Notice of Meeting

Notice is hereby given in accordance with the Federal Advisory Committee Act that a meeting of the Northeast Regional Advisory Committee will be held at 9 a.m., e.d.t., on February 25 and 26, 1974, at the Mid-Atlantic Regional Office Conference Room, at 143 South Third Street, Philadelphia, Pa.

The Northeast Regional Advisory Committee was established pursuant to Public Law 91-383, August 18, 1970, to provide for the exchange of ideas between the National Park Service and the public, and to facilitate the solicitation of advice or other counsel from members of the public on problems and programs pertinent to the Northeast Region of the National Park Service.

The members of the Advisory Committee are as follows:

Mr. Norman G. Duke (Chairman)
Northfield, Ohio
Mr. Hyman J. Cohen
Arlington, Virginia
Mrs. Antoinette Downing
Providence, Rhode Island
Mr. Charles H. W. Foster
Needham, Massachusetts
Mr. Fred D. Hartley
Kenosha, Wisconsin
Mr. Lewis W. Jones
Bloomington, Illinois
Mr. William L. Lieber
Indianapolis, Indiana
Mr. Frederick R. Micha
Ontario, New York
Dr. M. Graham Netting
Pittsburgh, Pennsylvania

The matters to be discussed at this meeting are: (1) Impact of the Energy Crisis in Parks, (2) The National Park Foundation, (3) The Regional Advisory Committee under the reorganization, and (4) Summary of action on Committee Resolutions to date.

The meeting is open to the public. It is expected that 25 persons will be able to attend the session in addition to the Advisory Committee members and the Mid-Atlantic Regional staff.

Any member of the public may file with the Committee a written statement concerning matters to be discussed.

Further information concerning this meeting may be obtained from George A. Palmer, Special Assistant to the Regional Director, at 215-597-7014. Minutes of the meeting will be available for public inspection four weeks after the meeting at the office of the Mid-Atlantic Region, 143 South Third Street, Philadelphia, Pa.

Dated: February 8, 1974.

ROBERT M. LANDAU,
*Liaison Office, Advisory Commissions, National Park Service.*

[FR Doc.74-4147 Filed 2-20-74;8:45 am]

---

Office of Hearings and Appeals

[Docket No. M 74-42]

BECKLEY COAL MINING CO.

Petition for Modification of Application of Mandatory Safety Standards

Notice is hereby given that in accordance with the provisions of section 301(c) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. section 861 (c) (1970), the Beckley Coal Mining Company has filed three petitions to modify the application of mandatory safety standards. The first petition requests modification of section 303(y)(1), also published as 30 CFR 75.326; the second requests modification of section 303(y)(2), also published as 30 CFR 75.327, and implementing regulation 30 CFR 75.327-1; and the third requests modification of 30 CFR 75.1707. All such requests relate to Petitioner's mine located at Glen Daniel, West Virginia. Since the three petitions are all interrelated, they have been assigned the same docket number, and they will be considered together.

Section 303(y)(1) reads in pertinent part, as follows:

In any coal mine opened after the operative date of this title, the entries used as intake and return aircourses shall be separated from belt haulage entries, and each operator of such mine shall limit the velocity of the air coursed through belt haulage entries to the amount necessary to provide an adequate supply of oxygen in such entries, and to insure that the air therein shall contain less than 1.0 volume per centum of methane, and such air shall not be used to ventilate active working places. * * *

Section 303(y)(2) reads as follows:

In any coal mine opened on or after the operative date of this title, or, in the case of a coal mine opened prior to such date, in any new working section of such mine, where trolley haulage systems are maintained and where trolley wires or trolley feeder wires are installed, an authorized representative of the Secretary shall require a sufficient number of entries or rooms as intake courses in order to limit, as prescribed by the Secretary, the velocity of air currents on such haulageways for the purpose of minimizing the hazards associated with fires and dust explosions in such haulageways.

FEDERAL REGISTER, VOL. 39, NO. 36—THURSDAY, FEBRUARY 21, 1974.

