EXHIBIT 6

LEXSEE 109 IBLA 275

COLORADO OPEN SPACE COUNCIL, SIERRA CLUB

IBLA 86-151

Interior Board of Land Appeals

*109 IBLA 274; 1989 IBLA LEXIS 112*

June 20, 1989, Decided

**ACTION:**
[**1]

[*274] Appeal from a decision of the Colorado State Office, Bureau of Land Management, denying a protest to the approval of a suspension of the automatic elimination provisions of the Winter Flats Unit Agreement, CO-922.

Appeal dismissed.

**HEADNOTES:**

1. Rules of Practice: Appeals: Standing to Appeal

In order for an individual or organization to establish standing to appeal under 43 CFR 4.410, the individual or organization must show that he or she is a party to the case and that a legally cognizable interest has been adversely affected by the decision being appealed.

2. Rules of Practice: Appeals: Dismissal -- Rules of Practice: Appeals: Standing to Appeal

Where, on appeal from a denial of a protest, an appellant fails to make an adequate showing how any legally cognizable interest has been adversely affected by the denial of the protest, such an appellant will be deemed to lack standing to appeal and the appeal will be dismissed.

APPEARANCES:

Lori Potter, Esq., and Susan Andre, Esq., Denver, Colorado, for appellants;

Robert D. Buettner, Esq., Wichita, Kansas, for Koch Exploration Company;

Marla E. Mansfield, Esq., Office of the Solicitor, Denver, Colorado, for the Bureau of Land [**2] Management.

**OPINIONBY:** BURSKI

OPINION BY ADMINISTRATIVE JUDGE BURSKI

The Colorado Open Space Council (COSC) and the Rocky Mountain Chapter of the Sierra Club (Sierra Club) have appealed from a decision of the Colorado State Office, Bureau of Land Management, dated October 7, 1985, denying their protest against the approval of a suspension of the automatic elimination provisions of the Winter Flats Unit Agreement No. 14-08-0001-17042. BLM has filed a motion to dismiss the instant appeal on the ground that appellants lack standing to appeal as they are [*275] not adversely affected by the decision. For the reasons set forth below, we hereby grant that motion and dismiss the appeal. n1

   n1 We note that this case is being decided en banc with all regular members of the Board participating. See 43 CFR 4.2(a); cf. *28 U.S.C. § 46*(c) (1982).

In order to discuss the question of appellants' standing to appeal, it is first necessary to briefly review the history of the Winter Flats Unit up to the point of BLM's decision. [**3] The Winter Flats Unit was originally approved effective October 25, 1978, embracing more than 31,000 acres of land within Mesa County, Colorado. Forty-four Federal leases were either fully or partially committed to the unit and constituted over 98 percent of the total acreage within the unit area. Koch Industries, Inc., was originally appointed unit operator. Subsequently, Koch Exploration Company (Koch) was substituted as unit operator, effective December 13, 1982.

On November 2, 1979, the Area Oil and Gas Supervisor approved two initial participating areas, n2 effective May 8, and May 23, 1979, aggregating a total of 1,280 acres. A number of additional wells were completed so that by May 8, 1984, the fifth anniversay of the establishment of the first participating area, more than 7,100 acres were included in participating areas.

> n2 A participating area is "[t]hat part of a unit area which is considered reasonably proven to be productive of unitized substances in paying quantities or which is necessary for unit operations and to which production is allocated in the manner prescribed in the unit agreement." 43 CFR 3180.0-5. See *48 FR 26764* (June 10, 1983).

[**4]
Section 2(e) of the unit agreement provided, inter alia, that:

All legal subdivisions of lands * * *, no parts of which are entitled to be in a participating area on or before the fifth anniversary of the effective date of the first initial participating area established under this unit agreement, shall be eliminated automatically from this agreement, effective as of said fifth anniversay, and such lands shall no longer be a part of the unit area and shall no longer be subject to this agreement, unless diligent drilling operations are in progress on unitized lands not entitled to participation on said fifth anniversary, in which event all such lands shall remain subject hereto for so long as such drilling operations are continued diligently, with not more than 90 days elapsing between the completion of one such well and the commencement of the next such well.

Thus, pursuant to this provision, in order to keep the nonparticipating acreage within the unit, the unit operator was required to conduct diligent drilling operations as of May 8, 1984, and to continue such operations as provided for above.

[*276] By letter dated May 4, 1984, a landman for Koch informed BLM that, [**5] while its 90-day drilling requirement necessitated the commencement of a well by May 8, 1984, Koch had been informed by the Grand Junction District Office, BLM, that, due to adverse weather and road conditions, it would not be permitted to move equipment to the site specified in its approved Application for Permit to Drill (APD). Accordingly, Koch requested an extension of its drilling requirement to June 8, 1984. By return letter of the same date, the requested extension was granted.

