EXHIBIT 7

LEXSEE 97 IBLA 367

U.S. FISH AND WILDLIFE SERVICE, RUST'S FLYING SERVICE, ALASKA
CHAPTER OF THE SIERRA CLUB

IBLA 85-655

Interior Board of Land Appeals

*97 IBLA 367; 1987 IBLA LEXIS 289*

May 27, 1987, Decided

**ACTION:**
[**1]

[*367] Appeal from a decision of the Alaska State Office, Bureau of Land Management, approving conveyance of land to Point Possession, Inc., a Native group corporation, under the Alaska Native Claims Settlement Act (AA-11130).

Affirmed.

**HEADNOTES:**

1. Alaska Native Claims Settlement Act: Appeals: Standing

Standing to appeal decisions relating to land selection under the Alaska Native Claims Settlement Act requires that a party have a property interest in land affected by the decision. 43 CFR 4.410(b). The allegation of ownership and use of lands as a member of the public does not establish standing. 

2. Alaska Native Claims Settlement Act: Appeals: Standing

The holder of a current permit from the U.S. Fish and Wildlife Service to use lands selected by a Native group has a property interest or valid existing right derived from the permit which is protected under sec. 14(g) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1613(g) (1982), and such property interest in the land is sufficient to confer standing under 43 CFR 4.410(b) to appeal a decision involving the Native group land selection.

3. Alaska Native Claims Settlement Act: Appeals: Generally -- Res Judicata -- [**2] Rules of Practice: Appeals: Generally

Where a determination of Native group eligibility has been made by the Bureau of Indian Affairs pursuant to sec. 14(h)(2) of the Alaska Native Claims Settlement Act, as amended, 43 U.S.C. § 1613(h)(2) (1982), the doctrine of administrative finality operates to bar the eligibility issue from consideration in an appeal from a decision approving lands for patent pursuant to [*368] sec. 14(h)(2) of the Act, 43 U.S.C. § 1613(h)(2) (1982).

4. Alaska Native Claims Settlement Act: Withdrawals and Reservations: Generally -- Wildlife Refuges and Projects: Generally -- Withdrawals and Reservations: Generally

No formal withdrawal is necessary to "withdraw and convey" lands out of the National Wildlife Refuge System pursuant to sec. 14(h)(7) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1613(h)(7) (1982), because the primary purpose of a withdrawal under the Act is to protect the Native claimant from creation of an intervening interest in the property. No such protection is necessary as the lands have previously been withdrawn for wildlife refuge purposes.

5. Alaska Native Claims Settlement Act: Conveyances: Generally -- Statutes [**3]

The Secretary is authorized to convey lands out of a wildlife refuge pursuant to sec. 14(h)(7) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1613(h)(7) (1982). This authority has not been rescinded by amendments to the National Wildlife Refuge System Administration Act or by the Alaska National Interest Lands Conservation Act.

6. Alaska Native Claims Settlement Act: Conveyances: Generally -- Regulations: Waiver

Departmental regulation 43 CFR 2653.6(b)(1) (1976) precluded Native groups from receiving land benefits under the Alaska Native Claims Settlement Act if the lands selected by them were in a wildlife refuge. However, Secretarial Order No. 3083 of June 17, 1982, issued pursuant to 43 CFR 2650.0-8 which permits the Secretary to waive any non-statutory regulation promulgated to implement the Alaska Native Claims Settlement Act, waived the bar to conveyance of refuge lands.

APPEARANCES:

Geoffrey Y. Parker, Esq., Anchorage, Alaska, for Alaska Chapter of the Sierra Club and Rust's Flying Service;

Sharon Allender, Esq., Division of Conservation and Wildlife, Office of the Solicitor, Washington, D.C., for U.S. Fish and Wildlife Service;

F. Christopher Bockmon, Esq., [**4] Office of the Regional Solicitor, Anchorage, Alaska, for the Bureau of Land Management;

Russell L. Winner, Esq., Anchorage, Alaska, for Cook Inlet Region, Inc.;

David D. Clark, Anchorage, Alaska, for Point Possession, Inc.

**OPINIONBY:** MULLEN

[*369] OPINION BY ADMINISTRATIVE JUDGE MULLEN

The U.S. Fish and Wildlife Service (FWS), Rust's Flying Service (Rust), and Alaska Chapter, Sierra Club (Sierra Club), appeal from a decision of the Alaska State Office, Bureau of Land Management (BLM), dated April 29, 1985, which held the surface estate of 4,481.32 acres of land located in the Kenai National Wildlife Refuge (KNWR) to be proper for acquisition by Point Possession, Inc. (PPI), and approved the lands for patent, pursuant to section 14(h)(2) of the Alaska Native Claims Settlement Act (ANCSA) of December 18, 1971, 43 U.S.C. § 1613(h)(2) (1982).

In its decision BLM noted that FWS identified Rust's Special Use Permit KN 13-84 as a third-party interest. BLM explained that this permit was issued to Rust for use of lands included in PPI's selection application. BLM noted that the permit would expire the following day and would not be renewed by FWS. Therefore, BLM concluded, the con-veyance of [**5] the lands to PPI would not be subject to this third-party interest.

The BLM decision further stated that section 14(h)(2) of ANCSA, 43 U.S.C. § 1613(h)(2) (1982), as amended by section 1406(b) of the Alaska National Interest Lands Conservation Act of December 2, 1980 (ANILCA), P.L. 96-487, 94 Stat. 2493, 2494, 43 U.S.C. § 1613(h)(2) (1982), provides that the subsurface estate in lands located in a wildlife refuge shall not be conveyed to a regional corporation. BLM held that Cook Inlet Region, Inc. (CIRI), the appropriate regional corporation, was entitled to select the subsurface estate of 4,480 acres from those areas designated for in-lieu selections in paragraph I.B.(2) of the document identified as "Terms and Conditions for Land Consolidation and Man-agement in Cook Inlet Area" in the Act of January 2, 1976, pursuant to section 14(h)(9) of ANCSA, as amended by section 1406(d) of ANILCA, 43 U.S.C. § 1613(h)(9) (1982).

