R. Collin Middleton, Esq.
Law Offices of R. Collin Middleton, P.C.
P.O. Box 113128
Anchorage, Alaska  99511
Ph:  907-222-0506
Fax:  907-279-7029
Email:  collinmiddleton@gci.net

Counsel for Defendant, Koniag, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OMAR STRATMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. A02-0290 CV (JKS) |
| | ) |
| LEISNOI, INC., KONIAG, INC., and | ) |
| GALE A. NORTON, Secretary of the | ) |
| Interior, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
RE CHEVRON DEFERENCE AND ANILCA 1427 AND
<u>FEDERALLY RECOGNIZED TRIBAL LIST ACT</u>**

## I.    <u>Introduction</u>

As Plaintiff's complaint states, this case is an appeal pursuant to the

Administrative Procedure Act.[1]  It was filed in December of 2002.  Clearly, there has

been earlier litigation, the significance of which is contested.[2]  What is not contested is

---

[1] Third Amended Complaint, ¶ 1.  Docket 111.  The Administrative Procedures Act is 5
U.S.C. §701 et seq.

[2] <u>See</u> Leisnoi's Motion to Dismiss at Docket 110.

that Interior Secretary Kempthorne in December of 2006 determined that Mr. Stratman's claims seeking Leisnoi's decertification were moot.[3] He did this because Congress had ratified Leisnoi as an ANCSA Native village corporation in 1980 with the passage of ANILCA, PL 96-487 (94 Stat. 2371) at Section 1427.

The history and facts concerning the dispute between Mr. Stratman who wants Leisnoi decertified and Leisnoi, Koniag, and the United States who insist Leisnoi remain certified are well put forth elsewhere.[4]

There is no need to recite them further because as the Secretary has found certification is no longer the issue. Since, in the words of the Secretary, ". . . section 1427 of ANILCA did ratify the Department's 1974 eligibility determination," the case is moot.[5]

Koniag's brief will concentrate on this ratification, the deference owed the Secretary's opinion, and to a lesser extent, the implicit ratification of Leisnoi by the Federally Recognized Indian Tribe List Act, 24 U.S.C. §479(a) (FRITLA). Koniag recognizes that the Secretary did not consider FRITLA, in light of his reasoned opinion on ratification from the 1427(c) of ANICLA. This Court, consequently, does not have the completed agency action from the Department of Interior.[6] Koniag raises it here because it is an additional form of ratification. Finally, Koniag will also argue that there is significant legislative history which supports the Secretary's decision on 1427(c)

---

[3] See Kempthorne Decision at 2, Docket 96.

[4] See e.g. Decision of Dirk Kempthorne, Secretary of Interior, Docket 96 at 2-3; Decision of Interior Board of Land Appeals, 157 I.B.L.A. 302, 303-24 (2002), Exhibit 5 to Docket 6; Leisnoi, Inc. v. Stratman, 835 P.2d 1202, 1214-15 Alaska (1992).

[5] Kempthorne Decision, Docket 96 at 2. Further, ". . . I conclude that Section 1427 ratified Leisnoi's status as a Native village eligible for ANCSA benefits thus mooting Stratman's challenge to Leisnoi's status." Id. at 13. As discussed infra, only if this Court found the Secretary's ruling incorrect would the certification argument be reached.

[6] The review of the Secretary of Interior is mandatory on village eligibility. 43 C.F.R. § 2651.2(a)(5). The Secretary so found in this case. Kempthorne Decision, Docket 96 at 2 and 5.

ratification, and which Koniag raised before the Interior Board of Land Appeals.[7]  The interplay between the Secretary's decision on mootness and this Court's two scheduling orders need some discussion.  Koniag believes and is going forward on the basis that at this time Koniag need not brief the factual and related arguments on the actual certification.

## II.     **The Issues Briefed**

### A.     This Court's Orders

This Court in its Order at Docket 103 directed the Defendants to file "their motions to dismiss on jurisdictional grounds."  It included within those motions to dismiss a request to brief whether "the Secretary's interpretation of ANILCA, section 1427 and his conclusion that Congress mooted Stratman's contest by enacting that statute" requires acceptance by the Court under Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 n. 11 (1984) and other cases.

### B.     The Merits

Motions for clarification led to a further court order at Docket 139 stating that this Court might well find "the merits of the Secretary's decision would have to be reached" and, this Court further stated "the ultimate resolution of this case would be advanced if the parties briefed the merits at the same time [as motions to dismiss on jurisdictional and statutes of limitations grounds]."  Koniag reads "merits" as meaning the merits and deference, if any, owed Secretary Kempthorne's decision on Congressional ratification.[8]

---

[7] No record has been lodged.  D. AK. L. R. 16.3(b).  It is voluminous, and possibly open to further secretarial review as noted above.  Koniag will use only those brief portions of the record Koniag used to support its ratification argument before the Department of Interior as attachments to this brief.

[8] Koniag had urged that the legal reasoning and deference to Secretary Kempthorne's decision was tied to further reasons that the decision was correct which Koniag had briefed in 1995 before this Court and later before the Interior Board of Land Appeals. See Koniag's Response to Motion to Strike, at Docket 133.

Memorandum in Support of Motion to Dismiss Re Chevron Deference        -3-
A02-0290 CV (JKS)

Koniag does not understand that this Court wishes briefing on the underlying merits which the Secretary found were mooted by Congressional ratification in ANILCA. Koniag notes that an extension of time for the Secretary to file an answer to Mr. Stratman's complaint is not due prior to June 1, 2007[9] suggesting further proceedings should this Court deny the motion.  Further, as stated, the massive record before the Department of Interior has not been filed.  Since the Secretary found the claim that Leisnoi should not have been certified was moot, this Court has been deprived of the final agency action on the certification issue should it find that Secretary Kempthorne's reasoning was invalid and entitled to no deference.  Possibly this Court would consequently go forward in that event and review the record itself or more possibly direct the agency to provide further review.  That decision would, however, be a subject for later proceedings.  Finally, as Koniag suggested, it is premature to discuss whether the remedies Mr. Stratman requests are actually available under the APA.[10]

### III.    <u>Congressional Ratification</u>

Unquestionably, congress can ratify the certification of Leisnoi no matter the correctness of the original certification decision, just as the Secretary found it has in 1427(c) of ANILCA.

### A.    <u>Congress Has the Authority to Ratify Unauthorized Acts of Government Officials If Those Acts Could Have been Authorized When Taken</u>

The Supreme Court has consistently held that Congress may ratify unauthorized acts of government officials if those acts could have been authorized by Congress at the time they were taken.[11]  For example, in <u>Swayne & Hoyt v. United States</u>, the court

---

[9]  Docket 139 at 3.

