

**Thanks Kodiak!**
**KMXT marathon**
**a big success**

Entertainment - Page 10

**Raw fish tax —**
**Did state try**
**to slide one by?**

See Whistling — Page 10





# KADIAK TIMES

| VOLUME 3 - NUMBER 43 | MARCH 1, 1979 | KODIAK, ALASKA | 50 CENTS |

# Citizens Action Group draws full house after columnist spurs interest

## Island news in brief

### Lee Jones ill

Colorful pioneer Lee Jones, 75, who ran a rooming house in Kodiak for many years, is seriously ill in a San Luis Obispo, Calif., hospital her brother Stan Skoog reports. Lee, who is legally known as Ruth Falconer, may have brief visits and phone calls. She is at Sierra Vista Hospital, 1010 Murray Ave., San Luis Obispo, Calif., telephone 805-543-6550. Lee entered the hospital last Friday and is expected to be there for at least two weeks.

### Pillar Mountain

Rep. Fred Zharoff, D-Kodiak, told Kadiak Times Tuesday he has introduced HB 299 making a $900,000 appropriation to the Community and Regional Affairs Agency to study effects of landslides and possible Tsunami here, in relationship to Pillar Mountain. The funds would be used for a preliminary slope stabilization design program, Zharoff said. The plan would possibly call for removal of 400,000 cubic yards of material from the mountain. Zharoff said if the bill passes, he hopes it "Will take care of part of the problem, if not all of it."

### Supplement

A special supplement today, in the centerfold, Pages A through D, includes the Jack Anderson columns and Koniag's response.

### Index

| | |
|---|---|
| Legion | 2 |
| Koniag response | 3 |
| Action Line | 4 |
| Forum | 5 |
| Fisheries | 10-13 |
| Sports | 17 |
| KOTV | 20 |
| Our Kodiak | 21 |



Photo by Nell Waage

FUND RAISER—In the past four years, 70-year old Fern Fuller has raised $4,000 to benefit the Kodiak Island Hospital. An avid in-door gardener, Fern has sold plants and more recently pickled fish, donating proceeds to the Hospital Auxiliary. (story and photo on page 9 today.)

First of a series:
## Apprehension here grows over 'Moonies'

by NELL WAAGE
Staff Writer

The Moonies are coming! The Moonies are coming!

It strikes fear into the hearts of some Kodiakans...and others are beginning to worry. Processors in particular fear alleged unfair competition from the plant the Unification Church — nicknamed Moonies because it was founded and is headed by Korean Rev. Sun Myung Moon — intends to build here. They question the motives behind the growing involvement of the church — or International Oceanic Enterprises, a company established by the church — in the seafood industry.

Those in the industry on the East Coast, where the church has maintained

(Continued on Page 11)

## Good morning! *Times goes twice weekly*

Kodiak will have its first morning newspaper, to be distributed twice weekly, beginning Tuesday, March 13, Kadiak Times Publishers Alan and Ginny Austerman have announced.

The all local newspaper, which has been published each Thursday since May, 1976, will come out each Tuesday and Friday morning for a 60 day trial

March, the Austermans announced.

"We are grateful for the enormous community support which enables us to do this," Austerman said. "We have put a great deal of money and energy into upgrading the publication, it has grown very rapidly, and we feel it is now undoubtedly the island's best read all local newspaper," he said.

Austerman said additional rates will be dropped to guarantee an even higher circulation.

After the 60 day trial period, the frequency of publication will be analyzed, and Kadiak Times might continue twice weekly, might go back to weekly publication or could go daily, depending upon community interest. Additional information on the transition is carried in an advertisement on the

by NELL WAAGE
Staff Writer

A full house was on hand Friday evening for the Citizen's Action Group meeting at the borough meeting room. A C.A.G. booster says most members of the group attributed the good turnout to "all the new publicity."

The C.A.G.'s cause has been the subject of a series of Jack Anderson columns the past week. The well-known Washington, D.C. columnist is sydicated in some 900 newspapers nationwide. An associate of Anderson's visited Kodiak and Anchorage last month researching the article, which compared the situation locally with the "Teapot Dome" scandal of the 20's.

Those attending the meeting Friday heard a rundown on C.A.G. purposes and background, were introduced to two nationally well-known attorneys retained by the group to pursue their cause, and heard a plea for funds necessary to continue the case.

In outlining the C.A.G. position, Nick Szabo emphasized the issue is "not Native versus non-Native." He said group members fully supported the Alaska Native Claims Settlement Act of 1971, calling it, "fair and just and certainly appropriate." He said the, "basis of the problem is a difference of interpretations of what the act meant." The "regional corporation (Koniag, Inc.) took a liberal view." Some people have a difference of interpretations of what the act meant." Some people have a difference of opinion of what constitutes a village," Szabo said.

Attorney Ed Furia from Seattle added, "We

(Continued on Page

EXHIBIT 2
PAGE 1 OF 9 PAGES

EXHIBIT C
Page 1 of 9 Pages

**Kodiak Wrap-Up**

# Top Native leaders, Koniag attorney reply to Jack Anderson's 'land grab scheme' charge



CLOSE CALL FOR CITRUS — The Coast Guard Cutter CITRUS, a 180-foot seagoing buoy tender, scheduled for decommissioning soon, almost sank Monday evening after she struck a submerged object while passing through Ouzinkie Narrows north of Kodiak. The 36-year-old vessel suffered substantial damage and flooding, but there were no injuries, according to Coast Guard spokesman Ken Freeze. Additional details under "Our Kodiak" on page 21 today.

*by KENT BRANDLI*
*Editor*

Two top executives of the Alaska Federation of Natives (AFN) and a leading Washington, D.C. attorney representing Koniag, Inc., have responded to nationally syndicated columnist Jack Anderson's allegations that Koniag (the Native regional corporation in Kodiak) has attempted fraudulently to obtain more than 600,000 acres of valuable land it is not entitled to.

"I have read with dismay the recent newspaper columns attacking Koniag and its people. I deplore what I regard as an apparent smear campaign against Koniag," said Morris Thompson, president of the AFN. "I further feel the reference to Mr. Armstrong's not being a "simple, semi-literate Eskimo fisherman or Indian trapper" is an insult to the intelligence of all Alaskan Natives."

Dan Alex, chairman of AFN's Land Managers Association said the proposed Koniag land exchange amendment questioned by Anderson "has the formal and unanimous approval of the AFN Board — and of the land managers — despite the smear campaign in the press."

The Alaska Federation of Natives is a statewide political organization representing all 12 profit making regional corporations as well as all 12 regional non-profit associations.

Washington, D.C. attorney Edward Weinberg, who is employed by Koniag, made a detailed 21 page response to Anderson's charges in a letter addressed to Morris K. Udall, chairman of the U.S. House Committee on Interior and Insular Affairs.

### Leisnoi certified

Weinberg asserts that "Mr. Anderson is after the Koniag Amendment and his theme is that Leisnoi, which Mr. Anderson grudgingly concedes is a certified village, with the assistance of the seven uncertified villages, are somehow going to enable Koniag to make off with Afognak Island." Weinberg labels the charge "bunk!"

"As we have explained over and over, there is not an acre of Afognak Island that, under the Koniag Amendment, would be conveyed to the Natives by reason of the uncertified villages. In respect to Afognak Island, the Koniag amendment would operate in exactly the same way without the uncertified villages. Furthermore, not one cent more will be paid from the Alaska Native Fund on account of Koniag, Koniag Natives or the Koniag village corporations..."

Weinberg's letter says that Leisnoi is a certified village, having gone through the administrative process established by the Secretary of Interior under the Alaska Native Claims Settlement Act (ANCSA)

(Continued on Page 7)

---

**animal crackers too**

Island Retail Bldg.
Open 10-6

NEW
SPRING
ARRIVALS!

A GREAT SELECTION!



## Big Beast feast huge success

Alaska Department of Fish and Game employees, their families and guests enjoyed a variety of exotic wild game dishes at the department's annual Big Beast Feast Saturday evening.

Ken Manthey, coordinator of the "family evening" this year, says the table was laden with such goodies as sweet and sour beaver (It's good, Ken says), river otter back strap, pickled octopus, deer, elk, reindeer roast, beaver tail and squid — all taken by department employees on Kodiak Island.

