*Law Offices*

## Duncan, Brown, Weinberg & Palmer, P.C.

SUITE 1200

1775 PENNSYLVANIA AVENUE, N. W.

WASHINGTON, D. C. 20006

(202) 467-6370

TELECOPY (202) 467-6379

.WALLACE L. DUNCAN
JON T. BROWN
EDWARD WEINBERG
FREDRICK D. PALMER
FREDERICK L. MILLER, JR.
JAMES D. PEMBROKE
STEPHEN E. ROADY
PHILIP L. CHABOT, JR.
J. CATHY LICHTENBERG
MICHAEL D. OLDAK

OF COUNSEL:
STEWART L. UDALL

CHICAGO OFFICE
JOSEPH V. KARAGANIS
SUITE 2500
150 N. WACKER DRIVE
CHICAGO, ILLINOIS 60606
(312) 782-1905

ANCHORAGE OFFICE
DAN A. HENSLEY
SUITE 407
420 L STREET
ANCHORAGE, ALASKA 99501
(907) 276-1680

February 23, 1979

Honorable Morris K. Udall
Chairman
House Committee on Interior and
    Insular Affairs
1324 Longworth Building
Washington, D.C. 20515

Dear Chairman Udall:

This letter is prompted by the Jack Anderson articles
of the last three days concerning Koniag and the Koniag
villages.

Like a writer of whodunit plays, Mr. Anderson builds
his drama to a third act climax finally revealing the plot.
Capping hints tossed out in the first two acts, Friday's
article reveals that Mr. Anderson is after the Koniag
Amendment and his theme is that Leisnoi, which Mr. Anderson
grudgingly concedes is a certified village, with the assis-
tance of the seven uncertified villages, are somehow going
to enable Koniag to make off with Afognak Island.

Bunk!

As we have explained over and over, there is not an



EXHIBIT
PAGE __ OF __ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 2

acre of Afognak Island that, under the Koniag Amendment,
would be conveyed to the Natives by reason of the uncertified
villages.  In respect of Afognak Island, the Koniag Amendment
would operate in exactly the same way without the uncertified
villages.  Furthermore, not one cent more will be paid from
the Alaska Native Fund on account of Koniag, Koniag Natives,
or the Koniag village corporations.

In a letter of January 25 to Steve Silver of Senator
Stevens' staff, I analyzed the impact of the Koniag uncertified
villages on the Koniag Amendment.  Rather than repeat what
is said there I enclose a copy.

Now, as respects Leisnoi.  Leisnoi is a certified
village.  It went through the administrative process estab-
lished by the Secretary of the Interior under ANCSA to
determine village eligibility.  Leisnoi was certified by the
Secretary of the Interior after its examination by the BIA
which was charged with examining each and every village that
claimed eligibility under ANCSA.

The administrative process established by the Secretary
afforded anyone wishing to dispute or object to the eligibility
of an applicant for village status the opportunity to do so.
Wide publicity was given to the pendency of applications
for eligibility.  The simple fact is that those residents of
Kodiak, Alaska who are referred to in Mr. Anderson's second
article, that of February 22, as the "Citizens Action Group"

EXHIBIT 3
PAGE 2 OF PAGES

Honorable Morris K. Udall
February 23, 1979
Page 3

and who are now attempting through Mr. Anderson's "good offices" to deprive Leisnoi of its eligibility, had their opportunity to protest and to obtain an evidentiary, trial-type hearing from the Department of the Interior in the fall of 1973 and the spring of 1974 when Leisnoi's eligibility was considered. They did not avail themselves of that right.

ANCSA required [§11(b)(3)] that the Secretary of the Interior within two and a half years after December 18, 1971, the date of ANCSA's enactment, determine eligibility of villages not listed in section 11(b)(1).

