region, including Leisnoi.[3]

In July 1976, Stratman and other members of the Citizens Action Group[4] filed the "decertification" action challenging the Secretary's determination that Leisnoi

---

[3] The other villages included Bells Flats, Anton Larsen, Litnik, Uganik, Uyak, Ayakulik, and Port Williams. After having been initially determined to be eligible by the BIA Area Director, these villages were ultimately found to be ineligible by the Secretary in separate agency proceedings. These villages subsequently filed suit challenging the Secretary's decision. See Koniag, Inc. v. Kleppe, 405 F.Supp. 1360 (D.D.C.1975), aff'd in part and rev'd in part, 580 F.2d 601 (D.C.Cir. 1978), cert denied, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978).

These villages were also the subject of a Congressional investigation, conducted in 1974 by the House Subcommittee on Fisheries and Wildlife Conservation and the Environment of the House Committee on Merchant Marine and Fisheries. See Koniag v. Kleppe, supra at 1371-72. The Committee was extremely critical of the Department of Interior's investigation and procedures for determining the eligibility of these villages. Committee Chairman John D. Dingell questioned the villages' qualifications for ANCSA status, and stated that a final determination of their eligibility would be contrary to congressional intent. Id. The Court in Kleppe noted that the Chairman made a "strenuous effort . . . to encourage protest and appeals" of the BIA Director's initial determinations of the villages' eligibility in additional agency proceedings. Id. at 1371.

Ironically, it was the Chairman's perceived intervention in the intra-agency appeals of the BIA Area Director's determinations of these villages' eligibility that led the Court of Appeals in Koniag v. Kleppe, 580 F.2d 601 (D.C.Cir. 1978) to order the vacation of the Secretary's subsequent determinations of their ineligibility. Id. at 610-11. The Court remanded their cases back to the Secretary for a redetermination of their eligibility. Id. at 610-11.

It was at this point that Congress interceded, and enacted a special provision in ANILCA to settle these villages' claims of eligibility by granting limited ANCSA status in return for their acceptance of less land than they would have otherwise been entitled under ANCSA, provided they filed a release of all claims. See ANILCA § 1427(e)(1).

[4] The other plaintiffs included Toni Burton, John Murray, Michael Devers, James Schauff, and Brian Shafford. [Exc. 24].

was eligible for ANCSA Native village status.[5] The complaint alleged that Woody Island was not an "established Native village" and did not have twenty-five Native residents on the 1970 census enumeration date.[6] [Exc. 24]. The complaint sought to enjoin the government from "issuing any patents to or other interest in real property" to Leisnoi, and declare "null and void" any conveyances that might already have been made. Id.

2.  The first Ninth Circuit appeal

On October 26, 1978, the district court dismissed the action, ruling that none of the members of the Citizens Action Group had standing to maintain the action, and had otherwise failed to exhaust their administrative remedies. Watt at 1323. Stratman and the other members of the Citizens Action Group appealed the dismissal to the Ninth Circuit.

In Stratman v. Watt, 656 F.2d 1321 (9th Cir. 1981), cert. dismissed 456 U.S. 901,

---

[5] The action also challenged the certification of two other Native villages, Anton Larsen and Bells Flats Natives, but those claims were litigated separately in another action. See Watt at 1322 n. 1. These villages were among those ultimately found to be ineligible by the Secretary. See Koniag, Inc. v. Kleppe, 405 F.Supp. 1360 (D.D.C.1975), aff'd in part and rev'd in part, 580 F.2d 601 (D.C.Cir.), cert denied, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978). They were also among the villages that were granted limited ANCSA status under ANILCA in return for their release of claims for full ANCSA benefits. ANILCA § 1427(e)(2).

