Michael J. Schneider
Law Offices of Michael J. Schneider, P.C.
880 "N" Street, Suite 202
Anchorage, AK 99501
(907) 277-9306 - phone
(907) 274-8201 - fax

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| OMAR STRATMAN, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| LEISNOI, INC., KONIAG, INC., and DIRK KEMPTHORNE, Secretary of the Interior, | ) | |
| Defendants, | ) | |
| _____ | ) | |
| KONIAG, INC., | ) | |
| Counter-claimant, | ) | Case No.: 3:02-cv-0290 (JKS) |
| v. | ) | |
| OMAR STRATMAN, | ) | |
| Counter-claimed Defendant. | ) | |
| _____ | ) | |

**STRATMAN'S COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AT DOCKET NOS. 120, 143, & 149 (ANILCA SECTION 1427 LEGISLATIVELY RATIFIED LEISNOI'S STATUS AND MOOTED STRATMAN'S ACTION)**

i

**TABLE OF CONTENTS/LIST OF EXHIBITS**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    ANILCA Section 1427 cannot be construed as exempting Leisnoi from
ANCSA's village eligibility requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The background, legislative history, and section-by-section analysis of
ANILCA Section 1427 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    The principles and canons of statutory construction regarding implied
repeals govern the determination of this issue . . . . . . . . . . . . . . . . . . . . 8

    C.    The applicable principles and canons of statutory construction
regarding implied repeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    The provisions in ANILCA Section 1427 are not in "irreconcilable
conflict" with ANCSA's village eligibility and enforcement provisions . . 19

    E.    The language and provisions of ANILCA Section 1427 do not
evidence a "clear and manifest" congressional intent to repeal
ANCSA's village eligibility provisions as to Leisnoi . . . . . . . . . . . . . . . . 30

    F.    The legislative history of ANILCA Section 1427 does not evidence a
"clear and manifest" congressional intent to repeal ANCSA's village
eligibility provisions as to Leisnoi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        1.    The "legislative history" produced by Koniag . . . . . . . . . . . . . . . 36

        2.    The "legislative history" relied on by the Secretary . . . . . . . . . . . 40

    G.    The Secretary's analysis and construction of ANILCA Section 1427
was flawed and erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III.    The Secretary's interpretation of Section 1427 is not entitled any deference under
*Chevron* or *Skidmore* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *52*

    A.    The issue of whether Section 1427 ratified or impliedly repealed
ANCSA's village eligibility requirements as to Leisnoi is not
"ambiguous" for purposes of *Chevron* deference . . . . . . . . . . . . . . . . . 52

    B.    The Secretary's interpretation of Section 1427 is not entitled to
Chevron deference on the ground that Congress did not implicitly

delegate the authority to the Secretary to decide this issue  . . . . . . . . .  60

C.    Other grounds for denying *Chevron* deference . . . . . . . . . . . . . . . . . . . .  64

D.    The Secretary's interpretation is not entitled to *Skidmore* deference  . .  66

E.    Even if the Secretary's interpretation is entitled to Chevron
deference, it must be rejected because it is not a permissible
construction of the statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  67

IV.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

### List of Exhibits

Exhibit 1:    Portion of brief filed by Leisnoi in the remanded agency proceedings,
entitled "Respondent, Leisnoi, Inc.'s Opening Brief," addressing the issue
of ANILCA Section 1427

Exhibit 2:    Portion of brief filed by Koniag in the remanded agency proceedings,
entitled "Brief of Koniag, Inc.," addressing ANILCA Section 1427

Exhibit 3:    Brief filed by Regional Solicitor in the remanded agency proceedings,
entitled "Opening Post-Hearing Brief," joining in Leisnoi's and Koniag's
briefing

Exhibit 4:    Portion of brief filed by Stratman in the remanded agency proceedings,
entitled "Omar Stratman's Consolidated Responsive Brief," addressing
ANILCA Section 1427

Exhibit 5:    Portion of brief filed by Leisnoi in the remanded agency proceedings,
entitled "Leisnoi, Inc.'s Reply Brief," addressing ANILCA Section 1427

Exhibit 6:    Portion of brief filed by Koniag in the remanded agency proceedings,
entitled "Reply Brief of Koniag, Inc.," addressing ANILCA Section 1427

Exhibit 7:    Brief filed by Regional Solicitor in the remanded agency proceedings,
entitled "Reply Brief," joining in Leisnoi's and Koniag's briefing

Exhibit 8:    Portion of brief filed by Leisnoi in the remanded agency proceedings,
entitled "Leisnoi, Inc.'s Objections to Recommended Decision of the
Administrative Law Judge Harvey Sweitzer," addressing ANILCA Section
1427

Exhibit 9:     Portion of brief filed by Koniag in the remanded agency proceedings, entitled  "Koniag's Objections to ALJ Recommended Decision," addressing ANILCA Section 1427

Exhibit 10:     <u>Amendments to Alaska Native Claims Settlement Act: Hearing Before the Comm. On Interior and Insular Affairs U.S. Senate</u>, 94th Cong., pp. 227-241, 390-394 (1975)

## I.    Introduction

All three defendants move to dismiss Stratman's action on the ground that Congress legislatively ratified Leisnoi's status as an eligible ANCSA Native Village in ANILCA Section 1427.  Leisnoi's motion to dismiss and supporting memorandum appear at Docket Nos. 120 and 121; Koniag's motion to dismiss and supporting memorandum appear at Docket Nos. 143 and 145; the Federal Defendant's brief appears at Docket No. 149.

This issue was originally raised by the defendants in Stratman's original action in Stratman I (A76-0132 CV (JAV)), and was remanded to IBLA for its "initial determination", along with the re-determination of Leisnoi's eligibility, pursuant to the Court's order of remand of September 13, 1995.[1]  Stratman I, Docket No. 292.

This issue was fully briefed by the parties in the remanded agency proceedings, in the context of separate motions to dismiss that were filed by the defendants.[2]  Leisnoi's motion was briefed in "Respondent, Leisnoi, Inc.'s Opening Brief," dated December 7, 1998, at pages 379-381 of its brief.  Exhibit 1.  Koniag's motion was briefed in "Brief of Koniag, Inc., Intervenor," dated December 7, 1998, at pages 73-91 of

---

[1] Prior to the remand of this issue to IBLA, this issue was briefed by the parties in Stratman I pursuant to separate motions to dismiss filed by the defendants.  Leisnoi's motion was filed in Stratman I at Docket No. 245; Koniag's motion was filed at Docket No. 250; the Federal Defendant's motion was filed at Docket No. 249.  Stratman's combined opposition to the defendants' motions to dismiss was filed at Docket No. 260.

[2] The administrative record recently filed by the Government in this action is incomplete, and failed to include the parties' briefing on this matter.  For this reason, Stratman is attaching the relevant portions of the parties' briefs as exhibits hereto.

its brief.  Exhibit 2.[3]  The Office of the Regional Solicitor, which represented the BIA in

the administrative proceedings, filed an "Opening Post-Hearing Brief," dated December

7, 1998, in which it joined the analysis and contentions raised in Leisnoi's and Koniag's

briefs.  Exhibit 3.  Stratman briefed this issue in response to the defendants' motions, in

"Omar Stratman's Consolidated Responsive Brief," dated February 8, 1999, at pages

10-77.  Exhibit 4.[4]  This issue was further briefed by Leisnoi, in "Leisnoi, Inc.'s Reply

Brief," dated March 26, 1999, at pages 6-38.  Exhibit 5.  It was also further briefed by

Koniag, in "Reply Brief of Koniag, Inc.," dated March 26, 1999, at pages 19-55.  Exhibit

6.[5]  The Regional Solicitor's Office also filed an additional "Reply Brief," dated March 26,

1999, in which it joined Leisnoi's and Koniag's positions on this issue.  Exhibit 7.

Leisnoi and Koniag submitted additional briefing on this issue, in their "objections" to the

ALJ's Recommended Decision.  Leisnoi briefed this issue in "Leisnoi, Inc.'s Objections

to Recommended Decision of the Administrative Law Judge Harvey Sweitzer," dated

January 31, 2000, at pages 3-17.  Exhibit 8.  Koniag briefed this issue in "Koniag's

Objections to ALJ Recommended Decision," dated January 31, 2000, at pages 56-76.

Exhibit 9.

On October 29, 2002, IBLA issued its decision.  AR Tab D, 157 IBLA 302.  IBLA

rejected the defendants' various contentions, and found that ANILCA Section 1427 did

---

[3] Koniag's briefing on this issue also included exhibits, which cannot currently be located.

[4] Stratman's briefing on this issue included 3 attachments, labeled Appendix B, C, and D, which are appended to the portion of his brief attached as Exhibit 4.

[5] Koniag's briefing on this issue also included an exhibit, labeled Exhibit A, which is appended to the portion of its brief attached hereto as Exhibit 6.

not constitute a congressional ratification of Leisnoi's eligibility as an ANCSA Native

village.  IBLA noted that, at the time Congress passed ANILCA, Leisnoi's status as an

eligible Native village had already been established by a final decision by the Secretary

and that Stratman's lawsuit had already been dismissed, although the dismissal was still

on appeal to the Circuit Court.  157 IBLA at 314.  IBLA reasoned that, because the

Secretary's final decision that Leisnoi satisfied ANCSA's requirements for status as a

Native village was in effect at the time Congress passed ANILCA, and was not the

subject of an immediate judicial challenge, Congress' listing and inclusion of Leisnoi and

ANILCA Section 1427(a)(4) "was merely reflective of that status."  Id.  IBLA concluded

that Leisnoi's inclusion in Section 1427 could not be construed as having ratified its

status as an eligible Native village because "[t]here was no unauthorized act to ratify,"

and under the Secretary's final decision, Leisnoi was already "qualified to participate in

ANCSA entitlements."  Id.  IBLA stated that its conclusion that Congress did not intend

to moot any lawsuit regarding Leisnoi's eligibility was reinforced  "by the fact that in the

same section Congress expressly provided for the resolution of disputes concerning the

status of seven unlisted villages by declaring each to be 'deemed an eligible village

under the Alaska Native Claims Settlement Act.'  It could have done the same for

Leisnoi, but it did not."  Id.

Following the issuance of IBLA's decision, Leisnoi requested, by letter to the

Secretary of Interior, that the Secretary reconsider and reverse IBLA's decision.  AR

Tab F.  Leisnoi's letter repeated its contention that ANILCA Section 1427 legislatively

ratified its status.  Id.  The Office of the Regional Solicitor also submitted a request to

the Secretary of Interior that the Secretary reconsider and reverse IBLA's decision, and

joined in the arguments presented by Leisnoi that ANILCA Section 1427 ratified its

status as an eligible Native village.  AR Tab H, at pp. 5-6.

On December 20, 2006, the Secretary of Interior, in a single-sentence decision,

adopted the analysis and conclusions presented in an attached memorandum prepared

by the Office of the Solicitor, authored by Deputy Solicitor Lawrence J. Jensen.  AR Tab

A.  In his memorandum, the Deputy Solicitor rejected IBLA's analysis, and concluded

that Leisnoi's status was legislatively ratified by ANILCA Section 1427.  The Deputy

Solicitor concluded that, in view of Section 1427's legislative scheme for the resolution

of all Koniag region land claims, it was "reasonable to conclude that Congress intended

to resolve all of the uncertainties and did not intend to leave the parties at risk of having

their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's

eligibility."  Id. at p. 7.

In reaching his conclusion, the Deputy Solicitor relied on the rules of statutory

construction that a statute is to be read as a whole, and that remedial legislation should

be construed broadly to effectuate its purposes.  Id. at pp. 10-11.   The Deputy Solicitor

concluded that, when read as a whole, "it is clear that section 1427 was intended to

settle with finality and 'as soon as practicable' the land entitlements of Koniag Regional

Corporation and its villages," and that "[c]ertainty about the status of Leisnoi was a

necessary predicate to achieving that finality." Id. at p. 10.  He reasoned that, without

such certainty, the full entitlements of the various parties would be incapable of

calculation, or would be subject to future correction in the event Stratman were to

prevail in his challenge.  Id.  The Deputy Solicitor also reasoned that, because

Congress intended Section 1427 to provide "a permanent solution" to the Koniag-region

-4-

land entitlements, "it is necessary to read section 1427 as settling Leisnoi's status as an ANCSA village." Id. at p. 11. In view of these purposes, the Deputy Solicitor concluded that "[r]eading section 1427 as a whole, and in the absence of any clear evidence to the contrary, I conclude that the language in subsections (b)(1) and (a)(2) is best read as ratifying the Secretary's eligibility determination with respect to Leisnoi." Id.

The Deputy Solicitor also relied on the legislative history regarding ANILCA Section 1427, and concluded that the examination of that history "reveals that Congress, when considering section 1427, was aware that questions had been raised about the eligibility of Leisnoi." Id. at p. 11. The Deputy Solicitor based his conclusion on testimony presented by the Sierra Club and the Alaska Conservation Society before the Senate Committee on Interior and Insular Affairs, and concluded that "[b]ecause Congress was specifically aware of concerns about Leisnoi's eligibility, and had been cautioned that settlement of the Koniag issues prior to a resolution of those concerns would be premature, it is reasonable to conclude that, in choosing to proceed with the settlement, Congress intended to moot the concerns about Leisnoi's eligibility." Id. at pp. 11-12.

The Secretary's decision is subject to review under the APA, and must be set aside if it is not in accordance with law. 5 U.S.C. § 706(2)(A). Questions of statutory interpretation are reviewed de novo. Perez-Gonzalez v. Ashcroft, 379 F.3d 783, 786 (9th Cir. 2004). However, an agency's interpretation of a statute it is charged with administering may be entitled to deference, under Chevron or Skidmore, if it satisfies the requirements for being accorded such deference.

Under Chevron, "a court must first analyze the law applying normal principles of

statutory construction, and then defer to the agency if, after performing that analysis, it concludes that the statute is ambiguous or uncertain." Castro-Cortez v. INS, 239 F.3d 1037 (9th Cir. 2001), citing Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778.  As discussed below, an examination of the provisions and legislative history of ANILCA Section 1427 demonstrates that there is only one possible construction with regard to this issue. Under the applicable canons of statutory construction, Section 1427 must be construed as not having "ratified" Leisnoi's status as an eligible Native village, and as not having exempted Leisnoi from ANCSA's village eligibility requirements and enforcement provisions.  As such, there is no ambiguity that would require deference to the Secretary's decision.

II.    **ANILCA Section 1427 cannot be construed as "ratifying" Leisnoi's status as an eligible ANCSA Native Village, or as exempting it from ANCSA's village eligibility requirements**

As noted above, the issue of whether ANILCA Section 1427 ratified Leisnoi's status, and mooted Stratman's APA challenge, was fully briefed by the parties in the remanded agency proceedings.  For the most part, the memoranda filed in support of the defendants' motions to dismiss in this action repeat the same arguments, and rely on the same supporting materials, as did their briefing in the administrative proceedings. To the extent that Stratman has already briefed and responded to the defendants' specific arguments and supporting materials, he will refer to and incorporate the relevant portions of his administrative briefing and supporting exhibits, where indicated in this memorandum.

A.    The background, legislative history, and section-by-section analysis of ANILCA Section 1427

The text, legislative history, and section-by-section analysis of ANILCA Section 1427 was fully set out, in a lengthy analysis, in Stratman's administrative briefing on this issue. See Stratman's Consolidated Responsive Brief, Ex. 4, pp. 13-42.  For purposes of brevity, Stratman hereby references and incorporates this analysis, as though set forth in full.[6]

As set forth in the above-referenced analysis, the primary purpose of Section 1427 was to amend ANCSA's land selection and entitlement provisions, to provide for the exchange of the Koniag villages' land selection and entitlement rights to lands that had been withdrawn on the Alaska Peninsula under ANCSA's original land selection and entitlement provisions, for other specified lands on Afognak Island.

