# **EXHIBIT 2**

# **BRIEF OF KONIAG**

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
139 East South Temple, Suite 600
Salt Lake City, Utah 84111
Phone: 801-524-5344

| | |
|---|---|
| OMAR STRATMAN, ) | IBLA 96-152 |
| ) | No. A76-0132 CV (JKS) |
| Protestant ) | |
| v. ) | |
| ) | Challenge to the eligibility of |
| ) | Woody Island as a Native village |
| ) | under Section 11 (b)(3) of the |
| ) | Alaska Native Claims Settlement |
| ) | Act, 43 U.S.C. §1610(b)(3) (1994) |
| LEISNOI, INC., ) | |
| ) | |
| Respondent ) | |
| KONIAG, INC., ) | |
| BUREAU OF INDIAN AFFAIRS, ) | |
| ) | |
| Intervenors ) | |

**BRIEF OF KONIAG, INC.**
Intervenor


R. Collin Middleton
Brennan Cain
MIDDLETON & TIMME, P.C.
421 West First Avenue, Suite 250
Anchorage, Alaska 99501
(907) 276-3390
Fax (907) 276-8238

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................. 2
   1. Certification of Woody Island ................................................................... 3
   2. This Litigation ........................................................................................... 4

III. CERTIFICATION AS A NATIVE VILLAGE ........................................... 11
   1. Roy Madsen ............................................................................................. 11
   2. Relevant Statutes and Regulations .......................................................... 13
   3. ANCAB Village Eligibility Decisions .................................................... 15

     a. ANCAB Decisions Have Liberally Interpreted The Requirement of Twenty Five Native Permanent Residents On April 1, 1970 ................................................................................. 15

     b. ANCAB Decisions Have Liberally Interpreted The Requirement That A Native Village Have An Identifiable Physical Location Evidenced By Occupancy Consistent With The Natives' Own Cultural Patterns and Lifestyle on April 1, 1970 ...... 18

     c. ANCAB Decisions have Liberally Interpreted The Requirement Of 13 Natives Using the Village During 1970 As A Place Where They Actually Lived For a Period of Time ......................... 20

     d. The Board Held That 43 C.F.R. § 2651.2(b) Is Valid ..................... 21

IV. THE TESTIMONY ...................................................................................... 22

   1. Woody Island Was a Village in 1970 ..................................................... 22

     a. Frank Feichtinger ............................................................................. 23

     b. Chris Wooley .................................................................................... 24

     c. Nancy Davis ..................................................................................... 25

   2. There Were Far More Than Twenty-Five Native Residents of Woody Island in 1970 ......................................................................... 27

     a. There is a "Strong Presumption" That the Official Roll's Determination of Residency is Correct. ............................................ 27

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

  b. Research by Frank Feichtinger Demonstrates that Woody Island Had More Than Twenty Five Permanent Residents in 1970 ............................................................... 28

  c. Dr. Davis' Interviews and Kinship Charts Demonstrate That There Were Far More Than Twenty Five Permanent Residents on Woody Island in 1970 ............................ 29

   1. Demographics ............................................................. 31

  d. Testimony of Leisnoi Enrollees Demonstrated That There Were More Than Twenty Five Native Permanent Residents on Woody Island in 1970 ...................................... 31

   1. Closure of School and Lack of Employment Did Not Change These Peoples' Perception That Woody Was Their Native Home ........................................................ 35

3. Leisnoi Had An Identifiable Physical Location on April 1, 1970 ......... 40

  a. Leisnoi Enrollees Demonstrated A Sense of Community on Woody Island in 1970 ................................................ 40

  b. Natives Who Enrolled in Villages Other Than Leisnoi Corroborated The Community of Those Individuals Who Did Enroll to Leisnoi ............................................ 42

  c. The Dwellings Show an Identifiable Physical Location ......... 43

   1. North Village ............................................................ 43

   2. South Village ............................................................ 44

  d. All Three Experts Found the Native Village of Woody Island had an Identifiable Physical Location ...................... 47

