> As to Stratman and Burton, the Court permitted the lawsuit to proceed because of a claimed lack of personal knowledge on their part that the Department of the Interior had scheduled an opportunity for protest and hearing on Leisnoi's application. This assertion of lack of knowledge is simply an unproven claim. We dispute it and consider it incredulous in view of the wide publicity given such matters in Kodiak, where both resided, in 1973 and 1974. . . .
>
> In our opinion, Stratman and Burton's claims that their grazing leases were threatened by Leisnoi are not well founded. To begin with, grazing leases are "valid existing rights" under ANCSA, which remain with the holders regardless of Native selection. ANCSA, §14(g). . . .
>
> In sum, the federal grazing leases covering the Leisnoi lands on Kodiak Island remain in effect and are valid, and Leisnoi must and will respect them. Further, if they had a State right to a renewal, (assuming that the State's repeal of its statute was not binding as to them), they have, under the Secretary's Orders above noted, a valid existing right to such a renewal.
>
> The lawsuit based on the amended complaint was dismissed by the Federal District Court in Anchorage on October 16, 1978, as moot (copy of opinion attached), Leisnoi having relinquished the limited acreage covered by the Stratman and Burton grazing leases because it came to the conclusion that the land, burdened in any event by a long term lease, was simply not worth fighting over. The District Court also held that whatever rights Stratman and Burton might have to a state lease were preserved as valid existing rights and finally, the Court noted that Stratman and Burton's complaint appeared to be in violation of Rule 17(a) of the Federal Rules of Civil Procedure, since the grazing leases were held not by Stratman and Burton, but by corporations.
> . . . .
> Stratman and Burton have filed a notice of appeal with the Ninth Circuit Court of Appeals. . . .

Koniag Exhibit H at 2-B (emphasis in original). It is thus apparent that the House Committee on Interior and Insular Affairs was fully and completely apprised of the CAG's claims, the allegations made in this litigation, the status of the litigation at the time of the letter, and Koniag's response to the allegations.

The United States Senate also responded to the Anderson columns. Senate Energy Committee Chairman Henry Jackson requested a report from the Department of the Interior on the Koniag land dispute, and told the General Accounting Office to be ready to "probe the Interior Department report." Anchorage Daily News, April 21, 1979. Jackson also stated that his committee would look into two issues: whether the Koniag villages are legally entitled to land under the Alaska Native Claims Settlement Act (ANCSA), and whether Congress should legislate land exchanges.

The Anchorage Daily News quoted Jackson's letter to Interior Secretary Andrus as stating:

> Like several other ANCSA amendments, the Koniag proposal was accepted by the committee last year without hearings "on the understanding that it was non-controversial."

The article went on to state that Jackson said that he had recently been informed that the Citizens' Action Group in Kodiak opposed the amendment. *Id.* Thus, the Senate, as well as the House of Representatives, became aware of the claims of the CAG and their allegations that Leisnoi should not be a valid ANCSA corporation.

In early July 1979, Senator Stevens requested Mr. Weinberg to draft some general language to the effect that it was not the intent of the d-2 legislation to effect the eligibility status of any Alaska Native corporation. Mr. Weinberg complied with the request, and submitted proposed language by letter dated July 13, 1979. Koniag Exhibit I. He proposed the following language:

> "but nothing in this Act shall affirm or deny any claim of eligibility of any Native Corporation for benefits under the Alaska Native Claims Settlement Act except as provided in section[s] 1427(e) [and the section number of the section comparable to section 930 of the House passed H.R. 39, if included in S.9] of this Act."

The two sections excluded from the disclaimer were the ones which ratified the eligibility of the seven Koniag villages which had been declared ineligible by the

Secretary, and the section ratifying an agreement between the Secretary of the Interior and Cook Inlet Region, Inc. ("CIRI") settling the dispute over the eligibility of Salamantof and Alexander Creek, two CIRI villages. In short, the amendment requested by Senator Stevens was specifically designed to make it clear that the enactment of the Koniag amendment in section 1427 was not to be deemed to be a ratification by Congress of Leisnoi's eligibility. Mr. Weinberg concluded his letter by stating:

> I would hope that Senator Stevens will not feel impelled to offer such an amendment unless it appears that this matter will actually become an issue in the consideration of S. 9.

