## EXHIBIT 4

## PORTIONS OF OMAR STRATMAN'S CONSOLIDATED RESPONSIVE BRIEF

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
139 East South Temple, Suite 600
Salt Lake City, Utah 84111

| | | |
|---|---|---|
| OMAR STRATMAN, | ) | IBLA 96-152 |
| | ) | |
| Protestant | ) | No. A76-0132 CV (JKS) |
| | ) | |
| V. | ) | Challenge to the eligibility of Woody |
| | ) | Island as a Native village under Section |
| LEISNOI, INC., | ) | 11(b)(3) of the Alaska Native Claims |
| | ) | Settlement Act, 43 U.S.C. § |
| Respondent | ) | 1610(B)(3) (1994) |
| | ) | |
| KONIAG, INC., | ) | |
| BUREAU OF INDIAN AFFAIRS, | ) | |
| | ) | |
| Intervenors | ) | |

---

## OMAR STRATMAN'S CONSOLIDATED RESPONSIVE BRIEF

---

Michael J. Schneider
Eric R. Cossman
LAW OFFICES OF
MICHAEL J. SCHNEIDER, P.C.
880 "N" Street, Suite 202
Anchorage, Alaska 99501
(907) 277-9306
(907) 274-8201 (Fax)

Attorneys for
OMAR STRATMAN

# TABLE OF CONTENTS

I.     Introduction ................................................................ 1

II.    Stratman's Consolidated Response to Respondents' Post-Hearing Briefs ........... 1

III.   Stratman's Consolidated Response to Respondents' Motions to Dismiss for Failure to
       Satisfy his Burden of Proof ............................................... 2

IV.    Stratman's Combined Response to Leisnoi's Motion to Dismiss for Lack of
       Administrative Standing, Motion to Dismiss for Failure to Timely Appeal Leisnoi's
       Eligibility Determination, and Motion to Dismiss Pursuant to the Doctrine of
       Administrative Finality ................................................... 3

V.     Stratman's Consolidated Response to Respondents' Motions to Dismiss on the ground
       that Leisnoi's Eligibility was Legislatively Ratified by ANILCA Section 1427 ....... 10

       A.    Introduction ......................................................... 12

       B.    Background ........................................................ 13

             1.    The Alaska National Lands Conservation Act (ANILCA) ........... 13

             2.    Section 1427 ................................................. 16

             3.    Text and section-by-section analysis of Section 1427 .............. 24

       C.    Section 1427 did not repeal ANCSA's Section 11(b)(3)'s village eligibility
             requirements as to Leisnoi ....................................... 43

             1.    Applicable Law ............................................. 43

             2.    The language of Section 1427 does not evidence a "clear and manifest"
                   congressional intent to repeal Section 11(b)(3)'s village eligibility
                   requirements as to Leisnoi, nor is Section 1427 in "irreconcilable
                   conflict" with Section 11(b)(3) .............................. 54

             3.    The legislative history of Section 1427 does not evidence a "clear and
                   manifest" intent to repeal ANCSA's village eligibility requirements
                   as to Leisnoi ............................................... 63

VI.    Conclusion ................................................................ 77

December 2, 1980, 94 Stat. 2371, 2518 ("ANILCA").

This issue is also before the Board pursuant to the judicial referral issued by the District Court in Stratman vs. Babbitt et al., No. 76-0132-A-CV (JKS). Leisnoi and Koniag had previously moved to dismiss Stratman's action on this ground in the District Court proceedings. In its order of September 13, 1995, the District Court referred this issue to the Board for its initial determination, along with the issue of whether Woody Island satisfied the criteria for eligibility as an unlisted Native Village under ANCSA. Id. at 2.

In its order of November 21, 1997, the Board referred this matter to the Hearings Division for assignment of an ALJ to convene a hearing "for the purpose of determining whether Woody Island meets the legal requirements for eligibility for certification as a Native village." Id. at 10. The Board deferred ruling on the issue of whether Woody Island's eligibility had been legislatively ratified by ANILCA Section 1427.

A hearing on the issue of Leisnoi's eligibility was subsequently conducted by Administrative Law Judge Harvey C. Sweitzer on August 3, 1998 through August 14, 1998. At the conclusion of the hearing, the ALJ directed the parties to file post-hearing briefs, and any other motions they intended to file, on or before November 30, 1998. At that time, there was some confusion regarding whether the Board's order of November 21, 1997 required the parties to file motions with the ALJ regarding the issue of whether ANILCA Section 1427 ratified Leisnoi's eligibility, or whether such motions were to be filed with the Board after the issuance of the ALJ's recommended decision. The ALJ directed the parties to file their motions on this issue at the time of their post-hearing briefs, and indicated that he would later determine whether or not to rule on this issue.

11

In accordance with the ALJ's ruling, Leisnoi and Koniag have both filed motions on this issue. This memorandum constitutes Stratman's opposition to those motions. In the event that the ALJ defers ruling on this issue, this memorandum will also serve as Stratman's brief on this issue to the Board.[3]

A.    Introduction

Leisnoi and Koniag contend that Section 1427 of ANILCA operated to "ratify" or "confirm" Leisnoi's eligibility as a Native Village under ANCSA.

As discussed below, the real issue, properly framed, is whether or not Section 1427 repealed the village eligibility requirements provided in ANCSA Section 11(b)(3) with regard to Leisnoi, thereby exempting it from having to satisfy those requirements as a condition to its receipt of ANCSA land benefits.

