Deficiency Village Corporation to conveyance under that Act of the surface estate of deficiency village acreage on the Alaska Peninsula; (C) the right of each Koniag 12(b) Village Corporation to conveyance under the Alaska Native Claims Settlement Act of surface estate of 12(b) acreage on the Alaska Peninsula; (D) the right of Koniag, Incorporated under the Alaska Native Claims Settlement Act to conveyances of the subsurface estate of the deficiency village acreage on the Alaska Peninsula and of the 12(b) acreage on the Alaska Peninsula; and (E) the right of Koniag, Incorporated, to receive the minerals in the subsurface estates that, under subsection (g)(3) of this section and sections 12(a)(1) and 14(f) of the Alaska Native Claims Settlement Act, it will be conveyed on the Alaska Peninsula, other than oil and gas and sand and gravel that it will be conveyed as provided in subsection (l) of this section; and in lieu of conveyances thereof otherwise, the Secretary of the Interior shall, under the terms and conditions set forth in this section, convey as provided in subsection (c) of this section the surface estate of all of the public lands on Afognak Island except those lands referred to in subparagraphs 2 (A), (B), (C), and (D) of this subsection, and simultaneously therewith, the Secretary shall, under the terms and conditions set forth in this section, convey the subsurface estate of such lands to Koniag, Incorporated.

Subsection (b)(2) specifies certain exceptions from the lands to be conveyed on Afognak Island, including lands previously selected by the State of Alaska and by three of the Koniag-region Native corporations, as well as other specified exceptions.

Subsection (b)(3) provides that, after the effectuation of the land exchange, the "deficiency" lands on the Alaska Peninsula are to be withdrawn from all forms of appropriation under the public land laws, and included within the Alaska Peninsula National Wildlife Refuge.

Subsection (b)(4) requires each of the Koniag village corporations and Koniag, Inc. to file a resolution with the Secretary of Interior, adopted by their board of directors, "accepting the conveyances provided for in this subsection as being in full satisfaction of their respective entitlements." The filing of such resolutions was made an express "condition precedent" to the conveyance of the lands on Afognak Island:

(4) As a condition precedent to the conveyances provided for by subparagraph (1)

33

of this subsection, Koniag, Incorporated, each Koniag Deficiency Village Corporation and each Koniag 12(b) Village Corporation shall file with the Secretary of the Interior resolutions duly adopted by their respective boards of directors accepting the conveyances provided for in this subsection as being in full satisfaction of their respective entitlements to conveyances of Koniag 14(h)(8) lands on the Alaska Peninsula, of deficiency village acreage on the Alaska Peninsula and of 12(b) acreage on the Alaska Peninsula, and Koniag, Incorporated, shall further file with the Secretary of the Interior a resolution duly adopted by its board of directors accepting the provisions of subsection (1) of this section.

Subsections (b)(5) and (b)(6) provide specified restrictions on the lands to be conveyed on Afognak Island, and provide that they are to remain open and available for designated public uses and for governmental management and administration pursuant to cooperative agreements entered into between the regional and village corporations and federal and state governmental agencies.

Subsection (c) provides that the Secretary is to convey the Afognak lands to a joint venture comprised of the Koniag regional and village corporations.  The conveyance is conditioned upon the filing with the Secretary of a joint venture agreement executed by all of the Native corporations, specifying the shares and interests of each corporation in the joint venture, as provided in the subsection.  The subsection provides separate formulas for determining the shares of the regional and village corporations, based on their share of the three entitlements that were exchanged for the Afognak lands.  The four "Koniag deficiency village corporations" were to be granted shares based on the amount of their entitlements to the deficiency acreage on the Alaska Peninsula.  The "Koniag 12(b) village corporations" were to be granted shares based on the amount of their 12(b) entitlements to the lands on the Alaska Peninsula.  As noted above, the "Koniag 12(b) Village Corporations" included all of the Koniag-regional village corporations–

34

including the four "deficiency village corporations." Consequently, the four deficiency village

corporations were granted a greater share of the joint venture, based on both their village

deficiency and 12(b) entitlements. The seven uncertified village corporations were also included

in the definition of "Koniag 12(b) Village Corporation," provided they file a release of all further

claims, and were thus entitled to a share in the joint venture in an amount equal to the 12(b)

shares of the other village corporations. Koniag, Inc. was to receive a share of the joint venture

based on the amount of 14(h)(8) entitlement. It was also to receive a conveyance of the

subsurface estate of all the lands conveyed on Afognak Island. Subsection (c) provides:

> (c) The Secretary of the Interior shall convey the surface estate on Afognak Island
> to be conveyed under subsection (b)(1) of this section to a joint venture providing
> for the development of the surface estate on Afognak Island to be conveyed under
> this subsection, consisting of the Koniag Deficiency Village Corporations, the
> Koniag 12(b) Village Corporations and Koniag, Incorporated (or wholly owned
> subsidiaries thereof), in which (1) the share of the Koniag Deficiency Village
> Corporations as a class in the costs and revenues of such joint venture is
> determined on the basis of a fraction, the numerator of which is the deficiency
> village acreage on the Alaska Peninsula and the denominator of which is the sum
> of the deficiency village acreage on the Alaska Peninsula plus the 12(b) acreage
> on the Alaska Peninsula plus the Koniag 14(h) acreage on the Alaska Peninsula,
> which fraction shall be multiplied by the number of acres on Afognak Island to be
> conveyed by reason of subparagraph (b)(1) of this subsection; (2) the share of the
> Koniag 12(b) Village Corporations as a class is determined on the basis of a
> fraction, the numerator of which is the 12(b) acreage on the Alaska Peninsula and
> the denominator of which is the denominator referred to in (1) above, which
> fraction shall be multiplied by the number of acres on Afognak Island referred to
> (1) above; and (3) the share of Koniag, Incorporated is determined on the basis of
> a fraction, the numerator of which is the Koniag 14(h) acreage on the Alaska
> Peninsula and the denominator of which is the denominator referred to in (1)
> above which fraction shall be multiplied by the number of acres on Afognak
> Island to in (1) above. In such joint venture, each Koniag Deficiency Village
> Corporation shall participate in the share of the Koniag Deficiency Village
> Corporations as a class in the ratio that the entitlement of each to deficiency
> village acreage on the Alaska Peninsula and each Koniag 12(b) Village
> Corporation shall participate in the share of the Koniag 12(b) Village
> Corporations as a class in the ratio that the number of Natives enrolled under the

