**APPENDIX C**

# UNITED STATES CODE

## Congressional and Administrative News

96th Congress—Second Session

1980

Convened January 3, 1980
Adjourned December 16, 1980

## Volume 5

LEGISLATIVE HISTORY
[Public Laws 96–472 to 96–522]

ANCHORAGE LAW LIBRARY

ST. PAUL, MINN.
WEST PUBLISHING CO.

# Legislative History

Numerical Table of Legislative History, see Table 1, Public Laws and Legislative History, and Table 4, Legislative History at end of the sixth volume

*Portions of the Senate, House and Conference Reports which are duplicative or are deemed to be unnecessary to the interpretation of the laws are omitted herein. Omitted material is indicated by a line of asterisks.*

*Page numbers of the official Senate, House or Conference Report [Bracketed] are inserted for convenience to the user.*

LEGISLATIVE HISTORY
P.L. 96-487

ALASKA NATIONAL INTEREST LANDS
CONSERVATION ACT

*P.L. 96-487, see page 94 Stat. 2371*

House Report (Interior and Insular Affairs Committee) No. 96-97(I),
   Apr. 18, 1979 [To accompany H.R. 39]

House Report (Merchant Marine and Fisheries Committee)
   No. 96-97(II), Apr. 23, 1979 [To accompany H.R. 39]

Senate Report (Energy and Natural Resources Committee)
   No. 96-413, Nov. 14, 1979 [To accompany H.R. 39]

Cong. Record Vol. 125 (1979)

Cong. Record Vol. 126 (1980)

DATES OF CONSIDERATION AND PASSAGE

House May 16, 1979; November 12, 1980

Senate August 19, 1980

The Senate Report is set out.

SENATE REPORT NO. 96-413

## CONTENTS

[page III]

| | Page |
|---|---|
| H.R. 39, as reported | 1 |
| I. Purpose of the measure | 126 |
| II. Summary of major provisions | 127 |
| III. Background and need | 129 |
| IV. Legislative history | 134 |
| V. Committee recommendation and tabulation of votes | 135 |
| VI. Committee amendments | 136 |
| VII. Section-by-section analysis | 266 |
| VIII. Cost and budgetary considerations | 334 |
| IX. Regulatory impact evaluation | 344 |
| X. Executive communications | 345 |
| XI. Additional views | 369 |
| XII. Changes in existing law | [omitted] |

[page 1]

The Committee on Energy and Natural Resources to which was referred the act (H.R. 39) to provide for the designation and conservation of certain public lands in the State of Alaska, including the designation of units of the National Park, National Wildlife Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation Systems, and for other purposes, having con-

5070

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

sidered the same, reports favorably thereon with an amendment and recommends that the act, as amended, do pass.

\* \* \* \* \* \* \* \*

[page 126]

# I. PURPOSE

The principal purpose of H.R. 39, as reported by the Committee, is to designate approximately 105 million acres of Federal land in Alaska for protection of their resource values under permanent Federal ownership and management. The bill more than doubles the size of the National Park System and the National Wildlife Refuge System. It triples the size of the National Wilderness Preservation System. It virtually completes the public land allocation process in Alaska which began with the Statehood Act of 1958 which granted the State the right to select approximately 104 million acres of public land. This Federal land disposal process was continued by the Alaska Native Claims Settlement Act of 1971 which granted Alaska Natives the right to select approximately 44 million acres of Federal land.

In order to carry out the principal purposes, the Committee adopted a number of other significant provisions which, together with the land designations, are discussed in the following Summary of Major Provisions.

[page 127]

# II. SUMMARY OF MAJOR PROVISIONS

### TITLE I—PURPOSES, DEFINITIONS, AND MAPS

Sets forth the purposes of the bill and spells out general definitions and map references.

### TITLE II—NATIONAL PARK SYSTEM

Establishes or expands 13 management units of the National Park System totaling 42.80 million acres. Sets out specific rules for management and use of these areas.

### TITLE III—NATIONAL WILDLIFE REFUGE SYSTEM

Establishes or expands 14 management units from the National Wildlife Refuge System totaling 42.47 million acres. Sets out specific rules for management and use of these areas.

