# ALASKA LANDS CONSERVATION ACT
## P.L. 96-487

drawals, changes that would benefit both the Natives and the agencies. On September 17 the Secretary made his final 17(d)(2) withdrawals. The total area withdrawn was 79.3 million acres.

During the remainder of 1972 and early 1973, the review agencies continued their analysis of the 17(d)(2) and related 17(d)(1) lands. Individual proposals for the conservation systems were then presented to the Department Task Force on Alaska in June of 1973. The Task Force had been established earlier by the Secretary of the Interior to advise him on matters relating to implementation of the Alaska Native Claims Settlement Act. It consisted of all the Assistant Secretaries of Interior involved, plus an Assistant Secretary of Agriculture since the Forest Service is an agency of that Department. The Department Task Force was supported by a special working group chaired by the Legislative Counsel of the Department of the Interior.

In March, 1973, the Alaska Planning Group was established in Washington, D.C. This was a multi-agency coordinating unit made up of National Park Service, Fish and Wildlife Service, and Bureau of Outdoor Recreation personnel, with the Bureau of Land Management and the Forest Service participating where those agencies are involved. The Planning Group was established to coordinate many of the activities and the production of materials relating to the implementation of ANCSA involving particular interests of more than one of these agencies, mainly as related to the "Four Systems" areas. The Group was particularly active in the production of the draft and final environ-

[page 133]

mental impact statements prepared for the legislative proposals sent to the Congress in December 1973.

During May and June, 1973, the Federal-State Land Use Planning Commission held over 30 hearings in Alaska and four hearings in the lower 48 state to obtain public comment concerning use potentials for the 17(d)(2) lands without consideration as to the managing agency. The testimony from these hearings, as well as specific recommendations submitted by the Commission regarding the 17(d)(2) withdrawals, were considered by the Departmental Task Force in developing its final recommendations to the Secretary on which lands should go into what System. Discussions were also held with the Secretary of Agriculture prior to Secretary of the Interior making his final decisions on areas which were submitted to the Congress on December 18, 1973.

During the period 1974-77 the Departments of the Interior and Agriculture, the Federal-State Land Use Planning Commission for Alaska and others continued study and evaluation of the Alaska lands and resources and the proposed national interest lands areas. In 1977 the Federal-State Land Use Planning Commission made detailed recommendations for new parklands, wildlifee refuges, wild and scenic rivers and other conservation areas in Alaska. In September 1977, the Secretary of the Interior presented updated recommendations to the Congress for national interest lands in Alaska.

## EXECUTIVE ACTIONS

As December 18, 1978 approached without enactment of an Alaska Lands bill (see "Legislative History") the Carter Administration took several major administrative actions designed to protect the lands under consideration for four systems designations by the Congress.

5077

Case 3:02-cv-00290-JKS    Document 173-4    Filed 06/11/2007    Page 2 of 10

## LEGISLATIVE HISTORY
### P.L. 96-487

First, in November 1978, Secretary Andrus withdrew some 110 million acres of Federal land in Alaska from appropriation under the public land laws pursuant to his "emergency" withdrawal authority under Sec. 204(e) of the Federal Lands Policy and Management Act. These are 3 year temporary withdrawals. Then on December 1, 1978, the President designated 17 national monuments totaling some 56 million acres. The President took these actions pursuant to his authority under the Antiquities Act of 1906.

The State of Alaska and a number of private parties have brought suit in Federal District Court challenging the authority of the Secretary of the Interior and the President to take these actions.

[page 134]

## IV. LEGISLATIVE HISTORY

The Committee had 11 bills relating to the Alaska National Interest Lands pending before it during the 95th Congress. S. 499, containing the 1973 proposals of Interior Secretary Rogers C. B. Morton and S. 500, the Alaska Coalition proposal, were introduced by Senators Jackson and Hansen (by request), on January 28, 1977.

