## LEGISLATIVE HISTORY
P.L. 96-487

mittees recommendation serves to provide the legislative authority needed to accomplish the exchange. While ample authority exists under Section 22(f) of the ANCSA to complete the exchange without the need of further Federal Legislation, the Committee felt it appropriate to complete the exchange through this Act since some of the lands involved have been recommended at various times for inclusion in various conservation system units. The exchange also serves to eliminate substantial acreage of private inholdings within the Yukon-Charley Rivers National Preserve, as such, the Committee felt that this was the appropriate vehicle to formalize the agreement.

[page 260]

A series of technical changes, primarily corrections in land descriptions, to the DOYON Land Exchange provisions were adopted. With regard to the conveyances authorized in Section 1422, Committee actions during this Congress and the previous Congress, are not intended to affect the outcome of the litigation referred to in the section, or to prejudge the validity or invalidity of the selections at issue in that case.

*Section 1425: Eklutna Village Corporation Lands*

This section is designed to solve severe and unique land selection problems for the Native Village of Eklutna. While many of the individual issues from which the Eklutna Native corporation seeks relief in this Section are not unique, the quantity and severity of the problems facing Eklutna brought about legislative action.

Technical amendments to Section 1425, the Eklutna Village Corporation Lands provision, were adopted by the Committee to reflect the passage of time since the drafting of the original proposal and to clarify the provision. During consideration of S. 9, some concern was expressed (by the Federal Railroad Administration) about the meaning of the phrase "this withdrawal and the agreement shall not affect the administrative jurisdiction of (the holding agency)" found in subsection (b) of Section 1425. The Committee's understanding of this phrase is as follows:

The holding agency may, in accordance with existing law, continue to use the lands involved as they would without this amendment. The sale or other transfer of the railroad to private industry or the State for continued operation as a railroad would not trigger Eklutna's claims. Such claims would be triggered only upon abandonment of railroad operations.

The following clarifying points were enumerated on Section 1425:

    1. The parties drawing up the agreement specified in this provision will consult with the Secretary of the Interior on the substance of their negotiations throughout the process and prior to any final commitment.

    2. Surveys for purposes of agreement would be undertaken by the parties themselves.

    3. The Secretary of the Interior may continue to exercise his authority under Section 17(b) of ANCSA to reserve easements, should the agreement in the Secretary's opinion not adequately do so.

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

4. After holding agency excesses its lands, the Department of the Interior will have interim administrative authority before conveyance. In the case of Department of Defense, proper efforts to decontaminate their lands must be undertaken prior to excessing after which time the parties receiving the lands assume any risk for further liability.

*Koniag Village and Regional Corporation Lands*

The Committee agreed to a land exchange proposed by the Koniag Region, Inc. which provides for the relinquishment of native selection rights to almost 300,000 acres of surface and subsurface estates and to an additional approximately 40,000 acres of surface estate on the Alaska Peninsula between Becharof Lake and the Aniakchak-

[page 261]

Caldera National Monument in exchange for some 280,000 acres of surface and underlying subsurface estate on Afognak Island now within the Chugach National Forest. The National Peninsula lands to be relinquished are among the finest wildlife areas in Alaska and will be included in the Alaska Peninsula National Wildlife Refuge. The Committee believes that this exchange will be beneficial to state and national interests as well as to the natives as it—

(1) Assures public access for sports hunting, fishing and other recreational purposes pursuant to cooperative management agreements with appropriate, Federal, State and local agencies to the Afognak Island land that is transferred to Native ownership.

(2) Restricts Native retained subsurface right on the Alaska Peninsula to oil and gas under regulations designed to minimize interference with surface values.

(3) Guarantees the retention in federal ownership, through addition to the Kodiak National Wildlife Refuge, of islands offshore of Afognak Island and the "Red Peaks" area of over 46,000 acres of Afognak Island, the latter being an area having unusual scenic and recreational value.

(4) Preserves for the Aniakchak-Caldera National Monument almost 50,000 acres which otherwise would be conveyed to Native ownership under ANCSA.

(5) Preserves state selection of some 4,000 acres of land on Afognak Island selected by the State of Alaska under Section 6 of the Alaska Statehood Act.

