ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 323]

existing selection rights and entitlement under the Settlement Act. Because the actual conveyance to Eklutna of acreage or interests in lands withdrawn by subsection (b)(1) is dependent upon a number of factors outside the control of the parties, Eklutna's entitlement under existing law will not be reduced. However, to safeguard the interests of the parties, Eklutna is required to subject to the land bank provisions of the Act, land of at least equal acreage to that which may at some future date be conveyed to Eklutna pursuant to the subject agreements. The lands subject to land bank provisions will remain available to be disgorged by Eklutna in the event of any oversatisfaction of its entitlement under the Settlement Act by reason of conveyances to it pursuant to the subject agreements. The State of Alaska is the intended recipient of these disgorged lands. In the event of any resulting oversatisfaction of the State's entitlement, the State is required to reconvey lands to the United States accordingly. The mechanism set forth in subsection (g) is designed to insure that neither Eklutna nor the State receives more than their respective entitlements under existing law.

*Subsection (h)* is intended to make clear that Cook Inlet Region, Inc. or its grantee can be the owner of the subsurface estate in those lands conveyed to Eklutna, Inc. pursuant to the agreement. The mechanism adopted is as follows: (a) the Secretary will patent to Cook Inlet Region, Inc. or its grantee the subsurface estate in those lands conveyed to Eklutna, Inc.; if (b) the Region or its grantee disgorges to the State the subsurface estate in any lands the surface estate in which is disgorged by Eklutna to the State. Any disgorgement of the subsurface estate in those lands conveyed to Eklutna shall take place only upon the consent of the Region or its grantee; if that consent is not received, then the subsurface estate in those lands conveyed to Eklutna under the agreement shall be conveyed to the State.

*Section 1426: Eklutna-Anchorage Agreement*

Ratifies an agreement which is nearing final execution between the Eklutna Village Corporation, the Municipality of Anchorage, and the State of Alaska regarding Eklutna's, the State's and Anchorage's duties and rights under section 14(c)(2) and (3) of the ANCSA. If the agreement between the parties is not executed by the State of Alaska, Eklutna is not discharged from its obligations under section 14(c)(3) of the ANCSA and this section shall have no force and effect.

*Section 1427: Koniag Village and Regional Corporation Lands*

*Subsection (a)* defines pertinent terms.

*Subsection (b)(1)* identifies the Native corporations to receive title to the lands on Afognak Island to be conveyed pursuant to the section, and provides that such conveyances shall be in full satisfaction of the rights of each such corporations to conveyance under the Alaska Native Claims Settlement Act of lands and interests therein on the Alaskan Peninsula.

*Subsection (b)(2)* identifies exceptions to the conveyances provided for in subsection (b)(1).

*Subsections (b)(3) and (b)(4)* provide the mechanics of effectuating the extinguishment of certain Koniag Native corporation deficiency selection rights on the Alaska Peninsula in exchange for which the conveyances of land on Afognak Island are to be made.

LEGISLATIVE HISTORY
P.L. 96–487

[page 324]

*Subsection (b)(5)* provides for public access for recreational purposes to the lands on Afognak Island except in areas where commercial activities, such as logging, are taking place. Cooperative management agreements between the appropriate Koniag Native corporations and the Department of the Interior, appropriate state agencies and appropriate local political subdivisions (to the extent that the Department and such state and local agencies wish to enter into such agreements) may further define the lands to be so opened, the conditions under which they will be opened, and will establish appropriate limits and conditions upon the recreational uses.

*Subsection (c)* provides that the surface estate on Afognak Island to be conveyed under subsection (b)(1) is to be conveyed to a joint venture consisting of Koniag deficiency village corporations, Koniag 12(b) village corporations and Koniag, Inc. Provision is made, at the election of any of the Koniag Native corporations involved, to be represented in the joint venture by a wholly owned subsidiary corporation. The subsection prescribes the share each of the participants is to have in the joint venture. The patent will name all the grantees of the surface estate but it will not set out their relative shares. Simultaneously with the conveyance of the surface estate to the joint venture, the subsurface estate in the lands conveyed is to be conveyed to Koniag, Inc. Finally, the joint venture and Native corporations involved are prohibited from taking or permitting actions inimical to bear denning activity on the Tonki Cape Peninsula on Afognak Island.

