1228

determined to be a part of subsurface estate as that term is used in ANCSA. This question is now in litigation before the United States Court of Appeals for the Ninth Circuit. Subsection (1) also restricts Koniag, Inc.'s exercise of its subsurface mineral rights similarly to the restriction effected by subsection (i) described above. In the event sand and gravel is determined to be an element of surface estate under ANCSA, subsection (1) requires the Secretary of the Interior to make available at fair market value, sand and gravel needed for oil and gas operations.

Subsection (m) incorporates within the Kodiak National Wildlife Refuge all remaining public lands on Afognak Island, including submerged lands below the line of mean high tide, within the present boundaries of the Chugach National Forest and not otherwise disposed of or dealt with in the section. It saves to the Native joint venture, however, the timber resources on two islands, Delphin and Discoverer, subject to management and harvest in accordance with management plans jointly developed between the joint venture and the Secretary of the Interior.

Subsection (n) is a savings clause designed to preserve existing Forest Service timber contracts and Forest Service cabin leases on Afognak Island.

Section 303(5)

Section 303(5) conforms the boundaries of the Kodiak National Wildlife Refuge to the additions effected by the Koniag Amendment.

1229

1/25/79

KONIAG PROPOSAL
(Acreages based on protractions are approximate)

| | | |
|---|---:|---:|
| Acreage of Afognak Island | | 458,300 |
| Less Koniag certified village land entitlements on Afognak | | |
| A. Afognak Native Corporation | 79,360 | |
| B. Ouzinkie Native Corporation | 25,600 | |
| C. Natives of Kodiak, Inc. | 22,000 | - 126,960 |
| Less other claims on Afognak Island land: | | |
| A. State selections | 4,130 | |
| B. Ouzinkie-Kodiak Borough Land Trade | 7,680 | - 11,738 |
| Afognak acreage available for Koniag and Koniag certified village exchange, including Red Peaks | | 320,052 |
| Less Red Peaks area (remaining in federal ownership under Koniag land exchange) | | - 40,460 |
| Net Afognak acreage available to Koniag and Koniag certified villages under Koniag land exchange | | 279,592 |

- - - - - - - - - -

| | | |
|---|---:|---:|
| Koniag and Koniag certified villages entitlements on Alaska Peninsula | | |
| A. Koniag, Inc. 14(h)(8) | 52,531 | |
| B. Certified village deficiencies | 199,860 | |
| C. Koniag 12(b) | 88,470 | 340,861 |
| Net Afognak acreage to Koniag and Koniag certified villages under Koniag land exchange | | - 279,592 |
| Total shortfall of available land on Afognak to satisfy Koniag and Koniag certified villages Mainland entitlement | | 61,269 * |

\* Under the Koniag proposal, subsurface estate of 48,000 acres on the Alaska Peninsula (Drilling Block #1) will be retained under relinquished surface estate. Therefore, as to subsurface estate, the shortfall would be 13,269 [61,269 minus 48,000].

1230



DEPARTMENT OF AGRICULTURE
OFFICE OF THE SECRETARY
WASHINGTON, D C 20250

SEP 11 1978

Honorable Henry M. Jackson
Chairman, Committee on Energy
  and Natural Resources
United States Senate
Washington, D. C. 20510

Dear Mr. Chairman;

On June 2 we transmitted to you, on behalf of the Administration, an amendment to S. 2465, "Alaska National Interest Lands Conservation Act."

Our letter addressed Native exchange proposals in southeast Alaska. We are still working closely with the Native village corporations in an effort to develop mutually satisfactory off-Admiralty Island exchanges. Since our transmittal, other proposals have been submitted by the Koniag and Chugach Native Corporations, each suggesting changes in the Alaska Native Claims Settlement Act to accommodate their particular concerns. These proposals are summarized as follows:

### Koniag Native Corporation

On August 3, Koniag, Incorporated, submitted draft legislation identified as "Koniag Amendment, August 2, 1978," which would shift Koniag's 14(h)(8), 12(b) and deficiency entitlements from the Alaska Peninsula to Afognak Island. This proposal would transfer to the Koniag Natives in excess of 300,000 acres of National Forest lands not currently eligible for selection.

Certain villages on Kodiak Afognak Islands are restricted by the acreage limitations of section 12 from selecting lands adjacent to their village sites included within the Kodiak Wildlife Refuge, the Chugach National Forest or State selections. As a result, the Corporations were to select alternative lands on the Alaska Peninsula. The Koniag proposal would transfer their selection rights from the Peninsula to National Forest lands on Afognak Island. The selected areas on the Alaska Peninsula have since been proposed for a wildlife refuge in H.R. 39 as passed by the House.

