and that statements of interested parties have been used to determine legislative intent:

> In Congress official verbatim records of committee hearings are kept. They are printed and distributed to members of the legislature and the public. In the Federal courts statements of members of the committee or of interested parties at the hearing have been considered as aids in determining the legislative intent. Because records of committee hearings are distributed to members of Congress, it is assumed they had knowledge of these statements and of the evils described. Passage of the proposed bill is evidence of their intent to remedy these evils. The use of such statements is justified on the ground that it is felt the committee intent is the legislative intent. . . .

*Id.*

Of course, in the present matter, there is no need to use the legislative history to determine what Congress intended. The plain language of ANILCA § 1427 is clear, Leisnoi is a Koniag 12(b) village corporation entitled to receive ANCSA benefits. *See supra.* The legislative history is important here to show that Congress was aware of the controversy surrounding the Koniag region villages and chose to declare Leisnoi an eligible village anyway. Edward Weinberg's hearing testimony, Jack Anderson's vitriolic editorials, Chairman Udall's inquiries on these editorials, and Mr. Weinberg's response to these inquiries, establishes without a doubt that Congress was aware of this controversy.

Further, to the extent that Stratman argues that courts cannot use hearing testimony to determine legislative intent, this argument is contradicted by numerous Supreme Court decisions. Indeed, the Supreme Court has used hearing testimony to interpret phrases in statutes.

Stratman fails to address the numerous Supreme Court cases which rely on hearing testimony to determine legislative intent. *See, e.g., Chicago and*

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

*North Western Railway Company v. United Transportation Union*, 402 U.S. 570 (1971) (hereafter "*United Transportation*"); *Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 204 (1980) (stating that "principal sources for edification concerning the meaning and scope of ... [the section in issue] are the extensive hearings that were held on the legislative proposals that led up to the final enactment."); *see also McNabb v. Bowen*, 829 F.2d 787, 793 n.6 (9th Cir. 1987) (noting that "[s]tatements made by parties integral to the considered bill shed some light on legislative intent."). These cases show that: (1) hearing testimony is legislative history; and (2) Koniag's reliance on Edward Weinberg's testimony and letters to Congress is well founded.

At issue in *United Transportation* was whether language in the Railway Labor Act "imposes a legal obligation on carriers and employees or is a mere exhortation." *Id.* at 574. To resolve this issue, the Supreme Court placed "great weight" on the testimony presented at the hearings:

> the Railway Labor Act of 1926 was, and was acknowledged to be, an agreement worked out between management and labor, and ratified by the Congress and the President. Accordingly, the statements of the spokesmen for the two parties made in the hearing on the proposed Act are entitled to great weight in the construction of the Act.

402 U.S. at 576.

*United Transportation* is also significant in that the Railway Labor Act was a compromise between management and labor, "ratified" by Congress. *Id.* ANILCA § 1427 was also a compromise, among many parties, "ratified" by Congress.

In *United Transportation*, the Court noted that uncontradicted testimony by one of the negotiators evidenced the intent of all the parties.

> Since the Act was the product of months of discussion between the carriers and unions and since Mr.

> Richberg's testimony was uncontradicted by the representatives of the carriers, it seems fair to say that the above testimony evidences an understanding on the part of the unions, carriers and Congress....

*Id.* at 593.

Section 1427, like the Railway Labor Act, was the result of many months of negotiations. *See* above. Congress, was not only aware of these extensive negotiations, but explicitly complimented Mr. Weinberg for his diligence in handling those negotiations:

> THE CHAIRMAN: Let me start out then by directing a couple of questions to people here. I see Mr. Weinberg here representing Koniag. Mr. Weinberg have we worked out to your satisfaction the problem with regard to land exchanges that are so delicately worked out?
>
> Mr. WEINBERG: Yes, sir, Chairman Udall.
>
> THE CHAIRMAN: And the language in the bill is language that you prepared and we have agreed to incorporate?
>
> Mr. WEINBERG: I have sent to the committee as a part of the Koniag statement which was the same as the Senate bill modified only to take care of different section references in H.R. 39.
>
> THE CHAIRMAN: You have eased our problems by putting this agreement together. It solves a number of difficulties all at once and I personally see no difficulty in getting this carried out.
>
> Mr. WEINBERG: Thank you, very much.

