**EXHIBIT 9**


**KONIAG'S OBJECTIONS TO ALJ RECOMMENDED DECISION**

# UNITED STATES DEPARTMENT OF THE INTERIOR

## OFFICE OF HEARINGS AND APPEALS
Interior Board of Land Appeals
4015 Wilson Boulevard
Arlington, Virginia 22203

| | |
|---|---|
| OMAR STRATMAN, | ) IBLA 96-152 |
| | ) No. A76-0132 CV (JKS) |
| Protestant, | ) |
| | ) Challenge to the eligibility of Woody Island |
| vs. | ) as a Native village under Section 11(b)(3) |
| | ) of the Alaska Native Claims Settlement |
| LEISNOI, INC., | ) Act, 43 U.S.C. §1610(b)(3) (1994) |
| | ) |
| Respondent. | ) |
| | ) |
| KONIAG, INC.; | ) |
| BUREAU OF INDIAN AFFAIRS, | ) |
| | ) |
| Intervenors. | ) |

# KONIAG'S OBJECTIONS TO ALJ RECOMMENDED DECISION

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

**TABLE OF CONTENTS**
**INTERVENOR'S OBJECTIONS**

Page

INTRODUCTION ................................................ 1

STANDARD OF REVIEW .................................... 3

STATEMENT OF FACTS

    1.    Alaska Natives Have Lived On Woody Island
        For Thousands of Years.............................. 5

    2.    The Certification of Woody Island...................... 17

    3.    The Litigation............................................. 19

    4.    The Hearing............................................... 20

ARGUMENT

I.    ALJ SWEITZER COMMITTED REVERSIBLE ERROR
    BY SUBORDINATING THE ENROLLEE'S SUBJECTIVE
    INTENT TO HER PHYSICAL LOCATION TO
    DETERMINE PERMANENT RESIDENCE

    1.    Relevant Statute and Regulation............................ 25

    2.    Permanent Residence...................................... 26

    3.    ALJ Sweitzer Improperly Weighted Subjective Intent. 31

II.    WOODY ISLAND'S NATIVES OCCUPIED THE VILLAGE
    CONSISTENT WITH THEIR OWN CULTURAL PATTERNS
    IN 1970

    1.    Woody Island's Native Village Had an Identifiable
        Physical Location in 1970................................... 36

    2.    Woody Island's Natives Occupied the Village Consistent
        With Their Own Cultural Patterns in 1970................. 38

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

**Page**

3.    ALJ Sweitzer Incorrectly Assumed That Leisnoi's
Enrollees Assimilated Into The Non-Native Community
While Away From Woody Island........................... 42

4.    ALJ Sweitzer and Protestant's Witnesses Disregarded the
Extensive Kinships of Leisnoi's Enrollees................. 43

III.    CONTRARY TO THE ANCAB PRECEDENT, ALJ SWEITZER
SHIFTED THE BURDEN TO LEISNOI TO PROVE THAT
240 ENROLLEES IGNORED BY STRATMAN PROPERLY
ENROLLED TO WOODY ISLAND.............................. 47

IV.    ALJ SWEITZER PLACES AN UNFAIR BURDEN ON
LEISNOI'S ENROLLEES TO DOCUMENT THE LENGTH OF
TIME THEY SPENT ON WOODY ISLAND IN 1970.

1.    The ANCAB's Holdings in *Chitina* and *Kasaan* Compel
Finding that More Than 13 Enrolled Natives Lived on
Woody Island in 1970...................................... 50

2.    ALJ Sweitzer Unfairly Places the Burden on Leisnoi's
Enrollees to Document Their Time on Woody Island
in 1970.................................................. 54

3.    In Determining Permanent Residency, the Critical Date
is April 1, 1970......................................... 55

V.    CONGRESS RATIFIED LEISNOI'S ELIGIBILTY .............. 56

1.    Introduction.

The "d-2 Legislation and the Koniag Amendment........ 57

2.    Argument

A.    Congress Possesses the Plenary Power to
Designate Woody Island as an Eligible Village
Corporation Under ANCSA Entitled to Receive
Benefits Under the Act............................... 65

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

Page

1. Congress Has the Authority to Ratify Unauthorized Acts of Government Officials If Those Acts Could Have Been Authorized When Taken.................................... 65

2. Under the Property Clause of the United States Constitution, Congress' Power to Dispose of Public Lands is Unlimited............ 66

3. Congress Also Has the Authority to Moot a Pending Controversy by Enacting New Legislation.................................... 67

B. In Section 1427 of ANILCA, Congress Ratified the Secretary's Certification of Woody Island as an Eligible Village................... 68

1. The Plain Language of Section 1427 Ratifies Leisnoi as an ANCSA Village Corporation.................................... 69

2. The Legislative History of ANILCA Makes it Clear that Congress Recognized That There Was an Ongoing Dispute Over the Eligibility of Woody Island, but Nonetheless Chose to Recognize Leisnoi as a Valid Village Corporation.................. 70

3. Conclusion on Section 1427 of ANILCA...... 72

CONCLUSION.................................................. 76

APPENDIX A ................................................ 77

APPENDIX B ................................................ 82

APPENDIX C ................................................ 92

APPENDIC D ................................................ 106

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

A.      Absolutely.

Q.      Okay.  Did you leave any of your personal
possessions behind?

A.      Lots of it, yes.

Q.      And tell us what some of those were.

A.      There were some -- I was, I did model building.  I
did a lot of carving.  Clothing.
***

Q.      And was, was there a place there that you intended to
return to?

A.      Well, of course, the family home was still standing
then.[311]

The ANCAB held in *Afognak* that leaving personal items in the village was strong
evidence that the Native intended to return to the village.[312]

In sum, prior decisions demonstrate that the critical date for determining
permanent residence is 1970.  Consequently, evidence that some of these Natives
subsequently, and reluctantly, gave up their intent to return to the village is immaterial to
determining permanent residence in 1970.

