Michael J. Schneider
Law Offices of Michael J. Schneider, P.C.
880 "N" Street, Suite 202
Anchorage, AK 99501
(907) 277-9306 - phone
(907) 274-8201 - fax

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| OMAR STRATMAN, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| LEISNOI, INC., KONIAG, INC., and DIRK KEMPTHORNE, Secretary of the Interior, | ) ) ) ) | |
| Defendants, | ) ) ) | |
| _____ | ) ) | |
| KONIAG, INC., | ) ) | |
| Counter-claimant, | ) ) | Case No.:  3:02-cv-0290 (JKS) |
| v. | ) ) | |
| OMAR STRATMAN, | ) ) | |
| Counter-claimed Defendant. | ) ) ) | |
| _____ | ) | |

## OMAR STRATMAN'S MOTION TO REVIEW AND AFFIRM IBLA'S DECISION ON REMAND, AND TO SET ASIDE THE SECRETARY'S ORIGINAL 1974 DECISION APPROVING LEISNOI'S APPLICATION FOR ELIGIBILITY AS AN UNLISTED ANCSA NATIVE VILLAGE

## TABLE OF CONTENTS/LIST OF EXHIBITS

I.    Motion presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.    The purpose of the remanded Agency proceedings . . . . . . . . . . . . . . . . 1

   B.    The outcome before the Administrative Agency . . . . . . . . . . . . . . . . . . . 3

   C.    Incorporation of other briefs and arguments by reference . . . . . . . . . . . 5

   D.    Stratman is entitled to judgment vacating the Department's
         1974 certification of Leisnoi as an eligible Native village, and
         rescinding the conveyances of lands and other settlement
         benefits that were unlawfully conveyed to it under ANCSA . . . . . . . . . . 7

         1)    *Relief is mandatory* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *9*

         2)    *"Time, time, time . . . see what's become of me . . .".* . . . . . . . . . *19*

         3)    *The unusual procedural history of this case is irrelevant* . . . . . . *28*

         4)    *The administrative burden on the Agency is irrelevant* . . . . . . . . *30*

         5)    *The burden on Leisnoi shareholders is irrelevant* . . . . . . . . . . . *31*

         6)    *The Agency's "re-enrollment" burden is irrelevant* . . . . . . . . . . *34*

   E.    Stratman should not suffer a further remand to the Agency
         under any circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

III.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## EXHIBITS

Exhibit 1           Secretarial Order 2965

Exhibit 30(g)       *Kodiak Daily Mirror* Ad of 4/4/73

I.     **Motion presented.**

The caption summarizes the relief that Mr. Stratman seeks through this motion.  He

explains below, and by reference to other pleadings, why he is now entitled to that relief.

II.     **Discussion.**

A.     **The purpose of the remanded Agency proceedings.**

The main dispute between the parties centers on the question of whether or not

Leisnoi met the eligibility requirements set forth in ANCSA for "village" status.  The dispute

is primarily factual in nature:

> In this case, Stratman and Burton, who were
> originally entitled to notice and an opportunity to
> participate in the administrative proceedings, did
> not deliberately flout or seek a premature
> interruption of the administrative process.
> (Citations omitted.) The Agency, on the other
> hand, undoubtedly had an interest and expertise
> in this <u>basically factual dispute</u>.     (Emphasis
> added.)[1]

Through various orders, this Court appeared to share the Circuit Court's view of the

dispute between the parties and directed the matter to IBLA to resolve this central factual

dispute:

> Suffice to say, Stratman argues that the
> Secretary of Interior incorrectly recognized a
> phantom native village in violation of Alaska
> Native Land Claim's Settlement Act and as a
> result thousands of acres of land have passed
> into the hands of men and women not entitled to
> receive them.  The Defendants respond that
> Stratman is using litigation to extort land and
> money from Alaska's native people.  There is

_____

[1]<u>Stratman v. Watt</u>, 656 F.2d 1321, 1326 (9th Cir. 1981).

little love lost between the parties.

\* \* \*

The agency in the first instance should determine whether Leisnoi is a phantom of the Secretary's imagination, as Stratman contends, or as its members contend, the modern representative of an ancient people, the victim of an itinerant berry picker.  Sending the issue back will permit the agency to exercise its expertise.  . . . If, despite the leeway he must be given, the Secretary did certify a phantom village, the agency is the best place for that determination to be made.

\* \* \*

Leisnoi has been in limbo too long.  It should have an opportunity to show that it is real.

\* \* \*

This case is remanded to the administrative agency for consideration not inconsistent with this order.[2]

The Clerk shall enter judgment remanding this case to the IBLA to determine once and for all if Leisnoi is a phantom village.  *See* order at Docket 292.[3]

Stratman contends in essence that the non-governmental defendants are thieves who have outwitted the gullible government defendants to permit rape and pillage of the public lands.  The non-governmental defendants implicitly, if not explicitly, contend that Stratman is a pirate who hopes to use some technical flaws in ancient proceedings as a device to extort money from needy Alaskans.  Stratman sees himself as Robin Hood, the defendants see him as Black Beard.  The government defendants have

---

[2]A76-0132 CV (JKS), Order of September 12, 1995, Docket No. 292.  See also Docket No. 162, Exh. A, Excerpts of Record, p. 100-102.

[3]Id. at Docket No. 309 and Exh. A, p. 103.

chosen to emulate Jane Austin's Mr. Bennett.[4]

It occurred to the Court that the central issue in this case – whether the government had improvidently certified a figment of a developer's imagination as a Native village entitled to benefits under the Alaska Native Claims Settlement Act – was a matter best addressed in the first instance by the certifying agency, the Interior Board of Land Appeals ("Agency"). Consequently, the court "remanded" the case to the Agency to allow the parties an evidentiary hearing to determine once, for all, and forever, whether Leisnoi is real or imaginary, and if imaginary, whether Leisnoi is improvidently-allocated land from the federal government.[5]

The Agency proceedings have taken place and Leisnoi has been determined to be a 'phantom of the Secretary's imagination; thieves who have outwitted the gullible government defendants to permit rape and pillage of the public lands.'[6]

### B.    The outcome before the Administrative Agency.

The outcome before the Agency is known to all.  See AR, Tab E (October 13, 1999 Recommended Decision by the ALJ) and Tab D (IBLA's October 29, 2002, decision reported at 157 IBLA 302).  We do, however, feel constrained to point out that this was never a close case.[7]  The Ninth Circuit has already put a stake in the heart of any Leisnoi

---

[4]Id., Order of September 25, 1996, Docket No. 329, n.1; Exh. A., p. 131.

[5]Id. at pp. 1-2; Exh. A, pp. 131-32.

[6]See Docket No. 150, Administrative Record, Tab E (ALJ Recommended Decision of October 13, 1999) and Tab D (157 IBLA 302, Decision of October 29, 2002).

[7]Before this matter was tried to the ALJ, no one with knowledge of the underlying facts believed Leisnoi had much of a chance. Dan Hensley, currently a retired Anchorage Superior Court Judge, but counsel for Leisnoi before its merger with Koniag,

and Koniag arguments to the effect that a Native person living in Kodiak or Washington

State can claim "residency" for ANCSA purposes on Woody Island because of some real

or imagined "historical ties", coupled with a real or imagined desire to return.[8]

The "investigation" relied upon by the Secretary in issuing his 1974 eligibility decision

---

and counsel for Koniag at the time of the 1982 "Stratman Agreement" that purportedly settled the decertification litigation, "believed that there was a 90% chance that Leisnoi would be decertified if the action was heard on the merits." See Leisnoi, Inc. v. Stratman, 835 P.2d 1202, 1205, n.10 (Alaska 1992). Hensley's assessment was prophetic. Beyond Koniag and Leisnoi's "bury my heart at Wounded Knee" theory of residency, the proof put on by Leisnoi and Koniag at the two-week administrative trial showed, at most, three actual "permanent residents" of Woody Island on April 1, 1970. "This vague evidence is juxtaposed against the voluminous evidence that the only Natives who lived in the alleged Village with any frequency or continuity after 1966 were William Wilfred Pavloff until he died in 1967, Johnny Maliknak, Nicholas Pavloff, and, possibly, Rudy Sundberg, Jr. and Christina Hoen." AR, Tab E, p. 55. The ALJ concluded that the Hoen "possib[ility]" was meritless (see ALJ's discussion of the use of perjured affidavits Id., pp. 29-30), just as Pavloff's 1967 demise precluded his residency on the magic date. We will not burden the Court with further quotations, but the ALJ's summary of Leisnoi's frivolous positions is found on pp. 42-44 and makes fascinating reading. Leisnoi and Koniag were not attempting to skate on thin ice; they were attempting to walk on water in asserting Leisnoi's right to "village" status under ANCSA.

