RECEIVED
REALTY & FORESTRY
JAN 21 PM 4 27

ROBERTSON, MONAGLE, EASTAUGH & BRADLEY
ATTORNEYS AT LAW
P. O. BOX 1211
JUNEAU, ALASKA 99801

200 NATIONAL BANK OF ALASKA BLDG.
PHONE 586-3340
CABLE ADDRESS: ROMEA

R. E. ROBERTSON (1885-1961)
M. E. MONAGLE
OF COUNSEL
F. O. EASTAUGH
J. B. BRADLEY
W. G. RUDDY
L. B. JACOBSON
R. B. BAKER
M. T. THOMAS

W. F. BRATTAIN II
J. F. CLARK

January 21, 1974

Mr. Clarence Antioquia
Acting Director
Bureau of Indian Affairs
P.O. Box 3-8000
Juneau, Alaska 99801

Re: Protest of eligibility of unlisted native villages published in Federal Register December 21, 1973

Dear Mr. Antioquia:

Please be advised that I represent Alaska Wildlife Federation and Sportsman Council Inc. and Mr. Philip Holdsworth. On their behalf, I hereby protest your determination of eligibility with respect to each of the nineteen Native Villages certified as eligible for benefits under the Alaska Native Claims Settlement Act as listed in the Federal Register December 21, 1973.

A. GRAVAMEN OF PROTEST

The protest is based upon the fact that the entire enrollment of Natives thus far conducted is arbitary and capricious in that Natives have not been enrolled as Congress ordered in §5 of the Act and villages have not been certified as ordered under §11(b) of the Act. Inasmuch as these are nondiscretionary duties of the Secretary of Interior, some of which have been delegated to your office, you are hereby called upon to correct the following deficiences before acting any further with respect to the villages involved.

B. INTRODUCTION

Paragraph 16 of the the Instructions accompanying the Enrollment Application Form states as follows:

> 16. YOUR PERMANENT RESIDENCE AS OF APRIL 1, 1970.
>
> "The place you name here is where you will be enrolled if you are found eligible under the requirements of the act. You need not have been physically present in that place on April 1, 1970, but you must have some ties back to that place as outlined in Section 43h.1(k) of the regulations."



Allowing a person to enroll to a village as a permanent resident on the basis of "some ties" permits the most ludicrous of results. For instance, a Native born in Anchorage of parents born in Anchorage, who lived in Anchorage all his life and never left Anchorage could claim permanent residence to a village outside Anchorage on the basis of a hunting trip. That the roll is hopelessly tainted by Natives who, in good faith, but pursuant to the above-quoted incorrect instruction listed villages as their permanent residences for just such reasons is patently clear from the affidavits presented in support of Alaska Federation of Natives International et al. v. Morton, (Civil Action 2141-73, United States District Court for the District of Columbia) copies of which are attached hereto. A representative sample of the problems caused for Natives by the language used in paragraph 16 of the Instructions is the affidavit of Fayetta L. Mullikin, paragraph 4 of whose affidavit states as follows:

> "At the time of my enrollment I was confused as to the meaning of permanent residence as stated in column 16."

The misleading instructions for filling out paragraph 16 has been apparently compounded in many instances by the incorrect information given Natives by enumerators who apparently were oftentimes themselves hopelessly confused by the meaning of paragraph 16:

> "9. These enumerators received little or no training from the Department of Interior in regard to how nonresident Natives should fill out their enrollment applications and gave out differing and conflicting information to the nonresident Natives about how to answer column 16 on the applications (permanent residency as of April 1, 1970);
>
> . . .
>
> "11. Most nonresident Natives have a limited education and were completely confused in regard to the enrollment forms and the benefits of enrolling in a 13th region. Affidavit of Helen Marie Klein, Alaska Federation of Natives, supra.

