BEFORE THE DEPARTMENT OF THE INTERIOR
ALASKA NATIVE CLAIMS APPEAL BOARD

In the matter of eligibility )
of the villages of Alexander )
Creek, Anton Larsen Bay, Bells )
Flat, Bettles Field, Caswell, )
Chenega, Chickaloon, )
Chuloonivik, Council, Eyak, )
Kasilof, King Island, Knik, )            Appeal of
Montana Creek, Point )                   Alaska Wildlife Federation and
Possession, Solomon, Umkumiut, )         Sportsmen Council, Inc., and
Woody Island for benefits )              Mr. Philip Holdsworth.
under the Alaska Native Claims )
Settlement Act of December 18, )
1971 (P.L. 92-203; 43 U.S.C. )
sec. 1601, et seq.) )
_____ )

   Please be advised that I represent Mr. Philip Holdsworth and the Alaska Wildlife and Sportsmen Council, Inc. On their behalf, I hereby appeal the final determination of eligibility of the villages of Alexander Creek, Anton Larsen Bay, Bettles Field, King Island, Woody Island; and Bells Flats, Chickaloon, Chuloonivik, Council, Montana Creek, Solomon, Umkumiut; and Caswell, Chenega, Eyak, Kasilof, Knik, Point Possession as eligible for benefits under the Alaska Native Claims Settlement Act as published in the Federal Register February 21, 22 and 26, 1974 respectively.

GRAVAMEN OF APPEAL

   The appeal is based upon the fact that the entire enrollment of Natives thus far conducted is arbitrary and capricious in that Natives have not been enrolled as Congress ordered in §5 of the Act and, in turn, villages have not been certified as ordered under §11(b) of the Act. Inasmuch as the Secretary of Interior has the authority to correct the rolls, and the duty to do so, the Secretary, through the Alaska Native Claims Settlement Act Board, is hereby requested to correct the Native rolls by redoing them completely. Alternatively, this Board should find that there is insufficient evidence in the file to support the conclusion that the villages involved have sufficient residents to qualify under the Act. Finally, should this Board decide to do neither of the foregoing, it should remand to the Juneau Area Director to perform the necessary investigation and finding of facts.

  I. THE ROLLS HAVE BEEN INCORRECTLY PREPARED AND, THUS, MUST BE REDONE.

    A. INTRODUCTION

   Paragraph 16 of the Instructions accompanying the Enrollment Application Form states as follows:

176

EXHIBIT 3

> "16. YC . PERMANENT RESIDENCE AS O. APRIL 1, 1970. <u>The place you name here is where you will be enrolled if you are found eligible under the requirements of the act.</u> You need not have been physically present in that place on April 1, 1970, but you must have some ties back to that place as outlined in Section 43h.1(k) of the regulations." (emphasis added)

(Note that with 25 C.F.R. missing from the section citation a Native could not hope to find the relevant criteria for residence.) Allowing a person to enroll to a village as a "permanent resident" on the basis of "some ties" permits the most ludicrous of results. For instance, a Native born in Anchorage of parents born in Anchorage, who lived in Anchorage all his life and never left Anchorage could claim "permanent residence" to a village outside Anchorage on the basis of a hunting trip. That the roll is hopelessly tainted by Natives who, in good faith, but pursuant to the above-quoted, incorrect instruction listed villages as their permanent residences for equally invalid reasons is patently clear from the affidavits presented in support of <u>Alaska Federation of Natives International et al. v. Morton</u>, (Civil <u>Action 2141-73</u>, United States District Court for the District of Columbia) copies of which are attached hereto. A representative sample of the confusion caused for Natives by the language used in paragraph 16 of the Instructions is the affidavit of Fayetta L. Mullikin, paragraph 4 of whose affidavit states as follows:

> "At the time of my enrollment I was confused as to the meaning of permanent residence as stated in column 16."

The misleading instruction for filling out paragraph 16 has been apparently compounded in many instances by the incorrect information given Natives by enumerators who, apparently, were oftentimes themselves hopelessly confused by the meaning of paragraph 16:

> "9. These enumerators received little or no training from the Department of Interior in regard to how non-resident Natives should fill out their enrollment applications and gave out differing and conflicting information to the nonresident Natives about how to answer column 16 on the applications (permanent residency as of April 1, 1970);
>
> . . .
>
> "11. Most nonresident Natives have a limited education and were completely confused in regard to the enrollment forms and the benefits of enrolling in a 13th region. Affidavit of Helen Marie Klein, <u>Alaska Federation of Natives</u>, <u>supra</u>.

