# EXHIBIT "2"

examination, the Court cannot give the affidavit as much weight as it would live testimony, but notes that the affidavit corroborates genealogical information that is a matter of public record, and evidences the desire of another Leisnoi shareholder to return to Woody Island.

366.   L-Doc 123 is a 1983 article prepared for the Institute for Public History describing the Navy in Alaska, 1867 through 1941, and focusing on the Naval Radio Station located on Woody Island.   The article recounts that the Naval Radio Station on Woody Island was established in 1911 and that the site included an office, a cottage, and two storehouses that had been built by the North American Commercial Company in 1890.   The article mentions a series of fires that destroyed the station on several occasions.   The report describes the Naval Radio Station on Woody Island as being "important to understanding of Alaskan and Naval communications history...The site is recommended to be considered for inclusion in the National Register of Historic Places...and to be included in the Alaska Heritage Resource Survey."   The Navy Wireless Station on Woody Island was an important part of the history of Woody Island in this century.

367.   L-Doc 124 is an affidavit of Maurice Harmon, who testified live at the hearings in Anchorage.   It corroborates the genealogical information contained in the Fadaoff Family Genealogy, L-Chart 5, lists a number of individuals of Native ancestry who lived on Woody Island in the 1960s, and reiterates Maurice Harmon's desire to move back to Woody Island on a permanent basis.   Maurice Harmon was subjected to cross

examination at the hearings in Kodiak, so Protestant had a full and fair opportunity to challenge any statements that were contained in the affidavit.

368.   L-Doc 125 is a May 18, 1995 affidavit of Paul R. Harmon, who also testified at the hearings in Anchorage. The document corroborates the Fadaoff Family Genealogy contained in L-Chart 5 and lists a number of Native Woody Islanders whom Paul Harmon knew while he was growing up as a child on Woody Island. Since Paul Harmon testified live at the hearings in Anchorage, the Protestant had a full and fair opportunity to cross examine him, so the Court finds that the affidavit is entitled to greater weight than unsworn testimony by witnesses who were not cross examined.

369.   L-Doc 126 is a 1952 article in the anthropological papers of the University of Alaska entitled "Notes on Koniag Material Culture". It describes how the Koniag economy was based upon salmon and sea mammals which they took with a variety of hooks and harpoons. The article is relevant to show the impact of the Russian contact and later the American contact with the Native Koniag peoples who resided in the Kodiak archipelago.

370.   L-Doc 127 are records pertaining to the Russian orthodox church in 1904 prepared by Antonii Hieromonk. The document references "two parcels of land situated on Wood Island two miles from St. Paul Harbor containing about 10 acres, used for a church and cemetery." The document establishes Russian church landholdings on Woody Island dating back to the turn-of-the-century.

371.   L-Doc 128 is the transcript of a June 16, 1997 interview with Mary Pavloff Hill, the daughter of Woody Island villager and Leisnoi shareholder Michle P. Pavloff. Mary

Anna Pavloff Hill identified her grandfather as having been Peter Pavloff, who died in the 1930s on Woody Island. Mary Anna Pavloff Hill described having returned to Woody Island in 1979 with her father and her brother, Peter Nicholas Pavloff. According to Mary Anna Pavloff Hill, her father had talked about wanting to live back on Woody Island again and "The only thing that stopped him was that it -- the cost of living was high and there was no work for him." (Doc 128 at p. 12.) Although Mary Anna Pavloff Hill did not testify live at the hearings, and therefore was not subjected to cross examination, most of the information contained in Document 128 relevant to these proceedings is genealogical in nature, and was used simply to prepare the Pavloff Family Genealogy, L-Chart 6. Since Mary Anna Pavloff Hill did not claim to have lived on Woody Island for a period of time in 1970, the document provides essentially background information rather than evidence directly pertinent to the core issues being litigated in these proceedings.

372. L-Doc 129 is the April 28, 1995 affidavit of Christina Simeonoff Hoen. The affidavit contains genealogical information about her parents and siblings, as well as historical data describing how Christina Simeonoff Hoen's grandmother, Ella Chabitnoy, lived on Woody Island her whole life in a house that was given to her by Chief Yellow Pants. Christina Simeonoff Hoen testified live at the hearings in Kodiak, and most of the information contained in her affidavit was the subject of live testimony. The affidavit does make it explicit that persons of Native heritage whom she knows have lived on Woody Island include her aunt Judy Komm and Judy's 11 children; her aunt Naustia Harmon, her husband and their eight children; the Sundberg family; the

253

Nicholas Pavloff family; Agnes Frump, a daughter of Angeline Maliknak, with her three children; the Michael Tunohon family; her uncle James Fadaoff; her uncle Mickey Chabitnoy; and Giorgi Nekeferoff. Tina Simeonoff Hoen states that in 1973 there were eight Native family homes that were still standing on Woody Island. Tina Hoen states in her affidavit that "I consider Woody Island my home and I would move back there and build a new home as a permanent residence if it were feasible." Since Protestant had an opportunity to cross examine Tina Simeonoff Hoen, the Court finds that her sworn affidavit is entitled to greater weight than unsworn statements or affidavits by persons who were not cross examined by the Protestant.

