# EXHIBIT "4"

goal, and they advanced the same legal theories. The interests of Stratman in trying to decertify the Native Village of Woody Island "are so closely related to the interests of [the first protestants who sought to decertify the Native Village of Woody Island] that the [Stratman] can fairly be considered to have had his day in court." *Sumlin*, 876 F.Supp. at 1081.

The RD erroneously recommends this Board declare that Leisnoi be required to defend itself against the same allegations and legal theories that were already considered and rejected by the Alaska Native Claims Appeal Board. The assertion at page 17 of the RD that collateral estoppel cannot be invoked "unless one of the parties to that case was a 'virtual representative' of Protestant" is legally unsound. The doctrine of collateral estoppel can be invoked against any party or entity in privity with a party to the prior litigation; the doctrine is not limited to those that are the 'virtual representative' of the earlier party. *Jackson v. Hayakawa*, 605 F.2d 1121 (9th Cir.1979).[14] Moreover, the two cases upon which the RD suggests this Board rely, *Annaco v. Office of Surface Mining Reclamation and Enforcement*, 119 IBLA 158 (1991) and *Triple R. Coal Co. v. Office of Surface Mining Reclamation and Enforcement*, 126 IBLA 310

---

[14] "[A] finding of privity is no more than a finding that all of the facts and circumstances justify a conclusion that non-party preclusion is proper." *Coates v. Kelley*, 957 F.Supp. 1080 (E.D.Ark. 1997). In this case, the facts and circumstances justify a conclusion that issue preclusion is appropriate as against protestant Stratman, who seeks to rehash the same issues already litigated by protestants in *In re Woody Island*, ANCAB VE #74-46. "Privity may be established by identification of interests, even where representation of those interests is not authorized." *Petitioning Creditors of Melon Produce, Inc., v. Braunstein*, 112 F.3d 1232 (1st Cri.1997). Protestants in both litigations against Leisnoi had the same interest: they all sought to prevent certification of the Native Village of Woody Island as being eligible for benefits under the Alaska Native Claims Settlement Act. The same legal theories have been presented by the protestants in both litigations. The RD improperly asks this Board to decide the issues differently, or effectively to overturn the earlier decision wherein the Alaska Native Claims Appeal Board resolved issues in favor of Leisnoi.

(1993) are completely inapposite to this matter, since in those cases the IBLA based its decision on the grounds that "the countervailing statutory policy of SMCRA precludes reliance upon the doctrines of res judicata and collateral estoppel based on a prior state enforcement proceeding which failed to secure abatement of a violation." *Triple R. Coal*, 126 IBLA at 315; see also, Judge Harris' opinion in *Annaco*, 119 IBLA at 158: "[T]he unique Federal/State balance created under the SMCRA manifests a 'countervailing statutory policy' and renders those doctrines inapplicable to issues arising in the Federal/State context." There is no such unique federal/state balance or countervailing statutory policy that renders the doctrine of collateral estoppel inapplicable to issues brought by two sets of protestants who each seek to have the Department of the Interior decertify the Native Village of Woody Island.

The Board should reject the erroneous suggestion at page 17 of the RD that the ANCAB did not adjudicate the merits of the arguments raised in the first challenge to Leisnoi's certification. See, recommended decision at page 17. The Alaska Native Claims Appeal Board considered all of the arguments against certification of the Native Village of Woody Island and rejected them, concluding that the Village was entitled to certification. See, Final Order Dismissing the Appeals of the Sierra Club, the Alaska Wildlife Federation and Sportsman's Council, Inc., and Philip R. Holdsworth, BIA Exhibit 1A at pp. 451-450. In its final order dismissing the appeals of the Sierra Club, the Alaska Wildlife Federation and Sportsman's Council, Inc., and Philip. Holdsworth, BIA Exhibit 1A at pp. 451-450, the ANCAB stated that it "considered the briefs previously filed by the Alaska Wildlife Federation and Sportsman's Council and Philip R. Holdsworth, and **finds the legal arguments advanced therein to be without** sufficient **merit** to justify the continuance of these proceedings." See, *In re Woody*

*Island*, ANCAB #VE-74-46, BIA Exhibit 1A at p. 450 (emphasis added). Accordingly, the ANCAB directed the Area Director "to certify the Native Village of Woody Island as eligible for benefits under the Alaska Native Claims Settlement Act, and to publish the information contained herein in the federal register." See, BIA Exhibit 1A at p. 450.

The RD is mistaken in its suggestion at page 18 that this Board deprive Leisnoi of the collateral estoppel benefits that should flow from having successfully defended the certification of the Native Village of Woody Island in the first challenge brought before the ANCAB, allegedly on the grounds that "Protestant's interests were not adequately represented by the parties to that case because they withdrew their appeals." In fact, unlike the Sierra Club that formally withdrew its protest of the eligibility of the Native Village of Woody Island, BIA Exhibit 1A at p. 448, the Alaska Wildlife Federation and Sportsman's Council and Philip R. Holdsworth did not withdraw their challenge to the eligibility of the Native Village of Woody Island. The arguments that these protestants raised were considered by the Alaska Native Claims Appeal Board and rejected on the merits. A final decision was entered in favor of the Native Village of Woody Island. See, *In re Woody Island*, ANCAB VE #74-46, BIA Exhibit 1A at pp. 451-450.

