# EXHIBIT "8"

In her 1978 deposition, Marie Redick Ungar vigorously defended her enrollment to the Native Village of Woody Island as well as her execution of an affidavit in support of her enrollment to Woody Island. When questioned about the affidavit, she stated:

> **"I do have definite ties. I had been to Woody Island,** and when the question came up about Woody Island this is one of the things that -- and **that's where I felt I belonged and that's why I signed this."**

Deposition of Marie Redick Unger at p. 11.

In response to questioning about whether anyone had discussed with Ms. Ungar "the difference between the place of enrollment and your actual residence prior to the time you signed this?", Marie Redick stated that "And it was just that where you felt was your permanent place of residence is where you should put originally on your enrollment form." Depos. Tr. at p. 11.

Marie Redick Unger enrolled to Woody Island because she felt she belonged there:

> "Q.    Why did you ask for the form?
>
> "A.    Because that's where I felt I belonged was in Woody Island."

Depos. Tr. at p. 12.

As to some of the specifics of her affidavit, Marie Redick Ungar stated that although she had not planted the garden on Woody Island by Tina Hoen's house in which she frequently stayed, she did weed it. Deposition of Marie Redick Unger at p. 14. Marie described how she had frequently stayed in Tina Hoen's house when Tina was not on the island. She would stay a week, two weeks, and sometimes a month. Depos. Tr. at pp. 14-15.

**Under oath, Marie Redick Unger testified that she had stayed in Tina Hoen's home**

**on Woody Island in April and May of 1970 for at least a week, and maybe longer.** Depos.

Tr. at p. 15. Rebutting the theme that the RD espouses, Marie Redick Ungar stated that she

did not view her time spent on Woody Island as merely being some sort of a mere recreational

vacation:

> "Q.    What was the purpose of the visit?
>
> A.    We'd go over there every summer?
>
> Q.    For a vacation?
>
> A.    No, because that's where we felt we belonged."

Deposition of Marie Redick Unger at p. 15.

Squarely addressing the issue of claiming permanent residency status on Woody Island

although renting a home in Kodiak, Marie Redick Ungar candidly admitted that she had been

renting a house at 211 Circle on Kodiak, Depos. Tr. at p. 15, but that she still considered

Woody Island to be her permanent place of residence. Depos. Tr. at p. 17. Marie responded

to a series of questions posed by counsel for protestant that falsely implied permanent residence

was necessarily the same place where the individual was physically present, rather than the

place to which the individual intended to return when absent therefrom:

> "Q.    What was your opinion of the place 211 Circle
>          where you rented a house?
>
> A.    I rented a house.  I rented a house.
>
> Q.    That wasn't a residence in your opinion?
>
> A.    We lived there but it was a rented house.

> Q.    Okay. You lived there. Did you own a house on
>        Woody Island?
>
> A.    I told you it was Tina's house.
>
> Q.    If you could only pick one place as a residence,
>        would it have been 211 Circle in Kodiak or would
>        it have been Woody Island?
>
> A.    It would have been Woody Island."

Deposition of Marie Redick Unger at pp. 17-18.

When challenged about her affidavit that referred to a residence on Woody Island,

Marie Redick Ungar testified that she was referring to Tina Hoen's home that she was allowed

to use periodically. Depos. Tr. at p. 18. This home had formerly belonged to her great great

grandfather, Chief Yellow Pants, who gave the property to Tina Hoen's grandmother. Depos.

Tr. at p. 19. She rebutted the allegation that Tina Hoen's house could not be deemed to be

Marie Redick Ungar's residence on Woody Island, by observing that counsel for the Protestant

was arguing her permanent residence should be deemed to be a house she rented but did not

own in Kodiak:

> "Q.    But that doesn't cause the house that belongs to
>         somebody else to be your residence, does it?
>
> A.    Okay. Well, just like you claim my residence
>         was 211 Circle, why couldn't I claim that as my
>         residence?"

Depos. Tr. at p. 19.

Marie Redick Ungar elaborated on how a person's "home" is not necessarily the place

where the person is physically present:

"Q.    I want to know what in your opinion caused Woody Island to be your residence and not 211 Circle in Kodiak at that time in 1970?

A.    In 1970 because we didn't realize or I didn't realize that even though I lived here that I went over there for two or three weeks or whatever and still considered that as my home instead of here. I mean, now you can't say that you can't come from someplace other than Alaska. You still talk about home as being where you came from, right. Although I was born here in Kodiak but it was different here when it was a small village than it is now, but you still talk about home as being where you came from.
                                    . . .

Q.    In other words, the place that you felt that you had ties to was what you --

A.    Not just ties but where I go back."

Depos. Tr. at pp. 20-21.

Marie Redick Ungar qualifies as a permanent resident of the Native Village of Woody Island based upon her presence in the village, ties to Woody Island, and her intent to return. At page 30 of her deposition she confirmed that when away from Woody Island, it is her intent to return there.

Marie Redick Ungar also defended her enrollment to Woody Island by referring to the instructions for completing the permanent residency form, Stratman Exhibit 9. She noted, "[I]t says in the thing if you have ancestral ties that you can enroll back to a village that you have ancestral ties at." Depos. Tr. at p. 24. The instructions for filling in Column 16, "Your permanent residence as of April 1, 1970" state: "The place you name here is where you will be enrolled if you are found eligible under the requirements of the Act. You need not have

-129-

been physically present in that place on April 1, 1970, but **you must have some ties back to that place** as outlined in section 43h.1(k) of the regulations." Stratman Exhibit 9. Marie Redick Ungar confirmed that the reason she enrolled to Woody Island was not simply because she had ancestral ties to Woody Island, but "That I really feel that was where I belonged at that time."

