# EXHIBIT "9"

Frank and Ellen Pagano, who raised Joseph, Edson, Carole, Charlotte, and Michael, have substantial ties to Woody Island. In 1934, Frank Pagano, (who later served for many years as President of Koniag, Inc.), then age six, was put in the Mission on Woody Island when his father died. He was then raised in the Mission on Woody Island[64], and later Kodiak in the

---

"Q.  And when you went back to Kodiak, where did you, other than a visit to, to Woody Island, where did you stay when you would vacation at Kodiak Island?

A.  Well, we would stay in Kodiak, and sometimes **we would stay on Woody Island.** "

Tr. at 1073

"Q.  ...[T]hose were before, during, or after 1970?

A.  Well, I've been over the, to Woody Island before 1970, probably during 1970, and after 1970. Exact dates, I can't tell you."

Tr. at 1074

"Q.  Do you recall where it was that you stayed on, on Woody Island in 1970?

A.  ... Well, I know some time in that period **we stayed at our old house.**"

THE COURT:  What do you mean when you say 'that period'? Do you mean specifically 1970, or do you mean, or what do you mean?...

THE WITNESS:  Well, I thought he was asking during 1970... Well, I'm gathering what he's asking me is where I stayed in 1970 on Woody Island.

THE COURT:  Okay.

THE WITNESS:  Okay?

THE COURT:  Yeah.

THE WITNESS  It would have been **at the Fadaoff house,** probably."

Tr. at 1086-89.

[64]Dr. Nancy Yaw Davis, an expert anthropologist with impressive credentials and a thorough understanding of Alaska Native cultures, testified that the Mission area is part of the Village of Woody Island. She observed that "I think with the, the Mission connection for many of those people who chose to enroll to Woody, this was a connection to their Native identity, their Alaska Native identity. And I see the Alaska Native Claims Settlement Act should be supportive of those individuals who are Natives." Tr. at p. 3484. She further elaborated that there "was a sense of the Mission being a kind of family, for some people the only family. And it certainly is a connection. It is the Mission to those descendants, as Angeline [Pavloff

-151-

Mission until his teenage years. Frank Pagano later married Ellen Simeonoff, who was born on Woody Island. Ellen is the sister of Tina Simeonoff Hoen. Her father was Woody Island villager Kelly Simeonoff, Sr. (1911-1997). Her mother was Woody Island villager Natalie Fadaoff (1916-1992). The Fadaoff family started on Woody Island in the late 1800s. Nicholas Fadaoff (who had spelled his name Fadeef), born in 1888, was the grandfather of Ellen Simeonoff Pagano. He had been placed as a young boy in the Baptist Mission Orphanage on Woody Island at about the same time Fekla Balamutoff Kornilov (later known as Ella Chabitnoy) was placed in the orphanage. Fekla was Ellen Simeonoff's grandmother and was one of the matriarchs on Woody Island. (L-Chart 5; L-Doc 108 at Tab 4, p. 6.)

Both Frank Pagano and his wife, Ellen Simeonoff Pagano, are enrolled to the Native Village of Woody Island, and their names appear in the BIA certified roll, BIA Exhibit 2B at p. 22. Both Frank Pagano and Ellen Mae Simeonoff Pagano listed Woody Island as their place of permanent residence as of April 1, 1970. The RD is mistaken in its recommendation that this Board declare "They were not permanent residents of Woody Island on April 1, 1970" simply because they owned a home and worked in Anchorage. RD at p. 60. Frank Pagano, who was raised in the Mission on Woody Island, and his wife, a member of the Simeonoff clan with longstanding ties to Woody Island, are properly deemed to be permanent residents of Woody Island even though they owned a home in Anchorage.

---

Maliknak] is to the North Village and Ella [Fadaoff Chabitnoy] is, is to the South Village." Tr. at pp. 3508-09. She described the impact the Mission had on the lives of the Native Woody Islanders in terms of the "continuity of the people and the Native connections". Tr. at pp. 3635-3636.

Once again, the RD has lost sight of the definition of "permanent residence" which allows an Alaska Native to claim a village as a permanent residence so long as "he has continued to intend that place to be his home." 25 CFR §43h.1(k).

Omar Stratman, who has the burden of proof, and who had subpoena power for the hearings in Anchorage and Kodiak, failed to subpoena or call to the stand Frank and Ellen Simeonoff Pagano. He failed to negate their subjective intent to return to Woody Island. Joseph Fadaoff gave testimony about how he and his adoptive family would return every year to visit relatives on Woody Island, Tr. at p. 1052, sometimes spending the night in the village, Tr. at p.1074, 1086, so it is obvious that the Paganos still considered Woody Island to be their home. Stratman did not introduce any evidence negating their subjective intent. The RD recommends that this Board essentially write subjective intent out of the definition of permanent resident. Under the RD forumulation, if one did not own brick and mortar on Woody Island, one is automatically deemed to have forfeited residency in the village. This mistaken view of the law, that permeates the recommended decision, is inconsistent with the definition of "permanent residence" that emphasizes subjective intent: "A region or village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on that date, if he has continued to intend that place to be his home." 25 CFR 43h.1(k).

