# EXHIBIT "10"

island with him or her friends. Most of his visits were daytrips. His longest stay was two nights and three days.... Because Edward and Kyra were both minors on April 1, 1970, their permanent residence shall be determined according to that of their parents. Their father is the only parent with any ties to Woody Island and those ties were never clearly defined. What is clear is that he never lived there and there is no evidence that he even visited there. Neither parent's permanent residence was the alleged Village on April 1, 1970, and therefore the permanent residence of Kyra and Edward was not the alleged Village on April 1, 1970."

Recommended decision at page 74.

Here again, the RD, if adopted, would punish the Natives for having to seek employment elsewhere than on Woody Island. Edward Ward had commented on his father's economic hardship: "It was all my father could do to generate the money to get us up here and what not, and tried to get a place located for us...so we stayed at the Baptist Mission." (Tr. at p. 2458.) The evidence in the case has shown that there were no significant employment opportunities on Woody Island in 1970, so it is not surprising that Edward's father, Harold Ward, sought work in Kodiak. The Wards were nonetheless entitled to enroll to Woody Island:

> "The evidence submitted by the Forest Service relating to **where individuals owned property or dwellings, registered to vote, paid property taxes, have a telephone listing, are registered for purposes of automobile driver's licenses, does not by itself, or in conjunction with the family list, raise a substantial doubt** as to whether or not Kasaan had less than 25 Native residents on April 1, 1970. Such objective evidence is not necessarily inconsistent with an individual being a 'permanent resident' elsewhere under the terms of the Act and the regulations."

*Kasaan*, at p. 23 (emphasis added). See also, *Kaguyak*, VE 74-9 at p. 32.

There were no polling stations on Woody Island where votes could be cast, post offices where mail could be received, or Division of Motor Vehicle offices where drivers licenses

could be issued, Tr. at p.3093, so the RD, if adopted by this Board, would impose an impossible burden upon the Natives.[73]  According to the RD, since the Wards received their mail, voted, and obtained drivers licenses in Kodiak, they could not be residents of Woody Island; yet, even if the Wards lived 365 days a year on Woody Island, it would still have been necessary to go to Kodiak to receive mail, vote and obtain a driver's license.  Thus, under the formulation in the recommended decision, by voting, driving, or obtaining mail, the Native Woody Islanders necessarily forfeited their Woody Island residency!  This Board should not adopt such a recommendation.

The RD is erroneous in its failure to afford proper weight to Harold Ward's enrollment form that was duly submitted to the government, wherein Harold Ward attested to the fact that he was a permanent resident of Woody Island as of April 1, 1970 as that term is defined in the regulations.  The RD fails to acknowledge the legal "presumption that a person's statements on an official government form are true and accurate to the best of his knowledge and belief." *Manley Hot Springs*, at p. 19.  Just as there is "a strong presumption of the correctness of the residency shown on the Roll", *Kaguyak*, at p. 17, there is a separate presumption that each person's statement on an official government form is true and accurate.  *Manley Hot Springs*, at p. 19.  This Board should correct the RD's failure to follow the proper legal presumptions, and give proper weight to Harold Ward's sworn statement submitted on an official form to the government certifying that he was a permanent resident of Woody Island as of April 1, 1970.

---

[73]Even Johnny Maliknak, for whom the ALJ found "There is no dispute that his permanent residence throughout his lifetime, including on April 1, 1970, was in the area claimed to be the village of Woody Island", recommended decision at page 51, received his mail in Kodiak, Alaska, 99615. See, Alaska Native Roll, BIA Exhibit 2B.

-177-

As the children of Harold Ward, Edward and Kyra are also entitled to residency status, and they both spent time on Woody Island in 1970.

The protestant did not introduce any evidence rebutting the testimony of Harold Ward's ancestral ties to Woody Island, but the RD states that "those ties were never clearly identified" and that "Except for the testimony of Edward, no statement or testimony from any of the Wards was introduced into evidence." Once again, the RD recommends this Board place unreasonable burdens upon Leisnoi. There was no requirement that each and every permanent resident be called to testify at the hearings (many of the 1970 residents are now dead, so it would have been impossible to do so given the tardiness by which the protestant sought administrative hearings); indeed, the ALJ's schedule of only two weeks testimony, half of which time was given to the protestant, did not allow for such a comprehensive presentation of testimony. Leisnoi requested that it be granted the opportunity to present additional witnesses, but the ALJ refused:

> "This Court allowed only two weeks of testimony for the hearings in this case. Half of that time was given to the Protestant. Woody Island therefore only had one week of time in which to call witnesses. If the Court were to accept Stratman's theory that only persons who testified live can be deemed to be permanent residents of Woody Island, unless they had lived on the island year-round, then the hearings should be reopened to give the Native Woody Islanders a reasonable opportunity to present many more witnesses.
>
> At the hearings, Leisnoi called a number of Native Woody Islanders to the stand, but it did not call hundreds of witnesses as the Protestant apparently believes was necessary in order for Woody Island to defend its certification. His argument, based entirely upon overruled and discredited decisions, would necessitate a much longer hearing than two weeks. At the very least, Leisnoi, Inc. would request that another two weeks of hearings be held if the Court were inclined to adopt the discredited rule of law upon which Stratman now bases his case."

Leisnoi's answering brief at pages151-152.

