# EXHIBIT "11"

49.    Esther DeNato
50.    Walda Hoff
51.    Martin Love
52.    David Love
53.    Keith Abraham
54.    Randy Abraham
55.    Natalie Ponchene Chiliak
56.    Giorgi Nekeferoff
57.    Myra Malutin Robertson

**46.    Cecil Chabitnoy** (1937-1995),  the son of Mike Chabitnoy and Ella Fadaoff Chabitnoy[88], who lived on Woody Island, with occasional stays in Kodiak, throughout his life until his death on Woody Island on November 26, 1995[89], was erroneously found by the ALJ not to have been a permanent resident of Woody Island.  The protestant presented no evidence whatsoever negating Cecil Chabitnoy's subjective intent to live on Woody Island, and no objective evidence that would show Cecil Chabitnoy claimed some location other than Woody Island as his permanent residence.  Nonetheless, the RD recommends that Cecil Chabitnoy should not be counted as a permanent resident because Cecil's affidavit does not "explain why

---

[88]Cecil Chabitnoy's affidavit (L-Doc 73) listed a number of his other relatives and his family ties to Woody Island: "My full brother is Michael 'Mickey' Chabitnoy… My half brothers are Edson Fadaoff, Sr., James Fadaoff and Buddy Fadaoff. All my brothers lived on Woody Island until they died or moved away.  I am pretty sure that Mickey and James were living on Woody Island at the time of the earthquake in 1964.   James lived on Woody Island until he was arrested and Mickey until he was placed in institutional care and then at sometimes in between stays in care facilities.   My half sisters are Judy (Fadaoff) Komm …, Natalie (Fadaoff) Simeonoff, … Margarie (Fadaoff) Williams … and Naustia Fadaoff Harmon… All my sisters lived and grew up on Woody Island and I believe that Naustia and Natalie were living on Woody Island with their respective families in the early 1960's. **I was living and working on Woody Island at the time.  I worked for the FAA there.**" Affidavit of Cecil Chabitnoy, L-Doc 73.

[89]A November 27, 1995 Kodiak Daily Mirror article entitled "Man Dies on Woody Island" describes how Cecil Chabitnoy died at the age of 58 on Woody Island.

Cecil did not enroll to Woody Island or why he generally lived in Kodiak rather than Woody Island."

As the Alaska Native Claims Appeal Board observed in *Manley Hot Springs*, "There is nothing in the Act or in the regulations that require that the 25 Native residents on April 1, 1970, needed for certification of eligibility, be properly enrolled to [the Native Village] or enrolled at all." *Manley Hot Springs*, at p. 15. The theory that a lifetime resident of Woody Island with longstanding historical ties to the village is not a permanent resident of the village simply because he failed to fill out paperwork formally enrolling to the village is an unsound legal argument that is at variance with *Manley Hot Springs* as well as *Koniag, Inc. v. Kleppe*, 405 F.Supp. at 1373-74.

Likewise, spending time on Kodiak does not deprive Cecil of Woody Island residency status. Once again, the RD has mistakenly asked that this Board essentially do away with the subjective intent component in the definition of permanent residency: "It is the center of the Native family life of the applicant to which he has the intent to return when absent from the place. A region or village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on that date, if he has continued to intend that place to be his home." 25 CFR section 43h.1(k). Under the formulation in the RD, if a Native does not live year round on Woody Island, then he cannot be a resident of Woody Island. This

standard was not applied to the other villages certified under ANCSA[90], and should not now be applied as to Woody Island.

Under oath, Cecil Chabitnoy stated that "I was conceived of Michael and Ella Chabitnoy on Woody Island in 1937. **I have lived there most of my life.**[91] While I am presently living in Kodiak, I have lived on Woody Island as recently as last winter… **Woody Island has been my home since birth.** My family and cultural ties are all there. I still periodically go to Woody Island to live. My family has a long history there and my culture is linked to Woody Island." April 27, 1995 Affidavit of Cecil Chabitnoy. Mitch Gregoroff testified that his uncle, Cecil Chabitnoy, was a Native Woody Islander. Tr. at p. 1422. Anita Elizabeth Hartman stated "I also remember the Chabitnoy family living on Woody Island during the 1960's." Affidavit of Anita Hartman, L-Doc.122. Arlene Simpler, the granddaughter of Phyllis Carlson (who lived and worked at the FAA Station on Woody Island) recalls "that there were a number of native people living on Woody Island, not at the FAA Station, but rather in other domiciles during the period of April 1960 through the time that I left in 1962 … Cecil Chabitnoy … lived on the island with his mother, Ella Chabitnoy, at that time." L-Doc 353. Life-long Woody Islander Johnny Maliknak stated that he has personal knowledge that Cecil Chabitnoy resided on Woody Island at various times during the time frame April 1, 1960 through April 1, 1970. <u>See</u>, Affidavit of Johnny Maliknak, L-Doc 176.

---

[90]"In other words as long as a Native has some ties with a village and intends to return there, then he may be enrolled to that village as a permanent resident, irrespective of the fact that he may actually be living elsewhere." *Afognak*, recommended decision at p. 5.

[91]Photographs in the Hartle Collection, Phot 15-1 through 15-12, include pictures taken during the 1950s on Woody Island, of Ella Chabitnoy and Cecil Chabitnoy. (Tr. at p. 813.)

Likewise, Kelly Simeonoff Jr. verified that **Cecil Chabitnoy "continued to live in that residence [the Chabitnoy/Fadaoff house on Woody Island] for some years following her [Ella Chabitnoy] moving to Kodiak.** James Fadaoff was also living in that residence and I recall that all three were living there at various times following my return from the Navy in 1964." Affidavit of Kelly Simeonoff, Jr., L-Doc 346 at p. 4. Cecil's nephew, James Hartle, testified that **Cecil "did frequent the island in 1970."** Tr. at p. 1638.

