# EXHIBIT "12"

Woody Island."  Tr. at p. 2880.  **Judge Madsen testified that he believed that Giorgi Nekeferoff had been on Woody Island in 1970.**  (Tr. at p. 2880.)

**According to Esther DeNato, Giorgi Nekeferoff was on Woody Island in 1970 when he was not in the jail at Kodiak.**  (Tr. at pp. 2809-2810.)

The evidence establishes that this Alaska Native who had a cabin on Woody Island and was back and forth between Woody Island and Kodiak, qualifies as a permanent resident of the Native Village of Woody Island.  This Board should reject the recommendation that Giorgi be denied Woody Island residency status allegedly because "There is no subjective evidence of his intent to return there.  The objective evidence shows that he spent the vast majority of his time living in Kodiak.  His ties to Woody Island and use thereof during the decade ending in 1970 are vague and uncertain... [T]he jail and family residence were in Kodiak." RD at pages 77-78. Giorgi had a cabin on Woody Island.[100] Testimony of Roy Madsen, Tr. at p. 2879.  When Giorgi was out of jail, "he stayed" on Woody Island.  Tr. at p. 2880.  Judge Madsen is "sure that he must have been [on Woody Island in 1970] Tr. at p. 2880.   Although the individual concededly had an alcohol abuse problem, and therefore sought shelter frequently in the Kodiak jail, this Board should reject the thesis in the RD that Giorgi Nekeferoff intended a jail cell rather than Woody Island to be his home for the rest of his life.

---

[100]Judge Roy Madsen verified that Giorgi had spent time on Woody Island in the late 1960's and early 1970's, but could not recall when Giorgi's cabin became dilapidated: "I know that it was from '66 through probably the early '70s that he [Giorgi Nekeferoff] used to go over there.  And I don't remember the last time I went over there, or the earliest time I went over there and noticed that it [Giorgi's cabin] was dilapidated.  I know it is, the last time I was there it was.  But as far as the, whether it was in 1970 or not, I , I just couldn't say." Tr. at pp. 2927-28.

57.    **Myra Malutin Robertson**

In 1970, Yule Chaffin recorded the names of seven Native individuals who ca?e??? it

her at her cabin near Lake Una on Woody Island.  Included on her list was **Myra** ?????? **an**

**Robertson**. (Exhibit 17 of Deposition of Yule Chaffin, at p. 139, entry of September ? ? ? ).)

Myra (1900-1982) is another Native Woody Island villager who lived for a period ?? ? ? ?n

Woody Island in 1970 and has historic ties to Woody Island Village.  She was mar???? to

Woody Island villager and mission child William J. Robertson (1895-1965).  She was the

mother of William C. Robertson (born 1928) who testified at the hearings, and the grandmother

of current Leisnoi President, William Bruce Robertson (born 1953), who also testified at the

hearings.  Myra spoke "Russian, quite a bit of Aleut, and English." Testimony of William C.

Robertson, Tr. at p. 1744.

The happenstance that Myra Malutin Robertson did not formally enroll to the village

does not preclude her from being counted toward the minimum requirement of 25 permanent

residents.  The Alaska Native Claims Appeal Board ruled in *Manley Hot Springs* that "[T]here

is nothing in the Act or in the regulations that require that the 25 Native residents on April 1,

1970, needed for certification of eligibility, be properly enrolled to Manley Hot Springs or

enrolled at all." *Manley Hot Springs* at p. 15.

The tragic loss of the Robertson's homestead property on Woody Island was described

by William Robertson at the hearings, Tr. at pages 1701-1704, and is set forth in

correspondence with the Department of the Interior. L-Doc.334.[101]   In addition to making

_____

[101]Right when he was on the verge of perfecting the Robertson family homestead, John R.
Robertson, the father of Myra's husband, William J. Robertson, disappeared while on a trip

failed efforts to reacquire their Woody Island homestead, Myra's son, William C. Robertson, tried to buy Ella Chabitnoy's Woody Island property in the late 1960's, or the early 1970's.[102] He described how disappointed he was when he learned that Ella Chabitnoy had sold her property in the village to someone else:

> "Well, I, I, I wanted it pretty bad. There was a lot of attachment to the island for my, my folks. **They both worked and lived there. And, they've spent a lot of time there. And they were near retirement age, and I thought it would be a wonderful place** to have ... a place **for them to go and stay** for them and myself."

Testimony of William C. Robertson, Tr. at pp. 1748-49.

The RD refers to this as a "vague statement" and has effectively asked this Board to ignore the testimony of Myra's son showing her connections to the island and an intent to return thereto, and to give no efficacy to the objective evidence showing that Myra was on Woody Island in 1970. This Board should not disregard testimony by a son that his mother spent a lot of time in the village simply by characterizing it as being "vague." (In his cross-

---

to visit relatives. "[T]hey got to the point where they, they accepted the survey in Juneau, and they sent letters from the Anchorage office wanting him to finalize the Homestead Claim, but that summer [he disappeared]. ... All, all that had to have been done was to fill out a form saying that there was a homesite there, a domicile, and that he was doing some kind of horticulture or animal raising...[and] we would have got the homestead." Testimony of William Bruce Robertson, Tr. at pp. 1702-04.