HeinOnline -- 39 Fed. Reg. 6628 1974

EXHIBIT
Page 11 of 42 Pages

LEXSEE 656 F2D 1321

OMAR STRATMAN, ET AL., Appellants, v. JAMES G. WATT, SECRETARY OF
THE INTERIOR, ET AL., Appellees.

No. 79-4480

UNITED STATES COURT OF APPEALS, NINTH CIRCUIT

656 F.2d 1321; 1981 U.S. App. LEXIS 17956

September 11, 1980, Argued
September 8, 1981, Decided

SUBSEQUENT HISTORY: [**1]

Rehearing Denied November 27, 1981.

PRIOR HISTORY: Appeal from the United States District Court for the District of Alaska.

LexisNexis(R) Headnotes

COUNSEL:

Roger E. Henderson, Anchorage, Alaska; Frederick L. Miller, Duncan, Weinberg & Miller, Washington, D. C., argued, for plaintiffs-appellants; Roger E. Henderson, Houston & Henderson, Anchorage, Alaska, on brief.

Peter Steenland, Washington, D. C., argued, for defendants-appellees; Dan A. Hensley, Anchorage, Alaska, on brief.

JUDGES:

Before WALLACE, HUG and SCHROEDER, Circuit Judges.

OPINIONBY:

SCHROEDER

OPINION:

[*1322]

This is an action by various individuals to enjoin the granting of land patents to a Native corporation pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. § § 1601 et seq. Plaintiffs seek to demonstrate that the village corporation, Leisnoi, Inc. (Leisnoi), comprising the village of Woody Island, was not qualified as a Native village under the requirements of 43 U.S.C. § 1610(b)(3). n1 Defendants include the Secretary of the Interior and Leisnoi. A series of district court rulings resulted in the dismissal of all the plaintiffs' claims, and we partially remand.

n1. The action originally challenged two other Native villages, but those claims were separately litigated in another action, see Koniag, Inc. v. Kleppe, 405 F. Supp. 1360 (D.D.C.1975), aff'd in part and rev'd in part, 580 F.2d 601 (D.C.Cir.), cert. denied, 439 U.S. 1052, 99 S. Ct. 733, 58 L. Ed. 2d 712 (1978); those villages have subsequently been found by the Secretary to be ineligible.

[**2]

At the time suit was filed, these plaintiffs could have been grouped into two categories. The first group of plaintiffs were individuals who occasionally used the land subject to patent for recreational purposes. The other plaintiffs, Stratman and Burton, held long-term federal grazing leases on land within the area subject to patent, and were also recreational users. We affirm the district court's dismissal of the claims of the first category of plaintiffs, and reverse and remand the dismissal of the remaining recreational claims of Stratman and Burton.

The Alaska Native Claims Settlement Act (ANCSA), enacted in 1971, is intended to settle all aboriginal land claims by Natives and Native groups of Alaska. 43 U.S.C. § 1601; Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 493 (9th Cir.), cert. denied, 439 U.S. 954, 99 S. Ct. 352, 58 L. Ed. 2d 345 (1978). ANCSA provides for accomplishment of that settlement through distribution of 40 million acres of land and payment of $ 962,500,000 to Native villages and regional corporations established pursuant to the Act's provisions. The Act lists many Native villages which are eligible for

benefits, provided the Secretary determines [**3] [*1323] they meet specified qualifications. 43 U.S.C. § 1610(b) (1) & (2). ANCSA also provides that villages other than villages specifically enumerated in the Act can qualify as recipient Native villages under certain conditions. 43 U.S.C. § 1610(b)(3). n2 Regulations promulgated by the Secretary of Interior provide for particular kinds of notice and a hearing to determine the validity of each unlisted village's application. 43 C.F.R. § 2651.2(a)(8)-(10).

n2. 43 U.S.C. § 1610(b)(3) provides:

Native villages ... shall be eligible for land and benefits under this Act ... if the Secretary ... determines that

(A) twenty-five or more Natives were residents of an established village on the 1970 census enumeration date as shown by the census or other evidence satisfactory to the secretary, who shall make findings of fact in each instance; and

(B) the village is not of a modern and urban character, and a majority of the residents are Natives.