According to a Sundry Notice and Report filed on June 11, 1984, well No. 1-2-100 was begun on May 29, 1984, when Koch drilled a 30-inch hole to 40 feet, ran casing, and cemented to the surface. Work continued sporadically on the well until August 19, 1984, when the production casing was set. On August 29, 1984, Koch filed a notice of intent to fracture and acidize in order to test the well. The drilling rig was moved off-site on September 24, 1984, and completion work was started at that time. The pipe was perforated at the Dakota formation, but the well was not fractured. Instead, by notice dated October 30, 1984, Koch requested permission to suspend fracturing operations, citing winter weather [**6] and road conditions. On December 7, 1984, the District Manager approved the suspension until May 15, 1985.

By letter dated January 24, 1985, the Deputy State Director for Mineral Resources expressly advised Koch that failure to commence completion operations on or before May 15, 1985, would result in the contraction of the Winter Flats Unit, effective November 30, 1984. n3 Koch subsequently sought and received an additional extension of 30 days in which to commence completion operations due to adverse road conditions. Well No. 1-2-100 was completed on June 12, 1985. Therefore, under the unit agreement, in order to prevent the automatic elimination of all lands not within a participating area, another well was required to be commenced on or before September 11, 1985.

> n3 This date was determined by using the date of the last completion activity, Sept. 1, 1984, and allowing 90 days for the commencement of another well as provided for in section 2(e) of the Unit Agreement.

By letter dated August 29, 1985, Koch alluded [**7] to the requirement that it commence drilling prior to September 12, and requested a 30-day extension under section 25 of the Winter Flats Unit agreement. As a basis of this extension, Koch noted that it was in the process of preparing an application for suspension of operations for the Winter Flats Unit and that it needed more time to garner the signatures necessary under Instruction Memorandum (IM) No. 85-537. By letter dated September 4, 1985, the Deputy State Director granted the requested extension to October 11, 1985.

On September 16, 1985, a letter was submitted on behalf of COSC and the Sierra Club, protesting suspension of the automatic elimination provisions of the unit agreement. The protestants argued:

Members of COSC and the Sierra Club have a long-standing interest in the multiple uses of the resources of the lands contained within the Winter Flats Unit. Both organizations have [*277] sponsored member-led outings to these lands for the purposes of enjoyment of scenery, native flora and fauna, the wild horse herd, primitive recreation, and solitude. Suspension of the unit agreement on the grounds of unavoidable delay due to gas market conditions will render undue [**8] hardship on those resources of greatest value to our members by continuing the dominance of oil and gas development over other resources in the area.

Arguing that the granting of the suspension would run counter to, inter alia, the Federal Land Policy and Management Act of 1976 (FLPMA), *43 U.S.C. §§ 1701*-1783 (1982), and the Mineral Leasing Act of 1920, *30 U.S.C. §§ 181*-287 (1982), the protestants requested that the State Director deny the requested suspension.

By letter dated September 19, 1985, Koch formally requested suspension of the automatic elimination provisions and tolling of the unit term. In this letter, Koch noted that 12 gas wells existed within the unit boundaries but that all were currently shut-in due to a lack of market for the gas and the necessity of reducing the $CO_2$ content of the gas. Koch further noted that Northwest Pipeline Company had unilaterally terminated a gas purchase contract which it had entered into with Koch and had further refused to transport gas for Celsius Energy Company (a working interest owner in all of the wells) pursuant to a gas purchase contract between Celsius and Mountain Fuel Supply Company, because the gas did not meet the [**9] contract standards for $CO_2$.

After alluding to the requirement under section 2(e) of the Unit Agreement that Koch commence drilling another well by October 11, 1985, in order to avoid the automatic elimination of non-participating lands, the letter continued:

Under the market conditions described above, as Operator, Koch believes that nothing can be gained by drilling and shutting in still more gas wells simply to avoid contraction of the unit. By suspension of the continuous drilling obligations and of the automatic elimination provisions of the Unit Agreement, the unit would be retained intact for development as a unit when the gas market improves. As a result, pursuant to Section 25 of the Unit Agreement, Koch, as Operator of the Unit, requests a suspension of the automatic elimination provisions until the gas market improves in accordance with the guidelines provided in Instruction Memorandum 85-537 issued on July 9, 1985.

By letter dated October 7, 1985, the Deputy State Director, pursuant to section 25 of the Unit Agreement (Unavoidable Delay), suspended the automatic elimination provisions of section 2(e) for a 2-year period, commencing on October 12, 1985. The letter [**10] noted that, upon expiration of the extension period, Koch would be required to commence drilling within 90 days in order to forestall the automatic elimination of non-participating lands, and further noted that, since the unavoidable delay was not caused by any action undertaken by BLM, there was no suspension of the operating and producing requirements of the Federal leases committed to the unit, as set forth at 43 CFR 3103.4-2.