On May 24, 1985, BLM modified its April 29, 1985, decision by adding a stipulation that the conveyance to PPI would be made subject to the requirement in section 22(g) of ANCSA, 43 U.S.C. § 1621(g) (1982), which provides that the conveyed lands will remain [**6] subject to the laws and regulations governing use and development of a wildlife refuge.

The events leading to this appeal commenced on October 20, 1975, when PPI applied for Native group status. On December 18, 1975, PPI made its group selections. On August 1, 1977, FWS protested PPI's Native group applications designated as AA-11128 through AA-11130. In a memorandum to the Bureau of Indian Affairs (BIA) dated August 17, 1976, BLM stated that PPI's selection should be rejected, because 43 CFR 2653.6(b)(2) provides that segregation of land for Native groups whose dwelling structures are located outside, but adjacent to, a national wildlife refuge shall not

include such reserved lands. Throughout 1982, PPI, FWS, and the Kenai Borough sought solutions to the selection problems and attempted to negotiate a settlement. On June 15, 1983, PPI was certified as a group. The certification decision was not appealed within 30 days.

[*370] By a letter opinion dated June 4, 1984, the Anchorage, Alaska, Regional Solicitor for the Department of the Interior concluded PPI should be allowed to select land within the refuge. FWS was sent a copy of that opinion. From August 1984 to early [**7] 1985, PPI and FWS again attempted to resolve their dispute regarding the application of section 22(g) of ANCSA, *43 U.S.C. § 1621*(g) (1982), which requires that conveyed lands within a wildlife refuge remain subject to the laws and regulations governing use and development of the refuge.

Meanwhile, PPI's village application was pending appeal. By letter of January 21, 1985, PPI moved for withdrawal of its village application appeal to facilitate the processing of its group selection application. On February 21, 1985, the motion was granted and the village eligibility appeal was dismissed by the Board. On April 18, 1985, PPI relinquished all selections other than those identified by serial No. AA-11130. On April 29, 1985, BLM issued its Decision to Issue Conveyance (DIC) which was followed by its modified DIC of May 24, 1985. Notices of appeal to BLM's decision were filed by FWS, Sierra Club, and Rust on May 30, 1985.

[1] A threshold issue for consideration in this case is whether appellants have standing to appeal. The applicable regulation, 43 CFR 4.410(b), provides:

(b) For decisions rendered by Departmental officials relating to land selections under the Alaska Native Claims [**8] Settlement Act, as amended, any party who claims a property interest in land affected by the decision, an agency of the Federal Government, or a regional corporation shall have a right to appeal to the Board.

Initially we note that, as an agency of the Federal Government, FWS has standing to appeal under 43 CFR 4.410(b).

Rust states that it is an air taxi service based in Anchorage, Alaska, and has held a special use permit for 10 years. The permit is for use of a portion of the selected lands located at the edge of Sandpiper Lake where Rust has erected a sportfishing camp and tent-cabin which it owns. Rust states that, contrary to BLM's decision, it currently holds a valid permit, and therefore has a current property interest. Rust asserts that permits are generally protected as valid existing rights under section 14(g) of ANCSA, *43 U.S.C. § 1613*(g) (1982).

Sierra Club contends it has standing because it is a nonprofit corporation pledged to the conservation and proper management of the Nation's public lands, including the KNWR. Sierra Club explains that its members use the refuge, as do most Alaskans, for fishing, hunting, hiking, and other recreation. Sierra Club states [**9] it has approximately 350,000 members with more than 1,000 living in Alaska.

Sierra Club and Rust assert that the Board has authority on its own motion to review the eligibility of PPI and its enrollees, regardless of the [*371] standing issue. Sierra Club and Rust assert that the Secretary's seminal decisions on standing for administrative appeals under 43 CFR 4.410(b) support the Board's discretionary authority to grant review of factual issues when the appellant does not assert a property interest. In other words, appellants contend that there is a dual-pronged test to determine standing: property interest and factual dispute.

Rust and Sierra Club assert the Board can and should reinterpret 43 CFR 4.410(b) and the line of dismissals under it, so as to grant standing in this case. They submit that the plain language of the regulation is to grant standing to the listed classes of appellants, not to erect an absolute bar to those outside the class.

Sierra Club and Rust have also filed a motion for a factual hearing on the issues in this case. Appellants also move that the Board grant standing to appeal. In the alternative, they request the Board, the Secretary, or the Director, [**10] Office of Hearings and Appeals, to schedule a hearing on the factual issues on its own motion. If standing is not granted to either party, they petition for status as amicus curiae. In the alternative, they move for a remand of the issues of group eligibility, proper enrollment, and the amount of land to be conveyed and the availability of these lands.

In response, CIRI points out that Sierra Club has no property interest in the land affected by the decision and is neither a Federal agency nor a regional corporation. CIRI concludes Sierra Club does not meet the requirements for standing set forth by 43 CFR 4.410(b).

CIRI considers Rust's standing questionable, at best. In support of its position, CIRI refers to the following provision in Rust's permit: "20. Use of Native or State lands that have been selected but not yet conveyed is prohibited unless a letter of concurrence is submitted to the refuge manager prior to beginning any activities allowed by this per-

mit." CIRI also notes that section 2 of the Addendum to the permit states: "Permits do not grant the exclusive use of any area by the commercial tent camp operator permittee." CIRI states that, in effect, Rust has a nonexclusive [**11] right, along with the general public, to fly people into Sandpiper Lake, subject to the concurrence of PPI. CIRI concludes that this de minimis, defeasible right to use of the property is not sufficient interest "in land" to confer standing under 43 CFR 4.410(b).

PPI agrees with CIRI that Sierra Club has no property interest sufficient to confer standing. PPI asserts that neither a mere allegation of use of Federal lands as a member of the public nor a claim to represent a public interest constitutes a claim of property interest in land which would confer standing. PPI states that Sierra Club has independently failed to satisfy the standing requirements of 43 CFR 4.410(b).

PPI and CIRI both oppose the motions filed by Sierra Club and Rust. PPI contends that there has been a considerable amount of time, effort, fact-finding, and adjudication expended in establishing the number of Natives properly enrolled in PPI.