[10]  <u>See</u> Koniag's Reply to Request to Strike at Docket 133, p. 2, n. 1.

[11]  <u>See</u> <u>Swayne & Hoyt v. United States</u>, 300 U.S. 297, 81 L. Ed. 659 (1936); <u>Isbrandtsent-Moller Co. v. United States</u>, 300 U.S. 139, 81 L. Ed. 562 (1936); <u>see</u> <u>also</u> <u>Charlotte Harbor & Northern Railway Co. v. W.G. Wells</u>, 260 U.S. 8, 67 L. Ed. 100 (1922) (discussing ratification by state legislature).

considered an unauthorized order by the Secretary of Commerce.  In that case, shippers contested the Secretary's imposition of certain tariffs on the ground that the Secretary did not have legislative authority to impose those tariffs.  The court, however, noted that subsequent acts of Congress had acknowledged the Secretary's authority.[12]  Thus, the court held that Congress had ratified the Secretary's previously unauthorized acts.[13]  In so holding, the court stated:

> It is well settled that Congress may, by enactment otherwise appropriate, "ratify . . . acts which it might have authorized," and give the force of law to official action unauthorized when taken.  And we think that Congress, irrespective of any doctrine of ratification, has, by the enactment of the statutes mentioned, in effect confirmed and approved the exercise by the Secretary of powers originally conferred on the Shipping Board.[14]

This power has been acknowledged by the Ninth Circuit in Equal Employment Opportunity Commission v. First Citizens Bank of Billings.[15]  In that case, the Equal Employment Opportunity Commission ("EEOC") brought a suit against the defendant to redress employment discrimination violations by the defendant.  On appeal, the defendant challenged the EEOC's enforcement power.  The Ninth Circuit held, however, that the issue was rendered moot by Congress' subsequent ratification of the EEOC's authority.[16]

Thus, it is clear that Congress may ratify acts which it could have authorized when taken.  Given its plenary power over Indian affairs, Congress could have authorized Woody Island as a Native village eligible to receive benefits conferred by the Alaska Native Claims Settlement Act, at the time ANCSA was passed; it did so, as the Secretary found in Section 1427(c) of ANILCA.

---

[12] 300 U.S. at 301.
[13] Id. at 301-302.
[14] Id. (citations omitted).
[15] 758 F.2d 397 (9th Cir. 1985).
[16] Id. at 399-400 (citing Swayne & Hoyt v. United States).

Memorandum in Support of Motion to Dismiss Re Chevron Deference          -5-
A02-0290 CV (JKS)

B.    Under the Property Clause of the United States Constitution,
      Congress' Power to Dispose of Public Land is Unlimited

The decisions of the United States Supreme Court have long established that under the property clause of the United States Constitution, Congress has the power to dispose of public lands as it sees fit.  As early as 1886, the Supreme Court noted that Congress had authority to prescribe "the mode in which the lands may be disposed of, and the title conveyed to the purchaser."[17]  One year later, in Maxwell Land-Grant Case,[18] the court noted that when Congress disposes of public land by enactment, the courts can go no further than to make a construction of what Congress intended by the act.  Similarly, in Alabama v. Texas,[19] the Court noted that Congress had unlimited power to dispose of lands owned by the government and that Congress had both legislative and proprietary power with respect to such lands.

The unlimited power of Congress with respect to public lands has been reaffirmed by more recent decisions of the Supreme Court.  In Kleppe v. New Mexico,[20] the state of New Mexico challenged the constitutionality of the Wild Free-Roaming Horses and Burros Act.  The Supreme Court held that the Act was constitutional under the property clause.  In so holding, the Court noted that Congress had complete power over public property.[21]  This plenary power was summarized in California Coastal Comm'n v. Granite Rock,:

> The Property Clause provides that "congress shall have Power to dispose of and Make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  This Court has "repeatedly

---

[17] Van Brocklin v. Anderson, 117 U.S. 151, 165 (1886) (quoting a Senate debate).
[18] 121 U.S. 325 (1887).
[19] 347 U.S. 272 (1954).
[20] 426 U.S. 529, 49 L.Ed.2d 34 (1976).
[21] Id. at 540.

observed" that "[t]he power over the public land thus entrusted to Congress is without limitations."[22]

Accordingly, Congress also possessed the power to authorize the conveyance of federal lands to Leisnoi pursuant to the Alaska Native Claims Settlement Act whether Woody Island met the requirements of ANCSA or not.  And it did so authorize and ratify conveyances to Leisnoi in ANILCA, section 1427 as the Secretary found.

> C.     Congress Also Has the Authority to Moot a Pending Controversy by Enacting New Legislation

Congress also possesses the power to moot pending litigation and resolve controversies by enacting new legislation.  In Stop H-3 Association v. Dole,[23] the Ninth Circuit held that Congress may enact legislation which exempts a particular project from the requirements of existing statutes.  That case involved the construction of an interstate highway by the Department of Transportation.  The highway had been the subject of litigation for many years.  The plaintiffs alleged that the department was in violation of several environmental statutes.  Eventually, Congress intervened and ordered the Secretary to approve the highway construction notwithstanding the alleged violations.

On appeal, the plaintiffs presented various constitutional challenges to this congressional order.  For example, the plaintiffs argued that Congress had violated the principle of separation of powers because it usurped the executive branch's authority to execute the laws.[24]  The Ninth Circuit rejected this contention and held that the enactment of legislation exempting a project from statutory requirements did not constitute an execution of the law.[25]  The court further stated:

---

[22] 480 U.S. 572, 580 (1987) (citations omitted).  See also State of Nevada v. Watkins, 914 F.2d 1545, 1552-53 (9th Cir. 1990) (noting that Congress' power over public lands is "without limitations").

[23] 870 F.2d 1419 (9th Cir. 1989).

[24] Id. at 1433.

[25] Id. at 1434.

> Moreover, even if we were to accept appellants' argument that [Congress' order] represents an attempt by Congress to control the Executive branch's execution of [the statutory requirements], we still could not conclude that Congress violated the separation of powers. Simply put, Congress may change its mind, so long as it complies with the Constitution's requirements for action that alters the delegation of authority to the Executive branch.[26]

The court noted that it found no authority "forbidding Congress to alter a legislative grant of authority by means of new legislation directed at a particular project."[27] Accordingly, Congress had the authority to designate Leisnoi as an eligible village notwithstanding the pending Ninth Circuit Appeal. And, of course, it precisely did so in ANILCA section 1427.