Manthey says the annual event, which he describes as "very informal" started in 1973 and is financed by an in-house big buck contest. Proceeds from the contest cover expenses for "a hall" and such miscellaneous items as paper plates, napkins, etc., Ken says. Employees with no wild game dishes to offer "bring things like homemade bread," he says.

Pete Murray took the prize for the biggest buck this year and Guy Powell brought in a trophy close behind for second place. Both were big enough to make the Alaska trophy book, Manthey says.

There's one catch to winning the contest. Winners are automatically named to plan next year's Big Beast Feast, Manthey says. (NW)

---

*Hope your stay in Kodiak is a good one, American Legion!*



**L&S Travel, Inc.**
Next door to
Sweeney Insurance

486-3232

**HELLO!**
We hope all the legionnaires will enjoy their stay in Kodiak-we extend our friendship!

**Glacier State Telephone Company**
A Member of Continental Telephone System



decorating with distinction

*Ardinger's*
House of
Fine Furnishings

...best furniture in town.

1710 Mill Bay    486-5554

EXHIBIT 2
PAGE 2 OF 2 PAGES

EXHIBIT C
Page 2 of 9 Pages

# opinion/forum

**EDITORIAL:**

## ● The way it isn't

A widely read but opinionated columnist has entered the long standing fray over the eligibility of several so called "phantom villages."

We do not agree with Mr. Jack Anderson's opinion that the land claimed by the disputed villages and pending land swap constitutes the greatest land rip off since the Teapot Dome Scandal. But, Drew Pearson's successor has far more readers than we have, and perhaps our opinion will never be heard as loudly.

Mr. Anderson has given a ruling a lot faster than the courts have been able too. He and his staff have joined the ranks of those weekend experts who fly up to Alaska, talk to a few people, fly around for a couple of days and come away with all the answers — many of them wrong.

Mr. Anderson has missed the point, we think, on several aspects of the situation.

We would have to go back before Harding's administration to find a comparison to this so called "land swindle." Back maybe to 1847, when the U. S. ripped off Alaska from Russia for a paltry $7.2 million. Historically, before the Russians, the land in dispute belonged to the Koniags. Before that it was God's land.

The complicated situation that Mr. Anderson has delved into is a matter of pending litigation. The story is really nothing new. The columnist has said essentially what the Kodiak Citizen's Action Group has been saying rather clearly for years. Now they have a national audience.

The question of the contested or "phantom" villages is a matter of hotly contested opinion in Kodiak. It is a raw and sensitive nerve requiring judgement (in a legal sense) and requiring fairness and good taste in the presentation of its many complicated facets. Over simplification of any complex problem is the easy way out, if not always the fair way.

The act, for example, talks about villages, tribes and groups. What is a village? Must it have a general store and a church? What constitutes residency? How long may a group of people be absent and still claim residency? The opinion of one journalist is no better than that of another. What DOES count is the opinion of the court.

For an equitable solution, we can only look to the law and the Alaska Native Land Claims Settlement Act itself. The battle has been going on in the courtrooms and the legislative halls. If we can't solve things judicially or legislatively, what solution can a free people find?

We have disenfranchised Natives who lay claim to most of the Island area. We have others, also powerful in the community and believing themselves to be 100 percent correct, saying these claims are entirely bogus.

We think Jack Anderson and his staff have presented only the cowboy side of what Karl Armstrong calls the ongoing cowboy and Indian war. Only now the battlefield is in the courtroom and in the halls of Congress.

Our own position in this fight becomes more complicated because the Kadiak Times was originally founded by Armstrong. Subsequently Alan and Ginny Austerman bought control of the paper and Armstrong no longer owns it. He is a friend and an advertiser, but his influence is strictly limited to that. On many occasions we have run articles and editorials which are not to his liking. Some people cannot seperate Armstrong and Koniag in their minds. Their distaste for the individual carries over to the corporation.

While we are aware of Mr. Armstrong's various strengths and weaknesses, we think he has sought to help Alaska's Native people obtain what he considers to be their birthright. We do not feel he has sought personal riches, but rather has made many personal sacrifices on behalf of the Natives. He has not been alone. To smear him as a self-serving ripoff also taints



Kodiak on the Rocks
by Clint Seyer

"OKAY THEN, TWENTY-FOUR BUCKS, SELECTION OF BEADS & I'LL THROW IN THE WAMPUM EXTRA FOR MANHATTEN ISLAND"

*Afognak is not the first island to be involved in an Indian land swap*

many other area citizens with the same careless brush.

If the questioned villages have claimed too much, if the law is hazy to their advantage, or if the courts have given their final word, we feel it is a matter for the lawyers and judges, not for the journalists bent on the quick sensational scoop with only half the facts at their disposal.

What Jack Anderson has come up with is a rewrite of some rather old material. The case was more recently disclosed in the Alaska Advocate and his material is quite similar. But, both Anderson and the Advocate begin with the premise they are about to expose a big rip off and then only give details which support their premise. There are some equally valid arguments which they have failed to report.

On the d-2 land amendment, which would transfer Native ownership of the Native Land on the Alaska Peninsula for land on Afognak Island, this land swap can and probably will occur with or without the so called "phantom villages." An underlying question here is who will control Alaska's rich natural resources.

The largest Native village on the island is Kodiak City itself. If a Native is Native, does his village enrollment matter? In other words, if you give them the whole pie, does it matter how they slice it?

The amendment which trades the peninsula land for Afognak is strongly supported by national environmental groups. They want the peninsula land in the worst way for bird and wildlife preserves.

When we talk so loosely of "Natives" who are we talking about? In Kodiak we are talking about mayors, past or present, Judges, children, old folks, community religious leaders. Anyone who is one-quarter Aleut, Eskimo or Indian is a Native under the law. It is hard to divide this town into camps, or even villages, which is what we are apparently expected to do. One section of the law has been quoted. It is like quoting one verse from the scriptures.

Our own editorial staff is divided on the eligibility of the so called phantom villages. There are valid legal arguments advanced on both sides. It really requires extensive research on the part of persons qualified to interpret a complex law. We are not saying here whether the villages are eligible or not. We submit, the point is, the land swap can take place whether the courts rule the contested villages are eligible or fake. The proper decision rests with the courts and the Congress not with this small newspaper or the powerful Mr. Anderson.

The so called "rip off" might well occur legislatively or judicially, whatever the outcome of the contested villages.

We don't think Jack Anderson's vigorous re-write of this old material changes the facts of life one iota.

## Action Line!

Coordinated by Susan Jeffrey. Please address questions or responses to Susan at PO Box 2368, Kodiak, Ak., 99615.

**QUESTION:**

What can be done about the problem of snowmobiles riding on Island Lake from early morning until 11 p.m.? Would a borough ordinance regulating such activities be the solution?
CM
Island Lake
(Name on file, but withheld by request)

**ANSWER:**

Rick Garnett, borough attorney, says the Borough Assembly has the power to establish an ordinance limiting or restricting use of vehicles on a particular lake.

"There is precedent for such action in other municipalities. The Fire Lake residents in Eagle River raised similar complaints and the Anchorage Borough passed an ordinance limiting use of that lake," Garnett explained.

The borough's general counsel said that any borough assemblyperson can propose such an ordinance. Garnett advised the concerned person to contact her assembly representative. "If they want to dramatize their position, of course a petition would be in order," he added.



KADIAK TIMES

Alan and Ginny Austerman . . . . . . . . . . . . . . . publishers
Kent Brandley . . . . . . . assistant publisher & executive editor
Dennis Johnson . . . . . . . . . . . . . . . . . . . city editor
Nell Waage . . . . . . . . . . . . . . . . . . . . fisheries editor
Clint Seyer . . . . . . . . . . . . . . . . . . cartoonist/printer
Kay Linscheid . . . . . . . . . . . . . . . . . . graphics artist
Kathleen McNeeley . . . . . . . . . . . . . . . . . . . layout
Lynne Campbell . . . . . . . . . . . . . . darkroom & layout
Cherie Murray . . . . . . . . . . . . . . . . . . . . typesetter

P.O. Box 2368
Kodiak, Alaska 99615
486-3190

$18 per year second class
$36.50 per year first class
(c) Kadiak Times, 1979

EXHIBIT 2
PAGE 3 OF 9 PAGES

EXHIBIT C
Page 3 of 9 Pages

REPLY_____

(Continued from Page 3)
to determine village eligibility. He says those who now vehemently protest, failed to protest at the proper time although ample publicity and opportunity was provided them.