With that deadline in mind, the regulations of the Department established September 1, 1973 as the deadline for applications for certification by unlisted villages and provided an opportunity for protest and hearing. 43 C.F.R. §§2651.2(a)(6), 9, 10, 38 F.R. 14223 (May 30, 1973). The hearing on Leisnoi, by the way, would have been held, had anyone requested one, in Kodiak, not in far off Washington, D.C. or any other inconvenient place. Nine separate and widely publicized village eligibility hearings were held in Kodiak in 1974. The filing of village eligibility applications was widely publicized in the local Kodiak papers and village eligibility was a widely discussed topic in Kodiak. Anyone in Kodiak and vicinity who would have wanted to object to a village's eligibility application but who was unaware of the opportunity to do so and to obtain a hearing

EXHIBIT 3
PAGE 3 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 4

would have had to have been entombed for a year and a half
in the proverbial underground salt mine, completely out of
touch with the world.

But the handful of people in Kodiak who are now,
through Mr. Anderson's column, trying to "get" Leisnoi
through derailing the Koniag Amendment, neither filed
protests nor sought a hearing.

Almost two years after Leisnoi's certification (which
had occurred on September 9, 1974), some individuals in
Kodiak, who it later developed are apparently the nucleus
of the Citizens Action Group, filed a lawsuit against the
Secretary of the Interior in the Federal District Court in
Anchorage attacking Leisnoi's eligibility. Among the
allegations of the complaint were a charge of fraud, but
without specifics as required by Rule 9(b) of the Federal
Rules of Civil Procedure. (Kodiak-Aleutian Chapter, et al.
v. Kleppe, No. A76-182, Civil). Neither Leisnoi nor Koniag
were named as parties to that action. The Federal District
Court on December 7, 1976 (423 F. Supp. 544), entered an
Order which, as respects the charge of fraud, required the
plaintiffs to "put up or shut up" as required by Rule 9(b)
of the Rules of Civil Procedure. The plaintiffs chose to
shut up. These are the same people who are, with Mr.
Anderson, once again screaming fraud.

EXHIBIT 3
PAGE __ OF __ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 5

An amended complaint was filed shortly after the
December 7, 1976 Order, this time devoid of any charge of
fraud. Leisnoi and Koniag were named as defendants, along
with the Secretary of the Interior. The complaint alleged
that two individuals in Kodiak, Omar Stratman and Toni
Burton, claimed to hold grazing leases from the United
States, on lands (that had been TA'd to the state prior to
passage of ANCSA) which comprise a small part of the area on
Kodiak Island selected by Leisnoi under ANCSA. They challenged
Leisnoi's eligibility on the ground that there would be
interference with their property interests as the holders of
grazing leases. Other individuals who joined as plaintiffs
simply alleged that they occasionally used the land for
hunting, hiking, etc. As to these latter individuals,
the District Court in its Order of December 7, 1976, held
that by failing to have protested and asked for a hearing
from Interior when Leisnoi's application for eligibility was
under consideration, they had forfeited any right to complain.
They took no appeal.

As to Stratman and Burton, the Court permitted the
lawsuit to proceed because of a claimed lack of personal
knowledge on their part that the Department of Interior had
scheduled an opportunity for protest and hearing on Leisnoi's
application. This assertion of lack of knowledge is simply
an unproven claim. We dispute it and consider it incredulous

EXHIBIT 3
PAGE 5 OF PAGES

Honorable Morris K. Udall
February 23, 1979
Page 6

in view of the wide publicity given such matters in Kodiak,
where both resided, in 1973 and 1974.  Stratman and Burton
also claimed that had the lands on which they held grazing
leases been conveyed to the State of Alaska (since it was
TA'd land it would have gone to the State but for Leisnoi's
selection), they would have had a right under Alaska law to
state grazing leases following expiration of their federal
leases which still had something like 20 years to run in any
event.