[6] The allegations in Stratman's complaint have since been borne out by discovery. The Government's own records reflect that Woody Island had only 1 or 2 Native residents on April 1, 1970, that the "village" had long been abandoned in favor nearby Kodiak, and that 40 of the island's 41 inhabitants listed in the 1970 census were non-Native FAA personnel and their families living in a government-owned FAA tracking facility. Deposition testimony demonstrates that the original applicants for Leisnoi's certification were residents of the City of Kodiak, and had submitted false affidavits in support of their application averring that they had resided on Woody Island in 1970.

8

102 S.Ct. 1744, 72 L.Ed.2d 170 (1982), the Ninth Circuit reversed the district court. The Court held that all of the plaintiffs had sufficient interests as recreational users of the lands selected by Leisnoi to impart standing, but upheld the district court's dismissal as to all of the plaintiffs other than Stratman and Burton for failure to exhaust their administrative remedies. The Court distinguished Stratman and Burton from the other plaintiffs because they both held federal grazing leases on the lands selected by Leisnoi. Because they had record interests in the selected lands, the Court held that they had been entitled to actual notice of Leisnoi's application, and because they did not receive such notice, their failure to exhaust could be excused. Id. at 1325. Because the district court had not considered this issue, the Court remanded the matter to the district court for its initial determination of whether Stratman and Burton should be excused from their failure to exhaust. Id. at 1325-26.

3. <u>Settlement and dismissal of the action</u>

In 1982, after the Ninth Circuit issued its decision in Watt, the parties entered into a settlement agreement. At the time of the settlement, Leisnoi and Koniag had merged into a single corporation. Leisnoi at 1202. Under the settlement agreement, Stratman agreed to dismiss the decertification action with prejudice. In return, the merged Koniag/Leisnoi agreed to sell Stratman certain parcels of land from the lands selected by Leisnoi under ANCSA. Koniag/Leisnoi was to convey these parcels to Stratman within thirty days of their interim conveyance by the government to Koniag/Leisnoi. Stratman was, in turn, to execute a deed of trust note in the sum of $233,099.50 on the parcels.

Leisnoi at 1206.

At the same time the settlement was entered into, a derivative action by a former Leisnoi shareholder was also pending in Alaska Superior Court, which sought to undo the merger between Leisnoi and Koniag. Leisnoi at 1204-05. That action culminated in a settlement agreement declaring the merger between Koniag and Leisnoi "void ab initio." Id. at 1205. Stratman was not a party to the derivative action or its settlement agreement.

4. <u>Patent of the lands to Leisnoi</u>

On November 21, 1985, nearly four years after the settlement of the decertification action, and two years after the settlement of the derivative action, Leisnoi received a patent from the Government for the lands it had selected under ANCSA. Leisnoi at 1205-06. The patent included title to Termination Point.[7] Leisnoi received the surface estate of the lands, while Koniag received the subsurface rights. Id.

Four days later, on November 25, 1985, Leisnoi refused to convey the lands to Stratman under the terms of the settlement agreement in the decertification action. Id. at 1206. Koniag tendered a quitclaim deed to convey the land's subsurface rights, however Stratman refused this offer unless Leisnoi's surface estate was also conveyed. Id.

---

[7] Termination Point is only a small portion of the lands Leisnoi received in the patent. It is approximately 1.5 square miles in size, compared with the over 80 square miles of land Leisnoi received in the same patent. However, for purposes of clarity, the patent will be referred to as the "Termination Point patent."

10

5.     Stratman's action for specific performance of the settlement agreement

In 1985, Stratman brought an action against Leisnoi and Koniag in Alaska Superior Court seeking specific performance of the settlement agreement. The trial court entered judgment for Stratman, and Leisnoi appealed. This Court subsequently reversed the trial court, and held that the settlement agreement was unenforceable against Leisnoi. Leisnoi, Inc. v. Stratman, 835 P.2d 1202 (Alaska 1992). The Court held that, even though Stratman was not a party to the derivative action, he was bound by its outcome, including the provision in the demerger settlement declaring the merger void ab initio. The Court held that the doctrine of lis pendens applied to the derivative action because it involved rights to real property, and because Stratman had knowledge of its pendency, he was bound by its outcome. The Court concluded that, as to Stratman, the merged Koniag/Leisnoi had no authority to agree to a future conveyance of Leisnoi's assets, and that Leisnoi was therefore not legally bound by the agreement.[8]

6.     Reopening of the decertification action

On March 5, 1993, Stratman filed a motion in federal district court to vacate the judgment of dismissal and reopen the decertification action pursuant to Fed.R.Civ.P. 60(b)(6). The district court denied the motion, and Stratman appealed to the Ninth Circuit.