A second purpose of Section 1427 was to settle the village eligibility litigation that had been brought against the Secretary of Interior by the seven uncertified Koniag-region villages, by according them limited eligibility status in return for their release of any further claims against the United States for additional benefits under ANCSA.[7]  To

---

[6] Stratman's administrative brief also references and attaches: 1) a copy of the full text of ANILCA Section 1427 and other relevant provisions in ANILCA (Appendix B); 2)  the legislative history regarding ANILCA Section 1427, as reported by the Senate Energy and Natural Resources Committee in Senate Report No. 96-413, reprinted in 5 United States Code Congressional and Administrative News, 96th Congress– Second Session 1980 (Appendix C); and 3) a statement prepared by Ed Weinberg, then counsel for Koniag and the Koniag-area village corporations, and accompanying attachments, presented to the House Committee on Interior and Insular Affairs during its public hearings on H.R. 39 in February 1979 (Appendix D).

[7] These villages included Bells Flats, Anton Larsen, Litnik, Uganik, Uyak, Ayakulik, and Port Williams.  After having been initially determined to be eligible by the BIA Area Director, these villages were ultimately found to be ineligible by the Secretary

effectuate this settlement, Section 1427(e)(1) provides that each of the seven

uncertified villages listed in subsection (e)(2) "shall be deemed an eligible village under

the Alaska Native Claims Settlement Act," provided that they each file, with the

Secretary, a release releasing the United States "from all claims of the village and the

Village Corporations to lands and interest therein arising under the Alaska Native

Claims Settlement Act or compensation in any form therefor (except as provided in

paragraph (3) of this subsection)."  Id.

B.    The principles and canons of statutory construction regarding implied
       repeal govern the determination of this issue

The defendants argue in their current motions, as they did in their administrative

_____

in separate agency proceedings.  These villages subsequently filed suit challenging the
Secretary's decision.  See Koniag, Inc. v. Kleppe, 405 F.Supp. 1360 (D.D.C.1975), aff'd
in part and rev'd in part, 580 F.2d 601 (D.C.Cir. 1978), cert denied, 439 U.S. 1052, 99
S.Ct. 733, 58 L.Ed.2d 712 (1978).
        These villages were also the subject of a Congressional investigation, conducted
in 1974 by the House Subcommittee on Fisheries and Wildlife Conservation and the
Environment of the House Committee on Merchant Marine and Fisheries.  See Koniag
v. Kleppe, supra at 1371-72.  The Committee was extremely critical of the Department
of Interior's investigation and procedures for determining the eligibility of these villages.
Committee Chairman John Dingell questioned the villages' qualifications for ANCSA
status, and stated that a final determination of their eligibility would be contrary to
congressional intent.  Id.  The Court in Kleppe noted that the Chairman made a
"strenuous effort . . . to encourage protest and appeals" of the BIA Director's initial
determinations of the villages' eligibility in additional agency proceedings.  Id. at 1371.
Ironically, it was the Chairman's perceived intervention in the agency appeals of the BIA
Area Director's determinations of these villages' eligibility that led the Court of Appeals
in Koniag v. Kleppe, 580 F.2d 601 (D.C.Cir. 1978) to order the vacation of the
Secretary's subsequent determinations of their ineligibility.  Id. at 610-11.  The Court
remanded their cases back to the Secretary for a redetermination of their eligibility.  Id.
at 610-11.  It was at this point that Congress interceded, and enacted a special
provision in ANILCA to settle these villages' claims of eligibility by granting limited
ANCSA status in return for their acceptance of less land than they would have
otherwise been entitled under ANCSA, provided they filed a release of all claims. See
ANILCA § 1427(e)(1).

briefs and in their original motions to dismiss filed in <u>Stratman I</u>, that ANILCA Section 1427 legislatively "ratified" or "confirmed" Leisnoi's status as an eligible Native village under ANCSA.  As discussed below, the real issue, properly framed, is whether Section 1427 impliedly repealed ANCSA's village eligibility requirements and enforcement provisions as to Leisnoi.

The defendants argue that Congress had the power to legislatively "ratify" Leisnoi's status as an eligible Native Village, and to "moot" Stratman's APA challenge to Leisnoi's eligibility.  The defendants cite three sources of such power: 1) Congress' power to "ratify" the unauthorized acts of government officials;[8]  2) Congress' power to dispose of public lands by legislative enactment;[9] and  3) Congress' power to moot a pending controversy by enacting new legislation.[10]

The defendants confuse the sources of Congress' powers with the standards for determining whether Congress exercised those powers.

Koniag and the Federal Defendant cite several cases for the proposition that Congress has the authority to "ratify unauthorized acts of government officials if those acts could have been authorized when taken."[11]  Stratman does not dispute that Congress has this power.  However, this power is not relevant to the issue presented in

---

[8] Koniag's memorandum at Docket No.145, pp. 4-5; the Federal Defendant's memorandum at Docket No. 149, p. 16.

[9] Koniag's memorandum at Docket No. 145, pp. 6-7; Leisnoi's memorandum at Docket No. 121, p. 12

[10] Koniag's memorandum at Docket No. 145, pp. 7-8.

[11] Koniag's memorandum at Docket No.145, pp. 4-5; the Federal Defendant's memorandum at Docket No. 149, p. 16.

this case.  The cases cited by the defendants relate to Congressional ratification of "unauthorized" acts of government officials.  There is no unauthorized act involved in this case.  There is no suggestion that the Secretary did not have the authority to certify Leisnoi as an eligible Native village.  ANCSA Section 11(b)(3) expressly conferred this power to the Secretary.  Stratman's challenge to the Secretary's determination of Leisnoi's eligibility is not based on the contention that Secretary's decision was unauthorized, it is based on the contention that the Secretary's decision was *erroneous*, in that Leisnoi was not, in fact, qualified as an eligible Native village under the criteria provided in ANCSA Section 11(b)(3).  The issue here is not whether Section 1427 "ratified" any unauthorized act by the Secretary in certifying Leisnoi as an eligible Native village.  Rather, it is whether Section 1427 exempted Leisnoi from the village eligibility requirements provided in ANCSA Section 11(b)(3), irrespective of the Secretary's determination, and irrespective of whether Leisnoi satisfied the eligibility requirements.  The issue, properly framed, is whether Section 1427 repealed Section 11(b)(3)'s village eligibility provisions with regard to Leisnoi.

The defendants also cite several cases for the proposition that Congress has the power, under the property clause of the Constitution, to dispose of public lands as it sees fit.[12]  Stratman does not dispute that Congress has this power.  But this only begs the question of whether Congress exercised that power, when it enacted Section 1427, to exempt Leisnoi from having to satisfy the village eligibility requirements provided in ANCSA Section 11(b)(3) as a condition to its receipt of ANCSA land benefits.  ANCSA

---

[12] Koniag's memorandum at Docket No. 145, pp. 6-7; Leisnoi's memorandum at Docket No. 121, p. 12

-10-

was itself an exercise of Congress' power to dispose of public lands, and the village eligibility requirements provided in Section 11(b)(3) were an express condition imposed by Congress to the entitlement and conveyance of those lands.  See Kidd v. U.S. Dept. of Int., Bureau of Land Manag., 756 F.2d 1410, 1412 (9th Cir. 1985) ("Congress' constitutional power over the proper administration and disposition of the public lands is without limitation.  Once Congress has acted in that regard, both the courts and the executive agencies have no choice but to follow strictly the dictates of such statutes.") (citing United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662 (1947)). The issue here is whether Congress repealed ANCSA's village eligibility requirements as a condition to Leisnoi's receipt of the land entitlements conferred to it under ANCSA and ANILCA Section 1427.

Koniag also cites a line of authority for the proposition that Congress has the power to moot a pending lawsuit by enacting new legislation to modify or repeal the law governing the suit.[13]  Stratman concedes that Congress has this power.  See e.g., Robertson v. Seattle Audubon Soc., 503 U.S. 429, 112 S.Ct. 1407 (1992).  But again, this only begs the question of whether Congress exercised that power to moot Stratman's lawsuit when it enacted Section 1427.  In Stop H-3 Association v. Dole, 870 F.2d 1419 (9th Cir. 1989), the case relied on by Koniag, the Court held that Congress had legitimately mooted a lawsuit challenging the construction of an interstate highway, by enacting new legislation that specifically exempted the construction project from the requirements of the environmental statute that was the basis for the plaintiffs' challenge.

---

[13] Koniag's memorandum at Docket No. 145, pp. 7-8.

There was no question, in Stop H-3, whether the new legislation had modified or

repealed the prior statutory provisions with regard to the highway project.  The new

legislation had expressly modified the prior statute to exempt the specific project from its

requirements.  The issue here is whether Section 1427 modified or repealed Section

11(b)(3) as to exempt Leisnoi from having to satisfy its requirements.  As noted by the

Court in Friends of the Earth v. Weinberger, 562 F.Supp. 265 (D.D.C. 1983), whether

Congress exercised its power to moot a lawsuit by enacting new legislation must be

determined according to recognized standards of statutory construction.  Where the

new legislation does not expressly modify or repeal the prior statutory requirements,

determination of the issue turns on whether the new legislation *impliedly* modified or

repealed the provisions of the prior statute:

> Through the passage of legislation which governs the lawsuit, Congress
> can effectively moot a controversy notwithstanding its pendency before
> the courts. . . .
>
> Although courts are reluctant to find repeal by implication based on
> congressional appropriations action, "when Congress desires to suspend
> or repeal a statute in force, '[t]here can be no doubt that . . . it could
> accomplish its purpose by an amendment to an appropriation bill, or
> otherwise.'"  Balancing these competing concerns requires inquiry into
> congressional intent to determine whether the two statutory provisions at
> issue are contradictory.
>
> To be sure, Congress can and does exempt projects from NEPA.  Yet
> NEPA's "deliberate command" that federal agencies comply with the Act's
> requirements, Flint Ridge, 426 U.S. at 787, 96 S.Ct. at 2437, assures that
> courts will not regard congressional action as exemptive without strong
> supporting evidence.  As the Court of Appeals for this Circuit has stated:
>
>> Given Congress' clearly expressed desire to ensure that all
>> government actions are taken in accordance with NEPA, and its
>> ability to expressly override the requirements of the Act . . . even
>> when substantive legislation is involved, repeal by implication
>> should be found only in the rarest of circumstances.  Absent very

> strong evidence in the legislative history demonstrating a
> congressional desire to repeal NEPA, or a direct contradiction
> between that Act and the new legislation, claims under NEPA
> should be reviewed.

Id. at 270, 271-72 (citations omitted).

Regardless of the source of congressional power, and regardless of the label of the theory used, a finding that Congress mooted Stratman's APA action by enacting ANILCA Section 1427 necessarily requires a finding that ANILCA Section 1427 impliedly repealed ANCSA's village eligibility requirements and enforcement provisions as to Leisnoi.  The defendants use the theory of "ratification" to argue that Congress mooted Stratman's lawsuit by enacting Section 1427. However, as noted above, the theory of "ratification" actually relates to Congressional ratification of "unauthorized" acts of government officials, and does not really apply here. What the defendants are really arguing is that Congress "ratified" Leisnoi's status in the sense that Congress *exempted* Leisnoi from ANCSA's village eligibility requirements.  As such, the defendants' theory is actually predicated on the theory of implied repeal.  The basis of the defendants' theory is that, by enacting Section 1427, Congress "ratified" or "confirmed" Leisnoi's status *for the purpose of exempting it* from ANCSA's village eligibility requirements, thereby mooting Stratman's APA challenge.  *Exempting* Leisnoi from ANCSA's village eligibility requirements is the same thing as *repealing* ANCSA's village eligibility requirements as to Leisnoi.  Consequently, in order for the defendants to prevail on their theory and proffered construction of ANILCA Section 1427, it must be determined that ANILCA Section 1427 impliedly repealed ANCSA's village eligibility requirements and enforcement provisions as to Leisnoi, as determined under the applicable canons of

-13-

statutory construction regarding implied repeals.

This is supported by the Ninth Circuit's decision in <u>Lujan-Armendiaz v. INS</u>, 222 F.3d 728 (9th Cir. 2000), which held that a new amendment to the immigration statutes defining the term "conviction" for purposes of the immigration laws did not impliedly repeal the provisions of the Federal First Offender Act, which provides for the exemption of certain convictions for first-time offenders under the immigration laws.    In reaching its decision, the Court rejected the contention that this issue could be resolved without deciding whether the prior statute had been impliedly repealed, based on the agency's interpretation of the new amendment, which did not rely on the theory of implied repeal. The Court held that the issue was governed by the principles and canons of statutory construction regarding implied repeals, because the agency's interpretation necessarily required a finding that the provisions of the prior statute had been impliedly repealed, because these provisions would be otherwise applicable and enforceable in the claimant's case.

> The INS argues that we should resolve this case without deciding whether the First Offender Act has been repealed.  In support of this argument, it contends that the BIA did not actually decide that the Act was repealed, but only determined that state expungement laws that are counterparts to the Act are no longer to be given effect for immigration purposes. . . .
>
> In any event, even if we were incorrect, and the BIA did in fact decide that expungements under state law are no longer to be given effect without deciding whether the provisions of the Federal First Offender Act were partially repealed by implication, it would still be necessary to decide whether the Act was repealed before the BIA decision could be upheld. Our decisions in <u>Garberding</u> and <u>Paredes</u> establish that aliens may not be treated differently based on the "mere fortuity" that they happen to have been prosecuted under state rather than federal law, or under different state laws, as there is no rational basis for distinguishing among the affected groups. <u>Paredes</u>, 36 F.3d at 811-12; <u>Garberding</u>, 30 F.3d at 1191.  Here, both petitioners could have been prosecuted under the

-14-

Federal First Offender Act and their offenses have already been expunged under state law.  Thus, if the Act has not been repealed, they cannot be deported for those offenses. Id. See also Section VI, infra.

Id. at 748.

This is also supported by the Supreme Court's decision in U.S. v. United Continental Tuna Corp., 425 U.S. 164, 96 S.Ct. 1319 (1976), which held that, because the statutory interpretation adopted by the Ninth Circuit amounted to an "effective repeal" of a prior statute, it was governed by the principles and canons of statutory construction regarding implied repeals:

The Public Vessels Act was not amended in 1960, and, as the Court of Appeals recognized, the 1960 amendment to the Suits in Admiralty Act contains no language expressly permitting claims previously governed by the Public Vessels Act to be brought under the Suits in Admiralty Act, free from the restrictive provisions of the Public Vessels Act. What amounts to the effective repeal of those provisions is urged as a matter of implication. It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored.  See, e. g., Regional Rail Reorganization Act Cases, 419 U.S. 102, 133 (1974); Amell v. United States, 384 U.S. 158, 165-166 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 357 (1963); United States v. Borden Co., 308 U.S. 188, 198-199 (1939).  The principle carries special weight when we are urged to find that a specific statute has been repealed by a more general one. See, e. g., Morton v. Mancari, 417 U.S. 535, 550-551 (1974); Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961); Rodgers v. United States, 185 U.S. 83, 87-89 (1902).