4. Far More Than Thirteen Leisnoi Enrollees Lived on Woody Island for a Period of Time in 1970 ............................................ 50

  a. Year Round ..................................................................... 50

  b. Less Than Year Round .................................................... 51

  c. Frequent Visits ................................................................ 53

  d. The Expert Testimony Was That At Least 13 Natives Lived on Woody Island in 1970 ........................................ 59

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

V. PROTESTANT'S WITNESSES ARE UNPERSUASIVE ............... 60
   1. Naughtons ............... 62
   2. Amox ............... 64
   3. Smith ............... 64
   4. Yule Chaffin ............... 65
   5. Other Witnesses ............... 68

VI. UNOCCUPATION RESULTING FROM AN ACT OF GOD OR GOVERNMENTAL AUTHORITY DURING THE PRECEDING DECADE ............... 70
   1. The Law ............... 70
   2. The Testimony ............... 71

VII. CONGRESSIONAL RATIFICATION ............... 73
   1. Introduction ............... 74
   2. Argument ............... 82
      A. Congress Possesses the Plenary Power to Designate Woody Island as an Eligible Village Corporation Under ANCSA Entitled to Receive Benefits Under the Act ............... 82
         1. Congress Has the Authority to Ratify Unauthorized Acts of Government Officials If Those Acts Could Have Been Authorized When Taken ............... 82
         2. Under the Property Clause of the United States Constitution, Congress' Power to Dispose of Public Lands is Unlimited ............... 84
         3. Congress Also Has the Authority to Moot a Pending Controversy by Enacting New Legislation ............... 85
   3. In Section 1427 of ANILCA, Congress Ratified the Secretary's Certification of Woody Island as an Eligible Village ............... 86
      A. The Plain Language of Section 1427 Ratifies Leisnoi as an ANCSA Village Corporation ............... 86

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

    B. The Legislative History of ANILCA Makes it Clear that Congress Recognized That There Was an Ongoing Dispute Over the Eligibility of Woody Island, but Nonetheless Chose to Recognize Leisnoi as a Valid Village Corporation ............. 88

VIII. MOTION TO DISMISS AT CONCLUSION OF PROTESTANT'S CASE ................................................................................ 91

CONCLUSION ................................................................................................ 93

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

had come to rely on FedAir 4 for transportation to Woody Island for seasonal living and subsistence purposes, lost their form of transportation.

The Woody Island School was closed after the 1968-69 term. Consequently, Woody Island Native families with school age children were unable to live on the island subsequent to 1969.

The Vietnam War was an act of governmental authority during the period between 1960 through 1970 which disproportionately impacted Woody Island Natives. Danny Harmon lost his life in Vietnam in 1967. A longtime Woody Island resident, Mr. Harmon was buried on Woody Island in the location where he had planned to build his home. Tr. 1576-77. Freddy Simeonoff was also killed in Vietnam. Mr. Simeonoff died on April 17, 1970. Tr. 3169. The siblings of both Mr. Harmon and Mr. Simeonoff testified to the affinity both men felt for Woody Island. None of Protestant's witnesses attended either funeral. Indeed, few of Protestant's witnesses had even seen Danny Harmon's grave and the white picket fence that prominently stands on the hill by the North Village of Woody Island.

Each of these natural or governmental disasters had their effect upon the Woody Island population. Each caused the full time population to decline and each caused the part time population to spend less and less time in their home. Separately or in concert these qualifying Acts of God or governmental authority decimated the population. Should it be found that fewer than 13 Leisnoi enrollees actually lived on Woody Island for a time, the balance, those who would have lived there for a time did not do so only because of these Acts of God and governmental authority.