*Id.* at 2.

More than a year later, in November 1980, Ronald Reagan was elected President of the United States. Before the end of the month, the d-2 legislation had passed both houses of Congress, and was submitted to the President for signature. On December 2, 1980, it became law. The Koniag amendment was contained in section 1427. The amendment drafted by Mr. Weinberg preserving the issue of the eligibility of Leisnoi was not included in the final bill, and, never introduced.

2. <u>Argument</u>

    A. <u>Congress Possesses the Plenary Power to Designate Woody Island as an Eligible Village Corporation Under ANCSA Entitled to Receive Benefits Under the Act.</u>

        1. <u>Congress Has the Authority to Ratify Unauthorized Acts of Government Officials If Those Acts Could Have Been Authorized When Taken.</u>

The Supreme Court has consistently held that Congress may ratify unauthorized acts of government officials if those acts could have been authorized by Congress at the time they were taken. *See Swayne & Hoyt v. United States*, 300 U.S. 297, 81 L. Ed. 659 (1936); *Isbrandtsen-Moller Co. v.*

*United States*, 300 U.S. 139, 81 L. Ed. 562 (1936); *see also Charlotte Harbor & Northern Railway Co. v. W.G. Wells*, 260 U.S. 8, 67 L. Ed. 100 (1922) (discussing ratification by state legislature); *Hodges v. Snyder*, 261 U.S. 600, 67 L. Ed. 819 (1922) (ratification by state legislature). For example, in *Swayne & Hoyt v. United States*, the Court considered an unauthorized order by the Secretary of Commerce. In that case, shippers contested the Secretary's imposition of certain tariffs on the ground that the Secretary did not have legislative authority to impose those tariffs. The Court, however, noted that subsequent acts of Congress had acknowledged the Secretary's authority. 300 U.S. at 301. Thus, the Court held that Congress had ratified the Secretary's previous unauthorized acts. *Id.* at 301-02 In so holding, the Court stated:

> It is well settled that Congress may, by enactment not otherwise inappropriate, "ratify...acts which it might have authorized," and give the force of law to official action unauthorized when taken. And we think that Congress, irrespective of any doctrine of ratification, has, by the enactment of the statutes mentioned, in effect confirmed and approved the exercise by the Secretary of powers originally conferred on the Shipping Board.

*Id.* (citations omitted).

This power has been acknowledged by the Ninth Circuit in *Equal Employment Opportunity Commission v. First Citizens Bank of Billings*, 758 F.2d 397 (9th Cir. 1985). In that case, the Equal Employment Opportunity Commission ("EEOC") brought a suit against the defendant to redress employment discrimination violations by the defendant. On appeal, the defendant challenged the EEOC's enforcement power. The Ninth Circuit held, however, that the issue was rendered moot by Congress' subsequent ratification of the EEOC's authority. *Id.* at 399-400 (citing *Swayne & Hoyt v. United States*). *See also Equal Employment Opportunity Commission v. Westinghouse Electric Corp.*, 765 F.2d 389 (3rd Cir. 1985); *Equal Employment Opportunity Commission*

*v. Dayton Power & Light Co.*, 605 F. Supp. 13, 19 (1984) (noting split in circuit courts on issue of implied ratification).

Thus, it is clear that Congress may ratify acts which it could have authorized when taken. Given its plenary power over Indian affairs, Congress could have authorized Woody Island as a Native village eligible to receive benefits conferred by the Alaska Native Claims Settlement Act.

2. <u>Under the Property Clause of the United States Constitution, Congress' Power to Dispose of Public Lands is Unlimited.</u>

The decisions of the United States Supreme Court have long established that under the property clause of the United States Constitution, Congress has the power to dispose of public lands as it sees fit. As early as 1886, the Supreme Court noted that Congress had authority to prescribe "the mode in which the lands may be disposed of, and the title conveyed to the purchaser." *Van Brocklin v. Anderson*, 117 U.S. 151, 165 (1886) (quoting a Senate debate). One year later, in *Maxwell Land-Grant Case*, 121 U.S. 325 (1887), the Court noted that when Congress disposes of public land by enactment, the courts can go no further than to make a construction of what Congress intended by the act. Similarly, in *Alabama v. Texas*, 347 U.S. 272 (1954), the Court noted that Congress had unlimited power to dispose of lands owned by the government and that Congress had both legislative and proprietary power with respect to such lands.