As discussed below, there are two ways that a statutory provision can be modified or repealed by a subsequent legislative enactment: 1) where the subsequent statute *expressly* repeals the provisions of the prior statute; or 2) where the subsequent statute *impliedly* repeals the provisions of the prior statute. A statute will be held to have been impliedly repealed by a subsequent legislative enactment where there is either a "clear and manifest" congressional intent to repeal the prior statute, or where the provisions of the new enactment are in "irreconcilable conflict" with the prior statute.

As discussed below, Section 1427 *did* expressly repeal the village eligibility requirements

_____

[3] Whether or not the ALJ chooses to rule on this matter is, of course, up to the ALJ. However, Stratman would strongly encourage the ALJ to make an initial ruling on this issue because of his familiarity with the relatively complex factual and legal background regarding this issue.

provided in ANCSA Section 11(b)(3)– but it did so only as to the seven uncertified Koniag-region villages that had been determined by the Secretary to be ineligible. Section 1427 did not expressly repeal these eligibility requirements *as to Leisnoi*.

Consequently, the issue is whether Section 1427 *impliedly* repealed the provisions of ANCSA Section 11(b)(3) with regard to Leisnoi.

As set forth below, the primary purpose of Section 1427 was to amend ANCSA's land selection and entitlement provisions, to provide for the exchange of the Koniag villages' land selection and entitlement rights to lands withdrawn on the Alaska Peninsula under ANCSA's original land selection and entitlement provisions, for other specified lands on Afognak Island.

As set forth below, there is nothing in either the language or legislative history of Section 1427 that evidences a "clear and manifest" congressional intent to repeal Section 11(b)(3)'s village eligibility requirements with regard to Leisnoi. Nor is there an "irreconcilable conflict" between Section 1427's land exchange provisions and the village eligibility requirements provided in Section 11(b)(3). Effect can be given to both sections, just as effect was originally given under ANCSA to both the village eligibility provisions and the original land selection and entitlement provisions that were amended by Section 1427.

B.    Background

1.    The Alaska National Lands Conservation Act (ANILCA)

The Alaska National Interest Lands Conservation Act (ANILCA), enacted December 2, 1980, is both complex and voluminous, and consists of 15 separate titles. The Act's official title states that its purpose is "to provide for the designation and conservation of certain public lands in the State of Alaska, including the designation of units of the National Park, National Wildlife

13

Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation

Systems, and for other purposes." The Act was precipitated by the provisions in Section 17(d)(2)

of ANCSA, which directed the Secretary to withdraw 80 million acres for the addition to, or the

creation of, units of the National Park, Forest, Wildlife, Refuge, and Wild and Scenic Rivers

Systems. See 43 U.S.C. § 1616(d)(2)(A).

As might be expected, the legislative history of the Act is also complex and voluminous.

The Anchorage Law Library contains a 41-volume set of documents and materials regarding the

legislative history of the Act. As discussed below, what documents can be regarded as

"legislative history" for purposes of construing Section 1427's provisions is disputed by the

parties. For purposes of this background discussion, reference will be made to the official Senate

Report issued on H.R. 39 (the bill subsequently enacted as ANILCA) by the Committee on

Energy and Natural Resources, in Senate Report No. 96-413. Attached as App. C are relevant

portions of the Senate Report, as reprinted in Vol. 5 of the United States Code, Congressional

and Administrative News, 96th Congress, 2d Session. The relevant provisions of ANILCA,

including Section 1427, are attached as App. B.

The Senate Report summarizes the purpose of ANILCA as follows:

> The principal purpose of H.R. 39, as reported by the Committee, is to designate
> approximately 105 million acres of Federal land in Alaska for protection of their
> resource values under permanent Federal ownership and management. The bill
> more than doubles the size of the National Park System and the National Wildlife
> Refuge System. It triples the size of the National Wilderness Preservation
> System. It virtually completes the public land allocation process in Alaska which
> began with the Statehood Act of 1958 which granted the State the right to select
> approximately 105 million acres of public land. This Federal land disposal
> process was continued by the Alaska Native Claims Settlement Act of 1971 which
> granted Alaska Natives the right to select approximately 44 million acres of
> Federal land.

14

In order to carry out the principal purposes, the Committee adopted a number of other significant provisions which, together with the land designations, are discussed in the following Summary of Major Provisions.

App. C at 5071 (internal document pagination).

The Senate Report further states:

The Alaska Native Claims Settlement Act of 1971 (ANCSA) did more than settle the longstanding aboriginal claims of Alaskan Native peoples. It also set in motion a sequence of events which may well constitute the most significant single land conservation action in the history of our country.

ANCSA directed the Secretary of the Interior to withdraw from all forms of appropriation up to 80 million acres of Federal lands in Alaska and to report to the Congress his recommendation for administering them as units of the National Park, National Forest, National Wildlife Refuge, and National Wild and Scenic Rivers Systems. These lands are often referred to as the "d-2" lands after section 17(d)(2) of the 1971 Act, which is the section authorizing the Secretary's action. .
. .

H.R. 39, as amended by the Committee, will virtually complete the public land allocation process in Alaska which began with Statehood in 1959. The Statehood Act granted the State of Alaska the right to select over 104 million acres of public land. This land disposal process was continued by the Alaska Native Claims Settlement Act, which granted Native corporations the right to select about 44 million acres of public land. As reported by the Committee, this bill would set aside for the future enjoyment and benefit of the American people other public lands in addition to the existing National Forests, National Parks and National Wildlife Ranges, totalling about 105 million acres.

Alaska's greatest problem now is uncertainty, concerning the status of its vast lands and related national resources. This is the uncertainty which H.R. 39 (as amended) addresses, and which it resolves by laying the groundwork for orderly, responsible, and sound development of Alaska's resources and society. By transferring title over validly selected lands to the Natives and to the State of Alaska, the bill goes far toward letting people know where they stand and to giving Alaska and its citizens the means of shaping their own future. Thus, this legislation is in the best interest of Alaska and her people, as well as of all the American people for whose future heritage it provides. . . .