Alaska Native Claims Settlement Act to the village that corporation represents bears to the number of Natives enrolled to all villages represented by Koniag 12(b) Village Corporations. The conveyance shall be made as soon as practicable after there has been filed with the Secretary of Interior a duly executed joint venture agreement with provisions for sharing of and entitlements in costs and revenues of such venture as provided in this subsection. The conveyance shall not indicate the respective interests of each of the corporations in the surface estate conveyed but shall be incorporated by reference into the conveyance. The subsurface estate in the foregoing lands shall be conveyed simultaneously to Koniag, Incorporated. Neither the joint venture, and Koniag Village Corporation having an interest in the joint venture or the lands conveyed thereto, nor Koniag, Incorporated shall take or permit any action which may be inimical to bear denning activities on the Tonki Cape Peninsula.

Subsection (d) resolves a dispute between the Kodiak Island Borough and the Ouzinkie Native Corporation and Koniag, Inc. The section-by-section analysis explains:

Subsection (d) provides the means of resolving a dispute between Ouzinkie Native Corporation and Koniag, Inc. on the one had and the Kodiak Island Borough on the other, over rights to the land on Kodiak Island described in the subsection. The dispute would be resolved by requiring the Secretary of the Interior to convey the surface and subsurface estate of the lands on Afognak Island described in the subsection to Ouzinkie Native Corporation and Koniag, Inc., respectively, in the even Ouzinkie Native Corporation and Koniag, Inc. enter into an agreement to convey to the Kodiak Island Borough their interests in the described Kodiak Island land which the Kodiak Island Borough desires as watershed.

App. C at 5268.

Subsection (e) contains the provisions according limited eligibility status to the seven uncertified Koniag villages, in return for their release of all further claims against the Government under ANCSA. The section-by-section analysis explains the purpose and effect of subsection (e) as follows:

Subsection (e) will, when implemented, resolve in favor of the Native villages listed therein, all disputes concerning their eligibility for ANCSA benefits and prescribes limits upon the ANCSA land benefits to which these villages shall be entitled. The time limits stated in this and other subsections are intended to be directory rather than mandatory.

36

App. C at 5268.

Subsection (e)(1) provides that each of the seven uncertified villages listed in subsection (e)(2) "shall be deemed an eligible village under the Alaska Native Claims Settlement Act," provided that they each file, with the Secretary, a release releasing the United States "from all claims of the village and the Village Corporations to lands and interest therein arising under the Alaska Native Claims Settlement Act or compensation in any form therefor (except as provided in paragraph (3) of this subsection)." A release was also required from Koniag, Inc., releasing the United States from any claims to the subsurface estate arising out of the claims from each village:

> (e)(1) Each village listed in paragraph (2) of this subsection which, through the Koniag Village Corporation listed alongside it, files with the Secretary of the Interior, within sixty days from the effective date of this Act, a release duly authorized by its board of directors releasing, in consideration of the benefits provided for in this section, the United States, its officers, employees, and agents from all claims of the village and the Village Corporations to lands and interest therein arising under the Alaska Native Claims Settlement Act or compensation in any form therefor (except as provided in paragraph (3) of this subsection) along with a release by Koniag, Incorporated, duly authorized by its board of directors, releasing the United States, its officers, employees, and agents, from Koniag's claims to subsurface estate under the Alaska Native Claims Settlement Act arising out of the claims of such village or compensation in any form therefor (except as provided in paragraph (3) of this subsection) shall be deemed an eligible village under the Alaska Native Claims Settlement Act. This section shall be inoperative as to any such village which does not file such a release but shall be operative as to each of such villages which files such a release.

Subsection (e)(2) lists the seven Koniag villages subject to the provisions of subsection (e):

> (2) The villages and Koniag Village Corporations referred to in the foregoing paragraph are:
>
> Anton Larsen Bay            Anton Larsen, Incorporated

37

| Bells Flats | Bells Flats Natives, Incorporated |
| Uganik | Uganik Natives, Incorporated |
| Litnik | Litnik, Incorporated |
| Port William | Shuyak, Incorporated |
| Ayakulik | Ayakulik, Incorporated |
| Uyak | Uyak Natives, Incorporated |

Subsection (e)(3) provides for the conveyance of one square mile of land to Uyak,

Uganik, and Ayakulik, provided they file a release as provided in subsection (e)(1):

> (3)(A) When Uyak Natives, Incorporated, Uganik Natives Incorporated, or
> Ayakulik, Incorporated (and Koniag, Incorporated in respect of such corporations)
> executes a release as provided for in paragraph (1) of this subsection, the
> Secretary of the Interior shall convey to each Village Corporation executing such
> release the surface estate of the one square mile of land excluded from the Kodiak
> Island National Wildlife Refuge by Public Land Order Numbered 1634 on
> account of the village it represents.  The Secretary of the Interior shall by reason
> of conveyance of surface estate to a Village Corporation under this paragraph (3)
> convey to Koniag, Incorporated the subsurface estate in such lands.

> (B) Upon conveyance of each Koniag Village Corporation of that land
> described in subparagraph (A), such Village Corporation shall comply with the
> requirements of subsection (f) of this section, except that it shall be required to
> convey twenty acres to the State in trust for any Municipal Corporation
> established in the Native village in the future for community expansion and
> appropriate rights of way for public use, and other foreseeable community needs.