### TITLE IV—NATIONAL CONSERVATION AREAS

Establishes 4 national conservation areas totaling 7.37 million acres and one national recreation area of 1 million acres, to be administered by the Secretary of the Interior through the Bureau of Land Management. Sets out specific rules for management and use of these areas.

LEGISLATIVE HISTORY
P.L. 96-487

### TITLE V—NATIONAL FOREST SYSTEM

Establishes one new National Forest of 5.4 million acres, adds 3.04 million acres to existing National Forests, establishes a 1.2 million acre Seward National Recreation Area in the existing Chugach National Forest, and establishes a 1.55 million acre Misty Fjords National Forest Monument in the Tongass National Forest. Sets out specific rules for management and use of these areas.

### TITLE VI—NATIONAL WILD AND SCENIC RIVERS SYSTEM

Designates 24 rivers or river segments as components of the Wild and Scenic Rivers System and designates 10 rivers for study for possible inclusion in the system.

### TITLE VII—NATIONAL WILDERNESS PRESERVATION SYSTEM

Designates 38.6 million acres as part of the National Wilderness Preservation system and designates 3 million acres for wilderness study.

### TABLE VIII—SUBSISTENCE MANAGEMENT AND USE

Recognizes the importance of subsistence use of fish, wildlife and other resources by many Alaskans. Establishes a statutory preference for subsistence resource use over other uses including sport hunting and fishing. Establishes a specific statutory program to assure that the preference is implemented under State regulation and management.

[page 128]

### TITLE IX—IMPLEMENTATION OF ALASKA NATIVE CLAIMS SETTLEMENT ACT AND ALASKA STATEHOOD ACT

Expedites conveyance of Federal lands to Alaska Natives and the State of Alaska so as to fulfill the land grants made under the Alaska Native Claims Settlement Act and the Alaska Statehood Act.

### TITLE X—FEDERAL NORTH SLOPE LANDS STUDY PROGRAM

Recognizes the unique combination of wilderness, wildlife, and oil and gas values on the Alaska North Slope by directing a special study of all Federal lands in the area except the Petroleum Reserve National—Alaska to assure that all elements of resource use and preservation will be presented to Congress at the same time. Includes a special oil and gas exploration program for the Arctic National Wildlife Range, an oil and gas leasing program for non-North Slope Federal lands and a mineral resource assessment program.

### TITLE XI—TRANSPORTATION AND UTILITY SYSTEMS IN AND ACROSS, AND ACCESS INTO, CONSERVATION SYSTEM UNITS

Establishes a special procedure for allowing access for transportation and other purposes across and into conservation system units. Recognizes the need to balance protection of the resources and the need for access to permit development of Federal, State, and private lands not included in such units.

# ALASKA LANDS CONSERVATION ACT
P.L. 96-487

### TITLE XII—FEDERAL-STATE COOPERATION

Establishes an Alaska Land Use Council as an innovative vehicle for Federal and State cooperation in the management of Federal and State lands. Also authorizes special cooperative agreements for wildlife refuges and designates the Bristol Bay Cooperative Region as a unique experiment in Federal-State cooperation.

### TITLE XIII—ADMINISTRATIVE PROVISIONS

Contains a variety of special management provisions dealing with various land management systems and other specific management concerns.

### TITLE XIV—AMENDMENTS TO THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND RELATED PROVISIONS

Contains a number of amendments to the Alaska Native Claims Settlement Act which will simplify administration of that Act and assure that the Natives receive full benefits which the Congress intended in the original law. Also authorizes a number of specific selections which will benefit both the Natives and the Federal Government.

### TITLE XV—NATIONAL NEED MINERAL ACTIVITY RECOMMENDATION PROCESS

Establishes a special procedure under which the President, with Congressional approval, can permit mineral exploration, development and extraction which is prohibited under existing law, but may be needed to meet future national needs.

[page 129]

## III. BACKGROUND AND NEED

### ALLOCATION OF PUBLIC LANDS IN ALASKA

The Alaska Native Claims Settlement Act of 1971 (ANCSA) did more than settle the longstanding aboriginal claims of Alaskan Native peoples. It also set in motion a sequence of events which may well constitute the most significant single land conservation action in the history of our country.