On May 12, 1977, Senator Metcalf introduced S. 1500 as a substitute for S. 500. Senator Durkin introduced an amendment to S. 1500 (No. 2176) on May 16, 1978. Senator Stevens' proposal, S. 1787 was introduced June 30, 1977. S. 2465, the Carter Administration proposal was introduced by request on January 31, 1978. Senator Gravel introduced his bill, S. 2944, on April 15, 1973.

H.R. 39, as passed by the House, was referred to the Committee on June 8, 1978.

In addition to comprehensive Alaska lands legislation, S. 1546, introduced by Senator Abourezk creating a National Preserve on Admiralty Island, S. 3016 proposed by Senators Gravel and Stevens and S. 3303, proposed by the Administration containing numerous provisions to improve the implementation of the Alaska Native Claims Settlement Act, were referred to the Committee on Energy and Natural Resources.

The Full Committee held 7 days of hearings in Washington on the Alaska National Interest Lands bills during the 95th Congress. During the 94th Congress 2 days of hearings were held on S. 1687, the Administration "d-2" proposal. In addition the Committee staff conducted workshops in 7 Alaska villages during September 1977 and participated in 7 days of workshops in February, 1978.

Committee markup of these proposals in the 95th Congress commenced on June 22, 1978. After 46 markup sessions, the Committee ordered H.R. 39 favorably reported with an amendment in the nature of a substitute on October 5, 1978.

The Committee on Energy and Natural Resources continued to consider Alaska Lands legislation in the 96th Congress. On January 15, 1979, Senator Jackson introduced S. 9 which was virtually identical to the bill reported by the Committee in October, 1978.

Senator Durkin introduced the Alaska Coalition Proopsal, S. 222, with 19 cosponsors, on January 25, 1979.

H.R. 39, once again the number of the House bill, passed by the House and was referred to the Committee on May 24, 1979.

The Committee met on July 10, 1979, to consider a request by Senator Gravel to conduct field hearings in the State of Alaska. Given the ex-

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

tensive legislative history and public debate on this issue, the Committee agreed to proceed to markup rather than to hold any further hearings.

Full Committee markup on Alaska Lands began on October 9, 1979. S. 9 was used as the text for purposes of amendment. On October 30, 1979, after 12 markup sessions, the Committee ordered H.R. 39 favorably reported with an amendment in the nature of a substitute.

[page 135]

## V. COMMITTEE RECOMMENDATION AND TABULATION OF VOTES

The Senate Committee on Energy and Natural Resources, in open business session on October 30, 1979, by majority vote of a quorum present, recommends that the Senate pass H.R. 39 amended as described herein.

Pursuant to section 133(b) of the Legislative Reorganization Act of 1946, as amended, the following is a tabulation of votes of the Committee during consideration of H.R. 39.

During the Committee's consideration of the Alaska National Interest Lands Act, many voice votes and formal roll call votes were taken on amendments to the bill. These votes were taken in open public session and, because they were previously announced by the Committee in accord with the provisions of section 133(b), it is not necessary that they be tabulated in the committee report.

H.R. 39 was ordered favorably reported to the Senate on a roll call vote of 17-1. The vote was as follows:

| Yeas | Nays |
|---|---|
| Jackson | Tsongas |
| Church* | |
| Johnston | |
| Bumpers | |
| Ford | |
| Durkin | |
| Metzenbaum* | |
| Matsunaga* | |
| Melcher | |
| Bradley | |
| Hatfield* | |
| McClure* | |
| Weicker* | |
| Domenici | |
| Stevens | |
| Bellmon | |
| Wallop | |

*Indicates voted by proxy.

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 189]

Native land selections. Through this action, the Committee believes it has ensured that the designation of refuge lands will have no adverse impact on the possible future development of Bradley Lake as a source for hydroelectric power.

The Kenai Refuge is a diverse area of mountain ranges, glaciers, forests, lowland lakes, wetlands, and rivers which support a diversity of fish and wildlife including the giant Kenai moose for which the area was originally established.