(6) Resolves a long standing dispute concerning the eligibility of certain villages in the Koniag region for ANCSA benefits.

(7) Resolves disputes between the affected Native corporations and the Kodiak Island Borough involving conflicting selection claims.

(8) Consolidates Native land holdings for the Koniag region in an area traditionally used by the Koniag people.

The land exchange provisions of Section 1427 were modified by the Committee in two areas. First, the language of subsection (b)(5), providing for public access to recreational purposes to the lands on Afognak Island subject to the terms of cooperative management agreements entered into by Koniag, Inc. with the Secretary and appropriate state agencis and local political subdivisions, was changed

5205

## LEGISLATIVE HISTORY
P.L. 96-487

to assure public access, except in the vicinity of logging and other commercial operations, and subject to reasonable public safety restrictions.

Second, the language of subsection (e)(3) was modified to provide that the three village corporations receiving land within the Kodiak National Wildlife Refuge shall each convey 20 acres to the State in trust for future community expansion purposes. This parallels the reconveyance requirements of Section 14(c) of the Settlement Act. Technical amendments to the language and land descriptions in Section 1427 were also agreed to by the Committee.

In its consideration of the Koniag exchange and other Native land exchanges involving National Forest lands, the Committee discussed the issue of timber harvesting practices on Native lands. While the Committee recognizes that lands conveyed under the Alaska Native

[page 262]

Claims Settlement Act are private lands and therefore, not subject to the multiple use mandates which govern the management of National Forest lands, we note that the Settlement Act restricts the management of lands conveyed from the national forests to native corporations for 12 years. This 12-year period runs from the date of the Settlement Act through December, 1983. Section 22(k) of that act provides:

> Any patents to lands under this Act which are located within the boundaries of a national forest shall contain such conditions as the Secretary deems necessary to assure that ... such lands are managed under the principle of sustained yield and under management practices for protection and enhancement of environmental quality no less stringent than such management practices on adjacent national forest lands for a period of twelve years.

The committee is aware of the fact that each conveyance document involving national forest lands includes the language of section 22(k) as a condition of the conveyance. The Committee also understands that the Departments of the Interior and Agriculture are developing a memorandum of understanding concerning their respective duties for implementation of Section 22(k), including providing training and advice on timber management practices to Native corporations.

In this regard, the Committee wishes to emphasize the importance of responsible implementation of Section 22(k) and to encourage both Departments in their efforts to develop such a program. In addition, the Department of Agriculture is urged to assist Native landowners with timber management problems through its existing State and private forestry programs.

*Chugach Region Lands*

The Committee adopted three amendments which open lands within the Chugach National Forest to selection by the Chugach village and regional corporation under Sections 12(b) and 14(h)(8) of the Alaska Native Claims Settlement Act, and for study for possible future selection under Section 12(c). By these amendments, the Committee recognizes the difficult and longstanding land ownership and land use problems in the Chugach region.

## ALASKA LANDS CONSERVATION ACT
### P.L. 96–487

The region covers virtually all of the Prince William Sound area, from the southwestern tip of the Kenai peninsula to Icy Bay, near Yakutat, and includes five coastal villages. Although the region boundary extends inland, the Chugach people are dependent upon traditional coastal pursuits for their livelihood and there is no historic or anthropological data to suggest that they ever used or occupied any inland areas. Thus, the Chugach people have desired to fulfill their land entitlement under ANCSA with coastal lands.

The Chugach National Forest encompasses the heart of the region— most of the coastal lands in the Prince William Sound area, including the Chugach villages of Chenega, Eyak and Tatitlek. Because ANCSA restricted and in some sections prohibited, Native selection of national forest land, the Secretary identified deficiency areas in the region for village and regional selection. However, these deficiency areas are located inland, on the northern side of the Chugach Moun-

[page 263]

tains and are not of similar kind and character to the lands traditionally used and occupied by the Chugach people. Because of these land ownership patterns and problems in the Chugach Region, the Committee determined that National forest lands were required to be made available for selection by the Chugach people in order to provide a fair and just land settlement for the Chugach region under the purposes and policy of the Settlement Act.