*Subsection (d)* provides the means of resolving a dispute between Ouzinkie Native Corporation and Koniag, Inc. on the one hand and the Kodiak Island Borough on the other, over rights to the land on Kodiak Island described in the subsection. The dispute would be resolved by requiring the Secretary of the Interior to convey the surface and subsurface estate of the lands on Afognak Island described in the subsection to Ouzinkie Native Corporation and Koniag, Inc. respectively, in the event Ouzinkie Native Corporation and Koniag, Inc. enter into an agreement to convey to the Kodiak Island Borough their interests in the described Kodiak Island land which the Kodiak Island Borough desires as watershed.

*Subsection (e)* will, when implemented, resolve in favor of the Native villages listed therein, all disputes concerning their eligibility for ANCSA benefits and prescribes limits upon the ANCSA land benefits to which these villages shall be entitled. The time limits stated in this and other subsections are intended to be directory rather than mandatory.

*Subsection (f)*. The intent of the subsection is to assure the applicability of the provisions of the Alaska Native Claims Settlement Act to conveyances to Native corporations made under this section to the extent that such provisions would have been applicable were the conveyances made pursuant to ANCSA. As one example, the applicability of otherwise applicable provisions of ANCSA are not to be affected by the fact that the conveyance provided for in subsection (c) is to be made to a joint venture rather than directly to the Alaska Native corporations that are the joint venturers.

*Subsection (g)* is a savings clause designed to preserve the rights of Koniag, Inc. on the Alaska Penninsula as therein provided.

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 325]

*Subsection* (*h*) withdraws, subject to valid existing rights, public lands on Afognak Island to be conveyed to Native corporations within the Koniag region under this section, and provides for the opening of such lands, in the event any are not conveyed, to the extent the Secretary of the Interior deems appropriate.

*Subsection* (*i*). The right of access and use of surface estate preserved for Koniag, Inc. under this subsection are restricted to the purposes of prospecting for, extraction and removal of subsurface resources retained under the section by Koniag, Inc. on the Alaska Peninsula. The rights of access and use preserved are those now provided for in existing regulations of the United States Fish and Wildlife Service (50 C.F.C. § 29.32) dealing with the rights of persons holding mineral interests in lands conveyed to the United States for wildlife refuge purposes. These regulations do not provide for permits but set forth standards designed to minimize, so far as practicable, adverse impact on other surface values.

*Subsection* (*j*) deals with one of the incidents of the settlement of the village eligibility dispute which is the subject of subsection (e). Its effect is, with the minor exception therein provided for amounting at the most to 1920 acres, to preclude diminution of land allocations to other Alaska regional corporations under subsection 12(b) of ANCSA because of resolution of the village eligibility dispute.

*Subsection* (*k*) is a corollary of subsection (f). The first sentence of subsection (k) makes it clear that Koniag, Inc.'s interest in the timber resources of the joint venture is to be deemed Koniag's timber resources for purposes of applicability of the revenue sharing provisions of ANCSA section 7(i). Subsection (k) also sets out the rules for determining the portion of Koniag's share of the proceeds from the timber resources of the joint venture which is to be distributed under section 7(i).

*Subsection* (*l*). By section (l) Koniag, Inc. surrenders all of its subsurface mineral rights on the Alaska mainland other than for oil and gas (which is to be understood as including minerals, for example, sulfur, found in solution or mixed with oil or gas) and sand and gravel used in prospecting for, extracting, storing and removing oil and gas in the event sand and gravel is judicially determined to be a part of subsurface estate as that term is used in ANCSA. This question is now in litigation before the United States Court of Appeals for the Ninth Circuit. Subsection (l) also restricts Koniag, Inc.'s exercise of its subsurface mineral rights similarly to the restriction effected by subsection (i) described above. In the event sand and gravel is determined to be an element of surface estate under ANCSA, subsection (l) requires the Secretary of the Interior to make available at far market value, sand and gravel needed for oil and gas operations.