1231

#### Chugach Native Corporation

We received a proposal on August 15, which we understand was also to be submitted to the Committee from the Chugach Natives Incorporated, which would legislatively transfer to the Chugach Natives 226,000 acres of National Forest land not currently eligible for selection.

That proposal would transfer Chugach village deficiency and regional selection rights in the Bremner and Copper River areas, located within the Administration proposed Wrangell-St. Elias National Park to various areas within the Chugach National Forest.

One of the primary concerns leading to the proposed legislation by Koniag, Inc., and Chugach, Inc., was that certain village selections, which are limited to 69,120 acres per village from National Forests and National Wildlife Refuges and State selections, would have to be completed from deficiency areas some distance from the historical, cultural and use areas of the villages. While we believe that some special consideration may be in order to accommodate native desires to receive village entitlements as near their home areas as feasible and the objectives of the Settlement Act to provide a meaningful land base to villages, the Administration is not prepared to endorse the present Koniag and Chugach proposals involving village selections for two reasons. First, in the effort to find and convey land to villages which is more proximate and which has higher traditional value to the Natives, greater consideration should be given to land from Wildlife Refuges, in addition to National Forests. Second, from the standpoint of equity with other regions and villages we believe that, in general, all such exchanges should be approached on a value-for-value basis in the manner defined by section 22(f) of the Act. It must be remembered that these villages with populations from 25 to 300 people have already had selection rights to 69,120 acres each of Wildlife Refuge, National Forest and State lands which, particularly in the Chugach National Forest, may be of higher economic value than was available to other native groups. The Secretary with jurisdiction over the land has authority, of course, to make land exchanges for other than equal value when he determines that it is in the public interest, but this judgment must be exercised carefully.

The Administration does not agree with the present Koniag and Chugach proposals to amend ANCSA to permit Regional Corporation selection rights on National Forest land. In the effort to fulfull the objectives of the Settlement Act it must be recognized that the present proposals have significant effects on important public values—particularly wildlife habitat and public access—which have been only partially evaluated. We are particularly concerned with the proposed Chugach regional selections in the Bering Coal Fields and on the eastern portion of Knight Island and other islands in Prince William Sound. Although the economic feasbility of developing known coal resources on the Bering River area remains in some

1232

doubt, the area provides critical habitat for trumpeter swan and other wildlife. In recognition of their high ecological values, both this area, Knight Island and other associated islands have been recommended by the Administration for wilderness study.

The ANCSA prohibited Regional Corporations from selecting lands within the National Forest and Wildlife Refuges. The ANCSA recognized that Regions would not have comparable economic bases. Therefore, section 7(i) of the Act provides that 70 percent of revenues from all Regional Corporations will be divided on a per capita basis among all Regions to help equalize the income to each Corporation. Since the question of whether either Region in these proposals was economically disadvantaged relative to other regions in the original Act is open to debate, we believe a better understanding of this issue is essential. It is our view that the ANCSA was intended as a final and complete settlement of claims against the United States. Though there have been subsequent amendments, any that would further modify the Act should be undertaken only with careful regard to their potential to detract from the initial objectives of the Act.

We believe that important public values and equity of treatment among Regions and villages demand that we adhere to certain general principles, particularly the requirement of the Act that exchanges be accomplished on a value for value basis. Also, we strongly believe that additional careful consideration of the impacts of these proposals on significant ecological and other resource values should be undertaken.

In summary, the Administration is committed to a resolution of the issues raised by the Chugach and Koniag proposals consistent with the spirit of ANCSA's objectives of equitably and permanently resolving Native land claims. At the same time, we think it is necessary to preserve the principles described above which are also provided in the ANCSA. We will be happy to work with Chugach and Koniag as well as with you, members of the Committee and Committee staff to explore reasonable legislative or administrative solutions.

The Office of Management and Budget advises that there is no objection to the presentation of this report from the standpoint of the Administration's program.