Hearings Before the Committee on Interior and Insular Affairs, on H.R. 39. 96th Cong. 1st Sess. at 372. (Exhibit A to this Reply brief.)

As acknowledged by Congressman Udall, Mr. Weinberg drafted H.R. 39, which later became ANILCA § 1427. Indeed, Stratman concedes that Congress's section by section analysis is identical to Stratman's proposed sectional analysis. Stratman Response Br. at 24.

The above conversation between Chairman Udall and Mr. Weinberg is relevant legislative history. Specifically, it shows that Koniag's reliance on Mr. Weinberg's testimony and materials is justified, despite Stratman's assertions to the contrary. Indeed, Congress "relied" upon Mr. Weinberg, who "eased [Congress's] problems by putting this agreement together." This legislative history does nothing to contradict the plain language of § 1427, which ratifies Leisnoi's status as an eligible village. Koniag Post-Hearing Br. at 86-87.

    4.    <u>Stratman Fails To Differentiate Between "Post Hoc" Legislative History and "Contemporaneous" Legislative History</u>

Another difficulty with Stratman's legislative history analysis is his failure to differentiate "post hoc" statements from contemporaneous testimony. Significantly, Stratman's analysis of *Gustafson* ignored the Court's criticism of the use of post hoc statements to determine legislative intent. *Compare* Stratman Response Br. at 65 with *Gustafson,* 513 U.S. at 579.

A second Supreme Court case cited by Stratman similarly criticized the reliance on "post hoc" recollections to determine legislative intent. Stratman Response Br. at 67; *Western Air Lines v. Board of Equalization of South Dakota,* 480 U.S. 123, 130 (1987). In *Western Air Lines*, appellants introduced an affidavit prepared ten years after the Act's passage by one of the interested parties. *Id.* The Supreme Court stated that "[a]ppellants' attempt at the creation of legislative history through the post hoc statements of interested onlookers is entitled to no weight...." *Id.*

Mr. Weinberg's statements were, of course, not post hoc, but made during the ANILCA Congressional hearings. Further, Koniag has not introduced an affidavit from Mr. Weinberg ten years later; rather Koniag presented the very evidence provided to Congress during the deliberation process. *See* Koniag Exhibit F, Hearings Before the Committee on Interior and Insular

34

Affairs, February 6, 1979 (including testimony of Mr. Weinberg before the Committee).

In short, by failing to acknowledge that *Western Air Lines*, like *Gustafson*, addressed post hoc statements, Stratman mischaracterizes these cases. And though the Court placed little weight on "post hoc" statements, it has accorded contemporaneous statements "great weight" in determining legislative intent. *United Transportation*, 402 U.S. at 576. The many contemporaneous events that demonstrate Congress's awareness of the controversy surrounding Leisnoi are discussed below. *See infra* at 41-45.

Stratman provides a two-pronged response to Koniag's legislative history discussion. First, Stratman argues that Congress was unaware of the raging controversy surrounding the certification of the Koniag region villages. Stratman Response Br. at 64-66. This argument is addressed below. *See infra* at 41-45.

Second, Stratman argues that the legislative history lacks "clear and manifest" evidence of "an affirmative Congressional intent to repeal" ANCSA's village eligibility requirements. Stratman Response Br. at 64. Of course, Congressional ratification of a Secretary's decision does not require "clear and manifest" evidence in the legislative history. Indeed, so long as the plain language of the statute is clear, Congress need not include a single word in the legislative history. Thus, in the present matter, "clear and manifest" evidence is not the applicable standard to evaluate the legislative history.