## V. CONGRESS RATIFIED LEISNOI'S ELIGIBILTY

In the District Court, Koniag urged that § 1427 of ANILCA (94 Stat. 2371,
2518 congressionally ratified Leisnoi's eligibility because Congress had before it the same
allegations of fraud but nonetheless chose to allow Leisnoi to trade certain land selections
for participation in the Afognak Joint Venture.  The allegations of fraud made in 1980 to
Congress are precisely those made today by Protestant.  The District Court in page 2 of its

---

[311]  Tr. 2764-65.
[312]  *Afognak*, ANCAB Dec. at 22.

1995 remand order, stated that the § 1427 argument "is a difficult question that should be decided in the first instance by the Agency."

Koniag urged the Interior Board of Land Appeals to postpone resolution of the legal issue until after the factual hearing took place. *See* IBLA Order of November 21, 1997, at pp. 8, 10 n. 13. Indeed, the factual hearing has now taken place. Consequently, Koniag's argument regarding ANILCA § 1427 is now ripe.

    1.   <u>Introduction.</u>

       <u>The "d-2 Legislation[313] and the Koniag Amendment.</u>

In the Koniag region, as well as several others, the land selection provisions of ANCSA did not mesh well with the existing land use patterns. The Kodiak National Wildlife Refuge occupied a substantial portion of the land on Kodiak Island, and completely surrounded a number of the Native villages. Most of the land outside of the Refuge was selected by the State of Alaska and tentatively approved prior to the enactment of ANCSA. Land in the City of Kodiak was privately owned, and a coast guard base, occupying additional land, is located just outside the City. To the north of Kodiak Island is Afognak Island. All of its approximately 500,000 acres were part of the Chugach National Forest.[314]

ANCSA limited the number of acres which a village corporation could select in a wildlife refuge or a national forest to 69,120. 43 U.S.C. § 1611(a)(1). In addition, the subsurface estate underlying village corporation land within a wildlife refuge could not be conveyed to the regional corporation, but remained with the United

---

[313] Section 17(d)(2) of ANCSA required the Secretary to withdraw up to 80 million acres of public land for possible inclusion in the National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems. The legislation to establish various conservation system units out of the land which was withdrawn was commonly referred to as the d-2 legislation. The following discussion does not purport to be a complete or exhaustive account of the d-2 legislation, which, as the Board is aware, was a lengthy, convoluted, and complex process, most of which is not germane to the issues raised in this motion.

[314] Statement of Edward Weinberg, Counsel for Koniag, Inc. Alaska National Interest Lands Conservation Act of 1979: Hearings Before the House Committee on Interior and Insular Affairs, 96th Cong., 1st Sess. (1979) at 1214-1222 ("Weinberg testimony"). Koniag Exhibit C.

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

States. In lieu thereof, the regional corporation was entitled to select an equal amount of acreage from other withdrawn land.[315]

As a result of these limitations, the Secretary withdrew, and Koniag and its village corporations were obligated to select, lands on the Alaska Peninsula.[316] This land was separated from Kodiak Island by the Shelikof Strait which is over 90 miles wide, and is some of the roughest waters in the world. The land was of little value to Koniag and its village corporations.[317] The land comprised, however, some of the finest wildlife habitat in the world, and was desired by the United States for inclusion in conservation system units.[318]

A second problem was the uncertain status of seven of the villages in the Koniag region which had applied for certification as eligible Native villages. Unlike Leisnoi, the Secretary of the Interior had determined that these villages were ineligible.[319] The Secretary's decision, however, had been reversed by the Court of Appeals for the District of Columbia, and remanded for further proceedings.[320]

The uncertain eligibility status of these seven villages delayed the completion of the ANCSA conveyance process.[321] Until such time as all of the eligible village corporations had been certified, it was impossible to know how much land would be conveyed pursuant to section 12(a) of ANCSA. 43 U.S.C. §1611(a). And, until that number was known it would be impossible for the Secretary to determine either the final

---

[315] *Id.*

[316] Weinberg testimony at 1215.

[317] *Id.* at 1215-16.

[318] *Id.*

[319] *Id.* at 1216-17.

[320] *Id.; see also Koniag et. al. v. Kleppe*, 405 F.Supp. 1360, 1364 (D.D.C. 1975, *aff'd in part, rev'd in part,* 580 F. 2d 601 (D.C. Cir. 1978).

[321] In addition to the Koniag villages, there were several other villages in other regions whose eligibility was in question. *See Koniag et. al. v. Kleppe*, 405 F. Supp. 1360, 1364 (D.D.C. 1975, *aff'd in part, rev'd in part,* 580 F. 2d 601 (D.C. Cir. 1978). To the best of Koniag's knowledge, this case contains a complete list of the villages whose eligibility had been denied by the Secretary. Koniag's understanding is that the eligibility of all of those villages was resolved by the time ANILCA became law, either through negotiations with the Secretary and/or confirming language in ANILCA. *See, e.g.,* ANILCA § 1432, 94 Stat. 2543-44, confirming the eligibility of Salamantof and Alexander Creek in the Cook Inlet Region.