[8]When last this matter was visited upon the patience of the Court, it was Koniag's and Leisnoi's hope-over-experience contention that virtually any tie of any nature to Woody Island by a Native person, coupled with the desire to someday return to Woody Island, magically transformed that Native person into a "permanent resident" of Woody Island. The ALJ summarizes these contentions at AR Tab E, pp. 40-42, but concludes at p. 42 that, "The problem with the approach of Respondents and their experts is that it deviates from the statutory, regulatory, and precedential guidance as to what constitutes a Native village and a permanent resident thereof." The "precedential guidance" was offered by the Ninth Circuit in litigation between these very parties. See Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1068-71 (9th Cir. 1998) ("This conclusion, however, does not end our inquiry. We must still determine exactly where the boundaries [of the Native village] lie. Are the boundaries marked by the Native village's historical use, as Leisnoi contends, or occupancy of the land, as Stratman contends? * * * Thus, in the Secretary's view, the "boundaries of a[ ] Native village" are defined by reference to this physical evidence of occupancy. * * * [W]e do not hold the Secretary's interpretation unreasonable. The "boundaries of a[ ] Native village" are defined by occupancy, not historical use.").

was no "investigation" at all, as the ALJ found and fully discussed at pp. 27-30 of his recommended decision.

The ALJ had evidence before him, although not specifically discussed in his Recommended Decision or the IBLA decision, of Koniag's fraudulent scheme to acquire land and money.[9]

The outcome before the Agency was unequivocal. And, as appears from a reading of the ALJ's recommended decision and IBLA's decision as well, and as will be further driven home when the Court reviews the factual record generated before the Agency, the Agency's findings and determinations easily meet the "substantial evidence" test demanded by the APA.

**C.    Incorporation of other briefs and arguments by reference.**

Mr. Stratman has filed, at Docket No. 162, "Straman's Opposition to: 1) Leisnoi's Motion to Dismiss at Docket No. 109 (re: Lack of Subject Matter Jurisdiction, Statute of Limitations), and Partial Opposition to: 2) Leisnoi's Motion to Dismiss at Docket No. 107 (Standing), and 3) Leisnoi's Motion to Dismiss at Docket No. 118-1 (Administrative Finality). Therein, Mr. Stratman discusses at length the nature and basis of his action as an APA action[10] and, under the law of this Circuit, this 2002 action is nothing more than a continuation of A76-0132 CV (JKS).[11]  Mr. Stratman sets forth the grounds and legal basis

_____

[9]See, for example, Mr. Stratman's Exhibit 30g attached hereto using the same exhibit designation. Mr. Stratman has moved separately (Docket No. 177) for an order directing the Federal defendant to file the complete Administrative Record generated as a consequence of the administrative trial that began approximately August 3, 1998.

[10]Id. beginning at p. 4.

[11]Id. beginning at p. 9.

for his APA claim, and the nature and legal effect of the orders of this Court issued in the 1976 case under the provisions of, and within the framework of, the Administrative Procedures Act.[12] Mr. Stratman discusses that the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) provides, consistent with the law of the Ninth Circuit, the very remand made by this Court to the Agency for the purpose of exhausting administrative remedies.[13] He explains therein this Court's authority to defer vacation of the Secretary's 1974 eligibility decision pending the issuance of the Agency's new decision on remand, as well as this Court's mandatory duty to set aside the Agency's original 1974 decision when the proceedings on remand alter that decision, as they have in this case.[14] The remanded Agency decision concluding that Leisnoi is, and has always been, "a phantom of the Secretary's imagination," stands so long as the decision satisfies the review standards applicable to Administrative Procedure Act claims.[15] Mr. Stratman now requests that this Court consider this brief at Docket No. 162 in its entirety, as well as specific portions referred to immediately above in considering the request he makes by this motion.

Additionally, Mr. Stratman has filed this date, at Docket No. 171, a brief illustrating why, employing controlling precedent from the United States Supreme Court and the Ninth Circuit Court of Appeals, the Secretary's epistle of December 2006 is entitled to no deference (indeed, the "deference" issue is never reached), or if entitled to some slight

---

[12]Id. beginning at p. 22.

[13]Id., generally, at pp. 22-42.

[14]Id., generally, and specifically, pp. 29-42.

[15]Id. and 5 U.S.C. § 706(2)(E) setting forth the supported "by substantial evidence" standard for testing the validity of Agency factual findings.

deference, may not stand, and must be reversed, under the facts, circumstances, and statutory provisions relevant in these proceedings. Mr. Stratman incorporates this briefing at Docket No. 171 filed this date by reference as if set forth in full.

> **D.    Stratman is entitled to judgment vacating the Department's 1974 certification of Leisnoi as an eligible Native village, and rescinding the conveyances of lands and other settlement benefits that were unlawfully conveyed to it under ANCSA.**[16]

In the event this Court affirms the Department's new determination of Leisnoi's eligibility issued by IBLA on remand, Stratman would be entitled to a judgment setting aside Leisnoi's certification as an eligible Native village, and rescinding the lands and other benefits that were unlawfully conveyed to it under ANCSA.

This action constitutes a continuation of the judicial proceedings in Stratman I, which culminated in an order remanding the matter to IBLA for redetermination of Leisnoi's eligibility after providing a curative hearing to Stratman.   The purpose of Stratman's new action is to "clean up any leftovers" remaining from Stratman I.  Segal v. American Telephone & Telegraph, Co, Inc., 606 F.2d 842, 846 (9th Cir. 1979).   In this case, the "leftovers" from Stratman I include the issuance of the relief that was originally sought in Stratman I, including the vacation of the Department's original decision approving Leisnoi's application for eligibility, and the restoration to the United States of the lands and benefits that were unlawfully conveyed to Leisnoi under ANCSA.

Stratman is entitled to a judgment vacating the Department's original decision

---

[16]Mr. Stratman, in this motion, at this time, seeks no more than vacation of the 1974 eligibility decision and affirmation of IBLA's decision on remand.  Per informal agreement with other parties, we defer a request for specific additional remedies until a later date.

approving Leisnoi's application for eligibility, on two separate grounds.  First, Stratman is entitled to a judgment setting aside the Department's decision on the ground that it violated "the procedures required by law" in making its decision, based on its failure to provide Stratman with the required notice and opportunity to participate in the Department's original proceedings regarding Leisnoi's application.  Section 706(2)(D) of the APA provides that the reviewing court "*shall* . . . hold unlawful and *set aside* agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  5 U.S.C. § 706(2)(D) (emphasis added).  The District Court in <u>Stratman I</u> exercised its equitable authority to maintain the status quo, and deferred vacating the Department's decision pending the completion of the remanded agency proceedings.  However, now that the remanded agency proceedings have been completed, and IBLA has issued a new decision reversing the Department's original determination of Leisnoi's eligibility, the Court can no longer defer its mandatory duty to vacate the Department's original decision on the ground that it was issued in violation of the "procedures required by law" under Section 706(2)(D).

Stratman is also entitled to the vacation of the Department's original decision, on the merits, based on IBLA's determination on remand that Leisnoi was not qualified for eligibility as an unlisted Native Village.  IBLA's new decision establishes that Leisnoi was not entitled to eligibility as an unlisted Native Village, and that Depart's original decision approving Leisnoi's application for eligibility had been unlawful, and contrary to village eligibility requirements established by Congress in ANCSA.  Stratman is therefore entitled to a judgment setting aside the Department's certification of Leisnoi as an eligible Native Village.