A village entered by a Native as his "permanent residence", pursuant to the misleading instructions for completing item 16, was never checked for accuracy by an investigation of other indicia of his residence in that village as you were ordered to do under

43 C.F.R. 2651.2(a)(1): rather, the village named in item 16 was simply accepted by you as the enrollee's permanent residence notwithstanding: 1) oftentimes the named village was not listed in the 1970 census; 2) the BIA enrollment printout showed that the enrollee did not live there in 1970; and 3) the enrollee does not now live there. (See for example, the information with respect to the 19 "unlisted" villages of which protest is here made as set forth at the end of this protest).

C. MEANING OF "RESIDENCE"

What constitutes domicile and residence as those terms are ordinarily used in the law is set forth in Restatement (Second) Conflict of Laws §§14 - 15 (1971):

> §14 Domicile of Origin.
>
> (1) Domicile of origin is the domicile which a person has at birth.
>
> . . .
>
> §15. Domicile of Choice.
>
> (1) A domicile of choice may be acquired by a person who is legally capable of changing his domicile.
>
> (2) In addition to legal capacity, acquisition of a domicile of choice requires
>
> (a) Physical presence as described in §16 and
>
> (b) An attitude of mind as described in §18.
>
> (3) The fact of physical presence at the particular place must concur with the existence of the required attitude of mind. If there is such concurrence and the requisite legal capacity a change of domicile takes place."

What is clearly contemplated by the interaction of these two rules (which represent the majority rule with respect to the law of residence) is that one has the domicile of his parents upon being born. Thereafter he can change it if he has the legal capacity to do so, is physically present at the site, and has the intention to make that place his home. A mere statement of intention to reside at a place, or having "some ties" to a place is insufficient to make one a resident of that place.

That this is the law in Alaska is seen from the case of United States v. Twelve Ermine Skins, 12 Alaska Rptr. 28, 42 (1948):

> "Under the authority of the Supreme Court in the case of State of Texas v. Florida [306 U.S. 398 (1939)] and the other authority to which I have adverted, I believe that declarations of intention cannot overcome the results of law or the conclusions of law which follow from the undisputed facts. Those facts have been recited. Those facts in the face of Mr. Gaier's declarations [that he was a resident of Alaska] say that he had not resided in Alaska for three years prior to September 13, 1946 - that his domicile was not in Alaska for that period. If that be correct, it was the duty of the court to instruct a verdict."

That Congress intended the foregoing definition of residence to apply is seen in several ways. First section 2(c) of Alaska Native Claims Settlement Act states, in part, that "no provision of this Act shall replace or diminish any right, privilege, or obligation of natives as citizens of the United States or of Alaska, ..." Since the broadened concept of residence set forth in the Instruction for completing paragraph 16 of the Enrollment Form allows a Native to claim benefits of residence without being a "resident" of a particular place under Alaska law, it is clear that the "some ties" interpretation is in derogation of what Congress intended under the Act.

Secondly, Section 5(b) of the Act provides as follows:

> "b) The roll prepared by the Secretary shall show for each Native, among other things, the region and the village or other place in which he resided on the date on the 1970 census enumeration, and he shall be enrolled according to such residence. Except as provided in subsection (c) a Native eligible for enrollment who is not, when the roll is prepared, a permanent resident of one of the twelve regions established pursuant to subsection 7(a) shall be enrolled by the Secretary in one of the twelve regions, giving priority in the following order to -
>
> 1) The region where the native resided on the 1970 census date if he has resided there without substantial interruption for two or more years;
>
> 2) The region where the Native previously resided

for an aggregate of ten years or more;

3) The region where the Native was born; and

4) The region from which an ancestor of the Native came: The Secretary may enroll a Native in a different region when necessary to avoid enrolling members of the same family in different regions or otherwise avoid hardship."