A Native's declaration of "permanent residence" entered pursuant

to the misleading instruction for completing item 16, was never checked for accuracy by an investigation of other indicia of his residence, as the Director, Bureau of Indian Affairs at Juneau was ordered to do under 43 C.F.R. 2651.2(a)(1). Rather, the village named in item 16 was simply accepted as the enrollee's permanent residence notwithstanding: 1) oftentimes the named village was not listed in the 1970 census; 2) the BIA enrollment printout showed that the enrollee did not live there in 1970; and 3) the enrollee does not now live there. Accordingly, with respect to residence, the enrollment as conducted is blatantly inconsistent with the Act and Regulations and thus is arbitrary and capricious.

### B. MEANING OF "RESIDENCE"

Domicile and residence as those terms are ordinarily used in the law are defined in Restatement (Second) Conflict of Laws, §§14 - 15 (1971):

> "§14 Domicile of Origin.
>
> (1) Domicile of origin is the domicile which a person has at birth.
>
> . . .
>
> §15. Domicile of Choice.
>
> (1) A domicile of choice may be acquired by a person who is legally capable of changing his domicile.
>
> (2) In addition to legal capacity, acquisition of a domicile of choice requires
>
> > (a) Physical presence as described in §16 and
> >
> > (b) An attitude of mind as described in §18.
>
> (3) The fact of physical presence at the particular place must concur with the existence of the required attitude of mind. If there is such concurrence and the requisite legal capacity a change of domicile takes place."

Thus, one has the domicile of his parents upon being born. Thereafter, he can change it if he has the legal capacity to do so, is physically present at the site, and has the intention to make that place his home. A mere statement of intention to reside at a place, or the possession of "some ties" to a place is insufficient to make one a resident of that place. That this is the law in Alaska is seen from the case of United States v. Twelve Ermine Skins 12 Alaska Rptr. 28, 42 (1948):

-3-

174

> "Under th  authority of the Supreme   irt in the case of State of Texas v. Florida [306 U.S. 398 (1939)] and the other authority to which I have adverted, I believe that declarations of intention cannot overcome the results of law or the conclusions of law which follow from the undisputed facts. Those facts have been recited. Those facts in the face of Mr. Gaier's declarations [that he was a resident of Alaska] say that he had not resided in Alaska for three years prior to September 13, 1946 - that his domicile was not in Alaska for that period. If that be correct, it was the duty of the court to instruct a verdict."

That this is the law of the United States is seen in United States v. David, 235 U.S. 561, 569 (1915), which addressed the precise problem of domicile raised with respect to enrollment, the "floating" intention to return to a place notwithstanding indefinite residence elsewhere:

> "This matter of domicil has been often before this court, and was last under consideration in the case of Williamson v. Osenton, supra. In that case the definition of domicil, as defined by Mr. Dicey, in his book on "Conflict of Laws," 2d ed. 111, is cited with approval. There change of domicil is said to arise where there is a change of abode and the 'absence of any present intention to not reside permanently or indefinitely in the new abode.' Or, as Judge Story puts it in his work on "Conflict of Laws," 7th ed. §46, page 41, '_If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicil, it is to be deemed his place of domicil, notwithstanding he may entertain a floating intention of permanent or indefinite residence in a given place or country_, or negatively expressed, the absence of any present intention of not residing there permanently or indefinitely.' Price v. Price, 156 Pa. 617, 626, 27 Atl. 291.

> . . .

> "It is apparent from all the testimony that the plaintiff may have had, and probably did have, some floating intention of returning to Michigan after the determination of certain litigation and the disposition of his property in Connecticut, should he succeed in disposing of it for what he considered it worth. But, as we have seen, a floating intention of that kind was not enough to prevent the new place, under the circumstances shown, from becoming his domicil. It was his place of abode, which he had no present intention of changing, that is the essence of domicil." (emphasis added)

-4-

That Congress intended the foregoing definition of "resided" as used in §5(b) of the Act or "residence" as used in the enrollment forms to apply is seen in several ways. First section 2(c) of Alaska Native Claims Settlement Act states, in part, that "no provision of this Act shall replace or diminish any right, privilege, or obligation of natives as citizens of the United States or of Alaska, ... " Since the broadened concept of residence (i.e. "some ties") set forth in the Instruction for completing paragraph 16 of the Enrollment Form allows a Native to claim benefits of village residence without being a "resident" of a particular village under Alaska law, it is clear that the "some ties" interpretation is in derogation of what Congress intended under the Act. Namely, it <u>replaces</u> the <u>obligation</u> of Natives as citizens of Alaska to <u>comply with the laws of</u> Alaska with respect to residence: Clearly, Alaska law would not allow a Juneaunite to vote in a Fairbanks municipal election on no more than the voter's declaration of "some ties" to Fairbanks.