373.  L-Doc 130 is the transcript of a March 20, 1998 interview of Walda Ann Hoff by Kathleen Putman. Ms. Hoff states therein that she is the daughter of John and Mary Chya, and that her children's names are Keith, Randy, Marvin, and David, all four of whom were on Woody Island with her in 1970. Ms. Hoff states that in 1970 "We used to go over there quite often on the weekends, mainly on Sunday..." Walda Hoff informed Kathleen Putman that her father, John Chya, used to tell stories about Woody Island, and considered Woody Island to be his home. Additionally, she confirmed that her mother had considered Woody Island to be her home. Ms. Hoff states that if she had the opportunity to live on Woody Island she would, and noted that "It's beautiful over there, just beautiful." L-Doc 130 establishes the presence of Walda Hoff and her four children on Woody Island in 1970. Although Walda Hoff did not testify live at the hearings, and therefore was not cross examined, the Court notes that Protestant did not introduce any evidence negating the presence of Walda

254

Hoff and her four children on Woody Island in 1970. If there had been conflicting evidence about Walda Hoff's presence on Woody Island in 1970, the Court would attach greater significance to the fact that Walda Hoff did not testify live under oath at the hearings; however, since Protestant did not introduce any evidence directly challenging the statements contained in L-Doc 130, the Court finds no basis to disregard the statement of Walda Hoff that she and her four children were on Woody Island in 1970.

374. L-Doc 131, "Ethnographic Sketches of the Peoples of Russian America", is a paper containing extracts of material relating to Alaska Natives translated from the original 1856 German publication by Danish naturalist Heinrich Homberg, who spent two years, 1850-1852, in Russian America. He describes the Koniag rituals, customs, religious beliefs, foods, hunting techniques, physical characteristics, myths, wars, and dwellings. The article is relevant to show the traditional Native lifestyles and living arrangements in existence after the Russian contact. The indigenous people of the Woody Island area have ties to the land as well as traditional customs that go back thousands of years.

375. L-Doc 132 is the transcript of an April 14, 1997 interview by Frank Feichtinger with Joanne Holmes. Ms. Holmes describes her Native lineage in the course of the interview, and describes how she frequented Woody Island in the 1960s for recreational activities. Ms. Holmes concedes that she was not on Woody Island in 1970, so the Court finds no prejudice in reviewing her unsworn testimony as background material of another Leisnoi shareholder who has spent time on Woody

Island and evidenced a love for the Island. Ms. Holmes was prepared to testify live at trial in Kodiak; however, the parties stipulated that the substance of her testimony would be that she had lived on Woody Island for a period of time in the refurbished FAA housing units prior to the fire. Ms. Holmes had worked for Leisnoi helping to refurbish the FAA housing units. The relevance of the refurbishing of the FAA housing units is to confirm that the Leisnoi shareholders had an intent to repopulate Woody Island.

376.   L-Doc 133 was withdrawn.

377.   L-Doc 134 is a December 13, 1979 newspaper article in the <u>Kodiak Daily Mirror</u> describing the destruction of the refurbished FAA housing units on Woody Island on December 12, 1979. The document is relevant in showing that Leisnoi, Inc. has faced a number of obstacles that have prevented the Native Woody Islanders from repopulating Woody Island.

378.   L-Doc 135 is an August 6, 1996 newspaper article in the <u>Kodiak Daily Mirror</u> entitled "Human Bones Found on Woody Island." The article notes that the wooden coffin contained square nails, leading the curator of the Alutiiq Museum to conclude that the burial had likely taken place prior to the turn-of-the-century. The article is relevant to show the use and occupancy of Woody Island is not a recent phenomena.

379.   L-Doc 136 is a May 26, 1993 <u>Kodiak Daily Mirror</u> article entitled "Baptist Mission Celebrates 100 Years in Kodiak." The article recounts that in 1886, "Woody Island was Kodiak Island's center of activity; present day Kodiak was a Village. The Alaska Commercial Company operated its business from several buildings and a wharf on

Woody Island.  A San Francisco-based ice company moved its operation from Sitka to Woody Island in 1857 and ran its ice cutting and shipping business from there for 20 years.  The Russians had built a gristmill on Woody Island, grinding wheat shipped up from the Russian River Valley in California.  Woody Island also had a Native village and a Russian Orthodox Church."  The document is relevant to confirm some of the interesting historical facts about Woody Island, and also in that the article affirmatively states that there was a "Native village" on Woody Island.