Although the Alaska Wildlife Federation and Sportsman's Council, Inc. and Philip R. Holdsworth had filed with the Board a Notice of Inability to Continue in the Appeals Proceedings, these protestants did not withdraw their appeal or abandon their challenge to the certification of the Native Village of Woody Island as the RD erroneously suggests. Rather, after having submitted extensive briefing on the legal issues (from which briefs protestant Omar Stratman borrowed heavily in writing his briefs), the protestants filed a notice stating that due

-28-

to "insufficient funds to support continued legal counsel" these protestants would be unable to submit additional briefing in the appeals proceedings before the Alaska Native Claims Appeal Board. The RD is mistaken in its contention that the protestants "withdrew their appeals"; the protestants specifically requested that "the Alaska Native Claims Appeal Board continue to consider the various legal points presented by appellants in the material already before them in their deliberation on these matters." See, BIA Exhibit 1A at p. 429. In essence, these protestants stated that they had filed as much briefing as they could afford, and that although they lacked funds to file additional briefs, their protests were not withdrawn. Since ALJ Sweitzer himself has adopted a number of the legal theories advocated by the first set of protestants, and has recommended granting the relief those protestants advocated in their briefs, it is obvious that the first set of protestants were adequately represented.

This Board should reject the recommended decision and instead rule that Leisnoi, Inc. is entitled to the collateral estoppel benefits that flow from the Final Order the ANCAB issued on September 9, 1974 directing the Area Director "to certify the Native village of Woody Island as eligible for benefits under the Alaska Native claims Settlement Act." *In re Woody Island*, ANCAB #VE 74-46.

Even if this Board were unwilling to apply collateral estoppel, it should determine that under principles of *stare decisis*, Leisnoi's certification has been adjudicated and determined. Particularly in light of the congressional mandate that the Act be implemented "rapidly, with certainty... [and] without litigation", 43 U.S.C. section 1601(b), the 1974 adjudication of the same issues should not be disturbed at this late date.

-29-

### D.  Protestant's delay has deprived this Board of jurisdiction to consider his untimely challenge

In adopting ANCSA, Congress declared that the settlement should be accomplished rapidly, with certainty, and without litigation. See, 43 U.S.C. § 1601(b). Protestant Omar Stratman failed to file a Notice of Appeal within the time limits provided in 43 CFR §4.411(a). The Interior Board of Land Appeals has ruled that "Compliance with the time limits provided in 43 CFR 4.411(a) is essential to initiating a viable appeal...Failure to file an appeal within the time allowed requires a dismissal of the appeal." *B. L. and Norma Jean Newman*, 92 IBLA 314 (June 26, 1986).  The Protestant failed to pursue an administrative appeal of the certification of the Native Village of Woody Island within 30 days after he acquired actual knowledge that the Village had been certified as eligible. This Board should therefore decline to adopt the recommendation in the RD that it decertify the Native Village of Woody Island some 25 years after its certification by the Department of the Interior.

The protestant's delay has stripped the Interior Board of Land Appeals of jurisdiction to consider his untimely challenge. In discharging its administrative responsibilities pursuant to the order of the district court, this Board should follow its guidelines and administrative regulations.  Failure to file an appeal within the time allowed requires dismissal of the appeal. This Board should therefore decline to adopt the RD, since Stratman failed timely to comply with 43 CFR 4.411(a).

### E.  The protestant lacks administrative standing.

In referring this matter to the Agency, the federal district court did not order that the Agency suspend its rules of procedure.  Nothing in the federal district court order of referral

states that the Protestant should be deemed to have been relieved of his burden of showing he has administrative standing as is necessary in order for any protestant to pursue a challenge before the Interior Board of Land Appeals. For over 20 years, Leisnoi has suffered under unproven allegations of the protestant. One of those allegations, that protestant made to the Ninth Circuit Court of Appeals, was that he was a recreational user of the Native lands. Based upon those allegations, the Ninth Circuit observed that "The plaintiffs **alleged** they used the land subject to patent for a multitude of recreational purposes, including hunting, camping, picnicking and photography." *Stratman v. Watt*, 656 F.2d 1321, 1324 (9th Cir. 1981) (emphasis added). The issue for present purposes is whether the protestant has, in fact, established that he made such use of Leisnoi's land. As this Board can see by reviewing the transcripts, the protestant failed to introduce any testimonial, photographic or other evidence at the hearings that would corroborate, substantiate, or support naked assertions previously made by his attorney in pleadings.

Having failed to show that he would be adversely affected by an eligibility determination, and having conceded that he lacks a property interest in land that would be affected by the decision, (See, Tr. of August 4, 1998 proceedings at pp. 722-723), the protestant has failed to establish the required administrative standing under either 43 CFR §4.410(a), 43 CFR §4.410(b), or 43 CFR §4.902. More than thirty days elapsed since the United States District Court sent this matter to the Interior Board of Land Appeals, yet, protestant has made no showing of a property interest sufficient to confer administrative standing, so his administrative challenge now pending before this Board is subject to summary dismissal. 43 CFR section 4.412(c).