Responding to the challenge to her affidavit about having lived on Woody Island in 1970, Marie Redick Ungar noted that her affidavit "Says in here periodically. It didn't say I was there day after day, year after year." Depos. Tr. at p. 24.

She confirmed that, just as stated in her affidavit, she had hunted on Woody Island, eaten shellfish, engaged in sport fishing, berry picking, cutting trees for fuel, and beach combing on Woody Island. Depos. Tr. at p. 30.

Rebutting Stratman's contention that there was no "village" on Woody Island, Marie Redick Ungar testified that not counting the FAA complex on the far side of Woody Island, "The last I can remember was years with my mother and there was about 12 or 14 houses back up into the woods." Depos. Tr. at p. 28.

Rebutting Stratman's contention that there was something sinister about having changed her enrollment from Natives of Kodiak to Woody Island, Marie Redick Ungar explained that she changed to Woody Island when she found out that it was possible to enroll thereto:

> "Q.    I see. Had you enrolled to any village prior to Woody Island?
>
> A.    No. It was the Natives of Kodiak.
>
> Q.    The Natives of Kodiak?

A.    Um-hm.

Q.    But you later changed to Woody Island?

A.    I later changed to Woody Island when I found out
      that I could."

Depos. Tr. at p. 23.[50]

Marie Redick Ungar qualifies as a permanent resident of the Native Village of Woody

Island.  She is duly enrolled to the Native Village of Woody Island, listed the Native Village

of Woody Island as her permanent residence as of April 1, 1970, and does not lose her

permanent residency status merely because she rented a home in Kodiak.

Not only did Marie Redick Ungar testify that she had lived for a period of time on

Woody Island in 1970, but **she also confirmed that Larry T. Redick, William W. Redick,**

**and Robert J. Redick, all whom are her sons, had lived with her on Woody Island for**

**about two weeks in 1970**.  Depos. Tr. at p. 32.[51]   Marie Redick Ungar also confirmed that

her children had intended to go back to Woody Island to live.  Depos. Tr. at p. 33.

---

[50]One of the factors the RD lists as a basis for recommending Marie Redick Ungar be denied
her status as a 1970 resident of Woody Island was that "Marie originally enrolled to the Natives
of Kodiak but switched to Woody Island..." RD at page 70.  Once again, the RD asks this
Board to apply the law improperly.  *Koniag v. Kleppe*, 405 F.Supp. 1360, 1373-74 (D.C.
1975) <u>affirmed in part reversed in part</u>, *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir.
1978), makes it clear that a person can be deemed to be a permanent resident of Woody Island
even if the individual had been improperly enrolled to another Native Village.

[51]In his March 26, 1998 interview with Kathleen Putman, Larry Redick stated that during
the period to 1970, he went over to Woody Island and engaged in camping, fishing, beach
combing, and "just walked around there and enjoyed the land."  He stated that he was
accompanied by his mother, father, and brothers. L-Doc 330.

Marie Redick Ungar had four children who were still minors as of April 1, 1970: Larry, William[52], Robert, and David. Larry, William, and Robert had enrolled to Woody Island, but David did not.

All four children are entitled to permanent residency status by virtue of the presumption that they have the same residence as their Native parent, Marie Redick Ungar. See, *Manley Hot Springs* at p. 27. It is not necessary to have formally enrolled to the Village in order for David to be deemed to be a permanent resident of the Village. See, *Manley Hot Springs* at p. 15; *Koniag, Inc. v. Kleppe*, 405 F.Supp. at 1373-74.

Since Larry, William, and Robert Redick were enrolled to the Village of Woody Island and lived in the Village for several weeks in 1970, they also qualify as some of the 13 persons who used the Village in 1970 as a place where they actually lived for a period of time pursuant to 43 CFR §2651.2(b)(2). At page 83 of the recommended decision, the ALJ found that "Marie Redick Unger and three of her children, Larry, William, and Robert" are Woody Island enrollees "who come close to qualifying" as having lived in the village for a period of time in 1970. In light of the testimony at pages 15 and 32 of Marie Redick Unger's deposition that she and her children would stay in the village in Tina Simeonoff's house for "sometimes a week, two weeks. Sometimes a month", that they were there in April and May of 1970, for at least

---

[52]In his March 21, 1998 interview with Kathleen Putman, William Redick stated that he was on Woody island in 1970, that he spent the night there, that he would have been 18 years old in 1970, that he had been rabbit hunting and duck hunting on Woody Island, and that he views Woody Island as part of his ancestry, his history. L-Doc 332.

"A week, maybe longer ... because that's where we felt we belonged"[53], this Board should find that they are residents of Woody Island who did, in fact, live for a period of time in the village in 1970.