The Board should reject the mistaken suggestion at pages 58-60 of the RD that an inference must be drawn that the Paganos were not permanent residents of Woody Island as of April 1, 1970 merely because they listed Anchorage as the place of their permanent residence on the date they filed their enrollment application. RD at pages 58-60. The place of permanent residence as to the date the enrollment form was filled out, Column 17 of the form, "should be

-153-

totally disregarded for any enrollment purposes", according to the Solicitor of the Department of the Interior. *Kasaan*, at p. 22. Likewise, "conflicts between the information contained in Column 16 and that contained in Columns 18-21 does not by itself contradict the information in Column 16 so as to raise a substantial doubt either as to the residency of the individual or the residency of those enrolled to the village as a class." *Kasaan*, at p. 23. Moreover, the Paganos ownership of a home in Anchorage does not defeat their status as permanent residents of Woody Island since evidence "relating to where individuals own property or dwellings, register to vote, pay property taxes, have a telephone listing, are registered for purposes of automobile driver's licenses, does not by itself, or in conjunction with the Family List, raise a substantial doubt as to whether or not [a Native Village] had less than 25 Native residents on April 1, 1970. Such objective evidence is not necessarily inconsistent with an individual being a 'permanent resident' elsewhere under the terms of the Act and the regulations." *Kasaan*, at p. 23. A similar holding was made in *Kaguyak* at pp. 31-32.

Having failed to negate the subjective intent of the Paganos to return to Woody Island, having failed to overcome the presumption that the listing of the Paganos in the official roll was accurate, *Chitina* at pp. 17-18, and having failed to overcome the presumption that the statements by Frank and Ellen Pagano on their official enrollment form were true and accurate, *Manley Hot Springs* at p. 19, Stratman failed to carry his burden of proving that the Paganos were not residents of the Native Village of Woody Island. Since both Frank and Ellen Pagano were permanent residents of Woody Island on April 1, 1970, their biological children, Carole, Charlotte, and Michael, and their adopted sons, Joseph Francis Fadaoff and Edson Fadaoff,

Jr., are also permanent residents of Woody Island. The evidence shows that the Pagano family spent time on Woody Island every summer, including in 1970.

29.    **Rudy Sundberg, Jr.** (born 1934), another Native Woody Islander, lived for a period of time on Woody Island in 1970.[65]    Rudy Sundberg, Jr. is the son of Rudolph Sundberg, Sr. (1907-1984), a Woody Island villager who was on Woody Island in 1970, and Jenny Pestriakoffs (1917-1972), a Woody Island villager. Rudy Sundberg, Jr.'s grandfather was another Rudolph Sundberg, Rudolph Sundberg, Sr. (1857-date of death unknown). (L-Chart 30; L-Doc 108 at Tab 4, pp. 8-10.) (The Sundberg's family ties to Woody Island are discussed in greater detail *infra* in connection with Rudy Sundberg Jr.'s sister, Esther Sundberg DeNato.)

Remnants of the Sundberg house on Woody Island are partially standing today, and are pictured in Leisnoi photos Phot 28-028 through 28-038. Various household items dating from the 1950's, 60's, and 70's, including a Motorola black and white tube-style television set, dishes, electric iron, snow sled, a Schwinn bicycle, and a stove in the banya ruins are visible to this day. (Chris Wooley, "A Walk in Time", L-Doc A9, at p. 18; L-Chart 24B; L-Doc 108 at Tab 5, p. 2; and Phots 28-028-047.)[66]

In 1972, the Kodiak Area Natives Association (KANA) built a small cabin in the North Village area on Woody Island for Rudy Sundberg, Jr. (Doc 108 at p. 118.)

_____

[65]A Photograph of Rudy Sundberg Jr. appears in the Lind Collection at Phot A-1-097.

[66]In his testimony at the hearings, Joseph Francis Fadaoff was asked where Rudy Sundberg, Jr. lived, and responded "Well, it was up towards where little Johnny [Maliknak] lived... [T]here was -- Well, about three, three to four houses, probably a half a dozen buildings up in that area..." Tr. at p. 1039.

**Rudy Sundberg Jr.'s presence on Woody Island in 1970 is corroborated by the testimony of Maurice Harmon**. (Tr. at pp. 1585-1587.)  Stratman's witness, **Terry Olivia Johnson, who lived on Woody Island until 1971, also saw Rudy on Woody Island.** Tr. at p. 630.  Another witness called by Omar Stratman, **Tim Smith, also testified that Rudy Sundberg Jr. was on Woody Island in 1970**:

> "Q.  And did you observe Rudy Sundberg, Jr., living on Woody Island in 1970?
>
> A.  I know that he frequently asked us for rides from town to Woody and vice-versa.  I wouldn't be able to characterize him as a resident or not as a resident, but **he was certainly on the island practically daily during that time period.**

Testimony of Tim Smith, Tr. at p. 1957.

**Judge Roy Madsen confirmed that in 1970 he used to take Rudy Sundberg over to Woody Island in his boat.**  (Tr. at p. 2881.)

The ALJ observed at page 47 of his recommended decision that "Other than Nick Pavloff and Johnny Maliknak, he [Rudy Sundberg, Jr.] was the Native seen most often on Woody Island during the late 1960's.  He was also observed frequently on Woody Island by several witnesses in 1970."  Nonetheless, the RD contains the erroneous recommendation that this Board declare him not to have been a resident of Woody Island because "Valdez is identified on the Family List as the place where he resided for two or more years on April 1, 1970.  Woody Island is identified as his place of permanent residence on April 1, 1970, and Kodiak as the place where he resided for an aggregate of 10 years or more."  Here again, the RD contains a misconstruction of the law. It recommends denying Rudy his residency status merely because of differing responses in column 16, and column 17 - 18.