Given that the RD recommends this Board refuse to follow the proper presumptions that the ANCAB ruled apply in village eligibility cases, Leisnoi should be given the opportunity to call more Native witnesses to testify.[74]

36.    **Charles Colby Naughton** (1947-1997) is another Leisnoi shareholder who lived for a period of time on Woody Island in 1970.  Charles' blood line is from southeast Alaska, but he was brought up in the Kodiak area and frequented Woody Island.  For several years of his youth, until 1961 when he was 14, he was raised by relatives Janet and Pappy Lee on Woody Island.  The Lees were FAA employees and occupied housing at the FAA site on the eastern side of Woody Island.  (Feichtinger Investigative Report at Tab 4, p. 16.)

Mr. Naughton, who was raised on Woody Island, Naughton Depos. Tr. at p. 16, who frequently took trips to Woody Island with Karl Armstrong, Mike Waller, and Tina Hoen, Depos. Tr. at p. 5, who **took his boat to Woody Island "at least once a week" in 1970** and would siwash it, Depos. Tr. at p. 6, who would sometimes stay in the Chabitnoy house, Depos. Tr. at pp. 7-8, who **fished and hunted on Woody Island in 1970**[75], who testified that when

---

[74]The last day of hearings in Kodiak on August 13, 1998 were scheduled to last until 4:00 p.m., Tr. 3315, but ended at 3:30 p.m. Tr. at 3331.  Joanna Holmes had been scheduled to testify that afternoon; however, she was not called to the stand because the parties stipulated that if she were called to the stand to testify, she would have testified that she is a Leisnoi shareholder and that she moved out to Woody Island at the renovated former FAA housing units in the late 1970s.  (Tr. at p. 3080.)  Likewise, Rudy Sundberg, Jr. had been scheduled to testify on the last afternoon, but his sister, Esther DeNato, informed counsel that he was in poor health and unable to testify.  Tr. at 3314.  Accordingly, that witness was also not called.  Leisnoi should therefore not have been faulted for not having called one or two more witnesses to testify in the brief remaining time late in the afternoon of the last day of hearings in Kodiak.  See, recommended decision at page 99.

[75]While Charles hunted rabbits on Woody Island, Karl Armstrong would frequently accompany him.  Charles Naughton Depos. Tr. at p. 31.

he wasn't commercial fishing "I was there [on Woody Island]", Depos. Tr. at p. 8, was erroneously recommended in the RD to be found not to have been a permanent resident of the Native Village of Woody Island. Although Charlie Naughton was not listed in the original Native Roll, he later made a Column 16 change of enrollment in order to become enrolled to the Native Village of Woody Island. Depos. Tr. at p. 25. He explained that the census taker had told him that he had to enroll to Natives of Kodiak, and when he learned he could make a Column 16 change to Woody Island, he did so because"[T]his is where I belong... And that's where I made the change." Depos. Tr. at p. 25. Mr. Naughton testified that he enjoys being on Woody Island, where he fishes for salmon, or for "octopus if the tide is low enough", or fishing "crab off there", Depos. Tr. at p. 15. He testified that when staying in places other than Woody Island he merely exists: "I exist in Anchorage, but I live in -- you know, I live on Woody Island." Depos. Tr. at p. 28.

Charles Naughton's deposition testimony implies that he had an intimate relationship with Patricia Hampton, who testified live at the hearings in Anchorage. Referring to Patricia's father, Darryl Chaffin, Charles Naughton testified "He didn't particularly like Pat and I running off in the bushes together kind of a thing, but he always seemed to be involved with the FAA station and they kind of stayed away from most of the people except the federal employees." Depos. Tr. at p. 38. Like Karl Armstrong, who referred to the FAA employees on Woody Island as living in a separate society, or effectively living in another world, Armstrong Depos. Tr. at p. 44, Charles Naughton's testimony about the FAA employees staying away from most people on the island except for other federal employees helps explain how witnesses called by

the Protestant were unable to verify the existence of a number of Natives who were on Woody Island in 1970.

**Ed Naughton, the uncle of Charles Naughton, confirmed that Charles Naughton had camped on Woody Island during the decade of 1960 through 1970.** Tr. at p. 303. **Likewise, his other uncle, Harold Naughton, testified that Charles Naughton had camped and visited Woody Island during the decade 1960 to 1970.** Tr. at pp. 243-244.

Although the RD states that "The frequency of his visits to Woody Island during the 1960's and 1970 is unclear" RD at page 75, Charles Naughton testified that he stayed on Woody Island for consecutive periods of time of up to two weeks, and went on to state, on the same page of his deposition, "However, you know, I stay there frequently, you know. If we were to add up all the days, it would it accumulate to a whole lot." Depos. Tr. at p. 26.

Although the RD states that "A significant portion of his time at Woody Island was spent outside the alleged Village", in fact, Charles Naughton's deposition testimony reveals that he often stayed in the Chabitnoy house in Woody Island village with Karl Armstrong in 1970. Depos. Tr. at p. 30.    Karl Armstrong, Jr.'s testimony also revealed that when Charles Naughton was on Woody Island in 1970, he would sometimes stay in Tina Hoen's house. Karl Armstrong Depos. Tr. at p. 46.

The RD is erroneous in its recommendation at page 75 that because Charles "neither owned nor maintained any structure in the alleged Village", therefore, "He was not a permanent resident of the alleged Village on April 1, 1970." There is no requirement that a Native own a home with a white picket fence in order to have been a resident of a village. The

brick and mortar concept of residency, a theme that permeates the recommended decision, does not give proper deference to the transient Native lifestyle:

> "Other factors in the definition of 25 CFR §43h.1(k) recognize the special situation of Alaska Natives, where Native family life may be characterized by patterns of kinship and activities substantially different from non-Native family life. In addition, **the definition recognizes the frequently transient lifestyle of Alaska Natives.** Thus, the definition emphasizes the factors of Native family life and intent to return."