The RD mischaracterizes this evidence as being "vague statements that he spent time or lived on Woody Island periodically." The RD implies that, some 28 years after the April 1, 1970 date, Natives must be able to state precisely how many days Cecil spent on Woody Island in each year, including 1970. The RD imposes too exacting a standard upon the Woody Islanders and should not be adopted by this Board.[92] The above evidence amply demonstrates the historical and continuing ties Cecil Chabitnoy had with Woody Island until he died on Woody Island on November 26, 1995.

Likewise, the RD erroneously recommends that Cecil be stripped of his Woody Island residency status simply because Cecil "moved to Kodiak for work in 1964." Recommended decision at page 54. The RD overlooks the principle of law that "[W]here economic, educational, or other requirements have temporarily deprived one of any real choice, and both the subjective intent and the objective evidence indicate a genuine connection with the place of

---

[92]Frank Feichtinger testified that he was hampered in his investigation by the passage of time. Tr. at p. 1370. "[D]ocuments have disappeared. People's personal letters and notes, things like that have disappeared over that, that time span. And more importantly, many people who did have ... direct knowledge are, are dead... They were not available to be questioned." Tr. at p.1370.

enrollment, that place is considered to be the permanent residence of the individual within the meaning of 25 CFR 43h.1(k), notwithstanding that for other purposes a court or an administrative agency may find that person's residence or domicile to be some place other than his 'permanent residence' as determined for purposes of the Alaska Native Claims Settlement Act." *Afognak*, VE#74-7 at page 13. Cecil Chabitnoy's subjective intent, as set forth in his affidavit, coupled with objective evidence showing he has had a genuine connection with Woody Island all his life, suffice to establish that Cecil was a permanent resident of Woody Island for purposes of ANCSA. This Board should reject the thesis in the RD that all activities other than employment are "mere recreation", and if a Native leaves Woody Island to get a job in Kodiak, then the Native has forfeited Woody Island residency status even if the Native intends to return to Woody.

47.     Leisnoi shareholder and former director, and chairman of the Woody Island Committee **Michael "Mitch" Komm Gregoroff** (born July 2, 1937 in the Pavloff house in Woody Island village, Tr. at pp. 1393-1394 ) is another Native Woody Islander who testified at the hearing in this case and lived on Woody Island for a period of time in 1970. Mitch's family has longstanding ties to Woody Island. His mother, Anastasia Fadaoff, was the common law wife of Kelly Gregoroff, and later was married to Woody Island villager Raymond Royal Harmon, Sr. (1912-1946).   His half brothers include Woody Island villager, Leisnoi shareholder, and 1970 resident Paul Harmon (born 1941, and testified at the hearing in Anchorage); Woody Island villager, Leisnoi shareholder, and 1970 resident Maurice W. Harmon (born 1942, and testified at the hearing in Anchorage); Woody Island villager and Leisnoi shareholder Rayna Joyce Harmon (born 1944); Woody Island villager Daniel L.

"Danny" Harmon (born 1947, died in Vietnam in 1967, and is buried on Woody Island), and James G. Hartle (born 1952), a Leisnoi shareholder and Woody Island villager who lived for a period of time on Woody Island in 1970. (L-Chart 5; L-Doc 108 at Tab 4, p. 7.)[93]

When Mitch was only three years old, he fell on a boat and fractured a bone. Tuberculosis set in to his hip, necessitating him spending four and a half years at a hospital in Seattle. (Tr. at pp. 1394-1395.) After leaving the hospital, he returned to live with Earl and Judy Komm, whom at that time he thought to be his parents. (Tr. at pp. 1395-1396.) During the four and a half years Mitch was in the hospital in Seattle, Earl and Judy Komm had three children of their own, and Mitch Gregoroff testified that he "felt kind of like an outsider; that I didn't really belong there" after he returned. He then learned that his real mother was "Nettie Anastasia Fadaoff", and that the Harmon boys with whom he had been playing as friends were, in fact, his brothers. (Tr. at pp. 1404-1405.) Mitch Komm, like Joseph Fadaoff, is another example of a Native child having been adopted out to another Native family, although in Mitch's case, his natural mother took him back into her home, which at that time was in Kodiak. (Tr. at pp. 1405-1406.) The family then moved back to Woody Island in 1950, evidencing the Native patterns of mobility, moving to and from Woody Island. (Tr. at p. 1406.) They moved into the home in which Mitch had been born, the Pavloff house. (Tr. at p. 1406.)

---

[93]Mitch Gregoroff testified that his grandmother is Ella Chabitnoy, and that some of his uncles included Buddy Fadaoff, as well as Cecil Chabitnoy. (Tr. at pp. 1403-1404, 1421-1422), thereby verifying the accuracy of information contained in Leisnoi's genealogy table of the Fadaoff family, L-Chart 5.

After staying in the Pavloff house for about a year and a half, Angeline Pavloff wanted to move back into that house so that her daughter could move into the Sundberg house, or what was sometimes referred to as the Frump house. (Tr. at p. 1406.) Mitch and his family then moved into the Miller house, also in the Woody Island village, which has since then been known as the Harmon house. (Tr. at p. 1406.) The Native practice of sharing homes, and loaning homes for use by other members of the Village was evidenced by Mitch Gregoroff's testimony. (Tr. at p. 1406.)