[102]"I attempted to buy the Chabitnoy property here when Mrs. Ella Chabitnoy had moved off the island in the late '60's. And I heard that she had moved to Kodiak, and she was, I called her up, up and wondered what she was doing with the property. She said she was selling it, and I told her I was interested in buying it. And she said she had promised a businessman in Kodiak that she would sell it to him, and a year or two had transpired and she hadn't received any money from it. And she said 'I'll call him tomorrow, and if he doesn't come up with the money, it's yours.' The next day she called up with, she said 'He brought me a check.' So I, I couldn't get that property." Testimony of William C. Robertson, Tr. at pp. 1747-48.

examination, the protestant failed to delve further into the number of times Myra was in the village during the 1960's or in 1970.) Nor should the Board adopt the thesis in the RD that visiting an old friend in the village in 1970 carries absolutely no legal significance under ANCSA. Once again, the RD erroneously views anything other than employment on Woody Island as being insignificant.

Myra Malutin, who has longstanding historical and family ties to the Native Village of Woody Island, and who was on Woody Island in 1970, qualifies as a permanent resident of the Native Village of Woody Island.

### (ii) *More Permanent Residents of the Native Village of Woody Island*

Up to this point in the brief, only fifty-seven of the many Natives who were physically present on Woody Island in 1970 have been discussed. There are many other Natives who lived for periods of time on Woody Island in 1970, but the passage of 28 years between 1970 and the 1998 hearings, and the death of many shareholders who had knowledge relevant to this case, has made it virtually impossible to get a complete count. Thus, the 57 Natives who have been identified herein as having lived for a period of time in the village in 1970 is not an exhaustive list.

The definition of permanent residency, of course, does not require that a Native have been physically in the village in 1970: "A region or village may be the permanent residence of an applicant on April 1, 1970, even though he was not actually living there on that date, if he has continued to intend that place to be his home." 25 CFR 43h.1(k). Many other Woody Islanders qualify as permanent residents of Woody Island although they may not have been

-229-

physically present on Woody Island in 1970. A number, but certainly not all

discussed below, including:

58.  David Redick
59.  Herman Sundberg
60.  Freddy Simeonoff, Jr.
61.  Angeline Pananarioff Pestriakoff Pavloff Maliknak
62.  Herman Ponchene
63.  Ione Jean Shuravloff
64.  Mona Lynn Shuravloff
65.  Nicholas Shuravloff, Jr.
66.  Nicholas Shuravloff III
67.  Michael Wayne Shuravloff
68.  Walter Allen Shuravloff
69.  Richard Lee Shuravloff
70.  Anastasia "Nettie" Fadaoff Harmon Hartle
71.  Charlotte White Fadaoff
72.  Alexander John Fadaoff, Jr.
73.  David James Fadaoff
74.  Virginia "Ginny" Frump Griffin
75.  Harold Wayne Frump King
76.  Maryanne Frump
77.  Brenda Frump
78.  William Nicholas Pavloff
79.  Michle P. Pavloff
80.  Peter Nicholas Pavloff
81.  Tanya Alexandra Pavloff
82.  Mary Anna Pavloff
83.  Martin W. Pavloff
84.  Bobbie Marti Pavloff
85.  Fekla Ella Fadaoff Korniloff Chabitnoy

**50.**    Leisnoi shareholder and Woody Island villager **David W. Redick** (born 1964)

is a member of the Liknak/Redick clan with longstanding ties to Woody Island. His three

brothers, Larry (born 1960), Robert (born 1953), and William (born 1952) all lived on Woody

Island for a period of time during 1970 and are Leisnoi shareholders. David did not fill out the

formal paperwork to enroll to the village of Woody Island as did his brothers, so he does not

count towards the 13 enrollees who lived for a period of time on Woody Island       it

he does count as one of the 25 permanent residents of the village.[103]

David is the son of Marie Redick Unger, described in the list of enrollees who     lly

lived for a period of time on Woody Island in 1970.   His grandmother was Woody     ad

villager Pariscovia "Polly" Inga.  His great grandmother was Woody Island village    ia

Liknak (born 1887, died and buried on Woody Island in 1920).  His great grandfather was

Woody Island villager Alexis Unger.  William's great, great grandfather was Chief Yellow

Pants, Woody Island villager Nikolai Liknak.  (L-Chart 9; Feichtinger Investigative Report L-

Doc 108 at pp. 13-14; and Deposition of Marie Unger at p. 35.)  David has longstanding family

and historical ties to Woody Island.  His family would "go over there [to the Woody Island

village] every summer … because that's where we felt we belonged." Deposition of Marie

Redick Unger at p. 15

Tina Simeonoff Hoen testified that she allowed the Unger family to use her house on

Woody Island in 1970.  (Tr. at p. 2965.)  This home had formerly belonged to Marie's great

great grandfather, Chief Yellow Pants, who gave the property to Tina Hoen's grandmother.

Depos. Tr. at p. 19.

As a minor child in 1970, David Redick is automatically entitled to the Woody Island

permanent residency status of his mother, Marie Redick Unger. *Manley Hot Springs* at p. 27.

Moreover, he actually lived in the village for a period of time in 1970.

---

[103]In his March 19, 1998 interview with Kathleen Putman, David Redick described how his grandmother, Polly Inga Swenson, had been one of the children raised in the orphanage on Woody Island.  L-Doc 329.

59.    **Herman Sundberg** (1947-1992)   was a Native Woody Islander who has extensive personal and family ties to Woody Island and qualifies as a permanent resident. Herman Sundberg's parents were Woody Island villager and shareholder Jenny Pestriakoff and Woody Island villager, Leisnoi shareholder, and 1970 resident Rudolph Sundberg, Sr.  Herman Sundberg's grandfather was Woody Island villager Rudolph Sundberg, Sr. (1857-date of death unknown).  (L-Chart 30; L-Doc 108 at Tab 4, p. 10.)