Woody Island is not listed in the Act as an eligible Native [**4] village. Application was made, however, for Woody Island to be declared an eligible village. After an investigation in 1973, Woody Island was found eligible to form a village corporation and determination of that eligibility was published in the Federal Register and several Alaska newspapers in accordance with Department of Interior regulations. None of the plaintiffs received actual notice of the Woody Island village application, however, and none filed objections or participated in any hearings held on the application, which was approved by the Secretary of Interior on March 18, 1975.

After learning of Woody Island's certification and the subsequent incorporation of Leisnoi to select lands for patent, plaintiffs filed this action pursuant to 28 U.S.C. § 1331 in July 1976, claiming that the government's investigation of the application, as required by 43 U.S.C. § 1610(b)(3) and 43 C.F.R. §§ 2651.2(a)(8) & 2651.2(b), had been insufficient and that the village did not qualify as a Native village. In a published opinion, the district court initially dismissed the claims of the recreational users, other than Stratman and Burton, for their failure to exhaust administrative remedies. [**5] However it permitted Stratman and Burton, because they had property interests in the land, to amend their complaint and to proceed, notwithstanding their failure to participate in any administrative proceedings. The court determined Stratman's and Burton's record interests entitled them to actual, rather than constructive notice of the certification application when administrative proceedings were pending. *Kodiak-Aleutian Chapter of Alaska Conservation Soc'y v. Kleppe,* 423 F. Supp. 544 (D.Alaska 1976).

At that point, faced with a full-scale trial of the Stratman-Burton claims, Leisnoi quitclaimed any interest in all land subject to Stratman's and Burton's leaseholds, thus mooting any claims based upon economic injury. Upon application of the defendants, the district court withdrew its prior ruling in favor of Stratman and Burton and dismissed their claims on the ground that there no longer existed any "case or controversy" within the meaning of article III of the United States Constitution. n3 The district court, significantly in our view, did not expressly consider the claims of Stratman and Burton as recreational users, apparently agreeing with the defendants that the quitclaim [**6] deed eliminated Stratman's and Burton's standing to challenge the certification.

n3. Stratman and Burton argue that their economic claims are not moot because other land selections by Leisnoi may threaten harm to their future economic interests in the area. We agree with the district court's ruling that any injury to these generalized economic interests is too speculative to create a case or controversy under article III. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S. Ct. 1601, 1607-08, 60 L. Ed. 2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 498-99, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975). See also *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42-44, 96 S. Ct. 1917, 1926-27, 48 L. Ed. 2d 450 (1976).

Plaintiffs in this appeal ask us to review both the dismissal of the Stratman-Burton [*1324] claims for lack of a case or controversy and the dismissal of the recreational users' claims for failure to exhaust administrative remedies.

With respect to Stratman [**7] and Burton, the issue is whether their claims were properly dismissed following the relinquishment by Leisnoi of any claim to the land in which they had economic interests. Its ruling was based upon the defendants' argument that the plaintiffs lacked standing to pursue any claim of damage other than damage to economic interests, and thus could not pursue any remaining claim based on recreational interests.

A threshold question for all the plaintiffs is therefore one of standing. In determining standing, we must con-

EXHIBIT
Page ___ of ___ Pages

sider both constitutional and prudential concerns. To satisfy the constitutional requirement that a "case or controversy" has been made out, the plaintiff must allege that he has suffered injury resulting from the defendant's allegedly illegal action. *Warth v. Seldin, 422 U.S. 490, 498-99, 95 S. Ct. 2197, 2204-05, 45 L. Ed. 2d 343 (1975)*. We have concluded that to satisfy this requirement "the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought." *Bowker v. Morton, 541 F.2d 1347, 1349 (9th Cir. 1976)* (footnote omitted). See also *Sierra Club v. Andrus,* [**8] *610 F.2d 581, 592 (9th Cir. 1979)*.