[*278] By letter of the same date, the Deputy State Director informed appellants of his decision to grant the request for a suspension. In this letter, he noted that:

The existence of the Winter Flats Unit has enabled the BLM to manage the development of the gas resources in an orderly fashion. Without the existence of the unit agreement, each of those leases could be developed on an individual lease basis thus creating more surface disturbance and increasing the impacts on other resources. Unitization decreases surface disturbances by regulating the optimum number of wells required to maximize resource recovery and prevents the drilling of additional wells due to the drainage of mineral resources by neighboring leases.

The Deputy State Director [**11] also referenced the generalized allegations that suspension would be contrary to various laws. He noted that, pursuant to IM No. 85-537, inability to obtain a market for gas produced from presently completed wells could be considered as a "force majeure" situation. He concluded that, inasmuch as no market presently existed for the gas produced from the Winter Flats Unit, suspension of the automatic elimination provision of section 2(e) was in accord with the IM. A notice of appeal was duly filed from this determination.

In their statement of reasons (SOR) in support of their appeal, appellants first noted that approximately 8,200 acres of land which would have been subject to automatic elimination from the unit were in either the Little Bookcliffs Wilderness Study Area (WSA) or the Little Bookcliffs Wild Horse Range (WHR). After describing the organization of both COSC and the Sierra Club, and their active participation in past land management decisions concerning the lands in question, appellants addressed the question of the adverse effect of the decision on their interests:

> Members of the Sierra Club and COSC use Little Bookcliffs WSA and WHR for various forms of outdoor [**12] recreation, including nature study, photography, backpacking, camping, and picnicking. BLM's decision to suspend the automatic elimination provision of the Unit Agreement adversely affects COSC's and Sierra Club's rights to use these lands in their pristine state and to work for their designation as wilderness. Therefore, Appellants are parties adversely affected and entitled to seek review by this Board under 43 CFR § 4.410 and *California Association of Four Wheel Drive Clubs, et al.*, 30 IBLA 383 (1977).

(SOR at 3). The remainder of appellants' SOR was directed to the substantive matters which they argued were involved in this appeal.

On February 18, 1986, counsel for BLM filed a motion seeking dismissal of the instant appeal on the ground that appellants had not been adversely affected by the decision to suspend the automatic elimination provisions of the unit agreement and thus had no standing to appeal therefrom. Thus, BLM noted that, while the Board has traditionally afforded standing to appeal to organizations alleging injury from an action undertaken by BLM, the Board [*279] still requires a nexus between the decision under appeal and the interests which the association [**13] seeks to protect. BLM argued that, in the instant case, there was no correlation between the decision to suspend the automatic elimination provision and the interests of appellants' members.

On March 24, 1986, appellants submitted their reply to the motion to dismiss. Appellants asserted that the Board had already held that "where a party appeals BLM's approval of mining activity, the possibility that the activity may continue despite BLM's action is no bar to standing" (Reply at 1, citing *In re Pacific Coast Molybdenum*, 68 IBLA 325 (1982)). Appellants contended that:

> The existence of mineral leases in the Little Bookcliffs WSA is the major impediment to designation as a Wilderness Area. Once the leases expire, that impediment is removed. BLM's suspension of the automatic elimination of non-participating areas allow the terms of the non-producing leases in the WSA to be extended by their inclusion in the unit.
> * * *
> Even though the inclusion of the WSA lands in the unit may be only one of a series of impediments to Appellants' goal of wilderness area designation, this does not deprive Appellants of the right to remedy each impediment as the issue becomes ripe. The [**14] existence of unit operations is a bar to Appellants' goal. If Appellants succeed in this action, that bar will be removed.

(Reply at 2).

[1] Before addressing the specific issues involved in this appeal, it is useful to briefly recapitulate the elements necessary to show standing to appeal under 43 CFR 4.410. That regulation, with limited exceptions not applicable herein, confers standing to appeal on "[a]ny party to a case who is adversely affected by a decision of an officer of the Bureau of Land Management." 43 CFR 4.410(a). The decisional law of the Department has clearly established that the question of standing must be resolved by a two-step analysis. First, are the appellants parties to the case within the meaning of the regulation? Second, assuming that the answer to this first question is in the affirmative, have the appellants been adversely affected by the decision being appealed? See *Oregon Natural Resources Council*, 78 IBLA 124, 125 (1983); *In re Pacific Coast Molybdenum, supra; United States v. United States Pumice Corp.*, 37 IBLA 153, 158-59 (1978).