[*372] PPI and CIRI assert that appellants' argument regarding standing is flawed. Appellants claim there should be a hearing because of the factual dispute involved. PPI and CIRI point out, however, that in order to have a hearing, one must have standing. PPI [**12] asserts that under 43 CFR 4.415, a request for a hearing must be filed by "[e]ither an appellant or an adverse party" and, therefore, a party at a hearing must first meet the standing requirements of 43 CFR 4.410. PPI asserts that appellants' dual-pronged approach to standing is incorrect because there must always be a property interest before the Board will make a decision in its discretion whether or not to grant a hearing. PPI and CIRI conclude that neither Sierra Club nor Rust possesses the requisite property interest and, therefore, they are not entitled to a hearing.

PPI urges that 43 CFR 4.410 sets precise standards regarding standing to appeal and that regulation should be controlling. PPI asserts that it is not necessary for the Board to expand the concept of standing.

CIRI opposes each motion filed by appellants. CIRI interprets these motions filed by Sierra Club and Rust as a request for the Board to relax settled rules of standing and administrative finality in order to reopen enrollment proceedings of 12 years ago and a Native group eligibility determination nearly 3 years old. CIRI asserts that an unbroken line of Departmental decisions interprets the standing [**13] regulations in specific terms and these should be followed.

Finally, CIRI asserts that Sierra Club and Rust may not appear as intervenor or amicus curiae. CIRI contends that a motion to intervene should be denied where granting the motion would permit a party to pursue issues it failed to timely appeal and for which it has been denied standing. CIRI points out that although intervention is within the discretion of the Board, the Board should not allow the introduction of new issues to an appeal by an intervenor. For similar reasons, CIRI contends, Sierra Club and Rust should not be permitted to appear as amicus curiae.

As previously noted, Sierra Club asserts that it has standing because it is a nonprofit corporation pledged to the conservation and proper management of the nation's public lands. It states that its members use the KNWR for various recreational activities. For decisions relating to land selections under ANCSA, standing is limited to parties claiming a property interest in land affected by the decision. 43 CFR 4.410(b). This generally requires an interest in the land selected. See, e.g., *Walt Hanni, 6 ANCAB 307, 89 I.D. 14 (1982)*. The mere allegation of [**14] use of Federal lands as members of the public does not constitute a claim of property interest in land required to confer standing. Id. See also *Sierra Club, Alaska Chapter, 79 IBLA 112 (1984); In Re Pacific Coast Molybdenum Co., 68 IBLA 325, 334 (1982)*. Further, a claim to represent a public interest does not constitute a claim of property interest required to confer standing. *Circle Civic Community Association, Inc., 67 IBLA 376 (1982)*. See also *Sierra Club, Alaska Chapter, supra at 115*. The Board is bound by its own regulations. *McKay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955)*. These regulations require a claim of a property interest.

[*373] The Sierra Club and Rust brief contains a lengthy discussion of Departmental decisions on standing. According to these appellants these decisions recognize two distinct authorities for ordering hearings and granting standing in ANCSA appeals: (1) a nondiscretionary right of appeal and standing by virtue of due process and considerations arising from a property interest under 43 CFR 4.410(b), and (2) a discretionary prong under which appeals and standing may be justified when factual issues arise under [**15] 43 CFR 4.415, even when standing is not automatically granted by virtue of a property interest.

Appellants Sierra Club and Rust advance this second argument and claim they have relevant factual information regarding the eligibility issue which should be considered at a hearing. However, under the regulations, a request for a hearing must be filed by an appellant or adverse party, and under 43 CFR 4.410(b) such party must have a property in-

terest. Therefore, appellants must have standing before the Board can grant a request for a hearing. We find that appellants cannot revive the eligibility issue using this approach.

We recognize that Sierra Club and Rust have spent a great deal of time and effort in presenting their arguments in support of standing. While we have considered all arguments advanced by appellants, we find that they are not sufficiently persuasive to overcome the clear meaning of the regulation, i.e., that a property interest is a prerequisite for standing. This is the interpretation of the regulation that has been followed by the Board in its decisions. *Sierra Club, Alaska Chapter, supra.* Therefore, we find that Sierra Club has not met the standing requirements [**16] of 43 CFR 4.410(b).

[2] We find, however, that Rust has sufficient property interest to confer standing. Section 14(g) of ANCSA, *43 U.S.C. § 1613*(g) (1982), protects existing permits as valid existing rights and provides that patent is to be subject to the right of the permittee to the complete enjoyment of the rights, privileges, and benefits granted to him. Cf. Appeal of John F. Thein, 4 ANCAB 116, *87 I.D. 1 (1980);* Appeal of Kodiak Island Setnetters Association, 3 ANCAB 1, *85 I.D. 200 (1978).* In Appeal of Yak-Tat Kwaan, Inc., partial decision, ANCAB VLS 78-48 (Mar. 20, 1979), the Alaska Native Claims Appeals Board (ANCAB) found the holder of an expired Forest Service special use permit to be a necessary party in the context of a conveyance under ANCSA. n1 Here, Rust currently holds a valid permit which qualifies as a property interest. Therefore Rust meets the standing requirements of 43 CFR 4.410(b).

n1 ANCAB was abolished by Secretarial Order No. 3078, dated Apr. 29, 1982, effective June 30, 1982. See 43 CFR 4.1(b)(3)(i), *47 FR 26390* (June 18, 1982) (delegating to IBLA jurisdiction over appeals from decisions relating to land selections arising under ANCSA).

[**17]

Having determined that Rust does have the requisite property interest to convey standing, we will next consider whether Rust had proper notice of PPI eligibility as a Native group.

[*374] Rust states that PPI's eligibility report, issued by BIA in 1983, concerned selection AA-11128, which contained no lands within the refuge and wilderness. Rust asserts that neither the report nor the certificate indicated that refuge lands would be involved. Rust contends that, as a result, there was failure of effective notice and it had no opportunity to know that its interest would be affected by the eligibility report.

Rust also asserts that BIA's eligibility report certifying PPI as a Native group does not comply with the investigatory responsibilities of the agency. It claims all or most of the members of the group are improperly enrolled, and contends that nobody actually would or could have been at Point Possession on April 1, 1970, as required by ANCSA and the appropriate regulations. Rust also contends the use in 1970 and the state of improvements indicate that in 1970 the population consisted of one family, residing in one household. Rust concludes that selection AA-11130 must [**18] be rejected.