### D.    Secretary Kempthorne Found Congress Had Ratified Leisnoi in Section 1427 of ANILCA

Each of these enumerated powers of Congress are present here. When this case was last before this Court, Koniag moved for summary judgment, arguing that Congress had ratified Leisnoi's eligibility to receive land under ANCSA when it enacted the Act. Under section 1427, Leisnoi and the other Koniag villages received lands located on Afognak Island in exchange for relinquishing their land selections on the Alaska Peninsula even in the face of then pending litigation. Koniag argued, among other things, that by conveying these lands to Leisnoi, Congress confirmed Leisnoi's eligibility to receive land under ANCSA. The Court denied Koniag's motion, reasoning that "[t]his is a difficult question that should be decided in the first instance by the agency."[28] The Court accordingly remanded the issue to the Secretary for a determination.

---

[26] Id. at 1435.
[27] Id. at 1435 n. 24.
[28] Order, 9/12/95. The IBLA concluded the case was not really remanded, but was actually a "referral for agency action" 157 IBLA 302, 304 n. 1 (2002), and then found it had no jurisdiction. The Secretary reversed that determination. Kempthorne Decision at 2.

On December 20, 2006, the Secretary issued his final decision.  In it, he concluded that section 1427 of ANILCA had indeed ratified Leisnoi's eligibility to receive benefits under ANCSA.  The Secretary explained:

> [S]ection 1427 constructs an elaborate scheme for the resolution of the Koniag land claims, not just of Leisnoi, but of a sizable number of other entities.  In that scheme, in which Leisnoi's eligibility is clearly assumed, certainty about the eligibility of Leisnoi is a necessary predicate to the final and timely settlement of the claims of Leisnoi, the other Koniag villages, Koniag regional corporation and, to a lesser degree, all of the other Native villages and regional corporations entitled to ANCSA benefits.  Viewing the scheme as a whole, it is reasonable to conclude that Congress intended to resolve all of the uncertainties and did not intend to leave the parties at risk of having their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's eligibility.

Therefore, the Secretary determined, Stratman's claim that Leisnoi does not meet the eligibility criteria set forth in ANCSA is moot.

Having now received the benefit of the Secretary's expertise, Koniag again moves to dismiss this case based on section 1427 of ANILCA.  The Secretary's decision is entitled to deference under <u>Chevron</u> or, alternatively, under <u>Skidmore</u>.  Moreover, it is a rational and ultimately correct interpretation of the statute.  It is, therefore, entitled to this Court's respect and acceptance and Mr. Stratman's claims must be dismissed as moot.

### IV.    The Secretary's Decision Is Entitled To Deference Under Chevron

In <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel,</u>[29] the Supreme Court adopted an extremely deferential standard for reviewing an agency's interpretation of a statute which it administers.  The Court held:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

---

[29] 467 U.S. 837 (1984).

expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.[30]

The Court further explained, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[31]

The Ninth Circuit has applied Chevron deference to the Secretary's interpretations of ANCSA.  For example, Seldovia Native Association, Inc. v. Lujan,[32] involved an interpretation by the Secretary of section 11(a)(2) of ANCSA, 43 U.S.C. § 1610(a)(2).  That provision withdrew, "subject to valid existing rights," the lands surrounding Native villages for village selection.  The Secretary had interpreted "valid existing rights" to include open-to-entry leases with conditional purchase options.  Therefore, the Secretary had concluded, the lands subject to these leases were not available for Native village selection.[33]  Seldovia Native Association challenged the Secretary's interpretation.

On appeal, the Ninth Circuit observed that the principal responsibility for administering ANCSA lies with the Secretary of the Interior.[34]  Citing Chevron, the Court thus held that it need only determine "that the [Secretary's] determination is reasonable and is not contrary to congressional intent."[35]  The Court found the Secretary's construction to be reasonable.[36]  In a second Ninth Circuit decision, as

---

[30] Id. at 842-43.
[31] Id. at 844.
[32] 904 F.2d 1335 (9th Cir. 1990).
[33] 904 F.2d at 1340.
[34] Id. at 1342.
[35] Id.
[36] Id. at 1343.

pointed out by Leisnoi, such <u>Chevron</u> deference has been applied between two of the parties to this law suit.[37]

     <u>Seldovia</u>, of course, involved the Secretary's interpretation of ANCSA and not ANILCA.  However, like ANCSA, section 1427 of ANILCA clearly places the same principal responsibility for administering this section with the Secretary of the Interior.  For example, it specifically directs the Secretary of the Interior to make the conveyances required by this provision.[38]  Furthermore, the purpose of section 1427 was to resolve certain land claims of the Koniag villages arising under ANCSA.  And, indeed, it is a part of Title XIV of ANILCA, which is called "Amendments to the Alaska Native Claims Settlement Act and Related Provisions."[39]  Thus, it is part and parcel of the Secretary's administration of ANCSA.

     In <u>United States v. Mead Corporation</u>,[40] the Supreme Court clarified the application of <u>Chevron</u> deference.  It held that <u>Chevron</u> deference applies only to those agency interpretations that are intended to have legal force.  <u>Mead</u> involved a tariff classification ruling by the U.S. Customs Service.[41]  The Customs Service was authorized to issue ruling letters setting tariff classifications for particular imports.[42]  The ruling letters represented the official position of the Customs Service with respect to the particular transaction or issue, but were not intended to be applied to other transactions and were subject to modification or revocation.[43]  Significantly, "since ruling letters respond to transactions of the moment they are not subject to notice and comment before

---

[37] Memorandum in Support of Leisnoi's 12(b)(1) Motion to Dismiss Re: Congressional Ratification Through ANILCA Has Mooted This Controversy, Docket 121, at 3.  <u>Leisnoi, Inc. v. Stratman</u>, 154 F.3d 1062, 1068, 1072 (9th Cir. 1998).
[38] Pub. L. 96-487, § 1427(b)(1).
[39] Pub. L. 96-487, Title XIV.
[40] 533 U.S. 218 (2001).
[41] <u>Id</u>. at 221.
[42] <u>Id</u>. at 222.
[43] <u>Id</u>. at 222-23.

being issued, may be published but need only be made available for public inspection."[44] The Court held that such ruling letters were not intended to have legal force and therefore were not entitled to <u>Chevron</u> deference.[45]  The Court reasoned, "Indeed, to claim that classifications have legal force is to ignore the reality that 46 different Customs offices issue 10,000 to 15,000 of them each year. . . .  Any suggestion that rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting."[46]  Indeed, "most ruling letters contain little or no reasoning . . . ."[47]

The Ninth Circuit applied <u>Mead</u> in <u>Alaska Department of Health and Social Services v. Centers for Medicare and Medicaid Services</u>.[48]  There, the State of Alaska sought review under the Administrative Procedure Act of a final determination by the Administrator of the Centers of Medicare and Medicaid Services ("CMS") disapproving a proposed Medicaid state plan amendment.[49]  The agency initially rejected the state's plan because it did not "assure that payments are consistent with efficiency, economy, and quality of care," as required under the Medicaid Act.[50]  The state petitioned for reconsideration, and after briefing and a hearing, the Administrator affirmed the decision.[51]  The Administrator set forth his decision in a "reasoned opinion."[52]