Anderson's column appeared after his young associate Hal Bernton visited Kodiak. He met here with Armstrong, and with Nick Szabo, who recently assumed a leadership role in the Community Action Group, among others.

**Pious mouthings of fraud**
Weinberg pulls no punches in saying "Mr. Anderson and Mr. Bernton appear to have been misled, on the basis of pious mouthings of fraud by people with a private business axe to grind. But then, neither Mr. Anderson nor Mr. Bernton appear to have done much, if any, homework about what their informants may have been up to..."

Weinberg stresses that even without counting Leisnoi's land entitlement on the mainland, Koniag and the other Koniag certified villages would still be giving up on the Alaska mainland about the same acreage as will be received on Afognak Island under the Koniag amendment.

The attorney says "There is much sound and fury which signifies nothing except that a small band of diehards in Kodiak who chose not to have their charges tried before an administrative law judge of the Department of the Interior at the proper time and who got nowhere in court, are moving heaven and earth to destroy Leisnoi, Karl Armstrong and Koniag..."

Weinberg also vigorously attacks Andersons first and second articles in which the columnist refers to a federal grand jury indictment. "The impression is left that Koniag and Mr. Armstrong were among those indicted. This is not so. The indictment Mr. Anderson is talking about was returned by a federal grand jury in Anchorage in 1976 against one of the seven uncertified village corporations, Shuyak, and two of its officers, on grounds of attempting to defraud the U.S. in claiming eligibility. This indictment followed what I understand to have been an extensive investigation. No indictment was returned against any other village, nor against Koniag, nor against any other persons including Mr. Armstrong..."

**Stereotype**
Weinberg concludes that "It may be that what bothers Mr. Anderson and

**'Phantom villages'**
The "phantom village" allegation is also addressed at length by Weinberg. "With respect to the uncertified villages which Mr. Anderson calls "phantom," Mr. Anderson conveniently overlooks the fact that two federal courts, the Federal District Court in Washington and the U.S. Court of Appeals for the District of Columbia, concurred in concluding that in reversing the BIA determination of eligibility, the 'higher ups' in the Department of the Interior, to borrow Mr. Anderson's phrase, committed gross violations of due process of law. So outraged was Judge Gessell by the Department's conduct that he ordered that the last untainted decision within the Interior Department on the village's eligibility be reinstated..."

his assistant Mr. Bernton is that Karl Armstrong does not fit what the column reveals to be Mr. Bernton's (and Mr. Anderson's) stereotype of an Alaska Native — a person who, to use the column's language, is a 'simple, semi-literate Eskimo fisherman or Indian trapper." Weinberg says this view "betokens that paternal state of mind in which the 'good' Alaska Natives are docile simple minded souls, content to have others decide their fate and happy to be allowed to remain in their homeland as sort of living exhibits in a human zoo for the amusing tolerance of non-Indian exploiters and columnists..."

Weinberg concedes that Armstrong is not shy and that he is given at times to acerbic comment.

The Koniag attorney also says that in depositions taken in litigation plaintiffs (Omar) Stratman and (Toni) Burton testified that the Community Action Group (CAG) kept no membership lists or financial records and there were no officers or directors. He said the CAG itself had a "phantom quality."

Finally, Weinberg addresses at length the question of whether Armstrong himself qualifies as a "Native."

"In typical Anderson style," the attorney says, "He concludes his attack on Mr. Armstrong with a paragraph which infers, but does not quite openly charge, that Mr. Armstrong really does not qualify as an Alaska Native.

"Mr. Armstrong, along with some 3,000 other enrollees, was originally held not to have qualified as a 'Native' by the Anchorage enrollment office of the BIA because that particu-

lar office applied erroneous presumptions and failed to utilize the complete records available in the case of applicants in whose line of ancestry there was 'creole' blood," the lawyer says.

Weinberg says Armstrong appealed on the basis that a maternal ancestor was simply put down by the Anchorage enrollment officer as of 'unknown' origin, with no attempt to trace her lineage.

After relevant Russian Orthodox Church records were examined, and the proper rules were applied, Armstrong and several thousand others similarly situated were held to be qualified as Natives.

**Screams of the disappointed**
The lawyer says "What we are hearing now are the screams of the disappointed. Tallulah Bankhead's classic comment, 'There is less in this than meets the eye,' perfectly describes Mr. Anderson's articles..."

Weinberg calls the Koniag amendment a "finely tooled, delicately balanced resolution of a number of complex problems, and adds "The Koniag Natives are not stealing anything. They are offering a trade, a bargain from which all parties will benefit, as they should in any negotiated transaction. It is no accident that the Koniag Amendment is supported by the Alaska Coalition, the State of Alaska, the Kodiak Island Borough, and the Department of the Interior. It benefits each..."



## Sharon's Hair Styling

**WE'RE CELEBRATING OUR FIRST YEAR IN BUSINESS!**
15% off on all services from March 2 to 11!
Special sale price on many retail items too!

Our staff wishes to thank all the people in the community for making our first year successful. . .
Sharon, Tanya, Vi, Song, Mary & Bill.

Island Retail Bldg.
Open 8 am-6 pm daily
Appt. not always necessary
486-4928

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LEGAL NOTICE

Notice is hereby given that the Kodiak Island Borough will submit a preapplication for discretionary community development block grant funds from the U. S. Department of Housing and Urban Development (HUD) under Title I of the Housing and Community Development Acto of 1974 as amended.

A public hearing will be held on March 1, 1979, at 6:30 p.m. in the Borough Assembly Chambers for the purpose of seeking citizen recommendations and comments regarding this program. All residents of Kodiak Island Borough will have an opportunity to express their ideas and offer proposals.

Preapplications will be evaluated in competition with each other based upon the following criteria:

1. Percentage of poverty
2. Extent of poverty
3. Percentage of substandard housing
4. Extent of substandard housing

KODIAK ISLAND BOROUGH

Publish: March 1, 1979

1979
TIDE TABLES
Doc's Fishing Guide

ALASKA TRANSFER
&
STORAGE, INC.

12th and Mill Bay
Box 665
Kodiak, Ak. 99615
Phone 907-486-5354
486-5354

Pick up your 1979 Tide Table Booklets at our warehouse (12th & Mill Bay) or at the Harbormasters office.

486-5354

Alaska Transfer & Storage, Inc.

EXHIBIT 2
PAGE 4 OF 9 PAGES

EXHIBIT c
Page 4 of 9 Pages

# Anderson charges Koniag land rip-off;

*(Editor's note: Because of the tremendous and heated interest shown locally in recent articles on an alleged Koniag land fraud, written by nationally syndicated columnist Jack Anderson, the Anderson columns are printed here, in their entirety, with the permission of Mr. Anderson and United Features Syndicate. In the interest of fairness we are also printing the response from Koniag, Inc., the local regional Native corporation, prepared by attorney Edward Weinberg. The response was written in a letter requested by Rep. Morris K. Udall, chairman of the U.S. House Committee on Interior and Insular Affairs.)*

by JACK ANDERSON

Hollywood to the contrary, tracking down scandals in Washington is not just a case of cocking an ear at the right party, meeting an informant in an apartment garage or taking a phone call from a disgruntled government employee.

We recently assigned our associate Hal Bernton to a month-long investigation of what may prove to be the biggest attempted public-lands swindle in the 20th century. He crossed Afognak Island, Alaska, in a tiny Cessna, his bush pilot swooping down for close-up looks at phantom Native villages — settlements that existed only on paper and were the basis for the suspected land fraud.

The evidence Bernton gathered convinced us — as investigators for the Justice and Interior Departments had also concluded — that not only the federal government, but Native corporations in Alaska are being ripped off in a land-grab scheme that could dwarf Teapot Dome in acreage and potential profit.

To make matters worse, internal Interior Department documents reveal that the Bureau of Indian Affairs (BIA) ignored the fraud scheme. A federal grand jury indictment came to nothing when a strange affidavit by an Indian Affairs lawyer "knocked the bottom out of the case," according to Justice Department sources.

The background of the great Alaska land grab goes back to 1971, when Congress passed the Alaskan Native Claims Settlement Act. Under its terms, the state's Eskimos, Indians and Aleuts will eventually receive some 962 million in federal and in Alaska.