In our opinion, Stratman and Burton's claims that
their grazing leases were threatened by Leisnoi are not well
founded.  To begin with, grazing leases are "valid existing
rights" under ANCSA, which remain with the holders regardless
of Native selection.  ANCSA, §14(g).  Nobody disputes that,
least of all Leisnoi and Koniag.  Second, assuming that
Alaska law would have given Stratman or Burton a right to
later state leases if the State TA had been effective, the
Secretary of the Interior has recently held that such state
created third party interests in TA'd lands are valid exist-
ing rights under ANCSA even though the state itself does not
take title to the TA'd lands because of Native selection.
Secretary's Order Nos. 3016, December 14, 1977, and 3029,
November 20. 1978.  Incidentally, the state statute on which
Stratman and Burton rely had been repealed in June of 1976,
before they even filed their lawsuit.

EXHIBIT 3
PAGE 6 OF __ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 7

In sum, the federal grazing leases covering the
Leisnoi lands on Kodiak Island remain in effect and are
valid, and Leisnoi must and will respect them.  Further, if
they had a State right to a renewal, (assuming that the
State's repeal of its statute was not binding as to them),
they have, under the Secretary's Orders above noted, a valid
existing right to such a renewal.

The lawsuit based on the amended complaint was dismissed
by the Federal District Court in Anchorage on October 16,
1978 as moot (copy of opinion attached), Leisnoi having
relinquished the limited acreage covered by the Stratman and
Burton grazing leases because it came to the conclusion that
the land, burdened in any event by a long term lease, was
simply not worth fighting over.  The District Court also
held that whatever rights Stratman and Burton might have to
a state lease were preserved as valid existing rights
and finally, the Court noted that Stratman and Burton's
complaint appeared to be in violation of Rule 17(a) of the
Federal Rules of Civil Procedure, since the grazing leases
were held not by Stratman and Burton but by corporations.

It is significant, I believe, that Mr. Anderson's interest
in Leisnoi and Koniag surfaced only after the District Court
dismissed the Stratman and Burton litigation.

The Stratman and Burton lawsuit places these charges
against Leisnoi in perspective.  Stratman and Burton are

EXHIBIT 3
PAGE 7 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 8

asserting a concern about their private business interests
(which in fact cannot be harmed) out of imagined fears of
"Native control."  Mr. Anderson and Mr. Bernton appear to
have been mislead, on the basis of pious mouthings of
fraud by people with a private business axe to grind.  But
then, neither Mr. Anderson nor Mr. Bernton appear to have
done much, if any, homework about what their informants may
have been up to.

Stratman and Burton have filed a notice of appeal
with the Ninth Circuit Court of Appeals.  We regard this
appeal as sham and frivolous and have moved to dismiss it
without the necessity of briefing.

The fact of the matter is that even without counting
Leisnoi's land entitlement on the mainland, Koniag and the
other Koniag certified villages would still be giving up on
the Alaska mainland about the same acreage as will be received
on Afognak Island under the Konaig Amendment.  So, again,
there is much sound and fury which signifies nothing except
that a small band of diehards in Kodiak who chose not to have
their charges tried before an administrative law judge of
the Department of the Interior at the proper time and who
got nowhere in court, are moving heaven and earth to destroy
Leisnoi, Karl Armstrong and Koniag.  It is time to call a halt
to this kind of persecution and I think we are entitled to
demand, not simply ask, that others be held to the rules.

EXHIBIT 2
PAGE ___ OF ___ PAGES

EXHIBIT ___
PAGE ___

Honorable Morris K. Udall
February 23, 1979
Page 9

I would also point out that none of the people who
are throwing these charges about have appeared before either
this Committee or the Senate Committee, although there has
been ample opportunity for them to do so over the years.
The Koniag Amendment itself has been a matter of common
knowledge in Kodiak since last summer. Now, at the last
minute, they launch a lurid campaign through Mr. Anderson.

Further in connection with the relation of the uncerti-
fied villages to the Koniag Amendment, I call your attention
to my prepared testimony before your Committee on February
8, and particularly to pages 3 and 4 (a copy of my testimony
is enclosed).

Before closing, I would like to address a few additional
comments on the tenor of Mr. Anderson's articles.