In a memorandum decision dated December 5, 1994, the Ninth Circuit reversed

---

[8] Justice Moore dissented. See Leisnoi, 835 P.2d at 1211-14 (Moore, J., dissenting).

11

the district court, and remanded with instructions to vacate the judgment of dismissal and reopen the action. [Exc. 63]. On April 5, 1995, the district court entered an order reopening the action. [Exc. 71].

    7.    <u>Additional Proceedings and Remand to IBLA</u>

On April 20, 1995, Judge von der Heydt ordered a pretrial conference to be held in open court on May 1, 1995 for the purpose of determining the steps necessary to bring the litigation to a conclusion. [Exc. 73]. The parties were also ordered to file reports prior to the conference. <u>Id.</u>

On April 27, 1995, Leisnoi filed a Status Conference Report identifying the motions it expected to file. [Exc. 75]. Included was a motion to expunge Stratman's Lis Pendens, and a motion for summary judgment to establish that any suit to annul its land patents was barred by the statute of limitations. [Exc. 76].

On May 11, 1995, Judge von der Heydt issued a Scheduling Order based on the matters discussed at the pre-trial conference. [Exc. 79]. The order identified five "threshold issues." Included was whether the court should dismiss the action for Stratman's failure to exhaust his administrative remedies, and whether Stratman's Lis Pendens should be expunged. [Exc. 79]. The court went on to state:

> If the court does not resolve this action on one of the five threshold issues, the court will remand the matter to the Interior Board of Land Appeals for a determination of Leisnoi's eligibility.

[Exc. 80]. The court also stayed all motions other than those relating to the threshold issues. <u>Id.</u>

12

The case was subsequently re-assigned to Judge Singleton following Judge von der Heydt's retirement.

On September 13, 1995, Judge Singleton issued a written decision ruling on the threshold motions. [Exc. 100]. Among other things, the court denied the defendants' motion to dismiss the action for Stratman's failure to exhaust his administrative remedies. The court held that the matter should instead be remanded to the IBLA for its initial determination in order to satisfy exhaustion requirements, as well as to satisfy the doctrine of primary jurisdiction. [Exc. 100-103]. The order states:

> [T]his appears to be a perfect case to read ripeness and primary jurisdiction together to require that Stratman litigate his challenge to Leisnoi before the agency before he brings it here. The agency in the first instance should determine whether Leisnoi is a phantom of the Secretary's imagination, as Stratman contends, or as its members contend, the modern representative of an ancient people, the victim of an itinerant berry picker. Sending the issue back will permit the agency to exercise its expertise. . . .
>
> This case should therefore be sent to the IBLA for consideration of Stratman's challenge to Leisnoi. That course will permit exhaustion of administrative remedies, albeit belated, and give the Court the benefit of the agency's expertise and the agency the benefit of any intervening action by Congress.
>
> IT IS THEREFORE ORDERED:
>
> The motions at Docket Nos. 207, 245, 246, 248-251, 269, 270, and 287 are DENIED. The motions at Docket Nos. 264 and 286 are GRANTED. This case is remanded to the administrative agency for consideration not inconsistent with this Order.

[Exc. 103].

On November 21, 1995, the court issued another order, denying two subsequent

13

patent. [Exc. 96-98].