To be sure, the principle of these cases is not precisely applicable in this case — for here the argument is not that the Public Vessels Act can no longer have application to a particular set of facts, but simply that its terms can be evaded at will by asserting jurisdiction under another statute. We should, however, be as hesitant to infer that Congress intended to authorize evasion of a statute at will as we are to infer that Congress intended to narrow the scope of a statute.  Both types of "repeal" — effective and actual — involve the compromise or abandonment of previously articulated policies, and we would normally expect some expression by Congress that such results are intended.  Indeed, the expectation that there would be some expression of an intent to "repeal" is particularly strong in a case like this one, in which the "repeal" would

-15-

extend to virtually every case to which the statute had application.

The ultimate question in this case is whether Congress intended, by the deletion of the "employed as a merchant vessel" proviso from the Suits in Admiralty Act, to authorize the wholesale evasion of the restrictions specifically imposed by the Public Vessels Act on suits for damages caused by public vessels. An examination of the history of the Suits in Admiralty Act, the Public Vessels Act, and, in particular, the 1960 amendment to the Suits in Admiralty Act, indicates quite clearly that Congress had no such intent.

425 U.S. at 168-169, 96 S.Ct. at 1322-23.

Here, the interpretation of ANILCA Section 1427 proffered by the defendants, and adopted by the Secretary as discussed further below, necessarily requires a determination that ANILCA Section 1427 impliedly repealed ANCSA's village eligibility provisions as to Leisnoi, because these provisions would otherwise be applicable and enforceable in Stratman's APA action– and Section 1427 would not otherwise "moot" Stratman's action.  See Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994) ("As a general rule, if a challenged law is repealed or expires, the case becomes moot.").  Whatever theory or label is used by the defendants (or the Secretary) as support for their proffered construction of Section 1427, because it amounts to the "effective repeal" of ANCSA's village eligibility provisions as to Leisnoi, it must be analyzed and determined under the principles and canons of statutory construction regarding implied repeals.[14]

---

[14] This distinguishes this case from the cases involving "ratification" cited by the defendants, which did not involve a claim, and did not require a determination, that the congressional "ratification" of the unauthorized act also constituted and effectuated an implied repeal of a prior statute.

-16-

C.     The applicable principles and canons of statutory construction regarding
        implied repeals

Section 1427 does not contain any language expressly modifying or repealing the

provisions of ANCSA Section 11(b)(3) as to Leisnoi.  Although the provisions in

subsection (e) did modify and/or repeal the provisions of Section 11(b)(3)– it did so only

with regard the seven uncertified Koniag villages listed in subsection (e)(2).  Subsection

(e) expressly exempted these villages from the eligibility requirements provided in

Section 11(b)(3) by providing that they "shall be deemed an eligible village under the

Alaska Native Claims Settlement Act," provided they filed a release of all further claims

under ANCSA.  Section 1427 contains no similar provision with regard to Leisnoi.

The issue, therefore, is whether Section 1427 *impliedly* modified or repealed the

provisions of Section 11(b)(3) with regard to Leisnoi.

The determination of this issue is governed by several well-established canons of

statutory construction.  These include: 1) that repeals by implication are not favored,

and that the proponent of a request for a determination of repeal by implication "bears a

heavy burden of persuasion;" 2)  that when two statutes are capable of co-existence, it

is the duty of the courts to regard each as effective, absent a clearly expressed

congressional intention to the contrary; 3) that a congressional intent to repeal must be

"clear and manifest;" 4) that in the absence of a clear and manifest intent to repeal, the

provisions of both statutes must be given effect unless they are in "irreconcilable

conflict" in the sense that there is a "positive repugnancy" between them.[15]

_____

[15] The relevant Supreme Court cases in which these principles were adopted and
applied were discussed in Stratman's administrative brief, which is incorporated by
reference.  See Exhibit 4, Stratman's Consolidated Responsive Brief, pp. 47-53.

-17-

The application of these principles and canons of statutory construction in determining whether a new statute impliedly repealed a prior statute was summarized by the Ninth Circuit in <u>Lujan-Armendiaz v. INS</u>, 222 F.3d 728 (9th Cir. 2000). The Court held that a new amendment to the immigration statutes defining the term "conviction" did not impliedly repeal the provisions of the Federal First Offender Act, which provides for the exemption of certain convictions for first-time offenders under the immigration laws. The Court summarized the applicable canons of construction and test for determining implied repeals as follows:

> Straightforward principles of statutory construction require that we reject the INS's argument that the enactment of the statutory definition of the term "conviction" serves to partially repeal the Federal First Offender Act. The text of the new immigration law does not on its face repeal the Act. Indeed, the new law does not mention the Act. Thus, if there is a repeal, partial or whole, it must be by implication. In general, repeals by implication are "heavily disfavored," and may be found only where two statutes are in irreconcilable conflict or where one statute entirely displaces another. <u>NLRB v. Kolkka</u>, 170 F.3d 937, 941 (9th Cir. 1999). In either case, the repeal must be "clear and manifest." The Supreme Court has set forth the applicable rule as follows:
>
> > It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored. [citing cases] There are, however, two well-settled categories of repeals by implication (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest.
>
> <u>Radzanower v. Touche Ross & Co.</u>, 426 U.S. 148, 154 (1976) (internal quotations omitted); <u>see</u> <u>also</u> <u>In re Glacier Bay</u>, 944 F.2d 577, 581 (9th Cir. 1991).

<u>Id.</u> at 743.

As discussed below, the provisions of ANILCA Section 1427 and ANCSA's
village eligibility provisions are not in 'irreconcilable conflict."  Nor do the provisions or
legislative history of Section 1427 demonstrate a "clear and manifest" congressional
intent to repeal ANCSA's village eligibility requirements as to Leisnoi.

> D.    The provisions in ANILCA Section 1427 are not in "irreconcilable conflict"
>        with ANCSA's village eligibility and enforcement provisions

As discussed below, Section 1427 is not in "irreconcilable conflict" with ANCSA's
village eligibility provisions.  In Lujan-Armendiaz v. INS, supra, the Ninth Circuit held
that there was no "irreconcilable conflict" between the two statutes, in that the first
statute could continue to be given effect and applied, as an exception to the later
statute.  In so ruling, the Court summarized relevant Supreme Court and Ninth Circuit
precedent regarding this issue as follows:

> Irreconcilable conflict will not be found merely because two statutes
> compel different results in a particular case.  Radzanower, 426 U.S. at
> 155; United States v. Batchelder, 442 U.S. 114, 122 (1979).  Rather, there
> must be a "repugnancy" between the words or purposes of the two
> statutes.  Donaldson v. United States, 653 F.2d 414, 418 (9th Cir. 1981).
> If the statutes are capable of coexistence, it is the duty of the courts to
> regard each as effective. Id.  Put another way, even when two statutes are
> in some conflict, "[r]epeal is to be regarded as implied only if necessary to
> make the [later enacted law] work, and even then, only to the minimum
> extent necessary." NLRB v. Kolkka, 170 F.3d 937, 941 (9th Cir. 1999)
> (internal quotation omitted).
>
> * * *  There are three reasons we find no such conflict.
>
> First, whatever the purpose of the new definition of "conviction" as it
> affects state convictions in general, the provision need not be read as
> effecting an implied partial repeal of the First Offender Act. The two
> statutes may be construed in a manner that resolves any potential conflict
> by establishing a narrow exception to the later statute for proceedings
> subject to the earlier Act: under such a construction of the new definition,
> a conviction occurs whenever there is a finding or admission of guilt

-19-

coupled with some punishment, except where that finding is directly subject to the First Offender Act or would be subject to it and has been expunged pursuant to a state rehabilitation statute. Both this court and the Supreme Court have found no irreconcilable conflict where, by creating minor exceptions to later-enacted statutes based on earlier ones, both statutes can be preserved. The closest analogy may be found in Donaldson v. United States, 653 F.2d 414 (9th Cir. 1981), where we considered two statutes imposing different duties on the United States Navy in its capacity as the operator of a lake resort. Donaldson broke his neck when he dove into a reservoir operated, partly for recreational purposes, by the Navy. The earlier-enacted statute imposed stringent duties upon resort owners, with which the Navy did not comply. However, the later-enacted statute, which applied to all real property owners, stated that the owner "owes no duty of care to keep the premises safe for . . . any recreational purpose." Id. at 416 n. 1.

We found no conflict, holding that the resort provision "can continue as a minor exception to the general rule set forth in [the later statute] without shredding the protection of landowners that the latter section was intended by the legislature to forge. At most this leaves a small puncture in a broad shield." Id. at 418. The relationship between the statutes before us is analogous to that in Donaldson. Even if the INS's interpretation of the new law were generally correct and the new definition did eliminate the effect of rehabilitative statutes in the immigration context generally, the First Offender Act could continue to function as a "minor exception," covering only one small category of first-time offenses — a minor exception that would not frustrate the broad purposes of the new definition.

Other cases have reached similar results. In Radzanower, the Supreme Court declined to find an implied repeal of an earlier-enacted venue provision for national banks, even though a later-enacted inconsistent venue provision for securities actions applied, by its terms, to a broad class of institutions that included national banks. 426 U.S. at 153. As in Donaldson, the Court found that the earlier provision established a narrow exception to the broad, later-enacted provision, rather than holding that the two statutes were in irreconcilable conflict.

We have also declined to find irreconcilable conflict in a recent case involving a later-enacted immigration statute and an earlier-enacted statute concerning a different area. In NLRB v. Kolkka, 170 F.3d 937 (9th Cir. 1999), we considered an employer's argument that as a result of the passage of the Immigration Reform and Control Act (IRCA), undocumented aliens were no longer protected by the National Labor Relations Act (NLRA). Although the earlier-enacted statute, by its terms, protected the alien workers, the defendant argued that the provision had

-20-

been partially repealed by implication — in the immigration context — because IRCA makes it illegal to employ undocumented workers.  Id. at 940.  We found no irreconcilable conflict, holding instead that both statutes could be preserved.  Specifically, we concluded that an employer could not, in order to enforce IRCA, violate the NLRA and expressly rejected the employer's argument that the later statute effected "an implied [partial] statutory repeal" of the earlier act.  Id. at 941.

These cases alone dictate our conclusion that there is no irreconcilable conflict between the two statutes at issue here, and therefore no basis for finding an implied repeal. We need only construe the later-enacted immigration law as subject to the minor exception required by the provisions of the earlier enacted First Offender Act.  Under the construction that precedent requires us to adopt, the small number of aliens who commit first time simple drug possession offenses that are expunged are not subject to removal on account of those offenses, but all others "convicted" of drug or other offenses covered by the immigration laws, are.  Thus, we follow the mandate of Supreme Court and Ninth Circuit precedents in rejecting the suggestion of repeal by implication where the earlier statute can be preserved by reading a minor exception into the later statute.

Id. at 744-45.

        In accordance with Supreme Court and Ninth Circuit precedent, Section 1427

and ANCSA's village eligibility provisions cannot be regarded as being in "irreconcilable

conflict," because ANCSA's village eligibility provisions can be "preserved" by "reading a

minor exception" into ANILCA Section 1427.  In this case, the "exception" read into

ANILCA Section 1427 would be that Section 1427's land exchange and entitlement

provisions with regard to Leisnoi remain subject to the Secretary's final determination of

Leisnoi's eligibility, in accordance with ANCSA's village eligibility and enforcement

provisions.

        However, there is no need to "read" such an exception into ANILCA Section

1427, because, as discussed below, the provisions of ANILCA Section 1427 already

provide this exception.  As such, there is no apparent conflict between ANILCA Section

-21-

1427 and ANCSA's village eligibility provisions, let alone an "irreconcilable conflict," and thus need to resort to the rules of statutory construction by reading an "implied exception" into ANILCA Section 1427.

Leisnoi and Koniag argue that the inclusion of Leisnoi in the definition of "Koniag Deficiency Village Corporation" and "Koniag 12(b) Village Corporation" in subsections (a)(4) and (a)(5) demonstrates that Congress intended to ratify Leisnoi's status as a certified Native village, i.e., that Congress intended to exempt or repeal the village eligibility requirements as to Leisnoi.  However, these provisions merely "identified" Leisnoi as one of the villages subject to the Section 1427's land exchange provisions.

The purpose of Section 1427's land exchange provisions was to exchange the land selection and entitlement rights of the Koniag village and regional corporations to the lands on the Alaska Peninsula, to which they were entitled under ANCSA's original land selection and entitlement provisions, for lands on Afognak Island, which were unavailable for selection and conveyance under ANCSA's original provisions.  The exchange served two purposes.  First, it allowed the Koniag-region corporations to obtain lands that were in closer proximity to the region's villages, and which had higher economic value to the villages.  Second, it allowed for the relinquishment and inclusion of the lands on the Alaska Peninsula in the Alaska Peninsula National Wildlife Refuge. Conveyance of the exchanged lands on Afognak Island was also restricted to preserve the right of public access and government management.  The exchange thus furthered ANILCA's purpose of the preservation and conservation of public lands.

Section 1427 effectuated this land exchange by amending ANCSA's original land selection and entitlement provisions.  These amended land selection and entitlement

provisions are not in "irreconcilable conflict" with ANCSA's village eligibility requirements provided in Section 11(b)(3), just as ANCSA's original land selection and entitlement provisions were not in irreconcilable conflict with Section 11(b)(3)'s requirements. Effect can be given to both Section 1427 and Section 11(b)(3), just as effect was originally given under ANCSA to both Section 11(b)(3) and the land selection and entitlement provisions that were amended by Section 1427. Consequently, repeal of Section 11(b)(3) is not necessary in order to make Section 1427's amendments to ANCSA's land selection and entitlement provisions work.

ANCSA's original land selection and entitlement provisions were expressly conditioned on the recipient village's satisfaction of the eligibility requirements provided in Section 11(b)(3). Section 14(a) provided for the issuance of a patent for the lands selected by a village, to each "Village Corporation for a Native village listed in section 11 [43 USC § 1610] *which the Secretary finds is qualified for land benefits under this Act* . . .". 43 U.S.C. § 1613(a) (emphasis added). The land withdrawal and selection provisions, which provided for the withdrawal and selection of lands to be subsequently patented to the Native villages, did not approve or determine the eligibility of the villages for which the lands were withdrawn or selected. They merely provided for the withdrawal and selection of lands by villages "identified" in ANCSA. Section 11(a) provided for the withdrawal of lands for selection by a Native village, for "any Native village *identified* pursuant to subsection (b)." 43 U.S.C. § 1610(a)(1)(A) (emphasis added). Subsection 11(b)(1) listed a number of villages which were presumptively entitled to such land benefits. Subsection 11(b)(3) provided for the addition of villages not listed in subsection (b)(1), provided they satisfy the specified eligibility requirements.

-23-

These villages then became "identified pursuant to subsection (b)" for purposes of the land withdrawal provisions in Section 11(a).  Section 12(a) similarly provided for the selection of lands, from the lands withdrawn under Section 11(a), by the Village Corporation "for each Native village *identified* pursuant to section 11 [43 USC § 1610]." 43 U.S.C. § 1611(a) (emphasis added).  Patent of the lands withdrawn and selected by the "identified" villages remained subject to the requirement that the Secretary determine that the "identified" villages were "qualified for land benefits under this Act."