## VII. CONGRESSIONAL RATIFICATION

In the District Court, Koniag urged that § 1427 of ANILCA (94 Stat. 2371, 2518 congressionally ratified Leisnoi's eligibility because Congress had

before it the same allegations of fraud but nonetheless chose to allow Leisnoi to trade certain land selections for participation in the Afognak Joint Venture. The allegations of fraud made in 1980 to Congress are precisely those made today by Protestant. The District Court in page 2 of its 1995 remand order, stated that the § 1427 argument "is a difficult question that should be decided in the first instance by the Agency." Koniag urged the Interior Board of Land Appeals to postpone resolution of the legal issue until after the factual hearing took place. *See* IBLA Order of November 21, 1997, at pp. 8, 10 n. 13. Indeed, the factual hearing has now taken place.

It was unclear to Koniag in reviewing the IBLA's November 21, 1997, order whether the administrative law judge should rule on the 1427 issue. Tr. 36-41. In an abundance of caution, Koniag introduced the exhibits accompanying its summary judgment motion pursuant to § 1427 of ANILCA at the 1998 hearing. Tr. 43. Koniag's argument regarding ANILCA § 1427 is as follows.

1. Introduction

The "d-2 Legislation[34] and the Koniag Amendment.

In the Koniag region, as well as several others, the land selection provisions of ANCSA did not mesh well with the existing land use patterns. The Kodiak National Wildlife Refuge occupied a substantial portion of the land on Kodiak Island, and completely surrounded a number of the Native villages. Most of the land outside of the Refuge was selected by the State of Alaska and

---

[34] Section 17(d)(2) of ANCSA required the Secretary to withdraw up to 80 million acres of public land for possible inclusion in the National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems. The legislation to establish various conservation system units out of the land which was withdrawn was commonly referred to as the d-2 legislation. The following discussion does not purport to be a complete or exhaustive account of the d-2 legislation, which, as the Court is aware, was a lengthy, convoluted, and complex process, most of which is not germane to the issues raised in this motion.

74

tentatively approved prior to the enactment of ANCSA. Land in the City of Kodiak was privately owned, and a coast guard base, occupying additional land, is located just outside the City. To the north of Kodiak Island is Afognak Island. All of its approximately 500,000 acres were part of the Chugach National Forest. Statement of Edward Weinberg, Counsel for Koniag, Inc. Alaska National Interest Lands Conservation Act of 1979: Hearings Before the House Committee on Interior and Insular Affairs, 96th Cong., 1st Sess. (1979) at 1214-1222 ("Weinberg testimony"). Koniag Exhibit C.

ANCSA limited the number of acres which a village corporation could select in a wildlife refuge or a national forest to 69,120. 43 U.S.C. § 1611(a)(1). In addition, the subsurface estate underlying village corporation land within a wildlife refuge could not be conveyed to the regional corporation, but remained with the United States. In lieu thereof, the regional corporation was entitled to select an equal amount of acreage from other withdrawn land. *Id.*

As a result of these limitations, the Secretary withdrew, and Koniag and its village corporations were obligated to select, lands on the Alaska Peninsula. Weinberg testimony at 1215. This land was separated from Kodiak Island by the Shelikof Strait which is over 90 miles wide, and is some of the roughest waters in the world. The land was of little value to Koniag and its village corporations. *Id.* at 1215-16. The land comprised, however, some of the finest wildlife habitat in the world, and was desired by the United States for inclusion in conservation system units. *Id.*

A second problem was the uncertain status of seven of the villages in the Koniag region which had applied for certification as eligible Native villages. Unlike Leisnoi, the Secretary of the Interior had determined that these villages were ineligible. *Id.* at 1216-17. The Secretary's decision, however, had

75

been reversed by the Court of Appeals for the District of Columbia, and remanded for further proceedings. *Id. See also Koniag et. al. v. Kleppe*, 405 F. Supp. 1360, 1364 (D.D.C. 1975, *aff'd in part, rev'd in part*, 580 F. 2d 601 (D.C. Cir. 1978).

The uncertain eligibility status of these seven villages delayed the completion of the ANCSA conveyance process.[35] Until such time as all of the eligible village corporations had been certified, it was impossible to know how much land would be conveyed pursuant to section 12(a) of ANCSA. 43 U.S.C. §1611(a). And, until that number was known it would be impossible for the Secretary to determine either the final number of acres which would be allocated to the village corporation pursuant to section 12(b) (43 U.S.C. §1611(b)), or the number of acres to be allocated to the regional corporations pursuant to section 12(c) (43 U.S.C. § 1611(c)). *See also* Weinberg testimony, at 1216.