The unlimited power of Congress with respect to public lands has been reaffirmed by more recent decisions of the Supreme Court. In *Kleppe v. New Mexico*, the state of New Mexico challenged the constitutionality of the Wild Free-Roaming Horses and Burros Act. 426 U.S. 529, 49 L.Ed.2d 34 (1976). The Supreme Court held that the Act was constitutional under the property clause. In so holding, the Court noted that Congress had complete power over public

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

property. 426 U.S. at 540. This plenary power was summarized in *California Coastal Comm'n v. Granite Rock*,:

> The Property Clause provides that "congress shall have Power to dispose of and Make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." This Court has "repeatedly observed" that "'[t]he power over the public land thus entrusted to Congress is without limitations.'"

480 U.S. 572, 580 (1987) (citations omitted). *See also State of Nevada v. Watkins*, 914 F.2d 1545, 1552-53 (9th Cir. 1990) (noting that Congress' power over public lands is "without limitations").

Accordingly, Congress also possessed the power to authorize the conveyance of federal lands to Leisnoi pursuant to the Alaska Native Claims Settlement Act irrespective of whether Woody Island met the requirements of ANCSA.

3. <u>Congress Also Has the Authority to Moot a Pending Controversy by Enacting New Legislation.</u>

Congress also possesses the power to moot pending litigation and resolve controversies by enacting new legislation. In *Stop H-3 Association v. Dole*, 870 F.2d 1419 (9th Cir. 1989), the Ninth Circuit held that Congress may enact legislation which exempts a particular project from the requirements of existing statutes. That case involved the construction of an interstate highway by the Department of Transportation. The highway had been the subject of litigation for many years. The plaintiffs alleged that the department was in violation of several environmental statutes. Eventually, Congress intervened and ordered the Secretary to approve the highway construction notwithstanding the alleged violations.

On appeal, the plaintiffs presented various constitutional challenges to this congressional order. For example, the plaintiffs argued that Congress had violated the principle of separation of powers because it usurped

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 278-3390

the executive branch's authority to execute the laws. *Id.* at 1433. The Ninth Circuit rejected this contention and held that the enactment of legislation exempting a project from statutory requirements did not constitute an execution of the law. *Id.* at 1434. The court further stated:

> Moreover, even if we were to accept appellants' argument that [Congress' order] represents an attempt by Congress to control the Executive branch's execution of [the statutory requirements], we still could not conclude that Congress violated the separation of powers. Simply put, Congress may change its mind, so long as it complies with the Constitution's requirements for action that alters the delegation of authority to the Executive branch.

*Id.* at 1435. The court noted that it found no authority "forbidding Congress to alter a legislative grant of authority by means of new legislation directed at a particular project." *Id.* at 1435 n.24. Accordingly, Congress had the authority to designate Leisnoi as an eligible village notwithstanding the pending Ninth Circuit Appeal.

3.  **In Section 1427 of ANILCA, Congress Ratified the Secretary's Certification of Woody Island as an Eligible Village.**

    It is clear from the above authorities that Congress possessed the power to ratify the Secretary's decision that Woody Island was an eligible village and to recognize Leisnoi as a valid ANCSA corporation entitled to receive benefits under the Act. The issue, therefore, is whether section 1427 constitutes such a ratification. For the reasons discussed below, Koniag believes that it does.

    A.  **The Plain Language of Section 1427 Ratifies Leisnoi as an ANCSA Village Corporation.**

        It is clear from the plain language of section 1427 that Congress ratified Leisnoi's status as a valid ANCSA village corporation. Subsection (a)(4) defines "Koniag deficiency corporation" as:

86

(4) "Koniag deficiency village corporation" means any or all of the following:

> Afognak Native Corporation;
> Nu-Nachk-Pit, Incorporated;
> Ouzinkie Native Corporation; and
> *Leisnoi, Incorporated.*

(emphasis added). Subsection (a)(5) in turn defines "Koniag 12(b) Village Corporation" as:

> *the village corporations listed in subparagraph (4) above*, if within sixty days of the effective date of this Act, Koniag, Incorporated, by a resolution duly adopted by its board of Directors, designates them as such as a class and all of the following: Natives of Akhiok, Incorporated, Old Harbor Native Corporation, Kaguyak, Inc., Karluk Native Corporation and each of the corporations listed in subsection (e)(2) of this section which files a release as provided for in subsection (e)(1) of this section.