App. C at 5073-74.

2.    Section 1427

Section 1427 is contained in Title XIV of ANILCA, which is entitled "Amendments to

the Alaska Native Claims Settlement Act and Related Provisions."  Senate Report No. 96-413

summarizes the background and purposes of Title XIV as follows:

> During consideration of the Alaska National Interest Lands legislation, the
> Committee agreed to adopt Title XIV of S. 9, which contained several
> amendments to the Alaska Native Claims Settlement Act, as well as additional
> provisions relating to Alaska Native Corporations and their lands.  Many of the
> provisions originated in legislation pending before the Committee during the 95th
> Congress, proposed by the Administration (S. 3303) and Senators Gravel and
> Stevens (S. 3106).  The amendments would improve the implementation of the
> Settlement Act or provide clarifications to the provisions of that Act.  In general,
> the Committee adopted those provisions supported by at least three of the four
> parties primarily affected by or concerned with the Settlement Act– the Natives,
> the State of Alaska, the Administration, and the Alaska Coalition.  The
> Committee also considered and adopted on that basis, several proposals
> authorizing specified Native Corporations to exchange lands or selection rights to
> lands within Alaska, or to negotiate for such exchanges.  These Native land
> selection exchange amendments were adopted in order to further and fulfill the
> purposes of the Settlement Act; in addition, the exchanges would, in some cases,
> allow national interest lands to remain in public ownership, consolidate and
> rationalize land ownership patterns in Alaska and resolve or obviate the need for
> litigation.
>
> Background information and a discussion of the Committee's intent with respect
> to certain of the provisions contained in Title XIV is provided below.  In addition,
> each provision is described in detail in the Section-by-Section analysis of the
> Committee report. . . .

App. C at 5199-5200.

The Senate Report includes a description of the operation and effect of Section 1427.

The Report states:

> The Committee agreed to a land exchange proposal by the Koniag, Region, Inc.
> which provides for the relinquishment of native selection rights to almost 300,000
> acres of surface and subsurface estates and to an additional approximately 40,000
> acres of surface estate on the Alaska Peninsula between Becharof Lake and the

16

Aniakchak-Caldera National Monument in exchange for some 280,000 acres of surface and underlying subsurface estate on Afognak Island now within the Chugach National Forest. The National [sic] Peninsula lands to be relinquished are among the finest wildlife areas in Alaska and will be included in the Alaska Peninsula National Wildlife Refuge. The Committee believes that this exchange will be beneficial to state and national interests as well as to the natives as it–

(1) Assures public access for sports hunting, fishing and other recreational purposes pursuant to cooperative management agreements with appropriate, Federal, State and local agencies to the Afognak Island land that is transferred to Native ownership.

(2) Restricts Native retained subsurface right on the Alaska Peninsula to oil and gas under regulations designed to minimize interference with surface values.

(3) Guarantees the retention in federal ownership, through addition to the Kodiak National Wildlife Refuge, of islands offshore of Afognak Island and the "Red Peaks" area of over 46,000 acres of Afognak Island, the latter being an area having unusual scenic and recreational value.

(4) Preserves for the Aniakchak-Caldera National Monument almost 50,000 acres which otherwise would be conveyed to Native ownership under ANCSA.

(5) Preserves state selection of some 4,000 acres of land on Afognak Island selected by the State of Alaska under Section 6 of the Alaska Statehood Act.

(6) Resolves a long standing dispute concerning the eligibility of certain villages in the Koniag region for ANCSA benefits.

(7) Resolves disputes between the affected Native corporations and the Kodiak Island Borough involving conflicting selection claims.

(8) Consolidates Native land holdings for the Koniag region in an area traditionally used by the Koniag people.

The land exchange provisions of Section 1427 were modified by the Committee in two areas. First, the language of subsection (b)(5), providing for public access to recreational purposes to the lands on Afognak Island subject to the terms of the cooperative management agreements entered into by Koniag, Inc. with the Secretary and appropriate state agencies and local political subdivisions, was

17

changed to assure public access, except in the vicinity of logging and other commercial operations, and subject to reasonable public safety restrictions.

Second, the language of subsection (e)(3) was modified to provide that the three village corporations receiving land within the Kodiak National Wildlife Refuge shall each convey 20 acres to the State in trust for future community expansion purposes. This parallels the reconveyance requirements of Section 14(c) of the Settlement Act. Technical amendments to the language and land descriptions in Section 1427 were also agreed to by the Committee. . . .

App. C at 5205-06.

As noted in Koniag's brief, additional background regarding the purposes and effect of Section 1427 is contained in a statement prepared by Ed Weinberg, then counsel for Koniag, Inc. and the Koniag-region village corporations, that was presented to the House Committee on Interior and Insular Affairs during its public hearings on H.R. 39. The full text of Weinberg's statement, including its attachments, is attached hereto as App. D.[4]

Weinberg's statement notes that Section 1427, referred to as the "Koniag Amendment," was the product of extended negotiations with the Department of Interior, the Alaska Coalition, the Alaska state government, and the Kodiak Island Borough. App. D at 1218.