Subsection (e)(4) provides that the seven villages were entitled to share in the distribution

of funds and revenues to Village Corporations by Koniag, Inc., provided they file the release

provided in subsection (1):

> (4) There shall vest in the Native Village Corporation representing each village
> that files a release as provided for in subsection (e)(1) of this section the right to
> all revenues received by Koniag, Incorporated from the Alaska Native Fund which
> would have been distributed to it by Koniag, Incorporated under subsections (j)
> and (k) of section 7 of the Alaska Native Claims Settlement Act (subject to
> subsection (l) of section 7 of that Act) had such village been determined to be
> eligible at the time of such distributions, less amounts heretofore paid by Koniag,
> Incorporated under subsection (m) of section 7 of that Act to stockholders of such
> corporations as members of the class of at-large stockholders of Koniag,

38

Incorporated. Each corporation representing a village that files a release as provided for in subsection (e)(1) of this section shall hereafter be entitled to share pro rata with all other Koniag Village Corporations in distributions of funds to Village Corporations made by Koniag, Incorporated out of funds hereafter received by Koniag, Incorporated from the Alaska Native Fund or from any other source and shall be eligible for all other rights and privileges to which Alaska Native Village Corporations are entitled under any applicable laws, except as limited by this subsection. Nothing in this paragraph shall prohibit Koniag, Incorporated from withholding out of funds otherwise due a Village Corporation that files a release as provided for in subsection (e)(1) of this section, such sums as may be required to reimburse Koniag, Incorporated for an equitable portion of expenses incurred by Koniag, Incorporated in connection with or arising out of the defense of or assertion of the eligibility of the village represented by such corporation for benefits under the Alaska Native Claims Settlement Act, including costs incident to land selection therefor.

Subsection (f) provides that all conveyances made by reason of Section 1427 were to be subject to the terms and conditions of ANCSA, as if such conveyances had been made or issued by ANCSA:

(f) All conveyances made by reason of this section shall be subject to the terms and conditions of the Alaska Native Claims Settlement Act as if such conveyances (including patents) had been made or issued pursuant to that Act.

The section-by-section analysis for subsection (f) explains:

*Subsection (f).* The intent of this subsection is to assure the applicability of the provisions of the Alaska Native Claims Settlement Act to conveyances to Native corporations made under this section to the extent that such provisions would have been applicable were the conveyances made pursuant to ANCSA. As one example, the applicability of otherwise applicable provisions ANCSA are not to be affected by the fact that the conveyance provided for in subsection (c) is to be made to a joint venture rather than directly to the Alaska Native corporations that are the joint venturers.

App. C at 5268.

Subsection (g) relates to the rights of Koniag, Inc. to the subsurface estate of specified lands. The section-by-section analysis explains that subsection (g) "is a savings clause designed

39

to preserve the rights of Koniag, Inc. on the Peninsula as therein provided." App. C at 5268.

Subsection (h) provides for the withdrawal of the lands to be conveyed to the Koniag

Native corporations on Afognak Island. The section-by-section analysis explains that subsection

(h) "withdraws, subject to valid existing rights, public lands on Afognak Island to be conveyed to

Native corporations within the Koniag region under this section, and provides for the opening of

such lands, in the event any are not conveyed, to the extent the Secretary of the Interior deems

appropriate." App. C at 5269.

Subsection (i) relates to the limited rights accorded to Koniag, Inc. under subsection (l) to

the subsurface estate of lands on the Alaska Peninsula, and accords to Koniag, Inc. the rights of

access and use of the surface estate of such lands for purposes of extraction and removal of the

subsurface minerals.

Subsection (j) provides that the acreage to be allocated to Koniag, Inc. under section

12(b) of ANCSA is to be determined as though the seven uncertified villages listed in subsection

(e)(2) had each selected 69,120 acres. Subsection (j) provides:

> (j) The acreage to be allocated to Koniag, Incorporated under section 12(b) of the
> Alaska Native Claims Settlement Act shall be determined as though each village
> listed in subparagraph (e)(2) of this section had selected 69,120 acres under
> section 12(a) of the Alaska Native Claims Settlement Act. Acreages allotted to
> other regional corporations under section 12(b) of the Alaska Native Claims
> Settlement Act shall be determined on the basis of the acreages actually conveyed
> to such villages under this section or the Alaska Native Claims Settlement Act.

The section-by-section analysis for subsection (j) explains:

> *Subsection (j)* deals with one of the incidents of the settlement of the village
> eligibility dispute which is the subject of subsection (e). Its effect is, with the
> minor exception therein provided for amounting at the most to 1920 acres, to
> preclude diminution of land allocations to other Alaska regional corporations
> under subsection 12(b) of ANCSA because of resolution of the village eligibility

40

dispute.

App. C at 5269.

Subsection (k) relates to how Koniag, Inc.'s interest in the timber resources in the lands conveyed on Afognak Island are to computed for purposes of the revenue-sharing provisions in section 7(i) of ANCSA.

Subsection (l) relates to the restriction of Koniag, Inc.'s subsurface rights in lands conveyed to it on the Alaska Peninsula.

Subsection (m) provides for the inclusion within the Kodiak National Wildlife Refuge of lands in and around Afognak Island not conveyed to the Koniag Native corporations pursuant to Section 1427.

Subsection (n) provides that the provisions of section 22(j)(2) of ANCSA, as amended by ANILCA Section 1410, do not apply to Koniag, Inc. or any of the Koniag village corporations:

> (n) Section 22(j)(2) of the Alaska Native Claims Settlement Act as amended by section 1410 shall not apply to Koniag, Incorporated or to any Koniag Village Corporation.