ANCSA directed the Secretary of the Interior to withdraw from all forms of appropriation up to 80 million acres of Federal lands in Alaska and to report to the Congress his recommendations for administering them as units of the National Park, National Forest, National Wildlife Refuge, and National Wild and Scenic Rivers Systems. These lands are often referred to as the "d-2" lands after section 17(d)(2) of the 1971 Act, which is the section authorizing the Secretary's action.

The 1971 Act also set a deadline of December 1978 for Congress to act on these lands by providing that any of them which Congress has not by then chosen for special legislative protection will revert to ordinary public lands status. Congress, of course, has the ultimate responsibility for disposition of the public lands.

## LEGISLATIVE HISTORY
### P.L. 96-487

H.R. 39, as amended by the Committee, will virtually complete the public land allocation process in Alaska which began with Statehood in 1959. The Statehood Act granted the State of Alaska the right to select over 104 million acres of public land. This land disposal process was continued by the Alaska Native Claims Settlement Act, which granted Native corporations the right to select about 44 million acres of public land. As reported by the Committee, this bill would set aside for the future enjoyment and benefit of the American people other public lands in addition to the existing National Forests, National Parks and National Wildlife Ranges, totalling about 105 million acres.

Alaska's greatest problem now is uncertainty, concerning the status of its vast lands and related national resources. This is the uncertainty which H.R. 39 (as amended) addresses, and which it resolves by laying the groundwork for orderly, responsible, and sound development of Alaska's resources and society. By transferring title over validly selected lands to the Natives and to the State of Alaska, the bill goes far toward letting people know where they stand and to giving Alaska and its citizens the means of shaping their own future. Thus, this legislation is in the best interests of Alaska and her people, as well as of all the American people for whose future heritage it provides.

The State lands and the Native lands as well as other public lands, will be the basis for direct economic development. But the conservation system units themselves will be an economic asset to the State of Alaska and its people, as well as for all the Nation and the world. They should offer a tremendous boost to the recreation industry in Alaska.

[page 130]

Although still in its infancy compared to that of other States (Alaska ranks near the bottom in tourist-related revenues and jobs), Alaska's recreation industry is currently increasing at a rate of between 10 and 15 percent per year. Visits to Alaska's existing National Parks have more than quadrupled since 1971, growing more than 87 percent per year between 1971 and 1976.

The State of Alaska calculates tourism income in 1977 at $150 million from 270,000 tourists. By contrast, a recent study in next-door British Columbia reports that in 1976, 10.5 million visitors spend $1.2 billion—tourism is expected to be British Columbia's biggest industry by 1982. Although air fares and growing public awareness are attracting more and more people to Alaska, the State has, as yet, only scratched the surface of its tourism potential.

National parks, trails, wild and scenic rivers, wilderness areas and wildlife ranges are themselves major destination points for tourists. The National Park Service estimates that visits to the National Park System in the lower 48 generate between $15 and $20 billion for the Nation's recreation industry. A 1976 analysis of the tourism benefits to the village of Estes Park, Colorado—the eastern gateway to Rocky Mountain National Park—found that visitors to the park brought into the community a total of $30 million in initial expenditures per year.

HISTORY OF SECTION 17(d) OF ALASKA NATIVE CLAIMS SETTLEMENT ACT (ANCSA)

Section 17(d)(2) of ANCSA had its genesis in the Senate Native Claims bill (S. 35, sec. 24(c)(4) which directed the Secretary to conduct detailed studies and investigations of *all* unreserved public lands

# ALASKA LANDS CONSERVATION ACT
## P.L. 96-487

in Alaska, Naval Petroleum Reserve No. 4 (now the National Petroleum Reserve—Alaska) and the Rampart Power Site withdrawal, and within 3 years, submit his recommendations as to which areas were suitable as recreation, wilderness or wildlife management areas within the National Park, National Forest and National Wildlife Refuge Systems and withdraw such areas from entry under the public land laws.

This section was amended on the Senate floor by adoption of an amendment offered by Senators Bible, Jackson and Metcalf to make clear that while the State of Alaska could identify lands for selection within the withdrawn areas, such lands could not be tentatively approved or patented and, in the event the Congress enacted legislation establishing a conservation system unit, the State would be entitled to alternative public lands. Native village selections could be patented.