The Kenai lowlands are characterized by low ridges and muskeg dotted with more than 1,200 lakes and draining 160 miles of major streams and lesser waterways. Such areas, which are spawning grounds and nurseries support one-third of the multimillion-dollar commercial salmon fishery of Cook Inlet. This vast lake system also has one of the largest loon populations in North America. In addition, it supports 6 percent of the world's trumpeter swan and, during migration, serves as a major concentration area for birds moving to southern wintering grounds. One of the most important areas is the Chickaloon Flats, half of which was outside the original refuge and is now included by this Act.

The wetlands further support a variety of mammals, including minks, muskrats, weasels, otters, beavers and Kenai moose which number approximately 5,000 to 6,000 animals.

The Kenai Mountains along the eastern third of the refuge lend scenic, watershed and habitat values to the ecosystem. The glaciers of the Harding Icefield and in the proposed southern additions provide the water supply for the refuge. Cook Inlet and Kachemak Bay, Dall sheep, mountain goats and a variety of smaller mammals and birds inhabit higher elevations, and caribou, bears (black and grizzly), lynx, wolves and coyotes occur in lower transitional zones.

The variety of habitats and their fish and wildlife populations combined with the refuge's proximity to Anchorage, lend ample opportunity for quality environmental awareness and wildlife-oriented recreation programs. The existing refuge is presently used by many southcentral Alaska residents, who hike and canoe in summer, and ski in winter within the proposal.

The Chickaloon Flats unit is a popular waterfowl hunting area. This northern addition, consisting of some 80,000 acres, reflects recognition of a biological rather than a longitudinal boundary on the Chickaloon Flats between the existing area and the adjacent Chugach National Forest.

*Section 301(a)(9): Kodiak National Wildlife Refuge*

The Committee modified the boundaries of the existing Kodiak National Wildlife Refuge to include all public lands on Afognak and adjacent Ban Island not conveyed to Native Corporations under ANCSA or Section 1427 of this Act or to the State under the Statehood Act.

This action reflects the provisions of settlement of Koniag Village and Regional Corporation entitlements under ANCSA and transfers the small remaining tracts of Afognak public lands from the Chugach National Forest to the Kodiak National Wildlife Refuge. Such action will vest management authority for Federal lands in the Kodiak Island group and protection of the fish and wildlife resources in one agency.

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 189]

Native land selections. Through this action, the Committee believes it has ensured that the designation of refuge lands will have no adverse impact on the possible future development of Bradley Lake as a source for hydroelectric power.

The Kenai Refuge is a diverse area of mountain ranges, glaciers, forests, lowland lakes, wetlands, and rivers which support a diversity of fish and wildlife including the giant Kenai moose for which the area was originally established.

The Kenai lowlands are characterized by low ridges and muskeg dotted with more than 1,200 lakes and draining 160 miles of major streams and lesser waterways. Such areas, which are spawning grounds and nurseries support one-third of the multimillion-dollar commercial salmon fishery of Cook Inlet. This vast lake system also has one of the largest loon populations in North America. In addition, it supports 6 percent of the world's trumpeter swan and, during migration, serves as a major concentration area for birds moving to southern wintering grounds. One of the most important areas is the Chickaloon Flats, half of which was outside the original refuge and is now included by this Act.

The wetlands further support a variety of mammals, including minks, muskrats, weasels, otters, beavers and Kenai moose which number approximately 5,000 to 6,000 animals.

The Kenai Mountains along the eastern third of the refuge lend scenic, watershed and habitat values to the ecosystem. The glaciers of the Harding Icefield and in the proposed southern additions provide the water supply for the refuge. Cook Inlet and Kachemak Bay, Dall sheep, mountain goats and a variety of smaller mammals and birds inhabit higher elevations, and caribou, bears (black and grizzly), lynx, wolves and coyotes occur in lower transitional zones.

The variety of habitats and their fish and wildlife populations combined with the refuge's proximity to Anchorage, lend ample opportunity for quality environmental awareness and wildlife-oriented recreation programs. The existing refuge is presently used by many southcentral Alaska residents, who hike and canoe in summer, and ski in winter within the proposal.