In regard to the village land selections authorized by Section 1428, the Committee notes that the Chugach regional corporation had an estimated initial allocation of 64,400 acres under Section 12(b) of the Alaska Native Claims Settlement Act. The Committee understands that the amount of land to be reallocated by the region to the villages of Chenega, Eyak, and Tatitlek, which are located within the Chugach National Forest, is estimated to be 57,000 acres. Section 1428 permits the three villages to exercise their 12(b) selections within the forest, thus providing the villages with an exemption from the acreage limitation contained in Section 12(a) of the Settlement Act.

Selections made by the villages would be subject to all other applicable provisions of the Settlement Act, including the requirements for tract size, compactness, and contiguity. Village selections would also be subordinate to certain State selections as described in subsection (d).

Additional areas within the Chugach Forest which are not available for selection by the village corporations of Chenega (the area of Icy Bay and Whale Bay) and Eyak (the area east of Mountain Slough and south of the Copper River Highway) are identified in maps referenced in Section 1428.

In exchange for these selection rights the villages would relinquish rights to an equivalent acreage in the areas withdrawn by the Secretary for deficiency selections under 12(b) of the Settlement Act. These withdrawal areas are located in an area designated for inclusion in the Chugach National Forest under this Act.

Section 1429 authorizes Chugach Natives, Incorporated to select lands within the Chugach Region, including National Forest lands, in order to fulfill its regional entitlement under Section 14(h)(8) of the Settlement Act. The Committee notes that this entitlement amounts to approximately 33,000 acres of land.

# LEGISLATIVE HISTORY
## P.L. 96-487

Under the terms of the amendment, the 14(h)(8) selections are not permitted in those areas identified in the maps referred to in Section 1429(a) (Western Prince William Sound areas and the Copper River Delta Area), or in areas selected by the State prior to September 1, 1978. Most significantly, the amendment provides that 14(h)(8) selections will be subject to the terms of the agreement reached pursuant to Section 1430. This agreement would govern the location of the 14(h)(8) selections. The Committee expects the selections to be made in conformance with the applicable regulations under the Settlement Act. For example, these regulations provide that selections must be in reasonably compact tracts of at least 5,760 acres, unless good cause is shown for a smaller selection (43 CFR § 2653.9).

In exchange for these selection rights, the region would relinquish an equivalent amount of 14(h)(8) selection rights in a deficiency withdrawal area located east of the Copper River.

[page 264]

*Arctic Slope Regional Corporation Lands*

Section 1431 provides a comprehensive solution to most of the outstanding land ownership issues in the Arctic Slope Region of Alaska relating to implementation of the land withdrawal and selection provisions of ANCSA. The principal elements of this solution are: a land exchange and land consolidation within or immediately adjacent to Gates of the Arctic National Park between the Department of the Interior and the Arctic Slope Regional Corporation (ASRC), providing land ownership patterns mutually beneficial to the parties; special provisions for conducting oil and gas operations in the Kurupa Lake area on ASRC lands in an environmentally sensitive manner; a procedure for conveying lands previously identified for selection north of Gates of the Arctic National Park; special protection for the endangered peregrine falcon on ASRC lands along the Colville River; and, certain other land exchanges between the Interior Department and ASRC and certain village corporations in the region.

The elements of this solution of land issues in the Arctic Slope region were developed in extensive negotiations between the Department of the Interior and ASRC. These negotiations resulted in an agreement entitled "Terms and Conditions for Land Exchanges and Resolution of Conveyancing Issues in Arctic Slope Region Between the Department of the Interior and Arctic Slope Regional Corporation" entered into June 29, 1979 ("Terms and Conditions").

Section 1431 is intended to carry out or confirm and ratify (where appropriate) the provisions agreed to in the "Terms and Conditions."

*Other Provisions*

Five other provisions related to specific Native Corporations are included in the Committee amendment. The Committee adopted language which would implement settlement agreements negotiated between the Department of the Interior and the Salamatof Native Association and Alexander Creek, Incorporated, in order to resolve longstanding disputes over village eligibility. An amendment to withdraw for selection by Bristol Bay Native Corporation, five sections of land located outside of the section 11 withdrawals for the corporation was agreed to by the Committee. A third provision directs the

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

Secretary of the Interior to convey to Shee Atika, Incorporated, pursuant to Section 14(h)(3) of ANCSA, several small parcels of land located on Charcoal and Alice Islands.