*Subsection* (*m*) incorporates within the Kodiak National Wildlife Refuge all remaining public lands on Afognak Island, including submerged lands below the line of mean high tide, within the present boundaries of the Chugach National Forest and not otherwise disposed of or dealt with in the section. It saves to the Native joint venture, however, the timber resources on two islands, Delphin and Discoverer,

5269

Case 3:02-cv-00290-JKS    Document 173-6    Filed 06/11/2007    Page 4 of 9

## LEGISLATIVE HISTORY
P.L. 96–487

[page 326]

subject to management and harvest in accordance with management plans jointly developed between the joint venture and the Secretary of the Interior.

*Subsection (n).* The exclusions in subsection (n) are made because the section itself makes them unnecessary.

*Subsection (o)* is a savings clause designed to preserve existing Forest Service timber contracts and Forest Service Cabin leases on Afognak Island.

### Section 1427: Chugach Village Corporation Lands

Permits three villages in the Chugach Region to select their land entitlement pursuant to section 12(b) of ANCSA from lands within the Chugach National Forest notwithstanding that the limitations on village selections from National Forest land contained in section 12(a) of ANCSA are applicable to section 12(b). Subsection (a) reaffirms this applicability but permits an exception for three villages.

Subsection (b) exempts from selection pursuant to this section certain environmentally sensitive areas in the Copper River Delta and the Southwestern Prince William Sound Area. Further, subsections (b) and (c) establish a 90-day selection period for the villages and a 90-day period for the Chugach Regional Corporation to provide the Secretary with the number of acres to which each village is entitled under 12(b). Under subsection (d), National Forest selection applications filed by the State in certain named areas under section 6(a) of the Statehood Act are determined to be in areas of high public interest, and, therefore, if the State's applications are rejected, the Chugach Villages will still not be allowed to make 12(b) selections in these areas. However, in other named areas, village selections will be conveyed notwithstanding selection applications filed by the State. The Village selections are also restricted to areas formerly withdrawn for village selection pursuant to Section 11(a) of ANCSA.

Subsection (f) provide that any relinquished 12(b) selections within a conservation unit automatically becomes part of the unit.

### Section 1429: Chugach Regional Corporation Lands

Permits the Chugach Regional Corporation to select its land entitlement under section 14(h)(8) of ANCSA from lands within the Chugach National Forest. Subsection (a) establishes this selection right but in recognition of certain key national values does not extend it to certain areas in Western Prince William Sound or the Copper River Delta areas within the Chugach National Forest. Subsection (b) authorizes the Secretary to consider selections made under this section as though they were timely and properly filed pursuant to section 14(h)(8) of ANCSA. In recognition of certain key public values important to the State, subsection (c) establishes the priority of State selection applications filed under section 6(a) of the Statehood Act which overlap Chugach 14(h)(8) selections, but only if the State selection applications were filed before September 1, 1978. Through subsection (d), Chugach is allowed to relinquish its 14(h)(8) selections made outside of the National Forest and to replace them with regional selections under section 12(c) of ANCSA. Subsection (e) has the land selection made under this section subject to the proposal or legislation implemented pursuant to the study mandated in section 1430.

5270

ALASKA LANDS CONSERVATION ACT
P.L. 96-487

[page 331]

involved and no implication of a taking of property by the United States should be made.

Subsection (m) provides that the lands that ASRC and the village corporations will receive pursuant to the exchanges and transfers provided in Section 1431 shall be charged against their ANCSA acreage entitlements. Correspondingly, the acreage charges against the corporations will be reduced by the acreage of the lands that the Native corporations give up in the exchanges.

Subsection (p) requires that all conveyances shall be subject to valid existing rights and will be treated as conveyances in accordance with, and subject to, the provisions of ANCSA, except as otherwise expressly modified by this section and the "Terms and Conditions."