Sincerely,

*Sarah Weddington*

SARAH WEDDINGTON
Acting Secretary

1233

*Law Offices*
*Duncan, Brown, Weinberg & Palmer, P.C.*

SUITE 1200
1775 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006

(202) 467-6370
TELECOPY (202) 467-6379

WALLACE L. DUNCAN
JON T. BROWN
EDWARD WEINBERG
FREDRICK D. PALMER
FREDERICK L. MILLER, JR.
JAMES D. PEMBROKE
STEPHEN C. ROADY
PHILIP L. CHABOT, JR.
J. CATHY LICHTENBERG
MICHAEL D. OLDAK
OF COUNSEL
STEWART L. UDALL

CHICAGO OFFICE
JOSEPH V. KARAGANIS
150 N. WACKER DRIVE
CHICAGO, ILLINOIS 60606
(312) 782-1905

September 13, 1978

Honorable Henry M. Jackson
Chairman
Committee on Energy and Natural Resources
United States Senate
Washington, D.C. 20510

Re: Alaska National Interest Lands
    Legislation

Dear Senator Jackson:

As you and the Committee have previously been advised, the Koniag proposal is supported by the Alaska Coalition, the State of Alaska, the Kodiak Island Borough, AFN and the Department of the Interior.

Yesterday, the staff was kind enough to supply me with a copy of a letter of September 11 from Acting Secretary Weddington of the Department of Agriculture to you objecting (with the concurrence of OMB) to both the Koniag proposal and the proposal of Chugach Natives, Inc. I do not represent Chugach Natives, Inc. and I am not authorized to speak for that corporation. I represent Koniag, Inc. and the Koniag villages and this letter relates only to Koniag and its villages.

The Agriculture letter consists of generalities, with no specific objections directed to Koniag. Before addressing the Agriculture letter in its specifics (or to state it more accurately, its lack of specifics), I would like to briefly summarize the salient facts of the Koniag proposal.

1234

In brief summary, the Koniag proposal would:

1. Exchange selection rights on the part of Koniag and Koniag villages to almost 300,000 acres of surface and underlying subsurface estate and an additional approximately 40,000 acres of surface estate on the Alaska Peninsula between Becharof Lake and the area that would be encompassed by the Aniakchak-Caldera National Monument, for some 230,000 acres of surface and underlying subsurface estate on Afognak Island now within the Chugach National Forest. The Alaska Peninsula lands that Koniag and its villages would surrender are described by the Alaska Coalition as "some of the very finest wildlife habitat in the world," and part of "the finest wildlife area in Alaska." /The former quotation is from the Alaska Coalition's summary of the Coalition's re-commendations on the Alaska Native Corporation proposals. The latter is from the Coalition's September 11 letter to you.

2. Assure public access for sports hunting, fishing and other recreational purposes to the Afognak Island land that would be transferred to Koniag and its villages, pursuant to cooperative management agreements with appropriate federal, state and local agencies.

3. Restrict Koniag's retained subsurface rights on the mainland to oil and gas under regulations designed to minimize interference with the surface values. Koniag would, therefore, give up all hardrock mineral values.

4. Guarantee the retention in federal ownership, through addition to the Kodiak National Wildlife Refuge, of both islands offshore of Afognak Island and the "Red Peaks" area of over 46,000 acres, the latter being an area having unusual scenic and recreational value.

5. Preserve within the Aniakchak-Caldera National Monument that would be established by the D-2 legislation (See Sec. 102), almost 50,000 acres of village corporation selection rights which, absent the Koniag proposal, would be conveyed under ANCSA to Koniag villages, with conveyance of underlying subsurface estate to Koniag, Inc.

6. Preserve state selection rights to some 4,000 acres of land on Afognak Island heretofore selected by the State of Alaska under section 6 of the Alaska Statehood Act.

1235

    7. Resolve, in a mutually satisfactory manner, a long standing dispute concerning the eligibility of seven Koniag villages for benefits under the Alaska Native Claims Settlement Act in a manner which imposes no substantial additional land burden upon the United States, thus bringing to an end extensive administrative and judicial proceedings which otherwise may delay for several additional years the final determination of the respective entitlements of all twelve Alaska regional corporations and their eligible villages to almost 500,000 acres of land.

    8. Resolve, in a mutually satisfactory manner, disputes between the affected Native corporations and the Kodiak Island Borough involving conflicting selection claims.

    9. Assure management of the Afognak Island elk herd by either federal or state game managing agencies.

    10. Assure protection of denning areas of the world renowned Kodiak brown bear.

    11. Without the Koniag proposal about one quarter of the 455,000 acres of land on Afognak Island will in any event be conveyed to Native corporations. Thus, regardless of the Koniag proposal the Forest Service will lose its present land monopoly on Afognak Island. The Red Peaks area which (with the large offshore Ban Island) totals approximately 46,000 acres, is not forested, but has substantial scenic and recreational value. These 46,000 acres, therefore, should not be regarded as a loss to the primary mission of the Forest Service, which is the management of federally owned timber lands. They will remain in federal ownership and be managed for their true values, which are recreation and wildlife.