Rather, the "clear and manifest" evidence standard is only required in the rare event of implied repeal. As discussed below, to the extent that the legislative history lacks "clear and manifest" evidence of an intent to repeal, this absence is easily explained. Congress did not intend to impliedly repeal ANCSA § 11(b)(3). *See infra* at 46-53.

By arguing that the issue is implied repeal rather than ratification, Stratman ignores numerous rulings that Congressional authorization precludes judicial inquiry. For example, in *Texas Committee on Natural Resources v. Bergland*, 573 F.2d 201 (5th Cir.), *cert. denied*, 439 U.S. 966 (1978), the fifth circuit held that a congressional authorization to clear cut certain forests precluded judicial inquiry under the National Environmental Policy Act (NEPA). *Id.* at 209-210.

> We hold today that the congressional decision to permit clearcutting in national forests under the Church guidelines is not subject to judicial review during the period in which permanent guidelines are being established. This holding implicitly carries with it a rule that the decision is not subject to indirect review through the process of requiring an environmental impact statement before pursuing the congressionally determined course of interim action.

*Id.* at 210.

In the instant case, the legislative history shows that Congress gave full attention to the issue of village eligibility. As discussed above, Congress clearly recognized the existence of an ongoing dispute over Leisnoi's eligibility, but nevertheless determined that Leisnoi was entitled to participate fully in the AJV. *See supra* at 20; *see also* ANILCA § 1428(a)(4), (a)(5), (b)(1), (c). This congressional decision to allow Leisnoi to participate in the joint venture is not subject to judicial inquiry. Neither can it be subject to indirect review by requiring the Secretary to reexamine Leisnoi's eligibility.

In *State of Kansas, ex rel. Stephan v. Adams*, 608 F.2d 861 (10th Cir. 1979), the Secretary of Transportation discontinued railroad passenger service on certain routes. The Secretary's decision subsequently had been approved by Congress. The plaintiffs however, contended that the Secretary's decision violated NEPA. Rejecting plaintiffs' contentions, the tenth circuit reasoned:

> It is thus our view that the Congress had its attention specifically focused on the Secretary's Final Report and the complaints directed to it. With these concerns in mind the Congress nevertheless gave its imprimatur to portions of the Final Report, including the curtailment of the trains in question, and designated the pattern of the passenger rail system for the future.
>
> * * *
>
> The whole of this legislative process persuades us that Congress did not leave designing of the passenger system to the Secretary and the appellees' subsequent actions, with further deliberations and administrative procedures under the environmental and other statutes. We feel we have no problem of mere implied repeal of the procedural provisions of NEPA and the other statutes, but a direct Congressional decision designing the basic rail system, without the necessity of following those procedures.

*Id.* at 866.

The instant case is susceptible to a similar analysis. When Congress enacted section 1427 of ANILCA, Congress was aware of and focused on the Secretary's decision to certify Leisnoi and the complaints directed to it. Congress's knowledge came from Jack Anderson's editorials and Mr. Weinberg's response. Koniag Post-Hearing Br. at 77-82. Indeed, as demonstrated below, Jack Anderson notified Congress of the exact same complaints that Stratman recycles today. These arguments include the following: (1) Karl Armstrong fraudulently created "phantom" villages; (2) few, if any, Natives lived on Woody Island year-round in 1970; (3) false affidavits were used in village enrollments; (4) the BIA's final certification report contains misleading photographs; and (5) many village enrollees live out of state.[15]

---

[15] Indeed, precisely the same arguments presented by Stratman to this Board and this judge were presented by Jack Anderson. Anderson argued that the village enrollment list was filled with Natives who had never visited the village. S Exh. 30-A. Stratman argues that '[m]any of the Natives enrolled to Woody

37

Despite this knowledge of complaints addressed toward Leisnoi's certification, Congress designated Leisnoi as a "Koniag village corporation" entitled to participate in a complex joint venture which involved a massive land

---

Island had never resided on Woody Island before." Stratman Post-Hearing Br. at 149.