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

number of acres which would be allocated to the village corporation pursuant to section 12(b) (43 U.S.C. §1611(b)), or the number of acres to be allocated to the regional corporations pursuant to section 12(c) (43 U.S.C. § 1611(c)).[322]

To resolve these and other concerns, Koniag and its villages proposed a comprehensive settlement amendment to Congress. Pursuant to the amendment, all of the certified village corporations which had land selections on the Alaska Peninsula would relinquish all of those selections, comprising approximately 300,000 acres, and Koniag would relinquish its subsurface rights thereto. Koniag's subsurface rights to its other lands on the Alaska Peninsula would be limited to oil and gas rights only. In exchange, Koniag and the village corporations were entitled to form a joint venture which would receive title to the surface estate to a lesser amount of land on Afognak Island. Koniag would receive the subsurface estate underlying the surface estate. Finally, the seven villages whose eligibility was in question would be deemed to be eligible villages, but would not, with minor exceptions, receive title to any land.[323] Rather, their ANCSA land entitlement would be limited to their proportionate interest in the joint venture. Committee on Energy and Natural Resources, Report on H.R. 39, Alaska National Interest Lands, S. Rep. No. 96-413, 96th Cong., 1st Sess. 1979 at 323-326.[324]

Until February 1979, the Koniag amendment was viewed as noncontroversial. It was supported by the Department of the Interior, the State of Alaska, the Alaska Coalition (a coalition of environmental groups) the Kodiak Island Borough, and the Alaska Federation of Natives.[325] In that month, however, syndicated Washington Post columnist Jack Anderson wrote a series of articles on what he termed the "phantom"

---

[322] *See also* Weinberg testimony, at 1216.
[323] Three of the villages would each receive the one square mile of township land which had been excluded from the Kodiak Island Wildlife Refuge when it was created. *See* Koniag Exhibit H.
[324] Koniag Exhibit B.
[325] *Weinberg testimony*, at 1218

Koniag villages.[326]  In his third column, Anderson charged that Koniag, through its "subsidiary" Leisnoi tried to pull off a "gigantic public-land swindle in southwest Alaska."[327]  Anderson charged that Alaska Senator Ted Stevens was proposing to turn over to Leisnoi and the other Koniag village corporations over 115,000 acres of land on Afognak Island, worth millions of dollars.[328]  Anderson asserted that there was no such village as Woody Island, and that federal investigators had labeled the village a "fraud."[329]

The Anderson columns unleashed a firestorm of activity and galvanized the Citizens Action Group (CAG), a group of individuals protesting Leisnoi's certification who were the original plaintiffs in this action.  The group brought up two "nationally well-known" attorneys to speak to the members, and retained them to assist in their efforts.[330]  A Seattle attorney was hired by the CAG to lobby against the Koniag amendment.[331]  A New Jersey attorney was retained to work with Roger Henderson, Stratman's lawyer, on the 9th Circuit appeal of the district court's dismissal of the case.

Meanwhile, in Washington, D.C., Representative Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs, which had primary jurisdiction over the d-2 legislation in the House of Representatives, requested Koniag to respond to Anderson's allegations.  Koniag's counsel, Edward Weinberg, responded with

---

[326]  Three of the columns were reprinted in the March 1, 1979 edition of the Kadiak Times, portions of which are Koniag Exhibit E.

[327]  *Weinberg testimony,* at 1218

[328]  All three of the Anderson columns are so fraught with error that it is difficult to see any resemblance between the actual facts and those put forth in his column.  The accuracy of the columns, however, is not relevant to this motion; rather, it is their existence, and the effect which they had on subsequent events, which is relevant.  Consequently, Koniag will not in this motion refute the allegations made.  A comprehensive response to the allegations is contained in a February 23, 1979, letter from Edward Weinberg, counsel for Koniag, to the Honorable Morris K. Udall, Chairman of the House Committee on Interior and Insular Affairs.  A copy of that letter is attached as Koniag Exhibit H.  It is also reprinted in the *Kadiak Times.*  Koniag Exhibit E at 6-8.

[329]  *Id*

[330]  *Kadiak Time,* March 1, 1979 ed.  Exhibit E at 1.

[331]  *Id.*

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

a 23 page letter. Koniag Exhibit H. In response to Mr. Anderson's allegations

concerning Leisnoi, Mr. Weinberg responded as follows:

> Now, as respects Leisnoi. Leisnoi is a certified village. It went through the
> administrative process established by the Secretary of the Interior under
> ANCSA to determine village eligibility. Leisnoi was certified by the
> Secretary of the Interior after its examination by the BIA which was
> charged with examining each and every village that claimed eligibility
> under ANCSA.
>
> The administrative process established by the Secretary afforded
> anyone wishing to dispute or object to the eligibility of an applicant for
> village status the opportunity to do so. Wide publicity was given to the
> pendency of applications for eligibility. The simple fact is that those
> residents of Kodiak, Alaska, who are referred to in Mr. Anderson's second
> article, that of February 22, as the "Citizens Action Group" and who are
> now attempting through Mr. Anderson's "good offices" to deprive Leisnoi
> of its eligibility, had their opportunity to protest and to obtain an
> evidentiary, trial-type hearing from the Department of the Interior in the fall
> of 1973 and the spring of 1974 when Leisnoi's eligibility was considered.
> They did not avail themselves of that right.
>
> . . . .
>
> [T] regulations of the Department established September 1, 1973 as the
> deadline for applications for certification by unlisted villages and provided
> an opportunity for protest and hearing. 43 C.F.R. §§2651.2(a) (6) 9, 10, 38
> F. R. 14223 (May 10, 1973). The hearing on Leisnoi, by the way, would
> have been held, had anyone requested one, in Kodiak, not in far off
> Washington, D.C. or any other inconvenient place. Nine separate and
> widely publicized village eligibility hearings were held in Kodiak in 1974.
> The filing of village eligibility applications was widely publicized in the
> local Kodiak papers and village eligibility was a widely discussed topic in
> Kodiak. Anyone in Kodiak and vicinity who would have wanted to object
> to a village's eligibility application but who was unaware of the opportunity
> to do so and to obtain a hearing would have had to have been entombed for
> a year and a half in the proverbial underground salt mine, completely out of
> touch with the world.
>
> . . . .
>
> Almost two years after Leisnoi's certification (which had occurred
> on September 9, 1974), some individuals in Kodiak, who it later developed
> are apparently the nucleus of the Citizens Action Group, filed a lawsuit
> against the Secretary of the Interior in the Federal District Court in

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

Anchorage attacking Leisnoi's eligibility. Among the allegations of the complaint were a charge of fraud, but without specifics as required by Rule 9(b) of the Federal Rules of Civil Procedure. (Kodiak-Aleutian Chapter, et. al. v. Kleppe, No. A76-182 Civil). Neither Leisnoi nor Koniag were named as parties to that action. The Federal District Court on December 7, 1976 (423 F. Supp. 544) entered an Order which, as respects the charge of fraud, required the plaintiffs to "put up or shut up" as required by Rule 9(b) of the Rules of Civil Procedure. The plaintiffs chose to shut up. These are the same people who are, with Mr. Anderson, once again screaming fraud.

An amended complaint was filed shortly after the December 7, 1976 Order, this time devoid of any charge of fraud. . .The complaint alleged that two individuals in Kodiak, Omar Stratman and Toni Burton, claimed to hold grazing leases from the United States, on lands (that had been TA'd to the state prior to passage of ANCSA) which compose a small part of the area on Kodiak Island selected by Leisnoi under ANCSA. . .

As to Stratman and Burton, the Court permitted the lawsuit to proceed because of a claimed lack of personal knowledge on their part that the Department of the Interior had scheduled an opportunity for protest and hearing on Leisnoi's application. This assertion of lack of knowledge is simply an unproven claim. We dispute it and consider it incredulous in view of the wide publicity given such matters in Kodiak, where both resided, in 1973 and 1974. . . .

In our opinion, Stratman and Burton's claims that their grazing leases were threatened by Leisnoi are not well founded. To begin with, grazing leases are "valid existing rights" under ANCSA, which remain with the holders regardless of Native selection. ANCSA, §14(g). . . .

In sum, the federal grazing leases covering the Leisnoi lands on Kodiak Island remain in effect and are valid, and Leisnoi must and will respect them. Further, if they had a State right to a renewal, (assuming that the State's repeal of its statute was not binding as to them), they have, under the Secretary's Orders above noted, a valid existing right to such a renewal.

The lawsuit based on the amended complaint was dismissed by the Federal District Court in Anchorage on October 16, 1978, as moot (copy of opinion attached), Leisnoi having relinquished the limited acreage covered by the Stratman and Burton grazing leases because it came to the conclusion that the land, burdened in any event by a long term lease, was simply not worth fighting over. The District Court also held that whatever

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

rights Stratman and Burton might have to a state lease were preserved as valid existing rights and finally, the Court noted that Stratman and Burton's complaint appeared to be in violation of Rule 17(a) of the Federal Rules of Civil Procedure, since the grazing leases were held not by Stratman and Burton, but by corporations.

. . . .

Stratman and Burton have filed a notice of appeal with the Ninth Circuit Court of Appeals. . . .[332]

It is thus apparent that the House Committee on Interior and Insular Affairs was fully and completely apprised of the CAG's claims, the allegations made in this litigation, the status of the litigation at the time of the letter, and Koniag's response to the allegations.

The United States Senate also responded to the Anderson columns. Senate Energy Committee Chairman Henry Jackson requested a report from the Department of the Interior on the Koniag land dispute, and told the General Accounting Office to be ready to "probe the Interior Department report."[333] Jackson also stated that his committee would look into two issues: whether the Koniag villages are legally entitled to land under the Alaska Native Claims Settlement Act (ANCSA), and whether Congress should legislate land exchanges.

The Anchorage Daily News quoted Jackson's letter to Interior Secretary Andrus as stating:

Like several other ANCSA amendments, the Koniag proposal was accepted by the committee last year without hearings "on the understanding that it was non-controversial."

The article went on to state that Jackson said that he had recently been informed that the Citizens' Action Group in Kodiak opposed the amendment.[334] Thus, the Senate, as well as the House of Representatives, became aware of the claims of the CAG and their allegations that Leisnoi should not be a valid ANCSA corporation.