### 1)    *Relief is mandatory.*

The issuance of this relief by the District Court is mandatory under the APA. As discussed below, when an agency's action has been determined to be unlawful under the governing statute, the Court has no discretion or equitable authority under the APA to *not* issue a remedy, and must issue whatever relief is necessary in order to enforce the statute, and remedy the agency's violation.

This is illustrated by the Ninth Circuit's decision in <u>Biodiversity Legal Foundation v. Badgley</u>, 309 F.3d 1166 (9th Cir. 2002). <u>Biodiversity</u> involved an APA action by an environmental organization against the Department of Fish and Wildlife challenging its failure to issue determinations on petitions filed by the organization to list certain species as endangered, within the statutory 12-month deadline provided for the Department to make such determinations by the Endangered Species Act ("ESA"), 16 U.S.C. § 1533. As relief, the organization sought an injunction requiring the Department to issue the required determinations. The Ninth Circuit held that Department's failure to comply with statutory 12-month deadline constituted "agency action unlawfully withheld" under the APA, and held that the district court had a mandatory duty under the APA to issue the requested injunction. In so doing, the Court rejected the Department's contention that the District Court had the equitable authority to not issue the injunction:

> Appellants brought this claim under both the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Endangered Species Act's citizen suit provision, 16 U.S.C. § 1654(c) & (g). Persuaded by the Tenth Circuit's ruling in <u>Forest Guardians v. Babbitt</u>, 174 F.3d 1178, 1187 (10th Cir.1999), the district court implicitly held that the grant of injunctive relief was authorized under the

judicial review sections of the APA.  The district court adopted the following <u>Forest Guardians</u> holdings: (1) "when the Secretary fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action"; and (2) the APA "requires the court to issue an injunction when the Secretary misses deadlines under the ESA."  <u>See</u> <u>id.</u> at 1991.  The district court then issued an injunction requiring the Service to make the requested final determinations.

The Service posits that the district court erred in its ruling that the court lacked discretion to refrain from granting injunctive relief. . . .

The APA provides the judicial standard of review in this case.  <u>Envtl. Prot. Info. Ctr. v. Simpson Timber Co.</u>, 255 F.3d 1073, 1078 (9th Cir.2001).  "Under the APA, a court may set aside an agency action if the court determines that action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or without observance of procedure required by law."  <u>Id.</u> (citations and internal quotation marks omitted).

As discussed above, Congress imposed a twelve-month deadline for final determinations under the ESA.  "Congress intended the petitioning process to interrupt [] the department's priority system by requiring immediate review.  <u>Norton</u>, 254 F.3d at 850 (citation, internal quotation marks and emphasis omitted).  The Service's failure to comply with the twelve-month deadline is not in accordance with the ESA, the governing law.

Appellees correctly assert that a statutory violation does not always lead to the automatic issuance of an injunction.  <u>See</u> <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).  However, a review of Supreme Court precedent reveals that, when federal statutes are violated, the test for

-10-

determining if equitable relief is appropriate is whether an injunction is necessary to effectuate the congressional policy behind the statute.  See TVA v. Hill, 437 U.S. 153, 194, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

In TVA, the Supreme Court examined a violation of Section 7 of the ESA and did not balance the equities.   Id. at 193-95, 98 S.Ct. at 2279. Instead, the Court ruled that effectuating Congress' clear intent required issuance of an injunction, regardless of the equities involved. Id.  Similarly, in Sierra Club v. Marsh, 816 F.22d 1376, 1383 (9th Cir.1987), we noted:

In Congress' view, projects that jeopardize the continued existence of endangered species threatened incalculable harm: accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species.  We may not use equity's scales to strike a different balance.

Id.  (citation omitted).

While neither this court nor the Supreme Court has yet ruled that an injunction must issue when the Service fails to comply with Section 4 of the ESA, as it has violations of Section 7, Congress' purpose for passing the ESA applies to both provisions.  Regardless of whether the Service failed to comply with Section 7 or Section 4 of the ESA:

Congress has established procedures to further its policy of protecting endangered species.  The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection.  Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature.

-11-

Id. at 1384.

> In TVA, the Supreme Court held that the clear objectives and language of Congress in passing the ESA removed the traditional discretion of courts in balancing the equities before awarding injunctive relief. "Congress has spoken in the plainest of words, making it abundantly clear that the balance [of equities] has been struck in favor of affording endangered species the highest of priorities." TVA, 437 U.S. at 194, 98 S.Ct. 2279. Subsequent Supreme Court cases reinforced the holding of TVA and solidified the rule that, in the context of the ESA, Congress [has] foreclosed the exercise of the usual discretion possessed by a court of equity." Weinberger, 456 U.S. at 313, 102 S.t. 1798; see also Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 543 n. 9, 544-45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

Id. at 1176-78 (footnotes omitted).[17]

The Supreme Court further explained the application of these principles in its recent decision in U.S. v. Oakland Cannabis Buyers' Co-Op, 532 U.S. 483, 121 S.Ct. 1711 (2001). Oakland Cannabis involved an action brought by the federal government to enjoin the sale of marijuana for medicinal purposes in accordance with an initiative enacted by the State of California. The District Court held that the initiative violated the provisions of the Controlled Substances Act, and issued an injunction prohibiting the sale of marijuana for

---

[17]ONRC Action v. BLM, 150 F.3d 1132, 1137 (9th Cir. 1998) ("Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform[,]" quoting Marathon Oil Co. v. Lujan, 937 F.2d 498, 500 (10th Cir. 1991).)  See also Kidd v. U.S. Dept. Of Int., Bureau of Land Manag., 756 F.2d 1410, 1412 (9th Cir. 1985) ("Congress' constitutional power over the proper administration and disposition of the public lands is without limitation.  Once Congress has acted in that regard, both the courts and the executive agencies have no choice but to follow strictly the dictates of such statutes[,]" citing United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662 (1947).)

medicinal purposes.  532 U.S. at 488, 121 S.Ct. 1711.  On appeal, the Ninth Circuit

modified the District Court's injunction to allow for an exception based on a "medical

necessity defense."  Id.  The Supreme Court reversed the Ninth Circuit, holding that it had

no authority to recognize such a defense.  Id. at 489-95, 121 S.Ct. 1711.  The Court held

the Ninth Circuit had no equitable discretion to weigh the harm caused to seriously ill

persons by enforcing the Controlled Substances Act, in issuing the injunction, because "the

balance has already been struck against a medical necessity exception" in the Controlled

Substances Act.  532 U.S. at 499-500, 121 S.Ct. at 1722.  In so ruling, the Court clarified

the scope of the courts' equitable discretion in remedying a violation of a federal statute.

The Court emphasized that the courts have a mandatory duty to enforce federal statutes

"when[ever] enforcement is sought," and lack the discretion to consider the advantages and

disadvantages of nonenforcement of the statute, or the impact caused by the statute's

enforcement on the public interest or the conveniences of the parties.  The Court also held

that the courts have a mandatory duty to issue injunctive relief, if an injunction is the only

means by which the statute can be enforced:

> [T]he mere fact that the District Court had
> discretion does not suggest that the District
> Court, when evaluating the motion to modify the
> injunction, could consider any and all factors that
> might relate to the public interest or the
> conveniences of the parties, including the
> medical needs of the Cooperative's patients.  On
> the contrary, a court sitting in equity cannot
> "ignore the judgment of Congress, deliberately
> expressed in legislation."  Virginian R. Co. v.
> Railway Employees, 300 U.S. 515, 57 S.Ct. 592,
> 81 L.Ed. 789 (1937).  A district court cannot, for
> example, override Congress' policy choice,
> articulated in a statute, as to what behavior

should be prohibited. "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." Hill, 437 U.S. at 194, 98 S.Ct. 2279. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute. Id. at 194-195, 98 S.Ct. 2279. Their choice (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over another permissible means; their choice is not whether enforcement is preferable to no enforcement at all. Consequently, when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of "employing the extraordinary remedy of injunction," Romero-Barcelo, 456 U.S., at 312, 102 S.Ct. 1798, over the other available methods of enforcement. Cf. id., at 316, 102 S.Ct. 1798 (referring to "discretion to rely on remedies other than an immediate prohibitory injunction"). To the extent the district court considers the public interest and the convenience of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms.