Congress' intent that the word "residence" be used in its ordinary sense is seen in the foregoing because it provides, on the one hand, that a Native be enrolled to a village if he is a resident as of the 1970 census enumeration date and, on the other hand, sets up a system for enrolling Natives to a region who are not residents of a village, but have what amounts to "some ties" to a region, such as having ancestors born there. Stated obversely, Section 11(b) shows that "some ties" will permit enrollment to a region, but one must be a resident to be enrolled to a village. Congress clearly would not have set up the two separate procedures if "some ties" were sufficient to enable one to enroll to a village as well as a region. Thus, by making "some ties" the test for residency of a village the Bureau of Indian Affairs has clearly exceeded its authority under the Act.

Third, the word residence must be defined in terms of the purpose of the Act. (82 C.J.S. Statutes §323; In re National Discount Corporation, 196 F.Supp. 766, 1961.) Since the most obvious purpose of the enrollment provisions of the Alaska Native Settlement Claims Act is to provide land for the benefit of existing villages and their inhabitants, Congress must have intended that land go to villages where people actually lived. This was not a village-creating Native Resettlement Act: Congress did not intend to move the Natives out of the cities (which of course are ineligible as Native Villages under the Act) into Native villages in the countryside. Such an intention by Congress would have been cynical, indeed, in view of the declaration of purpose in §2(b) of the Act that the settlement should be accomplished "... without creating a reservation system ..."

Fourth, that Congress intended to pass land and other benefits to viable, existing villages is likewise seen in the chart set out in Section 14(a) of the Act, which states:

"If the village had on the 1970 census enumeration date a native popluation between - ." (emphasis added)

In Application of Bethel Township Veteran's Home Association, 119 A.2d 613 at 615 the word "population" was defined to mean "the whole number of people or inhabitants in a country, section, area or body of inhabitants of given locality." In YMCA Inc. v. Lamenzo, 238 F.Supp. 916 at 925 (D.C. N.Y.) the Court stated that "population may mean total number of citizens as well as total number of residents." 14 C.J.S. Census §6 defines population to mean the "enumeration of citizens". From these definitions we can see that the word population means actual inhabitants and that the words population and residence can be used interchangeably. Accordingly, Congress' use of the word in Section 14(a) signifies its intent that the word "residents" means people who actually dwelt at the village in question.

Finally, the word residence should be afforded its ordinary meaning as understood in law because:

> As a general rule words do not acquire a peculiar and different meaning when used in a statute. Ordinarily they are to be given their usual, natural, and plain, ordinary and commonly understood meaning, and strict grammatical usage will not necessarily control over the general and popular usage of the words. This rule applies in the absence of anything to indicate the contrary such as a statutory meaning or, as indicated in decisions on the question, a well established technical meaning to the contrary. The natural and commonly understood meaning will be give to words used in a statute unless it is plain or clear from the statute or from the context of the words within the statute, or unless as otherwise indicated it is plain or clear from the circumstances that a different meaning was intended, and it must then appear what that different meaning is; or unless such construction would defeat the mainfest intention of the legislature. The rules have also been held to apply unless to apply it would produce an absurd, unreasonable result, or unless to apply it would produce or develop an inconsistent, or futile result, plainly at variance with the policy of the legislation as a whole, or unless a restricted or enlarged meaning is necessary to harmonize all the provisions of the statute and make them effective. The rule has been held to apply to words which have definite meanings or which are unambiguous, to words not specially defined, to words which have, or are susceptible of, more than one meaning, and to words in common use.
>
> Forced or unusual meaning. For the purpose of either



8

> limiting or extending the operation of the statute the words therein are not to be given a forced, strained, subtle, or unusual meaning." (82 C.J.S. Statutes §329 (b)).

Inasmuch as residence has the meaning in common usage and in law as set out in the Restatement (Second) Conflicts of Law §§14 - 15 (1971) and in United States v. Twelve Ermine Skins, 12 Alaska Rptr. 28, 78 F.Supp. 734 (D.C. Alaska, 1948), the forced construction placed on the word in Paragraph 16 in the instructions accompanying the enrollment forms was improper.