Secondly, Section 5(b) of the Act provides as follows:

"b) <u>The roll prepared by the Secretary shall show for each Native, among other things, the region and the village or other place in which he resided on the date on the 1970 census enumeration, and he shall be enrolled according to such residence.</u> Except as provided in subsection (c) a Native eligible for enrollment who is not, when the roll is prepared, a permanent resident of one of the twelve regions established pursuant to subsection 7(a) shall be enrolled by the Secretary in one of the twelve regions, giving priority in the following order to -

1) The region where the native resided on the 1970 census date if he has resided there without substantial interruption for two or more years;

2) The region where the Native previously resided for an aggregate of ten years or more;

3) The region where the Native was born; and

4) The region from which an ancestor of the Native came: The Secretary may enroll a Native in a different region when necessary to avoid enrolling members of the same family in different regions or otherwise avoid hardship." (emphasis added.)

Congress' intent that the word "residence" be used in its ordinary sense is seen in the foregoing because it provides, on the one hand, that a Native be enrolled to the "region and the village or other place" of which he is a resident as of the 1970 census enumeration date and, on the other hand, sets up a system for enrolling Natives to a <u>region</u> who are not "permanent residents" of a village or region, but have what amounts to "some ties"

-5-   **172**

to a region, such as having ancestors born there. Stated obversely, Section 11(b) shows that "some ties" will permit enrollment to a region, but one must be a "resident" to be enrolled to a village. Congress clearly would not have set up the two separate procedures if "some ties" were sufficient to enable one to enroll to a village as well as a region. It would have been unnecessary to set up the "some ties" procedure for enrollment of nonresidents to a region if "some ties" constituted residence to a village, since there would be no nonresidents if "some ties" were sufficient for residence. Thus, by making "some ties" the test for residency of a village the Bureau of Indian Affairs has clearly exceeded its authority under the Act.

Third, the word "residence" must be defined in terms of the purpose of the Act. (82 C.J.S. Statutes §323) Since the most obvious purpose of the enrollment provisions of the Alaska Native Settlement Claims Act is to provide land for the benefit of existing villages and their inhabitants, Congress must have intended that land go to villages where people actually lived. Where there are more villages certified than there is land available, the deficiencies are made up from the selections authorized to the regional corporations: since the regionals are to select land on the basis of population, among other things, a deficiency due to "numerous village certifications" takes land from populated villages and distributes it to nonpopulated villages - a result Congress clearly did not intend. Alternatively, if Natives did populate the presently nonpopulated villages to which they enrolled, the Act would become a Native Resettlement Act, tending to move Natives from the urban areas, which are ineligible for village status, into Native villages in the bush. Such an intention by Congress would have been cynical, indeed, in view of the declaration of purpose in §2(b) of the Act that the settlement should be accomplished " ... without creating a reservation system ... " Accordingly, the definition of the word "residence" for which respondents contend would be in derogation of the principle that in construing or interpreting legislation passed for Indian peoples, the legislation and regulations promulgated thereunder must be construed in the way most favorable to the Indians. Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918).

Fourth, that Congress intended to pass land and other benefits to viable, existing villages is likewise seen in the chart set out in Section 14(a) of the Act, which states:

> "If the village had on the 1970 census enumeration date a native population between - ."  (emphasis added)

In Application of Bethel Township Veteran's Home Association, 119 A.2d 613 (Pa. 1956) at 615 the word "population" was defined to mean "the whole number of people or inhabitants in a country, section, area or body of inhabitants of given locality." In WMCA Inc. v. Lomenzo, 238 F.Supp. 916 (D.C.N.Y. 1965) at 925 the Court stated that "population may mean total number of citi-

zens as well as total number of residents." 14 C.J.S. Census §6 defines population to mean the "enumeration of citizens". From these definitions we can see that the word "population" means actual inhabitants and that the words population and residence can be used interchangably. Accordingly, Congress' use of the word in Section 14(a) signifies its intent that the word "residence" as used in §5(b) of the Act means that people must actually dwell in the village in question.