380.    L-Doc 137 is a June 21, 1984 obituary of John Chya, Sr.  The obituary includes a listing of his offspring, including Walda Hoff, who stated in an interview that she had been on Woody Island in 1970.  The document is relevant to show the genealogy of the Chya family as depicted in L-Chart 4, and also to show that Walda Hoff has longstanding family ties to Woody Island.

381.    L-Doc 138 is a November 17, 1967 newspaper article pertaining to a proposed development of a large airport on Woody Island.  The <u>Kodiak Island Mirror</u> comments that "the idea is both interesting and attractive", and suggests that the proposal should "be given greater study as a major product to assure Kodiak of a capability for participating in the air-tourism projected for the near future."  The document is relevant in that it shows how Natives considering moving back to Woody Island were aware of a risk that the entire Island would soon be converted into a large airport.  Coupled with the closure of schools, restriction of *FedAir IV* operations to FAA personnel only, and the scale-back in FAA employment on Woody Island,

L-Doc 138 is another example of the difficulties that would have to have been considered by Natives who wanted to return to Woody Island.

382.   L-Doc 139 is a June 19, 1997 on-line article by Lynn Johnston describing cartoonist Virgil Partch, one of the famous offspring of the Pavloff family, depicted at L-Chart 6.  She describes Virgil Partch's humor as being "ahead of his time" and "unique."  The document is relevant in that it shows that one of the descendants of perhaps the oldest Alaskan family made a place in history for himself.  The birthplace of a famous American cartoonist is another example of the interesting history of Woody Island.

383.   L-Doc 140 is an April 27, 1977 article that appeared in the Greatlander, Vol. 9, No. 17.  The article is entitled "Phyllis Carlson serves Alaska for over 60 Years."  The article describes the colorful and interesting life of Phyllis Carlson, the researcher and historian who had worked on Woody Island during the 1960s, and had observed that there were 20 Natives on Woody Island at the time of the earthquake.  The article describes how after living on Woody Island, Phyllis Carlson went on to become a researcher at the Loussac Library, ultimately retiring in 1974.  The document is relevant to show the skills and abilities of this researcher who identified there having been 20 Natives on Woody Island in 1964.

384.   L-Doc 141 is an excerpt from an August 18, 1918 Russian America newspaper article about Rev. Andrew Petrovich Kashevaroff, who was a Russian orthodox priest in Kodiak around the Turn of the Century.  The article references how the priest had made use of one of the Alaska Commercial Company's schooners.  The Alaska Commercial Company played a role in the history of Woody Island.

385.   L-Doc 142 is an October 1, 1887 publication in <u>The Alaskan</u>. The article describes how "At Wood Island, not many miles from Kodiak, there is a thrifty population with 50 or more children of school age. The men and women were greatly disappointed that no teacher could be provided for them. A lady could be stationed here, and no building need to be erected. There is a house formerly belonging to the Ice Company of San Francisco which could be fitted up at a small outlay..." The article is relevant to show the historical use and occupancy of Woody Island.

386.   L-Doc 143 is a December 20, 1972 letter to Karl Armstrong from an assistant to Congressman Begich responding to a request for a $20,000.00 community development grant application for Woody Island Village. The document is relevant to show Karl Armstrong's work on behalf of Woody Island Village and his efforts to repopulate the Island.

387.   L-Doc 144 is another letter to Karl Armstrong from assistant to Congressman Nick Begich approved for only $3,000.00, rather than the $20,000.00 requested. The document has the same relevancy as does Document 143.

388.   L-Doc 145 was withdrawn.

389.   L-Doc 146 is the transcript of a March 23, 1998 interview by Kathleen Putman of Harold W. King, who testified live at the proceedings in Anchorage. In the interview, Mr. King describes having grown up on Woody Island, and describes his family genealogy as it has been incorporated into L-Chart 6, the Pavloff Family Genealogy. Harold King recalls having played with the Chya boys while growing up on Woody Island, as well as the Harmons. Since Harold Frump King was cross-

259

examined at the hearings in Anchorage, the Court finds no prejudice in reviewing the transcript of his interview to provide supplementary background information pertaining to this witness.

390.    L-Doc 147 was withdrawn.

391.    L-Doc 148 is an April 28, 1969 <u>Kodiak Daily Mirror</u> newspaper article entitled "Kodiak Prisoner Ruled a Suicide." It describes how James O. Fadaoff committed suicide while serving a seven-year sentence for his manslaughter conviction of Rosemary Challiak. The document is relevant to corroborate testimony presented at the hearings describing the manslaughter of Rosemary Challiak, and the subsequent suicide of James Fadaoff.