-31-

A protestant challenging a village eligibility decision is required to show that he has a property interest that would be affected by the decision. See, 43 CFR §4.410(b), as well as former 43 CFR §4.902 (40 FR 33173, August 6, 1975). (Standing extends only to persons "who claim a property interest in land affected by a determination from which an appeal to [ANCAB] is allowed.")

Stratman's contention that the standing test of 43 CFR §4.10(a) rather than §4.410(b) applies is erroneous. Subsection (a) provides that "Any party to a case who is adversely affected by a decision of an officer of the Bureau of Land Management or of an Administrative Law Judge shall have a right to appeal to the Board..." The protestant seeking to decertify the Native Village of Woody Island is not challenging a decision made by the Bureau of Land Management, nor is he challenging a decision made by an Administrative Law Judge. Rather, he objects to the BIA's certification. Accordingly, 43 CFR §4.410(a) does not apply to his challenge. Rather, the stricter property interest test of 43 CFR §4.410(b) and 43 CFR §4.902 is applicable. Although Stratman contends that *Minchumina Homeowners Association, et al*, 93 IBLA 169 (1986) requires a contrary result, in fact, that case dealt with an appeal challenging a Native Group, and did not involve the eligibility of a Native Village. *Minchumina Homeowners Association* does not constitute precedent for the standing test in a Native Village eligibility case; moreover, Leisnoi contends that the decision was not correct, and this Board should not rely upon it.

Stratman does not even meet the lower standing threshold of 43 CFR §4.410(a). Even if he were to be excused from meeting the property interest test of subsection (b), Stratman has not shown that he has been "adversely affected" by the decision to certify the Native Village

-32-

of Woody Island. The purpose of the referral by the district court to the Interior Board of Land Appeals was so that all facts necessary for a determination of the propriety of the certification of the Native Village of Woody Island could be gathered, and the IBLA could make use of its agency expertise in applying the law to those facts, then make a final decision as to whether the Native Village of Woody Island was properly certified. Whereas in federal district court Stratman relied on mere allegations, he was required to present actual evidence at the hearings conducted by the ALJ in order to attempt to carry his burden of proof. One of the elements of his burden of proof in this administrative proceeding is to show that he has administrative standing to challenge the certification of the Native Village of Woody Island. The protestant failed to carry this element of his burden of proof.

As this Court can see by reviewing the testimony of the protestant at pages 714-734 of the Transcript of Proceedings of August 4, 1998, the protestant failed to present any evidence by which the Court could conclude that Omar Stratman has been adversely affected by the decision to certify the Native Village of Woody Island. Although Stratman's attorney filed pleadings in the federal case alleging that Stratman had made recreational use of lands affected by the certification decision, at the proceedings in front of the ALJ Stratman failed to introduce any evidence corroborating those conclusory allegations. Omar Stratman offered no sworn testimony to having made any recreational use of Woody Island or any lands that were selected by the Native Village of Woody Island. Stratman offered no testimony of any hiking, berry picking, photography, or similar recreational uses of Woody Island or any of the lands selected by Leisnoi, Inc.

-33-

This Board should not relieve the protestant of the consequences of his decision not to testify at the hearings. Counsel for the protestant never called his own client to the stand, and never questioned him. It was only Leisnoi, Inc. that questioned the Protestant about his lack of a property interest and lack of public interest litigant status. Even the proffer of evidence made by counsel for the protestant failed to include any proffered testimony that the protestant was somehow adversely affected by the certification decision.

In short, Omar Stratman has not demonstrated that he has administrative standing to challenge the certification of the Native Village of Woody Island. He concedes that he lacks a property interest in lands that would be affected by the decision, and failed to introduce any evidence whatsoever upon which this Board could conclude that he would be or has been adversely affected by a certification decision. If the protestant had, in fact, made sufficient use of the Native Woody Islander's land to qualify for administrative standing, then he should have testified so at the hearings. His testimony would then have been subjected to cross-examination, one of the greatest truth-finding mechanisms known to man. He failed to do so.

There are significant differences between administrative and judicial standing. Stratman appears to contend that simply because he was determined to have judicial standing, based upon unproven assertions, that he therefore is conclusively determined to be vested with administrative standing to challenge certification of the Native Village of Woody Island. Stratman's contention is not in accordance with the law. As Circuit Judge Bazelon made clear in his often cited concurring opinion in the village eligibility appeal *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978), "An examination of the theoretical foundations of judicial standing reveals no reason to equate judicial and administrative standing." 580 F.2d at 611.

-34-

Judge Bazelon noted that federal courts are governed by Article III of the United States Constitution, whereas administrative agencies derive their powers from Congress, and thus indirectly from Article I. 580 F.2d at 612.