20.    **Marty Charles Shuravloff** (born 1953) is another Woody Island villager who lived for a period of time on Woody Island in 1970 and has longstanding ties to Woody Island. Marty Shuravloff testified at the hearings in Kodiak.  Marty's mother was Mission child, Woody Island villager Martha Pestrikoff (born on Woody Island in 1915).  His father is Leisnoi shareholder Nicholas Shuravloff, Sr. (born 1909).  Marty's aunt is Woody Island villager, mission child Sara Pestrikoff (born on Woody Island in 1910).  Marty's grandparents were Woody Island villager Feona Katelnikoff (born 1885, died and buried on Woody Island in 1918) and Woody Island villager Michael Pestriakov (date of birth unknown to 1962).  Marty Shuravloff is married to Andrea Ponchene whose grandmother was Florence Ponchene, the sister of Woody Island villager Herman Ponchene (born 1897, died on Woody Island in 1973, the common-law husband of Woody Island villager and matriarch Angeline Pananarioff (1902-1972).  Her grandfather was Woody Island villager Efka Pestrikoff.  (L-Chart 7 and L-Chart 32; L-Doc 344 (June 24, 1997 interview of Marty Shuravloff),  and Feichtinger Investigative Report L-Doc 108 at Tab 4, p. 15.)

At the hearings, Marty Shuravloff testified that his mother, Martha Pestrikoff, had been raised in the Mission on Woody Island, and that her father had a house or a cabin on Woody Island where she had lived as a child.  (Tr. at pp. 3155, 3160-3161.)

_____

[53]Karl Armstrong confirmed that Marie Redick Unger and her family stayed in Tina Hoen's home on Woody Island.  Armstrong Depos. Tr. at p. 25.

While living in Kodiak during the 1960s, Marty Shuravloff frequently went to Woody Island. He testified "we would jump in our skiffs. Woody Island was always a popular place to hunt, fish. Mainly hunt. We would be duck hunting and rabbit hunting a lot." (Tr. at pp. 3155-3156.) Although Mr. Shuravloff could not recall a specific event that distinguished 1970 from other years in that time frame, he had, in fact, been on Woody Island engaging in the same activities in which he had engaged on the Island in other years. He testified that he would have been on the Island in 1970 because **"We were pretty much there every summer... Woody Island was always a favorite place to go."** (Tr. at p. 3157.)[54]

Marty was asked "Do you consider Woody Island your traditional home?" to which he responded "I've always thought it was. I've always actually wanted a piece of property over there. Actually, had I had a piece of property, I'd probably have a house -- a house there now." Interview of Marty Shuravloff, L-Doc 344 at p. 11.

During the mid-1970s, Marty Shuravloff served on the Leisnoi Board of Directors and also acted as General Manager of the housing project on Woody Island. (Tr. at pp. 3151-3152.) He had done carpentry work for Leisnoi while Bill Cordry (who testified at these proceedings) was Project Manager. After Mr. Cordry left, Marty Shuravloff took over his

---

[54]The RD asks the Board to mischaracterize this testimony as "Marty was not sure whether he spent any time there in 1970." Recommended decision at page 74. The Board should not expect each witness, some 28 years after 1970, to have been able precisely to identify a specific event from 1970, as opposed to a recollection that the witness went to the village every summer, including 1970. The Board should not place an unreasonable burden upon the Native Woody Islanders that was not placed upon other Natives whose village eligibility status was timely challenged by protestants. Had Stratman timely lodged an administrative challenge to Woody Island promptly after learning of the village's certification, witness' recollections would obviously have been much fresher.

position as General Manager. (Tr. at p. 3152.) He worked to get electricity lines re-energized and the water system and sewer system on line. (Tr. at p. 3152.) The cost of the project for Leisnoi was well in excess of $200,000.00, since the electrical contract alone cost the corporation more than $200,000.00. (Tr. at p. 3153.) The corporation spent money for shareholder housing on Woody Island because "We were trying to find homes to be able to put, where shareholders could move back if they so desired at that time." (Tr. at p. 3153.)

In addition to the electrical contract, material and labor expended in the housing project, the Leisnoi corporation purchased two boats. (Tr. at pp. 3154-3155.) These boats were used in support of the refurbishing effort. (Tr. at pp. 3154-3155.) Mr. Shuravloff described how the bad moorage situation on Woody Island, coupled with heavy winds, caused the destruction of both the 24-foot skiff as well as the small Boston Whaler. (Tr. at pp. 3154-3155.)

The expenditure of funds by the corporation to repopulate Woody Island shortly after being certified and receiving land patents is objective evidence that the shareholders of Leisnoi had the intent to return to Woody Island as of April 1, 1970.[55] The project that Marty Shuravloff managed, authorized by the very first resolution (Doc No. 165; Leisnoi Resolution 74-1-1) that the nascent Leisnoi Board of Directors had adopted, is compelling evidence that the Leisnoi shareholders did have the intent to return to Woody Island. If the shareholders' claims of intent to return to Woody Island had been some sort of a fraud, there would have been no reason for the corporation to have expended funds refurbishing housing units on Woody Island after the corporation had already been certified and received its land benefits.

---

[55]Marty Shuravloff described that "the philosophy was to make these units available for our shareholders, you know, so they can move back to Woody Island." L-Doc 344 at p. 6.

-135-

Leisnoi's work and expenditure of funds in refurbishing the FAA housing units, as described by Marty Shuravloff, rebuts Stratman's allegation that those who had enrolled to the Native Village of Woody Island did not have the intent to return to Woody Island when absent from that place.

The Shuravloff family, including Marty Shuravloff's brothers Nick, Michael, Walter, Richard, and his sisters Patricia, Yvonne, and Nettie, as well as his mother and grandfather all have longstanding family ties to Woody Island. (Tr. at pp. 3155, 3160, 3164-3165, 3167.) Marty Shuravloff testified that when he lived on Woody Island in the 1970's, he would take his mother over there frequently and that she would take her children on tours of the Island describing where people had lived, and how things had been when she was growing up. (Tr. at p. 3168.) Although Marty's mother owned a house in Kodiak, Woody Island "has always been, speaking for her, that has always been home, and continues to be." (Tr. at p. 3168.)