As was noted in *Kasaan*, conflicts between Columns 16 and 17-21 do not raise a substantial doubt as to the permanent residency status of an Alaska Native.  In fact, the information contained in Columns 17-21 is pertinent only to Alaska Natives who lived out of state as of the time of filing an application for enrollment.  Rudy Sundberg, Jr. resided on Woody Island and then in Valdez during 1970, so the Board would commit legal error if it were to adopt the recommendation that Rudy, Jr. lose his residency status based on such a perceived but false conflict.  The RD erred in recommending at pages 47-48 that simply because Rudy, Jr. is slightly developmentally disabled, "Rudy Jr.'s residency must be determined in accordance with his parents' residency..."  The RD does not contain any citations to any case law supporting its hypothesis that the 36 year old who traveled frequently on his own between Woody Island and Kodiak in 1970 must be deemed to have the same residency as his parents.

At page 83 of his recommended decision, the ALJ found that it was "more likely than not" that Rudy Sundberg Jr., qualified as an enrollee who lived for a period of time on Woody Island in 1970.  This Board should find that Rudy Sundberg, Jr. was a resident of the village who, in fact, did live on Woody Island for a period of time in 1970.[67]

---

[67]Rudy Sundberg Jr.'s case worker, Joanna McFarlane, executed an affidavit reciting what Mr. Sundberg told her about his connections with Woody Island: "He was born on Woody Island in 1934 and lived there with his family until 1941 ... He returned to Alaska in 1960 and from that point forward he lived on Kodiak and Woody Island until he became enrolled in the Community Support Program in the early 1970's.  During this time he and other family members alternated staying at their home on Woody Island and their home in Kodiak spending a week or more at a time at each residence... During this same period beginning on his return to Alaska in 1960 he recalls that there were a number of other native peoples living on Woody Island.  Specifically he recalls the Chabitnoy family consisting of Ella Chabitnoy, Mike Chabitnoy, Cecil Chabitnoy and "all the girls".  He remembers Stephan and Angeline Maliknak living there as well as Natalie Simeonoff... He recalls there being others as well but he cannot now recall the names."  L-Doc 182.

-157-

30.    **Jenny Pestriakoffs Sundberg,** (1917-1972), one of Angeline Pananarioff

Pestriakoff Maliknak's children, also qualifies as a resident of Woody Island.  She is enrolled

to the village and she was lived for a period of time on Woody Island in 1970.  Jenny was

married to Rudolph Sundberg, Sr.  They begat 13 children, including Anita Elizabeth

Sundberg, Esther Sundberg DeNato, Rudy Sundberg, Jr., and Herman Sundberg.  Jenny's

husband, Rudolph Sundberg, Sr., built a home on Woody Island in the 1930's, that was still

standing and being used in the 1960's and 1970's,   Tr. at pp. 1330-1331, although the

Sundbergs also had a home in Kodiak.  Their home on Woody Island was built on part of the

old Pavloff homestead. Tr. at pp. 1331-1332.  It is described as Site 5 in the Chris Wooley

report, L-Doc A9.  The archaeologist discovered evidence of usage in the 1970's, including a

Motorola black and white tube style television set and a Schwinn bicycle. See, Phots A28-028

through 036.  Esther DeNato testified that the house finally caved in in 1986. Tr. at p. 2819.

Jenny's presence on Woody Island is confirmed by the testimony of her daughter,

Esther, who described how the whole family visited, gathered berries, and  picnicked on

Woody Island in 1970. Tr. at pp. 2808-10.  In fact, on one memorable occasion in 1970, bad

weather set in, so they all spent the night in the North village area. Tr. at pp. 2820-21.

Jenny is duly enrolled to the village of Woody Island, owned a home in the village in

1970, spent time in the village in 1970, and has substantial family and historical ties to Woody

Island.  She qualifies as a permanent resident who actually lived for a period of time in the

village in 1970.

-158-

31.    **William C. Robertson**
32.    **Bruce Robertson**

Leisnoi shareholders **William C. Robertson** (born 1928) and **Bruce Robertson** (born 1953) lived for a period of time on Woody Island in 1970 and have longstanding ties to Woody Island Village. William C. Robertson's mother was Woody Island villager and 1970 resident Myra Malutin (1900-1982). His father was mission child and Woody Island villager William J. Robertson (1895-1965) [who served in World War I with Woody Island villager and mission child Mike Chabitnoy (1895-1958).]. His aunts include Woody Island mission child Catherine Robertson (born 1913), Woody Island villager and mission child Agnes Robertson (born 1896, died in 1907 of whooping cough at the Baptist Orphanage on Woody Island, and is buried on Woody Island), and Woody Island mission child Flora Robertson (1897-1985).[68] William C. Robertson's grandfather was Woody Island villager John R. "Jack" Robertson, who moved to Woody Island in 1903 after his wife Anastasia Zilleshnioff died. Jack's three children, Catherine, Agnes, and Flora, were placed in the Baptist Mission on Woody Island, and Jack Robertson became a part-time caretaker for the Mission and established his own homestead on the southwestern shore of Woody Island, a place called "Garboon." William C. Robertson's grandfather, Jack Robertson, disappeared in Seattle in about 1929, just one step away from perfecting his homestead on Woody Island. See, Document 334, a packet of letters concerning

---

[68]Firsthand primary source material establishes the longstanding ties of the Robertson family and other Native families to Woody Island. See, the Kodiak Baptist Orphanage Newsletters, L-Docs 189-276, 284-298. The October, 1903 newsletter, for example, states "We have just added Willie, Agnes and Flora Robertson to the orphanage family." The December, 1906 newsletter described how Ella Ballamutoff (later known as Ella Chabitnoy), Nikolai Fadaoff, and Willie Robertson participated in a school drama play on Woody Island.