*Manley Hot Springs* at p. 20.

Charles Naughton, who is enrolled to Woody Island, stayed on Woody Island for a period of time in 1970, considers Woody Island to be his home, has hunted and fished and engaged in traditional Native activities on Woody Island, qualifies as a permanent resident of the Native Village of Woody Island, and additionally as one of the 13 persons required to have been on Woody Island for a period of time in 1970 pursuant to 43 CFR §2651.(2)(b).

37.     **George M. Hansen** is another Leisnoi shareholder who lived for a period of time on Woody Island in 1970. George Hansen testified at the hearings in Kodiak. George is related by marriage into the Simeonoff family. George Hansen's mother was Barbara Neiman Hansen, a Native who enrolled to the Native Village of Shungnak. His father, Daniel Hansen, also of Native ancestry, enrolled to Shungnak as well, along with George's younger brother and sister. George's son is enrolled to Leisnoi, Inc. (Feichtinger Investigative Report at Tab 4, p. 17 and Testimony of George Hansen at pp. 3171-3184.)

At the hearings in Kodiak, George Hansen testified that he frequented Woody Island in the 1960s, Tr. at p. 3171, and **took his uncle's skiff out to Woody Island on many occasions in 1970 to picnic, fish, and beachcomb**. Tr. at pp. 3171-3173. He stated that in 1970 "**I used**

-182-

**to go over there, well, during the summer whenever the weather was nice, the opportunity arrived.**" Tr. at p. 3172. George Hansen fished in lakes in the village on Woody Island: "But almost every time I went over there I went, you know, to the lakes and fished." Tr. at p. 3173. He identified Talignak Lake and Long Lake as lakes where he fished for rainbow trout and land-locked silver salmon. Tr. at pp. 3173-74.

The RD notes at page 76 that George achieved majority in March of 1970 and moved out of his parents home, obtaining his own residence. Accordingly, George is not automatically deemed to have had the same residency as his parents.

At the hearings in Kodiak, George Hansen testified that he loves Woody Island, and that if economics would permit, he would like to move back there: "I love it... I would rather live there than in town." Tr. at p. 3174. George Hansen qualifies as a permanent resident of the Native Village of Woody Island, and, since he testified that he was on Woody Island in 1970, qualifies as one of the required 13 persons who actually lived for a period of time on Woody Island in 1970. This Board should reject the recommendation to the contrary.

Once again, the RD has downplayed fishing, a traditional Native activity on Woody Island: "His and his parents' only Woody Island ties and activities are recreational." Recommended decision at page 76. Once again, the RD asks the Board to attach no significance to the Native's love of Woody Island or his desire to move there. Once again, the RD has recommended that the Board declare a Native is denied permanent residency status merely because "He listed Woody Island as his permanent residence on April 1, 1970, but listed Kodiak as the place where he resided for two or more years on April 1, 1970, and Seward as the place where he resided for an aggregate of 10 or more years and the place where

-183-

he was born." Recommended decision at page 76. The RD should not be adopted because it fails to heed the principle of law that "conflicts between the information contained in Column 16 and that contained in Columns 18-21 does not by itself contradict the information in Column 16 so as to raise a substantial doubt either as to the residency of the individual or the residency of those enrolled in the village as a class." *Kasaan*, VE #74-17 at p. 23. Indeed, the official Native roll, the document certified by the Secretary of the Interior upon which this Board should rely "does not include information called for in columns 17 through 21 of the Application for Enrollment." *Afognak*, VE #74-7 at page 13.

38.    Leisnoi shareholder and mission child **Anna Kerr Blinn Bowers** is another Leisnoi shareholder who lived for a period of time on Woody Island in 1970 and has longstanding ties to Woody Island. Anna was born in 1922 from parents Mike and Mary Kerr. Her parents separated and in later years her father married Grace Amoknuk. Anna's stepmother, Grace Hobbs, was a mission child, as was Grace's first husband, Nicholai Amoknuk, who died in the 1918 Spanish Flu epidemic. Anna was raised in the Baptist Mission on Woody Island for one year in about 1929 due to her father and stepmother needing to work. Anna Blinn Bowers testified live at the hearing in Kodiak. Anna is the mother of deceased Leisnoi shareholder Paul Mueller (born March 4, 1948). **Anna is listed in Yule Chaffin's diary (Yule Chaffin deposition Exhibit 17 at p. 139) as having visited Yule on Woody Island in 1970.** Anna is the stepsister of Leisnoi shareholder Jacob Amoknuk, and the aunt of Leisnoi shareholders Paula Kerr, Cory Kerr, and Roxanne Kerr. She is the brother of Leisnoi shareholder Carl Kerr. Her biological mother is Leisnoi shareholder Mary May Mack.

(Frank Feichtinger's Investigative Report at Tab 4, p. 17 and Testimony of Anna Kerr Blinn Bowers, Tr. at pp. 3211-3241, 3243-3245.)

Anna Kerr Blinn Bowers, whose mother was raised in the Orphanage on Woody Island, Tr. at p. 3212, and who lived in the Woody Island Baptist Mission herself for one year in the 1930s, Tr. at p. 3212, and who, as an adult, has "gone over many, many times" to Woody Island, who is enrolled to the Native Village of Woody Island, and who listed Woody Island as the place of her permanent residence as of April 1, 1970, has mistakenly been recommended in the RD to be deemed not to have been resident of the Native Village of Woody Island. The RD equates everything that is not employment as being "primarily, if not wholly, recreational." Recommended decision at page 77. Since employment opportunities on Woody Island are virtually non-existent, under the formulation the RD recommends this Board adopt, it is almost impossible for any Native to qualify for Woody Island residency status. "Kodiak was the place where she was employed, registered to vote, and registered to drive", so the RD reasons that Anna Kerr Blinn Bowers must be denied Woody Island residency status, RD at page 77. This flawed reasoning overlooks the fact that there are no voting booths or Division of Motor Vehicles registration offices located on Woody Island.