Mitch Gregoroff disassembled the old submarine sounding station building, and his method of loosening the nails was somewhat unusual. He hung a stick of dynamite inside the house and used an electric charge to ignite it. (Tr. at p. 1407.) When asked question "And did that succeed in loosening the nails?", Mitch Gregoroff smiled and responded "You bet." He then used the wood to build the home in which Joey Fadaoff lived, what is now known as the Madsen house. (Tr. at p. 1408.) The Fadaoff house did not have a water well; instead, Mitch had tapped into the water line pumped from upper lake to the water tower, and then down from there to the house. Mitch and his brother Maurice plumbed the piping to the house.

After the earthquake, when the dock was taken out by the tidal wave, "It took the end of the pipe with it, so you have a heck of a time keeping the tank full. You couldn't shut it off...It's a moot point to try to fill the tank, because you couldn't keep it full." (Tr. at pp. 1410-1411 and 1447.) Mitch Gregoroff tried to seal off the flow of water where the dock had been so that they could fill the tank, but that they were unsuccessful in their efforts to do so. (Tr. at pp. 1448-1449.) The damaged water system had supplied water not only to the Harmon house, but to the other houses on that side of the Island except for the Pavloff house on the

-207-

north side. (Tr. at p. 1449.) The damage to the water system caused by the Tsunami Wave was an Act of God occurring within the 10 years preceding April 1, 1970.

Mitch Gregoroff gave dramatic testimony about having personally witnessed the earthquake and ensuing tidal wave. At the time, Mitch Gregoroff was working in the marine shop, Valdeen's Marine Repair. The earthquake and tidal wave that Mr. Gregoroff described in detail "Finished it off. There was nothing left." (Tr. at pp. 1400-1402.) This caused a loss of income for Mitch Gregoroff, who then had to move to Washington to find employment. (Tr. at pp. 1434-1435.) The impact of the tidal wave in destroying businesses in Kodiak that had employed Woody Island Natives was an Act of God occurring within the 10 years predating April 1, 1970 that adversely impacted the ability of Mitch and other Woody Island Natives to continue to live on Woody Island.

Another impact of the earthquake was that the land around the Island sunk in some places up to six feet, causing loss of clam beds that had been a food source for Mitch and his family. (Tr. at pp. 1411-1412.) Loss of the clam beds due to the sinking of Woody Island in the Great Earthquake of 1964 was another Act of God occurring within the 10 years predating April 1, 1970.

Mitch Gregoroff testified that there were a lot of rabbits on the Island and that he used to hunt rabbits. He described how he first started hunting with a pistol, but that he had better luck using a .22, although the person who had given him the pistol as a Christmas gift was annoyed that Mitch had traded in a Ruger pistol for a .22 rifle. (Tr. at pp. 1412-1413.) Mitch Gregoroff's testimony about extensive rabbit hunting on Woody Island to put food on the table for his mom and his brothers, and spending a lot of the summer months fishing for trout and

other fish out of the lakes on Woody Island as well as fishing off the beach during the spring months (Tr. at pp. 1414-1415) shows there was a lack of perception on the part of Straiman's witness Terry Johnson (Tr. at p. 633) and James Payne (Tr. at p. 669), who testified they had never seen anyone hunting for rabbits or fishing on Woody Island.  (Tr. at p. 669.)

During the fall on Woody Island, Mitch "spent a lot of time picking berries and stuff like that.  Mom used to put up jam for the winter supply."  (Tr. at p. 1443.)

There came a time when Mitch's mother wanted to move back to Kodiak because the home on Woody Island was over 100 years old, and needed a new roof and running water. Mitch wanted to stay on Woody Island, so he and his brothers put a new roof on the house and plumbed in running water.  (Tr. at pp. 1413-1414.)  When asked "Why didn't you want to move off the Island, Mitch?", the witness responded "We loved it over there.  It's a nice place. For one thing, you couldn't get into trouble over there.  And it's just a beautiful place." Mitch Gregoroff has a true and sincere love for Woody Island.

As Mitch Gregoroff got older, he obtained employment for the FAA on Woody Island. (Tr. at p. 1416.)  The scale-back of FAA operations in the late 1960s described by Protestant's witness Bill Cordry (Tr. at pp. 449-450), was an act of governmental authority occurring within the 10 years predating April 1, 1970, that had the effect of restricting employment opportunities available to Mitch and other Natives on Woody Island.

Mitch described the village on Woody Island both in terms of family relationships, houses in which children had been raised, food sources for the family, and even the names of boats upon which the Woody Island Natives fished.  "We had a pretty good fleet of boats operated off the Island there."  (Tr. at p. 1428)  He identified some of the boats as being the

-209-

*Ella C.*, built for his grandmother, Ella Chabitnoy; his vessel, the *Hawkeye*, his uncle Edson Fadaoff's boat, the *Prospector*, his uncle James Fadaoff's boats owned at various times over the years, such as the *Hazel M.*, the *Audrey V*, and the *Maxine*.  (Tr. at pp. 1399, 1428-1430.)

After moving to Washington, Mitch continued to return to Alaska to harvest king crabs. (Tr. at pp. 1435-1436.)  The name of the vessel upon which he fished for king crab was the *Joel B.*  (Tr. at p. 1436.)

**Mitch Gregoroff testified that he was on Woody Island "off and on" in 1970.**  (Tr. at p. 1437.)  He testified that he went back to a number of the old fishing holes to try to catch some fish, and stated that his grandmother's house was still standing, and so was the Simeonoff house.  (Tr. at p. 1438.)