The RD erroneously recommends this Board declare that since Herman Sundberg served in Vietnam in  1970, he cannot be counted as a permanent resident of Woody Island. Recommended decision at page 47.   Implicit in this recommendation is the ludicrous proposition that Mr. Sundberg must have intended permanently to reside in Vietnam.  The Board should not adopt this theory.  An American citizen serving his country with honor should not be deprived of the benefits of the Alaska Native Claims Settlement Act merely because he is fulfilling his duties of citizenship.  L-Doc 108 at Tab 4, p. 10.  He maintained strong ties to Woody Island until his death in 1992.  L-Doc 108 at Tab 4, p. 10.  Although he was not formally enrolled to the Native Village of Woody Island, he is still entitled to permanent residency status, as is made apparent by *Koniag, Inc. v. Kleppe*, 406 F.Supp. at 1373-74.  The Sundberg family of which Herman was a member, has longstanding ties to the Native Village of Woody Island and Herman Sundberg qualifies as a permanent resident.

60.    **Freddy Simeonoff, Jr.** (1949-1970), the son of Natalie Fadaoff and Kelly Simeonoff, Sr., lived on Woody Island with his family in their family home at various times in the 1960s. Tr. at p. 1591.[104] On April 17, 1970, Freddy Simeonoff was killed in combat in Vietnam while piloting a UH-1 Huey helicopter. (Tr. at pp. 3169-3170.)  Just as a Native who happens to be in Kodiak in 1970 does not lose Woody Island permanent residency status, so too, a 21 year old[105] Alaska Native who happened to be in Vietnam in April of 1970 does not lose his Woody Island permanent residency status.

Freddie Simeonoff died prior to enactment of ANCSA, so it would have been impossible for him to have enrolled pursuant to ANCSA.   Nonetheless, he had sufficient ties to the village[106] and qualifies as a permanent resident.  The Alaska Native Claims Appeal Board noted in *Manley Hot Springs*, there is no requirement that a permanent resident have formally enrolled to the Native Village in order to be counted as a permanent resident.

61.    **Angeline Pananarioff Pestriakoff Pavloff Maliknak** (1902-1972) was one of

---

[104]Natalie and Kelly Simeonoff's presence on Woody Island in the early 1960's is confirmed by FAA employee Wauldeman Johnson at page 7 of his deposition.

[105]Freddie had achieved majority, and was no longer living with his parents, so he is not automatically deemed to have the residency of his parents.

[106]A photograph of Freddy Simeonoff playing with Jimmy Hartle and Paul Harmon in front of the Chabitnoy home and the Simeonoff home is pictured at Phot 22-8.   Another picture of Freddy Simeonoff shows him with Danny Harmon (both of whom later died in Vietnam) playing together as children on Woody Island. Phot A-4.

three matriarchs on Woody Island in the 1960's[107], and she qualifies as a permanent resident of Woody Island.   Angeline is the daughter of Nicholai W. Pavloff (born on Woody Island in 1846, died on Woody Island in 1932).   She is the granddaughter of William E. Pavloff (1817-1872), the first Vice-Governor of Alaska.

Angeline was married several times in her life, and gave birth to numerous children. Her first husband was Larry Pestriakoff (deceased, 1918).   Offspring from this marriage was Jenny Pestriakoff (1917-1972), who married Rudolph Sundberg, Sr. (1907-1984). Grandchildren of Angeline from this marriage are depicted in the Sundberg Family Genealogy, L-Chart-30.

After being widowed, Angeline  married William N. Pavloff (1870 -1931).   Children from that marriage include Mary Ponchene (1924-1965), Martin W. Pavloff (born on Woody Island in 1926), Maria W. Pavloff (born on Woody Island in 1928, died on Woody Island in 1928); Mattie Pavloff (born on Woody Island in 1930), Agnes Pavloff (born on Woody Island in 1928, died in boating accident in 1963), Dorothea W. Pavloff (born on Woody Island in

---

[107]Dr. Nancy Yaw Davis observed that the Native Village of Woody Island was essentially a matriarchal society.  She noted there were three powerful women who had played pivotal roles in the recent history of the Native Village of Woody Island.  These included Angeline Pananarioff Ponchene Pestriakoff Maliknak in the North Village area; Fekla Ella Kornilov Fadaoff Chabitnoy in the South Village area; and Mary Ponchene Fadaoff Pavloff, who had married into both the North Village and South Village areas and had a link to both sides of the Village.  (Tr. at pp. 3479-3480, 3498-3499.)

1921, died 1965), and William Wilfred Pavloff.[108]  Grandchildren in her family are depicted in L-Chart 6.

After again being widowed, Angeline married Stephan Maliknak (1901-1958) See Chart-34. From this marriage Angeline's offspring includes Johnny Maliknak (born on Woody Island in 1933).

Stephan died in a boating accident in 1958, tragically leaving Angeline a widow for the third time in her life.  Herman Ponchene (born 1897, died on Woody Island in 1973) then became Angeline's common law husband.  Arlene Simpler testified that she knew Angeline Pavloff Maliknak, and that Angeline was living on Woody Island when Arlene was there in the 1960's.  (Tr. at pp. 3190-3191.)