In dealing with standing to assert recreational interests, the Supreme Court in *Sierra Club v. Morton, 405 U.S. 727, 734, 92 S. Ct. 1361, 1366, 31 L. Ed. 2d 636 (1972)* rejected the argument that only economic interests could provide standing, pointing out that "(a)esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society ...." The plaintiffs allege they use the land subject to patent for a multitude of recreational purposes, including hunting, camping, picnicking and photography. This injury is sufficiently particularized; it is clear that the injury results from the defendants' action in removing the land from the public domain; the injury will be redressed by the enjoining of the defendants' removal of the land from the public domain. Thus, we conclude that the plaintiffs have satisfied the constitutional requirements of standing.

Plaintiffs have also satisfied our prudential standing concerns. Plaintiffs' claims are not merely claims of generalized import, but seek to vindicate individual rights. In addition, plaintiffs are raising their own legal interests, rather than the [**9] interests of third parties. *Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S. Ct. 1601, 1607-08, 60 L. Ed. 2d 66 (1979)*.

Finally, we are satisfied that plaintiffs' claim is within the zone of interests to be protected by the statute pursuant to which the claim arises. *Id. at 100 n.6, 99 S. Ct. 1607-08 n.6,* citing *Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S. Ct. 827, 830, 25 L. Ed. 2d 184 (1969)*. In considering whether that claim is within this zone of interests, we look to both the statute and the regulations promulgated under it. See B. Mezines, J. Stein & J. Gruff, 5 Administrative Law § 50.03 at 50-29 & 30 (1981) (look to statute to determine purpose and class to be protected); B. Schwartz, Administrative Law § 153 at 455 (1976). The regulations do not restrict the nature of protests which may be filed but rather provide that "any interested party" may protest the village certification. *43 C.F.R. § 2651.2(a)(9)*. The Act itself indicates that Congress was well aware of the recreational interests of users of public land, and specifically provided for retention of public access easements in the lands selected by Native villages [**10] in order to preserve and protect recreational interests in the remaining federal lands. *43 U.S.C. § 1616(b)*. We are thus persuaded that recreational interests are within the zone protected by the statute and we reject the defendants' argument that the recreational [*1325] claims should have been dismissed for lack of standing.

We now turn to the district court's original determination that those plaintiffs (other than Stratman and Burton) whose interests were never more than recreational should have exhausted administrative remedies. The plaintiffs argue against imposition of such a requirement on the ground that they did not have actual notice of the village's application and thus could not have utilized administrative remedies. There are, however, a vast number of occasional users of this land and actual notice to all would have been impossible. Notice was provided by publication in the Federal Register and several Alaska newspapers. The district court correctly held that neither the government nor the village was required to give actual notice to all potential recreational users, and that the publication and other notice requirements set forth in the regulations, *43 C.F.R.* [**11] *§ 2651.2(a)(8)*, did not deny due process to those whose only connection with the land was, at the time of published notice, simply that of recreational users. See *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 317, 70 S. Ct. 652, 658, 94 L. Ed. 865 (1950); North Am. Pharmacal, Inc. v. HEW, 491 F.2d 546, 551-52 (8th Cir. 1973); 44 U.S.C. § 1508*. Thus, while those with recreational interests have standing to challenge the agency action in question, they may not be relieved of the prerequisite of exhaustion of administrative remedies by virtue of lack of actual notice.

Stratman and Burton, however, were not merely recreational users at the time of Woody Island's application. They had record interests in land which was subject to allotment and thus were potentially affected by the village certification at the time of the application. Given the ease with which such record interests could have been ascertained, we agree with the district court's original determination, *423 F. Supp. at 547*, that Stratman and Burton were entitled to actual notice of the proposed certification. *Schroeder v. City of New York, 371 U.S. 208, 212-13, 83 S. Ct. 279, 282, 9 L. Ed. 2d 255 (1962); Walker* [**12] *v. City of Hutchinson, 352 U.S. 112, 116, 77 S. Ct. 200, 202, 1 L. Ed. 2d 178 (1956); Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. at 314, 70 S. Ct. at 657*. Since they did not receive such notice, they should not be barred by exhaustion requirements. n4 *Wills v. United States, 384 F.2d 943 (9th Cir.*

EXHIBIT __
Page __20__ of __ __ Pages