With respect to the "party to a case" criterion, the Board has consistently held that this test is [**15] met where the party seeking to appeal has filed a timely protest to the action being taken under 43 CFR 4.450-1. n4 Appellants clearly filed a timely protest and BLM does not challenge their [*280] assertion that they are parties to the case within the meaning of 43 CFR 4.410.

> n4 This is not the only way, of course, that an individual may become a party to a case. Thus, for example, an oil and gas lease applicant may file an appeal from rejection of the application without ever having filed a protest to BLM's action. The filing of a timely protest, however, in and of itself establishes that the individual is

a "party to a case," and obviates any further need to examine the specific interests asserted insofar as this element of standing is concerned. See *Elaine Mikels, 41 IBLA 305 (1979)*.

But, as the Board has reiterated on numerous occasions, the mere fact that an individual is a party to a case does not necessarily establish that he or she has been adversely affected by the decision under appeal. See, e.g., [**16] *George Schultz, 94 IBLA 173, 177-78 (1986); Mark Altman, 93 IBLA 265 (1986)*. On the contrary, the Board has expressly held that in order to maintain an appeal, "the record must show that appellants have a legally recognizable interest." *Sharon Long, 83 IBLA 304, 308 (1984)*. Nor will the Board indulge in idle speculation as to why an appellant is concerned about a decision. See *Mark Altman, supra; Save Our Ecosystems, Inc., 85 IBLA 300, 301 (1985); James W. Smith, 85 IBLA 237, 239 (1985); Phelps Dodge Corp., 72 IBLA 226, 228 (1983)*. It is the responsibility of the appellant to allege facts establishing the nature of the injury for which redress is sought. *Donald Pay, 85 IBLA 283 (1985)*. Moreover, the injury must be an injury in fact; mere speculation that an injury might occur in the future will not suffice. There must, in short, be a causal relationship between the action undertaken and the injury alleged. See *Save Our Ecosystems, Inc., supra*. It is with these principles in mind that we must examine the contentions of the parties in the present appeal.

[2] Appellants allege that the decision of BLM to approve Koch's request for a suspension of [**17] the automatic elimination provision effectively injures their interest in having the land within the Little Bookcliffs WSA permanently designated as a wilderness area by indefinitely continuing the oil and gas leases presently in existence. BLM, for its part, argues that appellants have suffered no injury by the BLM decision because, even if BLM had refused to suspend the automatic eliminatio provision and the unit had contracted, the individual lessees would have retained the right to develop their leases during the 2-year extension afforded by *30 U.S.C. § 226*(j) (1982). n5 For reasons which we will explicate infra, we agree with BLM [*281] that appellants have failed to allege or prove facts sufficient to establish that they have been adversely affected by the decision under appeal.

> n5 We are aware of the fact that appellants have also challenged BLM's determination that any of the leases were subject to extension beyond their original lease terms because appellants assert there has never been production in paying quantities under the unit (SOR at 23). Even assuming appellants are correct in their assertion that there has been no production in paying quantities from any well within the unit, the leases would not be subject to termination because *30 U.S.C. § 226*(f) (1982) provides, in relevant part, that
>
> "[n]o lease issued under this section covering lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same unless the lessee is allowed a reasonable time, which shall be not less than sixty days after notice by registered or certified mail, within which to place such well in a producing status * * *."
>
> This provision has been held equally applicable to unit wells. See *Hiko Bell Mining & Oil Co. (On Reconsideration), 100 IBLA 371, 95 I.D. 1 (1988)*. As early as Aug. 16, 1979, the Acting Oil and Gas Supervisor found that Koch had completed a well capable of production within the Winter Flats Unit. Thus, appellants' assertion that a number of the leases would not be eligible for an extension upon the automatic elimination of the non-producing acreage is erroneous.

[**18]

Initially, we would note that it is arguable whether appellants could ever have standing to challenge a decision solely on the ground that the decision made it less likely that a specific WSA would be included in the permanent wilderness system, absent a showing that the decision, itself, led to impairment of the wilderness characteristics of the land. This is so because, once a decision has been made to classify acreage as a WSA, ultimate inclusion of that land within the wilderness system is a question which is, by statute, left solely to Congress, acting upon the recommendations of the President. See *43 U.S.C. § 1782*(b) (1982).