In response, CIRI contends that Rust is attempting to use this appeal to collaterally attack the certification of PPI as a Native group (as that term is defined in section 14(h)(2) of ANCSA, *43 U.S.C. § 1613*(h)(2) (1982), and 43 CFR 2653.6). CIRI points out that BIA issued the certificate of eligibility as a Native group to PPI on June 15, 1983, after an extensive field examination. CIRI and PPI argue that under 43 CFR 4.411(a) an appeal challenging the certification of eligibility must be filed within 30 days of the receipt of decision, and that appeals which are not timely filed must be dismissed. 43 CFR 4.411(c).

CIRI contends that Rust had adequate notice of the certification decision. CIRI denies Rust's allegation that the eligibility certificate erroneously gave the impression that refuge lands were not at issue. CIRI notes that PPI applied for eligibility as a Native group on October 20, 1975, and filed three overlapping selection applications on December 18, 1975. n2 PPI asserts the group application was published in the Federal Register on July 8, 1977, *42 FR 35228,* thus, satisfying the notice requirements. CIRI notes the State of Alaska protested [**19] selection applications AA-11128 and AA-11130 on July 29, 1977, and FWS protested the group applications on August 1, 1977, claiming an eligibility determination would adversely impact the Kenai National Moose Range. CIRI contends these protests contradict Rust's assertions that there had been no indication refuge lands might be conveyed to PPI.

n2 Application AA-11128 covered 5,208 acres of State-patented land adjacent to the group site and outside the Kenai National Moose Range boundary. Application AA-11129 covered 4,921 acres of land, most of which

is inside the Kenai National Moose Range. Application AA-11130, the application at issue in this appeal, covered 5,070 acres of land, most of which was in the Kenai National Moose Range.

CIRI argues that a claim PPI did not meet the eligibility requirements should have been raised when the certificate was issued and cannot now be collaterally raised. Addressing the same point, PPI asserts the doctrine of collateral estoppel as there has already been a finding of fact [**20] [*375] that there were 13 members properly enrolled in PPI. CIRI contends that to reopen the group-certification process would directly contradict section 2 of ANCSA that "a fair and just settlement" of claims by Native groups "be accomplished rapidly, with certainty," and "without litigation." *43 U.S.C. § 1601*(b) (1982). CIRI argues that to reopen the issue of certification 2 years after the certification would eliminate the "certainty" mandated by ANCSA and would subject any Native group to the possibility of a challenge to its status at any collateral proceeding.

PPI asserts the notice requirements for PPI group certification were met when the group application was published in the Federal Register on July 8, 1977 *(42 FR 35228)*. The State of Alaska protested selection applications AA-11128 and AA-11130, and FWS protested the group application claiming eligibility would adversely impact the Kenai National Moose Range. PPI asserts that no appeal was subsequently taken from the certificate of eligibility. PPI also notes that neither Rust nor Sierra Club maintains that they were parties of record in the eligibility determination in 1983 and, therefore, the only notice [**21] due them was published in the Federal Register. PPI asserts that group certification is independent from selection.

In addition, CIRI claims that BIA's investigation was extensive and thorough. CIRI notes that, following the investigation, a formal hearing regarding PPI's Native village application was held in 1974 and Sierra Club was a participant at that hearing. The recommended decision issued after the hearing found PPI did not have a sufficient number of members to qualify for village status but that 14 Natives were properly enrolled as members of PPI. n3 CIRI asserts this is the same number of people presently considered to be members of the group.

n3 The recommended decision of Sept. 16, 1974, states at page 32 that at least 13 Natives who were enrolled residents of Point Possession used the village during 1970 as a place where they actually lived for a period of time.

In its reply, Rust asserts that the Secretary's continuing jurisdiction over unconveyed lands gives the Board authority to reexamine the eligibility [**22] of PPI and its enrollees. Rust contends that, while timeliness may affect one's right of appeal, it does not affect the authority of the Board or power and duty of the Secretary to determine whether PPI's claim is valid. It states that the Secretary is not estopped by the principle of finality of administrative action from correcting or reversing an erroneous decision by his subordinates. Rust asserts that it has submitted numerous exhibits which provide grounds for reexamining whether a patent should issue. Rust urges a reexamination of the eligibility issue because the amount of land conveyed is directly proportional to the number of eligible enrollees.

PPI agrees that although the Secretary retains jurisdiction over the lands until patent issues, a separate question is presented in the context of certification of a group as a bona fide corporation pursuant to ANCSA. PPI asserts that certification of a group and the issuance of the DIC are [*376] totally different matters. PPI submits that the mere existence of additional facts (which existed at the time within which any appeal could have been filed), does not give rise to a suggestion of "fraud or gross mistake" at the [**23] time of certification. PPI asserts that the Bureau of Indian Affairs (BIA) acted pursuant to the regulations when certifying PPI as a Native group. PPI notes that appellants do not refute BIA's findings of fact that the subjective and objective intent of the Natives was to use Point Possession as their home.

CIRI asserts the principle of administrative finality is applicable to proceedings before the Board. CIRI submits that neither Sierra Club nor Rust appealed from the certification of group eligibility in 1983. CIRI states that the timely filing of a notice of appeal is jurisdictional and failure to file within the time allotted mandates dismissal. CIRI asserts that it must appear that a party filed a timely appeal; i.e., within 30 days after service or publication in the Federal Register. 43 CFR 4.411(a). CIRI states that because Rust now attacks the 1974 enrollment proceedings and the 1983 Native group eligibility report of PPI, Rust must establish the timeliness of its appeal from those proceedings.

CIRI contends that the Board should neither reopen the earlier enrollment and certification decisions in the context of the appeal of the DIC nor reopen the PPI [**24] enrollment or certification decisions on its own motion.

We note that the proposed decision concerning the eligibility of PPI as an unlisted village was published in the Federal Register on December 21, 1973 *(38 FR 35028-29)*. On February 26, 1974, a final decision on the eligibility of PPI as an unlisted village was published in the Federal Register *(39 FR 7473-74)*. Rust did not protest or appeal. On June 26, 1974, ANCAB issued an order that a hearing on the issues raised by parties who did appeal be conducted by an Administrative Law Judge who would make a recommended decision for review by ANCAB based upon the record made in the hearing and that motions and objections not presented at the hearing would be deemed waived.