The Ninth Circuit held that the Administrator's interpretation of the Medicaid Act was the type of determination entitled to <u>Chevron</u> deference.  The Court observed, quoting <u>Mead</u>, that "Congress contemplates administrative action with the effect of law

---

[44] <u>Id</u>. at 223.
[45] <u>Id</u>. at 232-33.
[46] <u>Id</u>. at 233.
[47] <u>Id</u>.
[48] 424 F.3d 931 (9th Cir. 2005).
[49] <u>Id</u>. at 934.
[50] <u>Id</u>. at 937.
[51] <u>Id</u>.
[52] <u>Id</u>.

when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."[53]  The Court concluded that the "formal administrative process afforded the State" contained these "hallmarks of fairness and deliberation."[54]  Therefore, under <u>Chevron</u>, the Court was required to defer to the Administrator so long as his decision was "based on a permissible construction of the statute,"[55] which it was.

Indeed, the formality of the process afforded specifically including adjudication, is the hallmark of <u>Chevron</u> deference.  As stated by the <u>Mead</u> court:

> We hold that administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice and comment rulemaking, or by some other indication of a comparable congressional intent.[56]

And, the <u>Mead</u> court emphasized the importance of an adjudicative process in conferring deference.

> Thus, the overwhelming number of our cases applying <u>Chevron</u> deference have reviewed the fruits of notice and comment rulemaking or formal adjudication.[57]

It was this adjudication process to which this Court turned when it remanded the issue of whether Leisnoi's certification had indeed been ratified by Congress in ANILCA.  And, It is that process which makes Secretary Kempthorne's decision so much more like the Administrator's decision in <u>Alaska DHSS</u> than the tariff classification ruling in <u>Mead</u>.

---

[53] <u>Id</u>. at 939.
[54] <u>Id</u>.
[55] <u>Id</u>.
[56] <u>Mead</u>, <u>supra</u> at 226-227.
[57] <u>Id</u>. at 230.  In footnote 12, which follows the quoted material, the United States Supreme Court cites us to eight United States Supreme Court cases where deference was applied to adjudication cases.

After extensive briefing on the issue, and examination of the exhibits to those briefs, the IBLA initially ruled that section 1427 of ANILCA did not ratify Leisnoi's eligibility to receive benefits under ANCSA. Leisnoi requested the Secretary's mandatory review. All parties had further opportunities to submit briefs to the Secretary, in addition to those including the exhibits already submitted. Indeed, Mr. Stratman did submit an extensive brief covering the issue of congressional ratification to the Secretary. The Secretary's final decision is not subject to any further administrative review or modification and is set forth in a "reasoned opinion." It thus reflects the type of "formal administrative procedure tending to foster fairness and deliberation." It is clear that it carries the force of law.

The decision of Secretary Kempthorne adopts "the analysis and conclusions" of a proposed decision drafted by the Solicitor of the Department of Interior and the Deputy Solicitor of the Department of Interior. This is not the situation facing the Ninth Circuit in The Wilderness Society v. United States Fish and Wildlife Service.[58] There, a Special Use Permit was issued by the USFWS for a fish stocking project. In issuing the permit, the USFWS concluded, based on a Solicitor's opinion, that the project was not a commercial enterprise that violated the Wilderness Act.[59] On appeal, the court found that the Solicitor's Opinion relied upon by USFWS "was not a document intended to have the general force of law."[60] The Court explained:

> Such opinions, which normally are the product of individual lawyers advising their client agencies, and which do not in their formulation involve procedural protections comparable to an agency's rulemaking procedures, do not invoke Chevron deference.[61]

---

[58] 353 F.3d 1051 (9th Cir. 2003).
[59] Id. at 1058.
[60] Id. at 1068.
[61] Id. at 1068 n. 16.

Here, of course, the Solicitor and Deputy Solicitor's proposed decision was exactly formulated with "procedural protection comparable to an agency's rule making procedure." Indeed, the proposed decision of the Solicitor and Deputy Solicitor was arrived at only after notice was given, after extensive briefing, and after the procedural safeguards of an entire adjudication before the Department of Interior. It was not "the product of individual lawyers advising their client agencies." It was a draft opinion which then became the Opinion of Secretary Kempthorne. It is accordingly entitled to Chevron deference. In the words of The Wilderness Society court, "the reviewing court must defer to the agency, so long as the agency's answer is based on a permissible construction of the statute."[62]

### V.     Alternatively, The Secretary's Decision Is Entitled To Deference Under Skidmore

Even were the Secretary's decision not entitled to Chevron deference, it still merits deference under Skidmore v. Swift & Co.[63] Under Skidmore, the amount of deference varies with the circumstances.[64] The factors to be considered include "the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position."[65] In Pronsolino v. Nastri, for example, the Ninth Circuit held that it owed the EPA's interpretation of a provision in the Clean Water Act "substantial deference" because it was part of "an intricate statutory scheme addressing technically complex environmental issues."[66]

Section 1427 of ANILCA is similarly part of an intricate statutory scheme involving complex issues. As the Secretary stated in his decision, Leisnoi's eligibility under section 1427 of ANILCA has broad implications not only for Leisnoi, but also for

---

[62] Id. at 1059, citing Chevron, supra, 467 U.S. at 843.
[63] 323 U.S. 134 (1944).
[64] Mead, 533 U.S. at 228.
[65] Id.  See also Pronsolino v. Nastri, 291 F.3d 1123, 1131 (9th Cir. 2002).
[66] Id. at 1133.

"the other Koniag villages, Koniag Regional Corporation and, to a lesser degree, all of the other Native villages and regional corporations entitled to ANCSA benefits."[67]  The Secretary, who is charged with principal responsibility for administering ANCSA, has specialized knowledge about how section 1427 fits within this elaborate statutory scheme.  Indeed, he drew upon the Department's experience in dealing with ANCSA, when he stated,

> Before discussing the language of section 1427 . . .  it is necessary to review the provisions of ANCSA that prompted the enactment of section 1427 and that led to the problems it was intended to solve.[68]

He explained in his decision:

> When read as a whole, it is clear that section 1427 was intended to settle with finality and "as soon as practicable" the land entitlements of Koniag Regional Corporation and its villages and, to a lesser extent, the land entitlements of all of the entities entitled to ANCSA benefits.  Certainty about the status of Leisnoi was a necessary predicate to achieving that finality.  Without such certainty, the full entitlements of all of the parties affected by the settlement would either be incapable of calculation or, if conveyances and other distributions of benefits were made on the assumption that Leisnoi was an eligible village, they would run the risk of having to be amended or corrected at some indeterminate date depending on the outcome of Stratman's challenge.  For example, Leisnoi's status was key to:  1) the amount of subsurface acreage to which Koniag Regional Corporation was entitled; 2) the sharing of costs and revenues by the Afognak Island joint venture partners; and 3) the 12(b) land entitlements of not just Koniag and its village but the land entitlements of all eleven of the regional corporations and their villages.[69]

Furthermore, as is equally significant to the <u>Skidmore</u> deference and as has been stated above, the Secretary issued his decision through a formal administrative process designed to foster fairness and deliberation.  The Secretary had the benefit of extensive briefings submitted by the parties.  And, his is clearly a thoughtful, reasoned opinion.