Title to the land is ceeded over to a dozen regional Native corporations and more than 200 village corporations. Individual Natives are stockholders in the corporations and share in the profits from sale or exploitation of the land.

Most of the Native corporations are doing a good job with heavy responsibilities laid on them by the claims act. But federal investigators are convinced that one of these corporations, Koniag, Inc. with headquarters in Kodiak, has attempted fraudulently to obtain more than 600,000 acres of valuable land it is

not entitled to. An FBI investigation into Koniag's affairs led to the grand jury indictment that was eventually shot down by the BIA affidavit.

Koniag's scheme, as outlined by government investigators, is fairly simple. It consists of creating phantom villages and setting up village corporations to claim land under the 1971 act.

Congress explicitly stated that a village must have had at least 13 permanent Native American residents in 1970 to qualify for a land grant. But seven out of the 16 villages sponsored by Koniag clearly failed to meet even this modest requirement, according to federal investigators.

Interior Department sources report that village enrollments, now in the possession of the Bureau of Indian Affairs, are filled with names of Natives who had never even visited the sites of their supposed villages.

One Koniag "village" called Litnik was inspected from the air by our reporter. He circled the area several times and photographed the only existing structure — four big red bunkhouses used as a summer retreat by military personnel. He found no evidence that 13 Natives had ever occupied the site. Yet Litnik's village corporation was certified by the BIA as eligible for 69,120 acres of land.

The FBI investigated another Koniag village, Port Williams. The only signs of life were a small fish cannery operated by Washington Fish and Oyster Co., plus a handful of residences connected with the cannery. The Natives claimed as residents were scattered all across the United States, and FBI sources told us that 90 percent of the residence affidavits were phony. Yet Port Williams, too, was certified by the BIA as eligible for 69,120 acres.

## 600,000 acre rip-off

(Column Number two)

Koniag Inc. is a native Alaskan development corporation that federal investigators say they believe has attempted the biggest public-lands ripoff of this century. Evidence gathered by the Justice and Interior departments indicates that Koniag claimed more than 600,000 acres of valuable government land for phantom native villages that

exist only on paper.

A federal grand jury indictment of some of the parties involved was quashed by a former Bureau of Indian Affairs official. So we sent our associate Hal Bernton on an investigative foray to Alaska, where he dug up the facts.

Koniag claimed the land under provisions of the 1971 Alaska Native Claims Settlement Act. The law was designed to give the state's Eskimo, Aleut and Indian population an economic base with which to ease their transition from the isolated village life of their ancestors to the realities of the 20th century.

But the driving force behind Koniag Inc. is no simple, semiliterate Eskimo fisherman or Indian trapper. He is an articulate, acerbic former newspaper editor with a talent for lobbying and a weakness for alliterative invective toward anyone who crosses him. His name is Karl Armstrong, and he is Koniag's executive vice president.

When residents of Kodiak banded together to fight Koniag's attempted land grab, Armstrong described the Citizens Action Group in a local newspaper he helped found as a "mysterious mob of malcontents making malicious mischief through misleading information."

He added, darkly: "It is not easy to find out just what this weird secret society is — or who it is. Like the Ku Klux Klan, it hides."

Armstrong was stretching poetic license to the point of nonsense. Our associate Bernton had no trouble locating members of the Citizens Action Group, and he found them neither weird nor mysterious.

They are local businessmen, ranchers, hunters and fishermen who are concerned and angry about what they see as Koniag's illegal move to gain ownership of valuable timberland worth millions of dollars. The land that Koniag seeks is located on the federally owned island of Afognak.

Seven of the 16 villages for which Koniag Inc. claims federal land under the 1971 act have been challenged as paper phantoms, imaginary entities that are not entitled to grants of federal land. After initially certifying all seven as eligible, the Bureau of Indian Affairs was reversed by higher-ups in the Interior Department on six of the alleged villages.

The one village that was given final certification is now being contested in court by the Kodiak citizens group.

Whether a court suit can overcome Koniag's clout in Washington remains to be seen. There seems little doubt that Armstrong has been

fective lobbyist in both the state and federal capitals. Backed by the increasing political strength of the native American corporations that have become Alaska's biggest private landowners, Armstrong is not above playing on the guilt of the white majority over the historically shabby treatment of native Americans. Those who question the validity of Koniag's villages are "trash, human trash, people who are here whom I would rather not have here," in Armstrong's words. "As far as I am concerned," he told our reporter, "the villages are there because they (the natives) said they are there. If that is where they have a sense of place, who am I to argue with them?"

Armstrong was once the editor of The Kodiak Daily Mirror. His successor in the editorship, Nell Waage, won a national award for her editorial writing. But when the Mirror published some articles critical of some of Armstrong's friends, he denounced Waage as a "racial bigot."

The odd thing about Armstrong's fierce championship of native Alaskan rights is that his credentials as a native — and thus his credibility as the executive officer of the native development corporation — are almost as ephemeral as the villages that Koniag Inc. has claimed land for.

Armstrong's initial application to the BIA for certification as a native was rejected because he could show only that he was only three-sixteenths native Alaskan. Eligibility for "native" status requires at least one-fourth native ancestry. But Armstrong protested, and the BIA gave him legal status as a native.

## Sen. Ted Stevens under attack

(Column Number three)

Sen. Ted Stevens (R-Alaska) has spearheaded legislation that will award 115,000 acres of federal timberland to a native Alaskan village corporation; federal investigators have labeled the village a "fraud."

The village corporation, called Leisnoi Inc., is a subsidiary of Koniag, Inc., a regional native corporation. Justice and Interior Department investigators believe Koniag has tried to pull off a gigantic public-land swindle in southwest Alaska.

Under the Alaska Native Claims Settlement Act of 1971, federal lands are granted to Aleut, Eskimo and Indian settlements on the basis of their population in 1971. Investigators found that seven of Koniag's 16 villages were phantom communities, unable to qualify even under the 1971 act's liberal definition. But seven

The act requires at least 25 residents, 13 actually on the site and another 12 transient or intended residents.

The seven phantom villages applied for a total of more than 600,000 acres of valuable federal land, and the Bureau of Indian Affairs (BIA) originally approved their claims. But six of the approvals were rescinded as a result of the investigations by Interior Department agents. Their final status is still in doubt.

Only Leisnoi has been final certificated as a legitimate native village; its 40 official residents entitle the village to 115,000 acres of land. It is this valuable property — the timber on just 60,000 acres is worth $150 million — that Stevens' legislation will turn over to Leisnoi Inc., and other village corporations.

Our associate Hal Bernton made a first-hand inspection of the supposed site of Leisnoi village, on a small, heavily forested piece of land called Woody Island, a few miles offshore from the fishing boomtown of Kodiak. He took a skiff out to the island and walked across it, but found few signs of a native village.

The chief evidence of human habitation was an old government housing complex built for Federal Aviation Administration employees, a Baptist summer camp and a single small, abandoned cabin. There was no sign of the 40 native residents, much less of the potential "enrollment" of 233 natives claimed in the identification papers for Leisnoi Inc.

The Alaska Advocate, a weekly newspaper published in Anchorage, has reported that Darrell Chaffin, who headed the FAA complex and has lived on Woody Island for 33 years, gave a sworn affidavit stating that only two natives have lived there since 1970. He has also sworn that Karl Armstrong, executive vice president of Koniag, Inc., who claims to be a resident of Leisnoi, has never lived on Woody Island.

Yet the BIA investigator, Ed Fitzpatrick, who was shown around the island by Armstrong, reported that 40 native Alaskans lived on the island in 1970. The BIA's final certification report contains photographs of the FAA housing with the caption, "Family dwellings at Woody Island" — giving the false impression that the government buildings are native housing.

Sen. Stevens explained to us that the land grants to Koniag were the result of a negotiated settlement that took months to complete. The agreement stipulated that Koniag, Inc. would give up its claim to maintain acreage that environmentalists

EXHIBIT 2
PAGE 5 OF 9 PAGES

EXHIBIT C
Page 5 of 9 Pages

# Koniag's attorney cal

February 23, 1979
Honorable Morris K. Udall
Chairman
House Committee on Interior and Insular Affairs
1324 Longworth Building
Washington, D.C. 20515

Dear Chairman Udall:

This letter is prompted by the Jack Anderson articles of the last three days concerning Koniag and the Koniag villages.