With respect to the uncertified villages which Mr.
Anderson calls "phantom," Mr. Anderson conveniently overlooks
the fact that two federal courts, the Federal District Court
in Washington and the United States Court of Appeals for the
District of Columbia, concurred in concluding that in revers-
ing the BIA determination of eligibility, the "higher ups"
in the Department of the Interior, to borrow Mr. Anderson's
phrase, committed gross violations of due process of law.
So outraged was Judge Gesell by the Department's conduct
that he ordered that the last untainted decision within
the Interior Department on the villages' eligibility be

EXHIBIT ___
PAGE 2 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 10

reinstated.  This was the BIA holding in each case that
the villages were eligible.  Koniag v. Kleppe, 405 F. Supp.
1360 (1975).  The United States Court of Appeals for the
District of Columbia Circuit did not disagree with Judge
Gesell's finding of violation of due process.  That Court
disagreed only with Judge Gesell's remedy and ordered that
the cases be returned to the Department of the Interior for
new administrative eligibility proceedings (free of due
process violations) on appeals from the BIA's favorable
determinations.  Koniag v. Andrus, 580 F.2d 601 (1978).
There is, therefore, at this time no outstanding determina-
tion of ineligibility by the Department of the Interior.
The Department's determination to that effect was vacated by
the District Court and the Court of Appeals.  Renewed
administrative proceedings will leave in doubt for several
more years land entitlements affecting all of the Alaska
Native regions.  See the first paragraph, page 4, of my
testimony.

As respects Leisnoi, ever since its certification
Leisnoi has been treated by the Secretary of the Interior
as an eligible village like all others, and it is entitled
to that treatment.  At no time in their litigative attempts
to frustrate Leisnoi's and Koniag's rights were the plaintiffs
willing to seek an injunction against the Secretary's treat-
ing Leisnoi as an eligible village.  This unwillingness to

EXHIBIT
PAGE OF  PAGES
3

Honorable Morris K. Udall
February 23, 1979
Page 11

put their claim to the ultimate test bespeaks volumes
about the motives of Leisnoi's tormentors and Mr. Anderson's
informants.

In Mr. Anderson's first and second articles, he refers
to a federal grand jury indictment. The impression is
left that Koniag and Mr. Armstrong were among those indicted.
This is not so. The indictment Mr. Anderson is talking
about was returned by a federal grand jury in Anchorage in
1976 against one of the seven uncertified village corporations,
Shuyak, and two of its officers, on grounds of attempting to
defraud the United States in claiming eligibility. This
indictment followed what I understand to have been an
extensive investigation. No indictment was returned against
any other village, nor against Koniag, nor against any other
persons including Mr. Armstrong.

After obtaining the indictment, the U. S. Attorney's
Office in Anchorage proposed to the defendants that the
criminal proceedings be held in abeyance pending the outcome
of the village eligibility cases then before the United
States Court of Appeals for the District of Columbia in which
Shuyak was one of the plaintiffs. This is unusual procedure
to hold up a criminal prosecution pending the outcome of
civil litigation and hardly indicates that the prosecutors
thought they had a strong case.

Further, a second most curious circumstance turned up.

EXHIBIT 3
PAGE 11 OF ____ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 12

The U. S. Attorney's Office, it was learned, had not pre-
sented to the grand jury exculpatory evidence that would
have been given, had he been called to testify before the
grand jury, by the Interior Department attorney who had been
assigned during the village eligibility proceedings to
personally look into the Shuyak application. Upon this
attorney's giving an affidavit to the effect that he had
made an investigation and reported his conclusions and
findings to the FBI, but that for reasons unknown to him he
had not been called to testify before the grand jury, the U.
S. Attorney's Office in Anchorage had the indictment dismissed
for want of prosecution. This is the affidavit that Mr.
Anderson in his first column, that of February 21, referred
to as "the strange affidavit" which "knocked the bottom out
of the case." Of course it knocked the bottom out of an
indictment handed down by a grand jury from which exculpatory
evidence had been withheld. What is "strange" about this is
that exculpatory information given by a federal official was
withheld by the prosecutors from the grand jury.