C. Leisnoi's quiet title action

On January 18, 1996, Leisnoi filed this action to quiet title to Termination Point.[12] [Exc. 105]. Its complaint alleged that Stratman lacked standing to vacate the Termination Point patent, and prayed for the following relief:

> A Final Judgment (i) quieting Leisnoi, Inc.'s title to Termination Point; (ii) removing any clouds therefrom; (iii) holding the claimed adverse interests of Omar Stratman to be naught and (iv) forever barring Omar Stratman from asserting, individually or on behalf of others, any claim in Termination Point adverse to Leisnoi, Inc.

[Exc. 107-108].

Stratman removed the action to federal court. [Exc. 109]. Stratman filed an Answer in federal district court, admitting that he had no claim of title to Termination Point, but alleging that the outcome of his decertification action could affect Leisnoi's

---

[12] Leisnoi's action sought to quiet title only to Termination Point, even though Termination Point is only a small portion of the lands it received in the under ANCSA, and only a small portion of the lands under challenge in Stratman's decertification action. This is attributable to a pledge Stratman made to clear Leisnoi's title to Termination Point in order to allow its sale to the Exxon Valdez Oil Spill Trustees ("EVOS"). Stratman remains ready and willing to cooperate with Leisnoi in clearing its title to Termination Point. He has already recorded a release of his Lis Pendens as to Termination Point. However, Stratman cannot allow Leisnoi to quiet title to Termination Point based on an adjudication of the merits of his decertification action. To do so would undermine the federal court's jurisdiction to decide his decertification action, and allow Leisnoi to assert the state court judgment as a bar to Stratman's claim for the restoration of Government's title of the remaining lands conveyed to Leisnoi in the Termination Point patent. As it now stands, the trial court's judgment bars Stratman from suing to challenge or annul the "patent . . . conveying Termination Point." [Exc. 159]. That patent included all of the lands conveyed to Leisnoi under ANCSA, not just Termination Point.

16

title and possession to Termination Point as well as Leisnoi's other land holdings. [Exc. 115].

Stratman then recorded a Partial Release of Lis Pendens, releasing Termination Point from his Lis Pendens for the purpose of allowing its acquisition by the EVOS Trustees. [Exc. 120].

On March 6, 1996, the district court remanded the action to state court, concluding that Leisnoi's action was "an action to quiet title under state law which does not present a federal question." [Exc. 125]. The court also noted that "[w]hether the state court has jurisdiction is a matter to be decided in that court." [Exc. 125].

Stratman moved for leave to file a First Amended Answer on March 29, 1997. [Exc. 127]. The court granted his motion on June 6, 1997. [R. 1000].

Leisnoi moved for summary judgment on the ground that Stratman lacked standing to vacate its patent to Termination Point, in either a new action or in his decertification action. [R. 273-346]. It argued that only a person who claims title to the land has standing to challenge a patent, and that Stratman claimed no such interest in Termination Point. [R. 275-277].

Stratman moved to dismiss Leisnoi's action on the ground that it presented the same claim and issues as his decertification action. [R. 83-84]. In the alternative, Stratman sought to stay the action pending the determination of the decertification action. [R. 95]. Stratman also argued that the State court lacked jurisdiction to adjudicate his decertification claim, and that the United States was an indispensable party over which

the court lacked jurisdiction. [R. 76-80, 86-89].

On February 25, 1997, the trial court issued a written decision granting Leisnoi's motion for summary judgment, and denying Stratman's motion to dismiss or stay the action. [Exc. 136].

The court rejected Stratman's motion to dismiss or stay Leisnoi's action, holding that his decertification action was no longer pending "in a court of competent jurisdiction" for purposes of abatement or stay of Leisnoi's action because it had been remanded by the district court to IBLA. [Exc. 148-149]. The court also stated that the federal district court had been given the opportunity to exercise jurisdiction over Leisnoi's action following its removal to federal court, but had declined to accept the case "finding that it should properly be heard in state court." [Exc. 149].