Section 1427 merely amended these land selection and entitlement provisions, by substituting the lands on Afognak Island for the lands withdrawn and selected by the Koniag villages on the Alaska Peninsula under ANCSA's original selection and entitlement provisions.   As such, the amended land selection and entitlement provisions in Section 1427– including the definitions provided in subsections (a)(4) and (a)(5)– merely "identified" Leisnoi and the other Koniag villages as the villages subject to the amended land selection and entitlement provisions, just as Section 11(b) had originally "identified" the villages subject to ANCSA's original land selection and entitlement provisions.  Patent of the Afognak lands, like the patent for the lands originally withdrawn for selection and conveyance to the Koniag-region villages, remained subject to the express condition, provided in Section 14(a), that the villages satisfy the eligibility requirements provided in Section 11(b).

There is therefore no apparent conflict between ANILCA Section 1427's land exchange and entitlement provisions and ANCSA Section 11(b)(3)'s village eligibility requirements, let alone an "irreconcilable conflict."  Effect can be given to both sections, just as ANCSA gave effect to both Section 11(b)(3) and the original land selection and

-24-

entitlement provisions that were amended by Section 1427.  This construction is consistent with the rule of statutory construction that amendments to one section of a statute must be construed along with the statute's original sections as part of an integrated whole, and that full effect should be given to all sections of the statute as if originally enacted in amended form.  See e.g. Markham v. Cabell, 326 U.S. 404, 411, 66 S.Ct. 193, 196 (1945) ("[T]he normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole.  We should give each as full a play as possible."); United States v. La Franca, 282 U.S. 568, 576, 51 S.Ct. 278, 281 (1931) (statutes after amendment are to be construed as if originally enacted in amended form).

In addition, other statutory provisions in ANILCA Section 1427, and ANILCA Section 1412, make clear that there is no "irreconcilable conflict" between ANILCA Section 1427's land selection and entitlement provisions and ANCSA's village eligibility provisions, by expressly providing that ANILCA Section 1427's amended land selection and entitlement provisions remained subject to ANCSA's village eligibility provisions.

Subsection (f) of Section 1427 expressly provides that all conveyances and patents made by reason of Section 1427 shall be subject to the terms and conditions of ANCSA as if they had been originally made or issued under ANCSA:

> (f) All conveyances made by reason of this section shall be subject to the terms and conditions of the Alaska Native Claims Settlement Act as if such conveyances (including patents) had been made or issued pursuant to that Act.

Id.

As noted above, ANCSA Section 14(a) expressly conditions the issuance of a patent to a Village Corporation on the Secretary's determination that the Native village

represented by the corporation is "qualified for land benefits under the Act."  Section

14(a) provides:

> **(a) Native villages listed in section 1610 and qualified for land benefits; patents for surface estate; issuance; acreage.**  Immediately after selection by a Village Corporation for a Native village listed in section 11 [43 USCS § 1610] *which the Secretary finds is qualified for land benefits under the Act*, the Secretary shall issue to the Village Corporation a patent to the surface estate in the number of acres shown in the following table . . . .
>
> The lands patented shall be those selected by the Village Corporation pursuant to subsection 12(a) [43 USCS § 1611(a)].  In addition, the Secretary shall issue to the Village Corporation a patent to the surface estate in the lands selected pursuant to subsection 12(b) [43 USCS § 1611(b)].

43 U.S.C. § 1613(a) (emphasis added).

The "qualifi[cations] for land benefits under the Act" referenced in Section 14(a)

consist of the village eligibility requirements provided in Section 11(b).  Subsection

11(b)(2) establishes  the requirements for eligibility for "land benefits" for listed villages,

while subsection 11(b)(3) provides the requirements for eligibility of "land and benefits"

for unlisted villages.  43 U.S.C. § 1610(b).

Thus, ANILCA Section 1427(f) expressly retained the condition that the Koniag

villages satisfy the village eligibility requirements provided in ANCSA Section 11(b)(3) as

a condition to the conveyance and patent of the lands to be conveyed under ANILCA

Section 1427's amended land selection and entitlement provisions.

In addition, the definitions of "Koniag village" and "Koniag Village Corporation"

provided in subsections (a)(7) and (a)(8) of Section 1427 also demonstrate that the

Koniag-area villages and village corporations remained subject to the village eligibility

requirements provided in Section 11(b), except for the seven uncertified villages listed in

subsection (e)(2).  "Koniag village" is defined in subsection (a)(7) as "a *Native village under the Alaska Native Claims Settlement Act* which is within the Koniag region."  Id. (emphasis added).  "Native village" is defined in ANCSA Section 3(c) as any tribe, band, clan, village, community, or association in Alaska that is listed in sections 11 and 16 of the Act, "or which meets the requirements of this Act, and which the Secretary determines, was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives."  43 U.S.C. § 1602(c).  Section 1427(a)(8) defines "Koniag Village Corporation" as a "corporation formed under section 8 of the Alaska Native Claims Settlement Act to represent the Natives of a Koniag village and any Village Corporation listed in subsection (e)(2) of this section which has filed a release as provided in subsection (e)(1) of this section."  Id.  ANCSA Section 8(a) provides:

> **(a) Organization of Corporation as prerequisite to receipt of patent to lands or benefits under chapter.**  The Native residents of each Native village *entitled to receive lands and benefits under this Act* shall organize as a business for profit or nonprofit corporation under the laws of the State before the Native village may receive patent to lands or benefits under this Act, except as otherwise provided.

43 U.S.C. § 1607(a) (emphasis added).

The definitions of "Koniag village" and "Koniag Village Corporation" provided in Section 1427 thus incorporated the village eligibility requirements provided in ANCSA Section 11(b) with regard to all of the Koniag villages, except for the seven uncertified Koniag villages listed in subsection (e)(2).  These definitions demonstrate that Congress did not intend to repeal the village eligibility requirements as to Leisnoi or any other of

the Koniag-region villages, with the express exception of the seven uncertified villages.

This is reinforced by the definitions provided in the general provisions for ANILCA

in Article I.  Section 102 sets forth the definition of terms used in ANILCA as follows:

> SEC. 102.  As used in this Act (except that in titles IX and XIV the following terms shall have the same meaning as they have in the Alaska Native Claims Settlement Act, and the Alaska Statehood Act) –
> . . .
> (6) The term "Native Corporation" means any Regional Corporation, any Village Corporation, any Urban Corporation, and any Native Group.
>
> (7) The term "Regional Corporation" has the same meaning as such term has under section 3(g) of the Alaska Native Claims Settlement Act.
>
> (8) The terms "Village Corporation" has the same meaning as such term has under section 3(j) of the Alaska Native Claims Settlement Act.
> . . .
> (10) The term "Native Group" has the same meaning as such term has under sections 3(d) and 14(h)(2) of the Alaska Native Claims Settlement Act.
>
> (11) The term "Native land" means any land owned by a Native Corporation or any Native Group and includes land which, as of the date of enactment of this Act, had been selected under the Alaska Native Claims Settlement Act by a Native Corporation or Native Group and had not been conveyed by the Secretary (except to the extent that such selection is determined to be invalid or has been relinquished) and land referred to in section 19(b) of the Alaska Native Claims Settlement Act.
> . . .
> (16) The term "Alaska Native" or "Native" has the same meaning as the term "Native" has in section 3(b) of the Alaska Native Claims Settlement Act.

Id.

These definitions incorporate the definitions provided in ANCSA, including

ANCSA's definition of "Village Corporation."  In addition, the precatory sentence in

Section 102 expressly provides that, for purposes of ANILCA Title XIV, which includes

Section 1427, these terms are to have the same meaning as they have in ANCSA.

-28-

These provisions demonstrate that Congress did not intend the amendments to ANCSA provided in Title XIV and Section 1427 to modify or repeal ANCSA's eligibility requirements for Native villages and village corporations, and that there is no "irreconcilable conflict" between ANCSA's village eligibility requirements and ANILCA Section 1427's amended land selection and entitlement provisions.

Lastly, the provisions in ANILCA Section 1412, also included in Title XIV, also make clear that ANCSA's village eligibility requirements remained fully applicable to the amended land selection and entitlement provisions in ANILCA Section 1427. ANILCA Section 1412 provides:

> SEC. 1412. Except as specifically provided in this Act, (i) the provisions of the Alaska Native Claims Settlement Act are fully applicable to this Act, and (ii) nothing in this Act shall be construed to alter or amend any of such provisions.

Id.

The provisions in ANILCA Section 1412 not only demonstrate that ANCSA's village eligibility provisions continue to apply to the amended land selection and entitlement provisions provided in ANILCA Section 1427, but also expressly provides that "nothing in this Act shall be construed to alter or amend any of such provisions," except as "specifically provided in this Act." Id. This provision expressly codifies the generally-applicable principles and canons of statutory construction regarding implied repeals, in determining whether any of ANCSA's provisions had been modified or repealed by ANILCA Section 1427. However, Section 1412 goes even further than the principles and canons of statutory construction regarding implied repeals, by expressly providing that all of the provisions in ANCSA are to remain valid and fully applicable to

-29-

the new provisions in ANILCA "except as *specifically* provided in this Act."[16]  Id.

(emphasis added).  In this case, the provisions in ANILCA Section 1427 do not

"specifically provide" for the modification or repeal of ANCSA's village eligibility

provisions as to Leisnoi (although Section 1427 did specifically so provide as to the

seven uncertified Koniag villages).  Consequently, in accordance with the express

provisions in ANILCA Section 1412, ANILCA 1427 must be construed as not having

modified or repealed ANCSA's village eligibility provisions as to Leisnoi, as a matter of

statutory mandate.  Because Section 1412's statutory mandate eliminates any apparent

conflict between ANCSA's village eligibility requirements and ANILCA Section 1427's

amended land selection and entitlement provisions, there is also no "irreconcilable

conflict" that would support a finding of implied repeal under the applicable canons of

statutory construction.

> E.    The language and provisions of ANILCA Section 1427 do not
> evidence a "clear and manifest" congressional intent to repeal
> ANCSA's village eligibility provisions as to Leisnoi

As discussed above, in order to find an implied repeal, there must be a "clear and

manifest" congressional intent to repeal the prior statute. As noted by the Ninth Circuit,

this requires a showing that Congress actually formulated the intent to repeal the prior

statute, as a matter of its actual intent, but that it somehow failed to carry out that intent:

In general, implicit repeal is not favored.  Tennessee Valley Authority v. Hill, 437

---

[16] Even if the principles and canons of statutory construction regarding implied repeals did not otherwise apply to the defendants' and the Secretary's construction of ANILCA Section 1427 as exempting Leisnoi from ANCSA's village eligibility requirements, because ANILCA Section 1412 expressly provides that any such modification or repeal of ANCSA's provisions must be "specifically provided," the defendants' preferred construction of ANILCA Section 1427 must satisfy this standard.

U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); Morton v. Mancari, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974).  If repeal is to be inferred, there must be actual Congressional intent to do so, which is "clear and manifest." Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936); see also Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Authority, 667 F.2d 1327, 1334 (11th Cir. 1982) (holding that if "clear evidence of affirmative congressional intent is lacking, we cannot infer that Congress has legislated silently.")

Rembold v. Pacific First Federal Sav. Bank, 798 F.2d 1307, 1310 (9th Cir. 1986).

A finding of implied repeal must be based on a finding that the legislative body actually formulated the intent to repeal the earlier enactment but somehow failed to carry out that intent. Kenai Peninsula Borough v. State of Alaska, 612 F.2d 1210, 1214 (9th Cir. 1980) ("There can be no implied repeal unless the intention of the legislative body to repeal is clear.").  The legislative history here demonstrates no such intent. . . .

Southern California Edison Co. v. Lynch, 307 F.3d 794, 810 (9th Cir. 2002).

These principles were also summarized and explained by this Court, in its

decision in Colonial Ins. Co. of California v. Tumbleson, 889 F.Supp. 1136 (D.Alaska

1995):

At the outset, it is important to identify those areas where my analysis and that of Chief Judge Holland and Judge Sedwick are in accord. . . .  We agree that the legislature, if it desired to do so, could have repealed section (h). We agree that it did not. We also agree that this Court has no license to rewrite legislation in order to achieve goals which we think the legislature should have reached but did not.  A judge has no authority to "repeal" inconvenient legislation, no matter how foolish, wrongheaded, or socially undesirable it may appear to him. The legislature, and it alone, has the power to enact and repeal legislation.  Finally, we agree that in some very rare circumstances a legislature will enact legislation that is so at odds with earlier legislation, so irreconcilable with an earlier statute, that no rational person acting as a competent legislator could have missed the inconsistency and failed to delete the offending earlier statute. In such a case, and in only such a case, where the only possible conclusion is that the legislature did in fact agree to repeal the earlier statute but through ignorance, incompetence, or if we sugar coat with euphemism, an oversight, failed to carry its clear intention into effect by expressly repealing the offending statute, may we find an implied repeal of the offending statute and ignore it in order to reach the true intent of the legislature. As we shall

-31-

see, courts are very hesitant to find repeal by implication because to do so, however euphemistically stated, is to deliver a stunning rebuke to a coordinate branch of government, the branch popularly elected by the people. What greater insult to a plumber than to publicly announce she cannot plumb? What more unwelcome reproach to a carpenter then to say she cannot carpenter? How demeaning to a legislator to imply she cannot effectively legislate? And yet, it is precisely this latter determination that underlies every judicial conclusion that the legislature has repealed a statute by implication.

Id. at 1141-42.

As discussed above, there is nothing in the language or the provisions of ANILCA Section 1427 that evidences an actual and "clear and manifest" intent by Congress to repeal ANCSA's village eligibility provisions as to Leisnoi.  On the contrary, the provisions in ANILCA Section 1427 and Section 1412, as set forth above, indicate that Congress affirmatively intended to not repeal ANCSA's village eligibility requirements as to Leisnoi.

In addition to the provisions discussed above, other provisions in ANILCA Section 1427 also indicate that Congress did not intend to repeal ANCSA's village eligibility requirements as to Leisnoi– including the provisions in subsection (e) under which Congress expressly exempted the seven uncertified Koniag villages from ANCSA's village eligibility requirements.  If Congress had intended to repeal the village eligibility requirements with regard to Leisnoi, it would have expressly so provided, either by including Leisnoi in the provisions in subsection (e) or by including a similar provision expressly exempting Leisnoi from ANCSA's village eligibility requirements.[17]  This is

_____

[17] The fact that Section 1427 expressly exempted the seven uncertified Koniag-region village from ANCSA's village eligibility requirements also negates any inference that Section 1427 impliedly repealed the village eligibility requirements pursuant to the definitions of "Koniag deficiency village corporation" and "Koniag 12(b) Village

underscored by the fact that, in addition to exempting the seven uncertified Koniag-region villages in Section 1427(e), ANILCA also expressly exempted the two other uncertified village corporations that had brought suit against the Secretary in Koniag v. Kleppe, 405 F.Supp. 1360 (D.D.C.1975), aff'd in part and rev'd in part, 580 F.2d 601 (D.C.Cir. 1978).  Section 1432 of ANILCA expressly exempted the Village of Salamatof from ANCSA's village eligibility requirements, pursuant to the terms of a settlement agreement entered into between the Secretary of Interior and the Salamatof Native Association and the Cook Inlet regional corporation.  Section 1432 also resolved the dispute regarding the eligibility of the Village of Alexander Creek, by providing for its certification as a Native Group corporation rather than as a Native Village Corporation. Section 1432, entitled "Cook Inlet Village Settlement," provides, in part:

> SEC. 1432.  The Secretary is directed to:
>
> (a) Terminate the review of the eligibility of Salamatof Native Association, Incorporated and withdraw any determination that said village corporation is not eligible for benefits under section 14(a) of this Act.
>
> (b) Implement the agreement among the Secretary, Cook Inlet Region, Incorporated and Salamatof Native Association, Incorporated, which agreement dated August 17, 1979 had been filed with the Committee on Energy and Natural Resources of the Senate and the Committee on Interior and Insular Affairs in the House of Representatives, the terms of which are hereby authorized.