To resolve these and other concerns, Koniag and its villages proposed a comprehensive settlement amendment to Congress. Pursuant to the amendment, all of the certified village corporations which had land selections on the Alaska Peninsula would relinquish all of those selections, comprising approximately 300,000 acres, and Koniag would relinquish its subsurface rights thereto. Koniag's subsurface rights to its other lands on the Alaska Peninsula would be limited to oil and gas rights only. In exchange, Koniag and the village corporations were entitled to form a joint venture which would receive title to

---

[35] In addition to the Koniag villages, there were several other villages in other regions whose eligibility was in question. *See Koniag et. al. v. Kleppe*, 405 F. Supp. 1360, 1364 (D.D.C. 1975, *aff'd in part, rev'd in part*, 580 F. 2d 601 (D.C. Cir. 1978). To the best of Koniag's knowledge, this case contains a complete list of the villages whose eligibility had been denied by the Secretary. Koniag's understanding is that the eligibility of all of those villages was resolved by the time ANILCA became law, either through negotiations with the Secretary and/or confirming language in ANILCA. *See, e.g.*, ANILCA § 1432, 94 Stat. 2543-44, confirming the eligibility of Salamantof and Alexander Creek in the Cook Inlet Region.

the surface estate to a lesser amount of land on Afognak Island. Koniag would receive the subsurface estate underlying the surface estate. Finally, the seven villages whose eligibility was in question would be deemed to be eligible villages, but would not, with minor exceptions, receive title to any land.[36] Rather, their ANCSA land entitlement would be limited to their proportionate interest in the joint venture. Committee on Energy and Natural Resources, Report on H.R. 39, Alaska National Interest Lands, S. Rep. No. 96-413, 96th Cong., 1st Sess. 1979 at 323-326. Koniag Exhibit B.

Until February 1979, the Koniag amendment was viewed as noncontroversial. It was supported by the Department of the Interior, the State of Alaska, the Alaska Coalition (a coalition of environmental groups) the Kodiak Island Borough, and the Alaska Federation of Natives. *Weinberg testimony*, at 1218. In that month, however, syndicated Washington Post columnist Jack Anderson wrote a series of articles on what he termed the "phantom" Koniag villages.[37] In his third column, Anderson charged that Koniag, through its "subsidiary" Leisnoi tried to pull off a "gigantic public-land swindle in southwest Alaska." *Kadiak Times*, March 1, 1979 ed. Koniag Exhibit E at 5. Anderson charged that Alaska Senator Ted Stevens was proposing to turn over to Leisnoi and the other Koniag village corporations over 115,000 acres of land on Afognak Island, worth millions of dollars.[38] Anderson asserted that there was no such

---

[36] Three of the villages would each receive the one square mile of township land which had been excluded from the Kodiak Island Wildlife Refuge when it was created. *See* Koniag Exhibit 7.

[37] Three of the columns were reprinted in the March 1, 1979 edition of the Kadiak Times, portions of which are Koniag Exhibit E.

[38] All three of the Anderson columns are so fraught with error that it is difficult to see any resemblance between the actual facts and those put forth in his column. The accuracy of the columns, however, is not relevant to this motion; rather, it is their existence, and the effect which they had on subsequent events, which is relevant. Consequently, Koniag will not in this motion refute the allegations made. A comprehensive response to the allegations is contained in a February 23, 1979, letter from Edward Weinberg, counsel for Koniag, to the

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

village as Woody Island, and that federal investigators had labeled the village a "fraud." *Id.*

The Anderson columns unleashed a firestorm of activity and galvanized the Citizens Action Group (CAG), a group of individuals protesting Leisnoi's certification who were the original plaintiffs in this action. The group brought up two "nationally well-known" attorneys to speak to the members, and retained them to assist in their efforts. *Kadiak Time,* March 1, 1979 ed. Exhibit E at 1. A Seattle attorney was hired by the CAG to lobby against the Koniag amendment. *Id.* A New Jersey attorney was retained to work with Roger Henderson, Stratman's lawyer, on the 9th Circuit appeal of the district court's dismissal of the case.