(emphasis added). Thus, under section 1427, Leisnoi was both in "Koniag Deficiency Village Corporation" and a "Koniag 12(b) Village Corporation."

Subsection (b)(1) then recognizes the rights of the Koniag deficiency village corporations and Koniag 12(b) Village Corporations to benefits under ANCSA:

> In full satisfaction of...(B) the right of each *Koniag Deficiency Village Corporation* to conveyance under that Act of the surface estate of deficiency village acreage on the Alaska Peninsula; (C) the right of each *Koniag 12(b) Village Corporation* to conveyance under the Alaska Native Claims Settlement Act of surface estate of 12(b) acreage on the Alaska Peninsula...it will be conveyed....

(emphasis added). Because only the village corporations of certified ANCSA villages had rights to the conveyance of land under the Act, this language compels the conclusion that Congress considered Leisnoi a *bona fide* village corporation created pursuant to ANCSA and entitled to receive the benefits thereunder.

B. <u>The Legislative History of ANILCA Makes it Clear that Congress Recognized That There Was an Ongoing Dispute Over the</u>

87

### Eligibility of Woody Island, but Nonetheless Chose to Recognize Leisnoi as a Valid Village Corporation.

As discussed above, the Jack Anderson columns brought to the forefront the dispute over Leisnoi's eligibility, and made Congress aware that the issue was pending before the Ninth Circuit. As a result of those columns, the committee chairman in both Houses before whom the legislation was pending took specific action to gather additional information concerning the dispute. House Interior chairman Udall contacted Koniag and requested a response. Senate Energy chairman Jackson went even further, and demanded an explanation from the Department of the Interior as well as requesting the General Accounting Office to review the Department's report. Senator Stevens then requested specific language for a possible amendment which would have made it clear that section 1427 was not intended to resolve the ongoing dispute over Leisnoi's eligibility. The amendment, however, was not included in the final bill, and the language defining Leisnoi as an eligible village corporation entitled to receive benefits under ANCSA was left unchanged.

Second, the legislative history makes it clear that one of the purposes of section 1427 was to resolve the eligibility disputes involving the Koniag villages. Subsection (e) was designed to "resolve in favor of the Native villages listed therein, all disputes concerning their eligibility for ANCSA benefits and prescribes limits upon the ANCSA land benefits to which these villages shall be entitled." S. Rep. No. 96-413, 96th Cong., 1st Sess. 323; *see also* H.R. Rep. No. 97 part I, 96th Cong., 1st Sess. 573 (1979). In a prepared statement to House of Representatives, Edward Weinberg, counsel for Koniag, stated:

> Until the eligibility status of these seven villages is determined, it is impossible to ascertain the total number of acres available under section 12(b) of ANCSA, which provides that the difference between 22,000,000 acres of the land entitlements of eligible

88

> village corporations is to be allocated among the eleven Alaska regional corporations (exclusive of Sealaska) on a relative population basis, and which provides further for a reallocation by each regional corporation of its share of the 12(b) acreage among eligible village corporations within its boundaries. Likewise, it is impossible to complete the determination of regional corporation land entitlements under section 12(c) of ANCSA, which provides for allocations totaling 16,000,000 acres determined on a formula which includes as a factor the number of acres within each region which is selected pursuant to sections 12(a) and 12(b).

Koniag Exhibit F at 3.