Weinberg's statement notes that Section 1427 had two primary purposes: 1) to resolve the "land problems" of the Koniag-region corporations, by providing for the exchange of lands on Afognak Island for the "deficiency" lands on the Alaska Peninsula; and 2) to settle the village eligibility litigation brought against the Secretary by the seven uncertified Koniag-region

---

[4]Weinberg's statement was introduced into evidence at the village eligibility hearing by Koniag as Ex. K-C. However, Koniag's exhibit did not include the attachments to Weinberg's statement. The full text of Weinberg's statement, including its attachments, are included in App. D.
    Weinberg's statement, and its attachments, were originally paginated at the top of each page, beginning with page 1214. For purposes of simplicity, reference herein will be to these original page numbers.

villages, by according them limited village eligibility status in return for their release of any

further claims against the United States for additional benefits under ANCSA. Weinberg's

statement states, in part:

> My name is Edward Weinberg. I am a member of the law firm of Duncan,
> Brown, Weinberg and Palmer, P.C., with offices in Washington, D.C. and
> Anchorage, Alaska. I am national counsel for Koniag, Inc., the regional Native
> corporation created under the Alaska Native Claims Settlement Act which covers
> the area of Kodiak Island and a portion of the western side of the Alaska
> Peninsula lying roughly between Lake Becharof and the western boundary of the
> Aniakchak National Monument. I also represent the Koniag villages in
> connection with the resolution of their land problems under the Alaska Native
> Claims Settlement Act.
>
> With me today are Karl Armstrong, Executive Vice President of Koniag, Inc. and
> President of one of the villages, Leisnoi, Inc., and Mr. Gene Sundberg, Vice
> President for Lands of Koniag, Inc. and a member of the Board of Directors of
> Afognak Natives, Inc., another of the Koniag villages.
>
> Most of Kodiak Island is within the Kodiak National Wildlife Refuge. Of the
> land on Kodiak Island outside the wildlife refuge, most was selected by the state
> of Alaska under the Alaska Statehood Act prior to the enactment of ANCSA and a
> large portion of the state selected lands were tentatively approved by the Secretary
> of the Interior for conveyance to the state prior to the passage of ANCSA. To the
> north of Kodiak Island is an island of almost 500,000 acres known as Afognak
> Island. All of Afognak Island is within the Chugach National Forest. And, of
> course, the City of Kodiak is also located on Kodiak Island, as is the Kodiak
> Island Coast Guard Base.
>
> Because of these federal reservations and the presence of the City of Kodiak, the
> land selection opportunities of the Koniag villages on Kodiak Island and Afognak
> Island were severely restricted. As a result, both those Koniag villages whose
> entitlement exceeded the limited amount of land available on Kodiak and
> Afognak Islands, and Koniag, Inc. whose subsurface estate entitlements were
> severely limited on Kodiak Island by reason of the existence of the Kodiak
> National Wildlife Refuge, were required under ANCSA to make what is known as
> deficiency selections elsewhere. The land withdrawn by the Secretary of the
> Interior for deficiency selection is located on the Alaska Peninsula in the area
> from Becharof Lake southward to the area included in the Aniakchak National
> Monument recently established by Presidential Proclamation.

The Alaska Peninsula is separated from Kodiak Island by the Shelikof Strait, over 90 miles wide and comprising some of the roughest waters in the world. While the deficiency area on the mainland includes what is considered to be some of the finest wildlife habitat in the world, it has little, known economic value to Koniag and the Koniag villages. Further, the Alaska Peninsula is not an area with which the Koniag Natives have a cultural affinity. The Koniag Natives do not inhabit or frequent the Alaska Peninsula.

A second element of Koniag's land problem is the village eligibility litigation. Seven Koniag villages are involved.

The uncertain eligibility status of the seven uncertified villages complicates and delays the completion of ANCSA land selections and conveyances throughout Alaska. Until the eligibility status of these seven villages is determined, it is impossible to ascertain the total number of acres available under section 12(b) of ANCSA, which provides that the difference between 22,000,000 acres of the land entitlements of eligible village corporations is to be allocated among the eleven Alaska regional corporations (exclusive of Sealaska) on a relative population basis, and which provides further for a reallocation by each regional corporation of its share of the 12(b) acreage among eligible village corporations within its boundaries. Likewise, it is impossible to complete the determination of regional corporation land entitlements under section 12(c) of ANCSA, which provides for allocations totalling 16,000,000 acres determined on a formula which includes as a factor the number of acres within each region which is selected pursuant to sections 12(a) and 12(b).

The seven village eligibility cases have been remanded by the United States Circuit Court of Appeals for the District of Columbia to the Secretary of the Interior for further administrative proceedings. Should it be necessary to resort to further administrative proceedings in order to resolve the eligibility of the seven villages, further extensive time delays will be encountered, thus delaying further final land determinations and conveyances under ANCSA.

A third factor complicates Koniag land entitlements. There are some unresolved disputes over land entitlements between the Kodiak Island Borough and certain of the Koniag villages. One involves lands which the Borough considers essential to its watershed for water supply purposes. Another concerns some very valuable land near the city of Kodiak which the Borough disposed of to third parties as homesites and for residential development purposes subsequent to the enactment of ANCSA. A third concerns other lands on Kodiak Island, which were TA'd to the State and which the Borough, in turn, seeks to obtain from the state.

In sum, to a very considerable extent, unless the Congress remedies the situation,

Koniag and the Koniag villages will not realize a fundamental objective of the settlement envisioned by Congress when it enacted ANCSA, that the Alaska Natives in each region be provided an economically viable land base.

The Koniag Amendment responds to these problems. The Koniag people are realists. They have understood early and well that no matter how unfair the operation of ANCSA has been in their case by reason of circumstances over which they had no control, springing largely from decisions taken in Washington as long ago as the turn of the century without their knowledge or consultation, no proposal to rectify their situation is going to be viable unless it dealt with the interests of others who are affected in a manner in which those others regard as fair and reasonable.