The provisions of Section 22(j)(2), as amended by ANILCA Section 1410, are similar to the original provisions of ANCSA Section 11(a)(3), which provided for the withdrawal of "deficiency" lands where the lands withdrawn for selection by a village corporation were insufficient to satisfy its land entitlements. Section 11(a)(3) provided that such withdrawals were to have been made by the Secretary within sixty days of the enactment of ANCSA, on December 18, 1971. 43 U.S.C. § 1610(a)(3)(B). Pursuant to section 22(h) (43 U.S.C. § 1621(h), all such withdrawals automatically expired within four years of the date of enactment of ANCSA (except for withdrawn land that had been selected). Section 22(j)(2), as amended by ANILCA section

1410 in 1980, authorized the Secretary to make new withdrawals of "deficiency" lands in order to satisfy any remaining deficiencies in the lands selected and/or conveyed to the Village Corporations under ANCSA sections 12(b), 14(a), 16(b), or 16(d).[9]

The section-by-section analysis of subsection (n) explains that the Koniag Native corporations were excluded from the provisions of ANCSA Section 22(j)(2) because the resolution of the Koniag land deficiency problem provided in Section 1427 rendered them "unnecessary":

> *Subsection (n).* The exclusions in subsection (n) are made because the section itself makes them unnecessary.

App. C at 5270.

Subsection (o) provides a savings clause to preserve existing Forest Service timber contracts and Forest Service Cabin leases on Afognak Island.

---

[9] Section 22(j)(2), as amended by ANILCA Section 1410, provides:

**(j) Interim conveyances and underselections.**

* * *

(2) Where lands selected and conveyed, or to be conveyed to a Village Corporation are insufficient to fulfill the Corporation's entitlement under subsection 12(b), 14(a), 16(b), or 16(d) [43 USCS § 1611(b), 1613(a), 1615(b), or 1615(d)], the Secretary is authorized to withdraw twice the amount of unfulfilled entitlement and provide the Village Corporation ninety days from receipt of notice from the Secretary to select from the lands withdrawn the land it desires to fulfill its entitlement. In making the withdrawal, the Secretary shall first withdraw public lands that were formerly withdrawn for selection by the concerned Village Corporation by or pursuant to subsection 11(a)(1), 11(a)(3), 16(a), or 16(d) [43 USCS § 1610(a)(1), 1610(a)(3), 1615(a), or 1615(d)]. Should such lands no longer be available, the Secretary may withdraw public lands that are vacant, unreserved, and unappropriated, except that the Secretary may withdraw public lands which had been previously withdrawn pursuant to subsection 17(d)(1) [43 USCS § 1616(d)(1)]. Any subsequent selection by the Village Corporation shall be in the manner provided in this Act for such original selections.

43 U.S.C. § 1621(j)(2).

C.    Section 1427 did not repeal ANCSA's village eligibility requirements as to Leisnoi

1.    Applicable Law

Leisnoi and Koniag argue that Section 1427 "ratified" or "confirmed" Leisnoi's status as an eligible Native village under ANCSA.  As discussed below, the real issue, properly framed, is whether Section 1427 repealed the village eligibility requirements provided in ANCSA Section 11(b)(3) as to Leisnoi.

Koniag argues that Congress possesses the plenary power to "designate" Leisnoi as eligible Native village corporation entitled to receive benefits under ANCSA.  It cites three sources of such power, including: 1) Congress' power to "ratify" the unauthorized acts of government officials; 2) Congress' power to dispose of public lands by legislative enactment; and 3) Congress' power to moot a pending controversy by enacting new legislation.  Koniag's Brief at 82-86.

Koniag confuses the sources of Congress' powers with the standards for determining whether Congress exercised those powers.

Koniag cites several cases for the proposition that Congress has the authority to "ratify unauthorized acts of government officials if those acts could have been authorized when taken." Koniag's Brief at 82-84.  Stratman does not dispute that Congress has this power.  However, this power is not applicable to the issue presented in this case.  The cases cited by Koniag relate to Congressional ratification of unauthorized acts of government officials.  There is no suggestion that the Secretary did not have the authority to certify Leisnoi as an eligible Native village. ANCSA Section 11(b)(3) expressly conferred this power to the Secretary.  Stratman's challenge

43

to the Secretary's decision to certify Leisnoi is not based on a contention that his decision was

unauthorized.  It is based on the contention that it was *incorrect*, in that Leisnoi was not qualified

as an eligible Native village under the criteria provided in ANCSA Section 11(b)(3).  The issue

here is not whether Section 1427 "ratified" any unauthorized act by the Secretary in certifying

Leisnoi as an eligible Native village.  Rather, it is whether Section 1427 exempted Leisnoi from

the village eligibility requirements provided in ANCSA Section 11(b)(3) regardless of the

Secretary's determination, and regardless of whether Leisnoi satisfied those requirements.  The

issue, properly framed, is whether Section 1427 repealed Section 11(b)(3)'s village eligibility

provisions with regard to Leisnoi.

Koniag also cites several cases for the proposition that Congress has the power, under the

property clause of the Constitution, to dispose of public lands as it sees fit.  Koniag's Brief at 84-

85.  Stratman does not dispute that Congress has this power.  But this only begs the question of

whether Congress exercised that power, when it enacted Section 1427, to exempt Leisnoi from

having to satisfy the village eligibility requirements provided in ANCSA Section 11(b)(3) as a

condition to its receipt of ANCSA land benefits.  ANCSA was itself an exercise of Congress'

power to dispose of public lands, and the village eligibility requirements provided in Section

11(b)(3) were an express condition imposed by Congress to the entitlement of those lands.  The

issue here is whether Congress repealed the village eligibility requirements as a condition to

Leisnoi's receipt of the land entitlements provided in ANCSA.