A modified version was adopted by the Conference Committee as Section 17(d)(2), which authorized the Secretary to withdraw up to 80 million acres of "National Interest" land by September 1972 for study for possible addition to the National Park, Wildlife Refuge, Wild and Scenic Rivers, and National Forest Systems. This provision also stipulated that all legislative proposals resulting from such studies needed to be submitted to the Congress by December 18, 1973, and that Congress would then have 5 years to act, during which time all of the lands included would be fully protected from appropriation under the public land laws.

Section 17(d)(1) originated in the House as an amendments to H.R. 3100 (numbered H.R. 10367 as reported) which withdrew all public

[page 131]

lands in the State of Alaska from all forms of appropriation under the public land laws. The Conference Committee, apprehensive about opening the public lands too quickly after several years of unavailability and fearful of a land rush which might frustrate the Secretary of the Interior's withdrawal actions and interfere with Native land selection rights, modified the House version to extend the "land freeze" for 90 days, in order to give the Secretary time to review and withdraw sufficient public land to satisfy Native selections and also meet the requirements of Section 17(d)(2) to withdraw land for "National Interest" purposes.

Section 17(d)(1), commonly called the "public interest" provision of ANCSA, authorized the Secretary to withdraw such public lands as he thought advisable for study and possible classification for future management, State selection or for opening of public land areas to entry. The Conference Report made clear that the larger public interest should be protected:

> The "classification" and "reclassification" authority granted under subsection 17(d)(1) is *new* legislative authority. The authority is limited to Alaska and to the purposes provided for in subsection 17(d). It is, however, a very broad and important delegation of discretion and authority and the conference committee anticipates that the Secretary will use this authority to insure that the purposes of this Act and the land claims settlement are achieved, that the larger public interest in the public lands of Alaska is protected, and that the immediate and unrestricted operation of all the public land laws 90 days from date of enactment—absent affirmative

## LEGISLATIVE HISTORY
P.L. 96-487

action by the Secretary under his existing authority—does not result in a land rush, in massive filings under the Mineral Leasing Act, and in competing and conflicting entries and mineral locations.

The Secretary utilized this authority to withdraw virtually all of the public land in Alaska including those lands withdrawn under Section 17(d)(2).

### REVIEWS BY FEDERAL AGENCIES

In January, 1972, less than one month after passage of the Settlement Act, the Fish and Wildlife Service and the National Park Service concentrated on the identification of "areas of interest" in Alaska. Much of the knowledge needed to identify such areas came from studies that had been conducted by these agencies over past years. Additional areas were added for consideration as a result of contacts with scientists and others acquainted with the natural and historic resources of Alaska.

During February, 1972, these two agencies screened the "areas of interest" to identify those specific areas that warranted withdrawal for definitive on-the-ground study for possible addition to the National Wildlife Refuge and National Park Systems. These areas were reviewed with Departmental officials in order to find the lands that should be withdrawn by the Secretary of the Interior in March,

[page 132]

1972, under the 17(d)(1) and 17(d)(2) provisions. The March withdrawal, when made, also protected certain scenic and wild river possibilities for study for possible addition to that System. The Secretary also withdrew lands for Native village and regional deficiency within which the Natives were to select the remaining land that would be coming to them.

In May, 1972, the National Park Service, the Bureau of Outdoor Recreation, and the Forest Service established special offices in Anchorage, Alaska, to conduct detailed studies of the withdrawn lands. The Fish and Wildlife Service utilized its existing organization in Alaska to conduct its studies, but did assign additional staff to the detailed study effort.

As a result of the 1972 studies, the agencies confirmed or modified the areas they thought warranted further consideration. Some areas were dropped from further consideration since they did not qualify for addition to the individual systems; in other cases it was apparent that changes were needed in the withdrawal boundaries for the 17(d)(1) and 17(d)(2) lands. The results of these studies were made public.

In August, 1972, the temporary Joint Federal-State Land Use Planning Commission, authorized for establishment by Section 17(a), met with the Secretary of the Interior to give him their recommendations for the forthcoming final 17(d)(2) withdrawals. In addition, the State and Department of the Interior, in order to settle a court suit that the State had filed against the Secretary because of implications of the March withdrawal, reached accord concerning future classification and use of some of the 17(d)(1) and 17(d)(2) lands withdrawn in March. Also, as a result of negotiations with some of the Regional Corporations, changes were needed in some of the Native deficiency with-