The Chickaloon Flats unit is a popular waterfowl hunting area. This northern addition, consisting of some 80,000 acres, reflects recognition of a biological rather than a longitudinal boundary on the Chickaloon Flats between the existing area and the adjacent Chugach National Forest.

*Section 301(a)(9): Kodiak National Wildlife Refuge*

The Committee modified the boundaries of the existing Kodiak National Wildlife Refuge to include all public lands on Afognak and adjacent Ban Island not conveyed to Native Corporations under ANCSA or Section 1427 of this Act or to the State under the Statehood Act.

This action reflects the provisions of settlement of Koniag Village and Regional Corporation entitlements under ANCSA and transfers the small remaining tracts of Afognak public lands from the Chugach National Forest to the Kodiak National Wildlife Refuge. Such action will vest management authority for Federal lands in the Kodiak Island group and protection of the fish and wildlife resources in one agency.

LEGISLATIVE HISTORY
P.L. 96-487

[page 190]

Provisions of the Koniag settlement also call for a cooperative effort by the Corporations and the Fish and Wildlife Service to identify, in a timely fashion, areas of Afognak Island that represent important habits for the Kodiak brown bear—a subspecies of national significance whose perpetuation is of concern to all people. It is assumed, also, that the Fish and Wildlife Service will provide technical assistance to the Native Corporations for the management of brown bears on their lands.

Other public lands within the Kodiak Borough, including submerged lands and islands previously part of the Chugach National Forest are of value primarily to marine birds, mammals and other aquatic fish and wildlife resources and have, therefore, been added to the Alaska Maritime National Wildlife Refuge.

Afognak Island is the home of elk, Sitka deer, 300–600 brown bears and major concentrations of sea otters. On close examination the committee found that all but about 50,000 acres of Afognak will be conveyed to the State or the Native corporations. In the interest of efficient management the committee decided to include the remaining isolated pieces of public land in the refuge so there would be only one Federal management agency involved in the area. All Federal lands and waters that were described in Presidential Proclamation No. 39, dated December 24, 1892, as being within the Afognak Forest and Fish Culture Reserve and which are not otherwise conveyed under the Alaska Statehood Act or the Alaska Native Claims Settlement Act will be within the Kodiak National Wildlife Refuge or the Alaska Maritime National Wildlife Refuge.

The Red Peaks area is of particular scenic and ecological significance as is Ban Island which supports key brown bear denning areas.

The Committee adopted an amendment by which provisions of this Act and the National Wildlife Refuge System Administration Act would not necessarily preclude development of a hydroelectric project at Terror Lake in the Kodiak Island Unit. This amendment did not, however, alter the need for studies and considerations, now ongoing, to determine the environmental impacts, feasibilities and alternatives of the proposed project or the implementation of other aspects of law.

The Committee notes that this project may have potential for providing the city of Kodiak an economic, long-term supply of electrical power. The project would avoid further expansion of diesel generating facilities and would save a substantial amount of such fuel over the life of the project. It is the feeling of the committee that through ongoing study and negotiations with the various Federal and State agencies involved mitigation and modifications may be agreed on which may avoid any significant adverse effects which the project might have on the wildlife values for which the unit was established, if such project is ultimately approved.

*Section 301 (a) (10): Koyukuk National Wildlife Refuge*

The proposed Koyukuk National Wildlife Refuge consists of approximately 3.50 million acres of public land located about 250 miles west of Fairbanks and immediately east of the Seward Peninsula.

The Committee's proposal represents a net reduction of 150,000 acres from that of the House of Representatives. The boundary adopted deletes 170,000 acres of public, Native or anticipated public lands within

# ALASKA LANDS CONSERVATION ACT
## P.L. 96-487

[page 255]

they automatically be included in the Alaska Peninsula refuge established by this Act. If status of the lands is not resolved during the study period, the selections will be adjudicated pursuant to existing law.