The Committee adopted a fourth proposal to permit Cook Inlet Region, Inc. to obtain surplus property anywhere in the United States at open bid or by negotiated disposition where it has already been determined that such property is not necessary for Federal purposes. The amendment is intended to assist the Secretary in meeting the Department's commitments under the Cook Inlet land exchange. The amendment does not give Cook Inlet Region, Inc. priority over any State or local users eligible for preference under the Federal Property and Administrative Services Act of 1949, and does not affect the existing authority of the Secretary or the GSA Administrator within Alaska.

The final provision concerns the residents of Port Alsworth who are in a unique situation concerning their status under the Alaska

[page 265]

Native Claims Settlement Act. While their settlement is physically located within the boundaries of the Cook Inlet Region, they are enrolled under ANCSA as shareholders of the Bristol Bay Regional Corporation. The Native residents of Port Alsworth have filed for group status in accordance with the provisions of section 14(h) of ANCSA. The amendment serves to clarify their status concerning location versus enrollment. The amendment also provides that should the Port Alsworth group be declared eligible by the Secretary they shall receive their selection from the lands described in the section. That description excludes any lands that were, prior to enactment, within the Federal power site withdrawal for Lake Kontrashabuna.

There is no intent by the Committee to prejudice the issue concerning group eligibility pending before the Secretary. The Committee is aware that the Bureau of Indian Affairs has found Port Alsworth not eligible for group status, and that the issue is currently under appeal. The intent of the Committee is to provide Port Alsworth with a mechanism for receiving any lands that they might be eligible to should their group become certified under ANCSA. If the final ruling is that they do not qualify as a group, then this aspect of the section shall not apply.

TITLE XV—NATIONAL NEED MINERAL ACTIVITY RECOMMENDATION PROCESS

This Title was added by the Committee in the 95th Congress in order to provide a means for future mineral exploration and development on lands where such activity is prohibited.

Title XV authorizes the President to recommend to Congress that a mineral development be permitted on specific lands because there is an urgent national need for such development which outweighs the other resource values of those lands.

Congress would have to pass a joint resolution approving any Presidential recommendation before any mineral exploration or development would be permitted. Such a resolution would be subject to expedited procedures in order to assure that there would be an opportunity to vote on it.

LEGISLATIVE HISTORY
P.L. 96-487

H.R. 39 as passed by the House does not contain any provisions comparable ot Title XV.

[page 266]

## VII. SECTION-BY-SECTION ANALYSIS

In general, the table of contents and the language of the Committee substitute speak for themselves. However, the language in title VII relative to the Special Management Areas and Forest Utilization Program; title VIII, Subsistence Management and Use; title IX, Implementation of Alaska Native Claims Settlement Act and Alaska Statehood Act; title X, Federal North Slope Lands Study Program; title XI, Transportation and Utility Systems In and Across, and Access Into, Conservation System Units; title XII, Federal State Cooperation; title XIII, Administrative Provisions; title XIV, Amendments to the Alaska Native Claims Settlement Act and Related Provisions; the title XV, National Need Mineral Activity Recommendation Process, is technical in nature and is therefore analyzed in greater detail in the following section of the report.

TITLE VII—NATIONAL WILDERNESS PRESERVATION SYSTEMS

*Section 705: Designation of Special Management Areas Within the Tongass National Forest*

This section designates nine areas of national forest land as "Special Management Areas" to protect the lands now and to provide management flexibility. Thus, the designation recognizes the important public values of these lands and the many existing uncertainties about future timber supply and demand in Southeastern Alaska.

*Section 706: Management Rules for Special Management Areas*

This section sets forth the management rules for special management areas. Under subsection 706(b) timber sales from these lands are prohibited for at least ten years after date of enactment. Despite this prohibition the timber volume on these lands will be included in determining the annual allowable sale quantity on the Tongass National Forest. This provisions does not affect timber sales made prior to enactment of this Act.