*Reserved Submerged Lands in the Colville River Delta.*—Subsection (n) resolves an impediment that is presently delaying conveyance of lands that Kuukpik Corporation previously selected on or adjacent to the delta of the Colville River. The village corporation does not wish to receive title to the submerged lands in the bed of the Colville River or in the bed of any of the channels of the river named in subsection (n). Ownership of the submerged lands in the river and these channels is in dispute between the United States and the State of Alaska. Subsection (n) does not resolve that dispute or in any way prejudice the lawsuit, *State of Alaska* v. *Warner* (U.S.D.C. Alaska, Civil No. J75-13), or any other litigation that may arise concerning this issue. Subsection (n) does, however, provide that Kuukpik Corporation will not receive title to or be charged with the submerged lands in the river and the named channels, nor will AGRC receive title to or be charged with the corresponding subsurface estate.

*Future Option Exchange.*—Subsection (o) provides for a future exchange, at the option of ASRC and subject to the concurrence of the affected village corporation, whereby ASRC will be entitled to acquire the subsurface estate of lands within the National Petroleum Reserve in Alaska or the National Arctic Wildlife Refuge as appropriate, beneath lands that the village corporations have previously selected. The exchanges would be conditioned on commercial development (rather than exploration) taking place within 75 miles of the affected village corporation lands and such development taking place within 40 years of the date of enactment of this Act. If the Secretary takes action to open any of such lands in the reserve or refuge for commercial leasing with the intent that development take place, the option to exchange would be triggered prior to the issuance of any leases. The exchanges would be on an acre-for-acre basis from other in lieu subsurface lands that ASRC would identify. ASRC will not be entitled to identify lands for exchange which it has already developed unless the Secretary determines such an exchange would be in the public interest. Finally, if an exchange takes place under this subsection, the Secretary will be authorized to promulgate such regulations as may be necessary to protect the environmental values of the reserve involved and are consistent with the regulations governing the development of lands within the reserve that have been opened for development.

*Section 1432: Cook Inlet Village Settlement*

This section would implement an agreement among the Salamatoff Native Association, Inc., Cook Inlet Region, Inc., and the Secretary

5275

## LEGISLATIVE HISTORY
P.L. 96-487

[page 332]

of the Interior. The agreement settles the issue of Salamatoff's village eligibility under ANCSA and establishes the amount of lands to be conveyed to Salamatoff including lands from the Kenai National Moose Range.

The section also provides for implementation of a settlement agreement among Alexander Creek, Cook Inlet Region, Inc., and the United States, should such an agreement be reached prior to December 18, 1979. Alexander Creek, Inc., has an application for village status under ANCSA, pending before the Department of the Interior.

*Section 1433: Bristol Bay Native Corporation Lands*

Subsection (a) withdraws five sections of land (approximately 3,200 acres) within township 14 south, range 56 west.

Subsection (b) provides that Bristol Bay Native Corporation (BBNC) may select the withdrawn lands.

Subsection (c) provides for the conveyance to BBNC of selected lands.

Subsection (d) provides that the acreage entitlement of BBNC is not changed by the amendment.

Subsection (e) provides that the lands withdrawn under (a) but not conveyed under (c) shall return to their status prior to enactment.

*Section 1434: Shee Atika-Charcoal and Alice Island*

This section directs the Secretary to convey to Shee Atika, Inc. and the Sealaska Corporation lands comprising Charcoal and Alice Islands, which have been declared excess to Federal agency needs. In exchange, Shee Atika, Inc. (and Sealaska, Inc.) shall relinquish land of equal acreage selected by or conveyed to it under Section 14(h)(3) of ANCSA.

*Section 1435: Amendment to Public Law 94-204*

This section amends Section 12(b) of Public Law 94-204, the Cook Inlet land exchange statute. It (1) authorizes Cook Inlet Region, Inc. (CIRI) to bid for surplus property in accordance with existing General Services Administration (GSA) regulations, (2) authorizes the Administrator to tender to the Secretary of the Interior surplus property to be offered to CIRI, (3) prohibits any disposition of property over the objection of State or local governments, (4) provides for the establishment of a CIRI surplus property account by the Secretary of the Treasury, (5) insures that GSA is credited, in accordance with existing law, for any dispositions of surplus property to CIRI, (6) establishes the basis of the land conveyed to CIRI, and (7) provides for a report to Congress on January 15, 1981.