    The Agriculture letter gives no evidence that it has considered the above points. In fact, it gives every evidence that it has not, as an examination of the letter will demonstrate. I discuss here some of the particulars of the Agriculture letter which demonstrate that the Koniag proposal has not been considered on its merits.

    1. On page 1 it is stated that in excess of 300,000 acres of land on Afognak Island would be transferred to Koniag and the Koniag villages. This is not correct. The Koniag proposal would transfer some 280,000 acres on Afognak

1236

Island to Koniag and the Koniag villages. The balance of Afognak Island, in excess of the 280,000 acres and the 120,000 acres which in any event will be conveyed to three Koniag villages, some 50,000 acres, will remain in public ownership; albeit, except for 4600 acres which would be available for state selection, that acreage would be incorporated into the Kodiak National Wildlife Refuge.

2. Perhaps the most telling evidence of the failure of the Agriculture letter to consider the Koniag proposal on its merits and to come to grips with the real issues, is the suggestion on page 2 that as at least a partial alternative to conveyance of National Forest lands on Afognak Island, the Kodiak National Wildlife Refuge on Kodiak Island should be reduced in size with conveyance of Wildlife Refuge lands to Koniag and the Koniag villages. This same suggestion was advanced in a meeting in my office a couple of week ago by a representative of OMB. It seemed incredulous then, both to me and to the representatives of the Department of the Interior who were present, that even a middle level OMB official would seriously suggest that the Kodiak National Wildlife Refuge should be reduced in size. It is even more astonishing to find that that suggestion has crept into a letter signed by the Acting Secretary of the Department of Agriculture and purporting to express the "Administration" position. Can anyone seriously believe that the genuine policymakers in the Carter Administration would seriously countenance such a suggestion being made if they were aware of it? The question answers itself. And, as the House has already demonstrated in its work on the D-2 bill and this Committee has already shown, it is obvious that that suggestion will find its way promptly to the Congressional wastebasket. The suggestion insults the intelligence and raises a question of the quality of staff work that went into the Agriculture letter.

3. Of a piece with the suggestion to take lands out of the Kodiak National Wildlife Refuge, is the suggestion on page 2 that in opposing the Koniag proposal the Department of Agriculture and its allies in OMB are acting in the interests of "equity" to other regions and villages. The fact of the matter is that AFN supports the Koniag proposal. The fact of the matter is that the Koniag proposal will end uncertainties over the status of some 500,000 acres of land, an uncertainty which must be resolved before ANCSA conveyances to villages in all 12 of the Alaska Native regions can be completed. The most charitable comment that can be made

1237

about this suggestion, along with the suggestion concerning a reduction in the size of the Kodiak National Wildlife Refuge, is that it is puerile.

4. The only specific examples of what Agriculture considers to be shortcomings in the Chugach and Koniag proposals deal not with Koniag at all, but with Chugach. I do not suggest that the criticisms of the Chugach proposals are well taken, but it does seem significant that the authors of the Agriculture letter could find no specifics with respect to the Koniag proposal that they could point to as "horribles."

At bottom, the premise of the Agriculture letter is that it is wrong to consider correcting ANCSA inequities as to individual Native corporations by conveying any Forest Service lands. The Congress has heard this plea before from the Department of Agriculture. When Sealaska Corporation in 1975 pointed out to the Congress that if the prohibition on selecting Forest Service lands under section 14(h)(8) of ANCSA were not relaxed, Sealaska's 14(h)(8) entitlement would have to be satisfied out of mountaintops and glaciers, the answer of the Agricultre Department then and now was that the land selection provisions of ANCSA were sacrosanct and that the public interest would not permit any modification. See, letter of December 3, 1975, from Assistant Secretary Long of the Department of Agriculture to Chairman Haley of the House Committee on Interior and Insular Affairs, set out in H. Rep. 94-729, 94th Cong., 1st Sess., at 81-85. The Congress was not impressed with the Agriculture argument. It enacted as section 10 of P.L. 94-204, the so-called ANCSA Omnibus Amendments Act of 1966, a provision giving Sealaska Corporation the right to select its 14(h)(8) entitlement from Forest Service lands in Southeast Alaska. It is only if regional corporations receive viable economic lands that the revenue sharing provisions of section 7(i) of ANCSA have substance.

As you and the other members of the Committee are well aware, the Koniag area was the first area in Alaska to be impacted by non-Native influence, it being the original site of the Russian incursion. Since that time, nearly all of the lands on Kodiak Island and the entire Afognak Island area were either placed in national reserves of various kinds (i.e., national forest and national wildlife),

1238

or TA'd to the State of Alaska under the Statehood Act prior to the passage of ANCSA. As a consequence, very little land was available on Kodiak Island itself and Native selection rights on Afognak Island were severely restricted because of its National Forest status.