Anderson claimed that the "driving force" behind Koniag and Leisnoi is Karl Armstrong. S Exh. 30-B. Stratman argues that the effort to certify Leisnoi was "part of a larger effort, by Karl Armstrong and Koniag, Inc., to certify other Kodiak-area villages in order to obtain additional a ANCSA benefits. Stratman Post-Hearing Br. at 80.

Anderson claimed that his assistant Hal Bernton "made a first-hand inspection" of Woody Island and discovered: (1) only one abandoned cabin; and (2) no sign of any Native residents. S Exh. 30-C. Stratman argues that by the mid 1960's, only John Maliknak and Nicholas Pavloff lived on Woody Island. Stratman Post-Hearing Br. at 289.

Anderson stated that Darrell Chaffin signed an affidavit which stated that only two Natives lived on Woody Island since 1970. S Exh. 30-C. Stratman quotes from Darrell Chaffin's deposition that only two Native lived on Woody Island in 1970. Stratman Post-Hearing Br. at 128.

Anderson stated that Karl Armstrong never lived on Woody Island. S Exh. 30-C. Stratman makes the same assertion. Stratman Post-Hearing Br. at 77.

Anderson argued that "BIA's final certification report contains photographs of the FAA housing with the caption 'Family dwellings at Woody Island'- giving the false impression that the government buildings are native housing." S Exh. 30-C. Stratman argues that all of the photographs attached to Leisnoi's application for eligibility were part of the *FAA complex.*" Stratman Post-Hearing Br. at 76.

Anderson argued that the "Justice Department['s] prosecution of a 'phantom' Native Alaska village corporation, indicted for allegedly trying to euchre Uncle Sam out of 69,120 acres was quietly- and reluctantly- dropped after a government lawyer's affidavit knocked the bottom out of the case." S Exh. 30-E. Stratman relying on an exhibit rejected by the ALJ at the hearing (S Exh. 30-H), argued that "investigations by Congress, the Department of the Interior, the FBI, and a federal grand jury" led to the indictments, on charges of criminal fraud, of several persons involved in the effort to certify Port Williams (Shuyak). Stratman Post-Hearing Br. at 80.

Anderson noted that "one federal investigator labeled the certification reports 'absolutely fraudulent,' noting that there were cases where 'the bulk of the supposed villagers were living in Los Angeles.'" S Exh. 30-E.

Anderson analyzed copies of "a dozen affidavits signed by natives claiming to be residents of the allegedly phantom villages" and determined that many of these individuals had mailing addresses "in places as distant as Los Angeles." S Exh. 30-F. Stratman argues that "the affidavits ... submitted in support of Woody Island Village's application for eligibility contained false or misleading information." Stratman Post-Hearing Br. at 51.

exchange in "full satisfaction of" Leisnoi's rights under ANCSA to lands on the Alaska Peninsula. *See id.* at § 1427(a), (b)(1). The official legislative history states:

> *Subsection (b)(1)* <u>identifies the Native corporations to receive title</u> to the lands on Afognak Island to be conveyed pursuant to the section, and provides that such conveyances shall be in full satisfaction of the rights of each such corporation to conveyance under the Alaska Native Claims Settlement Act of lands and interests therein on the Alaskan Peninsula.

Stratman Response Br. App. C at 5267 (underline added). Congress further directed the Secretary to convey designated lands to Koniag and the Koniag villages. *See* ANILCA § 1427(b)(1), (c). The only condition which Congress placed on these conveyances was that Koniag and each village corporation adopt resolutions accepting the conveyances as full satisfaction of their respective entitlements under ANCSA. *See id.* at § 1427(b)(4).

In addition, Congress directed the creation of a joint venture and designated each village's participation in that venture according to a set formula. *See id.* at § 1427(c). This comprehensive and complex settlement left no room for further deliberation or administrative procedures under ANCSA.