---

[332] Koniag Exhibit H at 2-B (emphasis in original).
[333] Anchorage Daily News, April 21, 1979.
[334] *Id.*

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

In early July 1979, Senator Stevens requested Mr. Weinberg to draft some general language to the effect that it was not the intent of the d-2 legislation to effect the eligibility status of any Alaska Native corporation. Mr. Weinberg complied with the request, and submitted proposed language by letter dated July 13, 1979.[335] He proposed the following language:

> "but nothing in this Act shall affirm or deny any claim of eligibility of any Native Corporation for benefits under the Alaska Native Claims Settlement Act except as provided in section[s] 1427(e) [and the section number of the section comparable to section 930 of the House passed H.R. 39, if included in S.9] of this Act."

The two sections excluded from the disclaimer were the ones which ratified the eligibility of the seven Koniag villages which had been declared ineligible by the Secretary, and the section ratifying an agreement between the Secretary of the Interior and Cook Inlet Region, Inc. ("CIRI") settling the dispute over the eligibility of Salamantof and Alexander Creek, two CIRI villages. In short, the amendment requested by Senator Stevens was specifically designed to make it clear that the enactment of the Koniag amendment in section 1427 was not to be deemed to be a ratification by Congress of Leisnoi's eligibility. Mr. Weinberg concluded his letter by stating:

> I would hope that Senator Stevens will not feel impelled to offer such an amendment unless it appears that this matter will actually become an issue in the consideration of S. 9.[336]

More than a year later, in November 1980, Ronald Reagan was elected President of the United States. Before the end of the month, the d-2 legislation had passed both houses of Congress, and was submitted to the President for signature. On December 2, 1980, it became law. The Koniag amendment was contained in

---

[335] Koniag Exhibit I.
[336] *Id.* at 2.

SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

section 1427. The amendment drafted by Mr. Weinberg preserving the issue of the eligibility of Leisnoi was not included in the final bill, and, never introduced.

2.    Argument

A.    Congress Possesses the Plenary Power to Designate Woody Island as an Eligible Village Corporation Under ANCSA Entitled to Receive Benefits Under the Act.

1.    Congress Has the Authority to Ratify Unauthorized Acts of Government Officials If Those Acts Could Have Been Authorized When Taken.

The Supreme Court has consistently held that Congress may ratify unauthorized acts of government officials if those acts could have been authorized by Congress at the time they were taken.[337] For example, in *Swayne & Hoyt v. United States*, the Court considered an unauthorized order by the Secretary of Commerce. In that case, shippers contested the Secretary's imposition of certain tariffs on the ground that the Secretary did not have legislative authority to impose those tariffs. The Court, however, noted that subsequent acts of Congress had acknowledged the Secretary's authority. 300 U.S. at 301. Thus, the Court held that Congress had ratified the Secretary's previous unauthorized acts. *Id.* at 301-02. In so holding, the Court stated:

> It is well settled that Congress may, by enactment not otherwise inappropriate, "ratify...acts which it might have authorized," and give the force of law to official action unauthorized when taken. And we think that Congress, irrespective of any doctrine of ratification, has, by the enactment of the statutes mentioned, in effect confirmed and approved the exercise by the Secretary of powers originally conferred on the Shipping Board.[338]

---

[337] *See Swayne & Hoyt v. United States*, 300 U.S. 297, 81 L. Ed. 659 (1936); *Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 81 L. Ed. 562 (1936); *see also Charlotte Harbor & Northern Railway Co. v. W.G. Wells*, 260 U.S. 8, 67 L. Ed. 100 (1922) (discussing ratification by state legislature); *Hodges v. Snyder*, 261 U.S. 600, 67 L. Ed. 819 (1922) (ratification by state legislature).
[338] *Id.* (citations omitted).

This power has been acknowledged by the Ninth Circuit in Equal *Employment Opportunity Commission v. First Citizens Bank of Billings.*[339] In that case, the Equal Employment Opportunity Commission ("EEOC") brought a suit against the defendant to redress employment discrimination violations by the defendant. On appeal, the defendant challenged the EEOC's enforcement power. The Ninth Circuit held, however, that the issue was rendered moot by Congress' subsequent ratification of the EEOC's authority.[340]

Thus, it is clear that Congress may ratify acts which it could have authorized when taken. Given its plenary power over Indian affairs, Congress could have authorized Woody Island as a Native village eligible to receive benefits conferred by the Alaska Native Claims Settlement Act.

2.    Under the Property Clause of the United States Constitution, Congress' Power to Dispose of Public Lands is Unlimited.

The decisions of the United States Supreme Court have long established that under the property clause of the United States Constitution, Congress has the power to dispose of public lands as it sees fit. As early as 1886, the Supreme Court noted that Congress had authority to prescribe "the mode in which the lands may be disposed of, and the title conveyed to the purchaser."[341] One year later, in *Maxwell Land-Grant Case,*[342] the Court noted that when Congress disposes of public land by enactment, the courts can go no further than to make a construction of what Congress intended by the act. Similarly, in *Alabama v. Texas,*[343] the Court noted that Congress had unlimited

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

---

[339]  758 F.2d 397 (9th Cir. 1985).
[340]  *Id.* at 399-400 (citing *Swayne & Hoyt v. United States*). *See also Equal Employment Opportunity Commission v. Westinghouse Electric Corp.*, 765 F.2d 389 (3rd Cir. 1985); *Equal Employment Opportunity Commission v. Dayton Power & Light Co.*, 605 F. Supp. 13, 19 (1984) (noting split in circuit courts on issue of implied ratification)
[341]  *Van Brocklin v. Anderson*, 117 U.S. 151, 165 (1886) (quoting a Senate debate).
[342]  121 U.S. 325 (1887).
[343]  347 U.S. 272 (1954).

power to dispose of lands owned by the government and that Congress had both legislative and proprietary power with respect to such lands.