532 U.S. at 498-99, 121 S.Ct. at 1721-22 (footnote omitted).

The application of these principles in APA actions is further illustrated by the District Court's decision in Center for Biological Diversity v. Pirie, 201 F.Supp. 113 (D.D.C. 2002). Pirie involved an APA action brought by an environment group against the Secretary of the Navy to enjoin the military's use of an island in the Pacific Ocean for live fire training exercises. The action alleged that the exercises violated the provisions of the Migratory Bird Treaty Act ("MBTA"), because they resulted in the killing or harming of

-14-

several species of migratory birds without a permit.  The District Court held that military exercises violated the MBTA, and issued an injunction enjoining the military from conducting any further exercises until it obtained a permit.  The District Court rejected the Navy's contention that it had the discretion to not issue the injunction, in view of the impact that it would have on national security.  The Court noted that, under the Supreme Court's decisions, it had no discretion to recognize a "national security" exception to the MBTA, and had a mandatory duty to order whatever relief was necessary in order to effect the military's compliance with the Act.  Because the injunction was only means of effectuating the military's compliance, the Court concluded that it had no discretion but to issue the injunction:

> In 2001, the Supreme Court clarified the scope of a court's equitable discretion to remedy a statutory violation.  Oakland Cannabis Buyers', 542 U.S. at 497, 121 S.Ct. 1711.  If, after examining a statute to determine whether Congress has restricted the traditional equitable discretion, a court concludes that discretion remains, the court can *not* exercise its discretion to provide no relief.  "Consequently, when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of employing the extraordinary remedy of injunction over other available methods of enforcement."  Id. at 498, 121 S.Ct. 1711 (citing Weinberger, 456 U.S. at 311, 102 S.Ct. 1798) (emphasis in original).  The Court further explained, "[t]o the extent that the district court considers the public interest and conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms."  Id.  A court sitting in equity can not choose to

-15-

grant no relief because "a court sitting in equity cannot ignore the judgment of Congress deliberately expressed in legislation. . . . A district court, cannot, for example, override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." Id. at 497, 121 S.Ct. 1711 (citation omitted). . . .

Thus, prior to considering the balance of the equities in this case, the Court should determine the scope of the possible remedies available to be considered.   Supreme Court precedent is clear that the range of potential remedies considered by a district court must include only remedies aimed at securing prompt compliance with the statute being violated by defendants. In Weinberger, after holding that Congress had not limited equitable discretion under the FWPCA, the Court then held:   "Rather than requiring a district court to issue an injunction for any and all statutory violations, the FWPCA permits the district court to order that relief it considers *necessary to secure prompt compliance with the Act.*  That relief can include, but is not limited to, an order of immediate cessation."   456 U.S. at 320, 102 S.Ct. 1798 (emphasis added); see also Oakland Cannabis Buyers', 532 U.S. at 497, 121 S.Ct. 1711.   Regardless of the balance of equities at stake here and contrary to defendant's assertions at oral argument, this Court can not decide to offer plaintiff no relief.

The facts of this case are such that an injunction halting all military activities on FDM is the only option that will ensure compliance with the APA and MBTA. . . .

Thus, the only option available that this Court can with any confidence say will ensure compliance with the mandates of the APA and the MBTA is ordering a halt to all military activities on FDM.  As explained in Oakland Cannabis Buyers', "[t]o the extent the district court considers the public interest and the

-16-

conveniences of the parties, the court is limited to evaluating how such interest and conveniences are affected by the selection of an injunction over other enforcement mechanisms." 532 U.S. at 498, 121 S.Ct. 1711. Here, this Court is presented with one, and only one, viable option for enforcing the requirements of these statutes.

Id. at 119-122 (footnote omitted, emphasis in original).

In accordance with these principles, the District Court in this case has no discretion but to issue whatever remedy is necessary in order to enforce ANCSA's village eligibility requirements, and to remedy violation of these requirements by the Department when it unlawfully certified Leisnoi as an eligible Native Village. In fashioning this relief, the Court cannot weigh the advantages and disadvantages of not enforcing ANCSA's village eligibility requirements, or not enforcing IBLA's new determination that Leisnoi did not satisfy these requirements. It can only weigh the advantages and disadvantages of employing the "extraordinary remedy of injunction" over other available methods of enforcement.

Here, as in Center for Biological Diversity v. Pirie, supra, the issuance of injunctive relief is the only effective means of enforcing ANCSA's village eligibility requirements. As noted above, the test for determining whether injunctive relief is appropriate is "whether an injunction is necessary to effectuate the congressional purposes behind the statute." Biodiversity Legal Foundation v. Badgley, supra. 309 F.3d at 1177. Here, the congressional purpose behind ANCSA was to settle all Alaska Native aboriginal claims, by establishing a framework for the distribution of land and settlement benefits to Native individuals based on individual, village, and regional entities. The congressional

-17-

purpose behind ANCSA's village eligibility requirements was to restrict the distribution of land and settlement benefits to only those villages that satisfied the criteria established by Congress in ANCSA. Consequently, its corollary purpose was to ensure that ANCSA's settlement benefits would *not* be given to any "village"that did not satisfy the requirements adjudged by Congress to be necessary in order to participate in ANCSA and share in its settlement for aboriginal claims.  This purpose can only be effectuated by issuing whatever relief is necessary, including declaratory and injunctive relief, to "decertify" Leisnoi, and prohibit it from receiving any additional ANCSA benefits, and to restore to the public domain the lands and other settlement benefits that unlawfully conveyed to it under ANCSA.[18]

In this case, injunctive relief is necessary in order to effectuate Leisnoi's "decertification" by the Department, in addition to an order setting aside its certification, because the Department has taken the position that IBLA's new determination regarding Leisnoi's eligibility is not binding on it, and that it will continue to recognize Leisnoi as an eligible Native Village in its ongoing administration of ANCSA.   Consequently, the Department must be ordered to officially "decertify" Leisnoi as an eligible Native Village, and to make any required adjustments, and take whatever administrative actions may be necessary, to effectuate Leisnoi's change of status in its administration of ANCSA.


2)      ***"Time, time, time . . . see what's become of me . . .."***[19]

Leisnoi and the Department have both previously argued that, regardless of

---

[18]Again, at this time, we ask only that Leisnoi be "decertified" by the Court and declared not entitled to further ANCSA benefits.

[19]Simon and Garfunkel, *A Hazy Shade of Winter*, P. Simon, 1966.

IBLA's decision on remand, Leisnoi's status as an eligible Native Village should not be disturbed in view of the length of time that has now passed since it was certified. Leisnoi has quoted Congress' statement of findings and declaration of policy in ANCSA Section 2(b) for the proposition that ANCSA was intended to settle the Alaska Natives' aboriginal land claims "rapidly, with certainty" and "without litigation." 43 U.S.C. § 1601(b). The Department has also previously argued that the government's "compelling interest" in the "speedy and certain determination of [village] eligibility" outweighs any interest in redetermining Leisnoi's status. See Stratman I, "Federal Defendant's Motion for Summary Judgment on Threshold Issues", Docket No. 249, pp. 20-22. Defendants have also argued that decertifying Leisnoi would be unduly burdensome to both the Department and Leisnoi's shareholders, by requiring the Department to redetermine and re-enroll Leisnoi shareholders to other village and regional corporations, and redetermine its distribution of ANCSA settlement benefits.

However, as set forth above, the Court has a mandatory duty to issue whatever relief is necessary in order to enforce ANCSA's village eligibility requirements, and cannot consider the advantages and disadvantages of not enforcing them, or the impact that their enforcement would have on the public interest or the convenience of the parties. The court cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." U.S. v. Oakland Cannabis Buyers' Co-Op, 532 U.S. at 498, 121 S.Ct. at 1721. Here, in enacting ANCSA's village eligibility requirements, Congress has articulated the clear policy choice that only those "villages" that satisfy ANCSA's requirements for eligibility can participate in ANCSA and receive its land and

settlement benefits. The Court cannot override this policy choice, or "use equity's scales to strike a different balance," Biodiversity Legal Foundation v. Badgley, 309 F.3d at 1177.