That the Secretary of Interior understood the word "residence" was to have its ordinary meaning and that he intended the regulations promulgated under the Act to convey that meaning is graphically illustrated in a letter from Mr. Morton to Mr. Aspinall, dated April 27, 1971, U.S. Code Cong. & Ad. News, 92d Cong. 1st Sess., 2203, (1971):

> "The second term that it defined in both bills is "native village". They are similar in that both definitions require at least 25 natives to reside in a village if it is to qualify as a native village. However Section 4(i)(2) of HR 3100 provides that the village must not be modern, or urban in character. The Department's proposal states in its definition that a village must be listed in either Sections 10 or 14 and must be determined by the Commission as having 25 natives on December 31, 1970.
>
> It is our feeling that both the listing of native villages in the bill and a cut-off date for qualification of 25 native residents is important to establish definite boundaries for land withdrawals. If the villages are not listed in the bill then for a certain period of time after enactment of the legislation there would be no way to determine what land would be subject to native settlement and what would be available for State selection or other use. It is quite important to establish by the enactment of this legislation the exact land acres that will be available for natives in order to eliminate conflicts in the future. Identifying the villages in the bill and tying land withdrawals and patents to specifically defined areas surrounding the listed villages will avoid such future conflicts."

In the above-referenced quotation the Secretary clearly sought to link the land reserved for Native selection with actual

---

Native Villages. This quest for certainty would require the withdrawal of land only for villages which existed in fact, not villages which someone desired to create. Congress' establishment of §11(b)(3) villages is not at odds with the principle so clearly stated by the Secretary above, but merely provides an opportunity for villages, existing in fact but inadvertently omitted from the list in 11(b)(1), to share in the benefits of the Act. Thus, the Secretary recognized the problems of interpreting the Act as village-creating and consequently the Bureau of Indian Affairs is far outside the scope of its authority in interpreting the word "residence" in derogation of the Secretary of Interior's plain understanding.

That the Secretary realized that the word "residence" was to have its ordinary meaning is further seen from his decisions not to file an environmental impact statement. Were the regulations to be defined as suggested by the words "some ties" as found in paragraph 16 of the instructions accompanying the enrollment form, they would have the effect of moving persons from cities like Anchorage, Fairbanks and Juneau to newly resurrected villages to which "some ties" may be had. It is clear that an environmental impact statement is required where federal action has such a demograph affect. (See, Lathan v. Volpe, 4 E.R.C. 1487, Hanley v. Mitchell, 4 E.R.C. 1152.) Thus, the Secretary's decision not to file an environmental impact statement demonstrates his understanding that the regulations would not have a demographic affect. He doubtless never dreamed that "residence" would be strained into the "some ties" interpretation given it by the Bureau of Indian Affairs.

Finally, while it does not go far enough, Regulation 25 C.F.R. 43h.1(K) comports with the normal definition of residence.

> "Permanent residence means the place of domicile on April 1, 1970 which is the location of the permanent place of abode intended by the applicant to be his actual home. It is the center of the Native family life of the applicant to which he has the intent to return when absent from that place. A region or village may be the permanent residence of an applicant on April 1, 1970 even though he was not actually living there on that date if he has continued to intend that place to be his home."

While tis definition does not explicitly state that to be a resident one must have actually lived in a place for some time, that result is implied by the phrase "is the location of the permanent place of abode". Abode in its ordinary sense means the place where someone dwells. Accordingly, it appears that the Secretary

understood that the word "residence" would be used in its ordinary sense: the foregoing simply does not allow the "some ties" interpretation given it by the Bureau of Indian Affairs.