Fifth, the word "residence" should be afforded its ordinary meaning as understood in law because:

> "As a general rule words do not acquire a peculiar and different meaning when used in a statute. Ordinarily they are to be given their usual, natural, plain, ordinary and commonly understood meaning, and strict grammatical usage will not necessarily control over the general and popular usage of the words. This rule applies in the absence of anything to indicate the contrary such as a statutory meaning or, as indicated in decisions on the question, a well established technical meaning to the contrary. The natural and commonly understood meaning will be given to words used in a statute unless it is plain or clear from the statute or from the context of the words within the statute, or unless as otherwise indicated it is plain or clear from the circumstances that a different meaning was intended, and it must then appear what that different meaning is; or unless such construction would defeat the manifest intention of the legislature. The rules have also been held to apply unless to apply it would produce an absurd, unreasonable result, or unless to apply it would produce or develop an inconsistent, or futile result, plainly at variance with the policy of the legislation as a whole, or unless a restricted or enlarged meaning is necessary to harmonize all the provisions of the statute and make them effective. The rule has been held to apply to words which have definite meanings or which are unambiguous, to words not specially defined, to words which have, or are susceptible of, more than one meaning, and to words in common use.
>
> Forced or unusual meaning. For the purpose of either limiting or extending the operation of the statute the words therein are not to be given a forced, strained, subtle, or unusual meaning." (82 C.J.S. Statutes §329 (b)).

Inasmuch as "resided" and "residence" have the meaning in common usage and in law as set out in Restatement (Second) Conflict of Laws, §§14 - 15 (1971) and in United States v. Twelve Ermine Skins, 12 Alaska Rptr. 28, 78 F.Supp. 734 (D.C. Alaska, 1948), the forced construction placed on the words in Paragraph 16 in

-7-

170

the instructions companying the enrollment orms was improper. Had Congress intended a different meaning it would have defined the word "reside" in the Act itself. That Congress did not define the word is a clear indication that the word was to be used in its ordinary sense.

Sixth, if Congress, indeed, intended for "some ties" to be sufficient for enrollment to a village, the result would be that an enrollee could have two different residences under the Act: 1) he could enroll to a village on the basis of "some ties"; and 2) he could also obtain a 160-acre tract under §14(h)(5) of the Act by showing that that tract was his primary place of residency. Inasmuch as having two residences is a legal impossibility (<u>Restatement</u> (<u>Second</u>) <u>Conflict of Laws</u>, §11(2)), it could not have been intended by Congress.

Seventh, Senator Stevens of Alaska addressed the question of the meaning of the word "residence" in the December 14, 1971 Congressional Record. In so doing, he introduced the 1970 CENSUS OF POPULATION, NUMBER OF INHABITANTS, ALASKA, MAY, 1971, P.S. (1) A3, ALASKA, which provides in pertinent part:

### USUAL PLACE OF RESIDENCE

"In accordance with the census practice, dating back to 1790, each person enumerated in the 1970 census was counted as an inhabitant of his usual place of residence, which is generally construed to mean the place where he lives and sleeps most of the time. This place is not necessarily the same as his legal residence, voting residence, or domicile. <u>In the vast majority of cases, however, the use of these different bases of classification would produce substantially the same statistics</u>, although there may be appreciable differences for a few areas." (emphasis added).

The article cited by Senator Stevens went on to state that the "appreciable differences" might be caused by members of the Armed Forces living in the area, college students living in an area, Americans overseas, and persons in hotels. Noting these exceptions to the usual standard of residence, Senator Stevens states:

"Mr. President, I called the particular attention of the Senate, for purposes of establishing legislative history, to the fact that residence under the census concept is not necessarily residence under this bill, because this bill is talking about permanent residence, whereas the Census Bureau counted students where they were in institutions where they were attending school and they counted persons overseas as not being included in the population of any state or the District of Columbia. Obviously, it is not the standard of the Census Bureau

-8-

169

> we are talking about in this bill but a concept
> of permanent residence in regard to §5."

While Senator Stevens states that, consistent with the <u>legal</u> definition of the word "residence", persons temporarily away from home would be counted as permanent residents of their village his remarks leave standing the concept set forth in the above-quoted paragraph that residence is the place where a person eats and sleeps most of the time. As can be seen from the entries of the vast majority of enrollees to the above-mentioned villages, there is a glaring disparity between the place where they actually reside, as listed in paragraph 3 of the enrollment print-out and paragraph 18 of the enrollment form, with the place listed as their "permanent residence" in column 16. This disparity was invited by the "some ties" language set forth in paragraph 16 of the enrollment instructions.