392.    L-Doc 149 is a May 18, 1995 affidavit of Mitch Gregoroff, who testified live at the hearings in Anchorage. The affidavit provides genealogical information, and confirms Mitch Gregoroff's having grown up on Woody Island and having been familiar with a number of Woody Island villagers. The affidavit supplements the live testimony given by Mitch Gregoroff. Since Mr. Gregoroff was subjected to cross examination at the hearings in Anchorage, the Court finds no prejudice in reviewing his affidavit that reiterates that "To this day I have wanted to move back to Woody Island on a permanent basis. It is a beautiful and quiet place and it is where my roots are. I would like to once again live the lifestyle I enjoyed as a resident there." The affidavit confirms that "As a result of the earthquake the running water system that supplied our house was damaged..."

260

393. L-Doc 150 is a May 22, 1991 article prepared by archaeologist Richard A. Knecht entitled "Archaeological Investigations at Woody Island, Kodiak, Alaska." The article was prepared as a part of consultation for the Kodiak Electrical Association. Archaeologist Knecht describes how he undertook a systematic archaeological survey along the site where an underground electrical line was to be installed. He describes the occupancy in the area as dating back to the Ocean Bay 1 Phase, approximately 6,200 years ago. He further describes how at the time of the sale of Alaska to the United States in 1868, the Russian American Company owned a store on Woody Island, and the American Russian Company of San Francisco owned the ice company on Woody Island. Mr. Knecht describes how "The ice company may have been the reason for the odd purchase price of 7.2 million the United States paid the Russian government. Apparently the $200,000 was to cover the outstanding contract the Russian American Company had with the American Russian Commercial Company of San Francisco to deliver ice." Mr. Knecht goes on to describe how "Woody Island became a thriving native community, and residents hunted sea otter in the summertime and cut and stored ice during the winter." Mr. Knecht further gives an historical overview of how the North American Commercial Company was established on Woody Island in 1891; how in 1911 the government built a wireless station on Woody Island; how in 1941 and for approximately 30 years thereafter, the FAA communications station played a major role in contributing to the history of Woody Island; and how "maps made early in the 20th century showed that the study area was on the outskirts of Woody Island Village." L-Doc is 150 is relevant in that it

261

confirms historical information described by Frank Feichtinger in his Investigative

Case Report, and further corroborates some of the archaelogical testimony given by

Chris Wooley.

394.    L-Doc 151 is an 1872 publication of <u>The Overland Monthly</u>, published in San

Francisco containing an article describing "Wood Island":

>"Wood Island, the depot of the Sitka Ice Company, is low, and
>covered with a dense growth of fir. From the centre of the
>island a small stream runs toward the coast, which has been
>dammed in several places, forming large ponds of pure, clear
>water. The ice is cut in the usual manner, and stored for the
>San Francisco market. The ice-houses are large and well built,
>and are said to have capacity for ten thousand tons. The
>company owns a number of vessels, and employ during the
>winter from one hundred fifty to two hundred men, who receive
>about twenty cents per diem, their food, and a drink of black
>rum. During the summer, the men are employed in hunting
>furs and fishing, and the women assist in cleaning and packing
>cod-fish. A large village of Aleuts, of the same tribe as those
>on Kodiak, is located near the company's head-quarters. Their
>houses are not so well built as those of their neighbors, being
>merely large holes in the ground, covered with a roof of
>timber. The church, recently erected by the company, has a
>bell, and is crowded with natives every Sunday."

(L-Doc 151 at p. 506.)

The article is relevant to confirm the fact that Woody Island supplied ice to the San

Francisco market, and also to demonstrate that there was a large Native Village on

Woody Island in 1872, buttressing Leisnoi, Inc.'s argument that the Native Village

of Woody Island is an historic and traditional Native Village.

395.    L-Doc 152 is an October 23, 1968 <u>Kodiak Daily Mirror</u> article entitled "Kodiak DAV

Post Named for Army Hero Dan Harmon." The article notes that Danny Harmon

"died on the battlefield in Vietnam", and described him as "a youth from one of

Kodiak's oldest established families..." The article is relevant to show that an act of governmental authority, the Vietnam War, took the life of a young Native Woody Islander. The article is also relevant in that it describes the Harmon family, four of whom testified at the hearings, as being one of the area's "oldest established families", thereby corroborating the testimony of the Harmon brothers about their longstanding ties to the region.