The starting point in determining administrative standing "should be the language of the statutes and regulations that provide for an administrative hearing, appeal or intervention." *Koniag, Inc. v. Andrus*, 580 F.2d at 614 (concurring opinion, Bazelon, J.). In his concurring opinion in the appeal from the village eligibility cases, Judge Bazelon specifically cited to 43 CFR §4.902 as the relevant regulation to be utilized in determining administrative standing:

> "An example of a regulation supplying relatively precise standards is 43 CFR §4.902 (1976), part of the new regulations on ANCSA hearing procedures...This section provides:
>
>> Any party who claims a property interest in land affected by a determination from which an appeal to the Alaska Native Claims Appeal Board is allowed, or an agency of the Federal Government, may appeal as provided in this subpart. However, a regional corporation shall have the right of appeal in any case involving land selections.
>
> This regulation quite clearly establishes three classes of persons who have standing: those asserting a property interest in land, federal agencies, and regional corporations in land selection cases. It thus provides fairly objective criteria that can be applied without recourse to a more refined analysis."

-35-

*Koniag, Inc. v. Andrus*, 580 F.2d at 614 (concurring opinion of Bazelon, Jr.).[15] The protestant has failed to establish that he has the required administrative standing to pursue the present challenge to the certification of the Native Village of Woody Island. Accordingly, his challenge should be dismissed, and the recommended decision rejected.

Judge Bazelon's citation to 43 CFR §4.902 in the appeal from the village eligibility challenges supports Leisnoi's assertion that Section 4.902 applies to village eligibility challenges, and not merely to land selection cases. Judge Bazelon's opinion demonstrates that even if the Protestant met the judicial standing requirements necessary for an Article III case, he is not thereby automatically deemed to have administrative standing as well. Judicial determinations of standing do not control questions of administrative standing. *Id.*; See also,

---

[15]The Alaska Native Claims Appeal Board has also held that 43 CFR Section 4.902 was the applicable administrative standing requirement that "set forth the criteria for bringing an appeal before this Board." *In re Appeal of Omar Stratman*, ANCAB No. LS 77-4C. Although the protestant contends that the entire regulation applies only in cases involving land selections, in fact, a part of the regulation specifies that "a regional corporation shall have the right of appeal in any case involving land selections", but the rest of the regulation is not limited to land selection cases. Rather, the regulation applies to all appeals to the Alaska Native Claims Appeal Board. The regulation makes it clear that the Secretary of the Interior knew how to specify or limit the application of a regulation to land selection cases. In the subject regulation, the Secretary made specific reference to land selection appeals only with respect to the standing of a regional corporation. The protestant's theory would distort the plain meaning of the regulation. If the Secretary of the Interior wished to limit all of Section 4.902 to land selection cases, he obviously knew how to do so, but elected not to do so. Section 4.902 on its face does not restrict the property interest requirement only to land selection cases, but rather imposes that requirement upon all appeals to the Alaska Native Claims Appeal Board. Moreover, the regulation was cited by Judge Bazelon in his concurring opinion in the appeal from the eligibility challenge to the Native Village of Uyak and the other Native Villages involved in *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D. C. Cir. 1978).

*High Desert Multiple-Use Coalition, Inc.*, IBLA 90-57 (1990); *In re Pacific Coast Molybdenum Co.*, IBLA 81-1027 (1982).

Having failed to show that he would be adversely affected by an eligibility determination, and having conceded that he lacks a property interest in land that would be affected by the decision, the Protestant has failed to establish the required administrative standing under either 43 CFR §4.410(a), 43 CFR §4.410(b), or 43 CFR §4.902. This Board should therefore report to the district court that as a matter of administrative law, the protestant lacks standing that is necessary in order to challenge Leisnoi's certification.

### III.  THE NATIVE VILLAGE OF WOODY ISLAND IS AN HISTORIC NATIVE VILLAGE THAT MEETS THE REQUIREMENTS FOR ELIGIBILITY UNDER THE ALASKA NATIVE CLAIMS SETTLEMENT ACT.

#### A.  The RD improperly relies upon recommended decisions in cases that were overturned in *Koniag, Inc. v. Kleppe*

The ALJ has reopened old wounds in the Native community by basing his ruling upon recommended decisions whose adoption by the Alaska Native Claims Appeal Board was overturned by the United States Court of Appeals for the District of Columbia Circuit in *Koniag, Inc. v. Andrus*, 580 F.2d 601 for violations of the due process rights of the Natives. The federal court reversed the decisions of the Alaska Native Claims Appeal Board and the Secretary of the Interior with respect to the Native Villages of Litnik, Salamatof, Anton Larsen Bay, Uganik, Bells Flats, Ayakulik, Port William, Solomon Bearing Straits, Alexander Creek, and Pauloff Harbor. *Koniag, Inc. v. Kleppe*, 405 F.Supp. 1360 (D.C. 1975), <u>affirmed in part and reversed in part</u>, *Koniag v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978).

-37-

There is no need to rely upon such tainted authority. There exists adequate authority on the governing legal standards set forth in numerous other ANCAB rulings. An ample number of Alaska Native Claims Appeal Board decisions are available to guide this Board as to the applicable law, without the necessity for relying upon recommended decisions to which the concerned and affected Alaska Natives were never given an opportunity to object or describe the flaws therein.[16] Many of the issues discussed by the Administrative Law Judges in those cases had never even been briefed. The Natives were precluded from reviewing the recommended decisions and filing briefs describing the errors contained therein. The decision-making process of the Alaska Native Claims Appeal Board and the Secretary of the Interior was so violative of the due process clause of the United States Constitution that the federal court concluded the decisions could not stand and had to be reversed.[17]

---

[16]The federal district court deemed it significant that "Some of the cases were decided adversely to the Villages by the Board and the Secretary on grounds that had never been raised before the Administrative Law Judges and of which the parties were unaware until the Secretary announced the final result." *Koniag, Inc. v. Kleppe*, 405 F.Supp. at 1370. The federal appellate court concluded that "the Secretary's secret review process is inconsistent with both constitutional constraints and the mandate of ANCSA that Natives participate as fully as possible in the decision making." *Koniag, Inc. v. Andrus*, 580 F.2d at 610.