In recommending that this Board find Marty Shuravloff not to have been a resident of Woody Island, the RD again erroneously relies upon perceived conflicts between answers to Column 16 of the enrollment form[56] with answers to Columns 17 and 19.[57] It states:

> "His maternal grandparents lived on Woody Island. His mother also lived there, both in the Baptist Mission and in her own home... [H]is parents sometimes took the family to Woody Island... He is enrolled to Woody Island. He listed Woody Island as his permanent residence on April 1, 1970, but listed Kodiak as the place

------

[56]Column 16 asked the Native enrollees to state "your permanent residence as of April 1, 1970." See, Enrollment Application, Stratman Exhibit 9.

[57]Column 17 asked for "your permanent residence as of the date you complete this form." Column 19 asked for the "region and village or city where you previously resided for an aggregate of 10 years or more." See, Enrollment Application, Stratman Exhibit 9.

where he resided for two or more years on April 1, 1970, and as the place where he resided for an aggregate of 10 or more years."

Recommended decision at pages 73-74.

The Board should reject the suggestion that it give weight to the information contained in Column 17, that asked the permanent residence of the Native as the date Marty completed the enrollment form. The Secretary of the Interior has determined that this information should be completely ignored for enrollment purposes:

> "Uncontradicted testimony was given that the Solicitor of the Department of the Interior had determined that Column 17 should be totally disregarded for any enrollment purposes."

*Kasaan*, at p. 22.

Likewise, column 19, asking where the Native had resided for an aggregate of 10 years or more should not have been considered in the RD, just as the RD should not have recommended that this Board deny Marty his Woody Island residency status simply because his parents owned a home in Kodiak:

> "Therefore, conflicts between the information contained in Column 16 and that contained in Columns 18-21 **does not by itself contradict the information in Column 16 so as to raise a substantial doubt** either as to the residency of the individual or the residency of those enrolled to the village as a class.

> "The evidence submitted by the Forest Service relating to **where individuals owned property or dwellings, registered to vote, paid property taxes, have a telephone listing, are registered for purposes of automobile driver's licenses, does not by itself, or in conjunction with the family list, raise a substantial doubt** as to whether or not Kasaan had less than 25 Native residents on April 1, 1970. Such objective evidence is not necessarily inconsistent with an individual being a 'permanent resident' elsewhere under the terms of the Act and the regulations."

-137-

*Kasaan*, at p. 23 (emphasis added).  See also, *Kaguyak*, VE 74-9 at p. 32.

Marty Shuravloff is a third generation Woody Islander whose mother was raised on Woody Island, has longstanding ties to the village, and always considered Woody Island to be her home. Tr. at p. 3168.  As a minor in 1970, he is automatically entitled to the same Woody Island residency status as his mother.  Marty spent time in the village in 1970 as he had every summer, later worked to re-establish housing for Native Woody Islanders in the village in the mid-1970's, had an intent to return, and qualifies for residency status.  This Board should reject the RD's flawed suggestion to the contrary.

21.    **Karl Armstrong, Jr.**, (1927-1963) is another Native Woody Island villager who lived for a period of time on Woody Island in 1970 and has longstanding family ties to the Woody Island Village.  Karl Armstrong, Jr., who was active in the formation of Leisnoi, Inc., is the son of Leisnoi shareholder Afanasiia Rysev (born on Woody Island in 1896, died 1989), and former U. S. Marshal Karl Armstrong, Sr. (1873-date of death unknown).  Karl Armstrong, Jr.'s grandparents were Woody Island villager Sophia Pestriakov (1879-1963) and Vasillie Rysev, Jr. (1873-date of death unknown).  His grandmother Sophia had at one time been married to Woody Island villager August Christian Anderson (1859-date of death unknown).  From that marriage his grandmother gave birth to Woody Island villager Janette Anderson (born 1902), Woody Island villager Herman Anderson (born 1905), Woody Island villager Anna Anderson (born 1908), Woody Island villager and Leisnoi shareholder Mary Anderson (1911-1982), as well as Marfa Anderson (1913-1913), Caroline Anderson (born 1917), and Verna Anderson (born 1921), who married Leisnoi shareholder Hugh Abston.  Karl Armstrong, Jr.'s mother remarried after her first marriage to Karl Armstrong, Sr., this time

-138-

to Lee Mathews (1903-1972). She gave birth to Leisnoi shareholder Laurel Lee Mathews (born 1929). Lee Mathews had previously been married to Vasillie Shmakov (1885-1927), and the offspring from that marriage included Woody Island villager and mission child Sophia Rossing (1914-1932), Woody Island villager and mission child Olga Vasillie Rossing (1916-1967), and Gordon Ralph Pullar (1907-1987), the father of Leisnoi shareholder and noted anthropologist Gordon Lee Pullar (born 1944). (L-Doc 108 at Tab 4, pp. 15-16; L-Chart 7.)    Karl Armstrong was born on Woody Island in 1927. Armstrong Depos. Tr. at pp. 17-18. His mother had also been born on Woody Island. Armstrong Depos. Tr. at p. 19.

Karl Armstrong returned to live on Woody Island in 1957. Depos. Tr. at p. 21. He again lived on Woody Island in 1968. Depos. Tr. at p. 21. Karl testified that in 1968 he had been on Woody Island for approximately 60 days, sometimes staying for five days at a stretch, and usually residing in Tina Simeonoff Hoen's house. Depos. Tr. at p. 24.[58] Karl Armstrong confirmed that Marie Redick Ungar and her family also stayed in Tina Hoen's home on Woody Island. Depos. Tr. at p. 25. "Woody Island is where I regard as my home", and the place where Karl felt his emotional ties were. Depos. Tr. at p. 27.