Jack Robertson's homestead on Woody Island (U. S. Survey 1674). William C. Robertson testified at hearing in Kodiak. He donated the Bill Robertson Collection, Phot 4-1 through 4-2. These photographs depict Natalie Pestriakoffs, Julia Pestriakoffs, Myra Robertson, Lydia Petroff, Dora Stewart, and Mary Stewart, with Navy boys from the Woody Island wireless station in 1912. (Feichtinger Investigative Report L-Doc 108 at Tab 4, pp. 3-4; L-Chart 8; and Docs 293 & 294, Baptist Orphanage News.) William C. Robertson served in the National Guard with Maurice, Paul, and Danny Harmon. (Tr. at pp. 1575-1576.)

William C. Robertson is the father of Leisnoi shareholder and current director **William Bruce Robertson** (born 1953), who also lived for a period of time on Woody Island in 1970 and testified at the hearings in Anchorage. **Bruce Robertson is listed in Yule Chaffin's diary as having been on Woody Island in 1970.** (Yule Chaffin's Deposition, Exhibit 17 at p. 134.)

William C. Robertson and his son, Bruce Robertson, both have a sincere love for Woody Island. Their desire and intent to return to Woody Island was manifested by their efforts to obtain their family home site on Woody Island, as well as their effort to purchase Ella Chabitnoy's property on Woody Island. The center of Native family life for the Robertson family was on Woody Island, and both of these individuals lived for a period of time on Woody Island in 1970.

At the hearings in August of 1998, William C. Robertson confirmed that his mother was Myra Malutin, who spoke Russian, Aleut, and English. (Tr. at p. 1744.) He reviewed the Robertson Family Genealogy, L-Chart 8, and corrected the spelling of his sister Viola (that had been misspelled Voila). He also changed the spelling of his grandmother's maiden name Zillesnioff (which had been misspelled Zillenioff). (Tr. at p. 1745.) Apart from the spelling

-160-

errors that he corrected, he testified that the information contained in L-Chart 8 was an accurate reflection of his family's genealogy.  (Tr. at pp. 1744-1745.)

William C. Robertson's grandfather had a homestead site on Woody Island, approximately 80 acres, but he disappeared on a trip to Seattle, and was never heard from again.  (Tr. at p. 1746.)  William C. Robertson made his own personal efforts to acquire the family homestead on Woody Island, and negotiated with the Bureau of Land Management.  (Tr. at pp. 1746-1747.)

In addition to attempting to perfect the title to the family homestead on Woody Island, William C. Robertson also attempted to purchase Ella Chabitnoy's house during the late 1960s. (Tr. at p. 1747.)  He felt bad when Ella Chabitnoy sold the property to someone else.  (Tr. at p. 1748-1749.)

**William C. Robertson was on Woody Island during 1970.**  (Tr. at p. 1749.)  **He specifically recalls having assisted in mending nets on Woody Island in 1970.  (Tr. at p. 1756.)  He further stated that in 1970 "I'm sure that I was there other times, too."**  (Tr. at p. 1764.)  Woody Island was his family's choice picnic area, main beachcombing area, and a favorite place to take his family.  (Tr. at p. 1757.)

William C. Robertson identified the leading families of Woody Island as being the Fadaoffs, Pavloffs, Maliknaks, Simeonoffs, and Chabitnoys.  (Tr. at pp. 1759-1760.)  He testified that people from Woody Island tended to be clannish as Woody Islanders.  (Tr. at p. 1761.)  He indicated he went to the Island many times to visit during the period 1960 through

1970. (Tr. at p. 1761.) He would often anchor his boat near Lake Una. (Tr. at pp. 1763-1764.)[69]

William's son, Leisnoi director and President **William Bruce Robertson,** also testified at the hearings in August of 1998. He identified himself as being the same individual referenced in Yule Chaffin's diary who swam in Lake Una on Woody Island in 1970. (Tr. at p. 1695.) He enjoyed swimming in Lake Una, but observed that Yule Chaffin "was under the presumption that it was hers, and I, I knew it wasn't." (Tr. at p. 1696.)

Bruce Robertson hunted rabbits frequently on Woody Island; the first rabbit he killed was on Woody Island with his grandfather. (Tr. at p. 1697.) He identified a number of spots on Woody Island where he had particularly good luck hunting rabbits along the road system on the Island. (Tr. at pp. 1697-1698.)

Bruce Robertson described his grandfather's application for a homestead on Woody Island. He identified the location of the old homestead on the U. S. Survey 1674 and stated "My dad and grandfather at certain times would be down there, and he showed us the, the original barn, the old log barn, and where the, where the house used to be...It was just down from Yule Chaffin's place down the beach. And there was a stream going through there, and just big, huge timbers. It was like going back into a 'Alice-n-Wonderland' place. It was all

---

[69]Corroboration that the Robertson family had been engaged in commercial fishing in 1970 is found in the June 29, 1970 <u>Kodiak Mirror</u> article entitled "Family of Fishermen" that notes "Bill Robertson, with his son and crewman Bruce, are busy on their boat LAURA ANN, getting ready for the humpies." It contains a photograph of the father and son, both of whom testified at the hearings 28 years later. L-Doc A-10.

covered, and big canopy, and just beautiful back there." (Tr. at p. 1700.)[70]  The effort to

homestead the property had failed because his great grandfather had disappeared just shortly

before having to sign the final papers in order to complete the homesteading process.  (Tr. at

pp. 1702-1703.)  Bruce would still like to move onto the homestead property on U. S. Survey

1674.  (Tr. at p. 1704.)

**Bruce Robertson testified that both he and his father, William Robertson, were on**

**Woody Island in 1970.**  (Tr. at pp. 1695, 1704.)  He knew that his father had been on Woody

Island with him in 1970 because they had been fishing together.  (Tr. at pp. 1704-1705.)