Anna Blinn is conclusively established to have been on Woody Island in 1970, since Yule Chaffin's September 9, 1970 diary entry specifically mentions her as having visited with Yule in the afternoon of that date. See, Yule Chaffin Deposition Exhibit 17 at p. 139. At the hearings in Anchorage, she testified that she has continued to visit Woody Island during the 1960s up to the present. She stated "I'd live, like I said, I'd live there if I had, the, the opportunity." Tr. at p. 3217. **She testified further that she had been on Woody Island**

-185-

**during 1970 for probably two or three times during the summer, and that she would**

**gather berries at various locations on Woody Island.** Tr. at pp. 3218-3219. This Leisnoi

shareholder has sufficient ties to the village to be deemed a resident of the Native Village of

Woody Island. Additionally, she qualifies as one of the 13 required persons who actually lived

in Woody Island for a period of time in 1970, pursuant to 43 CFR §2651.2(b)(2).

39. **Roy Harding Madsen**
40. **Charles Allen Madsen**
41. **Jacqueline Adams Madsen**

Retired Alaska Superior Court Judge **Roy Harding Madsen**, (born 1923), the present

owner of the "Fadaoff/Madsen" house on Woody Island that was built by Edson Fadaoff, Sr.

from the wood of the former Navy submarine station, and his children, **Charles Allen Madsen**

(born 1953) and **Jacqueline Adams Madsen** (born 1962), are Leisnoi shareholders who lived

for a period of time on Woody Island in 1970. Judge Madsen is the brother of Leisnoi

shareholder Thelma Madsen (born 1921) and Leisnoi shareholder Rose Madsen (born 1920).

Judge Madsen's parents were big game guide Charles Madsen (1884-1954) and Mary Metrokin

(1899-1927). Judge Madsen's aunt was Leisnoi shareholder Elizabeth Metrokin (born 1897).

Another of his aunts is Leisnoi shareholder Mary Rossing (born 1918), the mother of Leisnoi

shareholder Walter Metrokin (born 1937). Another of Judge Madsen's aunts was Freida

Metrokin (born 1912), who was married to Gustantine Reft (1922-1985), and gave birth to

Janice Reft (born 1950), the wife of Leisnoi shareholder and Woody Island villager Kelly

Simeonoff, Jr., an individual who testified at the hearing in Kodiak. Judge Madsen's Aunt

Freida had also been married to an Edward Bent (1907-1995), and from that marriage she gave

birth to Breta Bent, the wife of Leisnoi shareholder Robert Erickson, Sr. (born 1928), and

-186-

mother of Leisnoi shareholders Robert William Erickson, Jr. (born 1960), Edwin Norman Erickson (1961-1997), and Jeffrey Wayne Erickson (born 1965). Judge Madsen is the uncle of Leisnoi shareholder and director Jeffrey Chester (born 1958), Leisnoi shareholder Ronald Charles Brockman (born 1940), Leisnoi shareholder Mary E. Brockman (born 1948), Leisnoi shareholder Bruce E. Short (born 1950), Leisnoi shareholder Darla Chester (born 1959), Leisnoi shareholder Lorna Chester (born 1961), and Leisnoi shareholder Todd Chester (born 1966.) (L-Chart 33 and Transcript of Judge Madsen's testimony, pp. 2861-2865 and 2875-2876.)

In testimony at the hearings in August of 1998, Judge Madsen described how he has lived in the Kodiak area since 1937, and how he practiced law from 1962 until he was appointed to the Superior Court bench by former Alaska governor Jay Hammond. (Tr. at pp. 2864-2866.)

Together with Karl Armstrong, Marie Reddick, and other Woody Islanders, Judge Madsen had gone to Washington, D.C. to lobby for the passage of the Alaska Native Claims Settlement Act. (Tr. at p. 2867.) Following passage of ANCSA, he did corporate work for Koniag in some of the villages, training the directors, "because most of the people in the villages had never had any experience serving as boards of directors." (Tr. at pp. 2867-2868.)

Judge Madsen is a duly enrolled Leisnoi shareholder. (Tr. at p. 2869; BIA Exhibit 2B.) He obtained a copy of his family tree from the Bureau of Indian Affairs Archives in Washington, D.C. (Tr. at pp. 2869-2870.) Judge Madsen testified that he has ties to Woody Island through his grandparents. His younger sister was two years old when his mother died, and she was placed in the orphanage. Judge Madsen used to go over to Woody Island to visit

-187-

her.  Additionally, he had four cousins that were raised in the Mission on Woody Island from 1920 until 1936.  (Tr. at p. 2874.)

**Judge Madsen testified that he engaged in fishing and gathering berries on Woody Island in 1970 with his two youngest children** (Tr. at pp. 2875-2877.).[76]  **Charles Allen Madsen** (born 1953) and **Jacqueline Adams Madsen** (born 1962) are his youngest children.

His oldest child is Elizabeth Karlene Madsen, born 1944.  See, Family List, L-Doc 385.  **He went with the children "several times during the summer" to the village.** Tr. at p. 2877.

Roy Madsen was certain of the year 1970, because that was the year of the canonization of St. Herman, the first Russian orthodox saint that was canonized in the United States.   The canonization of St. Herman took place on August 9, 1970, and Judge Madsen recalls the event vividly.  (Tr. at p. 2876.)