Mitch has served as a director on the Leisnoi Board of Directors, and was the chairman of the Woody Island Committee.  (Tr. at p. 1463.)  He prepared Leisnoi Chart No. 26, that depicts future home sites on Leisnoi's land on the east side of the Island.  (Tr. at p. 1463.) Mitch has been active in trying to enable Natives to return to live permanently on Woody Island.

Mitch Gregoroff listed a number of Natives who lived on Woody Island during the 1960s, rebutting Stratman's contention that the Native Village of Woody Island was a "phantom village".  (Tr. at pp. 1464-1470.)  Some of the Native Villagers he identified include Herman Ponchene, Natalie Ponchene, Johnny Ponchene, John Maliknak, William Wilford Pavloff, Agnes Pavloff Frump, Harold Frump, Nicholas William Pavloff, Sr., his aunt Mary Ponchene Fadaoff Pavloff, his grandmother Ella Chabitnoy, Alexander John Fadaoff, Sr., and his wife, Charlotte Fadaoff White, Mitch's brother James Hartle, Kelly Simeonoff, Jr., Freddie

-210-

Simeonoff, Joseph Frances Fadaoff, Edson Nicholas Fadaoff, Jr., James O. Fadaoff, Rosemary Challiak, Mickey Chabitnoy, Cecil Chabitnoy, Anastasia Harmon, Maurice Harmon, Anna Joyce Harmon Monroe Otterhouse Wheatman, Danny Harmon, Leanna Harmon, Paul Harmon, Peter Simeonoff, and Giorgi Nekeferoff. (Tr. at pp. 1465-1469.) A photograph of Mitch Gregoroff and Johnny Maliknak unloading groceries from the FedAir IV at the Woody Island dock is depicted in Phot 22-2.

The RD is mistaken in recommending that Mitch be found not to have been a permanent resident of Woody Island. The factors listed in the RD are unpersuasive. For example, the RD contains incorrect reasoning that Mitch cannot have permanent residency status because "He is not enrolled to Woody Island." Recommended decision at page 65. In fact, as noted in *Manley Hot Springs*, "There is nothing in the Act or in the regulations that require that the 25 Native residents on April 1, 1970, needed for certification of eligibility, be properly enrolled to [the Native Village] or enrolled at all." *Manley Hot Springs*, at p. 15. Likewise, the RD contains incorrect reasoning that Mitch cannot be a permanent resident of Woody Island because Mitch "listed Kodiak as the place where he resided for an aggregate of 10 years or more." RD at page 65. In fact, as noted in *Kasaan*, "conflicts between the information contained in Column 16 and that contained in Columns 18-21 does not by itself contradict the information in Column 16 so as to raise a substantial doubt either as to the residency of the individual or the residency of those enrolled in the village as a class." *Kasaan*, VE #74-17 at p. 23.

The RD contains incorrect reasoning that the Board declare Mitch not to be a permanent resident of the Woody Island village since Mitch "does not live on Woody Island because there

is no ferry service to access Kodiak where employment opportunities, health care, and schools are located and because there is no running water on Woody Island." RD at page 65. In fact, as noted in *Afognak*, "[A]s long as a Native has some ties with a village and intends to return there, then he may be enrolled to that village as a permanent resident, irrespective of the fact that he may actually be living elsewhere." *Afognak*, recommended decision at page 5. The RD incorrectly asks the Board to declare that Mitch cannot be a permanent resident of Woody Island village because his trips to Woody Island were not "substantially for subsistence purposes." RD at page 66. In fact, there is nothing in ANCSA or the implementing regulation that requires the Native's use of a village be for subsistence purposes. This "subsistence use is required" standard formulated in the RD was not applied in other village eligibility cases, and should not be applied to this case. Finally, the RD contains incorrect reasoning that Mitch cannot be a permanent resident of the village because "the lack of employment opportunities stands out as the primary reason for his choice up through 1970." Once again, the RD has "failed to grasp the liberal nature of the Secretary's residency requirements and the Congressional intent concerning the Natives' personal and group identities, cultural patterns and lifestyles." *Chitina*, Recommended Decision at page 14.

Mitch Gregoroff testified that in 1970 he considered his home to be Woody Island: "It's always been my home. Always will be." (Tr. at p. 1463.) This Board should find that he qualifies for residency status.

### 48.    Rudy Sundberg, Sr.

Rudy Sundberg, Sr.'s longstanding ties to Woody Island can be objectively verified. On October 28, 1938, the Longwood School teacher, Leonard Roland, took a census of Woody

-212-

Island, excluding the Mission children still there. The Native population of Woody Island at that time was 52. Among the Native households on Woody Island at that time were Mike Chabitnoy (11); Gabe Lowell (2); Stephan Maliknak (9); Nicholas Pavloff (3); **Rudy Sundberg, Sr. (6)**; and Costia Tunohun (10). (Document 421 [Watson, Michael. Ed., "United States Bureau Of Indian Affairs, Woody Island/Longwood School Documents." Source: National Archives, 1997.]) Esther DeNato testified that her father, Rudy Sundberg, Sr., had fished on Woody Island and was also a boat builder. He smoked fish at a smokehouse in the north village area. (Tr. at p. 2813.) The family home the Sundbergs built on Woody Island had been "deeded to my father, Rudy Sundberg, Sr., by the Pavloffs.", according to Esther DeNato. "Actually, it was Pavloff estate, but it, my dad got acreage from Mr. Pavloff when he married my mother." (Tr. at p. 2854.)