The RD finds that Angeline "resided on Woody Island for over 50 years until she moved to a nursing home in Seward, Alaska, because of failing health.  She moved in 1965 or 1966, just prior to the time that her house on the homestead burned down." RD at page 45.[109] Again using a harsh and improper interpretation of the law, the RD erroneously recommends this Board declare that she was stripped of her Woody Island residency after having lived 50 years on Woody Island, simply because she then had to live in a nursing home in Seward for health reasons: "She is enrolled to Woody island and the Family List shows that she listed Woody Island as her permanent residence on April 1, 1970, and as the place where she resided

---

[108]Wilfred Pavloff's presence on Woody Island in the early 1960's is confirmed by the testimony of FAA employee Wauldeman Johnson at page 7 of his deposition.

[109]At page 7 of his 1977 deposition, FAA employee Wauldeman Johnson confirmed that Angeline lived on Woody Island when he was there in the early 1960's.

for an aggregate of 10 years or more. It also lists Seward as the place where she resided for 2 or more years on Aril 1, 1970... Angeline's permanent residence was the alleged Village until 1965 or 1966. The objective evidence indicates that her permanent residence was Seward thereafter..." RD at p. 45.

Once again, the RD has failed to effectuate "the liberal nature of the Secretary's residency requirements and the Congressional intent concerning the Natives' personal and group identities, cultural patterns, and life styles." *Chitina*, VE 74-10, recommended decision at p.14. *Afognak* makes it clear that a village can be deemed the permanent residence of a Native even "where economic, educational, or other requirements" have forced a Native to live elsewhere.

There are no hospitals or nursing homes on Woody Island. Angeline had no choice to but seek nursing home care outside of the village. The RD effectively penalizes her for this, by recommending that once a villager becomes infirm, the villager loses entitlement to ANCSA benefits. This Board should not adopt that recommendation.

62.    **Herman Ponchene** (born 1897, died on Woody Island in 1973) was the common law husband of Angeline Pananarioff Pestriakoff Pavloff Maliknak. The RD declares that "He lived with Angeline on Woody Island ... from approximately 1958 until she moved to the nursing home in Seward in 1965 or 1966." RD at p.45. The RD found that "There is no evidence of his whereabouts thereafter, except that he died on Woody Island in approximately 1973..." RD at p.45.

This Alaska Native has sufficient ties with Woody Island to qualify as a permanent resident thereof. The RD finds that "Herman's permanent residence was the alleged Village

-236-

from approximately 1958 until 1965 or 1966. His permanent residence was not the alleged

Village thereafter..." Recommended decision at p.45. The RD fails to identify where

Herman's permanent residence was, if it was not Woody Island. No evidence disproving

Herman's subjective intent to return to Woody Island was introduced by the protestant.

Herman Ponchene lived many years on Woody Island, and his intent to return to Woody Island

when absent therefrom in 1970 can be inferred from the fact that he later, in fact, returned to

Woody Island and died there in 1973.

> **63.    Ione Jean Shuravloff**
> **64.    Mona Lynn Shuravloff**
> **65.    Nicholas Shuravloff, Jr.**
> **66.    Nicholas Shuravloff III**
> **67.    Michael Wayne Shuravloff**
> **68.    Walter Allen Shuravloff**
> **69.    Richard Lee Shuravloff**

**Ione Jean Shuravloff** (born 1939) and her daughter, **Mona Lynn Shuravloff** (born

1967); **Nicholas Shuravloff, Jr.** (born 1947) and his son, **Nicholas Shuravloff III** (born

1969); **Michael Wayne Shuravloff** (born 1948); **Walter Allen Shuravloff** (born 1950); and

**Richard Lee Shuravloff** (born 1955) are all duly enrolled to Leisnoi, Inc. and qualify as

residents of Woody Island. Ione, Nicholas, Jr., Michael, Walter, and Richard are all siblings

of 1970 resident Marty Charles Shuravloff, described above at #20. Their mother was Mission

child, Woody Island villager Martha Pestrikoff (born on Woody Island in 1915).[110] Their aunt

is Woody Island villager, mission child Sara Pestrikoff (born on Woody Island in 1910). See,

---

[110]In his interview, Marty Shuravloff described how "My mom used to live there. My mom and her family used to live on Woody Island.... My mom was brought up in the mission over there... [H]er maiden name is Pestrikoff... They used to have a house down in the area that Johnny Pavloff, I thi -- I believe he's over there now, down in that area." L-Doc 344 at pp.7-8.

L-Chart-7.[111] Their uncle is Woody Island villager Sergay Pestrikoff, who was born on Woody Island and raised in the mission. Their grandparents were Woody Island villager Feona Katelnikoff (born 1885, died and buried on Woody Island in 1918) and Woody Island villager Michael Pestriakov (date of birth unknown to 1962).

The Shuravloffs have a long history of ties with Woody Island. Iona, Nicholas, Michael, Walter, and Richard Shuravloff all signed enrollment forms under penalty of law declaring that they were permanent residents of Woody Island. The protestant did not call these Shuravloffs to the stand or impeach their subjective intent to return to Woody Island. This Board should give efficacy the legal "presumption that a person's statements on an official government form are true and accurate to the best of his knowledge and belief." *Manley Hot Springs*, at p. 19. Just as there is "a strong presumption of the correctness of the residency shown on the Roll", *Kaguyak*, at p. 17, there is a separate presumption that each person's statement on an official government form is true and accurate. *Manley Hot Springs*, at p. 19. Likewise, Mona Lynn Shuravloff (born 1967) and Nicholas Shuravloff III (born 1969) are presumed to have the same Woody Island residency as their parents. *Manley Hot Springs*, at p. 27.