The Department of the Interior's role in this process is clearly delineated. The Secretary is required to review each WSA and report to the President as to his recommendations for inclusion or noninclusion within the wilderness system. See *43 U.S.C. § 1782*(a) (1982). Thus, not only is the Department's role limited to the making of recommendations, that function is, itself, vested in the Secretary. Since this Board is precluded from reviewing any decision approved by the Secretary (43 CFR 4.410(a)(3)), such recommendations as he may see fit [**19] to make are beyond the jurisdiction of the Board. n6

> n6 In contrast to the wilderness inventory phase, which was essentially adjudicatory and required the Department to ascertain the existence of wilderness characteristics on specific parcels in conformity with statutory guidelines, the ultimate decision to include or exclude land from the permanent wilderness system is inherently political. Thus, the fact that both the Federal Courts (see, e.g., *Sierra Club v. Watt, 608 F. Supp. 305 (D. Cal. 1985)),* and this Board, in cases too numerous to list, reviewed the correctness of BLM decisions to designate or not designate various inventory units as WSA's is functionally irrelevant to whether or not ultimate inclusion of any WSA in the permanent wilderness system is subject to administrative or judicial review.

This is to be contrasted with the unquestioned right of appellants to challenge a decision which would adversely affect their members in their enjoyment of the lands involved or which would result in a violation [**20] of the undue degradation or nonimpairment standards, as applicable. n7 Thus, for [*282] example, if BLM were to approve an APD for land within the Winter Flats Unit, appellants might properly allege that this action would interfere with their enjoyment of the lands in question and could show, therefore, that they were adversely affected. But in such a case appellants are adversely affected not because, in some theoretical sense, the decision makes it less likely that the land will be included within the wilderness system, but because, in a real and immediate way, the decision authorizes physical actions which, in and of themselves, may adversely affect those interests which appellants seek to protect.

> n7 As the Board indicated in *Colorado Open Space Council, 73 IBLA 226 (1983),* in the absence of any actual drilling operations prior to the enactment of FLPMA on an individual lease or within a unit, the nonimpairment standard is applicable, as drilling would not be considered a grandfathered use. However, the Board cautioned that where pre-FLPMA leases are involved, section 701(h) of FLPMA, 90 Stat. 2786, *43 U.S.C. § 1701* note (1982), expressly makes all actions of the Secretary subject to valid existing rights. Thus, the Board noted that "the nonimpairment standard cannot be used to defeat a lessee's valid existing right to develop a lease." *Id. at 229.*
>
> Consistent with this analysis, the Department has adopted the policy that, for pre-FLPMA leases which, as a general rule, were not encumbered with either a wilderness protection or a no surface occupancy stipulation and for which an adequate APD has been filed but denied for wilderness considerations, a suspension of the operation or production requirements will be granted "for the time necessary to complete necessary studies and consultations and, if applicable, for a decision on wilderness status to be made." Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP) at III.J.1.d. Thus, paradoxically, if appellants were successful in their appeal and the non-participating acreage eliminated from the unit, it is possible that many of the individual leases would be indefinitely suspended until a decision on the inclusion of the Little Bookcliffs WSA in the permanent wilderness was made by Congress.

[**21]

Moreover, as a practical matter, the assertion that the mere existence of these leases makes it less likely that the lands in question will be included in the permanent wilderness system does not withstand analysis. Appellants state "BLM's Grand Junction Resource Management Plan [RMP] explicitly acknowledges that existing oil and gas leases preclude a recommendation in favor of wilderness designation." See SOR at 22. In point of fact, the RMP does no such thing.

The Draft RMP, which was appended to the SOR as Exhibit G, analyzed various impacts from different sources on the wilderness character of a number of areas under consideration for inclusion in the wilderness system. Among the impacts considered were those from oil and gas management. That discussion is, in its entirety, set forth below:

Development of oil and gas leases would be the most severe in the Demaree Canyon and Little Book Cliffs WSAs where the probability of development is high as evidenced by the areas being completely under oil and gas lease. BLM has estimated there will be 33 wells developed in the Demaree Canyon WSA and 31 wells developed in the Little Book Cliffs WSA over the next 20 years. [**22] The [*283] resulting surface disturbance would segment these WSAs into parcels of less than 5,000 acres in size, disrupt naturalness and minimize opportunities to experience outstanding solitude and/or primitive confined recreation. Special features in the Little Book Cliffs WSA would also be impaired.

Development of ten pending applications for permit to drill (APD's) in the Little Book Cliffs area would have the following impacts: Two of the APD's area [sic] outside of the Little Book Cliffs WSA and would have no impact on wilderness characteristics. Development of seven APDs in Zone 1 would directly impact about 62 acres and would eliminate this northern portion of Zone 1 from further wilderness consideration. This would constrain Congress' ability to designate the balance of the area as wilderness. One well in Zone 2 would impact about 9 acres and would be a major impact on the unit. Any development in Zone 2 incrementally lessens this core area from being manageable as wilderness. Further well development on the pre-FLPMA leases that make up more than 90 percent of Zone 2 could make the entire WSA unsuitable for wilderness designation.