The formal hearing commenced on July 22, 1974. In his recommended decision of September 16, 1974, Judge Stewart found that the Native Village of Point Possession failed to meet the requisite criteria for village eligibility, but that at least 13 Natives who were enrolled residents of Point Possession, actually lived in the village for a period of time during 1970 (ALJ Decision at 32). The arguments Rust now advances stem from the evidence presented [**25] in the village eligibility proceeding.

Any "interested party" could have protested the decision of the Director, Juneau Area Office, BIA, regarding the eligibility of a Native village for land benefits by filing a notice of protest with the Director, Juneau Area Office, within 30 days from the date of publication of the decision in the Federal Register. 43 CFR 2651.2(a)(9). The Director must then evaluate the protest and render a decision on the eligibility of the Native village that is the subject of the protest. Such is to be rendered within 30 days from the receipt of the protest and published in the federal register. [*377] This decision then becomes final unless appealed to the Secretary by a notice filed within 30 days of its publication in the Federal Register. 43 CFR 2651.2(a)(4), (5), and (10). There is no evidence that Rust protested PPI's Native village eligibility application. Appellant could not expect to be served with a copy of the eligibility determination when it had not filed a protest, and was therefore, not a "party of record." See 43 CFR 2651.2(a)(4). An appellant will generally be regarded as a "party to a case" as required for standing [**26] to appeal under 43 CFR 4.410(a), where it has filed a protest to a proposed action and has appealed from a denial of that protest. *Utah Wilderness Association, 91 IBLA 124, 128 (1986)*, citing *In re Pacific Coast Molybdenum Co., 68 IBLA 325, 331 (1982)*.

Although Rust did not protest the village eligibility application, it did have notice of the eligibility determination by reason of the publication of that determination in the Federal Register. Under 43 CFR 4.411(a), if a decision is published in the Federal Register, a person not served with the decision must transmit a notice of appeal in time for it to be filed within 30 days after the date of publication. See 43 CFR 2651.2(a)(4). Rust failed to do so.

The timely filing of an appeal is jurisdictional and the failure to file an appeal within the time allotted requires dismissal. *B. L. Newman, 92 IBLA 314 (1986); Oscar Mineral Group #3, 87 IBLA 48, 49 (1985)*.

Under ANCSA, *43 U.S.C. § 1613*(h)(2) (1976), the Secretary of the Interior is authorized to "withdraw and convey to a Native group that does not qualify as a Native village, if it incorporates under the laws of Alaska, title to the surface [**27] estate in not more than 23,040 acres surrounding the Native group's locality." (Emphasis added.) It is clear from the language of the Act that Congress intended that Natives who failed to qualify as a village would have an opportunity to qualify as a group.

It is reasonable to conclude that a hearing on village eligibility would involve the same issues involved in group eligibility. A reconsideration of these issues would violate ANCSA's mandate that these claims "be accomplished rapidly, with certainty," and "without litigation." *43 U.S.C. § 1601*(b) (1982). Congressional mandates that there be speedy resolution of Native claims dictate that Native populations failing to qualify as a village can seek to qualify as a group without starting over the entire eligibility process.

Further, PPI's group eligibility application was published in the Federal Register on July 8, 1977 *(42 FR 35228)*. In 1982, an eligibility report was made regarding the Native group eligibility of PPI and on June 15, 1983, the certificate of eligibility was issued to PPI. We find that Rust did not comply with the regulations for protesting a group eligibility determination. See 43 CFR 2653.6(a)(3). n4 [**28]

   n4 In its statement of reasons filed Sept. 3, 1985, on page 5, Rust asserts that it has had its special use permit "for approximately 10 years." While there is some question as to whether Rust had a property interest at the time the proposed decision on village eligibility was published, there is no doubt that it had a property interest when the application for group eligibility was published on July 8, 1977 *(42 FR 35228)*.

[*378] [3] We find that the principle of administrative finality is applicable here.

It is well established that where the Department has acted within its jurisdiction and review of such action has not been sought on a timely basis, the principle of res judicata -- in its administrative law counterpart, the doctrine of finality of administrative action -- is operative to bar a claim for relief.

*Elsie v. Farington, 9 IBLA 191, 194 (1973),* aff'd sub nom. Farington v. Morton, Civ. No. S-2768 (E.D. Cal. Dec. 5, 1973).

The group eligibility issue has been decided and will not be reopened [**29] in the Board's consideration of this appeal.

The sole issue remaining for consideration is whether BLM may convey lands within the wildlife refuge to PPI.

FWS contends that the lands in question have not been withdrawn pursuant to section 14(h) of ANCSA, as amended, *43 U.S.C. § 1613*(h) (1982). FWS asserts that a withdrawal for a Native group conveyance under section 14(h)(2) and (7) of ANCSA is legally required to (1) modify the ban in E.O. No. 8979 against the disposal of KNWR lands under the public land laws; (2) satisfy the requirement found in the prefatory clause of section 14(h) that lands conveyed thereunder be "unreserved and unappropriated public lands"; and (3) give effect to section 14(h)(2) and (7), which authorize the Secretary of the Interior to "withdraw and convey" refuge lands to Native groups. FWS argues that, in order to make the lands available for a section 14(h)(2) or (7) selection by and conveyance to PPI, the Secretary or his authorized representative must have, as required by section 14(h) of ANCSA, published a public land order modifying or partially revoking E.O. No. 8979 to allow for possible conveyance under section 14(h). FWS cites cases which [**30] support the proposition that a withdrawal remains in effect until revoked or modified. A public land order withdrawing the lands in question under section 14(h)(2) and (7) of ANCSA (or modifying or partially revoking E.O. No. 8979 for the same purposes) has never been published.