---

[67] Kempthorne Decision, at 7.

[68] <u>Id</u>. at 5.

[69] <u>Id</u>. at 10.

Under <u>Skidmore</u>, then, Secretary Kempthorne's decision is entitled to the greatest deference so long as it is based upon a reasonable interpretation of the statute.

VI.    **The Secretary's Interpretation Of Section 1427 Is Rational And Ultimately Correct**

   A.    The Secretary's Historical Perspective

As the Secretary states, to understand the purpose of ANILCA, one needs some historical perspective. For the Koniag villages, two problems arose. First, the deficiency acreage was far away and unsatisfactory, although quite desirable to the federal government for a wildlife refuge.[70] The second problem was that unlike Leisnoi, seven villages had been denied certification by the then Secretary of Interior; however, that decision had been reversed by an appeals court.[71]

Consequently, Koniag and all of its village corporations proposed the comprehensive settlement of all their claims and the proposal was accepted by Congress and became Section 1427(c) of ANILCA. The seven villages became ANCSA Native village corporations, although with greatly reduced benefits.[72] Further, to solve the deficiency acreage problem, Congress directed that the Secretary convey land on Afognak Island to a joint venture made up of the seven villages, the other Koniag villages including Leisnoi, and Koniag itself.[73] Since each received different portions of the joint venture which received all of the land on Afognak, the Secretary then, and in the light of this history, analyzed section 1427 of ANILCA, a statute he administers.

_____

[70] <u>Id</u>. at 7
[71] <u>Id</u>.
[72] <u>Id</u>.
[73] <u>Id</u>. at 7. A fuller explanation is contained in the statement of Edward Weinberg, counsel for Koniag, Inc., Alaska National Interest Lands Conservation Act of 1979: Hearings Before the house Committee on Interior and Insular Affairs. 96th Cong. 1st Sess. (1979) at 1214-22, attached as Exhibit 1.

B.    The Secretary's Analysis of ANILCA

Noting that "section 1427 constructs an elaborate scheme for the resolution of the Koniag land claims, not just Leisnoi, but a sizeable number of entities," the Secretary stated:

> Viewing the scheme as a whole, it is reasonable to conclude that Congress intended to resolve all of the uncertainties and did not intend to leave the parties at risk of having their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's eligibility.[74]

But, as the Secretary goes on to state, even the terms which describe this complex relationship themselves treat Leisnoi as an ANCSA village corporation. Section (a)(7) defines a "Koniag village" as a village formed "under ANCSA" within the Koniag region.[75] Section (a)(8) defines a "Koniag village corporation" as one formed under ANCSA.[76] Leisnoi met each definition, but more so was named in the legislation as such.

Section (a)(4) defines Leisnoi as a "Koniag deficiency village corporation," meaning there was insufficient land in Kodiak to satisfy Leisnoi's ANCSA entitlements.[77] Similarly, Leisnoi is defined as a "Koniag 12(b) village corporation" meaning it is an ANCSA village corporation that will share in the difference between 22 million acres and the total acreage selected by all village corporations. "Thus, Leisnoi's status was key to a final determination of the entitlements of every entity entitled to ANCSA benefits."[78]

So, Leisnoi is defined as an ANCSA village corporation, both because it is a "Koniag deficiency village" and also because it is a "Koniag 12(b) village corporation." And, such status has consequence, not only does it fix the entitlements of the Koniag

---

[74] Id.
[75] Id. at 8.
[76] Id.
[77] Id.
[78] Id.

village corporations, but it fixes them so far as the Koniag region is concerned, with all regional and through them, all village corporations.

It also has other direct consequence. Secretary Kempthorne notes that the acreage available on Afognak was different from that available in the deficiency acres.[79] Additionally, of course, there were seven village corporations whose virtually only entitlement was an interest in the joint venture to which the Afognak Island lands were deeded. And, after reciting the complex formula for determining the division of costs of and revenues from the joint venture, the Secretary stated,

> Thus, Leisnoi's status was key to the proper sharing of costs and revenues of the joint venture to which the lands on Afognak Island were to be conveyed.[80]

Finally, the Secretary found that there was no provision for the conveyance of Afognak Island lands to await the outcome of the Stratman eligibility law suit, that the conveyance was to be "made as soon as practicable" after the joint venture's formation, and that both the Koniag deficiency village corporations and the Koniag 12(b) village corporations relinquished their "entitlements" under ANCSA to the lands on the Alaska Peninsula in favor of those entitlements in turn provided on Afognak. Leisnoi, Congress determined, had entitlements, and its entitlements which were traded in ANILCA section 1427(c) came from ANCSA.[81]

From the foregoing, the statute is clear on its face.[82] Leisnoi is a Native village corporation entitled to certain lands a status it shares with other Koniag Native village corporations, and which it, and other corporations exchanged for entitlements on Afognak Island. That Leisnoi is granted these entitlements on Afognak is in keeping

---

[79] Id. at 8.
[80] Id. at 9.
[81] Id.
[82] "If the intent of Congress is clear, that is the end of the matter." Chevron, supra. 467 U.S. at 842.

with the purpose of the entire section to make such exchanges "as soon as practicable," that the statute was to further the ANCSA goals of "rapidity, certainty, and without litigation;" and that section 1427(c) indeed was a complete and intricate solution to the problems facing Koniag and the village corporations in its region.  Certainly, the statute read as a whole[83] supports only that Leisnoi, along with other village corporations, was entitled to receive and hence exchange entitlements.  Certainly, that Congress ratified Leisnoi's status as an ANCSA corporation is not inconsistent, nor precluded by anything stated in "the language, purpose and structure of" section 1427(c).[84]

### B.    Ambiguity and Deference

Secretary Kempthorne noted that "these provisions in section1427, while complex, are, with arguably two exceptions, quite clear."[85]  The two sections are (b)(1) and (a)(2).