Like a writer of whodunit plays, Mr. Anderson builds his drama to a third act climax finally revealing the plot. Capping hints tossed out in the first two acts, Friday's article reveals that Mr. Anderson is after the Koniag Amendment and his theme is that Leisnol, which Mr. Anderson grudgingly concedes is a certified village, with the assistance of the seven uncertified villages, somehow going to enable Koniag to make off with Afognak Island.

Bunk!

As we have explained over and over, there is not an acre of Afognak Island that, under the Koniag Amendment, would be conveyed to the Natives by reason of the uncertified villages. In respect of Afognak Island, the Koniag Amendment would operate in exactly the same way without the uncertified villages. Furthermore, not one cent more will be paid from the Alaska Native Fund on account of Koniag, Koniag Natives, or the Koniag village corporations.

In a letter of January 25 to Steve Silver of Senator Stevens' staff, I analyzed the impact of the Koniag Amendment. Rather than repeat what is said there I enclose a copy.

Now, as respects Leisnol. Leisnol is a certified village. It went through the administrative process established by the Secretary of the Interior under ANCSA to determine village eligibility. Leisnol was certified by the Secretary of the Interior after its examination by the BIA which was charged with examining each and every village that claimed eligibility under ANCSA.

The administrative process established by the Secretary afforded anyone wishing to dispute or object to the eligibility of an applicant for village status the opportunity to do so. Wide publicity was given to the pendency of applications for eligibility. The

simple fact is that those residents of Kodiak, Alaska who are referred to in Mr. Anderson's second article, that of February 22, as the "Citizens Action Group" and who are now attempting through Mr. Anderson's "good offices" to deprive Leisnol of its eligibility, had their opportunity to protest and to obtain an evidentiary, trial-type hearing from the Department of the Interior in the fall of 1973 and the spring of 1974 when Leisnol's eligibility was considered. They did not avail themselves of that right.

ANCSA required (ss11(b)(3)) that the Secretary of the Interior within two and a half years after December 18, 1971, the date of ANCSA's enactment, determine eligibility of villages not listed in section 11(b)(1).

With that deadline in mind, the regulations of the Department established September 1, 1973 as the deadline for applications for certification by unlisted villages and provided an opportunity for protest and hearing. 43 C.F.B. ss2651.2(a)(6). 9, 10, 38 F.R. 14223 (May 30, 1973). The hearing on Leisnol, by the way would have been held, had anyone requested one, in Kodiak, not in far off Washington, D.C. or any other inconvenient place. Nine separate and widely publicized village eligibility hearings were held in Kodiak in 1974. The filing of village eligibility applications was widely publicized in the local Kodiak papers and village eligibility was a widely discussed topic in Kodiak. Anyone in Kodiak and vicinity who would have wanted to object to a village's eligibility applications but who was unaware of the opportunity to do so and to obtain a hearing would have to have been entombed for a year and a half in the proverbial underground salt mine, completely out of touch with the world.

But the handful of people in Kodiak who are now, through Mr. Anderson's column, trying to "get" Leisnol through derailing the Koniag Amendment, neither filed protests nor sought a hearing.

Almost two years after Leisnol's certification (which had occurred on September 9, 1974), some individuals in Kodiak, who it later developed are apparently the nucleus of the

Citizens Action Group, filed a lawsuit against the Secretary of the Interior in the Federal District Court in Anchorage attacking Leisnol's eligibility. Among the allegations of the complaint were a charge of fraud, but without specifics as required by Rule 9(b) of the Federal Rules of Civil Procedure. (Kodiak-Aleutian Chapter, et. al. v. Kleppe, No.A76-182, Civil). Neither Leisnol nor Koniag were named as parties to that action. The Federal District Court on December 7, 1976 (423 P. Supp. 544). entered an Order which, as respects the charge of fraud, required the plaintiffs to "put up or shut up" as required by Rule 9(b) of the Rules of Civil Procedure. The plaintiffs chose to shut up. These are the same people who are, with Mr. Anderson, once again screaming fraud.

An amended complaint was filed shortly after the December 17, 1976 Order, this time devoid of any charge of fraud. Leisnol and Koniag were named as defendants, along with the Secretary of the Interior. The complaint alleged that two individuals in Kodiak, Omar Stratmen and Toni Burton, claimed to hold grazing leases from the United States, on lands (that had been TA'd to the state prior to passage of ANCSA) which comprise a small part of the area on Kodiak Island selected by Leisnol under ANCSA. They challenged Leisnol's eligibility on the ground that there would be interference with their property interests as the holders of grazing leases. Other individuals who joined as plaintiffs simply alleged that they occasionally used the land for hunting, hiking, etc. As to these latter individuals, the District Court in its Order of December 7, 1976, held that by failing to have protested and asked for a hearing from Interior when Leisnol's application for eligibility was under consideration, they had forfeited any right to complain. They took no appeal.

As to Stratman and Burton, the Court permitted the lawsuit to proceed because of a claimed lack of personal knowlege on their part that the Department of Interior had scheduled an opportunity for protest and hearing on Leisnol's application. This assertion of lack of knowledge is simply an unproven claim. We dispute it and consider it incredulous in view of the wide publicity given such matters in Kodiak, where both resided, in 1973 and 1974. Stratman and Burton also claimed that had the lands on which they held grazing leases been conveyed to the State of Alaska (since it was TA'd land it would have gone to the State but for Leisnol's se-

lection), they would have had a right under Alaska law to state grazing leases following expiration of their federal leases which still had something like 20 years to run in any event.

In our opinion, Stratman and Burton's claims that their grazing leases were threatened by Leisnol are not well founded. To begin with, grazing leases are "valid existing rights" under ANCSA, which remain with the holders regardless of Native selection. ANCSA, ss14(g). Nobody disputes that, at least of all Leisnol and Koniag. Second, assuming that Alaska law would have given Stratman or Burton a right to later state leases if the State TA had been effective, the Secretary of the Interior has recently held that such state created third party interests in TA'd lands are valid existing rights under ANCSA even though the state itself does not take title to the TA'd lands because of Native selection. Secretary's Order Nos. 3016, December 14, 1977, and 3029, November 20, 1978. Incidentally, the State statute on which Stratman and Burton rely had been repealed in June of 1976 before they even filed their lawsuit.

In sum, the federal grazing leases covering the Leisnol lands on Kodiak Island remain in effect and are valid, and Leisnol must and will respect them. Further, if they had a State right to a renewal, (assuming that the State's repeal of its statute was not binding as to them), they have, under the Secretary's Orders above noted, a valid existing right to such a renewal.

The lawsuit based on the amended complaint was dismissed by the Federal District Court in Anchorage on October 16, 1978 as moot (copy of opinion attached), Leisnol having relinquished the limited acreage covered by the Stratman and Burton grazing leases because it came to the conclusion that the land, burdened in any event by a long term lease, was simply not worth fighting over. The District Court also held that whatever rights Stratman and Burton might have to a state lease were preserved as valid existing rights and finally, the Court noted that Stratman and Burton's complaint appeared to be in violation of Rule 17 (a) of the Federal Rules of Civil Procedure, since the grazing leases were held not by Stratman and Burton but by corporations.

It is significant, I believe, that Mr. Anderson's interest in Leisnol and Koniag surfaced only after the District Court dismissed the Stratman and Burton litigation.

The Stratman and Burton lawsuit places these charges against Leisnol in perspective. Stratman and

Burton are asserting a concern about their private business interest (which in fact cannot be harmed) out of imagined fears of "Native control." Mr. Anderson and Mr. Bernton appear to have been mislead, on the basis of pious mouthings of fraud by people with a private business axe to grind. But then, neither Mr. Anderson nor Mr. Bernton appear to have done much, if any, homework about what their informants may have been up to.

Stratman and Burton have filed a notice of appeal with the Ninth Circuit Court of Appeals. We regard this appeal as sham and frivolous and have moved to dismiss it without the necessity of briefing.

The fact of the matter is that even without counting Leisnol's land entitlement on the mainland, Koniag and the other Koniag certified villages would still be giving up on the Alaska mainland about the same acreage as will be received on Afognak Island under the Koniag Amendment. So, again, there is much sound and fury which signifies nothing except that a small band of diehards in Kodiak who chose not to have their charges tried before an administrative law judge of the Department of the Interior at the proper time and who got nowhere in court, are moving heaven and earth to destroy Leisnol, Karl Armstrong and Koniag. It is time to call a halt to this kind of persecution and I think we are entitled to demand, not simply ask that others be held to the rules.