Attached is the affidavit of the Interior Attorney.
The Committee will have no difficulty in determining whether
it is this attorney's conduct or Mr. Anderson's which is
"strange!"

Then there is the outrageous personal attack on Mr.
Armstrong which was the centerpiece of the second article,

EXHIBIT ___
PAGE 2 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 13

that of February 22.  It may be that what bothers Mr.
Anderson and his assistant Mr. Bernton is that Karl Armstrong
does not fit what the column reveals to be Mr. Bernton's
(and Mr. Anderson's) stereotype of an Alaska Native -- a
person who, to use the column's language, is a "simple,
semi-literate Eskimo fisherman or Indian trapper."  This
characterization is insulting to the Alaska Natives.
Moreover, it betokens that paternal state of mind in which
the "good" Alaska Natives are docile simple minded souls,
content to have others decide their fate and happy to be
allowed to remain in their homeland as sort of living
exhibits in a human zoo for the amusing tolerance of non-
Indian exploiters and columnists.

Admittedly Mr. Armstrong is not shy.  Admittedly
he is given at times to acerbic comment.  But I submit that
Mr. Anderson's own approach to these matters is hardly that
of the genteel drawing room and as Mr. Anderson's column
demonstrates, he himself is not one to approach a matter
under "Marquis of Queensbury Rules."  Mr. Anderson speaks of
Mr. Armstrong's use of "alliterative invective."  One must
of course concede Mr. Anderson's expert qualifications as an
alliterist.  As any regular reader of his column will
testify, Mr. Anderson's claim to all-world superiority in
that regard has gone without serious challenge since Spiro
Agnew's ghost writer quit the field.

EXHIBIT
PAGE 3 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 14

Perhaps it infuriates Mr. Anderson and Mr. Bernton that Mr. Armstrong, a former newspaperman, is not about to be pushed around and that he reacts accordingly when being interviewed by a man who, in effect, announces that he already knows that Mr. Armstrong, Koniag, Leisnoi and the uncertified villages are frauds, and then offers to change his mind if Mr. Armstrong will prove otherwise to his satisfaction.

While Mr. Armstrong's style may grate, it hardly warrants Mr. Anderson and company's engaging in character assassination. While Mr. Armstrong's adjectives are perhaps not those that one would utter in the calm and cloistered atmosphere of a library, some allowance must be made, I think, for the provocation to which Mr. Armstrong has been subjected with these constantly reiterated charges.

As regards the availability of the identity of the members of the "Citizens Action Group," in depositions taken in the Stratman and Burton litigation, the plaintiffs testified that CAG kept no membership lists or financial records, and that there were no officers or directors. And Mr. Anderson's characterizes these people as "neither weird nor mysterious." Not surprisingly, Mr. Bernton "had no trouble locating members of the" CAG. To Leisnoi, however, the organization's makeup and membership have an ectoplasmic, or to use one of Mr. Anderson's favorite terms, "phantom" quality.

EXHIBIT 3
PAGE 14 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 15

In typical Anderson style, he concludes his attack on Mr. Armstrong with a paragraph which infers, but does not quite openly charge, that Mr. Armstrong really does not qualify as an Alaska Native.

Mr. Armstrong, along with some three thousand other enrollees, was originally held not to have qualified as a "Native" by the Anchorage enrollment office of the BIA because that particular office applied erroneous presumptions and failed to utilize the complete records available in the case of applicants in whose line of ancestry there was "creole" blood. In this case "creole" was a term of Russian usage (borrowed from the French) which was loosely applied to any person with an ancestor that was the child of a marriage between a Russian male and a Native female (There were no Russian women in Russian Alaska).