The trial court held that it had subject matter jurisdiction to adjudicate Stratman's decertification claim under 28 U.S.C. § 1360(a). [Exc. 141-146]. It also held that joinder of the United States was not required because the court could properly determine the competing rights to Termination Point between only Stratman and Leisnoi without addressing any rights the United States may have in the property. [Exc. 149-150].

The court granted Leisnoi's motion for summary judgment, holding that Stratman had no standing to challenge or affect Leisnoi's title to Termination Point in his decertification action because he did not claim title to Termination Point for himself. [Exc. 153-157].

On April 11, 1997, the court entered Final Judgment quieting Leisnoi's title to

18

Termination Point, and "forever barring Omar Stratman from asserting, individually or on behalf of others, any claim in Termination Point adverse to Leisnoi, Inc.". [Exc. 159]. The judgment concludes:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED, that Omar Stratman has no interest in title to Termination Point and that Omar Stratman lacks standing to sue to challenge or annul the patent from the United States to Leisnoi, Inc. conveying Termination Point.

[Exc. 159].

Following the entry of judgment, Leisnoi moved for Rule 82 attorney fees and costs following the court's entry of judgment. [R. 1189]. Stratman opposed the award of any fees or costs on the ground that he was a public interest litigant. [R. 1090]. On August 13, 1997, the trial court issued an order ruling that Stratman was not a public interest litigant, and awarded Leisnoi $11,586.00 in attorney fees. [Exc. 161]. Stratman moved for reconsideration. [R. 1391]. On September 19, 1997, the trial court issued an Order on Motion for Reconsideration reaffirming its determination that Stratman was not a public interest litigant, and denying his motion for reconsideration. [Exc. 166].

## VII. STANDARD OF REVIEW

In reviewing a grant of summary judgment, this Court must determine whether any genuine issue of material fact exists and whether on the established facts the moving party is entitled to judgment as a matter of right. Nielson v. Benton, 903 P.2d 1049 (Alaska 1995).

Whether the superior court had subject matter jurisdiction is a question of law,

subject to de novo review by this Court. <u>Hydaburg Co-Op Ass'n v. Hydaburg Fish.</u>, 925 P.2d 246 (Alaska 1996). Subject matter jurisdiction may be raised at any stage of the litigation. <u>Id.</u>

## VIII. <u>ARGUMENT</u>

### A.   <u>Summary of Argument</u>

Leisnoi's action sought to quiet title to Termination Point by adjudicating the merits of Stratman's federal APA claim against the Secretary of Interior. It alleged that Stratman could not obtain a judgment restoring the federal government's title to Termination Point under his claim for relief in the decertification action because he lacks standing to challenge or vacate the Termination Point patent.

The trial court agreed with Leisnoi, and held that Stratman lacks standing to restore the Government's title to Termination Point as relief in the decertification action because he does not claim title to Termination Point for himself.

The trial court erred in holding that Stratman cannot restore the Government's title to Termination Point as relief in his decertification action. The federal district court has the power, under the APA, to order the reconveyance of Termination Point as a remedy under Stratman's original claim for relief, which sought to enjoin the then-<u>future</u> issuance of the Termination Point patent. Because the Government and Leisnoi, as parties to the transaction sought to be enjoined, were also parties to the action, the district court has the power to "undo" the transaction and order the reconveyance of the Termination Point

lands to the government. Stratman need not bring a new action, or establish any additional standing to "vacate" the Termination Point patent.

However, the trial court committed an even more fundamental error by deciding this case at all. Because Leisnoi's action presents the same claim and issues as Stratman's pending decertification action, it should have been dismissed or stayed pending determination of the decertification action. The issue of whether or not the federal district court can order the reconveyance of Termination Point as a remedy under Stratman's claim for relief in the decertification action is a matter to be determined by the district court itself. Determination of Stratman's claim by the state court would undermine the federal district court's own jurisdiction, and allow the state court judgment to be asserted as a bar to the claims and issues to be determined by the district court in the decertification action. It would also undermine the district court's existing orders. The district court has already denied two motions by Leisnoi to expunge the Lis Pendens, having determined that Stratman is entitled to cloud Leisnoi's title pending the final determination of the decertification action.