---

Corporation" under subsection (a).  The definitions provided in subsection (a) were not the mechanism employed by Section 1427 to effectuate the repeal of the village eligibility requirements as to the seven uncertified Koniag village corporations.  These villages were included in the definition of "Koniag 12(b) Village Corporation."  If Congress had intended the definition of "Koniag 12(b) Village Corporation" to repeal ANCSA's village eligibility requirements as to the villages identified in the definition, it would not have included a separate provision to this effect with regard to the seven uncertified villages in subsection (e).

(c) Remove from the Kenai National Moose Range the surface estate of any land, therein to be conveyed to Cook Inlet Region, Incorporated, pursuant to the agreement authorized to be implemented under subparagraph (ii) of this paragraph.

(d) Implement an agreement among Cook Inlet Region, Incorporated, the corporation representing the Village of Alexander Creek, the corporation representing the group of Alexander Creek and the United States, if such agreement is filed with the Committee on Energy and Natural Resources of the Senate and the Committee on Interior and Insular Affairs of the House of Representatives prior to December 18, 1979, the terms of which are hereby authorized, and upon performance of the conditions precedent set forth in said agreement, certify Alexander Creek, Incorporated, as a group corporation, eligible for land and other benefits under the Alaska Native Claims Settlement Act and this Act.

(e) Treat lands conveyed to Alexander Creek as lands conveyed to Village Corporations for the limited purpose of calculating the acreage to be charged against the entitlement of Cook Inlet Region under section 4 of Public Law 94-456. . . .

Id.

These provisions demonstrates that, if Congress had intended to repeal ANCSA's village eligibility requirements with regard to Leisnoi, it would have expressly so provided, either by including Leisnoi in the provisions in subsection (e) or by including a similar provision expressly exempting Leisnoi from ANCSA's village eligibility requirements.

These provisions also demonstrate that Congress did not rely on an "implied repeal" in order to effectuate its intended exemption and repeal of ANCSA's village eligibility requirements as to these other villages. Instead, Congress expressly exempted them from ANCSA's village eligibility requirements. These provisions also demonstrate that Congress did not exempt these villages from ANCSA's eligibility requirements based on a "ratification" of their status as eligible ANCSA Native villages. These villages had never been determined by the Secretary to be eligible ANCSA Native villages, so there was no eligibility determination for Congress to "ratify." Rather, these villages were

accorded ANCSA village status, for the first time by Congress, as part of a

congressionally-approved settlement of their lawsuits against the Secretary, which

sought to overturn the determinations of their ineligibility.  In settlement of their lawsuits,

Congress accorded them limited village eligibility status, in return for their acceptance of

a fraction of the lands and benefits to which they would have otherwise been entitled

under ANCSA, and on they condition that they file releases with the Secretary of Interior

releasing the United States from any further claims for benefits under ANCSA.[18]

F.    The legislative history of ANILCA Section 1427 does not
      evidence a "clear and manifest" congressional intent to repeal
      ANCSA's village eligibility provisions as to Leisnoi

As set forth in the analysis and legislative history regarding Section 1427 provided

in Stratman's administrative brief, there is nothing in the legislative history of Section

1427 that evidences a "clear and manifest" congressional intent to repeal ANCSA"s

village eligibility provisions as to Leisnoi.  See Stratman's Consolidated Responsive

Brief, Ex. 4, pp. 13-42.  The legislative history regarding Section 1427 only evidences its

dual purposes to: 1)  amend ANCSA's land selection and entitlement provisions, to

provide for the exchange of the Koniag villages' land selection and entitlement rights to

_____

[18] The mechanism employed in subsection (e) for effectuating the repeal of the
village eligibility requirements with regard to the seven uncertified Koniag villages was
not self-executing.  Subsection (e) required the seven villages to file a release with the
Secretary of Interior, releasing the United States from any further claims for benefits
under ANCSA, in order to effectuate the exemption from ANCSA's village eligibility
requirements.  In fact, none of the provisions in Section 1427 were self-executing.
Section 1427's land exchange provisions required the Koniag village corporations and
Koniag, Inc. to file resolutions with the Secretary of Interior accepting the land exchange
as being in full satisfaction of their respective entitlements under ANCSA.  The fact that
none of the provisions in Section 1427 were self-executing indicates that the definitions
provided in subsection (a) were not intended to operate as a self-executing repeal of
ANCSA's village eligibility requirements with regard to the villages identified therein.

lands that had been withdrawn on the Alaska Peninsula under ANCSA's original land selection and entitlement provisions, for other specified lands on Afognak Island; and  2) settle the village eligibility litigation that had been brought against the Secretary of Interior by the seven uncertified Koniag-region villages, by according them limited eligibility status in return for their acceptance of reduced ANCSA lands and benefits.

1.    The "legislative history" produced by Koniag

Koniag argues that the "legislative history" of Section 1427 demonstrates that Congress was aware of Stratman's lawsuit against Leisnoi when it enacted Section 1427.  It argues Congress' awareness of Stratman's lawsuit demonstrates that it intended to "ratify" Leisnoi's status as a certified Native village, i.e., that Congress intended to exempt or repeal ANCSA's village eligibility requirements as to Leisnoi. Koniag's memorandum at Docket No. 145, pp. 23-28.  In support of its contention, Koniag relies on the following documents:

> 1) a series of syndicated newspaper columns written by Jack Anderson, which attacked Leisnoi's qualifications as an eligible Native village (Docket No. 145, Ex. 2);

> 2) a letter from Koniag's counsel to Rep. Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, dated February 23, 1979, which explained the basis and procedural history of Stratman's lawsuit against Leisnoi (Docket No. 145, Ex. 3); and

> 3) a newspaper article published in the Anchorage Daily News, dated April 21, 1979, which noted that Senator Henry Jackson, Chairman of the Senate Energy Committee, had requested a report from the Department of Interior regarding the Kodiak land dispute (Docket No. 145, Ex. 4).[19]

---

[19] Koniag raised the same arguments, and relied on the same documents, in its administrative briefing on this issue.  See Ex. 2, pp. 88-91; Ex. 6, pp. 39-45; Ex. 9, pp. 70-72.

Koniag's contention must be rejected for several reasons. First, none of these documents can be regarded as part of the "legislative history"regarding Section 1427. Only documents prepared by Congress, and available to the lawmakers, are considered legislative history. See Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 115 S.Ct. 1061, 1071-72 (1995). Nor are statements made by persons who are not members of Congress, or that are not included in the official Senate or House Reports, regarded as legislative history. See Kelly v. Robinson, 479 U.S. 36, 50 n. 13, 107 S.Ct. 353, 361 n. 13 (1986). None of the documents relied on by Koniag were prepared by members of Congress. Nor is there any indication that they were submitted to, or considered by, Congress during its deliberations on ANILCA. They are not contained in the documents submitted during the public hearings held by the House Committee on Interior and Insular Affairs or the Senate Committee on Energy and Natural Resources. Nor are they contained or referenced in the official Senate and House Reports.

This is obviously the case regarding the newspaper columns written by Jack Anderson, and the newspaper article published by the Anchorage Daily News. There is nothing to indicate that these articles were ever submitted to, or considered by, Congress during its deliberations on ANILCA. Nor can it be presumed that Congress had knowledge of these articles, or their contents, or that Congress otherwise had knowledge of Stratman's lawsuit. A lawsuit is not like a statute, which Congress is presumed to have knowledge when enacting legislation regarding the same subject-matter.

This is also the case with regard to the letter written by Koniag's counsel to Representative Morris Udall. This letter was not submitted to the House or Senate

Committees during their public hearings on ANILCA.  Nor was it included, or referenced, in the official Senate and House Reports.  As is demonstrated by the affidavit attached to Koniag's motion, the copy of this letter was produced by Koniag *from its own files*, and not from any official Congressional reports or legislative history on ANILCA.  Koniag's memorandum at Docket No. 145, Ex. 5.  As such, they merely represent Koniag's *private correspondence* with Rep. Udall.  Because there is no indication that this letter was ever disseminated to other members of Congress, either by Koniag or Rep. Udall, or that it was considered by Congress in its deliberations on ANILCA, it cannot be regarded as part of the legislative history of Section 1427, and cannot be relied on in construing Section 1427 or in ascertaining Congress' knowledge or intent.[20]  Koniag cannot "create" legislative history by introducing its own self-serving correspondence.  See Western Air Lines v. Board of Equalization of South Dakota, 480 U.S. 123, 130 n.*, 107 S.Ct. 1038, 1042 n.* (1987) (the statements of interested onlookers who participated in the legislative process do not constitute legislative history, and are entitled to no weight).

Notwithstanding the foregoing, the letter submitted from Koniag's counsel to Rep.

---

[20] See Montana Wilderness Ass'n v. U.S. Forest Service, 655 F.2d 951, 956 (9th Cir. 1981) (correspondence between a House committee chairman and the Attorney General regarding the meaning of the proposed legislation was entitled to "little weight," particularly where there was "no indication that the House as a whole was aware of the correspondence."); TVA v. Hill, 437 U.S. 153, 190-91, 98 S.Ct. 2279, 2299-30, 57 L.Ed.2d 117 (1978) (In general, off-the-record views of congressmen are not attributed to Congress as a whole); Northwest Forest Resource v. Pilchuck Audubon Soc., 97 F.3d 1161, 1168 (9th Cir. 1996) ("Material not available to the lawmakers is not considered, in the normal course, to be legislative history.") (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 115 S.Ct. 1061, 1071 (1995);  Libby Rod and Gun Club v. Poteat, 594 F.2d 742, 746 & n. 6 (9th Cir. 1979) (isolated remarks in committee hearings or reports could not be regarded as "expressions of the intent or knowledge of Congress" as a whole, where there was no evidence that the remarks were the "product of a considered review of the issue.").

Udall does not evidence an intent to ratify Leisnoi's status or to exempt or repeal ANCSA's village eligibility requirements as to Leisnoi. If anything, it shows just the opposite.

In his letter to Rep. Udall, Koniag's counsel asserted that Stratman's lawsuit against Leisnoi was groundless, that it had already been dismissed by the District Court, and that it was unlikely that the Ninth Circuit was going to reverse the dismissal pursuant to Stratman's appeal, which was described by Koniag's counsel as a "sham and frivolous." Koniag's memorandum at Docket No. 145, Ex. 3. Koniag's counsel also emphasized that Leisnoi had already been determined by the Secretary to be an eligible Native village, and that no order vacating the Secretary's decision had ever been sought or granted by the District Court. If anything, Koniag's letter to Rep. Udall would have indicated that there was no need to repeal ANCSA's village eligibility requirements as to Leisnoi, and that no such repeal was intended by the Koniag amendment. In any event, there is no indication that Rep. Udall took any action on Koniag's letter one way or the other, or that he considered or disseminated the letter to other members of Congress for consideration during their deliberations on ANILCA.[21]

---

[21] In its administrative briefing on this issue, Koniag also relied on another letter from Koniag's counsel to Senator Ted Stevens, dated July 13, 1979, in which Koniag's counsel proposed draft language to the effect that it was not the intent of ANILCA to affect the eligibility status of any Alaska Native corporation. Koniag does not rely on or discuss this letter in its current opposition. As discussed in Stratman's administrative briefing, this letter was written in response to Senator Stevens' request that Koniag "prepare general language to the effect that it is not the intent of S. 9 to effect the eligibility status of any Alaska Native corporation," and actually supports the view that Congress did not intend to exempt Leisnoi from ANCSA's village eligibility requirements. See Stratman's Consolidated Responsive Brief, Ex. 4, pp. 68-70.

Koniag's contention must also be rejected on the ground that its underlying premise is flawed.  Even if Congress had been aware of Stratman's lawsuit when it enacted ANILCA Section 1427, as Koniag seeks to establish through its "legislative history," this would not demonstrate a "clear and manifest" congressional intent to moot Stratman's lawsuit by exempting Leisnoi from ANCSA's village eligibility requirements. Mere knowledge of Stratman's lawsuit does not mean that Congress must have intended to moot it.  Congress could just as well have acted on its knowledge of Stratman's lawsuit by choosing to <u>not</u> exempt Leisnoi from ANCSA's village eligibility and leaving the matter for subsequent determination by the courts.  In effect, Koniag argues that Congress' silence on this matter should be regarded as an intent to repeal.  As noted above, this is contrary to the canons of statutory construction regarding implied repeals. <u>Rembold v. Pacific First Federal Sav. Bank</u>, 798 F.2d 1307, 1310 (9th Cir. 1986)("If clear evidence of affirmative congressional intent is lacking, we cannot infer that Congress has legislated silently.").

   2.   <u>The "legislative history" relied on by the Secretary</u>

In the memorandum prepared by the Deputy Solicitor and adopted by the Secretary, the Deputy Solicitor also relied on the "legislative history" regarding ANILCA Section 1427 as support for his conclusion that Section 1427 legislatively ratified Leisnoi's status and mooted Stratman's challenge. The Deputy Solicitor concluded that the examination of that history "reveals that Congress, when considering section 1427, was aware that questions had been raised about the eligibility of Leisnoi."  AR Tab A, p. 11.

The Deputy Solicitor based his conclusion on testimony presented by the Sierra

Club and the Alaska Conservation Society before the Senate Committee on Interior and Insular Affairs, and concluded that "[b]ecause Congress was specifically aware of concerns about Leisnoi's eligibility, and had been cautioned that settlement of the Koniag issues prior to a resolution of those concerns would be premature, it is reasonable to conclude that, in choosing to proceed with the settlement, Congress intended to moot the concerns about Leisnoi's eligibility." Id., pp. 11-12.

Koniag and the Federal Defendant also seize upon the legislative history cited by the Deputy Solicitor, and argue that it demonstrates that Congress intended to exempt Leisnoi and moot Stratman's lawsuit in enacting ANILCA Section 1427. Koniag's memorandum at Docket No. 145, p. 22; Federal Defendant's memorandum at Docket No. 149, p. 22.

Remarkably, as is evident from the date of the citation, the "legislative history" relied on by the Deputy Solicitor was based on testimony provided at a congressional hearing held in 1975 by a *different* Congress in a *different* session-- and on different *legislation*. See Ex. 10. It is axiomatic that any such "legislative history" does not demonstrate the knowledge or intent of a different Congress in enacting different legislation. There is no evidence that this previous legislative history and public testimony was disseminated to the members of the Congress that subsequently enacted ANILCA Section 1427, or that it was considered in their deliberations.

The Deputy Solicitor, in his memorandum, was very careful in his wording in stating that this legislative history reveals that Congress was aware of "concerns about Leisnoi's eligibility," and "that questions had been raised about the eligibility of Leisnoi." AR Tab A, p. 11. That is because the testimony relied on by the Deputy Solicitor was

given to a congressional committee in 1975-- before Stratman even filed his 1976 APA challenge to the Secretary's determination of Leisnoi's eligibility.

Even if the "legislative history" cited by the Deputy Solicitor were assumed to establish that Congress was aware of general "concerns" and "questions" regarding Leisnoi's eligibility when it enacted ANILCA Section 1427, this does not demonstrate that Congress had a "clear and manifest" intent to exempt Leisnoi or repeal ANCSA's village eligibility provisions.  As discussed above, even if it were assumed that Congress had been aware of Stratman's lawsuit when it enacted ANILCA Section 1427, this does not demonstrate that Congress intended to moot Stratman's lawsuit, by exempting Leisnoi from ANCSA's village eligibility requirements.  Congress could well have decided to act on its knowledge by not exempting Leisnoi and allowing the courts to determine the issue, in accordance with ANCSA's existing enforcement provisions. The Deputy Solicitor's premise, that Congress' general awareness of "concerns" and "questions" about Leisnoi's eligibility demonstrates that it "intended to moot the concerns about Leisnoi's eligibility," is even less plausible than the premise that Congress' mere knowledge of Stratman's lawsuit demonstrates that it intended to moot it.