Meanwhile, in Washington, D.C., Representative Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, which had primary jurisdiction over the d-2 legislation in the House of Representatives, requested Koniag to respond to Anderson's allegations. Koniag's counsel, Edward Weinberg, responded with a 20 page letter. Koniag Exhibit H. In response to Mr. Anderson's allegations concerning Leisnoi, Mr. Weinberg responded as follows:

> Now, as respects Leisnoi. Leisnoi *is* a certified village. It went through the administrative process established by the Secretary of the Interior under ANCSA to determine village eligibility. Leisnoi was certified by the Secretary of the Interior after its examination by the BIA which was charged with examining each and every village that claimed eligibility under ANCSA.
>
> The administrative process established by the Secretary afforded anyone wishing to dispute or object to the eligibility of an applicant for village status the opportunity to do so. Wide publicity was given to the pendency of applications for eligibility. The simple fact is that those residents of Kodiak, Alaska, who are referred to in

---

Honorable Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs. A copy of that letter is attached as Koniag Exhibit H. It is also reprinted in the *Kadiak Times.* Koniag Exhibit E at 6-8.

Mr. Anderson's second article, that of February 22, as the "Citizens Action Group" and who are now attempting through Mr. Anderson's "good offices" to deprive Leisnoi of its eligibility, had their opportunity to protest and to obtain an evidentiary, trial-type hearing from the Department of the Interior in the fall of 1973 and the spring of 1974 when Leisnoi's eligibility was considered. They did not avail themselves of that right.

. . . .

[T] regulations of the Department established September 1, 1973 as the deadline for applications for certification by unlisted villages and provided an opportunity for protest and hearing. 43 C.F.R. §§2651.2(a) (6) 9, 10, 38 F. R. 14223 (May 10, 1973). The hearing on Leisnoi, by the way, would have been held, had anyone requested one, in Kodiak, not in far off Washington, D.C. or any other inconvenient place. Nine separate and widely publicized village eligibility hearings were held in Kodiak in 1974. The filing of village eligibility applications was widely publicized in the local Kodiak papers and village eligibility was a widely discussed topic in Kodiak. Anyone in Kodiak and vicinity who would have wanted to object to a village's eligibility application but who was unaware of the opportunity to do so and to obtain a hearing would have had to have been entombed for a year and a half in the proverbial underground salt mine, completely out of touch with the world.

. . . .

    Almost two years after Leisnoi's certification (which had occurred on September 9, 1974), some individuals in Kodiak, who it later developed are apparently the nucleus of the Citizens Action Group, filed a lawsuit against the Secretary of the Interior in the Federal District Court in Anchorage attacking Leisnoi's eligibility. Among the allegations of the complaint were a charge of fraud, but without specifics as required by Rule 9(b) of the Federal Rules of Civil Procedure. (<u>Kodiak-Aleutian Chapter, et. al. v. Kleppe</u>, No. A76-182 Civil). Neither Leisnoi nor Koniag were named as parties to that action. The Federal District Court on December 7, 1976 (423 F. Supp. 544) entered an Order which, as respects the charge of fraud, required the plaintiffs to "put up or shut up" as required by Rule 9(b) of the Rules of Civil Procedure. The plaintiffs chose to shut up. These are the same people who are, with Mr. Anderson, once again screaming fraud.

    An amended complaint was filed shortly after the December 7, 1976 Order, this time <u>devoid</u> of any charge of fraud. . .The complaint alleged that two individuals in Kodiak, Omar Stratman and Toni Burton, claimed to hold grazing leases from the United States, on lands (that had been TA'd to the state prior to passage of ANCSA) which compose a small part of the area on Kodiak Island selected by Leisnoi under ANCSA. . .

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390