Under 1427, all of the Koniag villages were addressed in one of two ways. Those villages which had been certified by the Secretary of the Interior were defined as Koniag Deficiency Village Corporations and/or Koniag 12(b) Corporations. Those villages whose eligibility had been denied by the Secretary were expressly certified in Section 1427(e), subject to major limitations on their rights. There is no evidence to suggest that Congress intended to except Leisnoi from this comprehensive scheme, and make its eligibility dependent upon subsequent judicial and/or administrative proceedings. Indeed the evidence suggests precisely the opposite. Senator Stevens was prepared to introduce an amendment preserving the issue of Leisnoi's eligibility if it became necessary in order to have section 1427 included in the legislation. Such an amendment was not deemed to be necessary, and was not included in the final bill. Accordingly, the conclusion must be drawn that Congress intended to section 1427 to ratify Leisnoi's status as an eligible village corporation.

It is clear that Congress, in ANILCA, knew how to leave open the question of certification if it desired. For example, in section 1416, Congress provided for certain land selection rights for the Native group Tanalian, Inc. Its rights under the section, however, were expressly conditioned upon its certification as an eligible group:

89

> *(c) If Tanalian Incorporated is certified as a group* under the Alaska Native Claims Settlement Act, Tanalian Incorporated shall be entitled to make selections in accordance with subsection (d) hereof.
>
> (d)(1) Tanalian Incorporated *if certified* shall be entitled to make selections of the surface estate of public lands . . . .

ANILCA, section 1416 (c), (d)(1), 94 Stat. 2499 (emphasis added). The absence of such language in section 1427, coupled with the specific definition of Leisnoi as a valid Koniag deficiency and 12(b) corporation compels the conclusion that Congress ratified Leisnoi's status as a valid ANCSA corporation.

3.  Conclusion

ANILCA was passed in 1980. Thereafter, the Afognak Joint Venture was formed, the lands described in section 1427 were conveyed to the AJV, and the AJV has been actively engaged in timber harvesting. Costs and profits of the AJV have been allocated by the AJV to its various members. In 1991, Koniag and Afognak Native Corporation purchased Leisnoi's interest in the AJV in exchange for over $4 million dollars in land and money.

Koniag and ANC have relied on the provisions of section 1427 of ANILCA granting Leisnoi its interest in the AJV as provided therein. This reliance is justified by both the express language of the section as well as its legislative history. Congress was aware, when it enacted section 1427, that there was an ongoing challenge to Leisnoi's eligibility. But it did nothing to condition Leisnoi's entitlement on a resolution of the issue in favor of Leisnoi. Instead, recognizing the issue, Congress went ahead and defined Leisnoi as an eligible village corporation under ANCSA, and proceeded to authorize it to exchange its rights under ANCSA to lands on the Alaska Peninsula for an interest in the Afognak Joint Venture.

90

For all of the above reasons, this Court should find that section 1427 of ANILCA ratified Leisnoi's status as an eligible village corporation, and dismiss this litigation with prejudice.

## VIII. MOTION TO DISMISS AT CONCLUSION OF OF PROTESTANT'S CASE

The appropriate motions for dismissal were deemed made at the conclusion of Protestant's case. Rather than argue them at that time, the parties agreed to defer briefing until now. Tr. 2665-66. Koniag here briefs the issue that Protestant's action must be dismissed because at the conclusion of his evidence he had failed to overcome the presumption that the Bureau of Indian Affairs had correctly found Woody Island and Leisnoi eligible for ANCSA Native village entitlements.

Protestant who has appealed a decision of eligibility for an unlisted village has the burden of proof in establishing the incorrectness of that decision. 43 C.F.R. § 2651.2(a)(9). The Interior Board of Land Appeals has specifically ordered so in this case. Order of November 21, 1997, at 10. ("Stratman will then be required to establish that the eligibility Decision was incorrect.") Protestant has failed to sustain his burden of proof; Mr. Stratman has not shown that the Secretary's decision in 1974 that Woody Island was an eligible village was incorrect. Consequently, the ANCAB's 1974 decision that Woody Island was indeed an eligible village must be affirmed. First, we must review that decision.

BIA investigator, Gail Fitzpatrick, visited Woody Island, with his supervisor, Delores Roullier, in 1973. Fitzpatrick Deposition at 24. They viewed both the F.A.A. structures on the east side of the island, and the houses, gardens, gravesites, and smokehouse on the west side of the island. *Id.* at 52, 100. Further, Mr. Fitzpatrick spoke with a number of Leisnoi enrollees about their ties to Woody Island. *Id.* at 109.

91

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390