Realizing that, Koniag over a period of almost eight months painstakingly negotiated with the Department of the Interior, the Alaska Coalition, the Alaska state government and the Kodiak Island borough. In each instance, as examination of details revealed specific problems, they were resolved in a mutually satisfactory fashion. In the end, Koniag was able to present to the Congress, before the Senate Committee completed its work on last year's version of H.R. 39, a legislative proposal which was supported by the Alaska Coalition, the Alaska state government, the Kodiak Island Borough and the Department of the Interior, in addition to Koniag, the Koniag villages and the Alaska Natives themselves through the Alaska Federation of Natives.

The Koniag Amendment is a finely tooled, delicately balanced resolution of a number of complex problems. Central to the resolution of Koniag's land problem is an exchange of land on the Alaska Peninsula to which Koniag and certain of the Koniag villages are entitled because of the deficiency of land in and around Kodiak Island to satisfy their entitlements, for land on Afognak Island. As for the acreages, Koniag and the Koniag villages give up more acreage than they will receive.

While the Koniag Amendment had not evolved when this Committee concluded its hearings last year and took action upon H.R. 39, we kept the Committee's staff currently and completely informed and have had the benefit of numerous discussion with the staff as the Amendment evolved.

Finally, we are grateful that the Chairman of the full Committee, the Chairman of the Subcommittee and Representative Young of Alaska support the Koniag Amendment. . . .

App. D at 1214-1219.

Weinberg's statement concluded:

In summary, the Koniag Amendment would:

1.  Exchange selection rights on the part of Koniag and Koniag villages to almost 300,000 acres of surface and underlying subsurface estate and an additional approximately 40,000 acres of surface estate on the Alaska Peninsula between Becharof Lake and the area that would be encompassed by the Aniakchak-Caldera National Monument, for some 280,000 acres of surface and underlying subsurface estate on Afognak Island now within the Chugach National Forest. The Alaska Peninsula lands that Koniag and its villages would surrender are described by the Alaska Coalition as "some of the very finest wildlife habitat in the world," and part of "the finest wildlife area in Alaska."

2.  Assure public access for sports hunting, fishing and other recreational purposes to the Afognak Island land that would be transferred to Koniag and its villages, pursuant to cooperative management agreements with appropriate federal, state and local agencies.

3.  Restrict Koniag's retained subsurface rights on the mainland to oil and gas under regulations designed to minimize interference with the surface values. Koniag would, therefore, give up all hardrock mineral values.

4.  Guarantee the retention in federal ownership, through addition to the Kodiak National Wildlife Refuge, of both islands offshore of Afognak Island and the "Red Peaks" area of over 46,000 acres, the latter being an area having unusual scenic and recreational value.

5.  Preserve within the Aniakchak National Monument almost 50,000 acres of land which, absent the Koniag proposal, would be conveyed under ANCSA to Koniag villages, with conveyance of underlying subsurface estate to Koniag, Inc.

6.  Preserve state selection rights to some 4,000 acres of land on Afognak Island heretofore selected by the State of Alaska under section 6 of the Alaska Statehood Act.

7.  Resolve, in a mutually satisfactory manner, a long standing dispute concerning the eligibility of seven Koniag villages for benefits under the Alaska Native Claims Settlement Act in a manner which imposes no substantial additional land burden upon the United States, thus bringing to an end extensive administrative and judicial proceedings which otherwise may delay for several additional years the final determination of the respective entitlements of all twelve

22

Alaska regional corporations and their eligible villages to almost 500,000 acres of land.

8.   Resolve, in a mutually satisfactory manner, disputes between the affected Native corporations and the Kodiak Island Borough involving conflicting selection claims.

9.   Assure management of the Afognak Island elk her by either federal or state game managing agencies.

10.   Assure protection of Afognak Island denning areas of the work renowned Kodiak brown bear.

11.   Without the Koniag proposal about one quarter of the 458,000 acres of land on Afognak Island will in any event be conveyed to Native corporations. Thus, regardless of the Koniag proposal the Forest Service will lose its present land monopoly on Afognak Island.  The Red Peaks area which (with the large offshore Ban Island) totals approximately 46,000 acres, is not forested, but has substantial scenic and recreational value.  These 46,000 acres, therefore, should not be regarded as a loss to the primary mission of the Forest Service, which is the management of federally owned timber lands.  They will remain in federal ownership and be managed for their true values, which are recreation and wildlife.

App. D at 1219-1221.[5]

---

[5] Weinberg's statement notes that the following documents were appended to his statement:

1.   The Koniag Amendment.
2.   A section-by-section analysis of the Koniag Amendment.
3.   A table dated January 25, 1979, entitled "Koniag Proposal," showing the acreages to be exchanged under the Koniag proposal.
4.   Letter from Acting Secretary of Agriculture Weddington to Senator Jackson dated September 11, 1978.
5.   Letter from Edward Weinberg to Senator Jackson dated September 13, 1978, commenting on the Agriculture letter of September 11, 1978.
6.   Letter of September 11, 1978 from the Alaska Coalition to Senator Jackson and Alaska Coalition's press release.
7.   Excerpts from S. Rep. 95-1300, 95th Cong., 2d Sess. (The Report of the Senate Committee on Energy and Natural Resources on H.R. 39, 95th Cong., 2d Sess.) regarding the Koniag Amendment.

App. D at 1221-1222.

3.    Text and section-by-section analysis of Section 1427

As noted above, the Senate Report provides a section-by-section analysis of Section 1427.

Comparison reveals that it is identical to the section-by-section analysis that was submitted as an

attachment to Ed Weinberg's statement to the House Committee on Interior and Insular Affairs.