Koniag also cites a line of authority for the proposition that Congress has the power to

moot a pending lawsuit by enacting new legislation to modify or repeal the law governing the

suit.  Koniag's Brief at 85-86.  Stratman concedes that Congress has this power.  See e.g.,

44

Robertson v. Seattle Audubon Soc., 503 U.S. 429, 112 S.Ct. 1407 (1992). But again, this only begs the question of whether Congress exercised that power to moot Stratman's lawsuit when it enacted Section 1427. In Stop H-3 Association v. Dole, 870 F.2d 1419 (9th Cir. 1989), the case relied on by Koniag, the Court held that Congress had legitimately mooted a lawsuit challenging the construction of an interstate highway, by enacting new legislation that specifically exempted the construction project from the requirements of the environmental statute that was the basis for the plaintiffs' challenge. There was no question, in Stop H-3, whether the new legislation had modified or repealed the prior statutory provisions with regard to the highway project. The new legislation had expressly modified the prior statute to exempt the specific project from its requirements. The issue here is whether Section 1427 modified or repealed Section 11(b)(3) as to exempt Leisnoi from having to satisfy its requirements. As noted by the Court in Friends of the Earth v. Weinberger, 562 F.Supp. 265 (D.D.C. 1983), whether Congress exercised its power to moot a lawsuit by enacting new legislation must be determined according to recognized standards of statutory construction. Where the new legislation does not expressly modify or repeal the prior statutory requirements, determination of the issue turns on whether the new legislation *impliedly* modified or repealed the provisions of the prior statute:

> Through the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy notwithstanding its pendency before the courts. . . .

> Although courts are reluctant to find repeal by implication based on congressional appropriations action, "when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'" Balancing these competing concerns requires inquiry into congressional intent to determine whether the two statutory provisions at issue are contradictory.

> To be sure, Congress can and does exempt projects from NEPA. Yet NEPA's

"deliberate command" that federal agencies comply with the Act's requirements, Flint Ridge, 426 U.S. at 787, 96 S.Ct. at 2437, assures that courts will not regard congressional action as exemptive without strong supporting evidence. As the Court of Appeals for this Circuit has stated:

> Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act . . . even when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances. Absent very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA, or a direct contradiction between that Act and the new legislation, claims under NEPA should be reviewed.

Id. at 270, 271-72 (citations omitted).

Consequently, the issue here is whether Section 1427 either expressly or impliedly modified or repealed the village eligibility requirements provided in ANCSA Section 11(b)(3) as to Leisnoi.

Section 1427 does not contain any language expressly modifying or repealing the provisions of ANCSA Section 11(b)(3) as to Leisnoi. Although the provisions in subsection (e) did modify and/or repeal the provisions of Section 11(b)(3)– it did so only with regard the seven uncertified Koniag villages listed in subsection (e)(2). Subsection (e) expressly exempted these villages from the eligibility requirements provided in Section 11(b)(3) by providing that they "shall be deemed an eligible village under the Alaska Native Claims Settlement Act," provided they filed a release of all further claims under ANCSA. Section 1427 contains no similar provision with regard to Leisnoi.

The issue, therefore, is whether Section 1427 *impliedly* modified or repealed the provisions of Section 11(b)(3) with regard to Leisnoi.

As set forth below, determination of this issue is governed by several well-established

46

canons of statutory construction. They include the following: 1) that repeals by implication are not favored, and that the proponent of a request for a determination of repeal by implication "bears a heavy burden of persuasion;" 2) that when two statutes are capable of co-existence, it is the duty of the courts to regard each as effective, absent a clearly expressed congressional intention to the contrary; 3) that a congressional intent to repeal must be "clear and manifest;" 4) that in the absence of a clear and manifest intent to repeal, the provisions of both statutes must be given effect unless they are in "irreconcilable conflict" in the sense that there is a "positive repugnancy" between them.

In Posadas v. National City Bank of New York, 296 U.S. 497, 56 S.Ct. 349 (1936), the Supreme Court summarized the application of these maxims as follows:

> The amending act just described contains no words of repeal; and if it effected a repeal of section 25 of the 1913 act, it did so by implication only. The cardinal rule is that repeals by implication are not favored. Where there are two acts upon the same subject, effect should be given to both if possible. There are two well-settled categories of repeals by implication: (1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment. . . .
>
> The implication of which the cases speak must be a necessary implication. Wood v. United States, 16 Pet. 342, 362, 363, 10 L.Ed 987. It is not sufficient, as was said by Mr. Justice Story in that case, "to establish, that subsequent laws cover some or even all of the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative or auxiliary." The question whether a statute is repealed by a later one containing no repealing clause, on the ground of repugnancy or substitution, is a question of legislative intent to be ascertained by the application of the accepted rules for ascertaining that intention.

296 U.S. at 503-504, 56 S.Ct. at 352 (citations omitted).

In <u>Amell v. United States</u>, 384 U.S. 158, 86 S.Ct. 1384 (1966), the Supreme Court held

that the proponent of a request for a determination of repeal by implication "bears a heavy burden

of persuasion." 384 U.S. at 165-66, 86 S.Ct. at 1388.

In <u>Morton v. Mancari</u>, 417 U.S. 535, 94 S.Ct. 2474 (1974), the Supreme Court held that a

statutory employment preference for the hiring of Indians by the Bureau of Indian Affairs was not

impliedly repealed by the enactment of the Equal Employment Opportunities Act of 1972. The

Court held that the courts "are not at liberty to pick and choose among congressional

enactments," and when two statutes are capable of coexistence, it is the duty of the courts to

regard each as effective, absent a "clear and manifest" congressional intention to the contrary:

> Appellees encounter head-on the "cardinal rule . . . that repeals by implication are
> not favored." <u>Posadas v. National City Bank</u>, 296 U.S. 497, 56 S.Ct. 349, 352, 80
> L.Ed. 351 (1936); <u>Wood v. United States</u>, 16 Pet. 342-343, 363, 10 L.Ed. 987
> (1842); <u>Universal Interpretative Shuttle Corp. v. Washington Metropolitan Area
> Transit Comm'n</u>, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968).
> They and the District Court read the congressional silence as effectuating a repeal
> by implication. There is nothing in the legislative history, however, that indicates
> affirmatively any congressional intent to repeal the 1934 preference. Indeed, as
> explained above, there is ample independent evidence that the legislative intent
> was to the contrary.
>
> This is a prototypical case where an adjudication of repeal by implication is not
> appropriate. The preference is a longstanding, important component of the
> Government's Indian program. The anti-discrimination provision, aimed at
> alleviating minority discrimination in employment, obviously is designed to deal
> with an entirely different problem. Any perceived conflict is thus more apparent
> than real.
>
> In the absence of some affirmative showing of an intention to repeal, the only
> permissible justification for a repeal by implication is when the earlier and later
> statutes are irreconcilable. <u>Georgia v. Pennsylvania R. Co.</u>, 324 U.S. 439, 456-
> 457, 65 S.Ct. 716, 725-726, 89 L.Ed. 1051 (1945). Clearly, this is not the case
> here. A provision aimed at furthering Indian self-government by according an

employment preference within the BIA for qualified members of the governed group can readily co-exist with a general rule prohibiting employment discrimination on the basis of race. Any other conclusion can be reached only by formalistic reasoning that ignores both the history and purposes of the preference and the unique legal relationship between the Federal Government and tribal Indians. . . .

The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible . . . . The intention of the legislature to repeal 'must be clear and manifest.'" United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). In light of the factors indicating no repeal, we simply cannot conclude that Congress consciously abandoned its policy of furthering Indian self-government when it passed the 1972 amendments.

417 U.S. at 549-51, 94 S.Ct. at 2482-83.

In Radzanower v. Touche Ross & Co., 426 U.S. 148, 96 S.Ct. 1989 (1976), the Supreme

Court held that the enactment of venue provisions in the Securities Exchange Act did not

impliedly repeal the venue provisions in the National Bank Act:

The issue thus boils down to whether a "clear intention otherwise" can be discovered– whether, in short, it can be fairly concluded that the venue provision of the Securities Exchange Act operated as a *pro tanto* repeal of § 94. "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored." United States v. United Continental Tuna Corp., 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653, 658. There are, however,

"two well-settled categories of repeals by implication– (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest. . . ." Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351, 355.

It is evident that the "two acts" in this case fall into neither of those categories.

> The statutory provisions at issue here cannot be said to be in "irreconcilable conflict" in the sense that there is a positive repugnancy between them or that they cannot mutually coexist. It is not enough to show that the two statutes produce different results when applied to the same factual situation, for that no more than states the problem. Rather, "when two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." Morton v. Mancari, supra, 417 U.S., at 551, 94 S.Ct. at 2483, 41 L.Ed.2d at 301. As the Court put the matter in discussing the interrelationship of the anti-trust laws and the securities laws: "Repeal is to be regarded as implied only if necessary to make the [later enacted law] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." Silver v. New York Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389, 400.

426 U.S. at 155-56, 96 S.Ct. at 1993-94 (footnotes omitted). In determining that the statutes were not in irreconcilable conflict, the Court emphasized that both statutes had been enacted for different purposes, and that implied repeal of the venue provisions in the National Bank Act was not "necessary" in order "to make the Securities Exchange Act work." 426 U.S. at 156-57, 96. S.Ct. 1994.

In Watt v. Alaska, 451 U.S.259, 101 S.Ct. 1673 (1981), the Supreme Court held that an amendment to the Wildlife Refuge Revenue Sharing Act did not impliedly repeal an inconsistent provision in the Mineral Leasing Act of 1920. The Court concluded that the language and legislative history of the amendment did not evidence a "clear and manifest" congressional intent to repeal the provisions of the Mineral Leasing Act:

> These cases involve two statutes, each of which by its literal terms applies to the facts before us. Restatement of the terms of § 401(a) cannot answer which statute Congress intended to control. Recognizing this, the Secretary invokes the maxim of construction that the more recent of two irreconcilably conflicting statutes governs. 2A C. Sands, Sutherland on Statutes and Statutory Construction § 51.02 (4th ed. 1973). Without depreciating this general rule, we decline to read the statutes as being in irreconcilable conflict without seeking to ascertain the actual intent of Congress. Our examination of the legislative history is guided by another maxim: "'repeals by implication are not favored,'" Morton v. Mancari,

50

417 U.S., at 549, 94 S.Ct., at 2482, quoting <u>Posadas v. National City Bank</u>, 296
U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). "The intention of the
legislature to repeal must be 'clear and manifest.'" <u>United States v. Borden Co.</u>,
308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939), quoting <u>Red Rock v.
Henry</u>, 106 U.S. 596, 602, 27 L.Ed. 251 (1883). We must read the statutes to give
effect to each if we can do so while preserving their sense and purpose. <u>Mancari</u>,
<u>supra</u>, 417 U.S., at 551, 94 S.Ct., at 2483; see <u>Haggar Co. v. Helvering</u>, 308 U.S.
389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940).

101 S.Ct. at 1678.

In <u>Blanchette v. Connecticut General Insurance Corps.</u>, 419 U.S. 102, 95 S.Ct. 335

(1974), the Supreme Court held that the Regional Rail Reorganization Act did not impliedly

repeal an inconsistent remedy provided in the Tucker Act. The Court concluded that the

legislative history of the Rail Act was ambiguous as to whether Congress intended to repeal the

Tucker Act remedy, and that, absent a clearly expressed congressional intent to the contrary, the

Rail Act could not be construed as repealing the provisions of the earlier Tucker Act:

In sum, we cannot find that the legislative history supports the argument that the
Rail Act should be construed to withdraw the Tucker Act remedy. The most that
can be said is the Rail Act is ambiguous on the question. In that circumstance,
applicable canons of statutory construction require us to conclude that the Rail
Act is not to be read to withdraw the remedy under the Tucker Act.