All lands withdrawn pursuant to subsection (f) shall be under the jurisdiction of the Bureau of Land Management. The Bureau of Land Management is urged to work cooperatively with the Fish and Wildlife Service in the protection of fish and wildlife values on Bureau of Land Management lands in the Bristol Bay Study Region.

An essential objective of this Committee's action is to ensure that no uses are permitted on these lands inconsistent with maintenance of fish and wildlife values or that impair future land use options that might be otherwise available under this plan.

The Committee understands that in the spirit of the study, State lands in the Study Region will be administered with a prudent regard for the wildlife values of the region. The Committee urges the State to effectuate land use and resource development with careful consideration of natural values in the Study Region.

If the State elects not to participate in the study, the Secretary is directed to conduct an independent study of the region and to prepare a management plan for the Federal lands involved. The Committee hopes that the State will consider the Federal plan, and any legislative or land exchange proposals contained in the plan, as it makes decisions concerning State selections or the use of State lands within the region.

### TITLE XIII—ADMINISTRATIVE PROVISIONS

Like the House-passed bill, S. 9 contained a number of general administrative provisions relating to the units designated in Alaska. The Committee amendment included a number of these provisions and included a number of other provisions. These provisions include sections relating to land acquisition, archaeological and paleontological sites, cooperative information centers, visitors facilities, management plans, wilderness management, and a scenic highway study.

The Committee included a new provision, Section 1324, which provides for the revocation of specific withdrawals made by the President and the Secretary of the Interior in November and December, 1978, and in June 1979. It is the intent of the Committee that this section not affect existing litigation regarding the authority of the President and the Secretary to make such withdrawals under the Antiquities Act of the Federal Land Policy and Management Act of 1976.

### TITLE XIV—AMENDMENTS TO THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND OTHER RELATED PROVISIONS

During consideration of the Alaska National Interest Lands legislation, the Committee agreed to adopt Title XIV of S. 9, which contained several amendments to the Alaska Native Claims Settlement Act, as well as additional provisions relating to Alaska Native Corporations and their lands. Many of the provisions originated in legislation pending before the Committee during the 95th Congress, pro-

## LEGISLATIVE HISTORY
### P.L. 96-487

posed by the Administration (S. 3303) and Senators Gravel and Stevens (S. 3106). The amendments would improve the implementa-

[page 256]

tion of the Settlement Act or provide clarifications to the provisions of that Act. In general, the Committee adopted those provisions supported by at least three of the four parties primarily affected by or concerned with the Settlement Act—the Natives, the State of Alaska, the Administration, and the Alaska Coalition. The Committee also considered and adopted on that basis, several proposals authorizing specified Native Corporations to exchange lands or selection rights to lands within Alaska, or to negotiate for such exchanges. These Native land exchange amendments were adopted in order to further and fulfill the purposes of the Settlement Act; in addition, the exchanges would, in some cases, allow national interest lands to remain in public ownership, consolidate and rationalize land ownership patterns in Alaska and resolve or obviate the need for litigation.

Background information and a discussion of the Committee's intent with respect to certain of the provisions contained in Title XIV is provided below. In addition, each provision is described in detail in the Section-by-Section aalysis of the Committee report.

The Committee adopted several technical and clarifying amendments to Title XIV during markup. A number of new provisions were also considered and agreed to. The major changes to the Title and the new provisions are also described below, and in the Section-by-Section analysis.

The Committee amendment is very similar to Title IX of the House bill.

*Section 1404: Vesting Date for Reconveyances*

A technical amendment to Section 1404, Vesting Date for Reconveyances, was adopted to address a problem unique to the Pribilof Islands. The amendment provides that the applicable date of residence for purposes of conveyance of surface estates under section 14(c) of the Settlement Act is determined as the date of conveyance to the appropriate Village Corporation of Pribilof Islands, rather than December 18, 1971.