The Committee intends that the special management areas will be managed so as not to preclude any land management options which Congress may consider in the future. No timber shall be sold from the special management areas without the approval of Congress. The Secretary may take certain steps to control disease, insects, and fire which might involve the harvesting of trees. In certain instances, it may also be desirous for the Secretary to authorize the harvest of wind thrown timber, when the harvest of such timber can contribute to the timber base without adversely affecting the other resource values of the special management area. The Committee does not intend that the Secretary would authorize the harvest of wind thrown timber in situations where the construction of roads or other developments would be necessary, or under any circumstances in which the scenic,

## LEGISLATIVE HISTORY
### P.L. 96-487

[page 310]

govern the areas covered by the legislation and that the provisions of existing law govern the other federal lands in the State of Alaska. The section becomes effective upon the relinquishment of specified State selections made on November 15, 1978.

*Section 1324: Access*

This section is designed to remove the uncertainties surrounding the status of the rights of the owners of non-Federal lands to gain access to such lands across Federal lands. It has been the Committee's understanding that such owners had the right of access to their lands subject to reasonable regulation by either, the Secretary of Agriculture in the case of national forests, or by the Secretary of the Interior in the case of public lands managed by the Bureau of Land Management under the Federal Land Policy and Management Act of 1976. However, a recent District Court decision in Utah (*Utah v. Andrus* et al., C79-0037, October 1, 1979, D. C. Utah) has cast some doubt over the status of these rights. Furthermore, the Attorney General is currently reviewing the issue because of differing interpretations of the law by the Departments of Agriculture and the Interior.

The Agriculture Department believes that non-Federal land owners have the right of access to national forest lands subject to reasonable rules and regulations. They find nothing in the Organic Act of 1897 (16 U.S.C. 473-478, 479-482, 551) or the Wilderness Act which precludes such access. In fact, they interpret Section 5(a) of the Wilderness Act (16 U.S.C. 1131-1136) as mandating access to non-Federal in holdings within national forest wilderness.

The Interior Department on the other hand, interprets Section 5(c) of the Wilderness Act as expressly authorizing denial of access to such inholders in wilderness areas. Based on that interpretation, Interior then concludes that the provisions for wilderness review of public lands organized by BLM in section 603(c) of the Federal Land Policy and Management Act also authorized denial of access across public lands subject to wilderness review.

The Committee amendment is designed to resolve any lingering legal questions by making it clear that non-Federal landowners have a right of access, National Forests and public land, subject, of course, to reasonable rules and regulations.

### TITLE XIV—AMENDMENTS TO THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND RELATED PROVISIONS

*Section 1401: Stock Alienation*

This section is intended to allow Native Corporations the option of giving their shareholders and Corporations additional protection after 1992 when stock can be alienated. The section is also designed to limit the possibility of take over of Native Corporations by outside interests. This is accomplished by allowing the Corporations the option of amending their bylaws to provide for a right of first refusal before the culmination of a sale or other transfer of the stock and also to limit voting in Native Corporations to Alaska Natives or their direct descendants. In addition, this section allows Alaska Native members of professional organizations to alienate their stock in cases where holding Native stock may interfere with their ability to conduct their business.

## ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 321]

provides that the land entitlement of Bering Straits is not increased or decreased by this section, however, those lands selected in the areas withdrawn by subsection (a) and conveyed to Bering Straits are to be charged against the corporation's existing 14(h)(8) entitlement. The intent of subsection (e) is clear. Subsection (f) is intended to make it clear that when withdrawn lands are selected under section 14(h)(8) of the ANCSA, those selections will be superior to any existing selections. For example, if any of the lands withdrawn for selection under subsection (a) where selected under Section 14(h)(1) as cemetery or historical sites prior to the date of this legislation, the Bering Straits Region is still allowed to make a Section 14(h)(8) selection on those same lands. Similarly, if lands withdrawn by subsection (a) are not selected under Section 14(h)(8) for any reason by Bering Straits' corporation, existing 14(h)(1) selection on those lands, if any, are to be allowed to stand and be adjudicated in the normal manner.

*Section 1425: Eklutna Village Corporation Lands*

This section is designed to solve severe land selection problems regarding the Native Village of Eklutna.

*Subsection (a)* declares the need for a special settlement and the goals of that settlement.