*Section 1436: Bristol Bay Group Corporation Lands*

The seven members of Tanalian, Inc. reside within the boundaries of Cook Inlet Region, but are registered at large to Bristol Bay Native Corporation (BBNC). This section would:

1. Validate the roll prepared by the Secretary of the Interior, thereby confirming the status of the Native members of Tanalian Incorporated as shareholders at large within the Bristol Bay Region.

2. Provide that if Tanalian Incorporated is certified as a group under ANCSA, it and BBNC shall be entitled to make selections according to the terms of the section.

3. Describe the lands from which the selections may be made.

5276

LEGISLATIVE HISTORY
P.L. 96-487

[page 364]

DEPARTMENT OF AGRICULTURE,
OFFICE OF THE SECRETARY,
*Washington, D.C., July 18, 1979.*

Hon. HENRY M. JACKSON,
*Chairman, Committee on Energy and Natural Resources,*
*U.S. Senate, Washington, D.C.*

DEAR MR. CHAIRMAN: As we indicated in our recent report on S. 9, we are now providing you with the views of this Department on sections 1427 through 1430 of Title XIV relating to the Chugach and the Koniag Village and Regional Corporation lands. In addition, we want to provide you with some additional comments on the Kootznoowoo, Inc., and Sheet Atika, Inc. proposed exchange provisions contained in section 703(b) of S. 9.

### KONIAG AND CHUGACH NATIVE CORPORATIONS

This Department recommends that sections 1427, 1478, 1428, and 1430 not be adopted and that an alternative approach be specified in the legislation.

Section 1427, 1428, 1429, and 1430 would authorize the Koniag Natives to transfer their deficiency selections from the Alaska Peninsula to National Forest System lands on Afognak Island; the Chugach Village Corporations to obtain their 12(b) entitlements entirely from National Forest System lands; the Chugach Regional Corporation to obtain its 14(h)(8) entitlement from the Chugach National Forest; and establish a 1-year study for relocating other Chugach Regional Corporation land entitlements.

The language of sections 1427 through 1430 would provide special treatment for the Koniag and Chugach Regional Corporations in contradiction with the basic provisions of section 12 of the Alaska Native Claims Settlement Act. While we believe that some special consideration may be in order to accommodate Native desires to receive village entitlements as near their home areas as feasible, we believe that any exchanges should be approached on a value-for-value basis in the manner defined by section 22(f) of the ANCSA. Under the established exchange process, the Secretary with jurisdiction over Federal lands has authority to exchange lands or selection rights for a variety of reasons. We believe that in any exchange, all Federal lands, not just National Forest System lands, should be given consideration for possible exchange. We would also like to point out that those villages with populations of 25 to 300 people have already had selection rights to 69,120 acres each of Wildlife Refuge and National Forest System lands. These selections, particularly those within the Chugach National Forest, may be of higher economic value than land available to other Native groups.

This Department recommends that the Secretaries of Agriculture and of the Interior in cooperation with involved Native corporations and other interested parties be directed to carry out a joint study to identify lands which can be made available for exchange for the purpose of consolidation of land ownership patterns. We would propose that the study be completed within 2 years and that its recommendations be carried out under existing law or, if necessary, additional legislative authority would be requested.

# ALASKA LANDS CONSERVATION ACT
## P.L. 96-487

[page 365]

Because of the high public values involved and the need to treat all Native groups with equity under the provisions of ANCSA, we strongly urge the adoption of our proposed alternative to sections 1427, 1428, 1429, and 1430.

### KOOTZNOOWOO AND SHEE ATIKA NATIVE CORPORATIONS

We are very concerned that if section 703(b(1) and (2) of S. 9 were enacted they would grant unprecedented selection authority to Kootznoowoo to timber rights anywhere within the Tongass National Forest without the approval of, or consultation with, the Secretary of Agriculture. We find this approach totally unacceptable. Furthermore, the current proposals could potentially result in a three-way split of the property interests: the subsurface with SEAlaska, Inc., the surface in Keootznoowoo, Inc., and the timber in the United States. This would make wilderness management impossible and would inevitably cause conflicts in uses in the future.