Koniag and the Koniag villages entitled to deficiency and 12(b) lands were forced to select from lands on the Alaska Peninsula, 90 miles away from the home islands, across the Shelikof Straits, one of the roughest bodies of water in the world.

The Koniag people have no cultural affinity to the mainland and save for what must at present be considered speculative oil and gas possibilities, the mainland lands have no economic value to them. In addition, because the lands upon which they are located were in either the Kodiak National Wildlife Refuge, or the Afognak Island portion of Chugach National Forest, the villages on Kodiak Island were subjected to a more intense eligibility scrutiny than was the case with most of the other Alaska Native villages, resulting in administrative and judicial proceedings affecting at the present time the status of seven Koniag villages.

It is literally true that the Natives who suffered the most from the white incursion of Alaska (the Koniag Natives) will, unless relief is granted along the lines of the Koniag proposal, have received, relatively speaking, the least of the benefits from the ANCSA settlement.

The above facts would justify the Koniag proposal as a matter of simple justice to Koniag and the Koniag villages. However, the Koniag proposal is supported by more than the interests of Koniag and the Alaska Natives alone. As above pointed out, the Alaska Coalition considers that the lands which Koniag will surrender on the Alaska Peninsula constitute some of the finest wildlife habitat in the world and that these lands are located within the finest wildlife area in Alaska. The Koniag proposal offers the opportunity for these lands to be retained in public ownership, whether national or state, or a combination of the two. Without the Koniag proposal, that possibility is foreclosed.

While concededly the parochial interests of the Department of Agriculture are not advanced by the retention of the Alaska Peninsula lands in public ownership, those parochial interests are not to be confused with the national interest.

1239

The Agriculture letter concludes with a nod in the direction of a willingness to negotiate "reasonable legislative or administrative solution" to the issues raised by the Chugach and Koniag proposals. Again, speaking for Koniag, the fact of the matter is that the Koniag proposal has been under negotiation for months. Consensus has been reached with the Department of the Interior, the State of Alaska, the Kodiak Island Borough, AFN and the Alaska Coalition. What the Agriculture letter comes down to is that everyone is out of step but that Department and its OMB allies. Since Agriculture has no program interest in the lands on the Alaska Peninsula which Koniag and the Koniag villages would surrender, it requires little imagination to perceive the lack of enthusiasm with which the Department of Agriculture will undertake negotiations or explorations once the threat of legislation has passed. It must be obvious that this suggestion for further negotiations is simply a ploy to sweep under the rug both Koniag's problem and the need from the standpoint of the national interest to free Koniag's Alaska Peninsula rights for retention in public ownership.

A concluding word. I have repeatedly made reference to the support of the Interior Department for the Koniag proposal. The statements in my letters of August 3, 9 and 17 that Interior supported the Koniag proposal were made on the basis of assurances from the authorized Interior officials who stated to me that I could make those statements to the Committee. Your own memorandum of September 6 to the members of the Committee notes that all parties, which includes the Department of Interior, except the Forest Service support the Koniag proposal. Whether the references to the "Administration" which appear to have been sprinkled over the Agriculture letter like salt from a shaker will now muzzle Interior, I do not know. What I do know is that the Interior Department recognized that the Koniag proposal was not only in the Natives' interest but in the national interest. On that score, I doubt that if Secretary Andrus were asked point blank he would join the Department of Agriculture (and OMB) in suggesting that reduction of the Kodiak National Wildlife Refuge is a viable solution to Koniag's problem.

Finally, my criticism of the Agriculture letter does not represent an attack on the credibility of Secretary Bergland, Acting Secretary Weddington, or the real policymakers in the Administration. I believe that the Agriculture

1240

letter represents a case of what is, to say the least, bad staff work, a situation which, unhappily, occurs from time to time in a government as complex as ours. I hope, Mr. Chairman, that the Committee will not be dissuaded from approving the Koniag proposal by Agriculture's September 11 letter.

                      Sincerely yours,

                      Edward Weinberg
    of DUNCAN, BROWN, WEINBERG & PALMER, PC

EW:vcr

cc:   All Committee Members
      Honorable Ted Stevens
      Honorable Mike Gravel
      Honorable John F. Seiberling
      Honorable Morris K. Udall
      Honorable Don Young
      Michael Harvey, Esquire
      Ms. Deborah Merrick
      Stanley Sloss, Esquire
      William Horn, Esquire