Using the very words of the court in *Stephan*, in ANILCA § 1427 there is "no problem of mere implied repeal of the procedural provisions [of ANCSA], but a direct Congressional decision [ratifying Leisnoi's eligibility] without the necessity of following [ANCSA § 11(b)(3)'s] procedures." 608 F.2d at 866.

5. <u>Congress was aware that section 1427 could be construed as a congressional ratification of Leisnoi's eligibility</u>.

The United States has not briefed the issue of congressional ratification. However, in 1979, the United States briefed an unrelated issue in a related case. In a footnote in that brief, the United States speculated on the

39

potential effect of proposed legislation which was pending before Congress, and concluded that the legislation would not affect Leisnoi's eligibility. Stratman Exh. 13 at 16 n.4, *quoted in* Stratman Response Br., at 71-72. The footnote does not explain or elaborate on this conclusion, and therefore it deserves little weight. Furthermore, this was the position taken over fifteen years ago by then Secretary Cecil Andrus, and it may not be the position of the current Secretary, Bruce Babbitt.

Moreover, the Secretary's opinion in 1979 is largely irrelevant. The issue of congressional ratification is a question of legislative intent. The legislative history does not indicate that the Secretary's 1979 opinion was ever communicated to Congress. Therefore, the Secretary's 1979 opinion in no way reflects the intent of Congress when it enacted section 1427. It is just one more interpretation of section 1427, and an unsupported one at that.

In fact, as Koniag discussed in its opening brief, Congress was all too aware of the possibility that section 1427 could be construed as a congressional ratification of Leisnoi's eligibility. Koniag Post-Hearing Br. at 77-79. Thus, at the request of Senator Stevens, Mr. Weinberg drafted an amendment which preserved the issue of Leisnoi's eligibility. Indeed, Stratman argues that Senator Stevens's request for the amendment shows that he did not intend to ratify Leisnoi. Stratman Response Br. at 68-70. Of course, this amendment was ultimately rejected by Congress. *Id.* Thus, to the extent that Senator Stevens did not intend to ratify Leisnoi, by refusing to include the amendment in ANILCA, the majority of Congress obviously disagreed.

At the very least then, this much may be said about congressional intent: (1) Congress was aware there was considerable controversy over Leisnoi's proof of eligibility; (2) Congress considered an amendment which would

40

have precluded such an interpretation; and (3) Congress rejected this amendment.

Congress was aware, or it should be presumed that Congress was aware, that Koniag, Leisnoi, and the other villages would reasonably rely on section 1427, and enter into various business transactions among themselves and with others. *See* Koniag Post-Hearing Br. at 90. Therefore, if the conveyances were to be conditional and subject to forfeiture, Congress would have or should have explicitly set forth such conditions.

However, Congress did not set forth such conditions. On the contrary, Congress quite explicitly and unequivocally stated that Leisnoi would be entitled to participate in the joint venture as a "Koniag deficiency village corporation" and as a "Koniag 12(b) Village Corporation" in "full satisfaction of" its rights under ANCSA. ANILCA § 1427(a)(4), (5), (b)1. This explicit and unconditional entitlement manifests a congressional intent to settle and forever put to rest any dispute over the selection rights of the Koniag villages in the Alaska Peninsula.

    6.    <u>Contemporaneous events to the passage of ANILCA Section 1427 demonstrate that Congress was aware of the controversy surrounding Leisnoi and chose to ratify the village.</u>

The Supreme Court has held that events which occur "immediately prior to the time when an act becomes law comprise an instructive source, indicative of what meaning the legislature intended. Therefore, the history of events during the process of enactment, from its introduction in the legislature to its final validation, has generally been the first extrinsic aid to which the courts have turned to construe an ambiguous act." *Sutherland on Statutory Construction*, at § 48.04, *citing Markham v. Carbell*, 326 U.S. 404 (1975); *United States v. Wyoming*, 331 U.S. 440 (1947).