The unlimited power of Congress with respect to public lands has been reaffirmed by more recent decisions of the Supreme Court. In *Kleppe v. New Mexico*,[344] the state of New Mexico challenged the constitutionality of the Wild Free-Roaming Horses and Burros Act. The Supreme Court held that the Act was constitutional under the property clause. In so holding, the Court noted that Congress had complete power over public property.[345] This plenary power was summarized in *California Coastal Comm'n v. Granite Rock*,:

> The Property Clause provides that "congress shall have Power to dispose of and Make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." This Court has "repeatedly observed" that "[t]he power over the public land thus entrusted to Congress is without limitations."[346]

Accordingly, Congress also possessed the power to authorize the conveyance of federal lands to Leisnoi pursuant to the Alaska Native Claims Settlement Act irrespective of whether Woody Island met the requirements of ANCSA.

3.    <u>Congress Also Has the Authority to Moot a Pending Controversy by Enacting New Legislation.</u>

Congress also possesses the power to moot pending litigation and resolve controversies by enacting new legislation. In *Stop H-3 Association v. Dole*,[347] the Ninth Circuit held that Congress may enact legislation which exempts a particular project from the requirements of existing statutes. That case involved the construction of an interstate highway by the Department of Transportation. The highway had been the subject of

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

---

[344]    426 U.S. 529, 49 L.Ed.2d 34 (1976).
[345]    426 U.S. at 540.
[346]    480 U.S. 572, 580 (1987) (citations omitted). *See also State of Nevada v. Watkins*, 914 F.2d 1545, 1552-53 (9th Cir. 1990) (noting that Congress' power over public lands is "without limitations").
[347]    870 F.2d 1419 (9th Cir. 1989).

litigation for many years.  The plaintiffs alleged that the department was in violation of several environmental statutes.  Eventually, Congress intervened and ordered the Secretary to approve the highway construction notwithstanding the alleged violations.

On appeal, the plaintiffs presented various constitutional challenges to this congressional order.  For example, the plaintiffs argued that Congress had violated the principle of separation of powers because it usurped the executive branch's authority to execute the laws.[348]  The Ninth Circuit rejected this contention and held that the enactment of legislation exempting a project from statutory requirements did not constitute an execution of the law.[349]  The court further stated:

> Moreover, even if we were to accept appellants' argument that [Congress' order] represents an attempt by Congress to control the Executive branch's execution of [the statutory requirements], we still could not conclude that Congress violated the separation of powers.  Simply put, Congress may change its mind, so long as it complies with the Constitution's requirements for action that alters the delegation of authority to the Executive branch.[350]

The court noted that it found no authority "forbidding Congress to alter a legislative grant of authority by means of new legislation directed at a particular project."[351]  Accordingly, Congress had the authority to designate Leisnoi as an eligible village notwithstanding the pending Ninth Circuit Appeal.

B.    <u>In Section 1427 of ANILCA, Congress Ratified the Secretary's Certification of Woody Island as an Eligible Village.</u>

It is clear from the above authorities that Congress possessed the power to ratify the Secretary's decision that Woody Island was an eligible village and to recognize Leisnoi as a valid ANCSA corporation entitled to receive benefits under the Act.  The

---

[348] *Id.* at 1433.
[349] *Id.* at 1434.
[350] *Id.* at 1435.
[351] *Id.* at 1435 n.24.

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

issue, therefore, is whether section 1427 constitutes such a ratification. For the reasons discussed below, Koniag believes that it does.

1.    The Plain Language of Section 1427 Ratifies Leisnoi as an ANCSA Village Corporation.

It is clear from the plain language of section 1427 that Congress ratified Leisnoi's status as a valid ANCSA village corporation. Subsection (a)(4) defines "Koniag deficiency corporation" as:

(4) "Koniag deficiency village corporation" means any or all of the following:

Afognak Native Corporation;
Nu-Nachk-Pit, Incorporated;
Ouzinkie Native Corporation; and
*Leisnoi, Incorporated.*

(emphasis added). Subsection (a)(5) in turn defines "Koniag 12(b) Village Corporation" as:

*the village corporations listed in subparagraph (4) above*, if within sixty days of the effective date of this Act, Koniag, Incorporated, by a resolution duly adopted by its board of Directors, designates them as such as a class and all of the following: Natives of Akhiok, Incorporated, Old Harbor Native Corporation, Kaguyak, Inc., Karluk Native Corporation and each of the corporations listed in subsection (e)(2) of this section which files a release as provided for in subsection (e)(1) of this section.

(emphasis added). Thus, under section 1427, Leisnoi was both in "Koniag Deficiency Village Corporation" and a "Koniag 12(b) Village Corporation."

Subsection (b)(1) then recognizes the rights of the Koniag deficiency village corporations and Koniag 12(b) Village Corporations to benefits under ANCSA:

In full satisfaction of...(B) the right of each *Koniag Deficiency Village Corporation* to conveyance under that Act of the surface estate of deficiency village acreage on the Alaska Peninsula; (C) the right of each *Koniag 12(b) Village Corporation* to conveyance under the Alaska Native

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

Claims Settlement Act of surface estate of 12(b) acreage on the Alaska
Peninsula...it will be conveyed....