Nor would the considerations argued by Leisnoi and the Department outweigh the interests in enforcing ANCSA's village eligibility requirements, even if the Court had the discretion to consider them.

That a long time has passed since Leisnoi was unlawfully certified does not provide a legal or equitable basis for allowing its unlawful certification to remain standing. Leisnoi correctly notes that ANCSA was intended by Congress to settle Native aboriginal claims "rapidly" and "with certainty." However, Congress also took care to ensure that only qualified Native villages would be granted eligibility, and provided that the determination of their eligibility was also to be made with care and "certainty." As discussed below, Congress did this by requiring the Secretary of Interior to make individual determinations of eligibility, after conducting an investigation and making specific findings of fact, for each village that sought recognition under ANCSA as an eligible Native Village. It then authorized actions for judicial review of the Secretary's eligibility determinations, in APA actions brought by persons "aggrieved" by the Secretary's determination, including this action. In so doing, Congress "struck a balance" in favor of the strict enforcement of ANCSA's village eligibility requirements, including their enforcement in actions such as this one, over the competing interest of providing a "rapid" and "certain" determination of a village's eligibility.

The Secretary's regulatory scheme for making village eligibility determinations was consistent with this purpose, and also struck a balance in favor of the careful

-20-

enforcement of ANCSA's village eligibility requirements over speed and certainty.  As noted

by the Court in <u>Koniag, Inc. Village of Uyak v. Andrus</u>, 580 F.2d 601 (D.C.Cir. 1978), the

Secretary's regulatory scheme also relied on protests filed by "aggrieved" third parties such

as Stratman, and was designed to allow the Secretary to make a more careful and

informed determination of a village's eligibility in the more difficult and disputed cases.  In

ruling that a protestant's standing to challenge the Secretary's village eligibility

determinations must be liberally construed in order to effectuate the Secretary's

enforcement scheme, and Congress' purpose, the Court explained:

> The Court is particularly reluctant to deny standing to those most likely to in fact to have a legitimate concern about these lands and to come forward to protect the public interest, especially where the effect of finding standing is simply to allow adversary proceedings to be held which, if properly conducted, could contribute to fair and informed decision making. . . .
>
> Congress sought to quiet the Native land claims in Alaska justly and expeditiously, so that the State's development could proceed. At the same time Congress took care to assure that grants of public lands would be made only to eligible Native groups by requiring the Secretary to review the eligibility of each village. Over two hundred villages were involved. Although many findings could be perfunctory because eligibility was clear, the eligibility of some villages was in dispute.   It is apparent that the Secretary intended the area director of the BIA to settle the easy, undisputed cases, but when a party was adversely affected by the area director's determination, the Secretary would make his own eligibility determination after more elaborate fact-finding in the three-tiered appeal process. A necessary corollary to this scheme is that the term "party aggrieved" must be construed

> generously to achieve the congressional
> objective that determinations be careful as well
> as quick. We conclude, therefore, that grafting
> strict judicial standing requirements onto these
> regulations would be inconsistent with the Act
> and the Secretary's plan to implement it.

Id. at 605-06 (citation omitted).

That the Secretary's regulatory scheme elevated the interests in making a careful and deliberate determination of a village's eligibility in disputed cases, over the interests of speed and finality, is further demonstrated by Secretarial Order No. 2965, in which the Secretary waived the deadline for making village eligibility determinations. ANCSA Section 11(b) provided that the Secretary was to review and determine the eligibility of all listed and unlisted villages within two and one-half years from the date of ANCSA's enactment (December 18, 1971). 43 U.S.C. § 1610(b)(2) & (3). On June 10, 1974, the Secretary issued Secretarial Order No. 2965, an order concluding that ANCSA's deadline was directory rather than mandatory, and directing the Department to continue with its adjudication of all pending village eligibility appeals. The order stated that "it has been decided to provide an opportunity for a full hearing to all parties in all disputes now or hereafter pending before the Alaska Native Claims Appeals Board concerning Native Village eligibility," and that "[t]his decision has been made in order to provide all parties due process of law and in order to develop a complete record so that the final secretarial determination of Native Village eligibility will be as correct, fair and just as possible." Ex. 1 at 1. The order also provided that it superseded any inconsistent provisions in the Department's regulations. Ex. 1 at 2.

The Secretary's order applied to all village eligibility disputes "now or

*hereafter* pending" before the Department, and demonstrates that Secretary's regulatory scheme was intended to provided for the careful and deliberate determination of village eligibility, through normal adjudicative procedures, including a full hearing in contested cases, rather than a summary and conclusive determination of eligibility, in the interests of providing a quick and certain determination of a village's eligibility.

Congress similarly provided for the careful and deliberate determination of a village's eligibility, as opposed to a summary determination in the interests of rapidity and certainty.  As noted above, it did this by requiring the Secretary to make individual determinations of eligibility for each village, and by authorizing actions for judicial review of the Secretary's eligibility determinations pursuant to the usual procedures for challenging the validity of an agency's action under the APA.  This is demonstrated by 43 U.S.C. § 1632, which established a two-year statute of limitations specifically for actions seeking judicial review of the Secretary's determinations under ANCSA. 43 U.S.C. § 1632 provides, in relevant part:

> **Statute of limitations**
> (a) Except for administrative determinations of navigability for purposes of determining ownership of submerged lands under the Submerged Lands Act, a decision of the Secretary under this chapter or the Alaska Native Claims Settlement Act shall not be subject to judicial review unless such action is initiated before a court of competent jurisdiction within two years after the day the Secretary's decision becomes final or December 2, 1980, whichever is later: Provided, That the party seeking such review shall first exhaust any administrative appeal rights.

Id.

-23-

Section 1632 was enacted by Congress as an amendment to ANCSA on December 2, 1980, as part of the Alaska National Interest Lands Conservation Act (ANILCA). As such, it acknowledged that all of the decisions that had been previously issued by the Secretary under ANCSA, including the Secretary's village eligibility determinations, were subject to actions for judicial review. It also expressly authorized such actions, and provided that such actions could still be filed up until December 2, 1980.[20]

Congress thus chose to strike a balance in favor of the careful and deliberate determination of a village's eligibility, and the strict compliance and enforcement of ANCSA's eligibility requirements, over the competing interests of "rapidity" and "certainty" in determining a village's eligibility. If Congress had wanted to strike a balance in favor of rapidity and certainty, it would have provided that the Secretary's village eligibility determinations were conclusive, just as it did with the Secretary's determinations of the eligibility of individual Natives. See 43 U.S.C. § 1602(b) ("Any decision of the Secretary regarding eligibility for enrollment shall be final"). Instead, it expressly authorized actions for judicial review of the Secretary's village eligibility determinations, as an additional safeguard and means for enforcing ANCSA's village eligibility requirements.

The fact that many years have passed since Leisnoi was originally certified

---

[20] Ordinarily, the statute of limitations for filing an APA action for judicial review of an agency's decision is six years from the date the decision became final. See e.g. Wind River Mining Corp. v. United States, 946 F.2d 710 (9th Cir. 1991) (six-year statute of limitations provided in 28 U.S.C. § 2401 for civil actions against the United States applies to APA actions). By enacting Section 1632, Congress instead established the fixed date of December 2, 1980 as the deadline for filing actions for judicial review of the decisions made by the Secretary under ANCSA before December 2, 1978 (i.e., the date two years prior to the fixed limitations date of December 2, 1980), and a two-year limitations period for decisions made by the Secretary under ANCSA after December 2, 1978.

is irrelevant.  Stratman's action was filed in 1976, less than two years after the Department

approved Leisnoi's application for eligibility– and more than *four years* before the expiration

of the statute of limitations specifically established for such actions in 43 U.S.C. § 1632.