Notwithstanding the Secretary's promulgation of the foregoing definition of permanent residence in 25 CFR 43h.1(K), which is correct albeit insufficient, the Secretary arguably has contributed somewhat to the Bureau of Indian Affairs' confusion by Regulation 43 CFR 2651.2(b)(1) and (2), although these regulations can easily be read to comprt with the Act:

> "(b) Except as provided in subparagraph (4) of this paragraph, villages must meet each of the following criteria to be eligible for benefits under Section 14(a) and (b) of the Act:
>
> (1) There must be 25 or more Native residents of the village on April 1, 1970, as shown by the census or other evidence satisfactory to the Secretary. A Native properly enrolled to the village shall be deemed a resident of the village.
>
> (2) The village shall have had on April 1, 1970, an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and lifestyle and at least 13 persons who enrolled thereto must have used the village during 1970 as a place where they actually lived for a period of time: . . ." (emphasis added)

The statement that a Native properly enrolled to the village shall be deemed a resident of the village seems to add nothing to the regulation because to be properly enrolled to the village one must be a permanent resident thereof as defined by 25 CFR 43 H.1(K). Since subsection (b) says each of the listed criteria must be met the requirement in (b)(2) that at least 13 or the 25 persons enrolled to the village must have actually lived there in 1970 is a further limitation on the word residence in accordance with the ordinary use of the word. That is to say, a resident is one who has lived there, intends to return, and maintains indicia of residence in that place. However, some people meeting these qualifications may be in the army or in school and thus be away from their residence. This section seems to require that even though a village may have 25 residents within the ordinary meaning of the word, 13 of those residents must actually be living in the village as of the 1970 census. Thus, if a village had 25 persons in the armed forces as of April 1, 1970 who met all the normal criteria of a resident, the village would not

qualify. Although it is conceivable that the Director of the BIA could have been confused by the Secretary's regulations by thinking that one could be a resident without living at the place, what the Secretary of the Interior was attempting to get at by this regulation is a far cry from allowing people to be residents of a village who have "some ties" to that village. The Director of the Bureau of Indian Affairs has a duty to read the regulations consistent with the statute and his cavalier interpretation as seen in paragraph 16 of the instructions accompanying the enrollment form does not even approach a serious attempt to make the regulations and statute consistent.

Parenthetically, this seems to be an appropriate place to protest most vigorously the Bureau of Indian Affairs' attempt to get around the April 1, 1970 cut-off date set forth in the Act by interpreting the words "or other evidence satisfactory to the Secretary" in Regulation 43 CFR 2651 (b)(2)(A) to mean that the 1970 census is irrelevant and that 1971 or 1972 self serving statements of what one's intent had been as of April 1, 1970 is sufficient to meet residency requirements. The wording of the Act is plain and unambiguous. If either the census or other evidence show <u>less</u> than 25 Natives as residents of the village then it cannot be certified. Thus, if the 1970 census showed 25 Natives as residents of the village, but other evidence showed less than 25, the village would not qualify. However, the wording does not permit the converse: that is to say if the census showed less than 25 residents a greater number cannot be shown by other evidence of residence. To permit the interpretation advanced by the Bureau of Indian Affairs would allow a person to become a resident of a village retrospectively simply by making a self serving declaration of what his intent had been in April 1970. This would be in clear derogation of Secretary Morton's understanding of the Act as set forth in his letter to Congressman Aspinall, as previously quoted. Thus, the Bureau of Indian Affairs is misreading the Act in its interpretation of 43 CFR 2651 (b)(2)(A) and it is protested.

In sum, the words "some ties" which the Natives were led to believe could mean "permanent residence", do not equate with permanent residence. Congress intended the words permanent residence to be given their ordinary meaning. Because the words were not so used many natives are enrolled to the wrong village. Because they are enrolled to the wrong village the Director of the Bureau of Indian Affairs has caused the Secretary of Interior to fail in his duty under Section 5(b), to wit:

> "The roll prepared by the Secretary shall show for each native among other things, the region and the

> village or other place in which he resided on the date of the 1970 census enumeration, and he shall be enrolled according to such residence."