That the Secretary of Interior understood the word "residence" was to have its ordinary meaning and that he intended the regulations promulgated under the Act to convey that meaning is graphically illustrated in a letter from Mr. Morton to Mr. Aspinall, dated April 27, 1971, U.S. Code Cong. & Ad. News, 92d Cong. 1st Sess., 2203, (1971):

> "The second term that is defined in both bills is 'native village'. They are similar in that both definitions require at least 25 natives to reside in a village if it is to qualify as a native village. However Section 4(i)(2) of HR 3100 provides that the village must not be modern or urban in character. The Department's proposal states in its definition that a village must be listed in either Section 10 or 14 and must be determined by the Commission as having 25 natives on December 31, 1970.
>
> It is our feeling that both the listing of native villages in the bill and a cut-off date for qualification of 25 native residents is important to establish definite boundaries for land withdrawals. If the villages are not listed in the bill then for a certain period of time after enactment of the legislation there would be no way to determine what land would be subject to native settlement and what would be available for State selection or other use. <u>It is quite important to establish by the enactment of this legislation the exact land acres that will be available for natives in order to eliminate conflicts in the future. Identifying the villages in the bill and tying land withdrawals and patents to specifically defined areas surrounding the listed villages will avoid such future conflicts.</u>" (emphasis added).

In the above-referenced quotation the Secretary clearly sought to link the land reserved for Native selection with actual Native

villages. This quest for certainty would require the withdrawal of land only for villages which existed in fact, not villages created by a declaration of a "floating intention" of residence. Congress' establishment of §11(b)(3) villages is not at odds with the principle so clearly stated by the Secretary above, but merely provides an opportunity for villages, existing in fact, but inadvertently omitted from the list in 11(b)(1), to share in the benefits of the Act. Thus, the Secretary recognized the problems of interpreting the Act as village-creating and consequently the Bureau of Indian Affairs is far outside the scope of its authority in interpreting the word "residence" in derogation of the Secretary of Interior's plain understanding.

    That the Secretary realized that the word "residence" was to have its ordinary meaning is further seen from his decision not to file an environmental impact statement. Were the regulations to be defined as suggested by the words "some ties" as found in paragraph 16 of the instructions accompanying the enrollment form, they would have the effect of moving persons from cities like Anchorage, Fairbanks and Juneau to newly resurrected villages to which "some ties" may be had. This is what has happened in the village of Nooiksut on the North Slope where a town was created overnight with the help of prefabricated, modular construction. It is clear that an environmental impact statement is required where federal action has such a demographic effect. (See, Lathan v. Volpe, 4 E.R.C. 1487, Hanley v. Mitchell, 4 E.R.C. 1152.) Thus, the Secretary's decision not to file an environmental impact statement demonstrates his understanding that the regulations would not have a demographic effect, inasmuch as withdrawals would be for existing, populated villages. He doubtless never dreamed that "residence" would be strained into the "some ties" interpretation given it by the Bureau of Indian Affairs.

    Third, while it does not go far enough, Regulation 25 C.F.R. 43h.1(k) comports with the normal definition of residence.

> "Permanent residence means the place of domicile on April 1, 1970 which is the location of the permanent place of abode intended by the applicant to be his actual home. It is the center of the Native family life of the applicant to which he has the intent to return when absent from that place. A region or village may be the permanent residence of an applicant on April 1, 1970 even though he was not actually living there on that date if he has continued to intend that place to be his home.

This regulation is inadequate insofar as it permits a finding of permanent residency without an independent determination thereof based on objective evidence. Moreover, this definition does not explicitly state that to be a resident one must have actually lived in a place for some time. However, that result is implied by the phrase "is the location of the permanent place of abode". Abode in its ordinary sense means the place where someone dwells.

-10-

167

Accordingly, it appears that the Secretary understood that the word "residence" would be used in its ordinary sense: the foregoing simply does not allow the "some ties" interpretation given it by the Bureau of Indian Affairs.