396.    L-Doc 153 is an article by Linda Tobolic pertaining to her interview of Natalie Simeonoff. Ms. Simeonoff is quoted in the article as describing how "When I grew up there was mostly Native people here, and only a few whites. But only the storekeeper and the bookkeeper at the Baptist mission. There were the workers and the missionaries. They were whites. There were only four or five of them, though, the rest of the people were a mixture of Native Aleut. We were strictly a majority then." Ms. Simeonoff went on to describe how during World War II, "A lot of military were on Woody Island along with the Net Depot and a sawmill. There was a lot of military people...Now we are the minority and there are more whites than natives." Ms. Simeonoff is quoted in the article as stating "Well, most of my fifty-nine years I was born on Woody Island, and lived there...We moved back and forth from here to Woody." The article is relevant in that it confirms Natalie Simeonoff was born on Woody Island and lived there most of her life, and also verifies that the history of Woody Island was one where the Native population was in the majority.

397.    L-Doc 154 was withdrawn.

263

398. L-Doc 155 is a March 1, 1979 newspaper article entitled "Koniag attorney replies to Jack Anderson columns." The article quotes a letter to Chairman Udall by Koniag's attorney. The article notes that "Leisnoi is a certified village. It went through the administrative process established by the Secretary of the Interior under ANCSA to determine village eligibility. Leisnoi was certified by the Secretary of the Interior after its examination by the BIA which was charged with examining each and every village that claimed eligibility under ANCSA." The article notes that "There is much sound and fury which signifies nothing except that a small band of diehards in Kodiak chose not to have their charges tried before an administrative law judge of the Department of the Interior at the proper time and who got nowhere in court, are moving heaven and earth to destroy Leisnoi, Karl Armstrong and Koniag. It is time to call a halt to this kind of persecution..." The article is relevant to show that there are certainly two sides to the story published by Jack Anderson to which the letter responds.

399. L-Doc 156 is a March 2, 1979 article completing the reply of Koniag's former counsel, Edward Weinberg's reply to nationally syndicated columnist Jack Anderson's columns dealing with ANCSA. The article has the same relevancy as does Doc 155.

400. L-Doc 157 was withdrawn.

401. L-Doc 158 is a February 27, 1979 article in the Kodiak Daily Mirror again pertaining to the response by Koniag's attorney in a letter to Representative Morris Udall, Chairman of the House Committee on Interior and Insular Affairs, responding to Jack

264

Anderson's syndicated column.  The article has the same relevance as do Documents 155 and 166.

402.    L-Doc 159 is a June, 1979 publication in Culture of Medicine and Psychiatry entitled "Socio-Cultural Stress and the American Native in Alaska:  An Analysis of Changing Patterns of Psychiatric Illness and Alcohol Abuse Among Alaska Natives".   The article notes that the number of Alaska Natives being treated for psychiatric illness and alcohol abuse has been rising steadily and that for each category of violent death, suicide, homicide, accidents and alcohol, rates for Alaska Natives are higher than rates for Alaska non-Natives.  The article notes that "In the last one hundred years the Natives have moved from a full-time subsistence hunting and fishing mode of life to part-time participation in the wage economy.  Depletion of game resources, larger families which tend to force the hunter into the cash economy, universal education, religious conversion by missionaries, and an increasing demand for goods and services are a few of the many and complex factors involved in this process.  The old nomadic way of life has been greatly attenuated."  (L-Doc 159 at pp. 112-113.)  The article is relevant in that the type of Native Village that the Court should expect to find in 1970 is not the same as would have existed 100 years ago due to a number of changed socio-economic conditions.

403.    L-Doc 160 is an 1827 Atlas of the Pacific Ocean published in St. Petersburg, containing a map showing "I. Boisee", what is now known as Woody Island.  The document is relevant to show that the Russians considered Woody Island significant enough to name and chart.

404.    L-Doc 161 is the Leisnoi shareholder database containing the names of each shareholder and the number of shares owned.  The document corroborates that the individuals whom Leisnoi called to testify at the hearings who claimed to be Leisnoi shareholders are, in fact, shareholders of this Native Village Corporation.   The document is also relevant in that when studying the shareholder names in conjunction with the various genealogy charts introduced by Leisnoi, such as the Pavloff Family Genealogy, L-Chart 6; the Fadaoff Family Genealogy, L-Chart 5; and the other genealogical charts, it is readily apparent that the present Leisnoi shareholders are the modern representatives of a Native people with longstanding, historic ties to Woody Island.