[17]The administrative process used in the cases upon which the RD relies was ruled unconstitutional:

> "[The]Secretary, who reserved final decision to himself, was prevented from making a rational decision on the records developed because the decisions of both the Administrative Law Judges and the Ad Hoc Board were kept *in camera* and remained undisclosed to the parties until the Secretary had already reached his final decision. This process denied the Villages the opportunity to bring to the Secretary's attention any exceptions or objections they might have had to the determinations below…

Before the errors in the recommended decisions could be litigated upon remand from the D.C. Circuit Court of Appeals, Congress enacted ANILCA legislation granting benefits to the villages, thereby statutorily mooting the necessity for further hearings.  The ALJ's suggestion that this Board rely upon the recommended decisions whose adoption by the Alaska Native Claims Appeal Board was thrown out as unconstitutional in *Koniag, Inc. v. Kleppe* is an affront to all Alaskan Natives.  Although it was the affirmance of the recommended decisions  by the ANCAB that was declared unconstitutional, and not issuance of the recommended decisions themselves, *Koniag, Inc. v. Andrus,* 580 F.2d at 609 n.8, the recommended decisions should not be granted precedential authority as the ALJ has asked this Board to do. The recommended decisions were never legally adopted by the Alaska Native Claims Appeal Board.  The concerned Natives were never given an opportunity to brief the flaws in the recommended decisions.  Moreover, the proposed legal standards erroneously set forth in the recommended decisions are at variance with published ANCAB decisions.

If there were good grounds to deny the certification of the Native Village of Woody Island, (which is not the case) then the ALJ should have been able to make his recommendations without reliance upon recommended decisions whose adoption was reversed by the federal courts, and whose content was never tested by the affected Native Villagers who

---

Indeed, it appears that the Secretary did not even see the Proposed Findings of Fact submitted by the Villages to the Administrative Law Judges."

*Koniag, Inc. v. Andrus,* 580 F.2d at 608, citing *Koniag, Inc. v. Kleppe,* 405 F.Supp. at 1370.

were in the best position to address the flaws in the recommended decisions. This is particularly true since those recommended decisions were based upon purported narrow legal standards that are at variance with more liberal principles adopted by the ANCAB in other cases.

The most egregious example of the recommendation that this Board adopt as law tainted cases that were thrown out by *Koniag v. Kleppe* is the RD's reliance at page 21 upon *Alexander Creek* and *Village of Uyak* for a proposed interpretation of the phrase "lived for a period of time." As this Board is no doubt aware, 43 CFR section 2651.2(b) requires that qualified villages must have had 25 or more Native residents of the village on April 1, 1970, and "at least 13 persons who enrolled thereto must have used the village during 1970 as a place where they actually lived for a period of time". The regulations do not state how many hunting or camping trips in the village or how much time the Native must have spent in the village in order to have ben deemed to have "lived for a period of time" in the village. Although the Alaska Native Claims Appeal Board gave a liberal interpretation of this phrase, in order to take into account the mobility and transient lifestyle of Alaska Natives, and the frequent necessity that the Natives leave the villages for extended periods of time in order to pursue educational and employment opportunities, *Village of Kasaan*, ANCAB #VE 74-17 at pages 19-20[18]; *Village*

---

[18]In *Kasaan*, the ANCAB adopted the recommended decision of former Chief Administrative Law Judge L.K. Luoma, and held that hunting, fishing, or berry-picking in the village, or staying overnight would be sufficient to meet the "period of time" requirement of 43 CFR section 2651.2(b):

> "Use in this case could mean a lot of things. It could mean the individual went out there and fished, may have gone out and picked berries; he may have gone out and hunted from the village

*of Chitina*, ANCAB #VE 74-10 at page 28[19], the RD mistakenly urges this Board instead to

adopt the narrow interpretation proposed in two tainted rulings: the *Alexander Creek* ANCAB

decision, ANCAB #VE 74-31 at page 35[20], and the *Village of Uyak*, ANCAB # VE 74-11

recommended decision at pages 18-19.[21]  This Board should reject the RD's invitation that it

---

and things of that sort; and in the same process, he had to
naturally live in the village for a period of time."

*Kasaan* at p. 20, citing testimony of BIA Area Realty Officer Charles H. Jones.