Karl Armstrong observed at page 20 of his deposition that for many years, "Kodiak was smaller than Woody Island and slowly a lot of people moved over to Kodiak."

Although Karl Armstrong did not own real property on Woody Island, "[T]he closest thing to a home that I had was the Hoen residence, their place over there. When they weren't

---

[58]Senator Fred Zharoff, in his March 30, 1998 interview, confirmed that Karl Armstrong was on Woody Island frequently and often spoke of wanting to live on Woody Island. L-Doc 438.

there, I could be there, and I didn't have any other place.  I couldn't afford -- at that time couldn't afford any other place."  Depos. Tr. at p. 39.  He did work in the garden and helped fix up the house while he was staying there.  Depos. Tr. at p. 39.  He also stated that he spent time gathering wood on Woody Island, again consistent with his affidavit.  Depos. Tr. at p. 39. Karl confirmed that the residence he described in his affidavit was the Hoen house.  Depos. Tr. at p. 41.

In 1968, 1969, 1970, and up to the date he was deposed in 1978, Karl Armstrong "spent whatever time I could get away I've spent over at the island."  Depos. Tr. at p. 41.

The Board should decline to adopt the recommendation that this son of Woody Island Villager Afanasiia Rysev, and grandson of Woody Island Villagers Sophia Pestriakov and Vasillie Rysev, Jr., be denied his status as a 1970 resident of the Native Village of Woody Island.  **Karl Armstrong testified under oath that he spent about five weeks on Woody Island in 1970.  He testified that persons with whom he visited on Woody Island during this period of time included members of the Chya family and the Redick family.  Depos. Tr. at p. 43.**

Karl Armstrong touched upon the fact that there were two societies existing simultaneously on Woody Island:  The FAA and government personnel, and the Natives:  "I think those of us that are from the island and those of us that are from the islands regard mostly FAA people in particular as transients.  Navy people, they're there two years and gone.  FAA people stay longer but they're never really part of the community, our community.  You know, they're two distinct societies or perhaps more for that matter, but certainly two distinct worlds..."  Depos. Tr. at p. 44.  He indicated that although he had seen Mr. and Mrs. Chaffin

-140-

on Woody Island he did not have occasion to speak to either of them on Woody Island: "Did you ever have occasion to speak to either one of them on Woody Island? A. I don't think so. I'd seen them around from time to time but they were typical government employees." Depos. Tr. at p. 44.

During 1970 while he was not staying at the Hoen house, Karl Armstrong left gear and his writing materials behind at the Hoen house. Depos. Tr. at pp. 47-48.

Explaining the references in his affidavit to his doing "subsistence fishing, hunting deer, elk, rabbits, and ducks", Karl Armstrong defended the veracity of his affidavit: "Well, the intent here is to show that I'm a subsistence lifestyle person. The rabbits are over there. That's where, you know -- if you're going to hunt rabbits in Kodiak, you're likely to go to Woody Island. Ducks you're going to go Long Island, but you can get ducks on Woody Island, too. But deer and elk, there's only one elk herd in Alaska and that's on Afognak." Depos. Tr. at p. 58. When asked "Then this was not intended to mean that you hunted those particular things on Woody Island?" Karl Armstrong responded "I'm not an idiot and I wouldn't list that elk excepting in the sense that I went over to Afognak." Depos. Tr. at pp. 58-59.

Describing the affidavits that the RD at page 78 asks this Board to mischaracterize as false and misleading, Karl Armstrong explained that the affidavits had simply been produced as forms to assist enrollees in authenticating their permanent residence status on Woody Island: "If it appeared some other village had adopted a form or use of a procedure that looked like it was a viable thing, we would look it over and adapt it or attempt to, and this was really what the affidavits were... I'm sure you'll find that all or most of the villages in the Koniag region used either similar -- identical or very similar affidavits. They were really prepared on a mass

-141-

production basis for people to -- could use that way." Depos. Tr. at p. 61. Karl Armstrong testified that there were a number of different affidavits designed to accommodate different situations of the various Natives enrolled to Woody Island: "I think we had around four or five, maybe six, of these with different situations. I don't recall what they were, but in an attempt to accommodate people." Tr. at p. 62. He indicated that the instructions to the enrollees had been to select the form that most nearly suited their circumstances as they believed it. Depos. Tr. at p. 62. Thus, there is nothing sinister about the use of similar forms for the affidavits. These affidavits were a good faith attempt by the Native enrollees to verify the basis for their permanent residency status.

Rebutting the flawed recommendation at page 92 that "the alleged Village failed to meet the requirements of being a 'Native village' and having an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style", Karl Armstrong testified that Natives dwelled in the Hoen home, the Chabitnoy home, the Simeonoff home, and the Hoen home. Depos. Tr. at p. 121. Corroborating testimony later presented at the hearings in Kodiak, Karl Armstrong described the condition of the Chabitnoy house in 1970: "It was occupied more than it was not, I'll put it that way, at least during the summertime. It was adequate shelter and I don't know who but somebody had taken visqueen and put it up on the windows and doors... This house was habitable." Depos. Tr. at p. 121.

Karl Armstrong confirmed that most of the persons who came from Kodiak to Woody Island to spend time on the island were Native people, rather than white people. Depos. Tr. at p. 122.