There were rainbow trout in the lakes on Woody Island that Bruce used to fish for with eggs.

(Tr. at p. 1706.)  Bruce used to pan for gold as a child on Woody Island, although he never

found any nuggets, only flakes.  (Tr. at p. 1707.)  Bruce Robertson testified that **in 1970, he**

**was on the Island at least six times hunting rabbits, and going over there in the summer,**

**approximately 15, 20 or more times.**  (Tr. at p. 1722.)  He also went over to the Island for

camping.  (Tr. at p. 1723.)  In 1970 he had the feeling that Woody Island "was our home away

from home."  He was drawn there by "the past history; the unique, the uniqueness of the,

---

[70]The old Robertson homestead is situated at almost the southernmost portion of the village,
a somewhat private area, at U.S. Survey 1674, pictured in L-Chart 27.  Bruce described how
when he was only five or six years old, the area around the homestead had only a few houses
nearby.   The RD erroneously recommends that the Board twist this testimony into a
generalization that "a Leisnoi director, Bruce Robertson, testified that no Native village or
active community existed on Woody Island in 1970 or even earlier" RD at p.92, when, in fact,
Bruce was speaking only about the area near the old homestead: "My grandmother would go
down to the old -- Back then it wasn't a village.  It was just the old houses down there... All
I remember is the houses all had little fences, white picket fences.  And they had nice gardens.
And they had these big, huge white cottonwood trees from, in front of them.  It was just a
beautiful place." Tr. at pp. 1725-26.

knowing it so well...I've walked the shores with my grandfather. My dad and I just hunted all the time on the road system." (Tr. at p. 1728.)

Bruce would have been interested in returning to live on Woody Island at the time of the application for certification of the Native Village of Woody Island, but stated that "I didn't have any means of making a living over there...." (Tr. at p. 1708.)

As a director of Leisnoi, Bruce is familiar with the shareholder home site program that the corporation is trying to implement. He identified the site depicted on Chart 26 as the proposed shareholder home sites that are part of a Leisnoi program to relocate shareholders to Woody Island to repopulate Woody Island. (Tr. at p. 1709.) Leisnoi shareholders have been extremely interested in acquiring land for personal residences on Woody Island. (Tr. at p. 1714.) Bruce Robertson testified the corporation adopted the shareholder home site program under a predecessor board of directors "seven years ago." (Tr. at p. 1720.) A questionnaire was sent by the board of directors to the Leisnoi shareholders, and their number one priority was to acquire land for homes on Woody Island. (Tr. at p. 1721.)

Bruce Robertson explained some of the problems that occurred when Leisnoi was denied land on the historical side of Woody Island. He stated that "When they drew the two-mile boundary from city-limit boundary, that took away from a lot of historical aspect of Woody Island. You know, you can't, the access to Woody Island, that's, that's the only sensible place to, for a harbor to, for a boat access. You can't access the back side. It's all rocky." (Tr. at p. 1741.) In response to a question by Mr. Schneider as to "If the problems of land status were not, if all the things you've just mentioned to His Honor, Mr. Robertson, were not problems,

where would you intend to go?"  Bruce Robertson responded "Back to our homestead." (Tr.

at p. 1742.)

The RD is mistaken in its recommendation that this Board deny William and Bruce

Robertson their Woody Island residency status:

> "Bruce testified that his father 'frequented' Woody Island in 1970.  At the time
> he considered Woody Island to be his 'home away from home.'  That year he
> and his dad made 15 to 20 or more daytrips to the island in their boat to fish,
> swim, hunt rabbits, and beachcomb.  He also went there with 'the Sundberg
> boys.'... Because Bruce was a minor on April 1, 1970, his permanent residence
> shall be determined according to that of his parents.  His father, William Jr.,
> established long-term employment and residency in Kodiak... Neither of them
> lived for a period of time in the alleged Village in 1970, but merely recreated
> there on daytrips."

Recommended decision at pages 71-72.

Once again, the RD asks this Board to mischaracterize Native activities such as hunting,

fishing, repairing nets, and spending time with family on Woody Island as mere recreation, and

erroneously to conclude that obtaining a job in Kodiak results in loss of residency status on

Woody Island.  This Board should reject this approach, since *Afognak* makes it clear that a

village can be deemed the permanent residence of a Native even "where economic, educational,

or other requirements" have forced a Native to seek employment elsewhere.  *Afognak,* VE #74-

7 at page 13.

33.    **John Michael Waller** (born 1947, former President of Leisnoi, Inc.) is another

Leisnoi shareholder who lived on Woody Island for a period of time during 1970 and testified

at the hearing in Kodiak.  John Michael Waller's mother was Woody Island villager Marjorie

Fadaoff (born on Woody Island in 1924, died 1991), whose common law husband was Woody

Island FAA employee Eugene Litz.  Woody Island villager Edson Nicholas Fadaoff, Sr. (born

-165-

on Woody Island in 1927, died 1958) was an uncle of John Michael Waller. Woody Island villager Mary Ponchene (born 1924, died 1965) was his aunt. Woody Island villager Simeon "Buddy" Fadaoff (1930-1933) was another uncle of John Michael Waller. Woody Island villagers James O. Fadaoff (1932-1969) and Rosemary Challiak (1915-1965) were his aunt and uncle. John Waller's grandfather was Woody Island villager, mission child Nicholas Fadaoff (born 1888, died 1932, and buried on Woody Island). His grandmother was Woody Island villager, mission child, and matriarch Fekla "Ella" Kornilov Chabitnoy (1891-1971). (L-Chart 5; L-Doc 108 at Tab 4, p. 5.)