Contrary to the flawed recommendation in the RD that "the alleged Village failed to meet the requirements of being a 'Native village' and having an identifiable physical location evidenced by occupancy consistent with the Natives' own cultural patterns and life-style", RD at page 92, Judge Madsen, testified that there were still standing a number of dwellings, sheds, and buildings that belonged to Native Woody Islanders.  These included the Chabitnoy house that was "in pretty good state of repair at that time"; the Simeonoff house "which is right next door and behind my place, was still standing.  And it was habitable."; and Angeline Pavloff's house that "was still standing.  I went up to visit up there...And the cabana that was in use

_____

[76]The Alaska Native Claims Appeal Board observed in *Eyak* that berry picking is one of those "traditionally Native activities ... not rendered less Native in character merely because, in 1970, non-Natives also engaged in them." *Eyak*, VE #74-75 at p. 33.

there, you know Johnny was still using it to take steam baths in."; Rudy Sundberg's smokehouse "was still there. And gear storage was still there because I used to go up to see Johnny and Nick when I'd go over there and walk up to their place." (Tr. at pp. 2878-2879.)

Judge Madsen purchased what had been known as the Fadaoff house on Woody Island. (Tr. at p. 2882.) The Kodiak Island Borough had been assessing property taxes against the building, and the Fadaoff boys had fallen into arrears on the taxes, so Judge Madsen testified that part of the terms of the sale were his paying the back taxes. (Tr. at p. 2884.) The Kodiak Island Borough tax assessments constitute an act of governmental authority within the 10 years predating April 1 of 1970 that had an adverse impact upon the ability of Native Woody Islanders, in this case the Fadaoff brothers, to live on Woody Island. See, Tr. at pp. 2883-2886.) The Borough taxation began shortly after the earthquake of 1964. (Tr. at p. 2886.)

Judge Madsen testified that land on the historic western side of Woody Island was given to the Natives of Kodiak instead of Leisnoi because the property was "within two miles of the city of Kodiak. That's why the Natives of Kodiak have acquired it instead of Leisnoi." (Tr. at p. 2892.)

Judge Madsen attempted to assist Johnny Maliknak obtain title to property on Woody Island in which Johnny Maliknak had lived his whole life; however, his effort was unsuccessful because patent to the property has never been issued. (Tr. at pp. 2895-2896.)

The RD is mistaken in recommending that this Board find "The evidence does not show that [Judge Madsen] frequently or consistently used Woody Island during the decade ending in 1970. He did not state how often or how long he visited Woody Island other than mentioning

several daytrips in 1970.  Some childhood visits to the island and several daytrips 35 years later do not make the alleged Village the center of his Native family life." RD at page 80.

When asked "And on April 1, 1970, which of those possibilities did you intend to be the center of your Native family life and did you intend to return to?", Judge Madsen stated "Woody Island." (Tr. at p. 2917.)  He had developed the intent to return to Woody Island (which he acted upon, as evidenced by his ownership to this day of a home on Woody Island) "Probably when I started going there on a regular basis -- in the, after '66." (Tr. at p. 2924.)

Judge Madsen, who has family ties to Woody Island,[77] who testified that in 1970 Woody Island had special meaning to him because "I've always felt that this is where I wanted to establish and, and maintain my home, (Tr. at p.2877-2878), who still owns real property on Woody Island (Tr. at p.2878), and who engaged in fishing and gathering berries with his children on Woody Island "several times during the summer" of 1970, Tr. at p.2877, qualifies as a permanent resident of Woody Island who actually lived there for a period of time in 1970.  Moreover, two of his children that accompanied him to Woody Island in 1970, Charles Allen Madsen and Jacqueline Adams Madsen, were minors at that time (Tr. at p.2877), and therefore automatically have the same Woody Island residency status as their father. *Manley Hot Springs* at page 27.

---

[77]Judge Madsen has strong ties to Woody island.  His younger sister "was two years old when my mother died, and she was in the orphanage.  And we used to go over there to visit her.  And I had four cousins that were raised in the Mission from about 1920 until about 1936... Dorothy Nelson Bactad and Charlie Nelson, and they were my brother's children and they had spent about 12 years in the Mission orphanage there.  Plus, it's a place that I used to travel to." (Tr. at p. 2874.)

42.  **Nicholas William Pavloff, Sr. (1924-1978)**
43.  **Nick Andy Pavloff, Jr. (born 1953)**

**Nicholas William Pavloff Sr.**, who lived on Woody Island during 1970, was born in 1924 and died in 1978, was the son of Angeline Pananarioff (1902-1972) and William N. Pavloff (1879-1931), who were both Woody Island villagers.  Nicholas William Pavloff, Sr.'s grandfather was Nicholai W. Pavloff (1846-1932), who was also a Native Woody Islander, and whose father was William E. Pavloff (1817-1872), the Vice Governor of Alaska from 1858-1867.  Nicholas William Pavloff, Sr. was married twice in his lifetime.  His first marriage was to Woody Island villager Christine Malutin.  He had four children from this marriage, all of whom were Woody Island villagers:  Agnes Jean Pavloff (born 1950, and a Leisnoi shareholder); Betty L. Pavloff (born 1952, and a Leisnoi shareholder); **Nick Andy Pavloff, Jr**. (born 1953, lived on Woody Island during 1970, and is a present Leisnoi shareholder); and Christine Sally Pavloff (born 1954, and presently a Leisnoi shareholder).  Nicholas William Pavloff, Sr.'s second marriage was to Mary Ponchene (1924-1965), also a Woody Island villager.  He had one child from this marriage:  William Nicholas Pavloff (1961-1985), a former Leisnoi shareholder who lived on Woody Island in 1970).  (L-Chart 6; L-Doc 108 at Tab 4, pp. 1-2.)  The ALJ found at page 49 of his recommended decision that Nicholas William Pavloff, Sr. "was a lifelong resident of Woody Island... His permanent residence was the alleged Village on April 1, 1970, and he did live there for a period of time in 1970", so there is no dispute that Nicholas Pavloff, Sr. was a permanent resident of the village who actually lived there for a period of time in 1970.