Esther DeNato confirmed that her father, **Rudy Sundberg, Sr. was on Woody Island in 1970.** "Q. Was he on Woody Island during 1970? A. He was there with the whole family." Tr. at p.2810

The ALJ relied upon his same mistaken legal propositions in recommending that this Alaska Native who owned property on Woody Island, frequented Woody Island, and had long family and historical ties to Woody Island be declared not to have been a resident of Woody island:

> "Many years prior to 1960 they chose to live where opportunities for employment, schooling, and medical care existed. There is no evidence that they substantially relied upon Woody Island for subsistence needs after making that choice. There are only vague references to picking berries and fishing (which may have been recreational in nature) in addition to visiting, picnicking, and beachcombing there. Rudy Sr. apparently did catch and dry some fish for

-213-

subsistence purposes, but he also did this elsewhere, including at Litnik, where he chose to enroll."

Recommended decision at page 48.

Alaska Natives do not forfeit their village residency status when they move from a village due to economic, educational, or medical needs. Alaska United States Senator Ted Stevens' letter of March 1, 1972 to the Secretary of the Interior observed that "Because our Native people have been compelled to move about the state to find employment or to continue their education, it is most difficult to define the permanent residence of an Alaska Native without regard to the mental attitude of the individual involved." BIA Exhibit 1A at p. 353. Senator Stevens made comments on the floor of the Senate that became a part of the legislative history of the Alaska Native Claims Settlement Act. Senator Stevens called the attention of the Senate "to the fact that residence under the census concept is not necessarily residence under this bill ... Obviously, it is not the standard of the Census Bureau we are talking about in this bill but a concept of permanent residence in regard to section 5." BIA Exhibit 1A at 352.

The Assistant Secretary of the Interior responded to Senator Ted Stevens' letter of March 1, 1972 by stating "Because we also recognize the necessity of many Natives to move around both within and outside the state of Alaska, we felt that the subjective intention of the applicant with respect to his actual home should be given as much weight as possible ... We have, in the final regulations ... added a further explanatory clause to the definition of 'permanent residence' quoted above. The additional language reads:

> 'It is the center of the Native family life of the applicant, to which he has the intention to return when absent therefrom. A region or village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on

-214-

that date, if he has continued to regard that place to be his home.'"

BIA Exhibit 1A at pp. 350-349.

Senator Stevens responded to the Assistant Secretary of the Interior by thanking him for clarifying the definition of "residence" and noting that the proposed regulation "would meet the objections I referred to in my previous letter." BIA Exhibit 1A at p. 348.

Moreover, "seasonal hunting, fishing, and berry picking ...[qualify as having] 'actually lived for a period of time' in [the village] in 1970." *Chitina*, VE #74-10 at page 28. There is no requirement that the hunting have been for subsistence purposes.

The recommendation in the RD that Rudy Sundberg, Sr. be declared not to qualify as a permanent resident of Woody Island simply because he had at one time enrolled to Litnik is also based upon the apparent misunderstanding of the applicable law in the RD. As the Alaska Native Claims Appeal Board observed in *Manley Hot Springs*, "There is nothing in the Act or in the regulations that require that the 25 Native residents on April 1, 1970, needed for certification of eligibility, be properly enrolled to [the Native Village] or enrolled at all." *Manley Hot Springs*, at p. 15. Moreover, *Koniag v. Kleppe*, 405 F.Supp. 1360, 1373-74 (D.C. 1975) <u>affirmed in part reversed in part</u>, *Koniag, Inc. v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978), makes it clear that a person can be deemed to be a permanent resident of Woody Island even if the individual had been improperly enrolled to another Native Village.

The Sundberg family has substantial ties with Woody Island, and the evidence shows that Rudy Sundberg, Sr. was actually present in the village for a period of time in 1970. He should be deemed to have residency status.

49.    **Esther Sundberg DeNato** (born 1935) lived for a period of time on Woody Island during 1970, and is a Leisnoi shareholder. Esther is the sister of Rudy Sundberg, Jr., Lillian Sundberg, Anita Sundberg, Herman Sundberg and Janet Irene Sundberg, all of whom are or were Leisnoi shareholders. Esther's parents were Woody Island villager and Leisnoi shareholder Jenny Pestriakoffs (1917-1972) and Leisnoi shareholder/Woody Island villager and 1970 resident Rudolph Sundberg, Sr. (1907-1984), who was described above in #48.[94] Her grandfather, Rudolph Sundberg, Sr. (1857-date of death unknown), was also a Native Woody Island villager. (L-Chart 30.)[95] She is the aunt of current Leisnoi director, Frankie Grant. (Tr. at p. 2860.)

Esther DeNato testified that her grandmother, Angeline Pananarioff, was on Woody Island during the 1960s. She confirmed that Mary Ponchene was also on Woody Island in the 1960s. Likewise, Nicholas William Pavloff, Sr. and his wife Mary, and their son William were on Woody Island in the 1960s. (Tr. at pp. 2804-2805.) **She confirmed that Nicholas Pavloff and his son, William Pavloff, were on Woody Island in 1970.** (Tr. at p. 2805.) Esther DeNato confirmed that Agnes Pavloff, her aunt, was on Woody Island during the 1960s prior to her death. Her uncle, William Wilford Pavloff, was also on Woody Island during the

---

[94]Affidavit of Esther DeNato, L-Doc 96. In addition to verifying the genealogical information, Esther DeNato states in her affidavit that she recalls Native families that were living on Woody Island while she lived there as including the Simeonoff family, the Shuravloff family, the Chabitnoy family, and the Fadaoff family." Esther states "I consider Woody Island my home and I would gladly return to live there if it were economically possible. It is peaceful and a great place to live." L-Doc 96.

[95]   Esther DeNato described how her grandfather, Rudolph Sundberg, had worked at the Woody Island Baptist Mission as a cook at the turn of the century. (Tr. at p. 2814.)