**70.    Anastasia "Nettie" Fadaoff Harmon Hartle** (born on Woody Island in 1911,

---

[111]L-Chart-7 contains the genealogy of the Shuravloff family. Enrolled shareholders Mona Lynn Shuravloff, born 1967, and Nicholas Shuravloff III, born 1969, were accidentally omitted from the chart. The Family List, L-Doc 385, reveals that Mona's mother is Leisnoi shareholder Iona Jean Shuravloff, and Nicholas Shuravloff III's father is Leisnoi shareholder Nicholas Shuravloff, Jr. As minor children in 1970, these children are automatically entitled to the Woody Island permanent residency status of their parents. See, *Manley Hot Springs*, VE #74-6 at p. 27.

died 1974) is another Alaska Native who qualifies as a permanent resident of Wo

She is the daughter of Woody Island matriarch Fekla "Ella" Kornilov Fadaoff (

(1891-1971) and mission child Nicholas Fadeef. (born 1888, buried on Woody Island )

See, L-Chart 5. She had several husbands over the course of her lifetime. While mar o

Kelly Gregoroff, she gave birth to Michael Nicholas "Mitch Komm" Gregoroff, who d

at the hearings and served on the Board of Directors of Leisnoi, Inc. While married to ly

Island villager Raymond Harmon Sr. (1912-1947), she gave birth to several children including

Maurice Harmon (born 1942) and Paul Harmon (born 1941), both of whom testified the

hearings. From a spouseless relationship, she gave birth to mission child Alexander John

Fadaoff, Sr. (born on Woody Island in 1934, died 1988), and mission child Ronald Fadaoff

(born on Woody island in 1932).

The RD concludes that Nettie "was born and raised on Woody Island", and that "She

and her family lived in the Harmon house [on Woody Island] from 1952 until approximately

1959, when they moved to Kodiak." RD at p.61. She then moved back and forth between

Washington and Kodiak. While in Kodiak, she did "'frequent Woody Island many times'

including living in the Fadaoff/Madsen house during the summer of 1964." RD at p.61.

Nonetheless, the RD declined to recommend the Board declare Anastasia "Nettie" Fadaoff a

resident of Woody Island because "No testimony or statement from Anastasia was introduced."

RD at page 61[112]. Obviously, since Nettie had died in 1974, she was unavailable to testify.

_____

[112]Another reason given in the RD for recommending this Board decline to find Nettie a permanent resident of Woody Island was that Nettie was willing to return to live permanently on Woody Island only "if her family's employment and earnings were such that it was feasible and affordable to do so." RD at p.61. Here again, the RD mistakenly invites this Board to

Evidence of her subjective intent to have returned to Woody Island was nonetheless introduced at trial:

> "Q.    [Y]our mother had lived on Woody Island?
> A.    Yes.
> Q.    And your step-father had lived on Woody Island?
> A.    Yes.
>
>                           …
>
> Q.    Did you speak to them about your interest in returning to Woody Island?
> A.    Yes, I did.
> Q.    And how did they respond?
> A.    Oh, they would, they were all for that.  **They would like to have moved, too, and actually live back there."**

Testimony of Maurice Harmon, Tr. at pp. 1656-57.

Nettie's presence on Woody Island in 1966 is confirmed by a photograph of her, together with her daughter-in-law, Charlotte White Fadaoff, and two of her grandchildren, Alex Fadaoff, Jr., and David Fadaoff, on Woody Island in 1966, pictured in the David Fadaoff Photographic Collection, Phot 6-2.

Nettie played an important part in the history of Woody Island.  She has longstanding family ties to the village, lived there for many years, returned to visit often, and expressed to her son her desire to return to live in the village.  She qualifies as a permanent resident of the village by virtue of her having sufficient ties plus a subjective intent to return to Woody Island when absent therefrom.

---

overlook the principle of law that a Native does not forfeit his residency status if compelled to leave the village to seek employment elsewhere.  Senator Ted Stevens' letter of March 1, 1972 to the Secretary of the Interior made this observation: "Because our Native people have been compelled to move about the state to find employment or to continue their education, it is most difficult to define the permanent residence of an Alaska Native without regard to the mental attitude of the individual involved."  BIA Exhibit 1A at p. 353. The Assistant Secretary of the Interior agreed in his response letter of March 1, 1972.

71.   **Charlotte White Fadaoff**
72.   **Alexander John Fadaoff, Jr.**
73.   **David James Fadaoff**

One of Nettie Fadaoff's children, Alexander John Fadaoff, Sr., was described above as individual #44, who actually lived for a period of time on Woody Island in 1970. His wife, **Charlotte White Fadaoff**, and his two children **Alexander John Fadaoff, Jr.** (born 1957) and **David James Fadaoff** (born 1959), also qualify as permanent residents of the village.

Mitch Gregoroff confirmed that Alexander John Fadaoff, Sr. and his wife, Charlotte, were on Woody Island in the 1960's. Tr. at p.1466. Maurice Harmon observed that Charlotte is seen in a picture "taken on Woody Island over by the flume" in 1966, Phot 6-2. Testimony of Maurice Harmon at pp. 1580-81. Kelly Simeonoff, Jr. testified that "Lexie, or Alexander, and his wife, Charlotte, lived there [in the Woody Island village] after they were married, with their children, during the '60's." Tr. at p. 2702. When asked who lived in the Harmon house in the 1960s, Tina Simeonoff Hoen testified "I believe Lexie was there with his family at one point. He, his wife is named Charlotte." Tr. at p. 2960.