The probability [**23] of oil and gas development is low in The Palisade, where a pre-FLPMA lease extends into the WSA and covers 120 acres. Overall, the impact from oil and gas development would be expected to be minimal. Prohibiting future oil and gas leasing and development in the Black Ridge Canyons (both units), Dominguez Canyon, and Sewemup Mesa WSAs would help preserve the areas' wilderness characteristics. [Emphasis added.]

(Draft RMP at 215-16). No changes were made in the Final RMP with respect to the language quoted above.

A review of the RMP makes it clear beyond any dispute that it was not the existence of the leases which constituted a ground for recommending denial of wilderness status but the likelihood of development of those leases. This is a critical distinction, since, while BLM's decision arguably had the effect of lengthening the period of the leases' existence, it was neutral (if not beneficial) with respect to development activities under the leases.

As noted above, Koch sought a suspension of the drilling requirements under the unit agreement in order to obviate the necessity of drilling additional wells within the unit area until a market could be obtained [**24] for the gas which it had discovered. Leaving aside the question whether BLM ought to have granted the suspension, it is important to recognize that there were three distinct futures that could have resulted from Koch's application. First, BLM could, as it did, grant the suspension. The effect then would be to suspend drilling requirements for 2 years and essentially continue the unit in status quo.

Alternatively, BLM could have denied the suspension. Koch, as unit operator, would have been faced with the immediate choice of either drilling [*284] or allowing automatic contraction. It might have elected to drill. In that event, assuming the drilling was timely under the unit agreement, all acreage would have been retained within the unit. Upon completion of the well, Koch would have 90 days, under section 2(e) of the unit agreement, in which to commence another well. So long as Koch continued to drill wells in accordance with section 2(e), all acreage would be retained within the unit for at least an additional 5 years, and possibly longer. n8

   n8 Under the unit agreement, an additional 2-year extension may be obtained pursuant to certain specified conditions.

[**25]

The third possibility was that BLM would deny the suspension and Koch would be unwilling or unable to timely commence drilling the required well. In that case, pursuant to section 2(e) of the unit agreement, all non-participating acreage would have been automatically eliminated. This would not mean, however, that the leases covering this acreage would thereby terminate or expire. On the contrary, all leases or parts of leases eliminated would be continued for their original term or for not less than 2 years, whichever was longer, and so long thereafter as oil or gas were produced in paying quantities. See *30 U.S.C. § 226*(j) (1982). n9

   n9 Moreover, we should recognize the possibility that the owners of excluded acreage might have formed a new unit and, upon the drilling of a successful well, obtained additional extensions.

What is important to note is that either of the latter two possibilities would have resulted in the necessity of drilling in the immediate future in order for the lessees to protect their interests. [**26] Thus, to the extent that development of the lands may represent an effective impediment to their inclusion in a wilderness area, a decision denying suspension of the drilling requirements would have almost certainly accelerated that development.

Indeed, if BLM had denied Koch's suspension request under section 25 of the unit agreement, appellants could have just as easily protested on the ground that the alternatives of either continued drilling or automatic exclusion of the non-

participating acreage under section 2(e) made development of that acreage more likely in the next 2 years. Thus, we seem to be faced with a situation in which appellants could claim to be adversely affected irrespective of the actual decision by BLM on the issue being appealed. How this can be possible is unclear.

The short answer, we would suggest, is that appellants would not be adversely affected by either action of BLM. It is not the continuation of the lease or the unit but the likelihood of development which provided the basis for BLM's recommendation with respect to the WSA. The decision being appealed is silent as to this point. In fact, we believe it is demonstrably clear that by suspending [**27] the drilling requirements, BLM has made it more likely that Congress might afford favorable consideration to inclusion of the Little Bookcliffs WSA in the wilderness system. This is so for the elementary reason that so long as an area retains its wilderness characteristics the possibility always remains that Congress will determine to preserve that area, even if this requires the expenditures of funds to acquire [*285] fee or leasehold estates. Once, however, the wilderness characteristics of an area are destroyed, there is little, if any, likelihood that such land would obtain favorable review for inclusion in the wilderness system.

Moreover, appellants appear to be operating under the assumption that, should the unit contract and the subject leases simply disappear, the land would automatically be deemed appropriate for inclusion in the wilderness system. But, by definition, all lands included within the study phase possess wilderness characteristics. This does not mean that all such land would be ultimately designated as wilderness areas. On the contrary, as this Board has noted innumerable times, the purpose of the wilderness study phase is

to analyze each WSA's suitability [**28] for wilderness designation in conjunction with the whole range of other public land uses that Congress has authorized. Thus, the mineral potential of any tract would be examined in the study phase to determine the impact that a permanent wilderness designation might have on such values. Moreover, this analysis is not limited to only mineral values, but embraces the full range of public uses, including grazing and recreational use, with an aim to determining the relative merits of a specific parcel's inclusion in the wilderness system. Indeed, the entire purpose of the study phase is the generation of data sufficient to make informed choices between competing claims to the land.