FWS contends that BLM erroneously treated PPI's group land selection application as the equivalent of a withdrawal of KNWR lands pursuant to 43 CFR 2653.2(d). This regulation states that the filing of an application will constitute a request for a withdrawal of the lands, and will segregate the lands from all other forms of appropriation under the public land laws. FWS claims that this regulation does not apply to its continued administration of KNWR lands under refuge laws and that such segregation does not [*379] change the degree to which the selected KNWR lands are available for refuge purposes or for disposal into Native ownership under ANCSA.

FWS points out that segregation is an administrative procedure preliminary to favorable or unfavorable action on a request to change the status of Federal lands (e.g., a withdrawal application, state selection application, or Native allotment application). [**31] Its purpose is the preservation of the status quo pending final administrative action by temporarily preventing further appropriations or nonconforming uses. FWS emphasizes that no authority appears in ANCSA or in other public land law which would confer the status of a withdrawal upon a selection of lands made by a Native group applicant, unless the Secretary has first formally withdrawn such lands for that purpose.

In its response filed September 3, 1985, CIRI asserts that the Secretary has clear authority to convey lands in a wildlife refuge to a Native group under section 14(h), *43 U.S.C. § 1613*(h) (1982). CIRI also refers to other sections of ANCSA and ANILCA to show Congress clearly intended to grant Secretarial authority to convey wildlife refuge lands to Alaska Natives.

CIRI argues that the lands were properly withdrawn pursuant to section 14(h). CIRI asserts that the term "withdrawal" does not have precise meaning under ANCSA. CIRI submits that, as a result of confusion over the precise definition and method of withdrawal, authorities consistently adopt a functional approach to the identification of withdrawals.

CIRI asserts that since 1979 BLM has applied this functional [**32] approach when withdrawing lands selected by Native groups pursuant to section 14(h) of ANCSA. CIRI refers to a memorandum from the Director, BLM, to the Alaska State Director, dated March 27, 1979. In this memorandum, the Director stated his conclusion that section 14(h) did not mandate withdrawal of the lands as a prerequisite to conveyance, but provided authority for withdrawal, should the Secretary deem it necessary or appropriate to do so.

CIRI submits that there are enormous practical problems inherent in FWS' strict construction of the term "withdrawal." CIRI notes the Alaska Office of BLM had over 4,000 section 14(h) applications pending in 1978. CIRI contends FWS' suggestion that a public land order withdrawing the lands should be filed before conveyance would frustrate the mandate of Congress that settlement under ANCSA be accomplished rapidly. Finally, CIRI emphasizes that it is an

established principle under Federal law that ambiguous expressions in statutes specifically affecting Native rights in land must be construed broadly in favor of the Native landholder.

PPI also contends a formal withdrawal is not necessary under *43 U.S.C. § 1613*(h) (1982). PPI asserts that [**33] the primary purpose of a withdrawal under ANCSA was to prevent an intervening claimant from gaining an interest in the land prior to conveyance to Native corporations. PPI argues that the lands selected by PPI are in a wildlife refuge, are therefore subject to a preexisting withdrawal, and an additional withdrawal was not necessary to protect PPI from an intervening claim.

[*380] PPI notes that *43 U.S.C. § 1613*(h) (1982) authorizes the Secretary to "withdraw and convey." PPI submits that a withdrawal need not always take the form of a public land order, and that, as in the present case, a conveyance has the same legal effect as a withdrawal.

[4] Section 14(h)(7) of ANCSA, *43 U.S.C. § 1613*(h)(7) (1982), provides that "[t]he Secretary may withdraw and convey lands out of the National Wildlife Refuge System and out of the National Forests, for the purposes set forth in paragraphs (1), (2), (3), and (5) of this subsection; * * *." FWS contends the Secretary or his authorized representative must formally withdraw from the refuge for Native group selection and conveyance. FWS submits that a public land order is therefore necessary to effectuate the called for withdrawal. We disagree. [**34] The terms "withdraw" and "withdrawal" are not defined by ANCSA, by any amendment to ANCSA or by any regulation promulgated under the authority of ANCSA. Section 103(j) of the Federal Land Policy and Management Act of 1976 (FLPMA), *43 U.S.C. § 1702* (1982), defines "withdrawal" as follows:

(j) The term "withdrawal" means withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program; * * *.

Guidelines for construing the term "withdraw" in section 14(h) were set forth in a memorandum from the Director, BLM, to the Alaska State Director, BLM, dated March 27, 1979. n5 In that memorandum the Director focuses on 43 CFR 2653.2(d) as a means for conveying selected lands. 43 CFR 2653.2(d) [*381] provides for the segregation of lands upon the filing of an application pursuant to section 14(h) of ANCSA. This approach to withdrawal is in accord with the functional definition of "withdrawal" in FLPMA.

        n5 The Director's memorandum contains the following instructions:

"The question has been raised by your staff as to the mechanics for withdrawing lands that have been selected pursuant to Section 14(h) of the Alaska Native Claims Settlement Act (ANCSA) before proceeding to interim conveyance. Section 14(h) authorized the Secretary to withdraw and convey 2 million acres of land for selection under Section 14(h)(1), (2), (3), (5), and (8). We believe the Secretary's withdrawal and conveyance authority in this section is discretionary in its implementation. We do not feel that the language of section 14(h) mandates that withdrawal of the lands is a prerequisite to conveyance, but rather, it provides authority for the Secretary to withdraw should he deem it necessary or appropriate to do so, such as in the instance of section 14(h)(3) withdrawals.

"43 CFR 2653.2(d) provides for the segregation of lands upon the filing of an application pursuant to section 14(h). We feel that in most cases, further withdrawal of the land is not necessary and section 14(h) selections may be conveyed, providing they otherwise comply with the regulations in 43 CFR 2653.

"This memorandum has been approved by the Office of the Solicitor, Division of Energy and Resources."

[**35]

Appeals decided by this Board illustrate that a formal withdrawal is not always required. In *Sitnasuak Native Corp., 91 IBLA 86 (1986)*, the Board considered the meaning of the provision "withdrawn or reserved for national defense purposes," in section 11(a) of ANCSA, *43 U.S.C. § 1610*(a) (1982), which excludes military lands from village corporation selections. The Board referred to the legislative history which indicates that the purpose of the provision was to give general protection to lands held by the military and prevent their selection by village corporations. The Board concluded that section 11(a) includes not only lands formally withdrawn for military purposes, as claimed by appellant, but also land which has been effectively reserved for such purposes. *Sitnasuak Native Corp., supra at 90-91*.