Section (b)(1) as stated above allows the conveyance of lands on Afognak to be "in full satisfaction of the right of each Koniag deficiency village corporation to conveyance under ANCSA of the surface estate of deficiency acreage on the Alaska Peninsula."  Secretary Kempthorne stated that "on its face this language can be read as a Congressional affirmation" [that] "Leisnoi . . . has a right to the conveyance of certain lands under ANCSA [which can be traded for the Afognak Island lands . . . ."  It becomes "arguably" ambiguous because under ANCSA, the Secretary was charged with the determination of village eligibility and there was a judicial challenge to Leisnoi's eligibility.  In that light, did Congress "simply acknowledge . . . that pending the outcome of the judicial challenge, Leisnoi had a right to certain acreage . . ."?[86]

The second "arguable" ambiguity comes from section (a)(2).  It declares Leisnoi to be "entitled under section 14(a) of [ANCSA] to a conveyance of surface estate because

---

[83] <u>Washington State Department of Social and Health Services v. Keffler</u>, 537 U.S. 371, 384 n.7 (2003).
[84] <u>Wilderness Society v. U.S.F.W.S.</u>, 353 F.3d 1051, 1062 (2003).
[85] Kempthorne Decision at 9.
[86] Kempthorne Decision at 10.

of a deficiency of land in Kodiak." While, as the Secretary states "on its face this language . . . can be read as a Congressional ratification . . . ." still entitlements were the subject of the Secretary's decision. In light of the judicial challenge, was Congress simply acknowledging that pending the outcome of the litigation Leisnoi was entitled to a conveyance.[87]

> While I acknowledge, as did the district court, that these are "difficult question[s]," I conclude for the following reasons that the better reading of section 1427 is as a ratification of the 1974 eligibility determination that mooted Stratman's challenge.[88]

It is the resolution of these two "arguable" ambiguities to which this Court must give Chevron deference. As the Supreme Court in Chevron stated, ". . . if the statute is silent or ambiguous with respect to the specific issue, the question for the Court is whether the agency's answer is based on a permissible construction of the statute."[89]

The reasoning of the Secretary is again set forth in his decision. First, he notes the statute must be read as a whole.[90] And as a whole it was intended to settle with finality and "as soon as practicable" the land entitlements of the Koniag corporations. Leisnoi's status was necessary for "finality."[91] As noted above, it was necessary for a determination of Koniag's subsurface estate, the sharing of costs and revenues from the joint venture and the land entitlements of all Alaska Native village corporations.

Second, the Secretary noted that Section 1427(c) of ANILCA is remedial legislation and "should be construed broadly to effectuate its purposes."[92] The purpose of section 1427 was to remediate Koniag's and the villages deficiency acreage, and as

---

[87] Id.
[88] Id.
[89] Chevron supra 467 U.S. at 843.
[90] Kempthorne Decision at 10, citing Washington State Department of Social and Health Services v. Keffler, 537 U.S. 371, 384 n. 7 (2003).
[91] Id.
[92] Kempthorne Decision at 11, citing Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).

stated above, provide a permanent solution.  A permanent solution meant Leisnoi's certification had to be accepted as final, that is it had to be ratified.  Any other reading would not construe this remedial legislation broadly.

Finally, the Secretary relied upon legislative history which indicated that Congress was aware from testimony by the Sierra Club that Leisnoi, a "former FAA installation" was thought by at least them to have been incorrectly certified.[93]  There was a clear dispute despite which ANILCA 1427 was passed and the Secretary's 1974 certification was adopted as final.  Clearly these are reasons which are "based on a permissible construction of the statute."  Moreover, although it is not necessary for <u>Chevron</u> deference, they are superior reasons to those otherwise advanced.

Because the Secretary was overruling a decision of the Interior Board of Land Appeals, he discussed at length and dismissed the reasons advanced by the board that 1427(c) was not a Congressional affirmation or ratification of Leisnoi's entitlements.  He listed three reasons advanced by the IBLA and dismissed each.

First, the IBLA urged there was no judicial challenge to Leisnoi's certification.  That was certainly incorrect, even if the action before the Ninth Circuit was "on procedural grounds."  As the Secretary states that "doesn't mean there was nothing to moot."[94]

> Congress could well have intended to moot such a challenge by accepting as final the Secretary's determination that Leisnoi was eligible, so the settlement of Koniag land claims could proceed.[95]

Second, Congress expressly resolved the dispute concerning the seven villages.  IBLA stated that Congress could have done so for Leisnoi.  However, the seven villages

---

[93] Kempthorne Decision at 11, citing Amendments to Alaska Native Claims Settlement Act.  Hearings Before the Comm. On Interior and Insular Affairs, U.S. Senate, 94th Cong. at 392 (1975).  Further legislative history is presented <u>infra</u>.

[94] Kempthorne Decision at 12.  There was much more information provided Congress, as is discussed, <u>infra</u>.

[95] <u>Id</u>.

were uncertified, and Congress certified them so the intricate ownership of lands on Afognak could be final. Leisnoi was already certified. Congress needed to do nothing but accept the Secretary's eligibility determination with respect to Leisnoi as final. And, the Secretary states, "which is what I have concluded section 1427 does."[96] As the Secretary states, it makes no sense to resolve the status of the seven villages so the Afognak exchange could go through and simply leave Leisnoi's status unresolved.

Third, in 1995, the Senate passed a bill confirming Leisnoi's eligibility which ultimately did not become law. In the words of the Secretary,

> However, legislation proposed to a Congress sitting in 1995 that does not pass is not a reliable indication of what another Congress sitting 15 years earlier in 1980 may or may not have intended.[97]

Clearly, then, the Decision of Secretary Kempthorne deserves <u>Chevron</u> deference. It is the result of an extensive adjudicatory process; it is well reasoned; it is what this Court requested in sending this matter to the Department of Interior. The Secretary is charged with implementing both ANCSA and ANILCA. It is based on a permissible construction of the statute and it carries the force of law.[98] "A court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency."[99] Mr. Stratman's challenge is moot.

## VII.   <u>Additional Legislative History</u>

The following is additional legislative history concerning the Congressional awareness of Leisnoi's certification litigation. As stated in the introduction to this brief, it was presented to the Interior Board of Land Appeals and is somewhere within the massive administrative record. The exhibits attached here are parts of that record, although they come from Koniag's 1995 motion.

---

[96] <u>Id</u>. at 12-13.
[97] <u>Id</u>. at 13.
[98] <u>Chevron</u> <u>supra</u> 467 U.S. at 842-43; <u>Mead</u> <u>supra</u> 533 U.S. at 232-33.
[99] <u>Id</u>. at 844.