I would also like to point out that none of the people who are throwing these charges about have appeared before either this Committee or the Senate Committee, although there has been ample opportunity for them to do so over the years. The Koniag Amendment itself has been a matter of common knowledge in Kodiak since last summer. Now, at the last minute, they launch a lurid campaign through Mr. Anderson.

Further in connection with the relation of the uncertifed villages to the Koniag Amendment, I call your attention to my prepared testimony before your Committee on February 8, and particularly to pages 3 and 4 (a copy of my testimony is enclosed).

Before closing, I would like to address a few additional comments on the tenor of Mr. Anderson's articles.

With respect to the uncertified villages which Mr. Anderson calls "phantom," Mr. Anderson conveniently overlooks the fact that two federal courts, the Federal District Court in Washington and the United States Court

## Anderson charges

Continued from Page A)

wanted to keep as a wildlife refuge in return for Leisnol's grant of 115,000 cres. The senator stressed that the legislation was supported by the Interior department as well as the state and local governments.

A Stevens aide told us

that if pending litigation shows Leisnol to have been illegally set up, the court could revoke the congressionally authorized land grant. Meanwhile, Koniag, Inc. has already made plans to harvest millions of dollars' worth of timber on the 115,000 acres.

EXHIBIT 2
PAGE 6 OF 9 PAGES

EXHIBIT C
Page 6 of 9 Pages

# Is accusation "bunk"

of Appeals for the District of Columbia, concurred in concluding that in reversing the BIA determination of eligibility, the "higher ups" in the Department of the Interior, to borrow Mr. Anderson's phrase, committed gross violations of due process of law. So outraged was Judge Gesell by the Department's conduct that he ordered that the last untainted decision within the Interior Department on the villages' eligibility be reinstated. This was the BIA holding in each case that the villages were eligible. Koniag v. Kleppe, 405 F. Supp. 1360 (1975). The United States Court of Appeals for the District of Columbia Circuit did not disagree with Judge Gesell's finding of violation of due process. That Court disagreed only with Judge Gesell's remedy and ordered that the cases be returned to the Department of the Interior for new administrative eligibility proceedings (free of due process violations) on appeals from the BIA's favorable determinations. Koniag v. Andrus, 580 F. 2d 601 (1978). There is, therefore, at this time no outstanding determination of ineligibility by the Department of the Interior. The Department's determination to that effect was vacated by the District Court and the Court of Appeals. Renewed administrative proceedings will leave in doubt for several more years land entitlements affecting all of the Alaska Native regions. See the first paragraph, page 4, of my testimony.

As respects Leisnoi, ever since its certification by the Secretary of the Interior as an eligible village like all others, and it is entitled to that treatment. At no time in their litigative attempts to frustrate Leisnoi's and Koniag's rights were the plaintiffs willing to seek an injunction against the Secretary's treating Leisnoi as an eligible village. This unwillingness to put their claim to the ultimate test bespeaks volumes about the motives of Leisnoi's tormentors and Mr. Anderson's informants.

In Mr. Anderson's first and second articles, he refers to a federal grand jury indictment. The impression is left that Koniag and Mr. Armstrong were among those indicted. This is not so. The indictment Mr. Anderson is talking about was returned by a federal grand jury in Anchorage in 1976 against one of the seven uncertified village corporations, Shuyak, and two of its officers, on grounds of attempting to defraud the United States in claiming eligibility. This indictment followed what understand to have been an extensive investigation. No indictment was returned against any other

village, nor against Koniag, nor against any other persons including Mr. Armstrong.

After obtaining the indictment, the U.S. Attorney's Office in Anchorage proposed to the defendants that the criminal proceedings be held in abeyance pending the outcome of civil litigation and hardly indicates that the prosecutors thought they had a strong case.

Further, a second most curious circumstance turned up. The U.S. Attorney's Office, it was learned, had not presented to the grand jury exculpatory evidence that would have been given, had he been called to testify before the grand jury, by the Interior Department attorney who had been assigned during the village eligibility proceedings to personally look into the Shuyak application. Upon this attorney's giving an affidavit to the effect that he had made an investigation and reported his conclusions and findings to the FBI, but that for reasons unknown to him he had not been called to testify before the grand jury, the U.S. Attorney's Office in Anchorage had the indictment dismissed for want of prosecution. This is the affidavit that Mr. Anderson in his first column, that of February 21, referred to as "the strange affidavit" which "knocked the bottom out of the case." Of course it knocked the bottom out of an indictment handed down by a grand jury from which exculpatory evidence had been withheld. What is "strange" about this is that exculpatory information given by a federal official was withheld by the prosecutors from the grand jury.

Attached is the affidavit of the Interior Attorney. The Committee will have no difficulty in determining whether it is this attorney's conduct or Mr. Anderson's which is "strange."

Then there is the outrageous personal attack on Mr. Armstrong which was the centerpiece of the second article, that of February 22. It may be that what bothers Mr. Anderson and his assistant Mr. Bernton is that Karl Armstrong does not fit what the column reveals to be Mr. Bernton's (and Mr. Anderson's) stereotype of an Alaska Native — a person who, to use the column's language, is a "simple, semi-literate Eskimo fisherman or Indian trapper." This characterization is insulting to the Alaska Natives. Moreover, it betokens that paternal state of mind in which the "good" Alaska Natives are docile simple minded souls, content to have others decide their fate and happy to be allowed to remain in their homeland as sort of living exhibits in a human

for the amusing tolerance of non-Indian exploiters and columnists.

Admittedly Mr. Armstrong is not shy. Admittedly he is given at times to acerbic comment. But I submit that Mr. Anderson's own approach to these matters is hardly that of the genteel drawing room and as Mr. Anderson's column demonstrates, he himself is not one to approach a matter under "Marquis of Queensbury Rules." Mr. Anderson speaks of Mr. Armstrong's use of "alliterative invective." One must of course concede Mr. Anderson's expert qualifications as an alliterist. As any regular reader of his column will testify, Mr. Anderson's claim to all-world superiority in that regard has gone without serious challenge since Spiro Agnew's ghost writer quit the field.

Perhaps it infuriates Mr. Anderson and Mr. Bernton that Mr. Armstrong, a former newspaperman, is not about to be pushed around and that he reacts accordingly when being interviewed by a man who, in effect, announces that he already knows that Mr. Armstrong, Koniag, Leisnoi and the uncertified villages are frauds, and then offers to change his mind if Mr. Armstrong will prove otherwise to his satisfaction.

While Mr. Armstrong's style may grate, it hardly warrants Mr. Anderson and company's engaging in character assassination. While Mr. Armstrong's adjectives are perhaps not those that one would utter in the calm and cloistered atmosphere of a library, some allowance must be made, I think, for the provocation to which Mr. Armstrong has been subjected with these constantly reiterated charges.

As regards the availability of the identity of the members of the "Citizens Action Group," in depositions taken in the Stratman and Burton litigation, the plaintiffs testified that CAG kept no membership lists or financial records, and that there were no officers or directors. And Mr. Anderson's characterizes these people as "neither weird nor mysterious." Not suprisingly, Mr. Bernton "had no trouble locating members of the" CAG. To Leisnoi, however, the organization's makeup and membership have an ectoplasmic, or to use one of Mr. Anderson's favorite terms, "phantom" quality.

In typical Anderson style, he concludes his attack on Mr. Armstrong with a paragraph which infers, but does not quite openly charge, that Mr. Armstrong really does not qualify as an Alaska Native.

Mr. Armstrong, along with some three thou-

originally held not to have qualified as a "Native" by the Anchorage enrollment office of the BIA because that particular office applied erroneous presumptions and failed to utilize the complete records available in the case of applicants in whose line of ancestry there was "creole" blood. In this case "creole" was a term of Russian usage (borrowed from the French) which was loosely applied to any person with an ancestor that was the child of a marriage between a Russian male and a Native female (There were no Russian women in Russian Alaska).

In Mr. Armstrong's case, a maternal ancestor was simply put down by the Anchorage enrollment officer as of "unknown" origin, with no attempt to trace her lineage. Mr. Armstrong appealed.