In Mr. Armstrong's case, a maternal ancestor was simply put down by the Anchorage enrollment officer as of "unknown" origin, with no attempt to trace her lineage. Mr. Armstrong appealed.

Appeals on enrollment went not to the BIA, as Mr. Anderson says, but to the Regional Solicitor of the Department of the Interior in Anchorage. His office was also assigned the entire "creole" problem and all creole cases were taken out of the local enrollment office's hands by the Interior Department when it became aware, through Mr. Armstrong's

EXHIBIT ____
PAGE __ OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 16

appeal and thousands of others, that the local BIA enrollment
office was committing gross and repeated errors in creole
cases.

The Regional Solicitor, with approval of his Washington
superiors, issued a detailed memorandum of how such cases
would be handled, including an independent, disinterested
analysis of the original Russian Orthodox Church records in
the Russian language by qualified scholars.  That memorandum
also corrected the egregiously erroneous presumptions that
had been used by the local office.  A copy of the Regional
Solicitor's memorandum of April 3, 1974 is enclosed.

Upon a full examination of the relevant Russian
Orthodox Church records and the application of proper rules,
Mr. Armstrong and in all, several thousand others similarly
situated, were held to be qualified as Natives.

This situation had threatened to decimate Native
enrollment in three Alaska Native regions, not only Koniag,
but the Aleut and Cook Inlet regions as well.  Mr. Armstrong,
again perhaps in a fashion which would not comport with Mr.
Anderson's stereotype of a "simple, semi-literate Eskimo
fisherman or trapper," not only appealed his own case, but
was instrumental in bringing the erroneous creole case prac-
tices of the Anchorage enrollment office to light.  His in-
terest and insistance that corrective action be taken, not
simply for himself but for the many others who were the vic-

EXHIBIT ___
PAGE ⁴⁄₆ OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 17

tims of those erroneous practices, was indirectly responsible for saving the benefits of the Settlement Act for thousands of people.  For that he deserves commendation, not villification from the Andersons and the "Citizen Action Groups" of this world.

Finally, there are the reiterated allusions to information from unnamed and unidentified "Interior Department" and "Justice Department" "investigators" or "sources."

Mr. Anderson, while it is not apparent on the face of his articles, is, after all, writing about events that transpired in 1973 and 1974, for that is when village applications were filed and the reviews by BIA were made.  With all of Mr. Anderson's references to the "investigators" and "sources" and his shouts of fraud and comparisons with Tea Pot Dome, one must inquire why weren't there more indictments followed by prosecutions and convictions?  The government "sources" surely haven't been sitting on evidence of criminality, waiting for Mr. Anderson to "reveal all" in his column five years and more after the alleged plot was hatched and the alleged criminal events occurred.

The answer is obvious.  There was an intensive criminal investigation.  It produced but one indictment, which then backfired.  What we are hearing now are the screams of the disappointed.  Tallulah Bankhead's classic comment, "There is less in this than meets the eye," perfectly describes Mr.

EXHIBIT ___
PAGE ___ OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 18

Anderson's articles.  It is time, long since past time, to
call a halt to these smears.

The Koniag Amendment is no theft and no fraud.  If it
is enacted the public interest will be the gainer, not the
loser.

If the Koniag Natives are forced to remain on the
Alaska mainland, their land, almost 350,000 strategically
located acres, land of incalculable wildlife and wilderness
values, will not be returned to public ownership to be
available for inclusion in a  federal wildlife refuge or for
selection by the State of Alaska.  The Secretary of the
Interior, in testifying before your Committee on February
13, stated that he now recommends that a refuge be established
on federal lands on the Alaska Peninsula because, since he
made his 1977 recommendation that there be a study of land
status in the area, "land ownership patterns have become
considerably clearer, so it is now appropriate to establish
a refuge in this highly important area."  The Secretary gave
the same testimony the next day before the Merchant Marine
and Fisheries Committee.  The reason why "land ownership
patterns have become considerable clearer" is, of course,
the emergence of the Koniag Amendment.