Even more importantly, the trial court lacked subject matter jurisdiction to adjudicate Stratman's claim. First, because Stratman's decertification action and claim for relief is a claim against the Secretary of Interior under the federal APA, the state court lacks jurisdiction to adjudicate it. The APA's waiver of sovereign immunity under the APA does not extend to actions brought in state court.

Second, because Stratman's decertification claim challenges the Secretary of

21

The federal government has reserved to itself the "plenary and exclusive power to regulate Indian affairs." Calista Corp. v. Mann, 564 P.2d 53, 57 (Alaska 1977), citing Bryan v. Itasca County, 426 U.S. 373, 376-377 n 2, 96 S.Ct. 2102, 2105 n. 2, (1976). Indian affairs are subject to state law only to the extent that Congress explicitly so provides. Ollestead v. Native Village of Tyonek, 560 P.2d 31, 33 (Alaska 1977). The federal government's exclusive power and jurisdiction to regulate Indian affairs extends to the adjudication of rights under ANCSA. See Calista Corp. v. DeYoung, 562 P.2d 338, 341 (Alaska 1977) ("The federal government's plenary and exclusive power over Indian affairs mandates that we find a jurisdictional basis in the federal acts giving Alaska's courts the power to adjudicate rights under the Alaska Native Claim Settlement Act.").

The trial court held that state court jurisdiction was conferred by 28 U.S.C. § 1360. [Exc. 142-143]. 28 U.S.C. § 1360 provides, in part:

> (a) Each of the States listed in the following table shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State . . . .

28 U.S.C. § 1360(a) (emphasis added). The statute lists the State of Alaska as having jurisdiction over "all Indian country." Id.

The trial court described § 1360(a) as a "broad Congressional grant of jurisdiction to state courts over disputes involving Indians." [R. 143]. However, the courts have

26

consistently held that, despite its seemingly broad language, § 1360(a) must be strictly construed as conferring state court jurisdiction over only "private civil litigation" involving Indians. See Chilkat Indian Village v. Johnson, 870 F.2d 1469, 1480 and n. 8 (9th Cir. 1989); Segundo v. City of Rancho Mirage, 813 F.2d 1387 (9th Cir. 1987); Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 661 (9th Cir. 1975). In Bryan v. Itasca County, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court held that § 1360(a) could not be construed as conferring upon states the power to levy personal property taxes on Indian reservations. In reaching its decision, the Court reviewed the legislative history of § 1360, and concluded that it was intended only to confer jurisdiction over "private civil litigation involving reservation Indians in state court." 426 U.S. at 380-386, 96 S.Ct. at 2106-09.

This Court has also recognized the limited nature of jurisdiction conferred to the state courts by § 1360(a). See e.g., Heffle v. State, 633 P.2d 264, 268 (Alaska 1981) (noting that courts have strictly interpreted section 1360 against a broad grant of state jurisdiction over allotment lands). In Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977), this Court held that § 1360(a) did not confer state court jurisdiction to adjudicate a wrongful death claim against the Metlakatla Indian Community. The Court held that, in view of the Supreme Court's approach in Bryan, § 1360(a) must be narrowly construed as conferring jurisdiction over only "private civil litigation":

> The issues decided by the Supreme Court in Bryan was the state's power, presumably conferred by 28 U.S.C. § 1360, to tax the personal property of some individual Indians which was located on the reservation. Thus

> respondent's contention that <u>Bryan</u> is distinguishable from the case at bar is certainly correct. But in our view the importance of the Supreme Court's opinion is the fact that the approach of the Supreme Court in <u>Bryan</u> was to determine, on the basis of legislative history and wording of the Act, what Congress expressly intended and to go no further. In <u>Bryan</u>, the Supreme Court stated:
>
>> [T]he consistent and exclusive use the terms 'civil causes of action,' 'aris[ing] in,' 'civil laws of general application to private persons and private property,' and 'adjudicat[ion],' in the Act and legislative history virtually compels our conclusion that the primary intent of § 4 was to grant jurisdiction over <u>private civil litigation</u> involving reservation Indians in state court.
>
> The question thus arises whether a suit against the Metlakatla Indian Community is "<u>private civil litigation</u>." . . .