G.    The Secretary's analysis and construction of ANILCA Section 1427 was flawed and erroneous

As noted above, in its decision on remand, IBLA determined that ANILCA Section 1427 did not constitute a congressional ratification of Leisnoi's eligibility as an ANCSA Native village. AR Tab D, 157 IBLA 302.  IBLA reasoned that, because Leisnoi's status as an eligible Native village had already been established by a final decision by the

Secretary, and was not the subject of an immediate judicial challenge, Congress' listing and inclusion of Leisnoi in ANILCA Section 1427(a)(4) "was merely reflective of that status." 157 IBLA at 314. IBLA also stated that its conclusion that Congress did not intend to moot any lawsuit regarding Leisnoi's eligibility was reinforced "by the fact that in the same section Congress expressly provided for the resolution of disputes concerning the status of seven unlisted villages by declaring each to be 'deemed an eligible village under the Alaska Native Claims Settlement Act.' (citations omitted). It could have done the same for Leisnoi, but it did not." Id.

Following Leisnoi's request to the Secretary of Interior for reconsideration of IBLA's decision, the Secretary issued a one-sentence decision in which he adopted the analysis and conclusions presented in an attached memorandum prepared by the Office of the Solicitor, authored by Deputy Solicitor Lawrence J. Jensen. AR Tab A. In his memorandum, the Deputy Solicitor rejected IBLA's analysis, and concluded that Leisnoi's status was legislatively ratified by ANILCA Section 1427. The Deputy Solicitor concluded that, in view of Section 1427's legislative scheme to resolve all Koniag region land claims, it was "reasonable to conclude that Congress intended to resolve all of the uncertainties and did not intend to leave the parties at risk of having their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's eligibility." Id. at p. 7.

As discussed below, the Deputy Solicitor's conclusion that ANILCA Section 1427 legislatively ratified Leisnoi's status and mooted Stratman's lawsuit is based on a flawed analysis, and must be rejected as contrary to the applicable canons of statutory construction.

The most glaring deficiency in the Deputy Solicitor's analysis, apart from his

reliance on the "legislative history" discussed above, is that he failed to examine and apply the relevant canons of statutory construction regarding implied repeals.  As discussed above, because the Deputy Solicitor's interpretation of Section 1427 amounts to the effective repeal of ANCSA's village eligibility provisions, his interpretation was governed by the principles and canons of statutory construction regarding implied repeals.

Rather than applying these canons of statutory construction, the Deputy Solicitor adopted a construction of Section 1427 that directly contravened them.  Among other things, the Deputy Solicitor erroneously concluded that Congress' silence on this issue could be reasonably inferred as an intent to repeal ANCSA's village eligibility provisions as to Leisnoi.  On page 10 of his memorandum, the Deputy Solicitor concludes that "[r]eading section 1427 as a whole, *and in the absence of any clear evidence to the contrary*, I conclude that the language in subsections (b)(1) and (a)(2) is best read as ratifying the Secretary's eligibility determination with respect to Leisnoi."  Id.  This is the exact reverse of the applicable canons.  As discussed above, under the applicable canons of statutory construction, Congress' silence must be construed as an intent <u>not</u> to repeal a prior statute, in the absence of a "clear and manifest" intent to the contrary.

In reaching his conclusion, the Deputy Solicitor relied on the rules of statutory construction that a statute is to be read as a whole, and that remedial legislation should be construed broadly to effectuate its purposes.  Id. at pp. 10-11.

The Deputy Solicitor's statement that a statute is to be read as a whole is certainly a correct recitation of this rule of statutory construction.  However, the application of this rule of statutory construction does not "trump" the substantive rules and canons of

statutory construction that govern implied repeals.  If, after reading the entire statute as a whole, there is no "irreconcilable conflict" or "clear and manifest" intent to repeal, then the statute must be construed as not repealing the prior statute.

Nor did the Deputy Solicitor read the statute as a "whole".  The Deputy Solicitor's analysis focused solely on the language and provisions in subsections (a) and (b) of ANILCA Section 1427.  Among other things, the Deputy Solicitor's analysis failed to also examine and consider: 1)  the provisions in subsection (f) of Section 1427, which expressly provide that all conveyances and patents made by reason of Section 1427 shall be subject to the terms and conditions of ANCSA as if they had been originally made or issued under ANCSA; 2)  the provisions in ANCSA Section 14(a), which expressly condition the issuance of a patent to a Village Corporation on the Secretary's determination that the Native village is "qualified for land benefits under the Act.;" and  3) the provisions in ANILCA Section 1412, which expressly provides that "nothing in this Act shall be construed to alter or amend any of such provisions," except as "specifically provided in this Act." Id.  The Deputy Solicitor also failed to examine the original land selection and entitlement provisions in ANCSA that were amended by ANILCA Section 1427, and their inter-relationship and provisions with regard to ANCSA's village eligibility and enforcement provisions.

The Deputy Solicitor based his conclusion that Section 1427 ratified Leisnoi's status and mooted Stratman's challenge on his view of the purpose of Section 1427, i.e., to settle the land entitlements of the Koniag-area villages "with finality" and "as soon as practicable":

As is readily apparent from the recitation below, section 1427 constructs an

elaborate scheme for the resolution of the Koniag land claims, not just of Leisnoi, but of a sizable number of other entitles.  In that scheme, in which Leisnoi's eligibility is clearly assumed, certainty about the eligibility of Leisnoi is a necessary predicate to the final and timely settlement of the claims of Leisnoi, the other Koniag villages, Koniag regional corporation and, to a lesser degree, all of the other Native villages and regional corporations entitled to ANCSA benefits.  Viewing the scheme as a whole, it is reasonable to conclude that Congress intended to resolve all of the uncertainties and did not intend to leave the parties at risk of having their entitlements upset by a judicial resolution of Stratman's challenge to Leisnoi's eligibility.

AR Tab A, p. 7.

When read as a whole, it is clear that section 1427i was intended to settle with finality and "as soon as practicable" the land entitlements of Koniag Regional Corporation and its villages and, to a lesser extent, the land entitlements of all of the entities entitled to ANCSA benefits.  Certainty about the status of Leisnoi was a necessary predicate to achieving that finality.  Without such certainty, the full entitlements of all of the parties affected by the settlement would either be incapable of calculation or, if conveyances and other distribution of benefits were made on the assumption that Leisnoi was an eligible village, they would run the risk of having to be amended or corrected at some indeterminate date depending on the outcome of Stratman's challenge.  For example, Leisnoi's status was key to: 1) the amount of subsurface acreage to which Koniag regional corporation was entitled; 2) the sharing of costs and revenues by the Afognak Island joint venture partners; and 3) the 12(b) land entitlements of not just Koniag and its villages but the land entitlements of all eleven of the regional corporations and their villages.

Reading section 1427 as a whole, and in the absence of any clear evidence to the contrary, I conclude that the language in subsections (b)(1) and (a)(2) is best read as ratifying the Secretary's eligibility determination with respect to Leisnoi.

AR Tab A, pp. 10-11.

The Deputy Solicitor erroneously concluded that Congress intended to ratify Leisnoi's status and repeal ANCSA's village eligibility provisions on the ground that it would serve the perceived purpose of Section 1427, as providing for the resolution of the land entitlements of all of the Koniag-region village with "rapidity" and "finality".  The

-46-

Deputy Solicitor failed to consider the competing purposes of ANCSA's village eligibility and enforcement provisions, which sought to ensure that only qualified Native villages would be granted eligibility to participate and receive ANCSA benefits, at the expense of the purposes of rapidity and finality.

One of the primary purposes of ANCSA itself was to settle the Alaska Natives' aboriginal land claims "rapidly, with certainty" and "without litigation."  43 U.S.C. § 1601(b).  However, Congress also took care to ensure that only qualified Native villages would be granted eligibility, and provided for the determination of their eligibility to be made with care and deliberation, even if it resulted in delay and litigation.  As discussed below, Congress did this by requiring the Secretary of Interior to make individual determinations of village eligibilities, after conducting an investigation and making specific findings of fact for each village that sought recognition under ANCSA as an eligible Native Village.  It then authorized actions for judicial review of the Secretary's eligibility determinations, in APA actions brought by persons "aggrieved" by the Secretary's determination, such as Stratman.  In so doing, Congress "struck a balance" in favor of the strict enforcement of ANCSA's village eligibility requirements, including their enforcement in actions such as this one, over the competing interests of providing for the "rapid" and "certain" determination of a village's eligibility, "without litigation."

As noted by the Court in Koniag, Inc. Village of Uyak v. Andrus, 580 F.2d 601 (D.C.Cir. 1978), ANCSA's regulatory scheme regarding village eligibility determinations relied on protests filed by "aggrieved" third parties such as Stratman, and was designed to allow the Secretary to make a more careful and informed determination of a village's eligibility in the more difficult and disputed cases.  In ruling that standing to challenge the

Secretary's village eligibility determinations must be liberally construed in order to

effectuate ANCSA's purpose and enforcement scheme, the Court explained:

> The Court is particularly reluctant to deny standing to those most likely to in
> fact to have a legitimate concern about these lands and to come forward to
> protect the public interest, especially where the effect of finding standing is
> simply to allow adversary proceedings to be held which, if properly
> conducted, could contribute to fair and informed decision making. . . .

> Congress sought to quiet the Native land claims in Alaska justly and
> expeditiously, so that the State's development could proceed. At the same
> time Congress took care to assure that grants of public lands would be
> made only to eligible Native groups by requiring the Secretary to review the
> eligibility of each village. Over two hundred villages were involved.
> Although many findings could be perfunctory because eligibility was clear,
> the eligibility of some villages was in dispute.  It is apparent that the
> Secretary intended the area director of the BIA to settle the easy,
> undisputed cases, but when a party was adversely affected by the area
> director's determination, the Secretary would make his own eligibility
> determination after more elaborate fact-finding in the three-tiered appeal
> process.  A necessary corollary to this scheme is that the term "party
> aggrieved" must be construed generously to achieve the congressional
> objective that determinations be careful as well as quick. We conclude,
> therefore, that grafting strict judicial standing requirements onto these
> regulations would be inconsistent with the Act and the Secretary's plan to
> implement it.

Id. at 605-06 (citation omitted).[22]

---

[22] That the Secretary's regulatory scheme elevated the interests in making a
careful and deliberate determination of a village's eligibility in disputed cases, over the
interests of speed and finality, is further demonstrated by Secretarial Order No. 2965, in
which the Secretary waived the deadline for making village eligibility determinations.
ANCSA Section 11(b) provided that the Secretary was to review and determine the
eligibility of all listed and unlisted villages within two and one-half years from the date of
ANCSA's enactment (December 18, 1971).  43 U.S.C. § 1610(b)(2) & (3).  On June 10,
1974, the Secretary issued an order concluding that ANCSA's deadline was directory
rather than mandatory, and directing the Department to continue with its adjudication of
all pending village eligibility appeals.  The order stated that "it has been decided to
provide an opportunity for a full hearing to all parties in all disputes now or hereafter
pending before the Alaska Native Claims Appeals Board concerning Native Village
eligibility," and that "[t]his decision has been made in order to provide all parties due
process of law and in order to develop a complete record so that the final secretarial

Congress elevated the interests of enforcing ANCSA's village eligibility requirements over the interests of speed and finality, by requiring the Secretary to make individual determinations of eligibility for each village, and by authorizing actions for judicial review of the Secretary's eligibility determinations pursuant to the APA. This is demonstrated by 43 U.S.C. § 1632, which established a two-year statute of limitations for bringing actions for judicial review of the Secretary's determinations under ANCSA. 43 U.S.C. § 1632 provides, in relevant part:

> **Statute of limitations**
> (a) Except for administrative determinations of navigability for purposes of determining ownership of submerged lands under the Submerged Lands Act, a decision of the Secretary under this chapter or the Alaska Native Claims Settlement Act shall not be subject to judicial review unless such action is initiated before a court of competent jurisdiction within two years after the day the Secretary's decision becomes final or December 2, 1980, whichever is later: Provided, That the party seeking such review shall first exhaust any administrative appeal rights.

Id.

Notably, Section 1632 was enacted by Congress in ANILCA Section 902(a), in the same legislation that enacted Section 1427. This demonstrates that Congress did not intend to conclusively resolve all outstanding village determinations with "finality," as was concluded by the Deputy Solicitor. Instead, at the same time that it enacted Section 1427, Congress expressly re-affirmed ANCSA's village eligibility and enforcement provisions, based on judicial challenges to the Secretary eligibility determinations, by

---

determination of Native Village eligibility will be as correct, fair and just as possible." See "Stratman's Motion to Review and Affirm IBLA's Decision on Remand, and To Set Aside the Secretary's Original 1974 Decision Approving Leisnoi's Application for Eligibility as an Unlisted ANCSA Native Village." The order also provided that it superseded any inconsistent provisions in the Department's regulations. Id., Ex. 1 at 2.

expressly authorizing the filing of such actions prior to the expiration of the specified

limitations period.

The mere fact that Section 1427 amended ANCSA's land selection and

entitlement provisions as to Leisnoi and the other Koniag-area villages does mean that

Congress must have intended to conclusively resolve all questions of their eligibility with

finality.  There is no basis for inferring that the Koniag-area villages' ultimate entitlement

to the substituted lands was any more final and any more certain than their entitlement to

the original lands, and any more final and certain than any other Native villages whose

eligibility still remained subject to final determination.

The Deputy Solicitor impermissibly inferred a congressional intent to exempt

Leisnoi and repeal ANCSA's village eligibility provisions, based on the perceived

"purpose" of ANILCA Section 1427 as providing for the resolution of the land

entitlements of all of the Koniag-region village with "rapidity" and "finality".  As noted by

the Supreme Court in Rodriguez v. U.S., 480 U.S. 523, 107 S.Ct. 1391 (1987), it is not

the function of the courts to choose between competing legislative purposes, or to

determine that the purpose of a subsequent enactment will best be served by repealing

the provisions of a prior statute:

>        Since § 3147 does not explicitly divest sentencing judges of their authority
> under § 3651, the Court of Appeals' judgment amounts to the conclusion
> that § 3147 is an implicit partial repeal of § 3651.  It is well settled,
> however, that repeals by implication are not favored, will not be found
> unless an intent to repeal is "'clear and manifest.'" Nothing in the language
> of these two provisions suggests the existence of the "''irreconcilable
> conflict,'''" from which an intent to repeal may be inferred. . . .

Additionally, and most impermissibly, the Court of Appeals relied on its

> understanding of the broad purposes of the CCCA, which included decreasing the frequency with which persons on pretrial release commit crimes and diminishing the sentencing discretion of judges.  But no legislation pursues its purposes at all costs.  Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice– and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.  Where, as here, "the language of a provision . . . is sufficiently clear in its context and is not at odds with the legislative history, . . . '[there is no occasion] to examine the additional considerations of "policy" . . . that may have influenced the lawmakers in their formulation of the statute.'"