Section 1427 is comprised of fifteen lettered subsections.  Following is the text of the

relevant subsections, including a discussion of each section and the explanation provided in the

section-by-section analysis.

The section-by-section analysis for subsection (a) states only that it  "defines pertinent

terms."  App. C at 5267.  The text of subsection (a) provides:

(a) As used in this section, the term–

(1) "Afognak Island" means Afognak Island, and Bear, Teck, Hogg, and
Murphy Islands . . . .

(2) "Deficiency village acreage on the Alaska Peninsula" means the
aggregate number of acres of public land to which "Koniag deficiency Village
Corporations" are entitled, under section 14(a) of the Alaska Native Claims
Settlement Act, to a conveyance of the surface estate on account of deficiencies in
available lands on Kodiak Island, and to which Koniag, Incorporated is entitled
under section 14(f) of that Act to conveyance of the subsurface estate.

(3) "12(b) acreage on the Alaska Peninsula" means the aggregate number
of acres of public lands to which "Koniag 12(b) Village Corporations" are entitled
under section 14(a) of the Alaska Native Claims Settlement Act by reason of
section 12(b) of that Act, to conveyance of the surface estate and to which Koniag,
Incorporated, under section 14(f) of that Act, is entitled to conveyance of the
subsurface estate, less the aggregate acreage of 12(b) lands on Kodiak Island as to
which Koniag 12(b) Village Corporations will receive conveyances, the latter
being estimated to be approximately fifteen thousand acres.

(4) "Koniag deficiency village corporation" means any or all of the
following:

Afognak Native Corporation;

24

Nu-Nachk-Pit, Incorporated;
Ouzinkie Native Corporation; and
Leisnoi, Incorporated.

(5) "Koniag 12(b) Village Corporation" means the village corporations listed in subparagraph (4) above, if within sixty days of the effective date of this Act, if within sixty days of the effective date of this Act, Koniag, Incorporated, by a resolution duly adopted by its Board of Directors, designates them as such as a class, and all of the following: Natives of Akhiok, Incorporated, Old Harbor Native Corporation, Kaguyak, Inc., Karluk Native Corporation and each of the corporations listed in subsection (e)(2) of this section which files a release as provided for in subsection (e)(1) of this section.

(6) "Koniag region" means the geographic area of Koniag, Incorporated, under the Alaska Native Claims Settlement Act.

(7) "Koniag village" means a Native village under the Alaska Native Claims Settlement Act which is within the Koniag region.

(8) "Koniag Village Corporation" means a corporation formed under section 8 of the Alaska Native Claims Settlement Act to represent the Natives of a Koniag village and any Village Corporation listed in subsection (e)(2) of this section, which has filed a release as provided in subsection (e)(1) of this section.

(9) "Koniag 14(h)(8) lands on the Alaska Peninsula" means the aggregate number of acres of public lands to which Koniag, Incorporated Regional Native Corporation is entitled under section 14(h)(8) of the Alaska Native Claims Settlement Act, less the acreage of lands withdrawn for conveyance to that corporation by Public Land Order Numbered 5627 (42 F.R. 63170) and conveyed to that corporation.

(10) Any term defined in subsection 3(e) of the Alaska Native Claims Settlement Act has the meaning therein defined.

(11) "Alaska Peninsula" means the Alaska Peninsula and all islands adjacent thereto which are withdrawn pursuant to section 11(a)(3) of the Alaska Native Claims Settlement Act for Koniag Village Corporations and Koniag, Incorporated, including but not limited to Sutwik, Hartman, Terrace, Nakchamik, and West and East Channel Islands, except those islands selected by Koniag, Inc. pursuant to section 15 of Public Law 94-204.

These definitions relate primarily to Section 1427's land exchange provisions, under

25

which the Koniag regional and village corporations were to receive lands on Afognak Island in exchange for their selection rights to the "deficiency" lands withdrawn on the Alaska Peninsula.

Subsection (a)(1) defines "Afognak Island" as the lands to be conveyed to the Koniag regional and village corporations in exchange for their selection rights to the lands on the Alaska Peninsula. Subsection (a)(11) defines the "Alaska Peninsula" as the lands that were withdrawn on the Alaska Peninsula pursuant to ANCSA Section 11(a)(3) for selection by the Koniag regional and village corporations. The definition states that these lands were lands withdrawn on the Alaska Peninsula pursuant to ANCSA Section 11(a)(3). ANCSA Section 11(a)(3) provides for the withdrawal of "deficiency" lands in areas that are not contiguous to a village corporation where the lands withdrawn around the village are not sufficient to satisfy the village's land entitlements.[6]

---

[6]ANCSA Section 11(a)(3), 43 U.S.C. § 1610(a)(3), provides:

**§1610. Withdrawal of public lands**

**(a) Description of withdrawn public lands; exceptions; National Wildlife Refuge lands exception; time of withdrawal.** (1) The following public lands are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws, including the mining and mineral leasing laws, and from selection under the Alaska Statehood Act [48 USCS prec. § 21 note], as amended:

    (A) The lands in each township that enclosed all or part of any Native village identified pursuant to subsection (b);

    (B) The lands in each township that encloses all or part of any Native village identified pursuant to subsection (b);

    (C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection.

The following lands are excepted from such withdrawal: lands in the National Park System and lands withdrawn or reserved for national defense purposes other than Naval Petroleum Reserve Numbered 4.