One canon of construction is that repeals by implication are disfavored. Rather,
since the Tucker Act and the Rail Act are "capable of co-existence, it is the duty
of the courts, absent a clearly expressed congressional intention to the contrary, to
regard each as effective." <u>Morton v. Mancari</u>, 417 U.S. 535, 551, 94 S.Ct. 2474,
2483, 41 L.Ed.2d 290 (1974). Moreover, the Rail Act is the later of the two
statutes and we agree with the Special Court:

"A new statute will not be read as wholly or even partially amending a prior one
unless there exists a 'positive repugnancy' between the provisions of the new and
those of the old that cannot be reconciled. . . . This principle rests on a sound
foundation. Presumably Congress had given serious thought to the earlier statute,
here the broadly based jurisdiction of the Court of Claims. Before holding that the
result of the earlier consideration has been repealed or qualified, it is reasonable
for a court to insist on the legislature's using language showing that it has made a

considered determination to that end. . . ." 384 F.Supp., at 943.

419 U.S. at 133-34, 95 S.Ct. at 353-54 (citations omitted).

In Rodriguez v. U.S., 480 U.S. 522, 107 S.Ct. 1391 (1987), the Supreme Court held that a new statute imposing an additional sentence on persons who commit a felony while on release pending judicial proceedings, did not impliedly repeal the provisions of a prior statute authorizing federal judges to suspend the execution of sentences. The Court held that the legislative history of the new statute did not contain the type of "clear and manifest" evidence of congressional intent necessary to establish repeal by implication, even though it contained references to such intent:

> Since § 3147 does not explicitly divest sentencing judges of their authority under § 3651, the Court of Appeals' judgment amounts to the conclusion that § 3147 is an implicit partial repeal of § 3651. It is well settled, however, that repeals by implication are not favored, see, e.g., TVA v. Hill, 347 U.S. 153, 189, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), and will not be found unless an intent to repeal is "'clear and manifest.'" United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939) (quoting Red Rock v. Henry, 106 U.S. 596, 602, 1 S.Ct. 434, 439, 27 L.Ed. 251 (1883)). Nothing in the language of these two provisions suggests the existence of the ""'irreconcilable conflict,'"" Kremer v. Chemical Construction Corp., 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982) (citations omitted), from which an intent to repeal may be inferred. To the contrary, the provisions fit together quite sensibly. . . .

> The Court of Appeals rested its conclusion in part on the legislative history of the CCCA, noting that various Senate and House Reports referred to § 3147 as establishing a "mandatory" sentence, as prescribing a "term of imprisonment of at least two years and not more than ten," and as "requir[ing] that the individual be imprisoned for an additional period of time." See 794 F.2d, at 26-29. Even if unrebutted, these passing references would not constitute the "clear and manifest" evidence of congressional intent necessary to establish repeal by implication. In fact, however, the totality of the legislative history of the Act demonstrates with unusual clarity that no repeal was intended. . . .

107 S.Ct. at 1392-93.

The Interior Board of Land Appeals has also recognized, and applied, these maxims in construing whether a statute was impliedly repealed by a subsequent legislative enactment. In Appeal of Kenneth F. Cummings, 62 IBLA 206 (March 10, 1982), the Board held that the Mineral Leasing Act of 1920 did not impliedly repeal a prior statutory withdrawal of specified lands from entry under the mineral laws of the United States:

> We are unable to construe the Mineral Leasing Act of February 25, 1920, as having repealed the 1914 Act by implication, nor has appellant pointed out any language or rationale by which such a conclusion might reasonably be supported. Moreover, repeal of a statute by implication is not favored in law, and there is a presumption against the implied repeal or amendment of any statutory provision. 1A Sutherland Statutory Construction, §§ 22.30, 23.10 (4th ed. 1972). Rebuttal of that presumption generally requires that there be an irreconcilable conflict between an earlier and a later statute. Peabody Coal Co., 4 IBLA 303 (1972).

62 IBLA at 209.

In City of Phoenix v. Alvin B. Reeves et al., 14 IBLA 315, 81 I.D. 65 (February 1, 1974), the Board held a withdrawal of lands, by executive order, was not impliedly repealed by a subsequent legislative enactment:

> The withdrawal was by executive order. Executive orders have the force and effect of law, and rules of statutory construction apply to them. Repeal of an executive order or statute may be either express or implied. However, there is a strong presumption against implied repeal. One statement of this policy is that if two statutes cover the same area and are not absolutely irreconcilable, effect is given to both. United States v. Borden Co., 308 U.S. 188, 198 (1938). Another expression is that a law will not be construed as impliedly repealing another law "unless no other reasonable construction can be applied." United States v. Jackson, 302 U.S. 628, 631 (1938); See Ely v. Velde, 451 F.2d 1130, 1134-35 (4th Cir. 1971); Feliciano, supra at 1359. . . .

81 I.D. at 69 (citations omitted).

53

2.    The language of Section 1427 does not evidence a "clear and manifest"
      congressional intent to repeal Section 11(b)(3)'s village eligibility requirements as
      to Leisnoi, nor is Section 1427 in "irreconcilable conflict" with Section 11(b)(3)

There is nothing in either the language or the legislative history of Section 1427 that

evidences a "clear and manifest" congressional intent to exempt or repeal the village eligibility

requirements provided in ANCSA Section 11(b)(3) with regard to Leisnoi. Nor is there an

"irreconcilable conflict" or "positive repugnancy" between Section 1427's land exchange

provisions and Section 11(b)(3)'s village eligibility requirements that would require the repeal of

Section 11(b)(3) in order to make Section 1427 "work."