*Section 1408: Basis in the Land*

The Committee agreed to adopt substitute language for Section 1408, Basis in the Land and Reserves from the Land, on the understanding that the amendment would meet the objections of the Treasury Department. The purpose of the provision is to eliminate an ambiguity in the language of section 21(c) of the Alaska Native Claims Settlement Act as to precisely which date is intended by the term "time of receipt", and also to eliminate a potential inequity in the tax treatment accorded different Native corporations. The effect of the amendment is to require the basis of land received under the Act to be determined on one of two dates. The general rule is that the basis of land received shall be the fair market value (FMV) at the time of receipt. The amendment provides that the time of receipt shall be defined as "the time of the conveyance" by the Secretary of the Interior, regard-

## ALASKA LANDS CONSERVATION ACT
### P.L. 96-487

less of whether the title document is a patent or an interim conveyance.

The amendment also provides that the basis of mineral deposits and timber shall be the FMV at the time of first commercial development.

The determination of the basis of mineral deposits and timber is

[page 257]

postponed until first commercial development, because the existence or the extent and quality of a mineral deposit may not be known at the time of receipt. The uncertainty as to the existance of a mineral deposit or as to extent and quality of a deposit would be a significant effect on value.

Timber is different from a mineral deposit in that it is clearly visible. Also, the quantity can be ascertained with reasonable accuracy at relatively little cost. However, there would be uncertainty as to the FMV if valued at time of receipt. The availability of large additional quantities of timber would create an element of uncertainty with respect to the market price. Also, a high percentage of the timber now being sold in Alaska is from Federal lands and subject to Forest Service export restrictions as set forth in 36 CFR 223.10 whereas timber on lands received under the Act will not be subject to these restrictions and could be exported without processing. Considering the difficulties in determining the FMV of timber at the time of receipt and the desire to apply the same rule to all natural resources, the basis for mineral deposits and timber is to be determined at time of first commercial development.

For these purposes, the time of first commercial development shall be the first day of the taxable year in which, (1) a deduction for depletion is allowed or allowable, (2) gain or loss is realized from a disposal of minerals or timber wtih a retained economic interest, or (3) minerals in place or standing timber are sold or exchanged.

The FMV of an interest in a mine, well, other mineral deposit or block of timber shall be determined under the rules set forth in section 1.611 of the Income Tax Regulations. Section 1.611-2 set forth the rules applicable to mines, oil and gas wells, and other natural deposits, and section 1.611-3 set forth the rules applicable to timber. For these purposes, a "block" of timber shall have the same meaning as given in that term in section 1.611-3(d), except that a block of timber would include timber stands of sufficient quantity to support a logging operation for at least five years, unless the total quantity owed by a native corporation is less than that amount.

The regulations under section 1.611 provides that if the FMV is used for ascertaining the basis such value must be determined subject to the approval of the district director.

*Section 1410: Interim Conveyance and Underselections*

An amendment to section 1410 authorizes the Secretary of the Interior to convey by "interim conveyance" lands selected by a Native, Native Corporation, or Native group pursuant to the Alaska Native Claims Settlement Act. The right, title, and interest in lands conveyed by an "interim conveyance" is exactly the same right, title, and interest conveyed by a "patent". While boundaries of lands conveyed by "interim conveyance" shall not be altered, they may be redescribed in a subsequent "patent" to reflect the plat of survey. However, in the

latter situation, the Secretary shall take appropriate action to insure that the Native, Native corporation, or Native group receives its full entitlement. The section also provides that the term "interim conveyance" is to be used interchangeably with the term "patent" throughout the Alaska Native Claims Settlement Act so that reference to the term "patent" in the Act by definition also will include reference to

[page 258]

"interim conveyance". The amendment is retroactive and validates all "interim conveyances" issued by the Secretary prior to the date of enactment of this Act.

*Section 1411: Escrow Account*

A technical amendment to Section 1411, Escrow Account, clarifying its application to the Cook Inlet Region, Inc. was agreed to by the Committee.

*Section 1416: Alaska Townsites*

In recognition that tracts within townsites were closed to entry at the date of enactment of the Federal Land Policy and Management Act of 1976 (Public Law 94-579), the Committee adopted amendments to section 1416 which clarify that the townsite trustee shall convey to the municipality or the State of Alaska, as appropriate, all lands within a townsite which were unoccupied on October 21, 1976. The trustee shall continue to administer and discharge his trust on all tracts occupied on October 21, 1976. Townsite lands conveyed to a municipality or the State of Alaska pursuant to this section, or pursuant to the Alaska townsite laws after December 18, 1971, shall be credited toward the reconveyance requirement of Section 14(c)(3) of the Alaska Native Claims Settlement Act.

*NANA/Cook Inlet Regional Selection Lands*

The Red-dog mineralized zone in Northwest Alaska is within the NANA Regional Corporation boundaries; a portion of the mineral rich lands is located on lands withdrawn under section 17(d)(2) of ANCSA for possible inclusion within the Noatak National Preserve. In its consideration of the Noatak, the Committee excluded the Red-dog area because of its high potential for mineral development, to provide for a Western Alaska transportation corridor to the North Slope. This deletion can be made without significant damage to the resources involved in the Noatak Preserve.

In deliberating the use of the (d)(2) lands, the Committee considered several options for this area which included adding the lands to the Noatak Preserve as the House did, leaving them in public domain status, or opening them to selection by either the State or Native corporations. The Committee determined that the best use was to open the lands to Native selection as provided for in this section.

The Committee felt that the Red-dog area should be open to mineral development and boundaries were carefully drawn which serve to delete the mineralized area from the conservation system unit without seriously damaging the purpose for which the Preserve is proposed. The Committee considered further deletions but rejected them because

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

of the importance the additional lands have to the Preserve and the biosphere reserve. The lands the Committee deleted drain to the south onto Native lands in the lower Noatak valley, and not onto lands within the Preserve.

The Committee determined that opening the Red-dog to selection by the Natives would be in the national interest, and in the interest of the local people. Should the NANA Corporation develop Red-dog the Committee feels that they would be in a position to insure that development in the area would not adversely impact its own lands which

[page 259]

are down-stream or the subsistence resources on which the people of the region are heavily dependent. The NANA Corporation also has a good record in developing local hire programs which would help the people of the region, should mining develop. In making this decision, the Committee expects to see these types of programs and environmental protection occur.

A portion of the Red-dog area is within the Noatak Biosphere Reserve, designed by UNESCO. The Committee hopes that NANA and the National Park Service will be able to develop cooperative research efforts so that the impacts of mining and other surface disturbances at Red-dog will be assessed and will contribute to our scientific knowledge of the Arctic when compared to the research conducted on the remaining portions of the Preserve.

The selection rights of NANA in this area will not serve to increase or decrease the entitlement due NANA under the ANCSA.

Recognizing the need to find lands for the Cook Inlet Regional Corporation in accordance with the terms and conditions of the Cook Inlet land exchange, as provided in P.L. 94-204, the Committee further provided for Cook Inlet Region, Inc., to have the right to make selections within the deletion, subject to approval by NANA and the State of Alaska.

The Committee noted that the State of Alaska has expressed an interest in selecting a portion of the lands deleted from the Noatak. While stipulating in the amendment the lands not selected by the Native corporations will return to a (d)(1) withdrawn status, the Committee also intends that the State of Alaska be allowed to select and receive conveyance to those lands which have been identified as State interest areas and are outside of the Preserve.

The Committee is aware that there has been a legal question raised concerning whether the Native corporations have the right to make land selections from lands withdrawn under Section 17(d)(1), or whether they are restricted to lands withdrawn under sections 11(a)(1) and 11(a)(3) of the ANCSA. The Committee provided specific statutory authority for NANA and Cook Inlet to select in one specific location. The committee's action is not intended to affect the resolution of the general legal question in any respect.

*Doyon Region Land Amendments*

These sections form the framework of a land exchange among the State of Alaska, the Secretary of the Interior, and Doyon, Limited, one of the Native regional corporations formed under the ANCSA. The exchange was negotiated among the three parties, and the Com-