*Subsection (b)* empowers the Secretary and further obligates him to implement any agreement executed by the State of Alaska, the Municipality of Anchorage, and Eklutna, Inc. respecting those lands located within Eklutna's 11(a) withdrawal area and which are described in subsection (b)(1). The parties are authorized to relinquish selections previously made and to agree as to the future disposition of acreage or interest in lands withdrawn by subsection (b). These relinquishments and conveyances will serve to facilitate land management with the Eklutna withdrawal area. If no agreement is reached, the legislation will be of no force and effect.

*Subsection (b)(1)* withdraws from all forms of appropriation under the public land laws with the exception of PL 94-204, section 12 as amended before this Act, those lands within the Eklutna 11(a) withdrawal area which are owned by the United States and which were not previously withdrawn by the Alaska Native Claims Settlement Act. The withdrawal is intended to preserve the subject matter of the contemplated negotiations between the State, the Municipality, and Eklutna, for the period authorized for negotiations, and further to require implementation of any agreement, if and when executed. If no agreement can be reached by the parties, the withdrawal will expire March 15, 1982.

*Subsection (b)(1)* makes it clear that the withdrawal is intended to permit the agencies currently administering the lands described therein to continue to administer those lands to the extent that they may lawfully do so. The United States is authorized to dispose of the lands to the parties in accordance with the agreement after the agreement has been signed and as soon as the federal property has been declared excess, provided that the land has not also been surplused prior to July 15, 1979. Before July 15, 1979, Cook Inlet Region, Inc. may be offered the property in accordance with the document entitled "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area as clarified August 31, 1976", as amended November 15, 1977 (PL 95-178).

LEGISLATIVE HISTORY
P.L. 96-487

[page 322]

*Subsection (b)(1)* further provides for a recognition of the prior vested rights of Cook Inlet Region, Inc. to any lands located within the region which are surplused and placed in the "in-Region pool" pursuant to Public Law 94-204 as amended before this Act, prior to July 15, 1979. After July 15, 1979, the parties will be entitled to any land that is declared excess in accordance with the terms of the agreement.

*Subsection (b)* revokes PLO 5187, as it pertains to the lands withdrawn by subsection (b)(1). PLO 5187 was a blanket withdrawal of all federal defense withdrawals to permit classification pursuant to subsection 17(d)(1) of the ANCSA after termination of the original withdrawal. This subsection also revokes power project withdrawals as to the lands described in subsection (b)(1), other than the Eklutna power project 350, Eklutna, Inc. and the Department of the Interior being in agreement that no others would ever be activated.

Certain other provisions of subsection (b) were developed to meet the concerns of the Department of the Interior. The parties' agreement is not intended to reach fixtures and personal property located on the Federal withdrawals at the time they are excessed, and such classes of property are to be disposed of pursuant to existing law. Subsection (b) also makes plain that the parties cannot by their agreement impose any procedural requirements or require the reassignment of additional personnel, however the agreement can impose obligations and outlays of funds where reasonable in the ordinary course of business. Subsection (b) further exempts the lands from section 14(c)(3) of the ANCSA because the participation of the Municipality of Anchorage in the negotiations will protect those interests.

Lands conveyed to the State of Alaska, the surface estate of lands conveyed to Eklutna and the subsurface estate of lands conveyed to Cook Inlet Region, Inc. pursuant to the subject agreement are to be charged against their respective entitlements under the Statehood Act and section 12 and 14 of the ANCSA.

*Subsection (c)* authorizes the State and Eklutna, to reach a second agreement dispositive of certain other lands located outside Federal installations. Subsection (c) is not intended to have any effect upon vested third party rights not upon the rights of Eklutna in the event that no agreement is reached.

*Subsection (d)* authorizes the State and Eklutna to relinquish their prior selections, in whole or in part, pursuant to the agreements contemplated by subsections (b) and (c). This subsection is also intended to make the lands affected by the relinquishment part of the withdrawal under section 11a()(1) of the ANCSA. The relinquishments by the State of its selections will relate back to the date of the passage of the ANCSA. Declaring any relinquished State selection as public land will mean the relinquished land will not count against the 69.120 acre limitation on State selections in subsection 12(a) of the ANCSA.

*Subsection (e) and subsection (f)* require the dismissal of the litigation which the agreements will compromise and settle. However, the obligation to dismiss does not arise before the settlements have been implemented.

*Subsection (g)* was requested by the Department of Interior to clarify the relationship between the subject agreements and Eklutna's