We believe it is in the public interest to preserve to the greatest degree possible the wilderness attributes of Admiralty Island, and offer an alternative subsection 703(b) to S. 9. In effect, we propose to exchange land with Kootznoowoo on an equal value basis and/or purchase some of their land outright. Our alternative would assure Native retention of aboriginal rights to subsistence hunting and fishing, and the continued use of such lands for all nonconsumptive religious and cultural purposes. It would also assure that the subsurface estate would be transferred off Admiralty Island along with any exchange of the surface estate.

Unfortunately, our efforts to resolve off-Admiralty Island selections for Shee Atika have not resulted in an agreement. A recent revised proposal from Shee Atika would shift their selections from the Hood Bay area in the south end of Admiralty Island to the lands formerly selected by Goldbelt in the northern portion of the Island. Their proposal also contains a set of specific criteria to determine the timber values of the respective areas. We believe those criteria, if applied, would weigh heavily in favor of Shee Atika and would result in a conveyance far in excess of any entitlement contemplated by Congress under section 14(h)(3) of ANCSA.

Application of the proposed criteria would result in conveyance involving far more land than Goldbelt received in exchange for their lands. In addition, the criteria are far in excess of those used in our normal exchange procedures, and implementation would result in substantial cost and manpower expenditures. We are convinced that further negotiations with Shee Atika based on the criteria they have suggested will not result in a speedy off-Admiralty settlement and would not be in the public interest.

In short, our efforts to date to consummate an off-Admiralty selection for Shee Atika have failed. We are not optimistic that satisfactory results can be achieved by continuing further negotiations using the present approach. Therefore, we would propose an alternate to section 703(b)(4) of S. 9 which, if implemented, would result in Shee Atika getting an equitable settlement of land away from Hood Bay and would accomplish the Administration's objective of reducing the quantity of

LEGISLATIVE HISTORY
P.L. 96-487

[page 366]

Native selections on Admiralty Island and thereby preserve the wilderness attributes of the Island to the greatest possible degree.

We would be happy to provide the Committee and Committee staff with additional information regarding our concerns and a more detailed explanation of our proposed alternatives.

The Office of Management and Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

Bob Bergland, *Secretary*.

Department of Justice,
*Washington, D.C., July 9, 1979.*

Hon. Henry M. Jackson,
*Chairman, Committee on Energy and Natural Resources,*
*U.S. Senate, Washington, D.C.*

Dear Mr. Chairman: This presents the views of the Department of Justice on S. 9, the "Alaska National Interest Lands Conservation Act". Our comments are confined to §§ 706 and 1002 of the bill, which contain legislative review provisions that are, in our opinion, unconstitutional.

Under § 706(d), the Secretary of Agriculture would be required to monitor timber demand in southeastern Alaska. Should he determine at a future date that timber from a "special management area" as defined by § 705 must be sold in order to maintain timber supply at a rate of 520 million board feet per year, he must transmit a so-called "request for waiver" of the prohibition on timber sales established in § 706(b) to your committee as well as the House Committee on Interior and Insular Affairs. Under § 706(e), this "request for waiver" becomes "effective" only if the Senate and House pass a concurrent resolution approving that waiver within the time frame established in that provision.

As we understand § 706, the intent is not to give the Secretary the power to grant waivers. Rather, it is in essence a requirement that the Secretary report to Congress when and if he determines that a particular set of facts, i.e., the need to sell timber from a special management area to maintain a rate of 520 million board feet per year, exists at a future time. Then, even if that set of facts exists, no waiver may be granted on the basis of that set of facts unless Congress takes action, by a concurrent resolution, to "approve" the waiver "proposed" by the Secretary.

Because conditions calling for a waiver under the substantive standards set forth in § 706(d) may exist but Congress for any reason or no reason at all may decline to "approve" a particular waiver, we think it is necessary to conclude that the concurrent resolution must be viewed as the only substantive authority the Secretary could rely on to overcome the statutory prohibition on such sales which would otherwise be imposed by § 706(b). Viewed this way, § 706(e) presents the question whether Congress may authorize the waiver of a statutory prohibition by a concurrent resolution. We do not believe that Congress may constitutionally do so.

5310