41

Each of the Koniag exhibits that Stratman complains about were created during the "process of [1427's] enactment." Specifically, Jack Anderson's "phantom village" newspaper articles were published on February 21, 22, and 23; March 1; and April 21, 1979. *See* Stratman Exhs. 30-A, 30-B, 30-C, 30-D, and 30-F. Mr. Weinberg's response letter to Chairman Udall was written on February 23, 1979. Koniag Exhibit H.[16] The newspaper article in the Anchorage Daily News, addressed by Koniag, was published on April 21, 1979. Finally, the letter from Mr. Weinberg to Senator Stevens was dated July 13, 1979. Koniag Exhibit I. President Reagan signed ANILCA into law in 1980. Koniag Post-Hearing Br. at 82.

Consequently, because all of these documents were created during the ANILCA § 1427 deliberations, this material "comprises an instructive source indicative of what the legislature intended."

7.   Congress was aware of Jack Anderson's vitriolic editorials.

Stratman's contention that Congress was unaware of Jack Anderson's trilogy of editorials which accused Congress of facilitating a "600,000 acre rip-off" is unavailing for numerous reasons. Stratman Response Br. at 66. First, Mr. Udall, Chairman of House Committee on Interior and Insular Affairs, requested a response from Mr. Weinberg immediately after Mr. Anderson's vitriolic articles were published. Stratman Exh. 30-F. As stated by Jack Anderson himself:

---

[16]   Koniag quoted extensively from Mr. Weinberg's letter to Chairman Udall to show Congress's awareness of the ongoing dispute over Leisnoi's eligibility:

> An Amended Complaint was filed shortly after the December 7, 1976, Order . . . . The lawsuit based on the amended complaint was dismissed . . . . Stratman and Burton have filed a notice of appeal with the Ninth Circuit Court of Appeals.

Koniag Post-Hearing Br. at 78-80, *quoting* Koniag Exh. H at 2B.

> Two months ago we reported confidential government findings that an Alaskan native development corporation had tried to euchre Uncle Sam out of 600,000 acres of valuable public land by setting up phantom native villages to claim the land.
>
> Rep. Morris K. Udall (D. Ariz.), chairman of the House Interior Committee, asked the corporation, Koniag Inc., to respond to our columns. The job was undertaken by Koniag's Washington representative, Edward Weinberg.

*Id.*

Second, Congress has historically been sensitive to Mr. Anderson's editorials. Mr. Anderson was a nationally syndicated columnist employed by the Washington Post. Indeed, in 1985 alone, the Congressional Record mentions Mr. Anderson's editorials on thirty occasions.[17] There can be little doubt that Congress was aware of Mr. Anderson's three vitriolic editorials, published during the very same month as the ANILCA hearings, which accused Congress of falling prey to the largest land rip-off since the Teapot Dome scandal. Stratman Exh. 30-A.

Third, Senator Stevens requested that Mr. Weinberg draft an amendment to preserve the issue of Leisnoi's eligibility. Of course, Mr. Anderson's editorials explicitly named and criticized Senator Stevens' involvement in ANILCA. *See, e.g.*, Stratman Exh. 30-C (stating "Sen. Ted Stevens

---

[17] 131 Cong. Rec. E5830-02; 131 Cong. Rec. E5762-01; 131 Cong. Rec. E5764-01; 131 Cong. Rec. S17006-01; 131 Cong. Rec. E5032-02; 131 Cong. Rec. E5049-02; 131 Cong Rec. S13027-02; 131 Cong. Rec. S12925-02; 131 Cong. Rec. E4206-02; 131 Cong. Rec. S11920-02; 131 Cong. Rec. H7286-05; 131 Cong. Rec. E3744-03; 131 Cong. Rec. S9405-01; 131 Cong. Rec. E3176-02; 131 Cong. Rec. S9029-01; 131 Cong. Rec. H4553-05; 131 Cong. Rec. S7736-02; 131 Cong. Rec. H2972-03; 131 Cong. Rec. E1973-01; S5332-03; 131 Cong. Rec. H2664-01; 131 Cong. Rec. E1518-03; 131 Cong. Rec. E1353-02; 131 Cong. Rec. H1311-02; 131 Cong. Rec. H453-01; 131 Cong. Rec. S1507-01; 131 Cong. Rec. S1145-01; 131 Cong. Rec. E260-02; 131 Cong. Rec. S694-01; 131 Cong. Rec. S429-07.

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

(R-Alaska) has spearheaded legislation that will award 115,000 acres of federal timberland to a native Alaska village corporation; federal investigators have labeled the village a fraud").

Fourth, by arguing in his response brief that Congress was unaware of the controversy surrounding Leisnoi's eligibility, Stratman contradicts assertions he made in his opening brief. *See* Stratman Post-Hearing Br. at 82. There, Stratman noted that Congress investigated the Koniag region villages and that the Committee was "extremely critical" of the Department of Interior's actions. *Id.* Indeed, Stratman notes that Congressman Dingell had made a "strenuous effort to encourage appeals" of these Koniag region villages. Further, Stratman notes that Leisnoi, specifically, was a target of Congressional inquiry. *Id.* at n. 35.

Fifth, as Stratman notes in his opening brief, newspaper reporters in addition to Mr. Anderson similarly publicized the "fraudulent" acquisition of federal land by Alaska Native corporations. *Id.* at 82-86.

In sum, there can be little doubt that Congress was aware of the controversy surrounding Leisnoi's eligibility.

8.    <u>Congress was aware of Omar Stratman's lawsuit.</u>

Further, Stratman's assertion that Congress was unaware of his lawsuit prior to passing ANILCA § 1427 is contradicted by both the facts and the applicable legal presumptions. Mr. Weinberg, in a letter provided to both House Committee Chairman Udall and Senate Committee Chairman Jackson, expressly stated that Stratman "had filed a notice of appeal with the Ninth Circuit Court of Appeals". Koniag Exhibit H at 8. Indeed, Mr. Weinberg even provided Chairman Udall, Chairman Jackson, Senator Stevens and other congressmen (*id.* at 20) with a copy of the federal district court's decision in *Stratman v. Watt*, No. 79-4480. *See* Koniag Exhibit H at 7 (stating "copy of opinion attached").

44

In addition to Mr. Weinberg notifying both Chairman Udall, Chairman Jackson, and other congressmen that Stratman's lawsuit was still alive, Mr. Anderson's articles also discuss Stratman's appeal. Stratman Exh. 30-B (stating "whether a court suit can overcome Koniag's clout in Washington remains to be seen.").

As to the legal presumptions, the United States Supreme Court has on many occasions held that legislative language will be interpreted on the assumption that the legislature was aware of the relevant judicial decisions. *Sutherland on Statutory Construction* at § 45.12. As stated by the United States Supreme Court:

> Congress is "predominantly a lawyer's body," *Callanan v. United States*, 364 U.S. 587, 594, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961), and it is appropriate for us "to assume that our elected representatives . . . know the law." *Cannon v. University of Chicago*, 441 U.S. 677, 696-697, 99 S.Ct. 1946, 1957-1958, L.Ed.2d 560 (1979). .... It is not a function of this Court to assume that "Congress was unaware of what it accomplished . . . ." *Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

*Albernaz v. United States*, 450 U.S. 333, 341 (1981).

Lawyers and laypersons alike know that an appealed trial court decision is not final. Congress was notified by both Mr. Weinberg and Mr. Anderson that Stratman's lawsuit was still alive in 1979.

In sum, the facts and the presumptions lead to the inevitable conclusion that Congress knew of the controversy surrounding Leisnoi's eligibility. Nonetheless, Congress took no steps to preserve the issue of Leisnoi's eligibility. Indeed, Senator Stevens requested an amendment keeping the issue of Leisnoi's eligibility open; Congress rejected this amendment.

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390