(emphasis added). Because only the village corporations of certified ANCSA villages
had rights to the conveyance of land under the Act, this language compels the conclusion
that Congress considered Leisnoi a *bona fide* village corporation created pursuant to
ANCSA and entitled to receive the benefits thereunder.

2.    The Legislative History of ANILCA Makes it Clear that Congress
      Recognized That There Was an Ongoing Dispute Over the
      Eligibility of Woody Island, but Nonetheless Chose to Recognize
      Leisnoi as a Valid Village Corporation.

As discussed above, the Jack Anderson columns brought to the forefront
the dispute over Leisnoi's eligibility, and made Congress aware that the issue was
pending before the Ninth Circuit. As a result of those columns, the committee chairman
in both Houses before whom the legislation was pending took specific action to gather
additional information concerning the dispute. House Interior chairman Udall contacted
Koniag and requested a response. Senate Energy chairman Jackson went even further,
and demanded an explanation from the Department of the Interior as well as requesting
the General Accounting Office to review the Department's report. Senator Stevens then
requested specific language for a possible amendment which would have made it clear
that section 1427 was not intended to resolve the ongoing dispute over Leisnoi's
eligibility. The amendment, however, was not included in the final bill, and the language
defining Leisnoi as an eligible village corporation entitled to receive benefits under
ANCSA was left unchanged.

Second, the legislative history makes it clear that one of the purposes of
section 1427 was to resolve the eligibility disputes involving the Koniag villages.
Subsection (e) was designed to "resolve in favor of the Native villages listed therein, all
disputes concerning their eligibility for ANCSA benefits and prescribes limits upon the

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

ANCSA land benefits to which these villages shall be entitled."[352]  In a prepared statement to House of Representatives, Edward Weinberg, counsel for Koniag, stated:

> Until the eligibility status of these seven villages is determined, it is impossible to ascertain the total number of acres available under section 12(b) of ANCSA, which provides that the difference between 22,000,000 acres of the land entitlements of eligible village corporations is to be allocated among the eleven Alaska regional corporations (exclusive of Sealaska) on a relative population basis, and which provides further for a reallocation by each regional corporation of its share of the 12(b) acreage among eligible village corporations within its boundaries.  Likewise, it is impossible to complete the determination of regional corporation land entitlements under section 12(c) of ANCSA, which provides for allocations totaling 16,000,000 acres determined on a formula which includes as a factor the number of acres within each region which is selected pursuant to sections 12(a) and 12(b).[353]

Under 1427, all of the Koniag villages were addressed in one of two ways.  Those villages which had been certified by the Secretary of the Interior were defined as Koniag Deficiency Village Corporations and/or Koniag 12(b) Corporations.  Those villages whose eligibility had been denied by the Secretary were expressly certified in Section 1427(e), subject to major limitations on their rights.  There is no evidence to suggest that Congress intended to except Leisnoi from this comprehensive scheme, and make its eligibility dependent upon subsequent judicial and/or administrative proceedings.  Indeed the evidence suggests precisely the opposite.  Senator Stevens was prepared to introduce an amendment preserving the issue of Leisnoi's eligibility if it became necessary in order to have section 1427 included in the legislation.  Such an amendment was not deemed to be necessary, and was not included in the final bill.  Accordingly, the conclusion must be drawn that Congress intended by section 1427 to ratify Leisnoi's status as an eligible village corporation.

---

[352] S. Rep. No. 96-413, 96th Cong., 1st Sess. 323; *see also* H.R. Rep. No. 97 part I, 96th Cong., 1st Sess. 573 (1979).
[353] Koniag Exhibit F at 3.

It is clear that Congress, in ANILCA, knew how to leave open the question of certification if it desired. For example, in section 1416, Congress provided for certain land selection rights for the Native group Tanalian, Inc. Its rights under the section, however, were expressly conditioned upon its certification as an eligible group:

> (c) *If Tanalian Incorporated is certified as a group* under the Alaska Native Claims Settlement Act, Tanalian Incorporated shall be entitled to make selections in accordance with subsection (d) hereof.

> (d)(1) Tanalian Incorporated *if certified* shall be entitled to make selections of the surface estate of public lands . . . .

ANILCA, section 1416 (c), (d)(1), 94 Stat. 2499 (emphasis added). The absence of such language in section 1427, coupled with the specific definition of Leisnoi as a valid Koniag deficiency and 12(b) corporation compels the conclusion that Congress ratified Leisnoi's status as a valid ANCSA corporation.

 3.    Conclusion on Section 1427 of ANILCA.

ANILCA was passed in 1980. Thereafter, the Afognak Joint Venture was formed, the lands described in section 1427 were conveyed to the AJV, and the AJV has been actively engaged in timber harvesting. Costs and profits of the AJV have been allocated by the AJV to its various members. In 1991, Koniag and Afognak Native Corporation purchased Leisnoi's interest in the AJV in exchange for over $4 million dollars in land and money.

Koniag and ANC have relied on the provisions of section 1427 of ANILCA granting Leisnoi its interest in the AJV as provided therein. This reliance is justified by both the express language of the section as well as its legislative history. Congress was aware, when it enacted section 1427, that there was an ongoing challenge to Leisnoi's eligibility. But it did nothing to condition Leisnoi's entitlement on a resolution of the issue in favor of Leisnoi. Instead, recognizing the issue, Congress went ahead and defined Leisnoi as an eligible village corporation under ANCSA, and proceeded to

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

authorize it to exchange its rights under ANCSA to lands on the Alaska Peninsula for an interest in the Afognak Joint Venture.

For all of the above reasons, this Board should find that section 1427 of ANILCA ratified Leisnoi's status as an eligible village corporation.

## CONCLUSION

This brief follows almost a quarter century of litigation. But, if there is history to this litigation, so, too, the Alaska Native Claims Settlement Act followed and was a product of history, a history of the United States that can only be described even in the most charitable fashion as unkind to Native Americans. But, the words of then-young William Hensley, an Eskimo leader and member of the Alaska State Senate, were heard in the halls of Congress:

> We are testing the American political system . . . . We know the history of our country in dealing with the American Indian and we want to see a final chapter not written in blood or in deception or in injustice. If there is no settlement or a poor one, we will have a generation of leaders who fought for years to protect their land and lost.[354]

Those same words were repeatedly quoted as the Act was debated and then passed.[355] And, indeed, those words are echoed in the Act itself.

Congress finds and declares that:

(a)     there is an immediate need for a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims.

(b)     The settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of natives, without litigation, with maximum

---

[354] Cong. Rec. S1468 (daily ed. Feb. 17, 1971)(statement by Senator Harris).
[355] Cong. Rec. S17291 (daily ed. Nov. 1, 1971) (statement of Senator Kennedy); Cong. Rec. H9924 (daily ed. Oct. 21, 1971) (statement of Rep. Begich).

MIDDLETON & TIMME, P.C.
LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

participation by Natives in decisions affecting their rights and property....[356]

Congress heeded the words of Mr. Hensley and his warning. Remarkably, it rose to the occasion in passing ANCSA; remarkably because the history of Congressional Native American relations before ANCSA had been so dismal.

While the Congress of the United States rose to find fairness and justice in its settlement of the Alaska Native peoples' claims, so Omar Stratman, the rancher from Kodiak, and the ALJ, have not.

Just as Larry Amox could give the genuinely surprising testimony that redress for the Alaska Native people must be only with Russia and not the Congress of the United States, so Omar Stratman argues that the Native people of Leisnoi deserve no settlement and no land. He urges that giving ANCSA land to these Natives is a rip-off of land, and an affront to him. The ALJ has been mesmerized by these arguments. However,

> There is a certain irony in a charge that a group of Native American people are trying to cheat the United States government out of some land.[357]

Doctor Pullar, an anthropologist, is a Leisnoi shareholder.[358]   Doctor Pullar is understated, for what Mr. Stratman really asks is that this Board follow the ALJ and return Stratman's ranch, and the law, to a time when the cowboys forever win and the Indians forever lose. He urges this with arguments finding their mark with the ALJ, which were however explicitly rejected by ANCAB in 1974. These very arguments were made there, were rejected, and Leisnoi was certified. The people of Leisnoi were given their land. Mr. Stratman urges this return with arguments to the ALJ which were explicitly made by Jack Anderson in 1980 to the United States Congress, and these very

LAW OFFICES
SUITE 250
421 WEST FIRST AVENUE
ANCHORAGE, ALASKA 99501
(907) 276-3390

---

[356] 43 U.S.C. § 1601.
[357] Gordon Pullar, "No Phantoms in Koniag Villages," Koniag, Exh. D.
[358] *Id.*

same arguments were rejected again when the Congress in ANILCA confirmed the validity of Leisnoi as a certified village corporation. Unfortunately, again, they hit their mark with the ALJ.

These arguments are now made to save the hundred or so thousand-acres of land selected by Leisnoi for the United States. But the United States has said it cannot benefit from the lands patented to Leisnoi so long ago. Its position has been in favor of certification in this litigation. Indeed, even if the land were to be taken from Leisnoi as Mr. Stratman so ardently urges, it would go to the other regional corporations and in turn their villages under sections 43 U.S.C.A. 1611(a) and (b) of ANCSA. It would initiate a process now some twenty-five years after certification which would drive the complexity and length of this already long and complex litigation to Dickens-like proportions.

Significantly, with some two hundred Native village corporations and twelve Native regional corporations, with all these entities that Mr. Stratman wishes to benefit, only one corporation has entered this litigation. That corporation, of course, is Koniag. And, Koniag urges the Interior Board of Land Appeals to affirm what ANCAB found, what Congress ratified, and what the 285 people of Leisnoi all know: that Leisnoi is a Native village corporation. It urges that Leisnoi's enrollees, including an anthropologist, a judge, a legislator, and fishermen, and people just living their lives, many of whom testified, are entitled to the rights of ANCSA. It urges that Mr. Stratman and the ALJ are just plain wrong. Koniag urges the IBLA not follow the recommended decision of ALJ Sweitzer and instead find that Leisnoi was validly certified for all those reasons outlined above and in the appendices to follow.

DATED this 31st day of January, 2000.

MIDDLETON & TIMME, P.C.

Attorneys for Intervenor
Koniag, Inc.

By _____
R. Collin Middleton
ABA #6803015

By _____
Brennan P. Cain
ABA #9806008