The fact that many years have passed since Stratman's action was originally

filed is also irrelevant.  As noted above, Congress expressly authorized actions for judicial

review of the Secretary's village eligibility decisions.  As such, Congress recognized and

expected that such actions would delay the final determination of a village's eligibility, and

chose to allow for this delay as a trade-off for the proper enforcement of ANCSA's eligibility

requirements.  Other actions for review of the Secretary's ANCSA eligibility determinations

have also resulted in the delay in the issuance of a final determination of eligibility.  For

example, in the Ninth Circuit's 1990 decision in <u>Chugach Alaska Corp. v. Lujan</u>, 915 F.2d

454 (9th Cir. 1990), the Court reviewed the Secretary's decision to deny an application for

eligibility of a Native Group.  The Native Group had filed its application for eligibility in 1976.

<u>Id.</u> at 456.  The Secretary denied its application on the ground that the majority of residents

in the group's locality were not members of the group, as required by ANCSA.  The group

then brought action in District Court for judicial review of the Secretary's decision, claiming

that the Secretary had improperly excluded persons who should have been counted as

members of the group, based on the Secretary's erroneous interpretation of ANCSA's

eligibility requirements.  The district court agreed that the Secretary's interpretation of the

eligibility requirements had been erroneous, and remanded the case to IBLA for further

proceedings.  <u>Id.</u> at 456.  The Secretary then filed an interlocutory appeal for review of the

district court's order of remand.  After concluding that it had jurisdiction over the Secretary's

appeal under the collateral order doctrine, the Ninth Circuit reversed the district court, and upheld the Secretary's decision as a reasonable interpretation of ANCSA's eligibility requirements.[21]  The Court then remanded with instructions for the district court to enter judgment for the Secretary.

Even more significant is the Ninth Circuit's 1995 decision in <u>Minchumina Natives, Inc. v. U.S. Department of Interior</u>, 60 F.3d 1363 (9th Cir. 1995), in which the Court held that the Secretary's eligibility determination, determining that a Native Group was not eligible, should be vacated and remanded to IBLA for redetermination in additional agency proceedings.  The Native Group had filed its application for eligibility in 1976.  <u>Id.</u> at 1366.  The BIA had initially determined that the Native Group was eligible.  It decision was then protested by non-Native residents in the area, on the ground that they would be adversely affected by the Native Group's land selections.  <u>Id.</u>  After conducting a hearing, the ALJ reversed the BIA's decision and determined that the group was not eligible.  The ALJ's decision was then appealed to IBLA, which determined that the group was not eligible after conducting a <i>de novo</i> review.  <u>Id.</u>  The Native Group then filed an action for judicial review of IBLA's decision, in the District Court for the District of Alaska.  The group claimed that IBLA had improperly redrawn the boundaries of its locality to include a non-Native residence, which disqualified the group from eligibility on the ground that it did not comprise

---

[21] The Court held that, even though the district court's order of remand was not a final decision, it had jurisdiction to review the district court's ruling invalidating the Secretary's statutory interpretation, under the recognized exception in cases where: "(1) the district court conclusively resolves a separable legal issue, (2) the remand order forces the agency to apply a potentially erroneous rule which may result in a wasted proceeding, and (3) review would, as a practical matter, be foreclosed if an immediate appeal were unavailable."  <u>Id.</u> at 457.

a majority of the residents in its locality, as required by ANCSA. The group argued that, in determining the boundaries of its locality, IBLA had improperly considered whether the occupants of the non-Native residence would be adversely affected by the Native Group's land selections. The District Court agreed that IBLA had erred in considering this factor, but went on to uphold IBLA's decision based on the court's own determination that the residence was properly included in the group's locality under the "relative proximity" test employed by the Board in other cases. Id. at 1366. On appeal, the Ninth Circuit held that the District Court had correctly determined that the Board had erred in considering the impact of the Native Group's land selections in determining whether the non-Native residence was included in the group's locality, but that the District Court had exceeded its authority in upholding IBLA's decision based on its own determination of the boundaries of the group's locality, and that the matter should have instead been remanded to IBLA for redetermination. Id. at 1369. The Court concluded by *vacating* IBLA's decision and instructing the district court to remand the matter to IBLA for redetermination of its decision:

> The Board's inclusion of the Holmes residence in the locality rests, at least in part, on an improper factor and must be reconsidered. Reconsideration of that inclusion may also necessitate reconsideration of the FAA site. Accordingly, we reverse the judgment of the district court, and vacate the Board's decision. We remand the matter to the district court with instructions to remand it to the Interior Board of Land Appeals for further proceedings consistent with this opinion..

Id. at 1369.

The Ninth Circuit's decision in Minchumina, directing the district court to

remand the Native Group's challenge back to IBLA for redetermination of its eligibility, was issued the same year that Stratman's challenge was remanded back to IBLA by the District Court in Stratman I for redetermination of Leisnoi's eligibility.

### 3)   *The unusual procedural history of this case is irrelevant.*

That fact that Stratman's action has had an usual procedural history, and has taken longer to adjudicate than the ordinary case, is also irrelevant.  Like any other action, Stratman's action must be viewed and determined as of the date it was filed, in 1976.  See Central Coun. of Tlingit & H. Ind. v. Chugach Native Ass'n, 502 F.2d 1323, 1326 (9th Cir. 1974). The delay in this case was occasioned by a number of things, but none of them standing alone, or in combination, alters the rule that Stratman's action must be determined as of the date it was originally filed. As in Minchumina, the delay in determining Stratman's APA action is not a cognizable ground for denying relief.

As set forth above, most of the delay in this case is attributable to the period that the action was dismissed pursuant to the parties' settlement. However, Stratman is not chargeable with this delay, nor does it alter the rule that his action must be evaluated and determined as of the date it was originally filed in 1976.  In its decision reversing the District Court's denial of Stratman's motion for relief from judgment, the Ninth Circuit held that Stratman was entitled to the vacation of the stipulated dismissal, and to have his action reopened, based on the failure of the parties' settlement agreement following its repudiation by Leisnoi, and Stratman's unsuccessful action for its specific enforcement.   Stratman v. Babbitt, Leisnoi and Koniag, Inc., No. 93-36006, Memorandum Decision of December 5, 1994, generally, and at pp. 7-8 thereof. Once the action was reopened, Stratman's action

-28-

was restored to the status quo that existed as of the date of its dismissal in 1982.  See Arnold v. U.S., 816 F.2d 1306, 1309 n. 3 (9th Cir. 1987); Fairfax Countywide Citizens v. Fairfax County, 571 F.2d 1299, 1305-06 (4th Cir. 1978).  If anything, the delay caused by the dismissal and subsequent reopening of Stratman's action is attributable to Leisnoi's own conduct in repudiating the parties' settlement agreemnt after obtaining the benefit of the action's dismissal.  As the Ninth Circuit noted in its decision reversing the denial of Stratman's motion for relief from judgment, Leisnoi sought "to secure a Panglossian result for itself," by holding Stratman to his agreement to dismiss the action while avoiding its own obligations under the settlement agreement.  Stratman, Memorandum Decision, at p. 8.

The balance of the delay in this case is attributable to the ordinary processes of adjudication and appeal, and is the type of delay that is inherent in any action.  Because this case involved several dispositive decisions that were ultimately reversed on appeal and remanded for further proceedings, it simply required more time to adjudicate than the usual case.  If the District Court had simply remanded Stratman's challenge to IBLA when the action in Stratman I was originally filed in 1976, instead of proceeding with a trial de novo, this action could have been determined in a relatively short period of time.  Additional delay was caused by the erroneous dismissal of Stratman's action following Leisnoi's relinquishment, on the eve of trial, of the lands on which Stratman held grazing leases, necessitating an appeal for its reversal.  Additional delay was caused by the erroneous denial of Stratman's motion to reopen the action following the failure of the parties' settlement agreement, necessitating another appeal to obtain its reversal.  The final source of delay was the eleven years it took the Department to adjudicate Stratman's challenge

in the remanded agency proceedings.

Because Congress has already "struck a balance" in favor of the strict enforcement of ANCSA's village eligibility requirements, including their enforcement in actions such as this one, the Court cannot "use equity's scales to strike a different balance" based on the interests of "rapidity" and "certainty" in determining Leisnoi's eligibility.

### 4)    The administrative burden on the Agency is irrelevant.

Nor can the Court use equity's scales to strike a different balance on the ground that Leisnoi's decertification would be unduly burdensome to the Department and Leisnoi's shareholders.  As noted above, the Court has no discretion to consider the impact caused by the enforcement of ANCSA's village eligibility requirements on the "conveniences of the parties." U.S. v. Oakland Cannabis Buyers' Co-Op, 532 U.S. at 498–99, 121 S.Ct. at 1721-22.  The Tenth Circuit rejected a similar argument in Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999), which involved an APA action brought by an environmental group to compel the Secretary of Interior to designate critical habitat for an endangered species, where the statutory deadline for the Secretary to do so had already expired.  The Court held that Secretary's failure to designate the habitat constituted agency action unlawfully withheld within meaning of the APA, and that the district court had a duty under the APA to issue the requested injunction.  In so ruling, the Court rejected the Secretary's contention that the injunction should not be issued, and that the Court should excuse his failure to comply with the statute, due to the Secretary's "impossibility of compliance" based on "unavailable resources" and "insufficient monetary allocation". Id. at 1191-92.

Nor would the burden that would be caused to the Department by Leisnoi's decertification outweigh the interests in enforcing ANCSA's village eligibility requirements, even if the Court had the discretion to consider this. The Department has the duty to administer and enforce ANCSA's eligibility requirements, as intended by Congress, and does not have the discretion to ignore or avoid its responsibilities. See ONRC Action v. Bureau of Land Management, 150 F.3d 1132, 1137 (9th Cir. 1998) ("Administrative agencies do not possess the discretion to avoid discharging the duties that Congress intended them to perform."). Leisnoi should not be allowed to retain its status as an eligible Native Village, and to retain the lands and benefits that it unlawfully received under ANCSA, simply because it would be too burdensome for the Department to correct its error.

### 5) *The burden on Leisnoi shareholders is irrelevant.*

Nor should Leisnoi be allowed to retain its status as an eligible Native Village on the ground that its decertification would be unduly burdensome on its shareholders. Contrary to Leisnoi's previous assertions, its decertification would not result in the disenfranchisement of its Native shareholders. As discussed below, they would still be able to participate in ANCSA following their re-enrollment to other Village or Regional Corporations. Any inconvenience caused by their re-enrollment does not outweigh the interests in enforcing ANCSA's village eligibility requirements by decertifying Leisnoi. As set forth above, Congress did not intend to confer ANCSA benefits to villages such as Leisnoi. This is especially true in Leisnoi's case, in view of the fact that many of its shareholders were actually residents of Kodiak. Congress specifically provided for the Natives residents of the City of Kodiak to receive land and settlement benefits. ANCSA

Section 14(h)(3) provides:

> (3) The Secretary may withdraw and convey to the Natives residing in Sitka, Kenai, Juneau, and Kodiak, if they incorporate under the laws of Alaska, the surface estate of lands of a similar character in not more than 23,040 acres of land, which shall be located in reasonable proximity to the municipalities.  The subsurface estate in such lands shall be conveyed to the appropriate Regional Corporation unless the lands are located in a Wildlife Refuge;

43 U.S.C. § 1613(h)(3).

Allowing Leisnoi to retain its status and the lands it obtained under ANCSA would thwart Congress' intent to provide for the settlement of the aboriginal claims of the Native residents of Kodiak according to this provision.  Congress specifically provided for the Native residents of Kodiak to receive only a limited amount of land.  The 23,040 acres provided for them is much less than the minimum 69,120 acres provided for other Native villages.[22]  See 43 U.S.C. § 1613(a).  Congress provided for only a limited amount of land to be conveyed to the Native residents of Kodiak in recognition of the fact that Kodiak was an urban center, and that any additional entitlement would adversely affect the other non-Native and local governmental interests in the area.  Congress made the same provision for the Native residents of Sitka, Kenai, and Juneau, in order to lessen the impact of their land entitlements in the suburban areas surrounding these cities.  This is also reflected in the Department's regulations, which imposed restrictions for the withdrawal and selection

---

[22] That is the reason why some of the Native residents of Kodiak sought to establish other "Native villages" in the region, in order to obtain additional land and benefits.  See Ex. 30g.

of lands by the Natives of Kodiak that were not imposed on other Native Villages, including

the requirement that any selections be reviewed by Secretary and approved following a

public hearing.  43 CFR 2653.7 provides:

> **Sitka-Kenai-Juneau-Kodiak selections.**
> (a) the corporations representing the Natives residing in Sitka, Kenai, Juneau, and Kodiak, who incorporate under the laws of the State of Alaska, may each select up to 23,040 acres of lands of similar character located in reasonable proximity to those municipalities.
>
> (b) The corporations representing the Natives residing in Sitka, Kenai, Juneau, and Kodiak, shall nominate not less than 92,160 acres of lands within 50 miles of each of the four named cities which are similar in character to the lands in which each of the cities is located.  After review and public hearing, the Secretary shall withdraw up to 46,080 acres near each of the cities from the lands nominated.  Each corporation representing the Native residents of the four named cities may select not more than one-half the area withdrawn for selection by that corporation.  The Secretary shall convey the area selected.

Id.

Allowing Leisnoi to retain the lands that it received under ANCSA will thwart

this purpose. Because of its proximity to the City of Kodiak, Leisnoi was entitled to select

and receive the very same lands that Congress intended to exclude from conveyance to

the Native residents of Kodiak.  Leisnoi selected most of the valuable lands surrounding

the City of Kodiak, including the lands along Kodiak's main roadway, and the lands that

were formerly used for recreational purposes by the local residents of Kodiak (including

Stratman).  Leisnoi ultimately logged some of these lands in the mid-1990's.

**6)      The Agency's "re-enrollment" burden is irrelevant.**

Nor would it be unduly burdensome for the Department to administer the changes required by Leisnoi's decertification in its administration of ANCSA.  Congress expressly provided for this contingency, when it enacted the provisions of Section 1(c) of the Act of Jan. 2, 1976, P.L. 92-204, 89 Stat. 1145.  Section 1(c) of the Act provides:

> (c) In those instances where, on the roll prepared under section 5 of the Settlement Act [43 USCS § 1604], there were enrolled as residents of a place on April 1, 1970, a sufficient number of Natives required for a Native village or Native group, as the case may be, and it is subsequently and finally determined that such place is not eligible for land benefits under the Act [43 USCS §§ 1601 et seq.] on grounds which include a lack of sufficient number of residents, the Secretary shall, in accordance with the criteria for residence applied in the final determination of eligibility, redetermine the place of residence on April 1, 1970, for all purposes under the Settlement Act: Provided, That each Native whose residence on April 1, 1970, is changed by reason of this subsection shall be issued stock in the Native corporation or corporations in which such redetermination entitles him to membership and all stock issued to such Native by any Native Corporation in which he is no longer eligible for membership shall be deemed canceled: Provided further, That no redistribution of funds made by any Native Corporation on the basis of prior places of residence shall be affected: Provided further, That land entitlements of any Native village, Native group, Village Corporation, Regional Corporation, or corporations organized by Natives residing in Sitka, Kenai, Juneau, or Kodiak, all as defined in said Act, shall not be affected by any determination of residence made pursuant to this subsection, and no tribe, band, clan, group, village, community, or association

-34-

> not otherwise eligible for land or other benefits as a "Native group" as defined in said Act, shall become eligible for land or other benefits as a Native group because of any redetermination of residence pursuant to this subsection: Provided further, That any distribution of funds from the Alaska native Fund pursuant to subsection (c) of section 6 of the Settlement Act [43 USCS § 1605(c)] made by the Secretary or his delegate prior to any redetermination of residency shall not be affected by the provisions of this subsection.    Each Native whose place of residence is subject to redetermination as provided in this subsection shall be given notice and an opportunity for hearing in connection with such redetermination as shall any Native Corporation which it appears may gain or lose stockholders by reason of such redetermination of residence.

Id.

As shown above, the APA does not allow the Court to consider the extent of the Secretary's "re-enrollment" burden.  Congress has nevertheless provided, above, a cookbook on how to get the job done.  The administrative burden should not be significant.

**E.    Stratman should not suffer a further remand to the Agency under any circumstances**.

As we have shown above, "this basically factual dispute"[23] has been resolved in proceedings before the Agency in Mr. Stratman's favor.  As our brief regarding the ANILCA § 1427 "implied repeal" issue shows, determining the intent of Congress is a task for the courts, not the Department of Interior, in the context of ANCSA and ANILCA.  As we have argued elsewhere, and as the record in Stratman I reflects, neither the terms of this Court's

---

[23]See n.1, supra.

-35-

order of remand,[24] nor the reports of the parties recommending procedures submitted

before the Agency between January 25 and March 6, 1996,[25] contemplated review by the

Secretary, and certainly not of Leisnoi's "silver bullet" legal issues.[26]   It should be noted

that, while the Secretary's review of village eligibility decisions was mandatory under 43

C.F.R. § 2651.2(a)(5), the Secretary's review was always performed as a merely ministerial

act.  The Secretary simply signed the decisions issued by ANCAB.[27]

---

[24]This Court knows better than the undersigned what its precise intentions were in remanding this matter to IBLA.  We presume, however, that this Court was mindful of IBLA's role in evaluating issues before it, and before the Department in general, and of the finality that typically attended IBLA's decisions per 43 C.F.R. Subtitle A § 4.1(b)(3), which provides: "(3) *Board of Land Appeals.*  The Board decides finally for the Department appeals to the head of the Department from the decisions rendered by Department officials relating to: (i) The use and disposition of public lands and their resources, including land selections arising under the Alaska Native Claims Settlement Act, as amended; . . .."  See also 43 C.F.R. § 4.403, "Finality of decision; reconsideration."

[25]This part of the Agency record has not yet been docketed in this matter.  If the Court elects to deny Stratman's pending motion to order the filing of a complete Administrative Record, the various reports of the parties recommending procedures, required when matters are remanded to IBLA from courts by 43 C.F.R. Subtitle A § 4.29, can be provided for the Court's examination, and to confirm our representation.

[26]The only exception to this statement was threshold issue number four, the ANILCA §1427 "implied repeal/ratification" issue.  The five threshold issues are quoted at AR Tab D, 157 IBLA 302, 307.  This Court, in 1995, ruled adversely to Leisnoi on the first (exhaustion), second (*res judicata*), third (1982 and 1990 Koniag settlement agreements), and fifth (whether *lis pendens* should be expunged) issues prior to remand.  Before the Agency, and now again before this Court (see Docket Nos. 111, 112, and 144), Leisnoi and Koniag raise the FRITLA issue.  Leisnoi did so before the Secretary.  AR, Tab F, p. 3, ¶2.  ¶1 restates the ANILCA §1427 issue.  ¶¶ 3,4, and 5 repeat, and purport to place before the Secretary, "threshold" issues decided by this Court in 1995.  Id. at pp. 3-4.

[27]Mr. Stratman entered the ANCAB eligibility decisions in the record as his Ex. 25 before the Agency.  Whatever the extent of the Secretary's discretion under 43 C.F.R. § 2651.2(a)(5) may have been, as a practical matter, review of these documents makes it plain that the Secretary did no more than "sign off" on the underlying Agency

This Court has frequently commented upon the age of this litigation. Another remand, for any purpose, would needlessly lengthen these proceedings. We feel compelled to observe that we have spent 11 years before the Agency; four of them waiting for a memorandum from a Deputy Solicitor of marginal quality, which appears to ignore controlling precedent of this Circuit and from the U.S. Supreme Court.

Citing Ford Motor Company v. NLRB, 305 U.S. 364, 373, and Asarco, Inc. v. Occupational Safety & Health Ad., 647 F.2d 1, 2 (9th Cir. 1981), the District Court for the District of Alaska, while acknowledging that the Administrative Procedures Act, § 706(2)(A), obligates a court to determine if an agency's remand decision is in accordance with the law of the case, and, where the agency action or decision is not sustainable, to vacate the agency decision and remand to the agency for further consideration, observed that:

> Nevertheless, the court may adjust its remedy to the exigencies of the particular case. (Citations omitted.)

---

proceedings. If this Court denies Mr. Stratman's pending motion seeking filing of the entire Administrative Record, and wishes review of these documents to confirm our representation, Mr. Stratman can provide them. The Secretary's election to handle his/her review powers ministerially is consistent with 43 C.F.R. Subtitle A § 4.21(c). That provision says that reconsiderations of IBLA decisions, whether by the Secretary or the Board itself, "may be granted only in extraordinary circumstances where, in the judgment of the Director or an Appeals Board, sufficient reasons appears therefore." There is little "extraordinary" in IBLA's decision, and Leisnoi's petition to the Secretary, which at p. 1 specifically invokes 43 C.F.R. § 4.403, does no more than plow old ground. Further review of this "basically factual dispute" by the Secretary, under these circumstances, is ill-considered and contrary to precedent. So say the commentators. "In practice, [43 C.F.R. § 4.403] means that the petition must allege an error or change of law, a misunderstanding of material fact, or new evidence. Resist the urge to restate arguments made earlier." (Emphasis added.) Michael C. Hickey, Litigation Before the Department of the Interior, Natural Resources & Environment, Vol. II, Number 1 (Summer 1996). Both IBLA's decision and Leisnoi's petition seeking Secretarial review of this matter fail this test.

> In this case, ANILCA mandates, pursuant to §
> 503(h)(5), expedited judicial review of any
> challenge of administrative action under § 503.
> (Footnote omitted.) ANILCA requires the court to
> 'render its final decision relative to any challenge
> within 120 days after the date the response to
> such a challenge is filed . . . .' ANILCA §
> 503(h)(5).[28]

Whatever the requirements of §503(h)(5) of ANILCA may be, eleven years is more than

enough time to resolve the "basic factual dispute" referred by this Court to the Department.

It is the job of the Court to determine the intent of Congress and resolve any remaining

legal issues, now that the Agency has resolved the "basic factual dispute" in Mr. Stratman's

favor.  Mr. Stratman should not suffer a further delay by remand to the Agency.

## III.    Conclusion.

For the reasons set forth above and incorporated by reference, we seek an order

from the Court (1) setting aside the Secretary's 1974 decision confirming Leisnoi as an

eligible "village" for ANCSA purposes, (2) affirming IBLA's "decertification" of Leisnoi as an

ANCSA "village", and (3) enjoining the conveyance by the Secretary, or anyone else, of

further benefits to Leisnoi as a result of its wrongfully conferred ANCSA "village" status.

We leave for another day consideration of such additional remedies as may be appropriate,

under the circumstances, including vacation of patents previously issued to Leisnoi.

RESPECTFULLY submitted this 11th day of June, 2007.

s/Michael J. Schneider
s/Eric R. Cossman

---

[28]Southeast Alaska Conservation Council v. Watson, 535 F.Supp. 653, 657-58
(D. Alaska 1982).

-38-

Law Offices of Michael J. Schneider, P.C.
880 "N" Street, Suite 202
Anchorage, AK 99501
Phone: (907) 277-9306
Fax: (907) 274-8201
E-mail: mjspc@gci.net
Alaska Bar No. 7510088


**CERTIFICATE OF SERVICE**
I hereby certify that **OMAR STRATMAN'S
MOTION TO REVIEW AND AFFIRM IBLA'S
DECISION ON REMAND, AND TO SET ASIDE
THE SECRETARY'S ORIGINAL 1974
DECISION APPROVING LEISNOI'S
APPLICATION FOR ELIGIBILITY AS AN
UNLISTED ANCSA NATIVE VILLAGE** was
served electronically on the 11th day of June, 2007,
on Bruce M. Landon, R. Collin Middleton,
and John R. Fitzgerald.
s/Michael J. Schneider

-39-