Because the Natives in many instances stated that they resided in a place to which they had some ties as opposed to their actual permanent residence many natives are misenrolled. Because they are misenrolled it is impossible for the Secretary of Interior to comply with his duty under 11(b)(2) to "review all the villages listed in subsection (b)(1) hereof" and "determine" whether or not a village had less than 25 residents. For this reason it is clear that the Secretary cannot proceed with respect to the certification of eligibility of any villages until the rolls are corrected. The protestants herein move that: 1) the rolls be corrected immediately and 2) no villages be certified as eligible under the Act until such corrections are made.

D. POWER TO CORRECT THE ROLLS

The Secretary of Interior has the power to correct the rolls. In Section 11(b)(2) he is ordered by Congress to conduct a review of the villages' eligibility and to determine their eligibility. This determination of eligibility is in turn dependent on enrollment. Likewise, the Juneau BIA Director is required to "investigate and examine available records and evidence that may have a bearing on the character of the village and its eligibility pursuant to paragraph b of this section." (43 CFR 2651.2(a)(1)) This duty, too, is dependent on enrollment. From both of these sections the conclusion is compelled that the Secretary can change the place of enrollment of an improperly enrolled native. This is borne out by the Supreme Court decision in Lowe v. Fischer, 223 U.S. 95 (1911). This was a suit to disenroll certain Indians from rolls prepared by the Dawes Commission. The Secretary of Interior was ordered by the Court of Claims to enroll certain Indians, whose names had erroneously appeared on the Kern Clifton roll, upon the final roll. The Court said at page 108:

> "In all the legislation providing for the making of the rolls care is observed to prevent or correct mistakes and to defeat attempts at fraud. We have seen what powers the Dawes Commission was given to investigate the rights of persons whose names were on the rolls, and, as to freedman, strict compliance with the decree of the court of claims was enjoined. By the Act of March 3, 1905 (cite omitted) the work of completing the unfinished business of the commission was devolved upon the Secretary of Interior, and all the powers theretofore granted to the commission were



3

> conferred upon the Secretary. It was subsequent to this act that action was taken as to relators and their names stricken from the rolls. This revisory and corrective power of the Secretary over the allotment of land is similar to that exercised by the Land Department respecting the entries upon public lands which this court has stated to be correct and annual entries of land which were made upon false testimony and without authority of law." (cites omitted)

Likewise, in Stookey v. Wilber, 58 F.2d 522 (D.C.Cir. 1932) the court said at pages 523:

> "We think the Secretary's power and authority to correct the rolls where mistakes and inadvertence appears is well settled."

Since the authority exists to correct the rolls, and since the Director Juneau Area Office of the Bureau of Indian Affairs has the duty to "investigate and examine all available records and evidence that may have a bearing on the character of the village and its eligibility", we call upon the Director to cure the protest made herein by comparing the 1970 census for the villages listed in the Federal Register as of December 21, 1973 (where such villages are listed in the 1970 census) with the place of enrollment listed by the various enrollees. Wherever it appears that a Native did not physically live in the village to which he was enrolled the director is called upon to show by other indicia of residence that said native was indeed a permanent resident of that village in accordance with the usage of those words as intended by Congress. Where said village does not appear in the 1970 census the Director is called upon to correct the roll; but such villages are not eligible for certification under §11(b)(2). The Director of the Juneau Area Bureau of Indian Affairs is also called upon to correct all the entire roll, notwithstanding the fact that this may effect villages hitherto certifed without protest. Inasmuch as this might be done by computer little time need be lost. The effort expended would insure a land distribution under the Act as contemplated by Congress.

B. VILLAGE BY VILLAGE PROTEST

Pursuant to the Bureau of Indian Affairs Director at Juneau's duty to "investigate and examine available records and evidence that may have a bearing on the character of the village and its eligibility pursuant to paragraph b of this section", (43 CFR 2651.2(a)(1)), the following matters are brought

to the attention of the Director of the Bureau of Indian Affairs at Juneau and it is respectfully submitted that investigation be made of the following villages. In each instance it is submitted that the Director should determine whether or not the individuals involved resided in the area to which they are enrolled as the term "residence" was intended by Congress to mean, as stated at the outset of this protest. The relevant records for determining residency as intended by Congress would be voter registration records, fish and game licensing records, employment records, census tract records, social security registration records, church membership and baptismal records, motor vehicle registration records or driving license records and other records of vital statistics. Where such villages are not shown on the 1970 census, this, in itself should cause their disqualification for certification under 11(b)(2). Because of the facts noted the Director's decision with regard to each village is hereby protested.

1. Alexander Creek - The Bureau of Indian Affairs printout for Alexander Creek run November 8, 1973 shows 37 persons enrolled to the village with only one, Lawrence Roberts, actually residing there now. Alexander Creek is not listed as a village in the unincorporated places of 25 to 999 in the 1970 census (hereinafter called 1970 census). Accordingly, the director should determine what other evidence of residence exists to warrant certification of the eligibility of the remaining persons enrolled to Alexander Creek.

2. Anton Larsen Bay - The printout run by the Bureau of Indian Affairs November 8, 1973 shows none of those certified as eligible as living at Anton Larsen Creek. Nor is it listed as a village in the 1970 census.

3. Bell's Flat - The printout prepared by the Bureau of Indian Affairs on November 7, 1973 and that prepared November 8, 1973 show only 22 persons enrolled to Bell's Flats. Of the persons listed in the November 7 printout (which includes information concerning their permanent residence on the filing date, where they resided for two years as of April 1, 1970, where they resided for 10 years prior to that, their birth place and ancestral birth place) none showed any connection whatsoever with Bell's Flats, other than listing it as it their permanent residence. Accordingly, even under the improper standard of "some ties" as printed on the instructions to enrollment form these individuals do not qualify for enrollment for Bell's Flats. Moreover, Bell's Flats is not listed as a village in the 1970 census.

14. Knik - The Bureau of Indian Affairs printout run November 8, 1973 shows only 8 enrollees to Knik as presently residing there. Knik is not listed as a village in the 1970 census.

15. Montana Creek - The Bureau of Indian Affairs prinout run on November 7, 1973 shows only 8 persons presently living in Montana Creek.

16. Point Possession - The Bureau of Indian Affairs printout run November 8, 1973 shows none of the enrollees to Point Possession as presently living there. Moreover, the 1970 census does not list it as a village.

17. Solomon - The Bureau of Indian Affairs printout run November 8, 1973 shows only 1 enrollee to Solomon as presently living there. Moreover, the 1970 census does not include it as a village.

18. Umkumiut - The Bureau of Indian Affairs printout run November 8, 1973 shows all of those enrolled to Umkumiut as living in Nightmute. Furthermore, Umkumiut is not listed as a village in the 1970 census.

19. Woody Island - The Bureau of Indian Affairs print-out dated November 8, 1973 shows only 2 of the persons enrolled to Woody Island as living there at the present time.

I hereby certify that a copy of the foregoing protest has been mailed to the representatives of the villages listed above, all regional corporations within Alaska, the State of Alaska, and the United States Forest Service. We are aware of the provision that all villages within the region affected be notified of any protest. In an attempt to comply with this provision, I called Mr. Charles Jones of the Bureau of Indian Affairs at Juneau on January 17, 1974 to get a list of these villages. Mr Jones stated to me that such a list was unavailable inasmuch as the Bureau of Indian Affairs has been unable to obtain same from the Regional Corporations. We stand ready and willing to notify all the affected villages of this protest when and if the Bureau of Indian Affairs at Juneau has records sufficient to enable us to do so.

The protest made herein will not be pursued if the Director corrects the rolls as he has nondiscretionary duty to do, and makes the consequentially necessary changes in the certification of villages.

Thank you for your consideration.

Yours very truly,

James F Clark
For Robertson, Monagle Eastaugh & Bradley

JFC/

97