In view of the foregoing, appeal is made of the Bureau of Indian Affairs' attempt to circumvent the April 1, 1970 cut-off date set forth in the Act by interpreting the words "or other evidence satisfactory to the Secretary" in Regulation 43 C.F.R. 2651(b)(2)(A) to mean that 1971 or 1972 self-serving statements of what one's intent had been as of April 1, 1970 is sufficient evidence of residence if the Juneau Area Director desires such evidence to replace objective indicia of intent. The wording of the Act is plain and unambiguous. If either the census or other evidence show less than 25 Natives as residents of the village then it cannot be certified. Thus, if the 1970 census showed 25 Natives as residents of the village, but other evidence showed less than 25, the village would not qualify. If other evidence equal in weight to the presumptive evidence of the census, were shown that would be sufficient to show 25 residents. To permit a self-serving declaration of what one's intent was in April 1970 to be <u>conclusive</u> evidence of residence on the basis of this section (as was done with respect to each of the above named villages) is a flagrant misreading of 43 C.F.R. 2651(b)(2)(A).

In sum, the words "some ties", which the Natives were led to believe could mean "permanent residence", do not equate with permanent residence. Congress intended the word "resided" as used in §5(b) of the Act to be given its ordinary meaning. Because the words "permanent residence" as used in the Regulations were not properly defined in paragraph 16 of the Instructions many Natives are enrolled to the wrong village. Because they are enrolled to the wrong village the Director of the Bureau of Indian Affairs has caused the Secretary of Interior to fail in his duty under Section 5(b), to wit:

> "The roll prepared by the Secretary shall show for each native among other things, the region and the village or other place in which he resided on the date of the 1970 census enumeration, and he shall be enrolled according to such residence."

Because the Natives, in many instances, stated that they resided in a place to which they had "some ties", as opposed to their actual permanent residence, many Natives are misenrolled. Because they are misenrolled it is impossible for the Secretary of Interior to comply with his duty under 11(b)(2) to "review all the villages listed in subsection (b)(1) hereof" and "determine" whether or not a village had less than 25 residents. For this reason it is clear that the Secretary cannot proceed with respect to the certification of eligibility of any villages until the rolls are corrected. Accordingly, the appellants herein move that: 1) the rolls be corrected immediately and 2) no villages be certified as eligible

-11-

166

under the Act unt___ such corrections are made.

### C. POWER TO CORRECT THE ROLLS

The Secretary of Interior has the power to correct the rolls. In Section 11(b)(2) he is ordered by Congress to conduct a review of the villages' eligibility and to determine their eligibility. This determination of eligibility is in turn dependent on enrollment. Likewise, the Juneau Area BIA Director is requred to "investigate and examine available records and evidence that may have a bearing on the charater of the village and its eligibility pursuant to paragraph b of this section." (43 C.F.R. 2651.2(a)(1)) This duty, too, is dependent on enrollment. From both of these sections the conclusion is compelled that the Secretary can change the place of enrollment of an improperly enrolled native. This is borne out by the Supreme Court decision in Lowe v. Fischer, 223 U.S. 95 (1911). This was a suit to disenroll certain Indians from rolls prepared by the Dawes Commission. The Secretary of Interior was ordered by the Court of Claims to enroll certain Indians, whose names had erroneously appeared on the Kern-Clifton roll, upon the final roll. The Court said, at page 108:

> "In all the legislation providing for the making of the rolls care is observed to prevent or correct mistakes and to defeat attempts at fraud. We have seen what powers the Dawes Commission was given to investigate the rights of persons whose names were on the rolls, and, as to freedmen, strict compliance with the decree of the court of claims was enjoined. By the Act of March 3, 1905 (cite omitted) the work of completing the unfinished business of the commission was devolved upon the Secretary of Interior, and all the powers theretofore granted to the commission were conferred upon the Secretary. It was subsequent to this act that action was taken as to relators and their names stricken from the rolls. This revisory and corrective power of the Secretary over the allotment of land is similar to that exercised by the Land Department respecting the entries upon public lands which this court has stated to be correct and annul entries of land which were made upon false testimony and without authority of law." (citations omitted)

Likewise, in Stookey v. Wilber, 58 F.2d 522 (D.C.Cir. 1932) the Court said, at page 523:

> "We think the Secretary's power and authority to correct the rolls where mistakes and inadvertence appears is well settled."

Since the authority exists to correct the rolls, and since the Director Juneau Area Office of the Bureau of Indian Affairs has the duty to "investigate and examine all available

records and evidence that may have a bearing on the character of the village and its eligibility", it is clear that the enrollment must be redone. Little time need be lost in so doing as computers can compare the 1970 census with the place of enrollment listed by the various enrollees. Wherever it appears that a Native did not physically live in the village to which he was enrolled the other indicia of residence stored on computer tapes would often be conclusive, objective evidence of residence. Only where the other indicia of residence appearing on the computer printouts are not conclusive as to residence would a re-enrollment be necessary. This procedure would be far less costly in terms of time and expense than litigation of the issue.

## II. VILLAGE BY VILLAGE APPEAL

The Juneau Area Director of the Bureau of Indian Affairs (hereinafter Director) was delegated the duty to "investigate and examine available records and evidence that may have a bearing on the character of the village and its eligibility pursuant to paragraph b of this section", (43 C.F.R. 2651.2(a)(1)). The following matters show that such an investigation was never made, but instead the Director relied solely on the declaration set forth in Column 16 of the enrollment form as conclusive as to residence. It is submitted that the Director should have determined whether or not the individuals involved resided in the area to which they enrolled as the term "residence" was intended by Congress to mean. The relevant records which should have been examined to determine residency as intended by Congress are voter registration records, fish and game licensing records, employment records, census tract records, social security registration records, church membership and baptismal records, motor vehicle registration records or driving license records, and other records of vital statistics. Where such villages were not shown on the 1970 census, this, in itself, should have caused the Director to make a careful examination of the residence listed in Column 16. Since he did none of these things with respect to any of the villages listed below, his decision with respect to each of them is arbitrary and capricious and is appealed.

The enrollment to each of the villages listed below highlights the contention of Part I that the rolls must be redone because they are patently incorrect:

1. Alexander Creek - The Bureau of Indian Affairs printout for Alexander Creek run November 8, 1973 shows 37 persons enrolled to the village with only one, Lawrence Roberts, actually residing there now. Alexander Creek is not listed as a village in the unincorporated places of 25 to 999 in the 1970 census (hereinafter called 1970 census).

2. Anton Larsen Bay - The printout run by the Bureau of Indian Affairs November 8, 1973 shows none of those certified as eligible as living at Anton Larsen Creek. Nor is it listed as a village in the 1970 census.

-13-

164

3. <u>Bells Flats</u> - The printout prepared by the Bureau Bureau of Indian Affairs on November 7, 1973 and that prepared November 8, 1973 show only 22 persons enrolled to Bells Flats. Of the persons listed in the November 7 printout (which includes information concerning their permanent residence on the filing date, where they resided for two years as of April 1, 1970, where they resided for 10 years prior to that, their birth place and ancestral birth place) none shows any connection whatsoever with Bells Flats, other than listing it as it their permanent residence. Accordingly, even under the improper standard of "some ties" as printed on the instructions to the enrollment form, these individuals do not qualify for enrollment for Bells Flats. Moreover, Bells Flats is not listed as a village in the 1970 census.

4. <u>Bettles Field</u> - The printout run by the Bureau of Indian Affairs on November 8, 1973 shows only 15 persons enrolled to Bettles Field who currently reside there. Moreover, Bettles Field is not listed as a village in the 1970 census.

5. <u>Caswell</u> - The printout run by the Bureau of Indian Affairs November 8, 1973 shows none of the enrollees presently living in Caswell. Furthermore, Caswell is not listed as a village in the 1970 census.

6. <u>Chenega</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows none of those enrolled to Chenega as presently living there. Nor is Chenega listed as a village in the 1970 census.

The <u>Cordova Times</u>, dated July 18, 1973, states that on July 17, 1973 the former residents of Chenega voted to return to the old townsite and that it was the first time they had met since 1964. In this respect, it is important to note that the Act-of-God clause included in Regulation 43 C.F.R. 2651.2(b)(2) goes beyond the authority of the Act. That is to say, Congress did not intend for abandoned villages to be resurrected by the Act, nor did it intend for the Act to cause population redistribution or village-creation. The intent was to provide land to actual villages. Congress' intent is even more clear with respect to the Act-of-God situation. During the course of the debate on the various proposed bills which Congress considered to settle Native claims, the village of Afognak, which likewise had been destroyed by the 1964 earthquake, was discussed. Significantly, Congress did not include an Act-of-God clause in the Act nor did it list Afognak as a village under 11(b)(1). Congress' deliberate rejection of Afognak as a village after discussing it on the floor points out with particular clarity Congress' intent not to resurrect abandoned villages. (See 82 C.J.S. Statutes §328). By the same token, Chenega should not be resurrected as a village and, to the extent that Regulation 43 C.F.R. 2651.2(b)(2) permits this to be done, the regulation is in derogation of the Act, is unlawful and, thus, protested. For the foregoing reasons, the inclusion of Chenega as a certifed village under this Act is protested.

7. <u>Chickaloon</u> - The Bureau of Indian Affairs' printout run November 8, 1973 shows none of the enrollees to Chickaloon to be residents. Moreover, Chickaloon is not listed as a village in the 1970 census.

8. <u>Chuloonivik</u> - The Bureau of Indian Affairs' printout dated November 8, 1973 shows only 7 persons presently residing in Chuloonivik. Moreover, Chuloonivik does not appear as a village in the 1970 census.

9. <u>Council</u> - The November 8, 1973 printout by the Bureau of Indian Affairs shows only 6 persons as presently living in Council. Council is not listed as a village in the 1970 census.

10. <u>Eyak</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows 313 persons enrolled to Eyak, but none presently living there. Moreover, Eyak is not listed as a village in the 1970 census.

11. <u>Kasilof</u> - The inclusion of Kasilof as a village under the Act is protested for the reasons set forth in the body of the protest with respect to the illegality of the entire enrollment as it has thus far been conducted under the Alaska Native Claims Settlement Act.

12. <u>King Island</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows none of the enrollees to King Island as presently living there. Moreover, it is not listed as a village in the 1970 census.

13. <u>Knik</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows only 8 enrollees to Knik as presently resid-ing there. Knik is not listed as a village in the 1970 census.

14. <u>Montana Creek</u> - The Bureau of Indian Affairs printout-out run on November 7, 1973 shows only 8 persons presently living in Montana Creek.

15. <u>Point Possession</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows none of the enrollees to Point Possession as presently living there. Moreover, the 1970 census does not list it as a village.

16. <u>Solomon</u> - The Bureau of Indian Affairs printout run November 8, 1973 shows only 1 enrollee to Solomon as presently living there. Moreover, the 1970 census does not include it as a village.

17. <u>Umkumiut</u>- The Bureau of Indian Affairs printout run November 8, 1973 shows all of those enrolled to Umkumiut as living in Nightmute. Furthermore, Umkumiut is not listed as a village in the 1970 census.

16. Woody Island - The Bureau of Indian Affairs print-out dated November , 1973 shows only 2 of the persons enrolled to Woody Island as living there at the present time.

With respect to the Director's administrative decision, then, the following is thus clear:  1) it was not preceded by a finding of fact as is required by the Secretary of Interior's own regulations quoted above; 2) the glaring discrepancy between the number of people enrolled to each of the above-mentioned villages with the 1970 census and the number shown living there now, clearly indicates the need for an investigation for other indicia of residence. The failure to investigate in view of this information is a clear breach of the Director's nondiscretionary duty, thus making his administrative decision "arbitrary and capricious"; and 3) for the foregoing reasons the Director's administrative decision is not based on "sufficient evidence".

On the basis of the information provided herein, this Board should, on its own authority, declare the above-mentioned villages ineligible for benefits under the Act. Alternatively, it should order the Director to perform the investigation which should have been already performed. Should the latter be the order of the Board, it is respectfully submitted that careful guidelines be set up for the Director to ensure that residence is determined as intended by Congress under the Act. Specifically, he should be ordered not to rely on column 16 of the enrollment form as proof-positive of the enrollees' permanent residence.

### III. PRAYER FOR RELIEF

On the basis of the foregoing, appellants herein make the following requests for relief:  1) that the entire enrollment made under the Alaska Native Claims Settlement Act be redone for the reasons set forth in Part I of this appeal; 2) pending determination of this issue by either this Board, the Secretary, or a court, no further action whatsoever be taken under the Alaska Native Claims Settlement Act, to include the determination of appeals by this Board; 3) that should the enrollment issue be determined adversely to the appellants, the Board should rule with respect to each village of the basis of the file before it or order a remand for a complete investigation into the residence of each of the enrollees to the above-mentioned villages inasmuch as gross investigation of the enrollment forms indicates a need therefore.

DATED this 29 day of March, 1974.

Respectfully submitted,

ROBERTSON, MONAGLE, EASTAUGH & BRADLEY

By _____
James F. Clark, Of Attorneys for Appellants Alaska Wildlife Federation and Sportsment Council, Inc., and Mr. Philip Holdsworth

161

-16-

pgs 7 thru 22 were filed under Woody Island