405.    L-Doc 162 is an October 17, 1977 <u>Kodiak Daily Mirror</u> article entitled "Leisnoi Elects Officers; Court Case Still Pending."  The article notes that Karl Armstrong was elected president, Fred Zharoff vice president, and Bob Erickson was appointed to fill the vacancy created by Anita Hartman.   The article describes how Leisnoi "has purchased a rental unit in the Aleutian homes project and is renovating the former FAA housing on Woody Island.  The total costs of the renovations are expected to involve about $200,000, according to the annual report."  The article is relevant to corroborate testimony by Mr. Shuravloff that Leisnoi had spent in excess of $200,000.00 in the renovation project, and also corroborates Fred Zharoff's testimony that he had been serving on the Board of Directors of Leisnoi, Inc. during the renovation project on Woody Island.  Renovation of the FAA housing units on Woody Island is pertinent to corroborate the intention of the Native Woody Islanders to return

266

to Woody Island, since it would have made no sense for the corporation to have invested large sums of money to provide Native housing units on Woody Island if the Natives did not have the intent to return.

406.    L-Doc 163 are the minutes of a February 13, 1978 Board of Directors meeting of Leisnoi, Inc.  The minutes reflect that Karl Armstrong "said that it would be a good idea if we fixed up Nick Pavloff's and Johnny Maliknak's house as it is starting to fall apart.  After some discussion it was decided to provide materials and supervision to help them."  L-Doc 163 is another example of Leisnoi, Inc. expending funds in an effort to provide housing for Natives on Woody Island, thereby further rebutting the contention of Protestant that the Native Woody Islanders did not have an intent to live on Woody Island.

407.    L-Doc 164 are the 1977 and 1978 consolidated financial statements of Leisnoi, Inc. and Subsidiary, prepared by Peat, Marwick, Mitchell & Co.  The notes to the financial statements reveal that "During 1978, the Company completed the renovation of several duplexes and a water and sewer treatment plant located on Woody Island. Approximately $352,000 has been invested in the project, the purpose of which is to provide housing on the island."  The document is relevant to show the major investment of capital resources made by Leisnoi, Inc. to repopulate the Native Village of Woody Island.

408.    L-Doc 165 is the very first Resolution adopted by the Leisnoi, Inc. Board of Directors, Resolution 74-1-1.  This was the document Senator Zharoff referenced in his testimony.  It reflects that the Board of Directors of Leisnoi, Inc. have resolved

to "make all necessary efforts to obtain the FAA housing complex on Woody Island and make feasibility studies of the use of a portion of the same for one or more of the following purposes.  A.  Senior Citizens Housing with preference to stockholder Senior Citizens. B.  Nursing Home Care. C.  A Convention Center. D.  Any other uses." The document is relevant to show the high priority given by the Leisnoi Board of Directors to repopulating the Native Village of Woody Island.  That the Corporation adopted a resolution encouraging feasibility studies of the use of FAA housing on Woody Island shows the priority given by the Corporation to efforts to repopulate Woody Island.

409.   L-Doc 166 is the order of remand from the Interior Board of Land Appeals directing that this administrative law judge conduct hearings regarding the certification of the Native Village of Woody Island, Inc.

410.   L-Doc 167 is Betty Pavloff Lind's affidavit for determination of right to receive ANCSA stock filed in connection with the estate of William Nicholas Pavloff.  The affidavit notes that Betty Lind is the surviving sister of William Nicholas Pavloff, who died on July 13, 1985.  The affidavit notes that Edson Fadaoff and Joseph Fadaoff were his half brothers, and that Nick A. Pavloff, Jr. was his brother.  The document is relevant to corroborate genealogical information used in preparation of L-Chart 6, the Pavloff Family Genealogy, and L-Chart 5, the Fadaoff Family Genealogy.

411.   L-Doc 168 is a June 19, 1997 interview by Frank Feichtinger with Betty Pavloff Lind and Nick Andy Pavloff.  The transcript reflects that Ms. Lind is the daughter of Nicholas Pavloff and Christine Malutin, and that her brother is Nick Pavloff, Jr.  She

268

also had a half brother who is deceased, William Pavloff. Betty Lind confirms that her father had remarried Mary Ponchene. In the interview, Nick Andy Pavloff describes how "We used to spend weekends with our father on Woody Island and then when we moved out here with my -- our grandparents, I used to get to spend two weeks out of -- two weeks in the summertime with my father on Woody Island." Mr. Pavloff stated that this went on for six to eight years. When asked by Mr. Feichtinger "Can you say for relative certainty that sometime in 1970, you were over visting him?" Nick Andy Pavloff stated "For certainty? Yes, I sure can. I got a uncle that lives over there right now." (L-Doc 168 at p. 14.) Mr. Pavloff identified his uncle as being Johnny Maliknak. Mr. Pavloff described how Johnny Maliknak and his father were very close, and stated "He still lives over there and he'll remember all the times that I would go over and visit with my dad." Mr. Pavloff stated that he would often stay overnight and spend a couple of days while visiting with his father in 1970. (L-Doc 168 at pp. 14-15.) Although Nick Andy Pavloff did not testify live at the proceedings in this case, and therefore was not subjected to cross examination, the Court notes that the Protestant did not introduce any evidence directly disputing Nick Andy Pavloff's statement that he had been on Woody Island visiting his father, Nicholas William Pavloff, Sr., and Johnny Malikank in 1970. Thus, while the Court is willing to give less weight to unsworn testimony than live testimony subjected to cross examination, in this instance, where the Protestant failed to produce any evidence directly rebutting Nick Andy Pavloff's statement as to when and why he was on Woody Island in 1970, the Court finds no reason to reject the

269

evidence.  Accordingly, the Court does find that Nick Andy Pavloff lived for a period of time on Woody Island in 1970.

412.    L-Doc 169 is a May 19, 1967 <u>Kodiak Mirror</u> obituary of Wilfred W. Pavloff.  The article notes that "Funeral services for Wilfred W. Pavloff, 47, of Woody Island, were held Friday at the Russian Church."  It notes that Mr. Pavloff "was the first Kodiak man drafted from the Kodiak area during World War II and served six years in the U. S. Army.  Mr. Pavloff's body was found on the beach near the FAA dock at Woody Island and he was reported as an accidental death."  The article notes that Wilfred Pavloff was survived by his sister, Jeannie Sundberg, as well as two brothers, Nick Pavloff and Martin Pavloff.  L-Doc 169 confirms Mr. Pavloff's ties to Woody Island, and corroborates the genealogical information contained in L-Chart 6.  The article is also relevant to show that this member of the Pavloff family, which has longstanding ties to Woody Island, had served his country, as did a number of other Woody Islanders.

413.    L-Doc 170 is a May 21, 1904 newspaper article in <u>The Alaskan</u> confirming that 16 Aleuts from the Kodiak area were participating in the World's Fair Exposition.  The document corroborates testimony by Frank Feichtinger that Woody Island Natives had participated in the St. Louis World's Fair Exposition of 1904.

414.    L-Doc 171 is an article in Volume 9 of the <u>Elwani</u> publication describing how during World War II "They confiscated all the boats that were around here (all the tenders, 70-80 foot) and turned them into patrol boats.  There was a submarine net across from

270

the Beachcombers over to Woody Island, made out of cable." The document establishes the role Woody Island played during World War II.

415.    L-Docs 172, 173, and 174 are two affidavits by Judge Madsen as well as an interview of Judge Madsen by Kathleen Putman. Judge Madsen testified live at the proceedings in Kodiak, and was subjected to cross examination, so the Court finds no prejudice in basing additional findings of fact on two affidavits and an interview by this witness.

In the first affidavit, L-Doc 172, dated March 19, 1979, Judge Madsen recounts how "Sometime in 1973 or 1974 Mr. Stratman approached me in the United States Post Office or immediately outside and said he knew I was a member of or attorney for the native village corporations and informed me that he wished to make a business proposition to the Woody Island Native Corporation (Leisnoi) to sell them his ranch at Kalsin Bay for $750,000.00 and wanted to know if I thought they would be interested." Judge Madsen's affidavit recounts how "his proposal struck me as being so ludicrous that I had a hard time keeping a straight face, but I managed in spite of the absurdity of it and told him I would pass the information on to the Board, which I did. The Board did not feel the offer warranted any response since it was so patently absurd and preposterous and therefore took no action." That affidavit is relevant to show the longstanding efforts by Omar Stratman to acquire money from the Native Corporation while he simultaneously pursues decertification of the Native Corporation. The document is relevant to the motive and intent of the Protestant.

The second affidavit, L-Doc 173, is dated April 8, 1995. In it, Judge Madsen recounts how he purchased the home from Edson, Jr. and Joseph Fadaoff on Woody

271

Island, and corroborates that the Fadaoffs, Pavloffs, Maliknaks, Sundbergs, and George Nekeferoff are all old Woody Island families with strong roots to Woody Island.

In his interview with Kathleen Putman, L-Doc 174, Judge Madsen describes how the gardening on Woody Island is better than gardening on Kodiak due to the difference in the length of time that the sun shines on the two islands. Whereas Kodiak is often in the shadows of some of the mountains, "over on Woody Island where my cabin is on the south end of the island, the sun, when it comes up in the summertime, I get the benefit of it as soon as it clears the trees to the east and it's there until the very last of it goes down behind the Three Sisters...about 10:30 at night, so we have extremely long days there..." (L-Doc 147 at p. 18.)

The affidavits and interview of Judge Madsen expand upon and supplement some of his testimony given at the hearings in Kodiak.

416.    L-Doc 175 is Judge Madsen's Notice of Valid Existing Claim Right pertaining to the real property Judge Madsen acquired on Woody Island "which premises I acquired from said Joseph Francis Fadaoff and on which I have rehabilitated, made improvements and paid Kodiak Island Borough taxes on." The document corroborates testimony by Joseph Francis Fadaoff and Judge Madsen that Judge Madsen had purchased the home on Woody Island that this Court observed during the walking tour, from Joseph Frances Fadaoff.

417.    L-Doc 176 is an April 28, 1995 affidavit of Johnny Maliknak submitted in the federal decertification litigation.

a)    The Court finds that there was virtually no disagreement as to the fact that Leisnoi shareholder John W. "Johnny" Maliknak (born December 17, 1933) has lived his entire life on Woody Island.  The Court observed his present home on Woody Island in the North Village area during the inspection of Woody Island as a part of the hearings in this case.  Since Johnny Maliknak has lived his whole life on Woody Island, the Court attributes great weight to his affidavit attesting to persons of Native heritage who resided in the Woody Island Village at various times during the period 1960 through 1970.  Although Mr. Maliknak did not testify live at trial, the Court finds that he would have testified consistent with his sworn affidavit, and notes that he appears to have been available for subpoena had Omar Stratman's attorney wished to cross examine him.

b)    The Court accepts the firsthand observations of the lifetime Woody Island villager John Maliknak as set forth in Doc 176 that the following people of Native heritage resided on Woody Island at various times during the period 1960 through 1970:

a.    Martin W. Pavloff, Sr.
b.    Bobbie Hall
c.    Martin Hall
d.    Nicholas Pavloff, Sr.
e.    Mary (Fadaoff) Pavloff
f.    Edson Fadaoff, Jr.
g.    Joseph Fadaoff
h.    William Pavloff
i.    Cecil Chabitnoy
j.    Mickey Chabitnoy
k.    Ella Chabitnoy
l.    James Fadaoff
m.    Rosemary Challiak
n.    Wilfred Pavloff

273

o.    Agnes Frump
p.    Harold Frump
q.    Mary Ann Frump
r.    Brenda Frump
s.    Rudy Sundberg, Sr.
t.    Rudy Sundberg, Jr.
u.    George "Giorgi" Nekeferoff
v.    Naustia Harmon
w.    Danny Harmon
x.    Leanna Harmon
y.    Rayna Harmon
z.    Mitch Komm
aa.   Paul Harmon
bb.   Maurice Harmon
cc.   Angelina Pavloff
dd.   Christina Hoen
ee.   Frank Johnson, Sr.
ff.   Frankie Johnson, Jr.
gg.   Mary Kay Johnson
hh.   Lois Penny Johnson
ii.   Charlie Johnson
jj.   Another Johnson Daughter
kk.   Natalie Ponchene Challiak
ll.   Johnny Ponchene
mm.   Kelly Simeonoff, Sr.
nn.   Natalie Simeonoff
oo.   Freddie Simeonoff

c)    Johnny Maliknak identified family homes of persons of Native heritage located in Woody Island Village, including the family homes of Nick and Mary Pavloff; the Chabitnoys; the Simeonoffs; himself; the Sundbergs; and the Harmons. Mr. Maliknak noted that there were other family homes at that time not shown in the photograph made a part of his affidavit (Doc 176). The Court finds that his identification of these structures and the Native families who resided therein is credible and based on firsthand personal knowledge of this eyewitness. Moreover, his identification of the structures was corroborated by other witnesses who testified live at the hearing.

274

d)     Johnny Maliknak, who was living on Woody Island at the time of the March, 1964 earthquake, has stated under oath that the earthquake caused the FAA dock to be washed away, and that the water system carrying water from Upper Lake to some Village homes was damaged and caused a hardship to those Village homes that had relied on it for running water. The Court accepts as true the fact that there was damage to the water system that did cause a hardship to Native Woody Islanders.

418.    L-Doc 177 is a September 14, 1985 affidavit of Johnny Maliknak claiming primary place of residence. In it he states that he was born on Woody Island at the home of his mother located at U. S. Survey 1676 on December 17, 1933 and has lived there ever since the date of his birth. He identifies his mother as being Angeline Maliknak, formerly Angeline Pavloff. He provides genealogical information that was used in preparing the Pavloff Family Genealogy, L-Chart 6. Mr. Pavloff recounts how "My lifestyle has been one of subsistence living. I cut wood on the property, picked berries, and digged clams. I have no skills and no other means of making a living and no source of income except for feeding livestock for the Baptist Mission which grazes cattle on the land." The affidavit corroborates testimony given by a number of witnesses who stated that Johnny Maliknak has lived on Woody Island throughout his entire life.

419.    L-Doc 178 is a November 27, 1995 Kodiak Daily Mirror article entitled "Man Dies on Woody Island." It describes how Cecil Chabitnoy died at the age of 58 on Woody Island. The document is relevant to show the date and place of death of Cecil

275