[19]In *Village of Chitina*, ANCAB # VE 74-10, Administrative Law Judge Forrest E. Stewart properly recommended that the Board recognize "the liberal nature of the Secretary's residency requirements and the Congressional intent concerning the Natives' personal and group identities, cultural patterns, and lifestyles." *Village of Chitina*, Recommended Decision at page 14. He wrote that Natives who were in Chitina for "seasonal hunting, fishing, and berry picking... 'actually lived for a period of time' in Chitina in 1970." Recommended decision at page 13. The ANCAB agreed, holding at page 28 of its decision that "[C]onsistent with their established cultural patterns and lifestyles", Natives who visited Chitina in 1970 for "seasonal hunting, fishing, and berrypicking ... 'actually lived for a period of time' in Chitinia in 1970." ANCAB # 74-10 at page 28.

[20]At page 35 of the discredited *Alexander Creek* decision, ANCAB # VE 74-31, reversed, *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C.App.1978), the Alaska Native Claims Appeal Board attempted to adopt a narrow interpretation at variance with *Chitina* and *Kasaan*, writing that "occasional fishing trips are insufficient to establish domicile." This Board should note that ALJ Sweitzer has cited to and attempted to rely, at page 21 of his decision, upon the actual ANCAB ruling in *Alexander Creek* that was thrown out in *Koniag, Inc. v. Andrus*, and did not even try to skate around the bad law by invoking the recommended decision rather than the ANCAB ruling. This Board should decline the ALJ's invitation that it rely upon case authority that has been reversed on the grounds that the Natives were deprived of constitutional due process.

[21]At page 19 of the recommended decision that led to the discredited *Village of Uyak* ruling, ANCAB # VE 74-11, reversed, *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C.App.1978), Administrative Law Judge Robert Mesch failed to follow the law as enunciated in *Village of Chitina* and *Kasaan*, instead writing that in order to meet the "period of time" requirement, "more than a couple of days" fishing in the village is needed. This Board should not adopt this narrow, restrictive interpretation of the remedial ANCSA legislation as suggested in the RD.

base its ruling upon overruled case authority. Instead, the Board should follow the law as enunciated in *Kasaan* and *Chitina*, and recognize that Natives who had an intent to return to Woody Island and did, in fact, spend time on Woody Island in 1970 engaging in hunting and gathering or fishing activities do qualify as having "lived for a period of time" in the village.

### B. The RD erroneously suggests disqualifying a number of Native Woody Islanders simply on the basis of perceived conflicts between the information contained in Column 16 and that contained in Columns 17-21.

The recommended decision should be rejected because the conclusions suggested therein rest upon false perceived conflicts between answers to Column 16 of the enrollment form[22] with answers in Columns 17-21.[23] The RD erroneously recommends the Board use these so-called conflicts to deprive Natives of their permanent residency status. See, recommended decision at pages 37-38, 64, 66, 72, 74, 77, 81. In fact, merely demonstrating that Native Woody Islanders gave differing responses to Columns 17-21 of the enrollment application than were given in response to Column 16 of the enrollment application does not justify depriving the Natives of their permanent residency status.

The erroneous theory espoused in the RD is that if persons who claimed Woody Island as the place of their permanent residence as of April 1, 1970 did not also list Woody Island in

---

[22]Column 16 asked the Native enrollees to state "your permanent residence as of April 1, 1970." See, Enrollment Application, Stratman Exhibit 9.

[23]Column 17 asked for "your permanent residence as of the date you complete this form." Column 18 asked for the "region and village or city where you resided on April 1, 1970, if you resided there two or more years without substantial interruption." Column 19 asked for the "region and village or city where you previously resided for an aggregate of 10 years or more." Column 20 asked for the "region and village or city where you were born, or if outside Alaska, city and state." Column 21 asked for the "region and village or city from which an ancestor came." See, Enrollment Application, Stratman Exhibit 9.

response to each question in Columns 17-21, then there is substantial doubt as to whether they were permanent residents of Woody Island on April 1, 1970. As noted earlier in this brief, this incorrect theory has already been considered and rejected by the Alaska Native Claims Appeal Board in connection with the challenge to the Native Village of Woody Island, BIA Exhibit 1A at pp. 398-397, 451-450. The same argument has also been rejected by the ANCAB in other Native Village eligibility cases.

First of all, with respect to Column 17, asking the permanent residence of the Native as the date he or she completed the enrollment form, the Secretary of the Interior has determined that this information should be completely ignored for enrollment purposes:

> "Uncontradicted testimony was given that the Solicitor of the Department of the Interior had determined that Column 17 should be totally disregarded for any enrollment purposes."

*Kasaan*, at p. 22.

Likewise, conflicts between the information contained in Column 16 and that contained in Columns 18-21 also does not raise a substantial doubt as to the permanent resident status of the Native on April 1, 1970:

> "Therefore, conflicts between the information contained in Column 16 and that contained in Columns 18-21 **does not by itself contradict the information in Column 16 so as to raise a substantial doubt** either as to the residency of the individual or the residency of those enrolled to the village as a class.

> "The evidence submitted by the Forest Service relating to **where individuals owned property or dwellings, registered to vote, paid property taxes, have a telephone listing, are registered for purposes of automobile driver's licenses, does not by itself, or in conjunction with the family list, raise a substantial doubt** as to whether or not Kasaan had less than 25 Native residents on April 1, 1970. Such objective evidence is

> not necessarily inconsistent with an individual being a
> 'permanent resident' elsewhere under the terms of the Act and
> the regulations."

*Kasaan*, at p. 23 (emphasis added).

Other Native Village eligibility cases also negate the recommendation in the RD that differing responses to Column 16 as compared with Columns 17-21 raise a substantial doubt as to the propriety of Woody Island's certification as being eligible for benefits under the Alaska Native Claims Settlement Act. For example, in *Kaguyak*, Administrative Law Judge Robert W. Mesch determined that "A printout of the answers elicited from the Native enrollees to Kaguyak on the official enrollment forms, can be accorded virtually no weight as regards the intent of the villagers to return to the village." As to question 17, "Your permanent residence as of the date you complete this form", the Administrative Law Judge wrote "I believe it would be manifestly unfair to utilize their answers to show either a lack of permanent residence at Kaguyak on April 1, 1970, or that the Natives of Kaguyak had abandoned their homes." *Kaguyak*, Recommended Decision at p. 21. As to question 19, "Region and village or city where you previously resided for an aggregate of 10 years or more", the Administrative Law Judge noted that "Once again I can ascribe little if any probative value to the exhibit." *Kaguyak*, Recommended Decision at pp. 21-22.

Particularly when dealing with a village certified pursuant to the Act of God proviso, which Woody Island has asserted as an alternative basis for its certification, it should be expected that Natives would not be residing in the village as of the date they filed their enrollment applications, since, by definition, the village would have been abandoned by virtue

-44-

of an Act of God or governmental authority occurring within the 10 years predating April 1, 1970.

Therefore,

> "Application of the Act of God proviso excuses the requirement of occupancy in 1970 ... Therefore, unoccupancy itself is not proof that 25 or more Natives were not residents... on April 1, 1970... Appellant offered no probative evidence as to the subjective intent of the Natives enrolled to the village. The stipulation relating to documents which might show residences at places other than Chenega is also of no probative value, because obviously Natives enrolled to an Act of God village which has been unoccupied since 1964 would have utility bills, rent receipts and driver's license which show a residence other than Chenega."

*Chenega*, Recommended Decision of Chief Administrative Law Judge L. K. Luoma at p. 9.

Although the Alaska Native Claims Appeal Board has ruled that "Conflicts between the information contained in Column 16 and that contained in Columns 18-21 does not by itself contradict the information in Column 16 so as to raise a substantial doubt either as to the residency of the individual or the residency of those enrolled to the village as a class", and has further held that evidence "relating to where individuals own property or dwellings, register to vote, pay property taxes, have a telephone listing, are registered for purposes of automobile driver's licenses, does not by itself, or in conjunction with the family list, raise a substantial doubt", *Kasaan* at p. 23, the RD nonetheless recommends this Board disqualify a number of Native Woody Islanders on the basis of different responses being given in Column 16 and in Columns 18-21. This aspect of the RD is legally unsound and should not be adopted by this Board.

-45-

## C. The Native Village of Woody Island is a Traditional Village

The Native Village of Woody Island qualifies as one of the most traditional Native villages in Alaska. In many respects, Woody Island is a microcosm of local Native history. Every major cultural change which occurred in the Kodiak region affected the Woody Island people. Somehow, they adapted and retain a sense of belonging to their island. The RD is in error at page 86 in asking that this Board find "Respondents failed to make a showing that the alleged Village was known as a traditional village."[24] In fact, Woody Island Village has a long and colorful history. Its inhabitants have deep ties to the village extending through many generations. The villagers love Woody Island and expressed a sincere desire and intent to return to the Woody Island Village. There is a strong sense of community between the villagers.

In order to understand the ties of the Native Woody Islanders to their village, and to assess the village's qualifications for eligibility under the Alaska Native Claims Settlement Act and its implementing regulations, a review of the history of the village is appropriate. Leisnoi suggests that the Board adopt the following findings of fact pertaining to the history of the traditional Native Village of Woody Island:

1.        Woody Island is a small island approximately 2.8 miles long and 1.8 miles wide situated about one mile east of Kodiak, Alaska. (Book 77 at p. 47.)

---

[24]The recommendation is inconsistent with the sworn statement of the Chairman of the Kodiak Island Borough, Wilton White: "Woody Island Village is known as a traditional village." July 26, 1973 Affidavit of Wilton T. White, BIA 1-A at p. 52.

2.      Natives have been inhabiting and using Woody Island for thousands of years. (L-Doc A9 at p. 1. (Wooley, C. "<u>A Walk in Time</u>."]).

3.      Early evidence of human use on Woody Island is evidenced by a Kachemak era (3300 to 1,000 years ago) site located west of the wharf and registered with the Alaska Heritage Resource Survey. KOD-018. (L-Doc A9 at p. 1 [Wooley, C., "<u>A Walk in Time</u>."])

4.      In the late 1700s, the Russians subjugated the Native population of Woody Island. Epidemics, forced relocations and wholesale extermination of those who resisted characterized the initial wave of foreign influence. (L-Doc A9 at p. 2 [Wooley, C. "<u>A Walk in Time</u>."])

5.      The first detailed published description of Woody Islanders dates to 1802. The Russian G.I. Davydov met Alutiiq Natives in skin boats near Woody Island, and later attended a ritual dance in a ceremonial house (kazim) on Woody Island. (Book 22 at pp. 163-164 [Davydov, Gavril Ivanovich. <u>Two Voyages To Russian America, 1802-1807</u>.])

6.      In the winter of 1794-95, James Shields, a British shipwright and officer in Russian service, built two small crafts on Woody Island for the Russian America Company. (Book 69 at p. 463 [Pierce, Richard A., ed. <u>The Russian Orthodox Religious Mission in America, 1794-1837</u>.])

7.      Hieromonk Gideon completed the "Round the World Voyage" in 1809, and in the course of it explored the Kodiak area. He noted that on Woody Island the Russians maintained an agricultural station and an artel (work camp) that was

used for brick manufacturing and salt boiling. (Book 34 [Gideon, Hieromonk. The Round The World Voyage Of Hieromonk Gideon 1803-1809.])

8.   In 1804, the Russian explorer Lisianski named Woody Island as "Leisnoi". He also charted it, for the first known time, and observed there was a settlement on the east side of Woody Island. (Book 5 [Baker, Marcus. Geographic Dictionary of Alaska]); (Book 58 [Lisiansky, Urey. Voyage Round The World In The Years 1803, 1804, 1805 And 1806]; and Book 65 [Orth, Donald J. Dictionary Of Alaska Place Names.])

9.   The Native population of Woody Island in 1805 was 54. (Book 58 [Lisiansky, Urey, Voyage Round The World In The Years 1803, 1804, 1805 And 1806.])

10.  In 1826, the famed Russian naval officer, hydrographer and explorer, Gavrill Andreevich Sarychev made a chart/map naming what is now known as Ice House Point on Woody Island "Mys Peschchanoye", meaning "sandy point". He also applied the name "Aleutskoye Aleksashkino Zhilo" or "The Aleut Dwellings of Aleksashkino" to a point on Woody Island located near present day Lake Una. (Book 65 [Orth, Donald J. Dictionary Of Alaska Place Names]; and Book 68 [Pierce, Richard A. Russian America: A Biographical Dictionary.])

11.  In 1837, a smallpox epidemic raged in the Kodiak and Woody Island area. The epidemic had a tremendous deleterious effect on the breakdown of families, communities and culture of the Native peoples. The survivors from 65 Kodiak area villages were re-settled into seven amalgamation villages, one of which was the Native village of Woody Island. (Book 31 [Fortuine, Robert. Chills and

-48-

Fever - Health and Disease In The Early History Of Alaska]; and Document 431 [Wooley, Chris B. "Historic Use and Occupancy of Woody Island Alaska, Vol. 1: Overview, Survey Notes and Field Observations."])

12.      In 1848, Russian skipper Arkhimandritov updated charts and maps in the Kodiak area. In the process, the major settlements were described, including the Native settlement on Woody Island. He described it as being called "Chiniak" by the "Aleutians" and "Aleksashkino Zhilo" by the Russian fur traders. The Native settlement was described at that time as being on the west side of the island. (Book 77 [Teben'kov, M. D. Captain 1st Rank. Atlas of the Northwest Coasts of America.])

13.      In 1849, a map was prepared by Russian captain M. D. Teben'kov showing a Native settlement on Woody Island near what is today called Ice House Point. A Russian-American Company map of that same year called the native settlement Tanignag-miut. (Book 5 [Baker, Marcus. Geographic Dictionary of Alaska.])

14.      In the early 1850s, another smallpox epidemic decimated the Native population of Woody Island. (Book 55 [Jacobs, Jane. A Schoolteacher In Old Alaska, The Story of Hannah Breece.])

15.      In 1852, Natives of Woody Island were employed to cut ice and pack it in sawdust so that it could be shipped on oceangoing vessels to San Francisco. Ice was needed in California because of the explosion of population and wealth generated by the 1849 California Gold Rush. (Book 14 [Chaffin, Yule.

Alaska's Konyag Country]; and Book 15 [Chaffin, Yule.  Koniag To King Crab.])

16.        With the coming of the Ice Company, Natives on Woody Island who had lived in barabaras around the island, each nearby a fresh water stream and a beach, were moved to the west side of the village where two rows of barabaras were built of six each.  Each row also had a storage house for food goods.  (Document 193 [News Letter, Kodiak Baptist Orphanage, July, 1908. Vol. IX, No. 4.])

17.        In 1858, William E. Pavloff was appointed Lieutenant Governor of Alaska.  His descendants continue to inhabit Woody Island to this day.  (Book 14 [Chaffin, Yule. Alaska's Konyag Country]; and Book 15 [Chaffin, Yule.  Koniag To King Crab.])

18.        In 1867, the United States and Russia signed a treaty for the purchase by the United States of Russian America (Alaska).  The price was set at $7,200,000.00.  The $200,000.00 was added in the few days prior to the actual signing as a compensation to the Russian American Company for the loss of its exclusive charter to operate in Alaska, *i.e.*, to produce ice and trade in furs exclusively.  This came about largely because of the Russian American Company operations on Woody Island.  (Document 409 ["Speech of Hon. Charles Sumner, of Massachusetts, on the Cession of Russian America to the United States."])