Like Marie Redick Ungar, Karl took issue with the protestant's thesis adopted in the RD that a home is where the individual happens to hang his hat most days out of the year, rather than where the individual intends to return and wants to be:

> "Home is where you're going to end up. That's where you're going to go. That's where you want to be, and it usually is for us. When you belong to -- people in the Lower States call it a tribe, but if you belong to a clan or a band you have your obligations and you have ties to that group that are -- they represent part of home. A village isn't just a place. First of all, it's people and that's part of the philosophy..."

Depos. Tr. at pp. 85-86.

In response to a follow-up question "I also get from your testimony that there is a type of home that you perhaps as a Native consider to be your permanent home. That's where your clan ties are, is that correct?" Karl Armstrong responded: "Yes. We have a sense of community... a sense of place... a sense of identity most of all. And all of these things go into home, go into village." Depos. Tr. at p. 87.

Although Karl Armstrong lived periods of time in a house in Kodiak owned by the Austermans, he stated "I don't consider it my home, but I -- that's where I hang my hat generally. When I'm there, that's where -- and when I'm in town." Depos. Tr. at p. 88.

Karl observed that a person can maintain a temporary residence anywhere, but that person has only one home:

> "Residence could be anywhere. You could have a number of residences. President of the United States, I understand, has three or four. Congressmen almost always have two. Indians by and large, they're lifestyle is apt to teach them that you can have a residence in a number of places, and we have people who do that, but there's only one home."

-143-

Depos. Tr. at p. 86.

This Native concept of "home" has been incorporated into the definition of "permanent residence" in the regulatory definition adopted by the Secretary of the Interior that ALJ Sweitzer failed properly to apply to these proceedings.

Karl Armstrong, Jr. not only described his own connections with Woody Island, and the use and occupancy of Native homes on Woody Island, but he also described the Village as complying with the eligibility requirements under ANCSA. Contrary to the recommendation at page 94 of the RD that "there is little evidence of communal activities on Woody Island after World War II"[59], Karl Armstrong testified that there were at least 25 Native residents of the

---

[59]In addition to testimonial evidence rebutting the flawed theory at page 94 of the RD that "there is little evidence of communal activities on Woody Island after World War II", ample photographic evidence shows this recommendation is mistaken and should be rejected. For example, the collection of photographs provided by Hal Post, Ph.D., the head teacher at the Woody Island School from 1956-1957 shows a number of communal activities, such as Woody Island schoolchildren working with shovels to plant trees (Phot 13-1, 13-2), children raising the Alaska and U.S. flag on Woody Island (Phot 13-12), children playing outside in the Woody Island school ground with snow on the ground (Phot 13-1), and children working with rakes behind a dump truck (Phot 13-16). A number of homes on Woody Island are also pictured in the Hal Post collection. A photograph of Ella Chabitnoy and Mitch Gregoroff in the kitchen at Ella's home on Woody Island in 1959 is pictured in the James Hartle collection at Phot 15-1. A photograph of Cecil Chabitnoy and Mitch Gregoroff playing chess on Woody Island in 1959 is pictured at Phot 15-2. Numerous photographs of the Harmon boys and their mother, Nettie Harmon, on Woody Island in the 1950's are pictured in Phot 15-3 through Phot 15-12. A photograph of Paul Harmon, Mitch Gregoroff and Johnny Maliknak unloading groceries at Woody Island from the *FedAir IV* is pictured in the Paul Harmon collection at Phot 22-2. A photograph of Paul Harmon, Jimmy Hartle, and Freddy Simeonoff playing in front of the Chabitnoy home and the Simeonoff home in 1953 is pictured at Phot 22-8. A photograph of Nettie Harmon, Judy & Earl Komm and two of the Komm Children in a home on Woody Island in the mid-1950's is pictured in Phot 22-12. A photograph of Cecil Chabitnoy seated with Johnny Maliknak behind Angeline Pavloff's home on Woody Island in the mid-1950's is pictured at Phot 22-13. A photo of Margie Fadaoff with a pretty dress seated at the Simeonoff home in the mid 1950's is pictured in Phot 22-15. A very endearing photograph of Freddy Simeonoff and Danny Harmon (both of whom later died in Vietnam) playing together as

Native Village of Woody Island in 1970. Depos. Tr. at p. 89, 91-92. He confirmed that "People that would go there for periods of time to do whatever it is they wanted to do which would have been over, the berry picking or the hunting, it would not be a bit unusual. That had been the way of people for as long as I can remember." Depos. Tr. at p. 92.

At page 83 of his recommended decision, the ALJ found that it was "more likely than not" that Karl Armstrong qualified as one of the enrollees who lived on Woody Island for a period of time. This Board should find that Karl Armstrong, a Native leader with longstanding family ties to Woody Island, who was born on Woody Island, has lived periodically on Woody Island, spent many weeks on Woody Island in 1970, and was active in the formation of Leisnoi, Inc., qualifies as a permanent resident of the Native Village of Woody Island who did, in fact, live in the Village for a period of time in 1970.[60]

**22.    Frank Pagano**
**23.    Ellen Simeonoff Pagano**

---

children on Woody Island is pictured in the Mitch Gregoroff collection at Phot A-4. A photograph of Tina Simeonoff Hoen, with Judy Simeonoff, Peter Simeonoff, Freddy Simeonoff, and Rayna Harmon at a birthday party on Woody Island in the 1950's is pictured in Phot A8-5. Cy Hoen is showing off in front of the Simeonoff House with a large halibut he caught in 1964 in Phot A8-1. A young Cien Hoen, playing with her dog, Oly Bones, on Woody Island in 1964 is pictured at Phot A8-10. A gathering of Nettie Fadaoff, Charlotte Fadaoff, David Fadaoff, and James Hartle, Alex Fadaoff, Jr. for a picnic on Woody Island in 1966 is pictured in the David Fadaoff collection, Phot 6-2. In light of this substantial body of photographic evidence, this Board should conclude that the theory "there is little evidence of communal activities on Woody Island after World War II", RD at page 94, is mistaken. This Board should not shut its eyes to the photographic evidence. The Native community on Woody Island was vibrant during the period the RD mistakenly asks this Board to deny the very existence of the community.

[60]Karl Armstrong's presence on Woody Island in 1970 is confirmed by Leisnoi shareholder Charlie Naughton in his deposition at page 30: "Oh, in 1970 we used to go over ... Karl would stay, you know, in the old Chabitnoy house and we'd stay there."

24.    **Carole Pagano**
25.    **Charlotte Pagano**
26.    **Michael Pagano**
27.    **Joseph Francis Fadaoff**
28.    **Edson Fadaoff, Jr.**

**Frank and Ellen Pagano**, their children, **Michael Pagano** (former Leisnoi President, born 1956), **Charlotte Pagano** (born 1958), **Carole Pagano** (current Chairman of the Board of Leisnoi, Inc., born 1959), and their adopted Native sons, **Joseph Francis Fadaoff** (born 1952) and **Edson Fadaoff, Jr.** (born 1954) are enrolled Leisnoi shareholders who lived for a period of time on Woody Island in 1970. Joseph testified live at the hearings in August of 1998.

Joseph Fadaoff, sometimes referred to as "Jo-Jo" or "Joey", was born in 1952 from the union of Woody Island villager Edson Nicholas Fadaoff, Sr. (1927-1958) and Woody Island villager Mary Ponchene (1924-1965). His brother is Leisnoi shareholder and Woody Island villager Edson Fadaoff, Jr. (born 1954). Joseph Fadaoff's grandparents are Nicholas Fadeef and Fekla Ella Kornilov Chabitnoy. (L-Chart 5; L-Chart 31; and Tr. at p. 1088.)

The Fadaoff family lived on Woody Island in the house built by Edson, Sr. When Edson, Sr. died in about 1958, his mother, Mary [Ponchene], remarried to Nicholas Pavloff, Sr. They continued to live on Woody Island until 1965, when Mary died of cancer.[61] At that time, Joseph Edson, Jr. was taken in and raised by Mission child, Woody Island villager, and Leisnoi shareholder **Frank Pagano** and his wife Woody Island villager and Leisnoi shareholder

---

[61] Arlene Simpler's April 9, 1995 affidavit, L-Doc353, corroborates that when she was on Woody Island from 1960-1962, "I also remember that the Pavloff family lived there and that there was a husband and wife, two boys named Edson and Joseph Fadaoff...The husband and wife were Nick and Mary Pavloff."

**Ellen Simeonoff Pagano**, and raised alongside their children, **Carole, Charlotte, and Michael Pagano**. (Document 108 at p. 97 and Book 14 [Chaffin, Yule. Alaska's Konyag Country] at p. 256, Document 103. [Fadaoff, Edson Jr. "Letter to Frank Feichtinger." 11 March 1997.])

Patricia Hampton was able to recognize a photograph from the Betty Pavloff Lind collection, A-1-032, a photograph of Angeline Pavloff Maliknak with Edson Fadaoff, Jr., and Joseph Fadaoff on Woody Island in August of 1960. She recognized the photograph as having been taken at Nick and Mary Pavloff's home. (Tr. at p. 202.)

Joseph Frances Fadaoff testified at the hearings in Anchorage. Mr. Fadaoff reviewed the Fadaoff family genealogy, L-Chart 5, and confirmed the accuracy of the chart. (Tr. at pp. 1022-1024.) Mr. Fadaoff testified that he grew up as a child on Woody Island. (Tr. at p. 1024.) He identified himself and his brother Edson as being pictured in a photograph from the Betty Pavloff Lind Collection, Phot A-1-032. (Tr. at p. 1024.) When shown a photograph taken in 1967 from the Alaska Aero Map Collection, Phot 1-3, Joseph Fadaoff labeled a number of the Native residences depicted in the photograph. (Tr. at pp. 1027-1029, Phot 1-3, Overlay No. 1.) He identified the Fadaoff house, the Chabitnoy house, the Simeonoff house, and the site where the Harmon house had been. (Tr. at pp. 1029-1030.) Mr. Fadaoff also labeled an acetate overlay identifying structures that appeared in the 1959 overflight photograph, Phot 9.

Joey, who was born in 1952, testified that he had lived in the Fadaoff house on Woody Island until about 1965. (Tr. at pp. 1023, 1029-1030.) Disputing the ALJ's flawed recommendation that "[M]any years prior to 1970 ... there were no congregations of a substantial portion of the alleged Village Natives each year or even sporadically" Joey testified

-147-

that some of his neighbors in Woody Island village were James [Fadaoff], his "Granny" [Ella Chabitnoy], his "Uncle Kelly" [Kelly Simeonoff, Sr.], and Natalie [Fadaoff]. (Tr. at p. 1030.) Although Joseph Fadaoff could not recall the names of all of the Harmon clan, he testified that "There was a whole slew of them" that lived in the Harmon house. (Tr. at pp. 1030-1031.) During the period 1960 through 1965, Joseph Fadaoff's recollection was that there were at least three to four children who lived in the Simeonoff house. (Tr. at p. 1032.) He testified that as a child he would frequently walk around the island and go berry picking and fishing both out of the ocean as well as the lakes on Woody Island. (Tr. at pp. 1033-1034.) Joseph Fadaoff testified that Natives would also come to visit from Kodiak. (Tr. at pp. 1037-1038.) He had a happy childhood growing up on Woody Island, and enjoyed being raised there. (Tr. at pp. 1037-1038.) He testified that a number of people used banyas, Native steam baths, and that his home also had running water for showers. (Tr. at p. 1039.)

Referring to photographs depicted at page 35 of the Chris Wooley publication entitled "A Walk in Time", Joseph Fadaoff identified his father, Edson Fadaoff, Sr. in the 1944 photograph of two sailors, (Tr. at pp. 1041-1042), and a photograph of two small boys in the 1960s with a toy boat as being a photograph of himself, his brother Edson, and his dog. (Tr. at pp. 1042-1043.) A color photograph also shown on page 35 of the Wooley publication was identified by Joseph Fadaoff as being a picture of his mother, Mary Ponchene, with his stepbrother, William Nicholas Pavloff. (Tr. at p. 1044.) Joseph Fadaoff testified that Kelly Simeonoff and Freddie Simeonoff had lived next door to him in the Simeonoff home while he was growing up on Woody Island. (Tr. at pp. 1045-1046.) Joseph's family grew food in gardens on Woody Island, the task of weeding those gardens sometimes falling upon him and

-148-

his brother.  (Tr. at pp. 1047-1048.)  Joseph Fadaoff was raised in the Russian Orthodox faith.  (Tr. at p. 1049.)

After moving from Woody Island to live with Frank Pagano and his wife Ella Mae Simeonoff Pagano, shortly after his mother died, Joey continued to see a number of the people whom he had grown up with on Woody Island.  (Tr. at pp. 1051-1052.)  He continued to feel that Woody Island was his home, and the place where he grew up, even after he had to move off the Island.  (Tr. at p. 1084.)

Joseph Fadaoff painted an vivid picture of life growing up as a child in the Native Village of Woody Island.  His recollections, testimony, and identification of photographs showing Native life in the village dispute the flawed recommendation at RD page 94 that "there is little evidence of communal activities on Woody Island after World War II."[62]

The recommendations in the RD on this matter are internally inconsistent.  On the one hand, the RD asserts that the Board should find there were no communal activities on Woody Island after World War II, RD at p. 94, yet, the RD also found that "By 1960" there were "20 consistent residents of Woody Island, including Angeline Maliknak, Herman Ponchene, Nicholas Pavloff, Sr., possibly Natalie Ponchene, possibly Johnny Ponchene, Mary Ponchene Pavloff, Edison [sic - should be Edson] Fadaoff, Jr., Joseph Fadaoff, Johnny Maliknak,

---

[62]One communal activity that took place on Woody Island, that many Natives would rather forget, is about 20 of them huddling together, frantic with fear, after the Earthquake.  See, "Tidal Action Takes Dock at Kodiak's Woody Island", L-Doc 67: "We had to bring all the Natives from the other side of Woody over to this side, about 20 of them, as they were frantic."  Patricia Hampton confirmed that Phyllis Carlson's comments in that 1964 newspaper article reflect what Phyllis observed immediately following the great earthquake.  Tr. at pp. 223-4.

-149-

William Wilfred Pavloff, Agnes Frump, Mary Anne King, Harold King, Brenda Pajurkin
a.k.a. Frump, Ella Chabitnoy, Mickey Chabitnoy, Cecil Chabitnoy, possibly Buddy Fadaoff,
and James Fadaoff.  Additions to the population in the early 1960's included William Pavloff,
born in 1961, and some of the Simeonoffs who returned for a year or two…" RD at p. 87.

The RD notes that "Edison [sic - should be "Edson"], Jr. and Joseph were minors on
April 1, 1970.  Consequently, their permanent residence is determined according to that of their
adoptive parents, Ellen and Frank Pagano." Recommended decision at page 60.   After the
death of his mother, Mary Ponchene Fadaoff Pavloff, Joseph Fadaoff was adopted and raised
by Leisnoi shareholders Frank Pagano and Ellen Simeonoff Pagano. Having been adopted by
Frank and Ellen Pagano, both of whom were properly enrolled to Woody Island and had listed
Woody Island as their place of permanent residence as of April 1, 1970, Joseph and his brother
also qualify for permanent residency status through their adopted parents, Frank Pagano and
Ellen Simeonoff Pagano.   Likewise, Frank and Ellen Pagano's three biological children,
Carole, Charlotte and Michael, also qualify for Woody Island permanent residency status
through their parents, Frank Pagano and Ellen Simeonoff Pagano. **Joseph Fadaoff testified
that he was on Woody Island in 1970 because the family used to return to Kodiak every
summer, and they would go visit Woody Island. (Tr. at pp. 1072-1075, 1086, 1089) When
they went back onto Woody Island in 1970 they had stayed at his old house, the Fadaoff
home.  (Tr. at pp. 1086-1089.)[63]**

---

[63]      "Q.    Did you miss Woody Island after you left it?
         A.    Yes.  **We** would go back in the summertime after I was living with Mae
                and Frank."
Tr. at 1052.