Michael Waller is the grandson of Nicholas Fadaoff, as shown on L-Chart 5. (Tr. at p. 3125.) Mr. Waller has served as a director as well as a President of Leisnoi, Inc. (Tr. at p. 3126.) He also served as general manager during the time in which Leisnoi, Inc. was refurbishing the FAA housing units on Woody Island. (Tr. at pp. 3126-3127.) Mr. Waller's father had built the FAA site on the east side of the Island in the 1940s. His mother was raised in the Mission and lived on Woody Island. He stated that "I was conceived in the fields of Woody Island." (Tr. at p. 3128.) It was not until Mike Waller became an adult that he learned that he had been adopted by the Wallers. He described it as being "one of Kodiak's best kept secrets." He regretted not having learned earlier, so that he could have spoken with his grandmother, Ella Chabitnoy: "I mean, I would, I would have liked to have talked to her. She was a village Shaman, and I understand that I have a lot of, of traits that she had. And I would have just loved to have spent some time with her, but such is life." (Tr. at p. 3149.)

In the 1960s, Mike Waller was frequently on Woody Island: "In about the Summer of 1962 I began to make frequent trips to Woody Island … by skiff, often with my friends. I

would spend time engaging in hunting and gathering activities..." Affidavit of John Michael Waller, L-Doc 419.  He also beachcombed, explored the Island, and walked through the woods. (Tr. at p. 3128.)[71]  Nonetheless, the RD recommends that this Board deny Mike his residency status:

> "The evidence shows that Woody island and other islands were merely his playground in his adolescence.  It does not establish that the alleged Village was the center of his family life, Native or otherwise, at any time during the decade ending in 1970.  He never lived there or engaged in subsistence activities of any significance.  The alleged Village was not his permanent residence on April 1, 1970, and he did not live there for a period of time in 1970."

Recommended decision at page 56.

Thus, according to the ALJ, "hunting and gathering" activities on Woody Island, such as were described under oath by John Waller, L-Doc 419, do not qualify as "subsistence activities of any significance."  Apart from disagreeing with the ALJ's characterization, this Board should note that there is no requirement in the Alaska Native Claims Settlement Act that Natives have engaged in "significant subsistence activities" in order to achieve residency status.  No such requirement was imposed upon the thousands of other Natives who enrolled to other villages pursuant to ANCSA, and it would be unfair to impose such a test on Woody Island or Woody Islanders.  There is no "significant subsistence activities" test listed in the definition of permanent residence:

> "'Permanent residence' means the place of domicile on April 1, 1970, which is the location of the permanent place of abode intended by applicant to be his actual home.  It is the center of the Native family life of the applicant to which he has the intent to return when absent from the place.  A region or

---

[71]Charles Naughton verified at page 10 of his deposition that he used to go rabbit hunting on Woody Island with Mike Waller.

village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on that date, if he has continued to intend that place to be his home."

25 CFR 43h.1(k).

ANCAB rulings plainly establish that engaging in seasonal hunting and fishing in a village qualify the Natives who did so as having lived in a village for a period of time:

> "These Natives were in Chitina for various reasons: ... seasonal hunting, fishing, and berry picking... In each case, consistent with their established cultural patterns and life styles, the record demonstrates that they 'actually lived for a period of time' in Chitina in 1970."

*Chitina*, VE 74-10 at pages 27-28.

Mike Waller testified about the tragic fire that burned down the FAA housing units after about two-thirds of them had been remodeled by Leisnoi in the 1970's. A heater too close to a bed started a fire in a bedroom, and 70-knot winds whipping across the Island caused the fire quickly to spread to other buildings. Mr. Waller personally observed the fire from Fuller Mountain, where he watched it with binoculars. (Tr. at pp. 3130-3131.)

Mike Waller graduated from college in Klamouth Falls, Oregon in 1971. **He testified that during the summer of 1970, his junior year, just as in his childhood, "Every time I'd get a chance I'd go find a skiff and go out there and fish..." He identified "there" as being Woody Island.** (Tr. at pp. 3131-3132.)

Mike Waller described one of the adverse effects of the earthquake as being that much of the beach on Woody Island had been washed out. This made it more difficult to pull a skiff safely out of the water onto the beach. (Tr. at pp. 3133-3134.)

Mike testified that he always liked going over to Woody Island and would like to go back. If given first choice of the Native home sites on Woody Island, his first choice would be Site 2 right off of Sawmill Point because it would be "a little bit easier to get at with a skiff." (Tr. at pp. 3136-3137.) His affidavit recites that "I consider my roots to be on Woody Island and would consider residing there at some point in the future, economics permitting." L-Doc 419. Moreover, he has imparted the Woody Island ties to his son, Michael Nicholas Waller: "My son, Michael Nicholas Waller, who is now fifteen years old, has attended Camp Woody, the Baptist Mission Camp presently operating on Woody island, on numerous occasions and I have shared with him our family's heritage concerning Woody Island." L-Doc 419.

This Native, who has ancestral ties to the village, spent many years hunting and gathering in the village, was in the village in 1970, and later was active in efforts to establish affordable housing for Natives on Woody Island in his capacity as a director, general manager, and later president of Leisnoi, Inc., L-Doc 419, qualifies as a resident of Woody Island who actually lived there for a period of time in 1970.

34.    **Kyra Ward**
35.    **Edward Ward**

Leisnoi shareholder **Edward Alan Ward**, who recently served as the President and Chief Executive Officer of Leisnoi, Inc., lived for a period of time on Woody Island in 1970. He is the brother of Leisnoi shareholder **Kyra Ward**, who also lived for a period of time on Woody Island in 1970. Ed and Kyra are the children of former Camp Woody employee Betty Ward and Leisnoi shareholder Harold Ward. Their other siblings are Leisnoi shareholders Joy

Ward, Star Ward, and Eric Ward. The Ward family tree was not introduced as an exhibit at trial; however, Edward Ward described the family ancestry and ties to Woody Island. His father's great, great, great grandmother was Agrafina from Old Harbor. Her descendants moved to the Kodiak area, and a number of them stopped at Woody Island. (Tr. at p. 2471.) Mr. Ward's grandmother's maiden name was Nascalkoff, who had ties to Woody Island. (Tr. at p. 2471.) Mr. Ward testified that his father's genealogy was documented "in a genealogy tree done by Senator Loren Lehman's brother..." Testimony of Edward Ward, Tr. at pp. 2455-2472.)

Edward Ward, born in 1953, arrived in the Kodiak area in September of 1965. (Tr. at p. 2456.) He and his other five siblings as well as his father, Harold Ward, are all Leisnoi shareholders. (Tr. at p. 2547.) When he first came to the Kodiak area, Ed Ward stayed at the Baptist Mission, the facility that had been run by Zelma Stone because "It was all my father could do to generate the money to get us up here and what not, and tried to get a place located for us...so we stayed at the Baptist Mission." (Tr. at p. 2458.) Ed Ward and his siblings all graduated from Kodiak High School. (Tr. at p. 2464.)

**Ed Ward was on Woody Island several dozen times during 1970.** (Tr. at p. 2466.) He stated "We would go down and snag one of the shag skiffs and we would go over there to hunt rabbits, which are very profuse over in that area..." (Tr. at p. 2466.) Most of the time these were day trips, but **"there was about three or four times that we overnighted for the complete weekend."** (Tr. at p. 2467.) The longest continuous period of time at a stretch that he spent on Woody Island in 1970 was two nights and three days. (Tr. at p. 2467.) **George Hansen verified that Ed Ward was on Woody Island in 1970.** (Tr. at p. 3173.) **Ed Ward**

-170-

**testified that her sister Kyra was also on Woody Island in 1970 and that "she accompanied me several times going over there."** (Tr. at p. 2467.)

Mr. Ward's father often talked about trying to be able to get back to Woody Island. (Tr. at p. 2475.) Coming back to Woody Island "was pretty emotional for him." (Tr. at p. 2475.) Mr. Ward testified that the Kodiak Island Borough Map displaying land ownership on Woody Island, L-Chart 27, accurately depicted the lands on Woody Island that were patented to Leisnoi, Inc. (Tr. at p. 2484.)

Ed Ward described the effort of Leisnoi "to give an acre and a half to shareholders" pursuant to a shareholder home site program. The chart of proposed shareholder home sites prepared by Leisnoi director Mitch Gregoroff, L-Chart 26, was described by Mr. Ward as being a map that "is a representation of the home sites to build on." (Tr. at p. 2490.) He described the conflict between the borough local zoning laws that require a five-acre minimum, and the federal shareholder homesite provisions of ANCSA that only permit a maximum of 1.5 acres. (Tr. at pp. 2491-2494.) According to Mr. Ward, Borough resistance to shareholder home sites is "a real heavy roadblock." (Tr. at p. 2491.) Another problem with implementing the shareholder homesite program is the Borough requirement that there be physical access to each parcel. (Tr. at p. 2498; 2523-2525.)[72] It would be necessary to get some sort of an

---

[72]   Edward Ward described a letter written to the Kodiak Island Borough attempting to get approval for a shareholder homesite program, Exhibit L-A-13. (Tr. at pp. 2516-2518.) If five-acre parcels were conveyed to shareholders as the Borough insists, then the land would be taxable, and if the taxes were not paid, "the property would be repossessed by the Kodiak Island Borough." (Tr. at pp. 2518-2519.) The Kodiak Island Borough refused to agree to the 1.5-acre shareholder home sites. (Tr. at pp. 2519-2520; L-Doc A-14.) When the Borough refused to allow the shareholder homesite program that had been authorized by federal law to be implemented on Woody Island, Leisnoi "filed suits against the Borough to settle this matter

easement in order to enable persons to travel from the dock on the western side of the Island to the Leisnoi land holdings on the eastern side of the Island. (Tr. at pp. 2498-2500.) This problem of Leisnoi getting land on only the eastern side of Woody Island stemmed from the federal regulations that precluded Leisnoi from selecting land within two miles of Kodiak. (Tr. at pp. 2501-2503; 2525-2526.)  Surveys of the shareholders indicated that they wanted to return to Woody Island. (Tr. at p. 2506.)

The shareholder homesite program is not the first effort of Leisnoi, Inc. to repopulate Woody Island. Prior to the fire at the refurbished FAA housing units that had been patented to Leisnoi, Leisnoi had "spent several hundred thousand in upgrades, and there were Leisnoi shareholders that were inhabiting those structures." (Tr. at p. 2497.) The refurbished FAA housing units made available to Leisnoi shareholders in the late 1970s were financed by Leisnoi, Inc. and leased to shareholders who relocated to Woody Island. (Tr. at pp. 2507-2508.)

During the period of time between the attempt to repopulate the Island by refurbishing the FAA housing units, and the more recent effort to repopulate the Island through conveyances of 1.5 acres under the shareholder homesite provisions of the Alaska Native Claims Settlement Act, the Native Village Corporation had merged with the regional corporation, Koniag, Inc., but that the merger was later set aside, and that "it took several, two, three, four years for it to get all resolved for them to get back on line." (Tr. at pp. 2509-2510.) Another impediment

in court..." (Tr. at p. 2521.) That suit, however, was dismissed in January of 1998 on the grounds that there had been an alleged failure to exhaust administrative remedies. (Tr. at pp. 2521-2522; Doc L-A-15.)

-172-

to repopulating Woody Island has been the *lis pendens* that Omar Stratman placed on all of Leisnoi land holdings, thereby clouding title.  (Tr. at pp. 2510, 2514-2515.)  Mr. Ward described the ramifications and deleterious effects that have resulted from the *lis pendens* that Omar Stratman placed on all of Leisnoi's land.

Counsel for the Protestant suggested that the Native Woody Islanders should have enrolled to the Natives of Kodiak if they wanted to get land on Woody Island, since the Natives of Kodiak ended up getting a 12-acre parcel on the western side of Woody Island, but Mr. Ward testified that "It was concurrence among the other shareholders, they want it to be done that they are natives of Woody Island and they are proud of it, not natives of Kodiak."  (Tr. at pp. 2526-2527.)  Mr. Ward noted that in order to have enrolled in the Natives of Kodiak, the Native Woody Islanders would have had to have said they were citizens of a first-class, home rule city, when, in fact, they had the intent to return to Woody Island, so Mr. Ward dismissed the theory that they could have enrolled to Natives of Woody Island because "In other words, they would have had to commit fraud."  (Tr. at p. 2527.)

Edward Ward also negated the theory advanced by counsel for the Protestant that persons had enrolled to the Native Village of Woody Island in order to obtain economic advantage, stating that persons who had such motivation would have enrolled to Afognak rather than Woody Island.  (Tr. at p. 2528.)  "Economic was not, gain was not their motivation." (Tr. at p. 2528.)  Responding to Omar Stratman's contention that Leisnoi's land is worth $95 million, and that was the motivation for people to have joined Leisnoi, Edward Ward noted that Omar Stratman has been paying only about $400.00 a year for the privilege of grazing his cattle on Leisnoi's land.  (Tr. at pp. 2542-2543.)

Edward Ward described the activities of protestant Omar Stratman in attempting to strangle the corporation by seeking an injunction freezing its bank accounts and blocking any and all timber harvesting. (Tr. at pp. 2533-2535.) He noted that Mr. Stratman's injunction was denied not only by the U. S. District Court in Anchorage, but also by the Ninth Circuit Court of Appeals. (Tr. at pp. 2534-2535.)

Responding to the testimony of Tim Smith implying that Yule Chaffin had told Mr. Smith Leisnoi planned to log Woody Island, Edward Ward testified that Leisnoi did not and never has had any attempt to log Woody Island. (Tr. at pp. 2536-2537.)

Rebutting Omar Stratman's contention that he is some sort of a public interest litigant, Edward Ward described how Stratman has been using Leisnoi's property as if it is his own. (Tr. at pp. 2549-2550.)  Stratman has tried to use this case to obtain Leisnoi land and money for himself. (Tr. at p. 2550.)  Mr. Ward described the Board of Director's view of the decertification case as being "We look at this thing as instead of fighting about the certification it would really lead one to believe it's really more about extortion." (Tr. at p. 2550.)

Edward Ward emphatically denied that Leisnoi, Inc. is the incantation of some sort of a phantom village. (Tr. at pp. 2551-2553.) He noted that Stratman's efforts over the years to harass Leisnoi with allegations of improper certification have been inconsistent with the spirit of ANCSA which stated that ANCSA was to settle without litigation and with rapidity the aboriginal land claims of the Alaska Natives. (Tr. at p. 2553.) The Native Village of Woody Island "is the most historical, most well-documented Native Village in Alaska that probably has more roots, more ties to the history of Alaska, even the purchase price of Alaska.  And

regardless of these hearings, they'll never strip us of that pride and that integrity." (Tr. at pp. 2553-2554.)

Mr. Ward objected to the characterization of the Native Village of Woody Island as being an "alleged village", stating that what "will clearly come out in these hearings that this village has existed." (Tr. at pp. 2569-2570.)

Edward Ward gave insight to some of the hostile feelings from the Kodiak Island citizens towards the Leisnoi shareholders as growing from the problem "they had a generic stereotype perception of this is what a village is." (Tr. at p. 2574.) There had been a failure to educate the public as to the definition of a Native Village under the Alaska Native Claims Settlement Act. (Tr. at p. 2574.) Additionally, Mr. Ward was of the view that Kodiak citizens objected to Leisnoi's certification because they had frequently used for recreation lands that were transferred to Leisnoi as a result of Alaska Native Claims Settlement Act. (Tr. at p. 2574.) The lack of understanding of the regulations pertaining to certification under ANCSA, as well as the perceived negative impact of the loss of public recreational lands led to the community opposition to certification of the Native Village of Woody Island. (Tr. at pp. 2574-2575.) Mr. Ward was of the view that these were the factors that led to testimony by persons such as Shirley Berns objecting to Leisnoi's certification. (Tr. at p. 2575.)

The RD is erroneous in its recommendation that this Board deny Edward Ward his Woody Island residency status:

"[A]s of 1970, the family's home was in Kodiak, where they lived, went to school, attended church, and received their mail and where his parents were registered to vote and licensed to drive. From 1969 to 1971 Edward visited Woody Island a couple of dozen times with friends to avoid chores at home, hunt rabbits, harass the cattle, and otherwise recreate. Kyra also visited the