Nicholas William Pavloff, Sr.'s son, **Nick Andy Pavloff, Jr.** (born 1953), was a minor child in 1970, and therefore is automatically entitled to the same Woody Island permanent residency status as his father. *Manley Hot Springs*, VE 74-6 at p. 27. Moreover, **Nick actually lived on Woody Island for a period of time in 1970.** Tr. at p. 2886-87. In his June 19, 1997 interview, he was asked "[W]ere you ever over there [in the Woody Island village] visiting in the 70's?", he responded "Oh, yeah, I was over there visiting my dad quite a bit. Every time I was in town, I went over to see him." Q: "Can you say for relative certainty that some time in 1970, you were over visiting him?" A: "For certainty? Yes, I sure can...I got a uncle [Johnny Maliknak] that lives over there right now ... and he'll remember all the times that I would go over and visit with my dad." Q: "Would you stay overnight sometimes?" A: "Oh, yeah, sometimes I'd spend a couple of days ... [M]y dad lived over there. I would -- you know, I was always cruising over to see him -- him and my uncle." Interview of Nick Andy Pavloff, L-Doc 168 at pp. 14-15.[78]

44.    **Alexander John Fadaoff, Sr.** (born on Woody Island in 1934, died 1988) is another Native Woody Islander who qualifies for Woody Island permanent residency status as of April 1, 1970, and who lived for a period of time in the village in 1970. Alexander, usually referred to as "Lexie", was the second son of Anastasia "Nettie" Fadaoff Harmon.[79] He is the

---

[78]Esther DeNato described Nick Andy Pavloff, Jr. as "my uncle Nick's son with Christine Malutin Pavloff." She stated that he was "back and forth" on Woody Island in the 1960's, and she is "pretty sure he had" been on Woody Island in 1970. Tr. at pp. 2806-07.

[79]A photograph of Lexie's mother, Anastasia "Nettie" Fadaoff, Charlotte White Fadaoff, Alex Fadaoff, Jr., and David Fadaoff, on Woody Island in 1966 is pictured in the David Fadaoff Photographic Collection, Phot 6-2.

brother or half-brother of Paul Harmon, Maurice Harmon, and Mitch Gregoroff, who testified at the hearings. He is the grandson of Ella Chabitnoy[80]. L-Chart 5. He was raised in the mission with his older brother, Ronald Fadaoff.[81] He fathered two children, Alexander John Fadaoff, Jr. (born 1957) and David James Fadaoff (born 1959). The Alexander John Fadaoff, Sr. family lived at various times on Woody Island. Mitch Gregoroff testified that he had seen Alexander John Fadaoff Sr. on Woody Island during the 1960's. Tr. at p. 1466. Kelly Simeonoff, Jr. testified that "Lexie, or Alexander, and his wife, Charlotte, lived there [on Woody Island] after they were married, with their children, during the '60s." Tr. at p. 2702 The ALJ found that "There is no doubt that Alexander Sr. did visit, as he was seen fishing there in 1970." Recommended decision at page 66. In 1970, Lexie was fishing with William C. Robertson, who testified at the hearings. L-Doc 118.

Investigator Feichtinger testified that "Alexander John Fadaoff, Jr., this was the, the second son of Nettie that was raised in the Kodiak Baptist Mission. During the 1960s he and his family, which consisted of Charlotte White, his sons Alex, Jr., and David James, were living in, primarily in Kodiak but visiting frequently for, for periods of time their mother and, and, and grandmother on, on, on Woody Island." Tr. at p. 979.

Lexie Fadaoff's ties to Woody Island continue posthumously; the RD notes that Lexie "is buried on Woody Island." RD at page 66. According to Maurice Harmon, "our brother

---

[80]A photograph of Ella Chabitnoy taken in 1966 is pictured in the David Fadaoff Photographic Collection, Phot 6-4.

[81]A photograph of Alex Fadaoff Sr., Ronald Fadaoff, and Mitch Gregoroff as young children is pictured in Phot 6-13.

Dan Harmon ... is buried, along with our brother Alexander Fadaoff on church property near where the Russian church stood." L-Doc. 118 at p. 1.

The RD is mistaken in its recommendation that this Board declare Alexander to be ineligible on the grounds that "live-long [*sic* - should be life-long] resident Johnny Maliknak identified 41 Natives as having resided on Woody Island at some time during the period of April 1, 1960, to April 1, 1970, and Alexander Sr. and his family were not included on that list. ... None is listed as a 1970 resident thereof in the Feichtinger report.  No statement or testimony from any of them was introduced into evidence." First of all, the affidavit of Johnny Maliknak is not meant to be an exhaustive list of each and every Native who lived on Woody Island.  His April 28, 1995 affidavit, L-Doc 125, lists names of persons he remembers, 25 - 35 years after the fact, as having lived in the village back during the period 1960- 1970.  His affidavit recites that he has personal knowledge of the 41 persons listed therein[82] as having

---

[82]The 41 persons of Native heritage whom Johnny Maliknak states he has personal knowledge resided at various times on Woody Island during the period 1960-1970 include:

1. Martin W. Pavloff, Sr.
2. Bobbie Hall (daughter of Martin)
3. Martin Hall (son of Bobbie)
4. Nicholas Pavloff, Sr.
5. Mary (Fadaoff) Pavloff
6. Edson Fadaoff, Jr.
7. Joseph Fadaoff
8. William Pavloff
9. Cecil Chabitnoy
10. Mickey Chabitnoy
11. Ella Chabitnoy
12. James Fadaoff
13. Rosemary Challiak
14. Wilfred Pavloff
15. Agnes Frump

resided in the village at various times during 1960-1970; however, his affidavit does not state

those were the only Natives who resided on Woody Island. Leisnoi should not be prevented

from identifying other Natives who also resided on Woody Island in 1970. Johnny Maliknak

did not state, for example, that Tina Hoen (#30 on his list) never brought her two young

children, Cien and Chrislyn, to the village in 1970. The affidavit of Johnny Maliknak was

executed in April of 1995, more than three years before the hearings in this case. During those

three years, the names of other Woody Island residents were discovered. As for the criticism

that "no statement or testimony" from Alexander John Fadaoff, Sr. was introduced at the

---

|     |     |
| --- | --- |
| 16. | Harold Frump |
| 17. | Maryanne Frump |
| 18. | Brenda Frump |
| 19. | Rudy Sundberg, Sr. |
| 20. | Rudy Sundberg, Jr. |
| 21. | George "Giorgi" Nikeferoff |
| 22 | Naustia Harmon |
| 23. | Danny Harmon |
| 24. | Leanna Harmon |
| 25. | Rayna Harmon |
| 26. | Michael Komm, Sr. |
| 27. | Paul Harmon |
| 28. | Maurice Harmon |
| 29. | Angelina Pavloff |
| 30. | Christina Hoen |
| 31. | Frank Johnson, Sr. |
| 32. | Frank Johnson, Jr. |
| 33. | Mary Kay Johnson |
| 34. | Lois Penny Johnson |
| 35. | Charlie Johnson |
| 36. | Another Johnson daughter |
| 37. | Natalie Ponchene Chiliak |
| 38. | Johnny Ponchene |
| 39. | Kelly Simeonoff, Sr. |
| 40. | Natalie Simeonoff |
| 41. | Freddy Simeonoff. |

hearings, RD at page 66, this Board should be mindful that he passed away in 1988, long before this case was remanded to the IBLA. If the Board adopts the view in the RD that additional evidence is needed to authenticate his finding that Alexander John Fadaoff, Sr. was seen fishing on Woody Island in 1970[83] or to confirm that he and had sufficient ties to the village to qualify as a permanent resident, then the Board should grant Leisnoi's prayer to reopen the hearings to allow presentation of additional evidence.[84] The two week hearing, half of which was spent by the protestant with his witnesses, simply did not allow sufficient time to produce live testimony of each and every person alive today who has knowledge that can

---

[83]"There is no doubt that Alexander Sr. did visit, as he was seen fishing there in 1970." Recommended decision at page 66.

[84]As for the reasoning in the RD that Alexander Fadaoff Sr. cannot be found to have lived on Woody Island in 1970 simply because he was not included in Frank Feichtinger's list, this is flawed, since Mr. Feichtinger was purposefully conservative in preparing his list, and did not include the names of many persons who were on Woody Island in 1970, but whose presence "I could not corroborate in some way ... that I thought was reliable." Tr. at p. 1364. Mr. Feichtinger answered affirmatively when asked "[H]ave you interviewed or heard of other persons who ... have stated they were on Woody Island in 1970 who you didn't include." Tr. at p. 1364. Thus, inclusion on his list means that the individual's presence on Woody Island has been independently and objectively corroborated in multiple respects; but exclusion from the Feichtinger list does not establish the person was not on Woody Island. Also, the list was prepared prior to the hearings, and therefore does not include the names of persons whose presence on Woody Island was established by testimony at the hearings. For example, the presence of the Pagano family on Woody Island in 1970 was established at the hearings by Joseph Fadaoff, Tr. at pp. 1052, 1073, 1086, who was called to the stand after Frank Feichtinger had already prepared his investigative case report that did not include the Pagano family as having been on Woody Island in 1970. It is ironic, of course, that the RD recommends this Board reject Mr. Feichtinger's list of at least 38 members of the Fadaoff family, Sundberg family, Robertson family, Ward family, Chya family, Redick family, Shuravloff family, Armstrong family, and other Native families who actually lived for a period of time on Woody Island in 1970, yet, it seeks to misuse that list falsely to imply that persons not on it were not in the village in 1970.

-196-

verify the eligibility of each of the many persons who qualify as permanent residents of Woody Island as of 1970.

Alexander John Fadaoff, Sr., who was listed as an eligible enrollee to Woody Island in Leisnoi's 1981 family list, L-Doc 385, had two children who were minors on April 1, 1970, Alexander John Fadaoff, Jr. and David James Fadaoff. Both of these children are automatically deemed to be permanent residents of Woody Island based upon the permanent residency status of their father. *Manley Hot Springs* at p. 26.

### 45.    Fred Zharoff

Former Alaska State Senator Fred Zharoff, Sr., who is enrolled to the Native Village of Woody Island, listed the Native Village of Woody Island as his place of permanent residency as of April 1, 1970, has served as a member of the Board of Directors of Leisnoi, Inc., Tr. at p. 3083, frequented Woody Island beginning in the mid-1950s, Tr. at p. 3084, used to row a boat to Woody Island to gather firewood for the family in the early 1960s, Tr. at pp. 3085-86, and described Woody Island as the situs of his "core of subsistence activities", Tr. at p. 3087, was erroneously recommended in the RD not to have been a permanent resident of the Native Village of Woody Island.

Senator Zharoff testified that he did a lot of berry picking on Woody Island, and would frequently camp overnight. Tr. at p. 3887. He also hunted rabbits and ducks on Woody Island, as well as sea lions and fur seals. Tr. at p. 3887. Sometimes he hunted seals from the land, and sometimes from a skiff in the waters off Woody Island. Tr. at p. 3887. The RD

mistakenly refers to these traditional Native activities as being merely "recreational" rather than consistent with the Natives' own cultural patterns and life style. RD at page 81.[85]

Senator Zharoff specifically recalls having been on Woody Island in 1970 because his wife accidentally shot him while they were hunting for rabbits on Woody Island in 1970. Tr. at pp. 3088-89.

While serving on the Board of Directors of Leisnoi, Inc., Senator Zharoff was active in efforts to build Native housing units so the Native Village of Woody Island could become repopulated. Tr. at pp. 3090-92. He also testified that the Leisnoi Board was actively "looking at how we could utilize Woody Island as an opportunity to not only provide the housing for the area, but also to provide employment opportunities, as well as to rejuvenate the island, if you will." Tr. at p. 3092. In the mid-1970s, Senator Zharoff moved into one of the housing units on Woody Island with his family. Tr. at p. 3092. Unfortunately, since he was then employed as a teacher, it became difficult to live on Woody Island and work in Kodiak "without having the reliable transportation running back and forth." Tr. at pp. 3092-3093.

Rebutting the argument that persons who vote or have a postal office box in Kodiak should not be deemed permanent residents of Woody Island, Senator Zharoff testified that there

---

[85]The flawed theme in the RD that anything other than employment is mere recreation is inconsistent with ANCAB rulings finding seasonal hunting, fishing, and berry picking in a Native village qualify as having "actually lived for a period of time" in the village consistent with established Native cultural patterns and life styles:

"These Natives were in Chitina for various reasons: ... seasonal hunting, fishing, and berry picking ... In each case, consistent with their established cultural patterns and life styles, the record demonstrates that they 'actually lived for a period of time' in Chitina in 1970." *Chitina*, VE # 74-10 at p. 27-28.

are no voting precincts on Woody Island and there is no post office on Woody Island. Tr. at p. 3093, so it would be impossible for Native Woody Islanders to have voted or received mail on Woody Island.

Senator Zharoff testified that in 1970, when he was on Woody Island, "It was refreshing. It was comfortable. It was -- well, it was, it was kind of a, it was, it was home." Tr. at p. 3094.

Simply because his family owned a house in Kodiak does not deprive Senator Zharoff of permanent residency status in Woody Island. There is nothing in the Code of Federal Regulations or in the United States Code that states an Alaska Native cannot be deemed to be a permanent resident of a village if the Native owns a house elsewhere. Likewise, the perceived conflict between Senator Zharoff's answers to columns 16 and 17-19 do not rebut or cast doubt on Senator Zharoff's sworn statement that he was a permanent resident of Woody Island in 1970.[86] Moreover, the protestant failed to negate the subjective intent of this Native to return to Woody Island.

Senator Fred Zharoff, who is duly enrolled to the Native Village of Woody Island and was physically present on Woody Island in 1970, qualifies both as a permanent resident of the Native Village of Woody Island and as one of the required 13 persons who actually lived for a period of time in the village in 1970.

---

[86]"Therefore, conflicts between the information contained in Column 16 and that contained in Columns 18-21 **does not by itself contradict the information in Column 16 so as to raise a substantial doubt** either as to the residency of the individual or the residency of those enrolled to the village as a class." *Kasaan*, at p. 23 (emphasis added).

-199-

### F. There were more than 25 permanent residents in the Native Village of Woody Island in 1970.

Leisnoi was required only to show that there were 25 permanent residents, of whom 13 persons enrolled to the village lived there for a period of time in 1970. 43 CFR section 2651.2(b)(2). The above listed 45 Natives, numbering much more than 13, all filled out papers enrolling to the village, actually lived there for a period of time in 1970, and qualify as permanent residents of Woody Island.[87]

The Board can see that Leisnoi, Inc. has established that there well over the 13 required users of Woody Island in 1970, and well over 25 required permanent residents.

### (i) *Additional Permanent Residents Were in the Native Village of Woody Island in 1970.*

Although persons who never enrolled to the village can not be counted as 13 enrollees who lived there for a period of time in 1970, they nonetheless are properly counted as some of the 25 required permanent residents. 43 CFR §2651.2(b)(1). See, *Manley Hot Springs* at p. 15. Woody Island Natives who count towards the 25 required permanent residents, and actually lived for a period of time in the village in 1970, but were not enrolled to Woody, include the following:

46.  Cecil Chabitnoy
47.  Mitch Gregoroff
48.  Rudy Sundberg, Sr.

---

[87]As noted earlier, Maurice Harmon, Paul Harmon, Charles Naughton, Nick Andy Pavloff, Jr., Alexander John Fadaoff, Sr., Alexander John Fadaoff, Jr., Jacqueline Adams Madsen, and John Allen Madsen all enrolled to the village, have sufficient blood quantum, and are listed in the Alaska Native Enrollment Family List, but were erroneously not included in the Alaska Native Roll Village - Woody Island. This Board should direct the BIA to correct the roll to ensure that these qualifying individuals are included therein.