1960s, before he died on Woody Island in 1967. Her cousin, Brenda Frump, the youngest daughter of her aunt Agnes, was also on Woody Island during the 1960s. Ginny Frump lived on Woody Island during the 1960s before she was adopted out. Mary Ann Frump lived on Woody Island along with her brother, Harold Frump King, in the 1960s. **Nick Andy Pavloff, Jr. was on Woody Island during the 1960s, and Esther DeNato believed that he had visited Woody Island in 1970.** (Tr. at pp. 2805-2807.)

**Esther DeNato testified that she and her children, Bill, Fred, Steve, Cindy, Liz, Eddie, and Joe, as well as her mother and father, Rudy and Ginny Sundberg were on Woody Island in 1970.** (Tr. at p. 2808.) **She made at least two trips to Woody Island during 1970.** (Tr. at p. 2808.) **According to Esther DeNato, Giorgi Nekeferoff was on Woody Island in 1970 when he was not in the jail at Kodiak.** (Tr. at pp. 2809-2810.) **She confirmed that her sister, Anita Elizabeth Sundberg Hartman was also on Woody Island during 1970.** (Tr. at p. 2810.) **She confirmed that her uncle, Nicholas William Pavloff, Sr. was on Woody Island in 1970 as was John Maliknak.** (Tr. at pp. 2810-2811.) **Esther DeNato's sister, Anita Hartman, and her family had spent time on Woody Island in 1970, picnicking, and fishing.** (Tr. at pp. 2836-2837.) **Esther DeNato's family spent the night on Woody Island in August or September of 1970 in the north side of the Village.** (Tr. at pp. 2820-2821.)

Esther DeNato testified that the Sundberg home in the north village area was still standing until 1986. (Tr. at p. 2819.)

Esther DeNato inherited her mother's shares of stock in Leisnoi, Inc. (Tr. at p. 2814.) Although she initially enrolled to Litnik, she testified that she still considered Woody Island

-217-

to be her home. (Tr. at pp. 2814-2815, 2845.) She still has an intent to return to Woody Island. (Tr. at p. 2846.)

On cross examination, counsel for the Protestant attempted to question Esther DeNato as to whether a picnic that she and her family had taken to Woody Island in 1970 during which time the weather turned foul necessitating the family spending the night on Woody Island could have been in 1972 as opposed to 1970. In response, Esther DeNato stated "I remember distinctly it was '70...that just sticks in my head. It was '70." (Tr. at p. 2853.)

The family home the Sundbergs built on Woody Island that had been "deeded to my father, Rudy Sundberg, Sr., by the Pavloffs.", was situated on "[acreage] my dad got ... from Mr. Pavloff when he married my mother. My mother was raised by Pavloff, my grandmother's second husband." (Tr. at p. 2854.) She testified that the Borough ultimately foreclosed on the property due to non-payment of Borough property taxes. (Tr. at p. 2855.) Shortly after the tidal wave in the 1960s, the Borough began taxing these properties. (Tr. at p. 2855.) The imposition of real property taxes on the Native residences on Woody Island was an act of governmental authority occurring within the 10 years predating April 1, 1970 that adversely affected the ability of Natives to live on Woody Island.

When shown Photo A-7-8, Esther DeNato identified the structure as being the house her dad had built on Woody Island above the Pavloff house on the hill. She also identified Photo A-7-6 as being a picture of her uncle, Wilford Pavloff holding herself when he was just a baby. Also in the photograph was her aunt, Mattie Pavloff, as well as her uncle, Nick Pavloff, holding her sister, Lillian. She identified the photograph as having been taken on Woody Island right next to the Sundberg house. (Tr. at pp. 2858-2859.)

-218-

When asked how scars had gotten on the trees near the remains of the S̶ᵘ⋯⋯ in the North Village area on Woody Island (that are still visible to this day), E̶s̶⋯ described how her dad had used the knees of the trees in constructing boats on Wₒₒ⋯ ⋯ (Tr. at p. 2859.) <u>See</u>, photo of knees cut from trees in the village, Phot 28-061.

Esther DeNato had a clear recollection of having visited Woody Island in 19⋯ ⋯ family. She was honest about her love for Woody Island and her intent to return ⋯ ⋯ Island. The RD mistakenly recommends that this Board declare "There is little to sug̶g̶⋯ ⋯ Woody Island, as opposed to Kodiak, was the center of their Native family life." E̶s̶⋯ strong family and historical ties to Woody Island, and the village is the center of he̶r̶ ⋯ ⋯ ⋯ family life, so she is entitled to Woody Island residency status. The instructions for ⋯ ⋯ ⋯ ⋯ Column 16, "Your permanent residence as of April 1, 1970" merely require some tie̶s̶ ⋯ ⋯ ⋯ io the place: "The place you name here is where you will be enrolled if you are foun̶d̶ ⋯ ⋯ᵢg̶ᵢᵦₗₑ under the requirements of the Act. You need not have been physically present in that p̶l̶ₐ⋯e on April 1, 1970, but **you must have some ties back to that place** as outlined in sectio̶n̶ ₄ ₃ᵢ ᵢ(k) of the regulations." Stratman Exhibit 9.

Esther DeNato has a continuing desire to be on Woody Island: "If I could ever get a regular passage, I'd be there all the time." (Tr. at p. 2814.) She testified that she considers Woody Island to be her home. (Tr. at p.814.) She should be deemed to have residency status for purposes of ANCSA.

50.    **Walda Chya Hoff**
51.    **Martin Love**
52.    **David Love**
53.    **Keith Abraham**
54.    **Randy Abraham**

Walda Chya Hoff (born 1943) is another Native Woody Islander who qualifies for permanent residency status under ANCSA. Moreover, she actually lived for a period of time on Woody Island in 1970.

Walda has strong ties to Woody Island. She is the daughter of John Chya, Sr. and his wife, Mary Shuravloff (1921-1996). Her siblings include Woody Island Village 1970 resident Tamera Rae Chya (1964-1996); 1970 Woody Island Village resident Edward Robert Chya (born 1963); Woody Island Village 1970 resident Nova Chya (1961-1988); 1970 Woody Island Village resident Michael George Chya (born 1958); 1970 Woody Island Village resident John William Chya, Jr. (born 1957); Virginia Lee Chya (born 1952); Jonna Christine Chya (born 1950); Norma Dale Chya (born 1949); Dorothy Gail Chya (born 1948); Nettie Carole Chya (1944-1981); 1970 Woody Island Village resident Walda Chya Hoff (born 1943); and Betty Joan Chya (born 1940). (L-Chart 4; L-Chart 7; and L-Doc 108 at Tab 4, pp. 10-12.)

Walda's grandparents were both mission children who lived and were married on Woody Island, Paul Chya, Sr. (born 1882 on Woody Island, died 1918 on Woody Island) and Mary Brown (1886-date of death unknown). Four of Walda's children spent time on Woody Island in 1970: Marvin Love, Jr. (born 1967); David Love (born 1969); Keith Abraham (born 1962); and Randall Abraham (born 1964). (L-Chart 4, and Feichtinger Investigative Report at Tab 4, pp. 12-13.)

**In 1970 she and her husband, Marvin Love, Sr., and four children visited Woody Island on numerous occasions for purposes of hunting and gathering.** March 20, 1998 interview of Walda Chya Hoff, L-Doc. 130 at p.2; L-Doc 108 at Tab 4, p. 12. Additionally, she is a Leisnoi shareholder. Walda testified that in 1970 "we used to go over there quite often on the weekends ... we'd generally end up over there."[96] L-Doc. 130 at p.3. Nonetheless, the RD erroneously suggests that the Board mischaracterize this as being "simply ... daytrips ... primarily for recreational purposes." Recommended decision at page 69. Once again, the RD has returned to its theme that anything done on Woody Island other than work is mere recreation and cannot qualify towards residency status. This theme assumes that Native identity is defined by employment, a distorted viewpoint that none of the cultural anthropologists expressed or shared at the hearings.

Natives hunting rabbits and gathering berries, together as a family in the village where their parents, grandparents, and great grandparents had lived is purportedly of no legal consequence, according to the RD, because "There is no substantial evidence that Woody Island served as a significant source of subsistence foods or otherwise served as the center of their Native family life during the decade ending in 1970." Once again, the RD has minimized the cultural significance of a Native family spending time together hunting rabbits, gathering berries, and eating meals together in the village frequently in 1970. The activities of the Natives on Woody Island was consistent with the natives' own cultural patterns and lifestyles.

---

[96]Numerous family visits to the Woody Island Village in 1970 by Native Walda Chya Hoff and her husband and children, that were described by Walda as occurring "quite often on the weekends", the RD dismisses on the flawed grounds that "There is no clear indication of how often they visited." Recommended decision at page 69.

Tr. at pp. 2360-61 (cultural anthropologist Chris Wooley); Tr. at p. 3515 (cultural anthropologist Nancy Yaw Davis); Tr. at pp. 1374-75 (investigator Frank Feichtinger).

Moreover, the RD attempts to graft onto the definition of permanent residency a requirement that the village have served as a source of "subsistence foods", a requirement not in the Act. The RD essentially asks this Board to adopt the view that the villagers in 1970 must act or behave as though they were living in 1709 in order to qualify as a resident of a village for purposes of ANCSA. This view overlooks the principle of law enunciated by the Alaska Native Claims Appeal Board in *Eyak* that:

> "[T]he concept of 'the Natives' own cultural patterns and lifestyle' referenced in 43 CFR 2651.2(d) is undefined and subject to interpretation. Because it relates to occupancy occurring on April 1, 1970, the Board concludes that this standard cannot be interpreted to contemplate exclusively the cultural patterns of Alaska Natives existing before contact with Caucasians. Such an interpretation could possibly exclude from benefits every village listed in the act, for the patterns of life in all such villages have been modified by the influence of non-Native culture. Accordingly, the character of occupancy of an area in terms of native cultural patterns and lifestyle must be assessed in the light of conditions existing in 1970 and the historical influences under which such conditions developed."

*Eyak*, VE #74-75 at p. 32.[97]

---

[97]A June, 1979 publication in Culture of Medicine and Psychiatry entitled "Socio-Cultural Stress and the American Native in Alaska: An Analysis of Changing Patterns of Psychiatric Illness and Alcohol Abuse Among Alaska Natives", L-Doc 159, notes that "In the last one hundred years the Natives have moved from a full-time subsistence hunting and fishing mode of life to part-time participation in the wage economy. Depletion of game resources, ... er families which tend to force the hunter into the cash economy, universal education, religious conversion by missionaries, and an increasing demand for goods and services are a few of the many and complex factors involved in this process. The old nomadic way of life has been greatly attenuated." The article is relevant in that the type of Native Village that the Board should expect to find in 1970 is not the same as would have existed 200 years ago, due to a number of changed socio-economic conditions. The ANCAB ruled in *Manley Hot Springs*, VE #74-6 at pp 29 that: "The Natives' cultural patterns and life style which is referred to in the

Walda Hoff had several children who were minors as of April 1, 1970:  Mar[...], David Love, Keith Abraham, and Randy Abraham.  These four children are deem[...] permanent residents of the village based upon the Woody Island permanent residency status of their mother, Walda Chya Hoff.

55.    **Natalie Ponchene Chiliak** is the common law wife of Johnny Maliknak[...], and her presence on Woody Island in 1970 is objectively established by Yule Chaffin's diary.  In 1970, Yule Chaffin recorded the names of at least seven Native individuals who came to visit her at her cabin near Lake Una on Woody Island that year.  Listed in the entry of Saturday, June 6, 1970 was "Johnny and his women".  (Exhibit 17 of Deposition of Yule Chaffin, at p 134.)  Yule's daughter, Patricia, testified at the hearings that it was fair to say that her mother was referring to Natalie Ponchene Chiliak in that entry.  Tr. at p. 213.  According to Patricia "She probably meant his woman.  She, she called Johnny's gal his woman."

Johnny Maliknak's affidavit, of course, confirms Natalie lives with him and that he has personal knowledge that Natalie resided at various times on Woody Island during the period April 1, 1960 through April 1, 1970.  L-Doc.176 at p.3.   Mitch Gregoroff also testified that she had been on Woody Island in the 1960's.  Tina Simeonoff Hoen testified that during the 1960's, Natalie Ponchene and her brother, Herman Ponchene, would visit their sister, Mary

---

regulation in 43 CFR 2651.2(b)(2) cannot be understood as referring to the primitive existence before the intrusion of the 'White man' and the adoption of many of the modern conveniences."

[98]The RD found that Natalie Ponchene Chiliak "cohabitated 'on and off' with Johnny Maliknak on Woody Island for unspecified periods of time." Recommended decision at pages 48-49.

Ponchene on Woody Island.[99]  Natalie Ponchene is the aunt of William Nicholas Pavloff ,

(offspring of Nicholas William Pavloff Sr. and Mary Ponchene), and Joseph Francis Fadaoff

(born 1954) and Edson Fadaoff, Jr. (born 1956) (offspring of Mary Ponchene and Edson

Nicholas Fadaoff, Sr.).  The Ponchene family genealogy is set forth at L-Chart 32.

The RD is mistaken in its recommendation that Natalie Ponchene Chiliak, a person of

Native heritage whose family has longstanding ties to Woody Island,  whose common-law

husband has lived all his life on Woody Island, who has lived "'on and off' Woody Island with

Johnny Maliknak", recommended decision at pp. 48-49, and whose presence on Woody Island

in 1970 is objectively confirmed by Yule Chaffin's diary, not qualify as being a resident of the

village for purposes of ANCSA.   The RD incorrectly reasons that she can not be certied as a

resident because "no testimony or statements from [her or her brother, Johnny Ponchene] were

introduced into evidence." RD at p. 48.  An entry in Yule Chaffin's diary, testimony by Tina

Hoen and Mitch Gregoroff, and an affidavit of Johnny Maliknak should suffice as competent

evidence.  Leisnoi should not have been required to call her to the stand.  If a high evidentiary

threshold rule is to be applied, such that testimony and objective evidence of others does not

suffice to prove one's residency status, and this Board finds that she must testify as well if she

is to be deemed to qualify as a resident, then this Board should grant Leisnoi's alternative

prayer that the hearings be reopened to allow Leisnoi a reasonable opportunity to call more

---

[99]"[Herman Ponchene and Natalie Ponchene] visited Mary [Ponchene] over there.  Mary
was married to my Uncle Edson [Fadaoff, Sr.]... Edson and Mary lived in our house for a
portion of time.  My mother and father rented it to them.  And Johnny [Maliknak] and Natalie
visited Mary." Testimony of Tina Simeonoff Hoen, Tr. at pp. 2949-4950.

Natives to the stand to testify. This Board can see, however, that Natalie Ponchene Chiliak has sufficient ties to Woody Island to qualify as a Woody Island resident.

56.    **Giorgi Nekeferoff** (1899-1978) is a Native Woody Islander who, although not enrolled to the village, lived there for a period of time in 1970. Giorgi's family name, Nekeferoff, is found in derivations on early census records of Woody Island and the records of the Baptist Mission on Woody Island. Giorgi is the son of Pete and Axenia Nekeferoff, and he had a brother, Bill. (Feichtinger Investigative Report at Tab 4, p. 17.)

Giorgi was often lodged at the Kodiak jail for alcohol related reasons, but he spent much of his adult life on Woody Island in the North Village area at Garden Beach at the home site labeled Site 10 in the Chris Wooley Archeology Report, "A Walk in Time: Woody Island's History, Use and Occupancy", L-Doc A9 at pp. 7, 10, and 22.) Mitch Gregoroff testified that Giorgi Nekeferoff lived on Woody Island and that he had his own home in North Village area, although he used to come and go between Kodiak and Woody Island. (Tr. at p. 1459.) Likewise, Mitch's brother, Maurice Harmon, identified Giorgi Nekeferoff as "the one living in the log cabin that my brother eventually tore down..." Tr. at p. 1597.

Judge Madsen described the arrangement of Giorgi Nekeferoff as being "a special arrangement" whereby Giorgi Nekeferoff "was a trustee. He had a special room and, but he was free to travel. And in those days alcoholism was a criminal offense instead of a social deed...but when he was out of jail he stayed, had a place over on Woody Island." (Tr. at pp. 2879-2880.) Acknowledging that Giorgi Nekeferoff spent a great deal of time in jail, Judge Madsen nonetheless testified that "But when he was out of jail he stayed, had a place over on