Alex John Fadaoff, Sr., his wife Charlotte, and their children have sufficient ties with Woody Island to qualify as permanent residents. Lexie was physically present in the village in 1970. "There is no doubt that Alexander Sr. did visit, as he was seen fishing there in 1970." RD at page 66. As minor children in 1970, Alexander John Fadaoff, Jr. and David James Fadaoff are automatically entitled to Woody Island residency status based on that of their father. *Manley Hot Springs* at p. 27.

-241-

74. **Virginia "Ginny" Frump Griffin**
75. **Harold Wayne Frump King**
76. **Maryanne Frump**
77. **Brenda Frump**

One of Angeline Pavloff Maliknak's children was Agnes Pavloff (born on Woo... land in 1923, drowned in1963). Agnes's children include Ginny Frump, Harold Fru... ing, Maryanne, and Brenda.[113]

Ginny Frump Griffin, the daughter of Agnes Pavloff Frump, "was adopted by a non-Native family, Lucille and Walt Westman. They lived on Woody island from 1946 to 1951 while Walt was employed by the FAA." Recommended decision at page 51.

The other children, and their mother, Agnes, "lived in the Frump home at Site 7 on Woody Island. Maryanne was a close friend of Trisha Chaffin, daughter of Yule Chaffin." Recommended decision at page 52.

In 1960, Harold, Maryanne, and Brenda were placed in the Kodiak Baptist Mission, but "Each summer until their mother died, they returned to Woody Island to live." Recommended decision at page 52.

When Agnes Pavloff died, "Brenda when to live with, but was not adopted by, the Miller family in Seward. Harold and Maryanne were adopted by, and went to live with, the King family in Seward... Until he moved with his adoptive family to Idaho in 1969, Harold spent 'a lot of time' 'visiting' his uncles, Johnny Maliknak and Nicholas Pavloff, on Woody

---

[113]Esther DeNato described Brenda Frump as "a cousin; my Aunt Agnes' daughter, youngest daughter", and confirmed that she was on Woody island in the 1960's. Tr. at p. 2805. She also confirmed that Maryanne Frump and Harold Frump had lived on Woody Island in the 1960s. Tr. at p. 2806. A photograph of Harold Frump with Johnny Maliknak on Woody island in July of 1962 is pictured in Phot A-1-044.

Island. Maryanne and Brenda may also have visited Woody Island." Recommendation

at page 52. Harold King, the brother of Ginny Frump Griffin, testified that the clan had

recently become reunited and "were all planning a trip to Woody Island" Tr. at p. 9.

Harold King testified that he grew up on Woody Island, and had recently visited the island,

spending a whole week on Woody Island. Tr. at p. 1779. When asked how it felt to go back

to Woody Island, he responded, "Well, I didn't want to go anywhere else." Tr. at p. 1780.

When Harold left Woody Island, "I always wanted to return...to come back and build a home

or cabin on the island..." Tr. at p. 1779. Harold Frump King plainly meets the definition of

a permanent resident of Woody Island.

Adoption by a Native into a non-Native household does not give rise to a presumption

that the Native center of family life of the child is in the non-Native household. Such a

proposition is anathema to the concept of "the center of the Native family life of the applicant"

as that term is used in the definition of permanent residence at 25 CFR §43h.1(k). For those

Native children adopted by white couples that removed the Natives from the village, the village

itself remains the only real center of the child's Native family life. Although their non-Native

family life may be based outside the village, it cannot sensibly be contended that persons who

know nothing about Native culture or traditions who remove a Native child from the village can

provide a center of Native family life. Thus, the presumption stated at page 27 of *Manley Hot

Springs*, that "for purposes of determining the residence of enrolled Native children, the

residence of such minor children should be determined according to the residence of their

enrolled Native parents" does not apply where Native children have been taken from the village

and raised by non-Natives. The "center of Native family life" of these individuals remains the

-243-

village itself where they were raised prior to their adoption.[114] Moreover, the children that had been adopted out have recently reunited and planned a trip back to Woody Island, so their feelings toward Woody Island have not diminished over the years. The village continues to serve as the center of Native family life for these individuals that qualify for residency status.

**78.    William Nicholas Pavloff (1961-1985).**

The RD observed that Nicholas William Pavloff, Sr.'s "permanent residence was the alleged Village on April 1, 1970, and he did live there for a period of time in 1970." Absent evidence of emancipation, minor Native children are deemed to have the residency of their parent. William Nicholas Pavloff's father was Woody Island permanent resident Nicholas "Nick" William Pavloff, Sr., so both father and son are therefore permanent residents of the Native Village of Woody Island.

**79.    Michle P. Pavloff**
**80.    Peter Nicholas Pavloff**
**81.    Tanya Alexandra Pavloff**
**82.    Mary Anna Pavloff**

**Michle P. Pavloff** (born on Woody Island in 1930, died 1992) and his children, **Peter Nicholas Pavloff** (born 1964), **Tanya Alexandra Pavloff** (born 1969), and **Mary Anna Pavloff** (born 1962) qualify as residents of Woody Island. Michle, the son of Peter Pavloff (born on Woody Island 1882, died on Woody Island 1932, buried on Woody Island) and Anna Chaupuk (died on Woody Island in 1932), was orphaned in 1932 when his mother died of

---

[114] Mr. King was born on March 21, 1950, Testimony of Harold King, Tr. at p. 1775, so he was not a minor child as of April 1, 1970. Accordingly, the presumption that a minor child has the same residency as his biological or adoptive parent for this reason as well does not apply to this individual who had already achieved majority as of April 1, 1970.

tuberculosis, and his father died a few months later while still grieving. L-Doc 128 [Interview of Michle's daughter, Mary Anna Pavloff] at p. 10; Tr. at p. 873.  His grandfather was Nicholai W. Pavloff (born 1846, died on Woody Island also in 1932). L-Chart-6.  Michle was then put into the orphanage on Woody Island, Tr. at p. 873, but kept running away to be with his uncle, Nicholas N. Pavloff (born on Woody Island in 1877 died in 1940, buried on Woody Island). L-Doc 128 at p. 12; L-Chart-6; Tr. at p. 873.

Michle frequently expressed to his children his desire to return to live to Woody Island, and brought his whole family to Woody Island in the late 1970's; however, there was no work available for him in the village. L-Doc 128 at pp.11-12.  Michle is formally enrolled to the village.  As a Woody Island mission child who has longstanding family ties to the village, and who continued to want to live on Woody Island, Michle qualifies as a resident of the village. Since he qualifies as a resident, his minor children in 1970, Mary Anna, Peter Nicholas, and Tanya Alexandra, automatically qualify as residents as well under the doctrine set forth in *Manley Hot Springs*, VE #74-6 at p. 27.

**83.    Martin W. Pavloff**
**84.    Bobbie Marti Pavloff**

**Martin W. Pavloff** (born on Woody Island in 1926) is the son of Woody Island villager William N. Pavloff (born on Woody Island in 1879, died in 1931 and buried on Woody Island) and Woody Island villager Angeline Pananarioff Pestrikoff Maliknak Pavloff (1902-1972). His grandfather was Woody Island villager Paul Pavloff (born 1844 died 1904, buried on Woody Island).

Martin grew up on Woody Island and joined the Navy during World War II.  A photograph of him and Edson Fadaoff, Sr. looking spiffy in their Navy uniforms is pictured in the Lind Collection at Phot A-1-016.

Johnny Maliknak's affidavit (L-Doc 176) states at page 2 that he has personal knowledge **both Martin, and his daughter, Bobbie, resided on Woody Island at various times during the time frame of April 1, 1960 through April 1, 1970**.  At page 5 of his affidavit, Johnny Maliknak explained that **in the mid 1960's, Martin and Bobbie "lived on Woody Island for about a year and a half.  They built a two story house,** the one that I am presently living in." L-Doc 176 at p. 5.

Dr. Nancy Yaw Davis described what she learned in her interview with Martin and his daughter Bobbie:

> "And there was a commitment to Woody Island that was so strong that they would come back periodically while her grandmother, Angeline, was living there... And they always wanted to move back to Woody Island.  And they came up and they tried to go back to Woody island and establish a home there.  They built a two-story home that John Maliknak, Martin's half-brother, is living in now. And they still want to come back."

Testimony of Dr. Nancy Yaw Davis, Tr. at pp. 3447-48.[115]

**85.    Fekla Ella Fadaoff Korniloff Chabitnoy** was one of the matriarchs of Woody Island still alive in 1970.  She qualifies as a permanent resident of the village, having lived there almost her entire life.  In 1901, Fekla Kornilov, in later years known as Ella Chabitnoy, arrived at the Baptist Mission as a young child from Unga.  She lived on Woody Island for over

---

[115]Cultural Anthropologist Dr. Davis interpreted "what I heard when I talked to Martin and Bobbie Pavloff" as being "a sense of community in the sense of an identity of soul on Woody" and an "identity of Woody Islandness." Tr. at pp. 3506-07.

60 years. Descendants from her first marriage to Nicholas Fadaoff (the ceremony    s performed once in the Baptist faith, and then again in the Russian Orthodox faith)         r second marriage to World War I veteran and Woody Island villager Mike Chabitnoy  re Leisnoi shareholders. (Book 14 [Chaffin, Yule. Alaska's Konyag Country]; and Book  5 [Chaffin, Yule. Koniag To King Crab]; and Doc 108 at p. 38.) Her many descendants are shown in the Fadaoff family genealogy, L-Chart-5.

Ella survived a number of natural disasters that struck Woody Island, including the 1912 Mt. Katmai eruption, the 1919 Spanish flu epidemic, and the 1964 earthquake.

Chief Yellow Pants gave a home on Woody Island to Ella. On March 3, 1964, just three weeks before the earthquake, the United States of America formally granted her a patent for 8.48 acres of land on Woody Island. (Doc 301, Patent #1235294). She continued to own a home on Woody Island throughout 1970, although her declining health forced her to move to Kodiak sometime in the 1960s. The RD found that Ella "lived on Woody Island from approximately 1895 until she moved to Kodiak in the early 1960's prior to the 1964 earthquake. She moved to have better access to medical services because of her failing health... Thereafter, she lived for periods of time in the summertime on Woody Island in the south Village until she grew too old to do so." RD at page 53.[117]

---

[116] (Doc 199, 200, and 108 at p. 47. [News Letter. Kodiak Baptist Orphanage. July/August 1909. Vol. X, No. 3]; [News Letter. Kodiak Baptist Orphanage. September 1909. Vol. X, No. 6.]; Doc 339, Russian Orthodox church Record of Marriages.])

[117]There are no hospitals on Woody Island, so Ella Chabitnoy should not be penalized with a loss of her Woody Island residency status merely because she had to move to Kodiak to have access to health care.

Ella Chabitnoy died in 1971 prior to the December 18, 1971 enactment of the Alaska Native Claims Settlement Act, so she never had an opportunity to sign enrollment papers pursuant to ANCSA. It is not necessary, however, for an Alaska Native to have formally enrolled to a native village in order to be deemed a permanent resident of the village. See, *Manley Hot Springs*, at p. 15.

In one of the only instances where some evidence was presented calling into question the subjective intent of a permanent resident of Woody Island to return thereto, Tina Hoen testified that following the death of Ella Chabitnoy's son, James Fadaoff, in 1969, her grandmother had stated that she would not live on Woody Island again. Tr. at p. 3004. Leisnoi, Inc. concedes that this constitutes some evidence of a lack of intent to return to Woody Island, but contends that an emotional outburst of a mother following the suicide of her son does not negate a lifetime connection with Woody Island or conclusively establish that she forever gave up the intent to return to Woody Island. Obviously, the tragic loss of a son, particularly as the result of a suicide, would be enough for any parent to state that they would not return to a place where they have many memories of the child having grown up, but the weight of the evidence shows that Ella Chabitnoy continued to own real property on Woody Island, still had friends on Woody Island, such as Yule Chaffin, and likely had the intent to return to Woody Island if circumstances would allow. One statement made in a depressed state of mind by an elderly Native who had just lost her son to a suicide is not sufficient to destroy the permanent residency status of Ella Chabitnoy who lived almost her entire life in the Native Village of Woody Island.

### (iii)  Other Woody Island villagers are listed in the Native Roll and they qualify as permanent residents of the Native Village of Woody Island.

Leisnoi has discussed herein 85 of the many Native individuals who qualify as permanent residents of the Native Village of Woody Island.  This discussion was merely illustrative, and is not meant to be construed as being exhaustive. Rather, Leisnoi defends each of the approximately 285 individuals who enrolled to the village, as well as those persons listed in the Family List whose names were not included in the BIA Roll.

The RD, like the briefing submitted by the protestant, failed to go through the entire list of enrollees and offer any evidence negating their ties to Woody Island or their subjective intent to return.  Instead, the RD recommends that this Board mistakenly declare that there is "evidence creating substantial doubt as to the validity of the presumption of residency for all of the 285 alleged Village enrollees, excepting Johnny Maliknak and Nick Pavloff." RD at page 40.  In other words, in one fell swoop, without any individualized proof, the RD recommends the Board disenfranchise hundreds of Native enrollees to Woody Island.  There is "a strong presumption of the correctness of the residency shown on the Roll." *Village of Council*, at p. 13.  By failing even to discuss hundreds of the 285 persons who enrolled to the Native Village of Woody Island, the RD does not present an adequate record by which this Board could conclude the protestant has overcome the presumption of the correctness of the roll.

Leisnoi contends that the RD is mistaken in recommending this Board find that Stratman raised a substantial doubt[118] as to the validity of the presumption of residency for all of the

_____

[118] It is not enough for Omar Stratman merely to raise a substantial doubt; rather, he must affirmatively prove his case by a preponderance of the evidence. Paragraph (e) of the burden of proof formula contained in the *Village of Manley Hot Springs* eligibility decision states

village enrollees.[119]  Moreover, the RD utterly fails to apply, or even to discuss, the ____ ate

presumption "that a person's statements on an official government form are true an_ ___ __ate

to the best of his knowledge and belief." *Manley Hot Springs*, at p. 19.  The enrollees ____ned

their enrollment forms under penalty of law attesting to the fact that Woody Island __ __ _heir

permanent residence as of April 1, 1970, as that term is defined in ANCSA ___ _ its

---

"After consideration of all the evidence produced by the appellant(s), the Board will ___ _ in favor of the Area Director's determination unless persuaded by a preponderance of the ___ __ _ce to the contrary." *Village of Manley Hot Springs*, at pp. 11-12. Thus, merely __ __ _ a substantial doubt about the validity of presumptions that persons who appear on the ___ of Alaska Natives are rebuttably presumed to be residents of the village named, does not ___ _ the ultimate burden of proof imposed upon a protestant. The Interior Board of Land Appe__ __ill find in favor of the Area Director's determination unless persuaded by a preponderance __ the evidence to the contrary." While raising a substantial doubt can affect the legal presumptions, the ultimate burden of proof is one of a preponderance of the evidence, and not merely __e of raising doubt about the eligibility of the Native Village. In other words, it is not eno__ _ for the RD to have recommended this Board find that Omar Stratman raised a doubt about whether the Native Village of Woody Island should have been certified. In order for the Protestant to prevail in this case, he must show by a preponderance of the evidence that the Native ___illage of Woody Island was improperly certified, a burden he has not carried, since the evidence shows that the Native Village of Woody Island was entitled to certification.

[119]Leisnoi filed a motion asserting that Stratman failed to carry his burden of proo_. See, Leisnoi's Opening Brief at p. 383. Leisnoi incorporates herein that motion, as well as all of the proposed findings of fact, conclusions of law, motions, and arguments set forth in its Opening Brief, Answering Brief, and Reply Brief. (The analysis of persons who were physically present in the village in 1970 is more thorough in this brief and therefore modifies the discussion in earlier briefs.) Leisnoi's opening brief was 386 pages long; its answering brief was 193 pages long, and its reply brief was 53 pages long. Obviously, this brief is much shorter. Leisnoi has endeavored herein to make this brief responsive to the R__, __t incorporates *in globo* its earlier briefs by reference. Leisnoi urges this Board to read all of the briefing that Leisnoi already submitted, and to study its exhibits and photographic evidence as well as the transcripts of the Natives' testimony. This brief has discussed and sorted some of the evidence and testimony, but a review of the raw transcripts, the photographic evidence, genealogy charts and the documentary evidence is essential to a complete understanding of how the Native Village of Woody Island qualifies for benefits under the Alaska Native Claims Settlement Act.