*Union Oil Company (On Reconsideration), 58 IBLA 166, 170 (1981).* Therefore, quite independent of the present right of any party to develop the minerals within the unit area, the mere existence of these mineral values could serve as a basis for a determination by Congress that the land should not be included within the wilderness system.

We do not mean to suggest that such a conclusion necessarily flows with respect to the instant acreage. Such a determination is ultimately committed to Congress. [**29] But we do believe that recognition of the realities of wilderness designation must make us wary of allowing simplistic arguments to substitute for real injuries. Appellants, in order to maintain an appeal to this Board, are required to show that they have suffered an injury in fact from the decision being appealed. Appellants' stated concern relates to the inclusion of the subject land within the wilderness system. The decision being appealed in no way negatively affects either the suitability of the land for inclusion therein or the likelihood that the land might actually be included, even assuming that appellants could properly base an appeal on this last contention. Thus, appellants have failed to meet the second prong of our traditional standing test -- they have failed to establish that any legally cognizable interest has, in fact, been adversely affected by the decision which they seek to appeal.

A few comments on the dissent's standing analysis appear warranted. The dissent commences with a nod towards the Board's often-stated observation that "there is no necessary congruity between the standing requirements which control the availability of judicial review and those [**30] which animate [*286] the arena of administrative practice" (*In re Pacific Coast Molybdenum Co., 68 IBLA 325, 331 (1982)),* and then proceeds to launch into a catalogue of judicial interpretations of Article III standing, supportive of the most expansive view of standing before the Federal courts. It is one thing to note, as we did in Pacific Coast Molybdenum, that determinations of judicial standing "provide a useful guide as to the types of interests which have been deemed relevant." *Id. at 332* (emphasis supplied). It is something far different to suggest, as the dissent does, that determinations of judicial standing control our adjudications of administrative standing. Indeed, that view was expressly rejected in Pacific Coast Molybdenum.

Moreover, application of the judicial pronouncements guiding Article III standing leads, we believe, to the same conclusion as that reached under our own standing adjudications. Thus, the "injury in fact" requirement embraces three separate elements, requiring, "at an irreducible minimum," that "the party who invokes the court's authority * * * 'show that he personally has suffered some actual or threatened injury [**31] as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favor-

able decision.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472 (1982)* (citations omitted).

The "actual or threatened injury" standard requires a concrete injury, not an injury to "abstract" interests. See *Diamond v. Charles, 476 U.S. 54, 66-67 (1986); Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 40 (1976)*. To the extent that appellants are attempting to premise standing on the right to be free from the fear that development may, at some future point, occur, they are not alleging a "concrete injury," but rather attempting to vindicate an abstract interest. To the extent, however, that appellants are basing their challenge on the likelihood of physical impairment of the wilderness characteristics, the possible injury cannot fairly "be traced to the challenged action," since, as we have explained above, the decision being appealed has a neutral, if not beneficial effect, on actual development.

The dissent suggests that [**32] the possibility of development, had BLM denied the requested suspension, is speculative. But it is no more speculative than appellants' fears that the suspension of the drilling requirement will ultimately result in the destruction of the wilderness characteristics of the land. If Koch is unlikely to develop the leases in the short run, where, then, is the perceived threat? As the Supreme Court has noted, "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. Eastern Kentucky Welfare Rights Org., supra at 44*.

Finally, the dissent argues that "BLM's motion to dismiss appellants for lack of standing cannot be granted without offering them the opportunity for a hearing or other means of supplementing the record (such as affidavits) to support their standing." Infra at 299. In point of fact, appellants had precisely such an opportunity. BLM's motion to dismiss was not filed ex parte. On the contrary, appellants subsequently filed a response [*287] to the motion, the substance of which is quoted in the text of this decision. That their response has proved inadequate to establish their standing is a deficiency which must be laid [**33] at their door. We are unaware of any rule of adjudication, either administrative or judicial, which supports the dissent's apparent theory that, after a motion to dismiss for lack of standing has been fully briefed by both sides, the deciding authority must, if it is of the view that the motion should be granted, afford the appellant yet another opportunity to cure the inadequacies of its original submissions. Having had ample opportunity to establish their standing to appeal in the instant case, we will not indulge in idle speculation as to what appellants might be able to show if afforded one more opportunity to establish standing to appeal. See *Oregon Natural Resources Council, supra*.

While our conclusion on standing negates any necessity to address the substantive issues raised in this appeal, since the dissent proceeds to rule that Koch has not shown it was prevented from drilling the wells required by unit agreement by circumstances "beyond its reasonable control," we feel compelled to offer the following observation. If this were a matter of statutory or regulatory interpretation, we would agree that Koch had failed to establish that the lack of a present market for [**34] its high carbon dioxide content gas has a causative relationship to its ability to drill additional wells as required by the unit agreement. But, this is not such a case.

Rather than presenting a question of statutory or regulatory construction, the issue is essentially one of contract interpretation. While it is true that the Department has provided a model form for unit agreements (see 43 CFR 3186.1), the unit agreement itself is a consensual undertaking of the various interest holders, the unit operator, and the United States for joint operation of the area to allow maximum recovery of hydrocarbons.

In essence, therefore, what the present case presents is a situation in which the parties to a contract are in agreement as to the interpretation of one of its provisions and a stranger to the contract asserts that the interpretation espoused by the signatories to the agreement is erroneous. n10 Clearly, even if one were willing to permit such a third party to challenge an interpretation agreed to by all signatories, this Board owes more than a passing deference to the interpretation espoused. A review of the dissent shows that, rather than requiring appellants to clearly establish [**35] that the interpretation adopted by BLM and Koch is contrary to the original intent of the parties, the dissent proceeds to interpret the language as if it were [*288] writing on a tabula rasa with total freedom to implement the policy it feels should be adopted. This, we would suggest, is an improper standard of review. Thus, even assuming appellants had established their standing to appeal, the ultimate conclusion of the dissent is not sustainable.

>    n10 Indeed, none of the provisions being analyzed is required by either statute or regulations. The applicable statute, *30 U.S.C. § 226(j) (1982)*, is written so as to grant the Department broad authority to approve unit agreements, but there is nothing in the statute concerning the duration of such unit agreements, the drilling requirements which may be enforced or the conditions for suspending or continuing the unit. Similarly, the regulations, 43 CFR Part 3180, while containing a model unit agreement, expressly authorize variances where ap-

propriate. See 43 CFR 3181.1. Thus, even when the model unit agreement is utilized without variation, this does not represent the mandate of the regulations but rather the agreement of the parties.

[**36]

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the instant appeal is dismissed on the grounds that appellants have failed to establish how any legally cognizable interest has been adversely affected by the decision which they seek to appeal.

James L. Burski
Administrative Judge

**CONCURBY:** HORTON; FRAZIER; GRANT; HARRIS; KELLY; MULLEN (In Part)

We concur: Wm. Philip Horton, Chief Administrative Judge
Gail M. Frazier, Administrative Judge
C. Randall Grant, Jr., Administrative Judge
Bruce R. Harris, Administrative Judge
John H. Kelly, Administrative Judge.

**DISSENTBY:** MULLEN (In Part); IRWIN

[*289] ADMINISTRATIVE JUDGE MULLEN DISSENTING IN PART AND CONCURRING IN PART:

The line of reasoning in the majority opinion gives me no little trouble. One of the primary bases for the final conclusion reached on the issue of standing is the fact that the final determination regarding whether lands will be made a part of the wilderness system is left solely to Congress. The majority correctly notes that Congress acts upon the recommendations of the President.

If the Presidential authority extends only to making recommendations [**37] to Congress, it stands to reason that Congress may reject those recommendations, not only as to the lands that are recommended for inclusion, but may also designate lands as a part of the wilderness system in spite of a Presidential conclusion that those lands should not be made a part of the wilderness system. E.g., Senator Cranston's proposal regarding the size and scope of the wilderness system in California.

Using the same logic used by the majority I could reject the vast majority of the appeals previously considered by this Board. A wilderness designation can only be made by Congress. Congress can create a wilderness which includes lands which had never been designated as a wilderness study area (WSA), and could make Federal lands having no wilderness characteristics a wilderness area. Thus, using the reasoning expressed in the majority opinion, one could hold that appellants such as those now before us are not adversely affected by a determination that lands should be excluded from a WSA.

I look at the decision to suspend the provision of the unit agreement calling for automatic elimination of the land as a decision which directly affects the status of the land. [**38] As a result of this decision, land which would otherwise be excluded remains subject to the agreement to develop the underlying oil and gas reserves as a unit. If the Bureau of Land Management (BLM) had reached the opposite conclusion, the land would no longer be encumbered by the unit agreement. Is this that much different than a decision to exclude land from a WSA, with the result that the land is no longer encumbered with a WSA designation? Similarly, if an oil company were to challenge a decision to include certain lands in a WSA, could we not say that they have no standing because the mere designation of the land as a WSA is no assurance that Congress will make it a part of a wilderness area, and it may eventually be open to "unrestricted" leasing?