This Board has also recognized that use of the word "withdrawal" is not necessary to effect a withdrawal. In *Richard F. Price, Jr., 82 IBLA 257, 260 (1984)*, the Board stated: "Clearly, the circumstance and purpose of the use of the words and phrases 'reserved' and 'set apart' must be considered in the context in which used, especially considering the purpose for which [**36] the action is proposed in order to determine the effect intended."

In the present case, the proposed action is conveyance of land to a Native group. Filing an application under 43 CFR 2653.2(d) and subsequent conveyance of land to the Native group accomplishes this purpose in a practical and efficient manner.

The primary purpose of a withdrawal, in the context of ANCSA, was to prevent an intervening claimant from gaining an interest in the land prior to selection and conveyance to Native corporations. See S. Rep. No. 405, 92d Cong., 1st Sess. 140 (1971). *43 U.S.C. § 1613*(h)(7) (1982) authorizes the Secretary to invade refuge lands for conveyance to Native groups. The intent of the withdrawal action was to protect the Native claimant from creation of an intervening interest in the property. However, in the case before us no such protection is needed as the land was subject to withdrawal and further segregated by PPI selection AA-11130. Therefore, no formal withdrawal is necessary.

[5] FWS' second argument is that the Secretary's authority to withdraw and convey refuge lands to PPI pursuant to section 14(h) has been rescinded. FWS contends that the discretionary authority [**37] conferred on the Secretary by section 14(h) to withdraw and convey lands out of the refuge system has been rescinded by subsequent legislation. FWS contends that the 1976 amendment to the National Wildlife Refuge System Administration Act (NWRSAA), *16 U.S.C. § 668dd*(a) (1976), rescinded the Secretary's then existing discretionary authority to modify or revoke refuge withdrawals for any purpose, including the selection by and conveyance of refuge lands to Native groups.

[*382] CIRI and PPI disagree with FWS' contention that the Secretary's authority to convey national wildlife refuge system lands to a Native group has been rescinded by the 1976 amendments to the NWRSAA, *16 U.S.C. § 668dd*(a) (1976).

The question of whether the Secretary's authority to convey NWRS lands to a Native group was rescinded by the 1976 amendments to the NWRSAA, *16 U.S.C. § 668dd*(a) (1976), can best be answered by reference to the Act itself. The applicable subsection reads as follows:

(3) Each area which is included within the System on January 1, 1975, or thereafter, and which was or is --

(A) designated as an area within such System by law, Executive order, or secretarial order; or

(B) so included [**38] by public land withdrawal, donation, purchase, exchange, or pursuant to a cooperative agreement with any State or local government, any Federal department or agency, or any other governmental entity,

shall continue to be a part of the System until otherwise specified by Act of Congress, except that nothing in this paragraph shall be construed as precluding --

(i) the transfer or disposal of acquired lands within any such area pursuant to paragraph (2) of this subsection;

(ii) the exchange of lands within any such area pursuant to subsection (b)(3) of this section; or

(iii) the disposal of any lands within any such area pursuant to the terms of any cooperative agreement referred to in subparagraph (B) of this paragraph.

There is nothing in this section repealing authority granted to the Secretary by ANCSA to convey lands within a wildlife refuge. As CIRI stated in its brief, any such repeal must be by implication. It is a basic principle of statutory construction that repeals of statutes by implication are not favored. *Watt v. Alaska, 451 U.S. 259, 266-67 (1981)*. To the extent there is any ambiguity as to whether such authority exists, that ambiguity should be construed [**39] in favor of the Native corporations. See *Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89 (1918); Hopkins v. United States, 414 F.2d 464, 472 (9th Cir. 1969); Wisenak, Inc. v. Andrus, 471 F. Supp. 1004, 1010 n.14 (D. Alaska 1979); Alaska Public Easement Defense Fund v. Andrus, 435 F. Supp. 664, 671 (D. Alaska 1977)*.

The legislative history of the 1976 amendments to NWRSAA contains dialogue between Senators Ted Stevens and Moss which supports the argument that the Secretary's authority under ANCSA to convey wildlife refuge lands [*383] to satisfy Native selection requirements was not modified by the 1976 amendments. Their exchange reads as follows:

Mr. STEVENS. I thank the Senator. He also concurs that there is no intent here to modify an act such as the Alaskan Native Land Claim Settlement Act and the lands granted to Native people.

Mr. MOSS.  Certainly.

Mr. STEVENS.  I point out, for instance, that in that act there is authority for the Secretary of the Interior to change lands in order to satisfy some of the Native selection requirements.  If it is necessary to add other sections of Federal land to wildlife refuges, he has that [**40] authority.

We have no intent to modify the settlement that was made in that massive act by this bill.  That is my understanding.

Mr. MOSS.  The Senator is correct.  There is no intention to modify the Alaskan Claims Act in any way by the terms of this bill.

122 Cong. Rec. 2296 (1976).

FWS supports its contention that the Secretary's authority to convey lands within a wildlife refuge has been rescinded by reference to ANILCA.  FWS points out that the purpose of section 1406 of ANILCA, 94 Stat. 2494 was to conform section 14(h)(2) of ANCSA, 43 U.S.C. § 1613(h)(2) (1976), to the original intent of Congress in passing ANCSA that the subsurface estate of lands located within pre-ANCSA refuges would be retained by the United States.

FWS submits that this interpretation of section 1406 is supported by section 304(c) of ANILCA, 94 Stat. 2393, which withdraws refuge lands in Alaska from future selection by Native corporations.

We note that FWS cites *Bering Straits Native Corporation (Bering Straits), 87 IBLA 96 (1985),* for the proposition that section 1406 was enacted to limit, not expand, the availability of lands under section 14(h).  In Bering Straits, the Board noted that [**41] prior to ANILCA, lands within a wildlife refuge were available for selection under section 14(h)(1) through operation of section 14(h)(7) of ANCSA.  ANILCA added the caveat that where wildlife refuges, only the surface would be patented to the applicants.  *Bering Straits, supra at 101.*  While we agree that section 1406 represents a diminution of the right to select land, we find that the Board in Bering Straits recognized that lands within a wildlife refuge could, in fact, be selected.  There would be no need to conform section 14(h) to the original intent of Congress regarding subsurface rights if the basic right to select surface lands within a wildlife refuge did not exist.

[*384]  Additional support for the Secretary's authority to convey lands within a wildlife refuge can be found in section 22(g) of ANCSA, 43 U.S.C. § 1621(g) (1982).  This section provides that patents issued by the Secretary must contain a provision that refuge lands remain subject to the laws and regulations governing use and development of the refuge.  Such a provision would have no meaning if the Secretary were not authorized to convey lands in the wildlife refuge.

As for section 304(c) of ANILCA, [**42] 94 Stat. 2393, this provision withdrew public lands in each refuge "subject to valid existing rights, from future selections by the State of Alaska and Native Corporations, from all forms of appropriation or disposal under the public land laws."  Therefore, Native groups may have valid existing rights to wildlife refuge lands selected before December 31, 1976.  See 43 CFR 2653.4(b).  Thus, we find that the Secretary has continuing authority to convey land in a wildlife refuge under section 14(h)(7) of ANCSA and that this authority has not been rescinded by either the 1976 amendments to NWRSAA or ANILCA.

[6]  For its third argument, FWS claims that the conveyance of the land in question is precluded by 43 CFR 2653.6(b)(1) (1976) which provided that Native groups shall not receive land benefits under section 14(h) of ANCSA if the selected lands were in wildlife refuges.  CIRI and PPI disagree, asserting that Secretarial Order No. 3083 of June 17, 1982, waived the bar found in 43 CFR 2653.6(b)(1), thereby allowing section 14(h) conveyances of refuge lands to Native groups.  We agree.  This waiver was made pursuant to 43 CFR 2650.0-8 (1981) which permitted Secretarial waiver of any [**43] nonstatutory regulations promulgated to implement ANCSA.  FWS contends that the regulatory bar found in 43 CFR 2653.6(b)(1) (1976) had, by 1982, been codified as a statutory requirement, either by the 1976 amendments to NWRSAA or by section 304(c) of ANILCA.  Thus, according to FWS, the requirements of 43 CFR 2653.6(b)(1) could not be waived at the time Secretarial Order No. 3083 was issued.  As previously discussed, we find that neither the amendments to NWRSAA nor ANILCA rescinded the authority of the Secretary to convey lands in a wildlife refuge.  Therefore, 43 CFR 2653.6(b)(1) (1976) is a nonstatutory regulation and subject to waiver under 43 CFR 2650.0-8.

FWS and Rust also argue that under the notation or tract book rule, 43 CFR 2091.1, PPI's selection AA-11130 should have been rejected.  They assert that the land was not available in 1976 under 43 CFR 2653.6(b) and did not be-

come available until 1982 when this regulation was waived by Secretarial Order No. 3083.  PPI asserts that the tract book rule has not been violated.

43 CFR 2091.1(a) provides that applications must be rejected and cannot be held pending possible future availability of land or interests in land if approval [**44] of the application is prevented by withdrawal or reservation of the land.  43 CFR 2091.1(e) states that such an application cannot be accepted for filing when the approval of the application is prevented by the fact that for any reason, the land has not been made subject, or restored, to the operation of the public land laws.

[*385]  Two major considerations for the tract book rule were recited in *State of Alaska, 73 I.D. 1 (1966)*, aff'd sub nom.  *Udall v. Kalerak, 396 F.2d 746 (9th Cir. 1968)*, cert. denied, *393 U.S. 1118 (1969)*: (1) avoidance of burdening land records with applications for land which is unavailable for the forseeable future, and (2) the equitable considerations of assuring the public an equal opportunity to file for the land and avoiding the possibility of giving the applicant a preference to which he has no right.  The Department held that when these considerations were not compromised, an application for land filed when the land was withdrawn could be considered after restoration of the land.  *State of Alaska, supra at 9.*  See also *Cook Inlet Region, Inc., 77 IBLA 383, 390, 90 I.D. 543, 547 (1983); David W. Harper, 74 I.D. 141, 149-50 [**45] (1967).*  We find that these considerations have not been compromised.

We find that the refuge land is available for conveyance under 43 CFR 2653.3 by authority of section 14(h)(7) of ANCSA and selection by a Native group is not prevented by the fact that the land is reserved for wildlife refuge purposes.  (Cf. *Sitnasuak Native Corp., supra,* where lands were not available for a village corporation's selection because the lands were reserved for military purposes.)  As noted by CIRI, there is no requirement in 43 CFR 2653.3(a) that the Secretary withdraw lands from the refuge prior to conveyance.  (See also Regional Solicitor's Memdorandum of June 4, 1984, in which he concludes that land could be conveyed from a wildlife refuge because *43 U.S.C. § 1613(h)(7)* (1982) specifically authorized such transactions.)

Without further belaboring this decision with additional references to contentions of appellants, except to the extent they have been expressly or impliedly addressed in this decision, they are rejected on the ground they are, in whole or in part, contrary to the facts and law or are immaterial.  *National Labor Relations Board v. Sharples Chemicals, Inc., 209 [**46] F.2d 645, 652 (6th Cir. 1954); Glacier-Two Medicine Alliance, 88 IBLA 133, 156 (1985).*

Therefore, pursuant to the authority delegated to the Board of Land Appeals by the Secretary of the Interior, 43 CFR 4.1, the decision appealed from is affirmed.

R. W. Mullen
Administrative Judge

**CONCURBY:** IRWIN; LYNN


I concur: Will A. Irwin, Administrative Judge

[*386]  ADMINISTRATIVE JUDGE LYNN SPECIALLY CONCURRING:

Contrary to the reasoning of the majority, I agree with the Fish and Wildlife Service that the Bureau of Land Management (BLM) took a shortcut through the procedures in approving the application at issue in this appeal.  Ultimately, however, I am not convinced that the result would have been different had BLM properly followed those procedures.  Accordingly, I believe BLM committed harmless error in the processing of this application, and on that basis, agree with the majority's affirmance.

Kathryn A. Lynn,
Administrative Judge,
Alternate Member.