In 1979, syndicated Washington Post columnist Jack Anderson wrote a series of articles on what he termed the "phantom" Koniag villages."[100]  In his third column, Anderson charged that Koniag, through its "subsidiary" Leisnoi tried to pull off a "gigantic public-land swindle in southwest Alaska."[101]  Anderson charged that Alaska Senator Ted Stevens was proposing to turn over to Leisnoi and the other Koniag village corporations over 115,000 acres of land on Afognak Island, worth millions of dollars.[102]  Anderson asserted that there was no such village as Woody Island, and that federal investigators had labeled the village a "fraud."[103]

The Anderson columns unleashed a firestorm of activity and galvanized the Citizens Action Group (CAG), a group of individuals protesting Leisnoi's certification who were the original plaintiffs in 76-0133 CIV.  The group brought up two "nationally well-known" attorneys to speak to the members, and retained them to assist in their efforts.[104]  A Seattle attorney was hired by the CAG to lobby against the Koniag amendment.[105]  A New Jersey attorney was retained to work with Roger Henderson, Stratman's lawyer, on the 9th Circuit appeal of the district court's dismissal of the case.

---

[100] Three of the columns were reprinted in the March 1, 1979 edition of the *Kadiak Times*, portions of which are attached hereto as Exhibit 2  The reprinted columns may be found beginning on page 5 of 9.  The affidavit of Jacqueline Luke testifying to the authenticity originally filed in 1995 is attached as Exhibit 5.

[101] *Kadiak Times*, March 1, 1979 ed. at Supplement page A, attached hereto as page 6 to Exhibit 2.

[102] All three of the Anderson columns are so fraught with error that it is difficult to see any resemblance between the actual facts and those put forth in his column.  The accuracy of the columns, however, is not relevant.  Rather, what is relevant is their existence, and the effect which they had on subsequent events.  Consequently, Koniag will not in this motion refute the allegations made.  A comprehensive response to the allegations is contained in a February 23, 1979, letter from Edward Weinberg, counsel for Koniag, to the Honorable Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs.  A copy of that letter is attached as Exhibit 3.  It is also reprinted in the *Kadiak Times*, Exhibit 2, beginning on page 2.

[103] Exhibit 2 at 5.

[104] *Kadiak Times*, March 1, 1979 ed., Exhibit 2 at 1.

[105] Id.

Meanwhile, in Washington, D.C., Representative Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, which had primary jurisdiction over the ANILCA legislation in the House of Representatives, requested Koniag respond to Anderson's allegations.  Koniag's counsel, Edward Weinberg, responded with a 21 page letter.[106]  In response to Mr. Anderson's allegations concerning Leisnoi, Mr. Weinberg responded as follows:

> Now, as respects Leisnoi.  Leisnoi is a certified village.  It went through the administrative process established by the Secretary of the Interior under ANCSA to determine village eligibility.  Leisnoi was certified by the Secretary of the Interior after its examination by the BIA which was charged with examining each and every village that claimed eligibility under ANCSA.
>
> The administrative process established by the Secretary afforded anyone wishing to dispute or object to the eligibility of an applicant for village status the opportunity to do so.  Wide publicity was given to the pendency of applications for eligibility.  The simple fact is that those residents of Kodiak, Alaska, who are referred to in Mr. Anderson's second article, that of February 22, as the "Citizens Action Group" and who are now attempting through Mr. Anderson's "good offices" to deprive Leisnoi of its eligibility, had their opportunity to protest and to obtain an evidentiary, trial-type hearing from the Department of the Interior in the fall of 1973 and the spring of 1974 when Leisnoi's eligibility was considered.  They did not avail themselves of that right.
> . . .
> [T] regulations of the Department established September 1, 1973 as the deadline for applications for certification by unlisted villages and provided an opportunity for protest and hearing.  43 C.F.R. §§2651(a)(6) 9, 10, 38 F.R. 14223 (May 10, 1973).  The hearing on Leisnoi, by the way, would have been held, had anyone requested one, in Kodiak, not in far off Washington, D.C. or any other inconvenient place.  Nine separate and widely publicized village eligibility hearings were held in Kodiak in 1974.  The filing of village eligibility applications was widely publicized in the local Kodiak papers and village eligibility was a widely discussed topic in Kodiak.  Anyone in Kodiak and vicinity who would have wanted to object to a village's eligibility application but who was unaware of the opportunity

---

[106] See Exhibit 3.

to do so and to obtain a hearing would have had to have been entombed for a year and a half in the proverbial underground salt mine, completely out of touch with the world.

. . . .

Almost two years after Leisnoi's certification (which had occurred on September 9, 1974), some individuals in Kodiak, who it later developed are apparently the nucleus of the Citizens Action Group, filed a lawsuit against the Secretary of the Interior in the Federal District Court in Anchorage attacking Leisnoi's eligibility.  Among the allegations of the complaint were a charge of fraud, but without specifics as required by Rule 9(b) of the Federal Rules of Civil Procedure.  (Kodiak-Aleutian Chapter, et. al. v. Kleppe, No. A76-182 Civil).  Neither Leisnoi nor Koniag were named as parties to that action.  The Federal District Court on December 7, 1976 (432 F. Supp. 544) entered an Order which, as respects the charge of fraud, required the plaintiffs to "put up or shut up" as required by Rule 9(b) of the Rules of Civil Procedure.  The plaintiffs chose to shut up.  These are the same people who are, with Mr. Anderson, once again screaming fraud.

An amended complaint was filed shortly after the December 7, 1976 Order, this time devoid of any charge of fraud. . .The complaint alleged that two individuals in Kodiak, Omar Stratman and Toni Burton, claimed to hold grazing leases from the United States, on lands (that had been TA'd to the state prior to passage of ANCSA) which compose a small part of the area on Kodiak Island selected by Leisnoi under ANCSA . . .

As to Stratman and Burton, the Court permitted the lawsuit to proceed because of a claimed lack of personal knowledge on their part that the Department of the Interior had scheduled an opportunity for protest and hearing on Leisnoi's application.  This assertion of lack of knowledge is simply an unproven claim.  We dispute it and consider it incredulous in view of the wide publicity given such matters in Kodiak, where both resided, in 1973 and 1974 . . . .

In our opinion, Stratman and Burton's claims that their grazing leases were threatened by Leisnoi are not well founded.  To begin with, grazing leases are "valid existing rights" under ANCSA, which remain with the holders regardless of Native selection.  ANCSA, §14(g) . . . .

In sum, the federal grazing leases covering the Leisnoi lands on Kodiak Island remain in effect and are valid, and Leisnoi must and will respect them.  Further, if they had a State right to a renewal, (assuming that the State's repeal of its statute was not binding as to them), they have, under the Secretary's Orders above noted, a valid existing right to such a renewal.

> The lawsuit based on the amended complaint was dismissed by the Federal District Court in Anchorage on October 16, 1978, as moot (copy of opinion attached), Leisnoi having relinquished the limited acreage covered by the Stratman and Burton grazing leases because it came to the conclusion that the land, burdened in any event by a long term lease, was simply not worth fighting over.  The District Court also held that whatever rights Stratman and Burton might have to a state lease were preserved as valid existing rights and finally, the Court noted that Stratman and Burton's complaint appeared to be in violation of Rule 17(a) of the Federal Rules of Civil Procedure, since the grazing leases were held not by Stratman and Burton but by corporations.
>
> . . . .
>
> Stratman and Burton have filed a notice of appeal with the Ninth Circuit Court of Appeals . . . .[107]

It is thus apparent that the House Committee on Interior and Insular Affairs was fully and completely apprised of the CAG's claims, the allegations made in this litigation, the status of the litigation at the time of the letter, and Koniag's response to the allegations.

The United States Senate also responded to the Anderson articles.  The Senate Energy Committee Chairman, Henry Jackson, requested a report from the Department of Interior and told the General Accounting Office to be ready to "probe the Interior Department reports."[108]  Obviously aware of pending charges and litigation surrounding Leisnoi's certification, the Senate nonetheless passed section 1427 the following year.

Despite the allegations of Mr. Anderson, the CAG, and despite the ongoing litigation of Mr. Stratman, Congress still described Leisnoi as a "Koniag 12(b) village," it still treated Leisnoi as a "Koniag deficiency village corporation," and it still made Leisnoi an integral and necessary part of an "elaborate"[109] resolution of all "of the Koniag land claims,"[110] "with finality" and with the exchange to occur "as soon as

---

[107] Exhibit 1 at 2-8 (emphasis in original).
[108] Exhibit 4 at 2.
[109] Kempthorne Decision at 7.
[110] Id.

practicable."[111]   The Secretary of Interior found that 1427 of ANILCA ratified the 1974 decision of the then Secretary of the Interior.  His decision is entitled to such deference that Mr. Stratman's case is moot.  In addition to such deference, which looks only to whether the decision is a reasonable one, the Secretary is also right.

### VIII.   Congress Reaffirmed Leisnoi's Status In FRITLA

The Secretary did not address this issue because, of course, he found that 1427 of ANILCA mooted all other arguments.  This argument could consequently be premature. Koniag raises it here because it has been briefed by Leisnoi,[112] and because it seems to follow within the Court's request for motions to dismiss.

While tribes are distinct entities from village corporations, the ANCSA definition of Native village has long been used as a criterion for federal recognition of tribal status. Section 1602(c) of ANCSA defines a "Native village" as:

> . . . any tribe, band, clan, group, village, community, or association in Alaska listed in sections 1610 and 1615 of this title, or which meets the requirements of this chapter, and which the Secretary determines was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives.[113]

Such Native villages are entitled to receive land and benefits under ANCSA.[114]

In 1982, the Department of the Interior first published a preliminary list of Alaskan tribal entities.[115]   The list included two types of entities; there were "traditional councils that were identified as tribes in the Alaska Native Claims Settlement Act (ANCSA)" and "Indian Reorganization Act councils organized under the Indian Reorganization Act (IRA)."[116]   In 1988, the Department published a new list which

---

[111] Id. at 10.
[112] Leisnoi's Motion at Docket 111 and Memorandum at Docket 112.
[113] 43 U.S.C. § 1602(c).
[114] Id. at § 1610(b).
[115] 58 F.R. 54364 at 2 (Oct. 21, 1993).
[116] Id.

added other types of Alaska entities, including village corporations and regional corporations formed under ANCSA.[117]  The addition of these other entities created some confusion about the tribal status of all of the listed entities.[118]

In January of 1993, the Solicitor of the Department of the Interior issued an opinion addressing these issues.  The opinion concluded that there are tribes in Alaska.[119]  The Solicitor did not specifically identify those villages which are tribes but found that "the villages eligible for benefits under ANCSA, referred to as the 'modified ANCSA list,' are considered tribes for purposes of Federal law."[120]  Thus, the Solicitor equated tribal status with Native village eligibility under ANCSA.  On October 21, 1993, the Department of the Interior published a list of Alaska tribal entities based on this opinion.[121]  The list included "Leisnoi Village (aka Woody Island)."[122]

Congress ratified the October 21, 1993, list of tribes when it passed the Federally Recognized Indian Tribe List Act of 1994 (FRITLA), Pub. L. No. 103-454, 108 Stat. 4791 (25 U.S.C. 479a & note, 479a-1).  FRITLA provides that while the Department of the Interior has authority to extend recognition to an Indian tribe, "a tribe which has been recognized in [this manner] may not be terminated except by an Act of Congress."[123]  Thus, Congress eliminated the Department's authority to remove any tribes from its 1993 list.  In so doing, Congress tacitly approved the Secretary's "modified ANCSA list" upon which the 1993 list of tribes was based.  It would make no sense otherwise for Congress

---

[117] Id.

[118] Id.

[119] 58 F.R. 52829 at 19 (Oct. 21, 1993).  The relevant portions are contained in Exhibit 1 to Leisnoi's Motion at docket 111.  There the page is 4.

[120] Id.

[121] 58 F.R. 54364.

[122] Id. at 20, page 7 of Leisnoi's exhibit.

[123] Pub. L. No. 103-454; Federally Recognized Indian Tribe List Act of 1994, H. Rep. No. 103-781, Oct. 3, 1994, at 3769-70.

to have permanently established the existence of such tribes, and to have taken away the Department of Interior's ability to modify the list.

**IX.**   **Conclusion**

For the foregoing reasons, Koniag requests that this Court dismiss this action by Mr. Stratman as moot.

DATED at Anchorage, Alaska this 14th day of April, 2007.

> LAW OFFICES OF R. COLLIN MIDDLETON
> Attorneys for Defendant
> Koniag, Inc.
>
> By /s/ R. Collin Middleton_____
>      ABA #6803015
>      Law Offices of R. Collin Middleton, P.C.
>      P.O. Box 113128
>      Anchorage, AK  99511
>      907-222-0506
>      907-279-7029 – Fax
>      collinmiddleton@gci.net

Certificate of Service
The undersigned certifies that the
foregoing document was served
by electronic service on this 14th
day of April, 2007.

Bruce M. Landon
Department of Justice
Environment & Natural Resources Division
801 "B" Street, Suite 504
Anchorage, Alaska  99501-3657

John R. Fitzgerald, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA  02210-1181

Michael Schneider, Esq.
880 "N" Street, Suite 202
Anchorage, Alaska  99501
_____
/s/ R. Collin Middleton

Memorandum in Support of Motion to Dismiss Re Chevron Deference      -30-
A02-0290 CV (JKS)