Appeals on enrollment went not to the BIA, as Mr. Anderson says, but to the Regional Solicitor of the Department of the Interior in Anchorage. His office was also assigned the entire "creole" problem and all creole cases were taken out of the local enrollment office's hands by the Interior Department when it became aware, through Mr. Armstrong's appeal and thousands of others, that the local BIA enrollment office was committing gross and repeated errors in creole cases.

The Regional Solicitor, with approval of his Washington superiors, issued a detailed memorandum of how such cases would be handled, including an independent, disinterested analysis of the original Russian Orthodox Church records in the Russian language by qualified scholars. That memorandum also corrected the egregiously erroneous presumptions that had been used by the local office. A copy of the Regional Solicitor's memorandum of April 3, 1974 is enclosed.

Upon a full examination of the relevant Russian Orthodox Church records and the application of proper rules, Mr. Armstrong and in all, several thousand others similarly situated, were held to be qualified as Natives.

This situation had threatened to decimate Native enrollment in three Alaska Native regions, not only Koniag, but the Aleut and Cook Inlet regions as well. Mr. Armstrong, again perhaps in a fashion which would not comport with Mr. Anderson's stereotype of a "simple, semi-literate Eskimo fisherman or trapper," not only appealed his own case, but was instrumental in bringing the erroneous creole case practices of the Anchorage enrollment office to light. His interest and insistence that corrective action be taken, not simply for him-

others who were the victims of those erroneous practices, was indirectly responsible for saving the benefits of the Settlement Act for thousands of people. For that he deserves commendation, not vilifications from the Andersons and the "Citizen Action Groups" of this world.

Finally, there are the reiterated allusions to information from unnamed and unidentified "Interior Department" and "Justice Department" "investigators" or "sources."

Mr. Anderson, while it is not apparent on the face of his articles, is, after all, writing about events that transpired in 1973 and 1974, for that is when village applications were filed and the reviews by BIA were made. With all of Mr. Anderson's references to the "investigators" and "sources" and his shouts of fraud and comparisons with Tea Pot Dome, one must inquire why weren't there more indictments followed by prosecutions and convictions? The government "sources" surely haven't been sitting on evidence of criminality, waiting for Mr. Anderson to "reveal all" in his column five years and more after the alleged plot was hatched and the alleged criminal events occurred.

The answer is obvious. There was an intensive criminal investigation. It produced but one indictment, which then backfired. What we are hearing now are the screams of the disappointed. Tallulah Bankhead's classic comment, "There is less in this than meets the eye," perfectly describes Mr. Anderson's articles. It is time, long since past time, to call a halt to these smears.

The Koniag Amendment is no theft and no fraud. If it is enacted the public interest will be the gainer, not the loser.

If the Koniag Natives are forced to remain on the Alaska mainland, their land, almost 350,000 strategically located acres, land of incalculable wildlife and wilderness values, will not be returned to public ownership to be available for inclusion in a federal wildlife refuge or for selection by the State of Alaska. The Secretary of the Interior, in testifying before your Committee on February 13, stated that he now recommends that a refuge be established on federal lands on the Alaska Peninsula because, since he made his 1977 recommendation that there be a study of land status in the area, "land ownership patterns have become considerably clearer, so it is now appropriate to establish a refuge in this highly important area." The Secretary gave the same testimony the next day before the Merchant Marine and Fisheries Committee. T—

EXHIBIT 2
PAGE 2 OF 9 PAGES

EXHIBIT C
Page 7 of 9 Pages

# Koniag responds

(Continued from Page C) reason why "land ownership patterns have become considerable clearer" is, of course, the emergence of the Koniag Amendment.

And as for the alleged deleterious impact of the Koniag Amendment on Afognak Island should the amendment become law, I refer you once again to my testimony, particularly to pages 7 and 8, paragraphs 2,4,6,9, 10 and 11. The Koniag Natives are not stealing anything. They are offering a trade, a bargain from which all parties will benefit, as they should in any negotiated transaction. It is no accident that the Koniag Amendment is supported by the Alaska Coalition, the State of Alaska, the Kodiak Island Borough, and Department of the Interior. It benefits each. As I stated in my recent testimony before your Committee:

The Koniag people are realists. They have understood early and well that no matter how unfair the operation of ANCSA has been in their case by reason of circumstances over which they have no control, springing largely from decisions taken in Washington as long ago as the turn of the century without their knowledge or consultation, no proposal to rectify their situation is going to be viable unless it deals with the interests of others who are affected in a manner in which those others regard as fair and reasonable.

Realizing that, Koniag over a period of almost eight months painstakingly negotiated with the Department of the Interior, the Alaska Coalition, the Alaska state government and the Kodiak Island Borough. In each instance, as examination of details revealed specific problems, they were resolved in a mutually satisfactory fashion. In the end, Koniag was able to present to the Congress, before the Senate Committee completed its work on last year's version of H.R.39, a legislative proposal which was supported by the Kodiak Island Borough and the Department of the Interior, in addition to Koniag, the Koniag villages and the Alaska Natives temselves through the Alaska Federation of Natives.

The Koniag Amendment is a finely tooled, delicately balanced resolution of a number of com-

plex problems.

I apologize for the length of this letter, but as you and I know, there is only one way to deal with blunderbus charges and that is with detailed rebuttal. The Koniag Natives do not apologize for the Koniag Amendment. It will be tragic indeed if the public is denied Koniag's mainland holdings and those Natives of Alaska who suffered the most from the incursion of the white man beginning with the Russians and who, but for the Koniag Amendment, would receive the least, should both be deprived of this opportunity by Mr. Anderson's patent attempt to frighten the members of this Committee and the Congress.

There are, and can be, legitimate differences of opinion over what constitutes "residence" under ANCSA, and use and occupancy under the regulations. Leisnoi was confirmed under the Department's standards and under the BIA standards and procedures which it applied in certifying more than 200 Native villages. The uncertified villages, although the holding of ineligibility has been vacated, are confronted with more years of heavy expense and emotional strain if they continue the fight for full certification. They have reached agreement with the Department of the Interior on the settlement that is included in the Koniag Amendment. It imposes what amounts to no land or additional money obligations on the government.

I should be very happy to supply further information if you wish, but I do not propose to try Native eligibility issues in the newspapers.

I am confident that this Committee will not let a handful of Kodiak malcontents and Mr. Anderson destroy Koniag's future and the status of Leisnoi as a village under ANCSA.

Sincerely yours,
/s/Edward Weinberg
of Duncan, Brown, Weinberg and Palmer, P.C.

EW:vcr
Enclosures
cc:Honorable John Seiberling, Honorable Don Young, Honorable Henry Jackson, Honorable Ted Stevens, Honorable Mike Gravel, Honorable John B. Breaux, Honorable Cecil D. Andrus.

# Ordinance to limit camping

A public hearing is scheduled for tonight on a borough ordinance which would restrict to three days the amount of time a person could camp on borough-owned land without a permit from the borough. The ordinance would also restrict people from either parking or camping on borough owned land, at one or more locations, for more than 30 days in a one-year period.

The ordinance gives the borough the authority to remove, store or destroy at the owner's expense any structure erected on borough land intended or designed for human habitation, except as provided by the permit. That includes tents, mobile homes, cabins, shacks and lean-tos, the ordinance says. Each day of violation will constitute a separate offense.

The ordinance calls for permits to be issued through the borough director of planning and community development.

The public hearing is on the agenda for the regular monthly meeting, 6:30 p.m. in the borough assembly chambers.

# F&G Advisory Committee meets March 8

The Kodiak Fish and Game Advisory Committee will meet at Fishermen's Hall Thursday, Mar. 8 at 7 p.m. to receive comments on proposed changes in subsistence law passed by the Alaska Legislature in 1978. This law requires that "Customary and Traditional" use of fish and game in Alaska be given priority. Copies of this law may be obtained at the local Alaska Department of Fish and Game office.

Comments should address the following topics: "Customary and tradi-

tional uses" of Fish and Game.

"Customary and direct dependence on the resource as the mainstay of one's livelihood."

"Local residency."

"Availability of alternate resources."

"Customary trade, barter or sharing."

Barter that is "of a limited and non-commercial nature."

# Wood as fuel

Alaskans have always been large users of firewood. Now, a free booklet is available that tells what species of wood are the best to use for fuel. It also suggest how to harvest wood, how to season it, and how wood heat costs compare with fuel oil.

The 12-page booklet was written by John Sturgeon, a forester with the State of Alaska's Department of Natural Resources, and it was printed by the USDA Forest Service (OI), P.O. Box 1628, Juneau, Alaska 99802 (telephone 586-7282).

## C.A.G.

(Continued from Page 1) very much believe in the Alaska Native Claims Settlement Act and the principals that underlie it." He said he believed ANCSA to be a sincere attempt by the President of the United States and Congress to redress the "incredible damage" done by whites — both Russian and American — over the centuries to Alaska's Native peoples.

"We support it in every way," he said of the ANCSA. "This isn't an issue of racism or bigotry," Furia said, "It's an issue of whether land should be claimed through use of false statements, fraud."

"Racism is to suggest that because a Native made a false statement it should be ignored...that's racism!" Furia said.

"It appears potentially false statements were made in an effort to establish villages which in the sense of the Alaska Native Claims Settlement Act never existed," he told the audience.

Furia addressed another issue he called, "the suggestion I'm here on behalf of one of my other clients, New England Fish Company (NEFCO)." NEFCO, he said, "did not ask me to come here and could not make me come here."

"I would hope there'd be less heat and more light in this situation," he added.

Szabo also explained that C.A.G. is involved in "two separate issues." He said of the original 16 villages claimed by Koniag, the authenticity of claims for eight were questioned, both by certain government agencies and/or members of C.A.G. "Since Interior was taking care of the other seven," Szabo said, "the Citizen's

they'd concentrate on Woody Island." He explained that while certification of Port Williams, Litnik, Anton-Larsen Bay, Bell's Flats, Uganik, Uyak and Aya Kulik had been withheld, Woody Island was certified "in 74 or 75." He said a State protest based on land selection of the Woody Island corporation, Lesnoi, Inc., had been withdrawn shortly before eligibility hearings on that claim.

In that case, he said, the judge had ruled only persons with a direct financial interest — two ranchers whose leases would be affected — had standing as defendents. The village corporation deeded 32,000 of the 115,000 acres claimed by Lesnoi to the Bureau of Land Management and filed for dismissal he said. The judge granted the dismissal and the C.A.G. has appealed, Szabo said.

Responsibility for deciding the question of eligibility of the other seven villages has, through various court actions, been returned to the Secretary of Interior, Szabo said. He added that an amendment to the "pending D-2 legislation would certify these seven villages by law rather than leave it up to Interior."

That same amendment calls for a land swap which would give Koniag 280,000 acres on Afognak Island in exchange for surface and hard rock mineral rights on 320,000 acres on the mainland. Koniag would retain the rights to oil on the mainland selections.

Under the amendment the seven questioned villages would get only a token amount of land on Kodiak Island, and further land claims would be abandoned.

"What they're doing."

land on Afognak for less valuable land on the mainland, while still retaining rights to oil on the mainland selections and getting certification of the villages in the bargain."

Szabo says members of C.A.G. and other groups are concerned about "logging practices" the Native corporations might employ on Afognak. "Their annual report speaks for the fact they haven't done very well," he said. He said the annual report implies Koniag is looking to logging on the island to "generate a positive cash flow."

Jim Seeley, an attorney from New Jersey who has been extensively involved in issues of land use law, environmental law and Indian rights told the audience he will, "be in on the appeal (of the Woody Island decision) along with Roger Henderson." Henderson is an Anchorage attorney who has been working for C.A.G. since it began. He said the appeal will be based in part on the "rights of the casual users of the public land involved."

In response to a question from the audience, Seeley said he expects the case to be ready for argument within two months but probably scheduled by the court for about six months.

"The opportunity for legislative remedies (the D-2 amendment) could come much more quickly," Furia said. He said, "If amounts to giving a prize for fraudulent activity," Furia said, adding, "Congress doesn't do that ... much."

Furia will be registering as a lobbyist for C.A.G. to lobby on the D-2 amendment, which he pointed out is in the Senate version of the bill, but not in the House version at the

EXHIBIT 2
PAGE 8 OF 9 PAGES

EXHIBIT C
Page 8 of 9 Pages

# Two vehicles totaled in accident

Two vehicles were totaled and one woman received a minor injury in a two-car collision Sunday near Boy Scout Lake, according to a press release from the Alaska State Troopers office here.

Datsun pickup driven by Frederick J. Barden, 25, made a left turn onto the Base-town Road at about 9:30 p.m. A north-bound Chevrolet pickup driven by Gene Black, 32, struck the Datsun. Mrs. Emma Black received a cut on the

## About those uniforms . . .

by NORMA W. NELSON
Staff Officer, Kodiak Flotilla
U.S. Coast Guard Auxiliary

Have you noticed around town lately, a few handsome guys in funny-looking blue suits? No, they're not Salvation Army uniforms. Neither are they airlines pilots uniforms. You haven't seen any ladies in them yet, but soon you will (when the suppliers come through, that is.)

Lo and behold, it's the U.S. Coast Guard Auxiliary, a non-military organization devoted to safety in all phases of boating activities. Surely, we here in Kodiak, without temperamental weather forces at play, have as much need for such an organization as any place in the world.

The local flotilla of the auxiliary, now numbering 30 members, was reactivated in October, 1977. Throughout 1978 officers were elected, committees chosen, and plans formulated for organization of a workable flotilla. Meanwhile new members joined every month.

At this writing, all members have become basically qualified, or BQ'ed as we call it, with a few members having gone on to earn other certificates of completion in courses.

Learn all about the U.S. Coast Guard Auxiliary by attending our meetings which are held on the Coast Guard Support Center, Building C-1 every second Thursday of the month at 7:30 p.m.

I'll be writing these articles frequently this year, as time permits, to "clue you in" on this fine organization of men and women who give in unselfish service for the boating public — for a SAFER boating public.



EDWARD J. (TED) NELSON
. . . safety in boating

## 10% off

8"x8"x16" CONCRETE BLOCKS

CEMENT

REDI-MIX

MORTAR MIX

LIME

## WESTCOAST LUMBER

Corner of Mill Bay & Cutoff
486-4119 or 486-4110

## Nazarenes will hear missionary

The Kodiak Church of the Nazarene will have a guest missionary speaker from the Middle East, Rev. Ivan Lathrop, on Friday, March 9. The activities of the evening begin at 6 p.m. with a family potluck dinner. At 7 p.m. Rev. Lathrop will speak on the Christian Church in the Middle East, an area of the world that is predominately Islamic. He will also show slides of his field of missionary activity in Lebanon, Syria and Jordan.

Everyone is welcome. For additional information or transportation please call 486-5345.

 FORD

FIBERGLASS PICK-UP BOX COVERS for 8' Ford Truck Bed

Standard model. . . . . . . . . . . . $525.70
Standard w/front s. window . . . $600.40
Deluxe model. . . . . . . . . . . . . $694.90
Deluxe w/front s. window. . . . . $769.10

## *Kodiak Motors*

Phone 486-3204
Box 926
Kodiak, AK 99615

THE CITIZENS ACTION GROUP (BOX 273, KODIAK, AK.) URGES THE FOLLOWING OR SIMILAR TELEGRAMS OR NIGHT LETTERS BE SENT AT ONCE TO OUR ALASKA CONGRESSMEN:

Dear_____:

Oppose Koniag D2 land trade amendment. Please investigate Leisnoi Inc. village certification.

Dear Congressman Young:

Request the House Merchant Marine and Fisheries Committee hold Hearings in Kodiak re: D2.

(Note: Hearings are being held in Fairbanks week of March 10th. None scheduled for Kodiak.)

Ted Stevens
U.S. Senate
Room 411 Russell Senate Office Building
Washington, D.C. 20510

Mike Gravel
U.S. Senate
Room 4107
Dirksen Senate Office Building
Washington, D.C. 20510

Don Young
U.S. House of Representatives
1210 Longworth House Office Building
Washington, D.C. 20515

The First National

Bank of Anchorage

Kodiak Branch

## Welcome

## to the

## American

## Legion Page 9 of 9 Pages

## Convention!


EQUAL HOUSING LENDER

Member FDIC

EXHIBIT 2
PAGE 2 OF 2 PAGES

EXHIBIT C
Page 9 of 9 Pages