And as for the alleged deleterious impact of the
Koniag Amendment on Afognak Island should the amendment
become law, I refer you once again to my testimony, parti-
cularly to pages 7 and 8, paragraphs 2, 4, 6, 9, 10 and 11.

EXHIBIT 3
PAGE ___ OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 19

The Koniag Natives are not stealing anything.  They
are offering a trade, a bargain from which all parties
will benefit, as they should in any negotiated transaction.
It is no accident that the Koniag Amendment is supported by
the Alaska Coalition, the State of Alaska, the Kodiak Island
Borough, and the Department of the Interior.  It benefits
each.  As I stated in my recent testimony before your
Committee:

> The Koniag people are realists.  They have understood
> early and well that no matter how unfair the operation
> of ANCSA has been in their case by reason of circum-
> stances over which they have no control, springing
> largely from decisions taken in Washington as long ago
> as the turn of the century without their knowledge or
> consultation, no proposal to rectify their situation
> is going to be viable unless it deals with the interests
> of others who are affected in a manner in which those
> others regard as fair and reasonable.
>
> Realizing that, Koniag over a period of almost
> eight months painstakingly negotiated with the Depart-
> ment of the Interior, the Alaska Coalition, the Alaska
> state government and the Kodiak Island Borough.  In
> each instance, as examination of details revealed
> specific problems, they were resolved in a mutually
> satisfactory fashion.  In the end, Koniag was able to
> present to the Congress, before the Senate Committee
> completed its work on last year's version of H.R. 39,
> a legislative proposal which was supported by the
> Alaska Coalition, the Alaska state government, the
> Kodiak Island Borough and the Department of the
> Interior, in addition to Koniag, the Koniag villages
> and the Alaska Natives themselves through the Alaska
> Federation of Natives.
>
> The Koniag Amendment is a finely tooled, delicately
> balanced resolution of a number of complex problems.

I apologize for the length of this letter, but as you
and I know, there is only one way to deal with blunderbus

EXHIBIT 3
PAGE __ OF __ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 20

charges and that is with detailed rebuttal.  The Koniag
Natives do not apologize for the Koniag Amendment.  It will
be tragic indeed if the public is denied Koniag's mainland
holdings and those Natives of Alaska who suffered the
most from the incursion of the white man beginning with the
Russians and who, but for the Koniag Amendment, would
receive the least, should both be deprived of this oppor-
tunity by Mr. Anderson's patent attempt to frighten the
members of this Committee and the Congress.

There are, and can be, legitimate differences of
opinion over what constitutes "residence" under ANCSA, and
use and occupancy under the regulations.  Leisnoi was
confirmed under the Department's standards and under the BIA
standards and procedures which it applied in certifying more
than 200 Native villages.  The uncertified villages, although
the holding of ineligibility has been vacated, are confronted
with more years of heavy expense and emotional strain if
they continue the fight for full certification.  They have
reached agreement with the Department of the Interior on
the settlement that is included in the Koniag Amendment.  It
imposes what amounts to no land or additional money obliga-
tions on the government.

I should be very happy to supply further information
if you wish, but I do not propose to try Native eligibility
issues in the newspapers.

EXHIBIT ___
PAGE 20 OF ___ PAGES

Honorable Morris K. Udall
February 23, 1979
Page 21


        I am confident that this Committee will not let a

handful of Kodiak malcontents and Mr. Anderson destroy

Koniag's future and the status of Leisnoi as a village under

ANCSA.

                        Sincerely yours,

                        Edward Weinberg
        of DUNCAN, BROWN, WEINBERG & PALMER, P.C.

EW:vcr

Enclosures

cc:   Honorable John Seiberling
      Honorable Don Young
      Honorable Henry Jackson
      Honorable Ted Stevens
      Honorable Mike Gravel
      Honorable John B. Breaux
      Honorable Cecil D. Andrus

EXHIBIT 3
PAGE 21 OF   PAGES