<u>Id.</u> at 165-66 (emphasis added, footnotes omitted). The Court went on to hold that § 1360(a) could be construed as conferring jurisdiction over a particular dispute "only if it is clear from the unambiguous language of 28 U.S.C. 1360(a) and its legislative history":

> Pursuant to the analysis employed by the Supreme Court in <u>Bryan v. Itasca County</u>, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), we hold that the sovereign immunity of the Metlakatla Indian Community was waived only if it is clear from the unambiguous language of 28 U.S.C. § 1360(a) and its legislative history that Congress intended such a waiver. As previously noted, the legislative history does not specifically mention any waiver of tribal sovereign immunity. The only reference in the legislative history which is at all relevant echoes the "general application to private persons or private property" language of the statute. . . .

<u>Id.</u> at 166.

§ 1360(a) cannot be construed as conferring state court jurisdiction to adjudicate Stratman's decertification claim. Stratman's claim is not a "private dispute," and his decertification action is not "private civil litigation." It is an action against the Secretary

28

of Interior under the APA, challenging his decision to recognize Leisnoi as an eligible Native Village under ANCSA. ANCSA was enacted by Congress to settle all aboriginal land claims by Alaska Natives and Alaska Native groups. 43 U.S.C. § 1601. As such, it represents a fundamental exercise of the federal government's plenary power to regulate Indian affairs, and is in the nature of an Indian treaty between the federal government and Alaskan Natives. Whether or not Leisnoi is qualified for official recognition as a ANCSA Native Village, and whether it is therefore entitled to participate in the Government's settlement of Native land claims, is a dispute that goes to the core of the federal government's Indian policy embodied in ANCSA. The plain language of § 1360(a) and its legislative history demonstrates that Congress did not intend to confer jurisdiction to the state courts to adjudicate such challenges.[14]

> 3. The state court lacks jurisdiction to quiet title to real property in which the United States claims an interest

The trial court also lacked jurisdiction over Leisnoi's action because state courts

---

[14] It is immaterial that Leisnoi's action was brought under state law. It still seeks to adjudicate Stratman's decertification claim. In State of Alaska, Dept. of Public Works v. Agli, 472 F.Supp. 70 (D.Alaska 1979), the district court held that the Alaska state courts did not have subject matter jurisdiction over a state ejectment and quiet title action against a Native who had filed a Native allotment application for the property. The court held that it was irrelevant that the action was brought under state law as a quiet title action, and that the court should "look beyond" the state causes of action and determine the "real nature" of the action to determine whether it seeks the adjudication of a matter for which the state courts lack subject matter jurisdiction. See also Heffle v. State, 633 P.2d 264, 269 (Alaska 1981) (the state court did not have subject matter jurisdiction over an action to enjoin the obstruction of a state highway where "the determination of rights to an easement over a Native allotment is the center of the controversy."). Id. at 269.

do not have jurisdiction over actions to quiet title to property in which the federal government claims an interest.

The federal Quiet Title Act ("QTA") (28 U.S.C. § 2409a) vests exclusive jurisdiction in the district courts over actions "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a provides, in part:

> **§ 2409a. Real property quiet title actions**
> (a) The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . .

Id. 28 U.S.C. § 1346, in turn, vests the district courts with exclusive jurisdiction to hear QTA actions:

> (f) The district courts shall have exclusive original jurisdiction of civil actions under section 2409a [28 USCS § 2409a] to quiet title to an estate or interest in real property in which an interest is claimed by the United States.

Id.

The QTA constitutes a waiver of the United States' sovereign immunity to be sued with respect to suits challenging the government's title to real property. Block v. N.D. ex rel Bd. of University & Sch. Lands, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819 (1983). However, this waiver extends only to federal courts. State courts do not have jurisdiction to decide quiet title actions against the United States. McClellan v. Kimball, 623 F.2d 83, 86 (9th Cir. 1980).

The QTA is the "exclusive means by which adverse claimants could challenge the

United States' title to real property." Block, supra, 461 U.S. at 287, 103 S.Ct. at 1819. It applies to any interest claimed by the United States in real property, not merely a fee interest, and encompasses actions that may not have been properly brought as an action to quiet title at common law. 16 Moore, Federal Practice, (3d ed. 1997) § 105.27[3] at 105-52.

Leisnoi's action is subject to the requirements of the QTA because it seeks to terminate the United States' interest in Termination Point. The United States still has an interest in the Termination Point lands for purposes of determining Stratman's decertification action because its title to Termination Point will be restored if Stratman prevails.[15] Leisnoi's action seeks to terminate this interest by adjudicating and quieting title against Stratman's claim.

Leisnoi's action is subject to the exclusive requirements of the QTA even though it was brought as a state quiet title action. The QTA is the "exclusive means by which adverse claimants could challenge the United States' title to real property." Block, supra, 461 U.S. at 287, 103 S.Ct. at 1819. Actions challenging the government's title to real property cannot circumvent the requirements of the QTA. Id., 461 U.S. at 285-86, 103

---

[15] Because the Government still held title to Termination Point at the time Stratman's decertification action was brought, and because the district court can order its reconveyance to the Government as a remedy under Stratman's claim for relief, the United States must still be regarded as holding title to Termination Point for purposes of Stratman's decertification action. Characterized another way, the United States must be regarded as holding equitable title to Termination Point for purposes of determining Stratman's claim. Either way, the United States still has some interest in Termination Point for purposes of determining Stratman's claim.

31

S.Ct. at 1818-19.[16]

That Leisnoi's action failed to join the United States as a defendant is a separate ground for dismissing the action, discussed below.

### 4. The United States is an indispensable party over which the state court lacks jurisdiction

Leisnoi's action should have also been dismissed based on the absence of the United States, which was an indispensable party over which the court lacked jurisdiction.

The United States is an indispensable party to Leisnoi's action for two reasons: 1) because Leisnoi's action seeks to terminate the United States' interest in Termination Point; and 2) because Leisnoi's action seeks to adjudicate Stratman's APA challenge against the Secretary of Interior.

As discussed above, joinder of the United States was required because it still has

---

[16] See also McClellan v. Kimball, 623 F.2d 83, 86 (9th Cir. 1980) (state court did not have jurisdiction over a state cause of action for ejectment where the action "was in reality a quiet title action against the United States," and therefore subject to the exclusive requirements of the QTA); Lee v. United States, 629 F.Supp. 721, 726 (D.Alaska 1985), aff'd 809 F.2d 1406 (9th Cir. 1987) ("Parties cannot circumvent the QTA's jurisdictional and procedural limitations by 'artfully pleading' such actions under other statutory provisions or legal theories . . .".) (claims against the United States to secure patents to disputed homestead entries were subject to the requirements of the QTA regardless of whether the claims were classified as administrative appeals, mandamus actions, or suits in equity); McIntyre v. United States, 568 F.Supp. 1, 2-3 (D.Alaska 1983), aff'd, 789 F.2d 1408 (9th Cir. 1986) (action by homestead entryman to obtain title to land already patented to Native village corporation was subject to requirements of the QTA because the relief sought included a favorable adjudication of title to real property in which the United States claimed an interest, in that the requested relief necessarily required a vacation of the Secretary's conveyance of the land to the Native village corporation and a subsequent conveyance by the government to the plaintiff).