480 U.S. at 523-26, 107 S.Ct. at 1392-93 (citations omitted, emphasis in original).

Here, Congress already struck a balance between the competing interests of rapidity and finality in determining a village's eligibility, and the interests in enforcing ANCSA"s village eligibility requirements and ensuring that only qualified villages are determined to be eligible to receive ANCSA lands and benefits.  As embodied in ANCSA's provisions, Congress came down on the side of ensuring that only qualified villages were determined to be eligible to receive ANCSA benefits, and provided for individualized determinations of eligibility by the Secretary, and for actions for judicial review of the Secretary's determinations, in order to enforce ANCSA's eligibility requirements.  There was no basis for the Deputy Solicitor to infer that Congress abandoned this purpose, in favor of the competing purposes of rapidity and certainty, when it enacted Section 1427.

III.    The Secretary's interpretation of Section 1427 is not entitled any deference under *Chevron* or *Skidmore*

      A.    The issue of whether Section 1427 ratified or impliedly repealed ANCSA's village eligibility requirements as to Leisnoi is not "ambiguous" for purposes of *Chevron* deference

As discussed below, the Secretary's interpretation of Section 1427 as ratifying

Leisnoi's 1974 village eligibility determination is not entitled to <u>Chevron</u> deference

because the issue of whether Section 1427 legislatively ratified Leisnoi's status, or

impliedly repealed ANCSA's village eligibility requirements as to Leisnoi, is not

"ambiguous," and can be determined by this court using the traditional tools of statutory

construction, including the applicable presumptions and canons of statutory construction

regarding ratification and/or repeal by implication.

The Ninth Circuit, in an en banc opinion, recently summarized the test for

determining whether an agency's statutory interpretation is entitled to <u>Chevron</u>

deference, or alternatively, to <u>Skidmore</u> deference, as follows:

> There is disagreement among the parties as to what level of deference, if
> any, we should accord the USFWS's decision to permit the Enhancement
> Project. Defendant USFWS maintains that the case is controlled by
> <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837,
> 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and that USFWS decisions
> interpreting the Wilderness Act and Refuge Act must be given broad
> deference.  Plaintiffs, on the other hand, argue that the challenged project
> offends the literal terms of the Wilderness Act by not preserving the
> designated wilderness area and by sanctioning a commercial enterprise
> within it. Responding to the defendant's argument for Chevron deference,
> which was adopted by the district court, Plaintiffs rely on the Supreme
> Court's clarification of <u>Chevron</u> in <u>United States v. Mead Corp.</u>, 533 U.S.
> 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), urging that the USFWS's
> permitting decision is entitled at most to "respect" as set forth in <u>Skidmore
> v. Swift & Co.</u>, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).
>
> In <u>Chevron</u>, the Supreme Court set forth a two-step test for judicial review
> of administrative agency interpretations of federal law. Under the first step:
> "If the intent of Congress is clear, that is the end of the matter; for the court,
> as well as the agency, must give effect to the unambiguously expressed
> intent of Congress."  <u>Chevron</u>, 467 U.S. at 842-43, 104 S.Ct. 2778.
> Congressional intent may be determined by "traditional tools of statutory
> construction," and if a court using these tools ascertains that Congress had
> a clear intent on the question at issue, that intent must be given effect as
> law.  <u>Id.</u> at 843 n. 9, 104 S.Ct. 2778; see <u>Defenders of Wildlife v. Browner</u>,
> 191 F.3d 1159, 1164 (9th Cir. 1999) (stating that questions of
> congressional intent "are still firmly within the province of the courts under

Chevron").  Conversely, at step two of <u>Chevron</u>, when applicable, we recognize that if a statute is silent or ambiguous with respect to the issue at hand, then the reviewing court must defer to the agency so long as "the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. 2778.  In such a case an agency's interpretation of a statute will be permissible, unless "arbitrary, capricious, or manifestly contrary to the statute."  <u>Id.</u> at 844, 104 S.Ct. 2778.

<u>Chevron</u> considered only formal notice-and-comment rule-making and did not state what other types of agency decisions should be given such deference. In <u>Mead</u>, the Supreme Court clarified that "administrative implementation of a particular statutory provision qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226-27, 121 S.Ct. 2164 (emphasis added).  <u>Mead</u> also clarified the weight that a reviewing court should give to administrative decisions not meeting these standards.  Quoting <u>Skidmore</u>, the Court held that the deference to be accorded to such decisions depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." <u>Mead</u>, 533 U.S. at 228, 121 S.Ct. 2164 (quoting <u>Skidmore</u>, 323 U.S. at 140, 65 S.Ct. 161).

With the Supreme Court's precedents in mind, we adopt the following analysis: Under Chevron's first-step test, we ask whether the Enhancement Project offends the plain meaning and manifest congressional intent of the Wilderness Act or the Refuge Act. If so, Congress's intent must be enforced and that is the end of the matter. Conversely, if the statutory terms are ambiguous, then we must give Chevron deference only upon a conclusion that the USFWS's statutory interpretation has the "force of law." Otherwise, we give the USFWS's view respect if persuasive based on the factors recited in <u>Skidmore</u> and endorsed in <u>Mead</u>.

<u>Wilderness Society v. U.S. Fish & Wildlife</u>, 353 F.3d 1051, 1059-60 (9th Cir. 2003) (en banc), *amended on rehearing en banc in part by* 360 F.3d 1374 (9th Cir. 2004).

In this case, the Secretary's interpretation fails under the first step of the <u>Chevron</u>

analysis, in that the issue of whether ANILCA Section 1427 impliedly repealed ANCSA's

village eligibility requirements as to Leisnoi, or "ratified" the Secretary's 1974

determination of Leisnoi's eligibility, is not "ambiguous" within the meaning of the

Chevron doctrine.

A statute is not "ambiguous" for purposes of the Chevron doctrine where its

meaning is clear after applying the traditional rules of statutory construction.  See

National Credit Union Admin. v. First Nat. Bank, 522 U.S. 479, 503, 118 S.Ct. 927, 940

(1998) (where the statute's meaning was clear after applying the established rules of

statutory construction, the agency's interpretation was impermissible under the first step

of Chevron, in that Congress had directly spoken to the precise question at issue); INS v.

Cardoza Fonseca, 480 U.S. 421, 446-448, 107 S.Ct. 1207, 1221 (1987) (the judiciary is

the final authority on issues of statutory construction, and if a court, employing traditional

tools of statutory construction, ascertains that Congress had an intention on the precise

question at issue, that intention is the law and must be given effect); General Dynamics

Land Systems, Inc. v. Cline, 540 U.S. 581, 600, 124 S.Ct. 1236, 1248 (2004) ("Even for

an agency able to claim all the authority possible under Chevron, deference to its

statutory interpretation is called for only when the devices of judicial construction have

been tried and found to yield no clear sense of congressional intent.") (quoting INS v.

Cardoza-Fonseca, 480 U.S. 421, 446-448 (1987)).[23]

_____

[23] See also Socop-Gonzalez v. INS, 272 F.3d 1176, 1187 (9th Cir. 2001) (en banc) (the court may only to defer to agency decisionmaking when congressional intent is unclear after employing the traditional tools of statutory construction.); Padash v. INS, 358 F.3d 1161, 1168 (9th Cir. 2004) (because the Court could ascertain congressional intent by employing the "traditional tools of statutory construction," deference to the agency's interpretation was not required); Ortiz v. Meissner, 179 F.3d 718, 723 (9th Cir. 1999) (the court need not defer to an agency's interpretation if the court can ascertain congressional intent using the traditional tools of statutory construction); Ayala-Chavez v. U.S. INS, 945 F.2d 288, 294 (9th Cir. 1991) ("Questions of law that can be answered with 'traditional tools of statutory construction' are within the special expertise of courts, not agencies, and are therefore answered by the court de novo."); Coalition for Clean Air v. Southern Cal. Edison, 971 F.2d 219, 228 (9th Cir. 1992) (under Chevron, the

Further, a statute that is otherwise ambiguous is not "ambiguous" for purposes of Chevron deference if the ambiguity must be construed as a specified result under the applicable canons of statutory construction.  For example, in INS v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271 (2001), the Supreme Court held that, because a statute that is ambiguous with respect to retroactive application is construed under the Court's precedent to be unambiguously prospective, there is no "ambiguity" for an agency to resolve for purposes of Chevron deference:

> The INS argues that we should extend deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.E.2d 694 (1984), to the BIA's interpretation of IIRIRA as applying to all deportation proceedings initiated after IIRIRA's effective date. We only defer, however, to agency interpretations of statutes that, applying the normal "tools of statutory construction," are ambiguous. Id., at 843, n. 9, 104 S.Ct. 2778; INS v. Cardoza-Fonseca, 480 U.S., at 447-448, 107 S.Ct. 1207.  Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, Landgraf, 511 U.S., at 264, 114 S.Ct. 1483, there is, for Chevron purposes, no ambiguity in such a statute for an agency to resolve.

533 U.S. at 320 n. 45, 121 S.Ct. at 2290 n. 45.

This rule was also recognized and applied by the Ninth Circuit in Castro-Cortez v. INS, 239 F.3d 1037 (9th Cir. 2001), *abrogated on other grounds by* Fernandez-Vargas v. Gonzales, 126 S.Ct. 2422 (2006).  After determining a provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) did not apply retroactively, the

---

courts must first exhaust the "traditional tools of statutory construction" to determine if Congress has spoken to the precise question at issue); Arizona State Bd. v. U.S. Dept. of Educ., 464 F.3d 1003, 1007 (9th Cir. 2006) ("To determine whether Congress has directly spoken to the issue, we 'employ the traditional tools of statutory construction.'") (quoting Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ., 272 F.3d 1155, 1165 (9th Cir.2001), *opinion amended on denial of rehearing*, 289 F.3d 599 (9th Cir. 2002)).

Court held the agency's interpretation was not entitled to <u>Chevron</u> deference because the issue of whether the statute applies retroactively was not "ambiguous" after applying the applicable canons of statutory construction and Supreme Court precedent regarding retroactive application of statutes:

> Furthermore, we conclude that deference would be inappropriate in this case because the proper interpretation of the applicability of § 241(a)(5) is clear.  Under <u>Chevron</u>, a court must first analyze the law applying normal principles of statutory construction, and then defer to the agency if, after performing that analysis, it concludes that the statute is ambiguous or uncertain. <u>Chevron</u>, 467 U.S. at 843 n. 9, 104 S.Ct. 2778; <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); <u>Lujan-Armendariz v. INS</u>, 222 F.3d 728, 749 (9th Cir. 2000).  As explained above, traditional tools of statutory construction demonstrate that § 241(a)(5) does not apply to reentries that occur before April 1, 1997.  Therefore, we have no occasion to apply Chevron's deference rule.

<u>Id.</u> at 1053.  <u>See</u> <u>also</u> <u>Valencia-Alvarez v. Gonzales</u>, 469 F.3d 1319 (9th Cir. 2006) (agency's interpretation regarding statute's retroactivity was not entitled to <u>Chevron</u> deference); <u>Estate of Reynolds v. Martin</u>, 985 F.2d 470 (9th Cir.1993) (same).

This principle of "unambiguous" ambiguity relates to what one treatise has referred to the "substantive" canons of statutory construction, and applies to the determination of certain statutory issues that are subject to special presumptions and canons of construction regarding Congress' presumed intent in such cases.  <u>See generally</u> John Duffy and Michael Herz, <u>A Guide to Judicial and Political Review of Federal Agencies</u>, ABA Publishing (2005), pp. 71-81.  As explained by Duffy and Herz, where a substantive canon of construction requires a clear expression of congressional intent in order to override Congress' presumed intent in such cases, any ambiguity is not "ambiguous" for purposes of <u>Chevron</u> deference if the ambiguity must be resolved under the canons of construction as a particular result:

Generally, courts use substantive canons, including the clear statement rules, at step one to determine the extent to which statutory meaning is clear. The justification for their use by courts is that if they are designed to protect constitutional objectives, they ought to operate to narrow the range of permissible interpretations to those that serve the objectives. Furthermore, if they have become part of the interpretive regime that serves as a background for legislative drafting, they may reflect legislative intent, providing additional justification for their use at step one. If lawmakers know that precise textual language is required, for example, to apply federal mandates to state and local governments and overcome federalism clear statement rules, the absence of such language sends a strong signal about the correct meaning of the text.

Justice Stevens recently clarified why one substantive canon– the presumption against retroactive legislation– should be applied at step one to allow the Court to determine the statutory meaning even if the statutory language is ambiguous.

> We only defer . . . to agency interpretations of statutes that, applying the normal "tools of statutory construction," are ambiguous. Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, there is, for Chevron purposes, no ambiguity in such a statute for an agency to resolve. [INS v. St. Cyr, 533 U.S. 289, 320 n. 45 (2001) (citations omitted).]

In other words, many substantive cannons, including clear statement rules and strong presumptions, establish an unambiguous meaning from the mere fact of ambiguity. If the canon against retroactive legislation requires clear language or specific legislative history to overcome its presumption and no clear congressional indication can be discovered, then the application of the canons leads to a finding that Congress did not intend the law to have retroactive effect.

These cases demonstrate that the use of these canons at step one may increase the number of cases decided by the Court at this stage. The Fourth Circuit used a similar analysis in Holland v. Pardee Coal Co. [269 F.3d 424 (4th Cir. 2001)]. At step one, it used the canon that statutory timing provisions should not be considered jurisdictional absent a clear indication of congressional intent to the contrary to find unambiguous meaning in somewhat unclear language. [See id. at 431-32. The court also considered legislative history in its step one determination. Id. at 435-38.]

Id. at 74-75 (footnotes supplied).

The same rule applies to repeals by implication.  As discussed above, the issue of whether a new statute impliedly repeals the provisions of a prior statute is governed by several specific "substantive" canons of statutory construction, including the rule that, in the absence of a "clear and manifest" indication to the contrary, Congress is presumed to have intended not to repeal the prior statute.  Because any ambiguity as to Congress' intent must be interpreted as an unambiguous intent not to repeal the prior statute, there is no "ambiguity" for purposes of <u>Chevron</u> deference for an agency to resolve.

This was also the Ninth Circuit's holding in <u>Lujan-Armendiaz v. INS</u>, 222 F.3d 728 (9th Cir. 2000).  As discussed above, in <u>Lujan-Armendiaz</u>, the Court held that a new statutory amendment to the immigration laws defining the term "conviction" did not impliedly repeal the provisions of the Federal First Offender Act, which provided for the exemption of certain first-time convictions from any use against the offender under the immigration laws.  In reaching its conclusion, the Court applied the applicable Supreme Courts precedents and canons of statutory construction regarding repeals by implication. <u>Id.</u> at 743.  The Court held that the language and legislative history of the new amendment did not evidence a "clear and manifest" intent by Congress to repeal the provisions of the First Offender Act.  <u>Id.</u> at 745.  The Court also found that there was also no "irreconcilable conflict" between the new amendment and the Federal First Offender Act, in that the provisions of the Federal First Offender Act would simply continue to operate as "a minor exception" to the new amendment.  <u>Id.</u> at 744-45.

In so ruling, the Court rejected the INS's argument that its interpretation of the new amendment should be accorded <u>Chevron</u> deference.  The Court held that the INS's contrary interpretation of the new amendment was not entitled to <u>Chevron</u> deference

because the issue was not "ambiguous" within the meaning of the <u>Chevron</u> doctrine, in

that the canons of statutory construction relating to repeals by implication "dictate a clear

and unequivocal answer," i.e., that the new amendment did not impliedly repeal the First

Offender Act:

> Finally, the INS argues that we should adopt the BIA's construction of the relevant statutes even if we disagree with it, placing great weight on the need for <u>Chevron</u> deference. <u>Chevron v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984). <u>Chevron</u> holds that an agency's interpretation of a statute must be accorded deference where Congress has left a gap for it to fill or where it makes a reasonable interpretation of a provision that is ambiguous or uncertain. <u>Chevron</u>, 467 U.S. at 844; <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415 (1999). <u>Chevron</u> deference is predicated on the assumption that a statute's ambiguity constitutes an "implicit delegation" to the agency to interpret the statute. <u>See</u> <u>Food & Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 120 S.Ct. 1291, 1314 (2000).
>
> Under <u>Chevron</u>, we are first required to analyze the law applying normal principles of statutory construction, and then to defer to the agency if, after performing that analysis, we conclude that the statute is ambiguous or uncertain. 467 U.S. at 843 n. 9; <u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421, 446 (1987); <u>Yang v. INS</u>, 79 F.3d 932, 935 (9th Cir. 1996). In this case, as we have explained, supra, application of the normal principles of statutory construction dictate a clear and unequivocal answer to the issue before us: the Federal First Offender Act was not repealed by implication, in whole or in part. <u>See</u> <u>National Credit Union Admin. v. First Nat'l Bank & Trust Co.</u>, 522 U.S. 479, 501-02 (1998) (finding the statute unambiguous after applying traditional canons of statutory construction). Accordingly, the statute is not ambiguous or uncertain and there is no occasion to apply <u>Chevron's</u> deference rule. <u>See</u> <u>Gorbach v. Reno</u>, 219 F.3d 1087, 1093-94 (9th Cir. 2000) (en banc); <u>Id.</u> at 1099-1100 (Thomas J. concurring).

<u>Id.</u> at 748-49.

Consequently, even if Section 1427 were regarded as otherwise ambiguous with

regard to whether it was intended to repeal ANCSA's village eligibility requirements as to

Leisnoi, because it must be construed under the substantive canons of statutory

construction as <u>not</u> effecting an implied repeal, it is not "ambiguous" for purposes of the

<u>Chevron</u> doctrine, and the Secretary's interpretation is not entitled to any deference.

B.    <u>The Secretary's interpretation of Section 1427 is not entitled to Chevron deference on the ground that Congress did not implicitly delegate the authority to the Secretary to decide this issue</u>.

The Secretary's interpretation of Section 1427 is also not entitled to <u>Chevron</u> deference on the additional but related ground that Congress did not implicitly delegate the authority to the Department of Interior to decide this issue.  The issue of whether ANILCA Section 1427 should be interpreted as repealing ANCSA's village eligibility requirements as to Leisnoi is not the type of issue that Congress is deemed to have implicitly delegated to an agency to decide, and is not the type of "gap" left for the agency to fill.  Congress either intended to exempt or repeal ANCSA's village eligibility requirements as to Leisnoi or it did not, but it did not leave the question open for the Department of Interior to decide, as a "gap" for the Department to fill pursuant to an implicit delegation of legislative authority.

As noted by the Supreme Court in <u>Food and Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 120 S.Ct. 1291 (2000), the <u>Chevron</u> doctrine is premised on the theory that, by leaving an ambiguity or a "gap" for the agency to fill, Congress has implicitly delegated the legislative authority to the agency to interpret the statute and fill in the gaps.  529 U.S. at 159; 120 S.Ct. at 1314.  However, as stated by the Court, in some cases "there may be reason to hesitate before concluding that Congress has intended such an implicit delegation," particularly where the issue involves an important policy decision that Congress usually reserves to itself:

> Finally, our inquiry into whether Congress has directly spoken to the precise question at issue is shaped, at least in some measure, by the nature of the question presented. Deference under <u>Chevron</u> to an agency's

construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps. See Chevron, supra, at 844. In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation. Cf. Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 370 (1986) ("A court may also ask whether the legal question is an important one. Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration").
. . .
Our decision in MCI Telecommunications Corp. v. American Telephone & Telegraph Co., 512 U.S. 218 (1994), is instructive. That case involved the proper construction of the term "modify" in § 203(b) of the Communications Act of 1934. The FCC contended that, because the Act gave it the discretion to "modify any requirement" imposed under the statute, it therefore possessed the authority to render voluntary the otherwise mandatory requirement that long distance carriers file their rates. Id., at 225. We rejected the FCC's construction, finding "not the slightest doubt" that Congress had directly spoken to the question. Id., at 228. In reasoning even more apt here, we concluded that "[i]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion — and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements." Id., at 231.

As in MCI, we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion. . . .

529 U.S. at 159-161, 120 S.Ct. at 1314-15.

Here, as in FDA and MCI, the issue of whether Section 1427 should be interpreted as ratifying or repealing ANCSA's village eligibility requirements as to Leisnoi is not the type of issue that Congress would have implicitly delegated to the Department of Interior to decide, in the exercise of its discretion. As noted by the Supreme Court, it is both "highly unlikely that Congress would leave the determination [of this issue] to agency discretion," and that it would do so "in so cryptic a fashion." Food and Drug Admin., supra.

-61-

The Ninth Circuit reached the same decision in <u>Castro-Cortez v. INS</u>, 239 F.3d 1037 (9th Cir. 2001), *abrogated on other grounds by* <u>Fernandez-Vargas v. Gonzales</u>, 126 S.Ct. 2422 (2006), with regard to the issue of whether a provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) applied retroactively.  As discussed above, the Court held that the agency's interpretation was not entitled to <u>Chevron</u> deference because the issue of whether the statute applied retroactively was not "ambiguous" after applying the applicable canons of statutory construction and Supreme Court precedent regarding retroactive application of statutes. <u>Id.</u> at 1053.  As an alternative holding, the Court also held that the agency's interpretation was not entitled to <u>Chevron</u> deference on the ground that Congress had not delegated the issue of whether the statute should be applied retroactively to the agency to decide:

> Finally, citing <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the government argues that we should defer to its interpretation concerning the applicability of § 241(a)(5) to reentries occurring prior to the statute's effective date. . . .

> In <u>Chevron</u>, the Supreme Court explained that an agency's interpretation of a statute must be accorded deference where Congress has left a gap for it to fill or where it makes a reasonable interpretation of a provision that is ambiguous or uncertain. <u>Chevron</u>, 467 U.S. at 843-44, 104 S.Ct. 2778; <u>INS v. Aguirre-Aguirre</u>, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). <u>Chevron</u> deference is predicated on the assumption that a statute's ambiguity constitutes an "implicit delegation" to the agency to interpret the statute.  <u>Food & Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 120 S.Ct. 1291, 1314, 146 L.Ed.2d 121 (2000).

> In this case, it is inconceivable that Congress intended to delegate to the BIA the decision whether to apply INA § 241(a)(5) to conduct that pre-dates its enactment.  IIRIRA contains extremely detailed transition rules dictating the application of IIRIRA to past, present and future cases. See IIRIRA § 309.  Because Congress assumed for itself the task of determining when and how IIRIRA's various provisions would become applicable, <u>Chevron</u>

> deference is not appropriate. See Gorbach v. Reno, 219 F.3d 1087, 1093
> (2000) (en banc) (declining to apply Chevron deference because the
> statute at issue, taken as a whole, "leaves no room to infer an implicit
> delegation").

Id. at 1052-53 (footnote omitted).

Here, as in Castro-Cortez, it is "inconceivable" that Congress intended to delegate to the Interior Department the decision whether to exempt or repeal ANCSA's village eligibility requirements as to Leisnoi, or any other Native village. This is especially true in view of Section 1427's provisions in which Congress expressly exempted the seven named Koniag villages from ANCSA's village eligibility requirements, in return for their acceptance of a fraction of the lands and benefits to which they would have otherwise been entitled.  Congress "assumed for itself" the task of deciding which, if any, villages should be exempted from ANCSA's village eligibility requirements, and the conditions upon which any such exemptions would be granted.  Here, Congress did not even leave the question of exempting the seven named villages up to the Department of Interior to decide, by means of an implicit delegation of authority.  There is even less reason to believe that it did so with respect to Leisnoi.

Because the Department of Interior had no authority to decide this issue, its interpretation is not entitled to any deference.  As noted by the Ninth Circuit in Northern Plains Resource v. Fid. Explor. and Dev., 325 F.3d 1155 (9th Cir. 2003), where an agency lacks the authority to grant exemptions from the statute's requirements, a statutory interpretation according such an exemption is not entitled to Chevron deference:

> [T]hough the district court reasoned that the EPA approved of section
> 75-5-401(1)(b), the EPA does not have the authority to exempt discharges

otherwise subject to the CWA. Only Congress may amend the CWA to create exemptions from regulation. See Am. Mining Congress v. E.P.A., 965 F.2d 759, 772 (9th Cir. 1992) (citing Natural Res. Def. Council v. Costle, 568 F.2d 1369, 1374 (D.C. Cir. 1977)). The EPA could not have approved of the MDEQ's exemption of CBM water discharges under section 75-5-401(1)(b) even if the EPA wanted to do so.

Judicial deference to agency action is not warranted where the agency had no authority to act. See United States v. Mead, 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Chevron deference applies only when Congress explicitly or implicitly gave the agency authority to fill certain gaps left by Congress). Therefore, the district court erred in giving judicial deference to the EPA's implicit "approval" of Montana's groundwater exemption. Congress did not grant the EPA the authority to create such exemptions.

Id. at 1164 & n. 4 (footnote supplied).

C.     Other grounds for denying Chevron deference

In addition to the foregoing, there are other grounds for denying, or reducing, the amount of deference to which the Secretary's decision would be otherwise entitled.

Among other things, these include the fact that IBLA initially determined that Section 1427 did not legislatively ratify Leisnoi's status, and that the Secretary rejected IBLA's determination.  See See Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 416-17, 113 S.Ct. 2151, 2161 (1993) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 446, n. 30 (1987)).

Another factor detracting from the amount of deference that would otherwise be accorded to the Secretary's decision is the fact that the Secretary wholly adopted the analysis and conclusions provided in the memorandum prepared by the Deputy Solicitor.

-64-

The Supreme Court has held that <u>Chevron</u> deference is not accorded to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice," because "the deliberateness of such positions, if not indeed their authoritativeness, is suspect." <u>Smiley v. Citibank (South Dakota), N.A.</u>, 517 U.S. 735, 741 116 S.Ct. 1730, 1733 (1996). The Supreme Court has also held that "*post hoc* rationalizations by counsel for agency action are entitled to little deference: 'It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress.'" <u>Security Industry Ass'n v. Board of Governors of Federal Reserve System</u>, 468 U.S. 137, 144-45, 104 S.Ct. 2979, 2983 (1984), quoting <u>Investment Company Institute v. Camp</u>, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097 (1971). <u>See also</u> <u>Bowen v. Georgetown University Hosp.</u>, 488 U.S. 204, 213,109 S.Ct. 468, 474 (1988) (declining to accord <u>Chevron</u> deference to the Secretary of Health of Health and Human Services' interpretation of his statutory authority, since deference "to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Here, the Deputy Solicitor's opinion appears to be nothing more than a convenient litigating position, which was then wholly adopted by the Secretary. The Secretary was already a defendant in Stratman's APA action, and the Solicitor's office was already representing the Secretary in the remanded agency proceedings. This, combined with the fact that Solicitor's opinions are generally not themselves entitled to <u>Chevron</u> deference, <u>Wilderness Society v. U.S. Fish & Wildlife</u>, 353 F.3d 1051, 1068 (9th Cir. 2003) (en banc), militates against granting deference to the Secretary's decision.

D.    The Secretary's interpretation is not entitled to *Skidmore* deference

The Secretary's interpretation of ANILCA Section 1427 is also not entitled to

Skidmore deference.  As noted above, Skidmore deference applies where the agency's

interpretation does not carry the force of law.  Wilderness Society v. U.S. Fish & Wildlife,

353 F.3d 1051, 1059-60 (9th Cir. 2003) (en banc), *amended on rehearing en banc in part*

*by* 360 F.3d 1374 (9th Cir. 2004).  However, Skidmore deference applies only in step 2 of

the Chevron analysis, after the determination has been made in step one that the statute

is "ambiguous", and does not apply where there is no "ambiguity" for which agency

deference is required:

> With the Supreme Court's precedents in mind, we adopt the following
> analysis: Under Chevron's first-step test, we ask whether the Enhancement
> Project offends the plain meaning and manifest congressional intent of the
> Wilderness Act or the Refuge Act. If so, Congress's intent must be
> enforced and that is the end of the matter. Conversely, if the statutory
> terms are ambiguous, then we must give Chevron deference only upon a
> conclusion that the USFWS's statutory interpretation has the "force of law."
> Otherwise, we give the USFWS's view respect if persuasive based on the
> factors recited in Skidmore and endorsed in Mead.

Id., 353 F.3d at 1059-60.

For the same reasons that the Secretary's interpretation is not entitled to Chevron

deference under step 1, because the statute is not "ambiguous", it is also not entitled to

Skidmore deference.

Even if Skidmore deference were otherwise applicable to the Secretary's decision,

it would be entitled to very little, if any, deference.  Under Skidmore, the weight accorded

to the agency's interpretation in a particular case depends on "the thoroughness evident

in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power

-66-

to control." <u>Gonzales v. Oregon</u>, 546 U.S. 243, 274, 126 S.Ct. 904, 922 (2006), quoting <u>Skidmore</u>, 323 U.S. at 140.  As discussed above, the analysis and reasoning provided in the Deputy Solicitor's opinion was deeply flawed, and does not reflect the type of thorough and reasoned analysis that would warrant <u>Skidmore</u> deference, especially in view of the fact that his opinion and conclusions appear to be nothing more than a convenient litigating position.

      E.    <u>Even if the Secretary's interpretation is entitled to Chevron deference, it must be rejected because it is not a permissible construction of the statute</u>

Even if the Secretary's interpretation were entitled to <u>Chevron</u> deference, or <u>Skidmore</u> deference, it must nevertheless have to be rejected, as an impermissible and unreasonable construction of ANILCA Section 1427.

As discussed above, the Deputy's Solicitor's analysis and interpretation of Section 1427 was deeply flawed.  Among other things, he failed to apply the proper canons of statutory construction, and violated the applicable canons by inferring a congressional intent to repeal ANCSA's village eligibility requirements from Congress' silence.  As set forth above, the only permissible construction of Section 1427, under the applicable canons of statutory construction, is that it did not impliedly repeal ANCSA's village eligibility requirements as to Leisnoi, and therefore did not moot Stratman's lawsuit.

Because the Secretary's determination is based on an impermissible construction of Section 1427, it must be rejected as contrary to law.  <u>Wilderness Society v. U.S. Fish & Wildlife</u>, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc).

**IV.**    **<u>Conclusion</u>**

For the foregoing reasons, the defendants' motion to dismiss at Docket Nos. 120,

143, & 149 must be denied, and the Secretary's decision must be rejected and set aside as contrary to law.

RESPECTFULLY submitted this 11th day of June, 2007.

s/Michael J. Schneider
s/Eric R. Cossman
Law Offices of Michael J. Schneider, P.C.
880 "N" Street, Suite 202
Anchorage, AK 99501
Phone: (907) 277-9306
Fax: (907) 274-8201
E-mail: mjspc@gci.net
Alaska Bar No. 7510088

**CERTIFICATE OF SERVICE**
I hereby certify that **Stratman's Combined Opposition** was served electronically on the 11th day of June, 2007, on Bruce M. Landon, R. Collin Middleton, and John R. Fitzgerald.
s/Michael J. Schneider