* * *

26

The definitions make clear that the land exchange was in satisfaction of 3 separate land entitlement rights under ANCSA, including: 1) the lands to which four of the Koniag Village Corporations were entitled, as part of their original entitlement under Section 14(a) of ANCSA; 2) the Koniag Village Corporations' share of the "residual" lands left over from the 22 million acres of lands withdrawn for selection by the Native village corporations, to which all of the village and regional corporations were entitled to share pursuant to ANCSA Section 12(b); and 3) Koniag, Inc.'s share of the "residual" lands left over from the 2 million acres of land withdrawn under ANCSA Section 14, to which all of the regional corporations were entitled to share pursuant to ANCSA Section 14(h)(8).

The first entitlement represented lands that were to be conveyed to Leisnoi and three other Koniag village corporations as part of their original land entitlements, which were to have been selected and conveyed from the "deficiency lands" that were withdrawn on the Alaska Peninsula. It is this entitlement that is defined in subsection (a)(2) as the "deficiency village acreage on the Alaska Peninsula." Subsection (a)(2) defined these lands as lands to which the

---

(3)(A) If the Secretary determines that the lands withdrawn by subsections (a)(1) and (2) hereof are insufficient to permit a Village or Regional Corporation to select the acreage it is entitled to select, the Secretary shall withdraw three times the deficiency from the nearest unreserved, vacant and unappropriated public lands. In making this withdrawal the Secretary shall, insofar as possible, withdraw public lands of a character similar to those on which the village is located and in order of their proximity to the center of the Native village: Provided, That if the Secretary, pursuant to section 17, and 22(e) [43 USCS §§ 1616, 1621(e)] determines there is a need to expand the boundaries of a National Wildlife Refuge to replace any acreage selected in the Wildlife Refuge System by the Village Corporation the withdrawal under this section shall not include lands in the Refuge.

(B) The Secretary shall make the withdrawal provided for in subsection (3)(A) hereof on the basis of the best available information within sixty days of the enactment of this Act [enacted Dec. 18, 1971], or as soon thereafter as practicable.

"Koniag deficiency Village Corporations" were entitled under section 14(a) of ANCSA.[7] Koniag, Inc. was entitled to the subsurface rights to these lands pursuant to section 14(f).

The four "Koniag deficiency village corporations" entitled to these lands are defined in subsection (a)(4) as including: 1) Afognak Native Corporation; 2) Nu-Nach-Pit, Incorporated; 3) Ouzinkie Native Corporation; and 4) Leisnoi, Incorporated.

An attachment to Ed Weinberg's statement to the House Committee on Interior and Insular Affairs provides a breakdown of the total acreage of lands to which all of the Koniag regional and village corporations were entitled, for each the 3 entitlements that were to be satisfied in the land exchange. App. D at 1229. The breakdown lists a total of 340,861 acres for all three entitlements. Id. Of this, the "deficiency village acreage on the Alaska Peninsula" to which the four "deficiency village corporations" were entitled consisted of 199,860 acres. Id.

---

[7] ANCSA Section 14(a) (43 U.S.C. § 1613(a)) provides for the conveyance of lands to eligible Native village corporations, in an amount based on the number of the Natives enrolled to the village:

**(a) Native villages listed in section 1610 and qualified for land benefits; patents for surface estate; issuance; acreage.** Immediately after selection by a Village Corporation for a Native village listed in section 11 [43 USCS § 1610] which the Secretary finds is qualified for land benefits under the Act, the Secretary shall issue to the Village Corporation a patent to the surface estate in the number of acres shown in the following table

| If the village had on the 1970 census enumeration date a Native population between– | It shall be entitled to a patent to an area of public lands equal to– |
|---|---|
| 25 and 99 | 69,120 acres |
| 100 and 199 | 92,160 acres |
| 200 and 399 | 115,200 acres |
| 400 and 599 | 138,240 acres |
| 600 or more | 161,280 acres |

The lands patented shall be those selected by the Village Corporation pursuant to subsection 12(a) [43 USCS § 1611(a)]. In addition, the Secretary shall issue to the Village Corporation a patent to the surface estate in the lands selected pursuant to subsection 12(b) [43 USCS § 1611(b)].

The breakdown does not apportion this figure to show what acreage each of the four deficiency village corporations was entitled.

The second land entitlement that was to be satisfied by the land exchange consisted of the "residual" lands left over from the 22 million acres of lands withdrawn for selection by the Native village corporations, to which all of the village and regional corporations were entitled to share pursuant to ANCSA Sections 12(b) and 14(a). This entitlement is defined in subsection (a)(3) as the "12(b) acreage on the Alaska Peninsula," to which the "Koniag 12(b) Village Corporations" were entitled pursuant to sections 12(b) and 14(a) of ANCSA. Section 14(a) provides that each Village Corporation was entitled to the conveyance of lands "selected pursuant to subsection 12(b)." 43 U.S.C. § 1613(a). Section 12(b), in turn, provides that the remaining unselected balance of the 22 million acres of land withdrawn for selection by all of the Village Corporations were to be conveyed to the eleven Regional Corporations. The Regional Corporations were to then redistribute these lands, on an "equitable basis," to each of the Village Corporations within their region.[8]

Consistent with Section 12(b), subsection (a)(5) defines "Koniag 12(b) Village

---

[8] Section 12(b) provides:

(b) Allocation; reallocation considerations. The difference between twenty-two million acres and the total acreage selected by Village Corporations pursuant to subsection (a) shall be allocated by the Secretary among the eleven Regional Corporations (which excludes the Regional Corporation for southeastern Alaska) on the basis of the number of Natives enrolled in each region. Each Regional Corporation shall reallocate such acreage among the Native villages within the region on an equitable basis after considering historic use, subsistence needs, and population. The action of the Secretary of the Corporation shall not be subject to judicial review. Each Village Corporation shall select the acreage allocated to it from the lands withdrawn by subsection 11(a) [43 USCS § 1610(a)].

43 U.S.C. § 1611(b).

29

Corporation" as including all of the village corporations in the Koniag region, including Leisnoi.
It lists these corporations as including: 1) the four "Koniag deficiency village corporations" listed
in subsection (a)(4); 2) the Natives of Akhiok, Inc., Old Harbor Native Corp., Kaguyak, Inc., and
Karluk, Inc.; and 3) the seven uncertified Native corporations listed in subsection (e)(2),
provided they file a release of any additional claims under ANCSA as provided in subsection
(e)(1).

The inclusion of the seven uncertified Native villages in the definition of "Koniag 12(b)
Village Corporation" reflects the provisions of the settlement of their claims against the United
States, provided in subsection (e). In return for their release of their claims against the United
States for full benefits under ANCSA, they were granted limited eligibility status, and entitled to
an interest in the lands conveyed on Afognak Island, in an amount equal to the interests received
by the other Koniag village corporations for their 12(b) entitlements. As noted in Weinberg's
statement, their grant of limited eligibility status did not result in the conveyance of any
additional lands by the United States. Their share of the Afognak lands came from the land
entitlements of the other Koniag-region village corporations. The breakdown attached to
Weinberg's statement shows that the Koniag regional and village corporations were entitled to
select 340,862 acres from the lands on the Alaska Peninsula. The lands on Afognak Island
exchanged for these selection rights consisted of only 279,592 acres, resulting in the conveyance
of 61,269 fewer acres than would have otherwise been conveyed to these corporations. App. D
at 1229. Consequently, the grant of limited eligibility status to the seven uncertified villages, and
the conveyance to them of a 12(b) interest in the Afognak lands, came from the diminished
shares of the other Koniag village corporations' entitlements.

The third land entitlement that was to be satisfied by the land exchange consisted of the "residual" lands left over from the 2 million acres of land withdrawn under ANCSA Section 14(h), to which all of the regional corporations were entitled to share pursuant to Section14(h)(8). It is this entitlement that is defined in subsection (a)(9) of the Koniag Amendment as "Koniag 14(h)(8) lands on the Alaska Peninsula." Section 14(h) authorized the Secretary to withdraw and convey 2 million acres for a variety of purposes, including: 1) conveyances to regional corporations of cemetery sites and historical places (14(h)(1)); 2) conveyances to Native groups (14(h)(2));  3) conveyances to the Natives residing in Sitka, Kenai, Juneau, and Kodiak (14(h)(3)); and 4) conveyances to individual Natives of land occupied as their primary place of residence (14(h)(5).  Subsection 14(h)(8) provided that "[a]ny portion of the 2 million acres not conveyed by this subsection shall be allocated and conveyed to the Regional Corporations on the basis of population. . . .".  43 U.S.C. § 1613(h)(8).  The breakdown attached to Weinberg's statement shows that, out of the total of 340,862 acres for all three entitlements involved in the land exchange, Koniag, Inc.'s Section 14(h)(8) entitlement consisted of 52,531 acres.  App. D at 1229.

The land exchange provisions in Section 1427 are provided in subsections (b) and (c). The section-by-section analysis attached to Weinberg's statement, and adopted in Senate Report No. 96-413, describe the operation and effect of subsections (b) and (c) as follows:

> *Subsection (b)(1)* identifies the Native corporations to receive title to the lands on Afognak Island to be conveyed pursuant to the section, and provides that such conveyances shall be in full satisfaction of the rights of each such corporations to conveyance under the Alaska Native Claims Settlement Act of lands and interests therein on the Alaskan Peninsula

> *Subsection (b)(2)* identifies exceptions to the conveyances provided for in

subsection (b)(1).

*Subsections (b)(3) and (b)(4)* provide the mechanics of effectuating the extinguishment of certain Koniag Native corporation deficiency selection rights on the Alaska Peninsula in exchange for which the conveyances of land on Afognak Island are to be made.

*Subsection (b)(5)* provides for public access for recreational purposes to the lands on Afognak Island except in areas where commercial activities, such as logging, are taking place. Cooperative management agreements between the appropriate Koniag Native corporations and the Department of the Interior, appropriate state agencies and appropriate local political subdivisions (to the extent that the Department and such state and local agencies wish to enter into such agreements) may further define the lands to be so opened, the conditions under which they will be opened, and will establish appropriate limits and conditions upon the recreational uses.

*Subsection (c)* provides that the surface estate on Afognak Island to be conveyed under subsection (b)(1) is to be conveyed to a joint venture consisting of Koniag deficiency village corporations, Koniag 12(b) village corporations and Koniag, Inc. Provision is made, at the election of any of the Koniag Native corporations involved, to be represented in the joint venture by a wholly owned subsidiary corporation. The subsection prescribes the share each of the participants is to have in the joint venture. The patent will name all the grantees of the surface estate but it will not set out their relative shares. Simultaneously with the conveyance of the surface estate to the joint venture, the subsurface estate in the lands conveyed is to be conveyed to Koniag, Inc. Finally, the join venture and Native corporations involved are prohibited from taking or permitting actions inimical to bear denning activity on the Tonki Cape Peninsula on Afognak Island

App. C at 5267-68.

Subsection (b)(1) provides for the conveyance of the lands on Afognak Island in lieu of, and in full satisfaction, of the three above-described land entitlements. It provides that the conveyance is to be made as provided in subsection (c), and is subject to "the terms and conditions set forth in this section":

(b)(1) In full satisfaction of (A) the right of Koniag, Incorporated, Regional Native Corporation to conveyance of Koniag 14(h)(8) lands on the Alaska Peninsula under the Alaska Native Claims Settlement Act; (B) the right of each Koniag