Leisnoi and Koniag argue that the inclusion of Leisnoi in the definition of "Koniag

Deficiency Village Corporation" and "Koniag 12(b) Village Corporation" in subsections (a)(4)

and (a)(5) demonstrates that Congress intended to ratify Leisnoi's status as a certified Native

village, i.e., that Congress intended to exempt or repeal the village eligibility requirements as to

Leisnoi. However, these provisions merely "identified" Leisnoi as one of the villages subject to

the Section 1427's land exchange provisions.

The purpose of Section 1427's land exchange provisions was to exchange the land

selection and entitlement rights of the Koniag village and regional corporations to the lands on

the Alaska Peninsula, to which they were entitled under ANCSA's original land selection and

entitlement provisions, for lands on Afognak Island, which were unavailable for selection and

conveyance under ANCSA's original provisions. The exchange served two purposes. First, it

allowed the Koniag-region corporations to obtain lands that were in closer proximity to the

region's villages, and which had higher economic value to the villages. Second, it allowed for

the relinquishment and inclusion of the lands on the Alaska Peninsula in the Alaska Peninsula

National Wildlife Refuge. Conveyance of the exchanged lands on Afognak Island was also restricted to preserve the right of public access and government management. The exchange thus furthered ANILCA's purpose of the preservation and conservation of public lands.

Section 1427 effectuated this land exchange by amending ANCSA's original land selection and entitlement provisions. These amended land selection and entitlement provisions are not in "irreconcilable conflict" with the village eligibility requirements provided in Section 11(b)(3), just as ANCSA's original land selection and entitlement provisions were not in irreconcilable conflict with Section 11(b)(3)'s requirements. Effect can be given to both Section 1427 and Section 11(b)(3), just as effect was originally given under ANCSA to both Section 11(b)(3) and the land selection and entitlement provisions that were amended by Section 1427. Consequently, repeal of Section 11(b)(3) is not necessary in order to make Section 1427's amendments to ANCSA's land selection and entitlement provisions work.

ANCSA's original land selection and entitlement provisions were expressly conditioned on the recipient village's satisfaction of the eligibility requirements provided in Section 11(b)(3). Section 14(a) provided for the issuance of a patent for the lands selected by a village, to each "Village Corporation for a Native village listed in section 11 [43 USC § 1610] *which the Secretary finds is qualified for land benefits under this Act . . .*". 43 U.S.C. § 1613(a) (emphasis added). The land withdrawal and selection provisions, which provided for the withdrawal and selection of lands to be subsequently patented to the Native villages, did not approve or determine the eligibility of the villages for which the lands were withdrawn or selected. They merely provided for the withdrawal and selection of lands by villages "identified" in ANCSA. Section 11(a) provided for the withdrawal of lands for selection by a Native village, for "any

55

Native village *identified* pursuant to subsection (b)." 43 U.S.C. § 1610(a)(1)(A) (emphasis added). Subsection 11(b)(1) listed a number of villages which were presumptively entitled to such land benefits. Subsection 11(b)(3) provided for the addition of villages not listed in subsection (b)(1), provided they satisfy the specified eligibility requirements. These villages then became "identified pursuant to subsection (b)" for purposes of the land withdrawal provisions in Section 11(a). Section 12(a) similarly provided for the selection of lands, from the lands withdrawn under Section 11(a), by the Village Corporation "for each Native village *identified* pursuant to section 11 [43 USC § 1610]." 43 U.S.C. § 1611(a) (emphasis added). Patent of the lands withdrawn and selected by the "identified" villages remained subject to the requirement that the Secretary determine that the "identified" villages were "qualified for land benefits under this Act."

Section 1427 merely amended these land selection and entitlement provisions, by substituting the lands on Afognak Island for the lands withdrawn and selected by the Koniag villages on the Alaska Peninsula under ANCSA's original selection and entitlement provisions. As such, the amended land selection and entitlement provisions in Section 1427– including the definitions provided in subsections (a)(5) and (a)(5)– merely "identified" Leisnoi and the other Koniag villages as the villages subject to the amended land selection and entitlement provisions, just as Section 11(b) had originally "identified" the villages subject to ANCSA's original land selection and entitlement provisions. Patent of the Afognak lands, like the patent for the lands originally withdrawn for selection and conveyance to the Koniag-region villages, remained subject to the express condition, provided in Section 14(a), that the villages satisfy the eligibility requirements provided in Section 11(b).

Therefore, the inclusion of Leisnoi in the definition of "Koniag deficiency village corporation" and "Koniag 12(b) Village Corporation" does not constitute "clear and manifest" evidence of a congressional intent to repeal Section 11(b)(3)'s village eligibility requirements as to Leisnoi. Nor are Section 1427's land exchange provisions in "irreconcilable conflict" with Section 11(b)(3)'s village eligibility provisions. Effect can be given to both sections, just as ANCSA gave effect both Section 11(b)(3) and the original land selection and entitlement provisions that were amended by Section 1427. This construction is consistent with the rule of statutory construction that amendments to one section of a statute must be construed along with the statute's original sections as part of an integrated whole, and that full effect should be given to all sections of the statute as if originally enacted in amended form. See e.g. Markham v. Cabell, 326 U.S. 404, 411, 66 S.Ct. 193, 196 (1945) ("[T]he normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole. We should give each as full a play as possible."); United States v. La Franca, 282 U.S. 568, 576, 51 S.Ct. 278, 281 (1931) (statutes after amendment are to be construed as if originally enacted in amended form).

In addition to the absence of any language in Section 1427 indicating an affirmative intent to amend or repeal ANCSA's village eligibility provisions as to Leisnoi, other provisions in Section 1427 and ANILCA affirmatively indicate that Congress did not intend to exempt or repeal Section 11(b)(3)'s village eligibility requirements as to Leisnoi.

Subsection (f) of Section 1427 expressly provides that all conveyances and patents made by reason of Section 1427 shall be subject to the terms and conditions of ANCSA as if they had been originally made or issued under ANCSA: