# EXHIBIT "14"

Although the RD espouses the view that closure of the school could not have caused the temporary abandonment of the Native Village of Woody Island since there were no Native Alaskans enrolled when the school closed, Recommended decision at p. 92, Karl Armstrong forcefully rebutted this contention and explained how there is a history of disrupting Native communities in Alaska by the government moving schools to other locations:

> "Any attempt to move there was pretty much prevented if you had children because there was no school... I think it inhibited it drastically.  There's a history to the closing and moving of schools for the Koniag people and probably for all the Alaskans, Alaska Natives, and that has to do with the BIA's policy of making the Natives move where they want them to by using the schools, movement of the schools.  You can -- in the history of the BIA, you'll find that the BIA decides where we're going to move -- we're going to close this school here and open one here and then, of course, they rely upon the people, their regard for their children is a very strong thing.  Inordinately, I would say... And it was an instrument used by the BIA to funnel people where they wanted them.
>
> ...
>
> [A]ny hope of trying to be at Woody Island on the part of those people with children would have been completely inhibited. They couldn't be because there was no school."

Depos. Tr. of Karl Armstrong at pp. 65, 77-79.

Karl Armstrong described how Senator Fred Zharoff had told him that he would move to Woody Island if the school opened there again.  Depos. Tr. of Karl Armstrong at pp. 80-81.

Senator Fred Zharoff testified about how the lack of a school and lack of reliable transportation between Woody Island and Kodiak prevented him from living on Woody Island:

> "[M]y wife and four children made the attempt to move over there.  And unfortunately, since my job as teaching, called for me to run back and forth on a daily basis, plus my children were in school.  That was another thing we were looking at, was creating, if we would have had enough children over there we

> could have create-opened up a school on the island... So, it just,
> it worked out there the way things were, without having the
> reliable transportation running back and forth, at that time we
> had decided there that what was best for the -- the family, and
> the safest for us, was to move back over to Kodiak."

Depos. Tr. of Senator Fred Zharoff at pp. 3092-3093.

Additional evidence about the impact of the closure of the Woody Island school was the

affidavit signed by Karl Armstrong, Marie Redick, Fred Zharoff, Bruce Robertson, Nicholas

Pavloff, John Maliknak, and others:

> "We, the undersigned permanent residents of the traditional Village of Woody
> Island, being individually first duly sworn on oath, depose and say that:
>
>> Our village was temporarily unoccupied in 1970 because of
>> circumstances and conditions caused by the closure of the Woody
>> Island public school by the Kodiak Island Borough."

BIA Exhibit 1A at p. 55.

Kelly Simeonoff, Jr. discussed how access to schooling in Kodiak was a factor that led

Woody Islanders to live in Kodiak: "All of my aunt's children. See, my aunt moved to Kodiak

for the same reasons we did, for, I think, as far as being able to go to school." Tr. at p. 2701.

"And in the late '60s and early '70s, most of the people had moved, moved to Kodiak for one

reason or another. What took them away was, was the lack of work, for the most part, or their

children needed to go to school." Tr. at p. 2746.    The necessity to provide schooling to

children not only caused Woody Islanders to leave the village, but also prevented them and new

families from moving back to the village. How could a Native family with young children even

consider moving to Woody Island when there was no high school, the grade school was closed

as of 1969, and the FAA was no longer willing to transport school children to Kodiak on the

-277-

*FedAir IV?* The act of local governmental authorities in closing the Woody Island school in conjunction with the act of the federal government in barring Native Woody Island school children from being transported on the *FedAir IV,* cumulatively contributed to the depopulation of the Native Village of Woody Island.

The Chairman of the Kodiak Island Borough, Wilton T. White, described how the closure of the school "made it virtually impossible for people with school age children to remain domiciled at Woody Island":

> "The last regular school classes were held in the Woody Island Public School was during 1969. The school was closed by the Kodiak Island Borough School District after the Federal Aviation Agency (FAA) announced it was moving its FAA facility personnel from Woody Island to the U.S. Naval Station, Kodiak, and closing the FAA housing project complex and reducing the frequency of FAA furnished ferryboat operations between Woody Island and Kodiak, the only scheduled, public transportation available for use to transport school students.
>     These acts of governmental authority, the closure of the school, transfer of FAA personnel, closure of the FAA housing complex and substantial reduction in ferryboat service, made it virtually impossible for people with school age children to remain domiciled at Woody Island."

July 26, 1973 Affidavit of Wilton T. White, Chairman, Kodiak Island Borough. (BIA 1-A at p.54).

### (iii) April 12, 1963 Removal of FAA Ferry Service and Subsequent Scale back in FAA Operations on Woody Island

The removal of the FAA ferry service and the scale back in FAA operations on Woody Island was another act of governmental authority that contributed to the temporary abandonment of the Native Village of Woody Island.

On April 12, 1963, Darrell Chaffin, the Station Manager of the FAA facility on Woody Island, announced that the use of the *FedAir IV* as a ferry to and from Kodiak would be

restricted to FAA employees, their families and the regular residents of Woody ..... his act of governmental authority impeded the ability of Native Woody Islanders to ..... dy Island and commute back and forth from Woody Island to Kodiak for school or empl ..... ent. (Doc 433 ["Woody Isle Ferry Now For FAA Only." <u>Kodiak Mirror.</u> 12 April 196.. .. [Tr. at pp. 2075-2076.])

The RD is mistaken at page 88 in stating that "the termination of the service ...curred after 1970." Stratman's own witness, Harold Naughton, testified that he believed the above-referenced <u>Kodiak</u> <u>Times</u> article dated April 12, 1963 entitled "Woody Isle Ferry Now ..or FAA Only", Doc 433, was the correct date that the *FedAir IV* service was restricted to FAA personnel only. (Tr. at p. 281.) He testified that prior to 1963, the Natives were able to commute from Kodiak Island to Woody Island on the *FedAir IV*, but that afterwards they were not allowed on the *FedAir IV* pursuant to the policy announced by the FAA. (Tr. at p. 282.) There were no high schools on Woody Island,[141] so if a Native family had high school aged children and continued to reside on Woody Island they would have had to have another means of transportation other than the *FedAir IV*. (Tr. at p. 282.)

Bill Torsen operated the *FedAir IV* from 1962 to 1966. Tr. at p. 2062. He confirmed that the April 12, 1963 newspaper article stating "The privilege of using the *FedAir IV*, the Government-operated ferry boat to Woody Island, has been restricted to employees of the FAA and their families and invited guests" was, in fact, the FAA policy that was adopted in 1963.

---

[141] "Q.    And in order to go to ninth grade and above you had to go to Kodiak?
A.    That's right."
Testimony of Patricia Hampton, Tr. at p. 231.

Tr. at p. 2075.  From that point forward, Native Woody Islanders could not ride the vessel, because unless he was directed by the station manager, "**I wouldn't take them**." Tr. at 2076. The RD mistaken in its recommendation that "after the announcement, the ferry was still officially available to non-FAA regular residents of Woody Island and available in practice to other non-FAA Natives." Recommended decision at p. 87.

William Cordry began operating the *FedAir IV* in 1969.  He enforced the rule that only FAA personnel were allowed on the vessel: "And at one instance I had to run Rudy off the boat, Rudy Sundberg... I warned him, you know.  He boarded the boat without permission." Tr. at pp. 426-27.

Another of Stratman's witnesses corroborated the restrictions the FAA had placed against transporting Native Woody Islanders: "You had to get permission from the boat operator to even ride the *FedAir IV*... **It was not open to the public**, the best I can recall. Q. Oh, I see.  So therefore you didn't there wouldn't have been any native children on it because so far as you were concerned they wouldn't have gotten permission? A. Right." Testimony of former FAA electronic technician Jim Payne at pp. 660-61.

The *FedAir IV* had been an important transportation link for Native Woody Islanders; it carried a large number of passengers and provided freight transportation service as well. On January 18, 1963, the <u>Kodiak Mirror</u> reported that the *FedAir IV* ran between Woody Island and Kodiak 2000 times each year and carried between 8000 and 9000 passengers in addition to freight. (Doc 434 ["Woody Island Ferry." <u>Kodiak Mirror.</u> 18 January 1963: 7.]) The loss of this means of transportation had deleterious consequences to the Native Woody Islanders.

Even Stratman's witness, John Murray, conceded that the *FedAir IV* "was the main transportation over to Woody and back... [T]he FAA station did permit people living there... to ride the *FedAir IV* back and forth, **and then they decided because the insurance problems, or whatever, that nobody else could ride.**" Deposition of John Murray at p.23.

The RD is mistaken in its legal theory that "any restriction on use of the ferry service is simply not an act of governmental authority within the meaning of the regulations." Recommended decision at p. 88. The Federal Aviation Administration is a part of the government of the United States of America. Its decision to exclude Native Woody Islanders from access to its ferry boat was an "act of governmental authority", that wreaked havoc on the ability of the Native Woody Islanders to participate in the modern economy by commuting from Woody Island to Kodiak.

The rationale for the conclusion in the RD is also flawed: "[M]any years prior to 1970, nearly all of the potential permanent residents of Woody Island had joined the modern cash economy...The alleged Village was a village long before the CAA/FAA began the ferry service in the late 1940's. Throughout its history the island has remained accessible and has been accessed by skiff or dory by many people, at least during good weather." Recommended decision at p. 88. In other words, the reasoning in the RD is that if Natives could get to Woody Island in dories 200 years ago, they should be expected to go without ferry service in 1970. This reasoning overlooks the admonition by the Alaska Native Claims Appeal Board that "The Natives' cultural patterns and life style which is referred to in the regulation in 43 CFR 2651.2(b)(2) cannot be understood as referring to the primitive existence before the intrusion

-281-

of the 'White man' and the adoption of many of the modern conveniences.'" *Manley Hot Springs*, VE #74-6 at pp 29.[142]

The reasoning the RD erroneously suggests this Board adopt also overlooks the difficulty the Woody Islanders would have in participating in educational and employment opportunities available on Kodiak, and meeting modern scheduling requirements, if forced to use 18th century means of transportation:

> "[I]n its earlier days, before the advent of, of larger vessels and, motorized vessels, Woody Island was very accessible by the old skin boat and small dories. And you could pull them up on the, the beach and get them away from the storm. But Woody Island has no wharf. There's no protected harbor. There's no place where you can pull in from the ocean and tie up your boat, or anchor your boat where it's not susceptible to storm... [A]nybody who's lived on Woody Island has lost at least one boat to these northeasters that come through.
>
> So, the issue of transition becomes a huge issue as we enter into the modern era where we're not using very small boats. And when we're talking about adjusting to a regimented society of being in school at 8:30 every morning and leaving at 2:30 every day, you have to have something like the *FedAir IV* to make that reliable or, or even feasible.
>
> There's no way you can rely on a skiff that's light enough to drag up on a beach to get your children safe to and from school every day when there's no school on the island. So, I have to say there it's a huge impact... [T]he *FedAir IV* was the reliable form of transportation that evolved to get to and from Woody Island... And the people of Woody Island, as well as the FAA folks of Woody Island, relied on the *FedAir IV* as their primary means of transportation, if you will, for the most part.

---

[142]"[T]he concept of 'the Natives' own cultural patterns and lifestyle' referenced in 43 CFR 2651.2(d) is undefined and subject to interpretation. Because it relates to occupancy occurring on April 1, 1970, the Board concludes that this standard cannot be interpreted to contemplate exclusively the cultural patterns of Alaska Natives existing before contact with Caucasians. Such an interpretation could possibly exclude from benefits every village listed in the act, for the patterns of life in all such villages have been modified by the influence of non-Native culture." *Eyak*, VE #74-75 at p. 32

> When that service ceased, there was nothing to replace it, at least in
> safe manner. And yes, you could take a skiff to Woody Island. Certainly you
> can. But if a storm comes up, you risk losing a skiff and everything that's in it,
> including yourself, to be realistic."

Testimony of Frank Feichtinger, Tr. at pp. 1378-80.

Likewise, Kelly Simeonoff, Jr. stated under oath that "[W]ithout reliable transportation

it was impossible for persons to live on Woody Island and work on Kodiak." Affidavit of Kelly

Simeonoff, Jr., Doc. 346 at p. 5.

Stratman's witness, Zelma Stone, was asked "What knowledge, if any, do you have

about the *FedAir IV* restricting use to FAA personnel only?", to which she responded "I know

that's true." Tr. at p. 616.

Karl Armstrong testified that by 1970 the FAA had significantly reduced the number

of employees who were permanently located on Woody Island. Depos. Tr. of Karl Armstrong

at p. 161.[143] The bulk of the FAA operations were moved from Woody Island in the 1960's,

according to former FAA employee William Cordry. Tr. at p. 449.[144] The inability of the

Alaska Natives to commute back and forth to Kodiak on the *Fed-Air IV* and the loss of the FAA

---

[143]Generators on Woody Island used to furnish electrical power to the FAA equipment that
assisted aircraft in landing required a great deal of maintenance by FAA employees. In the
1960's, however, the Kodiak Electric Association put underwater wiring out to the FAA
facility. Tr. at 449. Generators that used to be "on line to furnish all the power", and were
labor intensive in terms of maintenance, now were used merely for stand-by in case the Kodiak
Electric Association power grid failed. Tr. at 449.

[144] Stratman's witness, William Cordry, who operated the *FedAir IV* starting in May of
1969, Tr. at p. 405, was asked "But the bulk of the FAA operations were moved from Woody
to Kodiak in the 1960's; is that correct?" to which he responded "Yeah." Tr. at pp. 449-50.

-283-

job opportunities on Woody Island adversely affected the ability of the Natives to live on

Woody Island:

> "Q.   All right.  So, I'm still not following one of your
>        answers where you suggested that your fam - ,
>        one of the reasons your family moved off the
>        island was so you could go to school.  Sounds
>        like you could go to school anyway.
>
> A.    Not really.  The weather oftentimes was very
>        rough and we couldn't make it.  But my dad also
>        needed to work.
>
> Q.    All right.  And, and work, if I am following you,
>        played a huge role in people's ultimate decision to
>        stay on or leave Woody Island?
>
> A.    Yeah, I believe that's fairly true."

Tr. of Kelly Simeonoff, Jr. at pp. 2750-2751.

The RD is mistaken at page 88 in stating that "There simply was no testimony or

statements from the Natives that the alteration, if any, in the availability of the ferry service

caused them to leave or discouraged them from returning to the alleged village."  Paul R.

Harmon gave sworn testimony about how the closing of the FAA site and the restrictions

against transporting Natives on the *FedAir IV* prevented him from returning to live permanently

on Woody Island:

> "I wanted to stay and live on Woody Island but with the
> destruction of the running water system resulting from the
> earthquake and then with the closing of the FAA site with its
> related ferry service, it was just not possible to live there and
> make a living or raise children because the school was closed as
> well."

Affidavit of Paul R. Harmon, L-Doc 125 at p. 3.

Maurice Harmon also provided sworn testimony about the negative impact of the Acts of God and governmental authority:

> "To this day I have wanted to move back to Woody Island on a permanent basis. It is where my roots and heritage are. I frequently talk with my brothers, Mitch, Paul and Jimmy, about moving back there to live. I would like to once again live the lifestyle I enjoyed as a resident there. I have not returned largely because of the changes that took place as a result of the earthquake and the closing of the FAA site that I've previously mentioned."

Affidavit of Maurice W. Harmon, L-Doc 124 at p. 5.[145]

Lifetime Woody Island resident Johnny Maliknak summarized the terrible impact the restriction of *FedAir IV* to FAA personnel only had upon the Native Woody Islanders:

> "For many years the most reliable transportation to and from Woody Island was the FAA ferry. When the ferry service ceased at the time the FAA Station on Woody Island closed persons who had depended on it for reliable transportation to Kodiak for work or school no longer had reliable transportation… The result was that persons who had, at one time or another, resided on Woody Island that may have wanted to move back to re-establish their homes no longer could depend on transportation to and from Kodiak for work and school."

Affidavit of Johnny Maliknak, L-Doc 176 at p.5.

---

[145]The Rd concedes that "[I]t is reasonable to infer from the statements of at least some of them that re-initiation of a ferry service to provide access to employment in Kodiak might cause them to move back to Woody Island." RD at p.88. This Board should therefore conclude that the government's removal of the only reliable transportation Woody Islanders had to the jobs and educational opportunities in Kodiak was an act of governmental authority within the meaning of 43 CFR section 2651.2(b)(2).

(iv)   **Implementation of Borough Property Taxation on the Native Woody Islanders in the mid-1960's.**

The Kodiak Island Borough was formed after the earthquake and began imposing real property taxation on both Kodiak and Woody Island properties. When taxes could not be paid by the Native Woody Islanders, the borough foreclosed on Woody Island properties that had been in Native hands for many years. For example, L-Chart 27 displays how the Kodiak Island Borough now owns the green colored property in the North Village area, upon which the Sundberg, Pavloff, Nekeferoff, Tunohun, and Maliknak homes had been situated. Moreover, taxes owed on the Fadaoff house was a contributing factor that led the Fadaoff boys to sell the property to Roy Madsen: "[T]he Borough had been assessing the, the building for personal property taxes… and … the Borough had foreclosed on it…. I checked with the Borough, and so then I contacted the two boys, who were adults by that time, and asked them if they would be interested in, in selling the thing to me and I'd, I'd pay back taxes…" Testimony of Roy Madsen, Tr. at p. 2883.[146]

Imposition of Borough property taxes, and the resultant foreclosure when the Natives could not pay the taxes, has negatively impacted the ability of the Native Woody Islanders to

_____

[146]The RD tried to minimize the significance of the borough taxation by stating that "The unpaid taxes on the Fadaoff/Madsen house amounted to only $365.00 by the early 1970's." Recommended decision at p. 90. Although this may not seem like a large sum of money to Caucasians living in the modern world who have money market accounts, investments, and salaries, the Native Woody Islanders had been unable to pay it; Judge Madsen noted that "the Borough had foreclosed on it.." Tr. at p. 2884. The imposition of real property taxation in the 1960s is a prime example of the modern world forcing itself upon the traditional Native lifestyle, and shows the dire consequences that result. Natives who subsisted year to year could not pay taxes, so property that had been used and occupied by Natives for many years became subjected to foreclosure by the borough.

live in their ancestral lands. This action of the Kodiak Island Borough qualifies          f

governmental authority occurring within the 10 years predating April 1, 1970 that          at

temporary abandonment of the Native Village of Woody Island.

The RD mistakenly found that "The context of [Esther DeNato's] testimony         sts

that [the taxation and foreclosure] occurred in the late-1970's." RD at page 91.         a

review of her testimony shows that Ms. DeNato was simply confused about when the b    igh

began to tax the Native Woody Islanders:

> "Q.    How, how is it that the Borough owns this place right now? ...
> A.    Well, I think after the tidal wave the, the the Urban Renewal come in and they
>       set up their thing here, you know, and the Borough accessed these lands
>       somehow. My uncle had mentioned something about owing Borough taxes on
>       it.
> A.    All right. So, after the tidal wave this, or sometime in the '60s, to your
>       recollection, these properties began to be taxed?
> A.    Yes.
> Q.    Okay.
> A.    In the '70s I believe; the latter 70s.
> Q.    And is, is it your understanding that because of failure to pay taxes on the
>       property the property was ultimately reacquired by the Borough?
> A.    I believe so, yes."

Testimony of Esther DeNato, Tr. at p. 2855.

The ALJ found that "The Borough was created shortly after the 1964 earthquake,

probably in the fall of 1965. (Tr. 2920; Ex. S-61, p. 17).", so Esther DeNato's confusion about

when the taxation began should not bar application of this act of governmental authority that

the ALJ found began in the 1960s.[147]

---

[147]Kelly Simeonoff, Jr. testified that "the Borough began, began to tax the property I believe
in the late, mid-to late '60s" and that this continued in "the '70s." Tr. at p. 2573. Cy Hoen,
who was married to Tina Hoen during the 1960s, testified that when he " was married to     na
we maintained the taxes [on the Simeonoff property on Woody Island]." Tr. at p. 2137  ' na

In the late 1960s, it was no longer possible for Native Woody Islanders to simply live off the land. At the end of the year, the tax man cometh, and if a Native had not built up cash reserves, his home would be taken from him. The creeping hand of the borough has taken much Native land on Woody Island. A Native Woody Islander in the 1960's would have to get a job to earn money to pay taxes. Of course, to get a job requires commuting to Kodiak, and the federal government's termination of the only reliable means of transportation between Woody Island and Kodiak, the *FedAir IV*, made such a commute treacherous. The acts of the local governmental authorities in conjunction with the acts of the federal government, together, contributed to the temporary abandonment of the Native Village of Woody Island.

### (v) The Vietnam War

The Vietnam War also impacted the ability of the Native Woody Islanders to live on Woody Island. A number of young Native men from Woody Island fought in the Vietnam War rather than raising families on Woody Island. Two of the young men ultimately lost their lives in the service of their country, Freddie Simeonoff, Jr. and Danny Harmon. The Vietnam War, which took these boys off the island, and cost them their lives, was an act of governmental

---

Hoen was asked "During the 1960s, first of all, who was paying taxes on that property?" to which she responded "My brother paid taxes for a while, and then he let them lapse. I paid taxes for a while until, again, my marriage started coming apart..." Tr. at p. 2964. Thus, the evidence shows that the taxation of Native property on Woody Island began in the mid-1960s.

authority that occurred within the 10 years predating April 1, 1970 that caused the temporary[148] abandonment of the Native Village of Woody Island.

The RD inadvertently punishes the Natives for their patriotism.  Of the three Native Woody Islanders who served in the Vietnam War, Herman Sundberg, Danny Harmon, and Freddy Simeonoff, two lost their lives.   The war was an act of governmental authority that contributed to depopulation of the small island.  Yet, the RD states at page 91 that "If there was evidence that they were drafted, as opposed to having enlisted, there might be a legitimate argument that the war was an act of governmental authority within the meaning of the regulation.  There is no such evidence." Recommended decision at p. 91.  In other words, if Danny and Freddy had waited to be drafted, and then were killed in action, the village could point to the Vietnam War as an act of governmental authority, but  the RD erroneously recommends the Board declare that since they enlisted to serve their country, their death in combat was not due to an act of governmental authority.  The flawed interpretation in the RD has the untoward effect of punishing the entire village for the patriotism of the Natives who enlisted and gave their lives in the service of their country.

## V.  CONCLUSION

There were more than 25 permanent residents of the Native Village of Woody Island as of April 1, 1970.  The Protestant failed to introduce any evidence whatsoever as to the bulk

---

[148]The abandonment was temporary, not permanent.  Although on December 12, 1979, a fire, fueled by winds gusting up to 70 miles per hour, destroyed the renovated FAA housing project on Woody Island, Doc 134 [Kodiak Daily Mirror article dated December 13, 1979] and Doc 419 [Affidavit of Michael Waller], the fact remains that in the 1970's the Natives had, in fact, returned to the Woody Island, Tr. at pp. 1471, 3080, 3152-53, 3162,  such that the abandonment in the ten years predating April 1, 1970 was only "temporary."

of the 285 persons enrolled to the Native Village of Woody Island,[149] and the RD also fails to analyze, discuss, or even to mention by name most of the enrollees of the Native Village of Woody Island. Many of the only 94 persons selectively discussed in the RD were already dead in 1970, are not enrolled to Woody Island, or are not even claimed to have been in the village in 1970.

At least 13 persons who were enrolled to the Native Village of Woody Island used the village during 1970 as a place where they actually lived for a period of time. Although an exhaustive list cannot meaningfully be compiled more than 25 years after the fact, Leisnoi has shown herein that there were at least 45 Alaska Natives who were enrolled to the Native Village who lived for a period of time on Woody Island in 1970.

The Native Village of Woody Island had an identifiable physical location as of April 1, 1970. The location of the village was discussed by numerous witnesses, and archaeological evidence establishing the situs of the village was presented by Chris Wooley.

Occupancy of the Native Village of Woody Island was consistent with the Natives' own cultural patterns and lifestyle. The Woody Islanders continued to engage in traditional Native activities in the village in 1970.

Its residents engaged in traditional Native activities such as hunting seals and rabbits, fishing, gathering berries, mollusks and octopus, eating various plants that white people would find distasteful, and living off the land. The Native Village of Woody Island was a traditional

---

[149]Most of Stratman's witnesses were unable even to comment upon the subjective intent of the Native Woody Islanders to return to Woody Island. See, for example, Testimony of Gary Ennen, Tr. at p. 2107; Testimony of Bill Cordry, Tr. at p. 442; Testimony of James Payne, Tr. at pp. 676-677.

village rather than a modern and urban center. Although Leisnoi, Inc. qualifies for ... under ANCSA itself, it is also entitled to certification on the alternative theory that ... was temporarily abandoned by reason of Acts of God and governmental authority that ... within the preceding 10 years. See, 43 CFR section 2651.2(b)(2).

The Protestant has failed to carry the burden of proof. He has not disproved ... Island's eligibility by a preponderance of the evidence.

The Village of Woody Island is not some small fishing hole or a place where some one merely rested on a trail. The Native Village of Woody Island is one of the most his ... well-documented Villages in the state of Alaska. It is a traditional village. A substantial body of evidence pertaining to the fascinating history of this traditional village was introduced at the hearings.

Protestant Omar Stratman lacks standing to pursue this challenge, and is barred from doing so by virtue of the doctrines of administrative finality, collateral estoppel, and *stare decisis*. The Protestant failed to file a timely administrative challenge, and when he finally sought and obtained administrative hearings, more than twenty years after the certification, he failed to carry his heavy burden of proof, and failed to overcome the presumption of accuracy of the Native Roll introduced into evidence by the Government. He also failed to overcome the presumption of accuracy of sworn enrollment forms individually submitted to the government by the enrollees to the Native Village of Woody Island.

The Native Village of Woody Island met the statutory requirements of village eligibility for benefits under the Alaska Native Claims Settlement Act. Alternatively, it was excused from

-291-

meeting the statutory requirements by virtue of the act of God proviso of 43 CFR §2651.2(b)(2).

In addition to the ten volumes of testimony, and the hundreds of photographs introduced at the hearings, there is ample archaeological and other physical evidence of Native habitation and use of Woody Island from pre-European times into the ANCSA era. In the face of the extraordinary cultural changes engendered by Russian conquest, and throughout the accelerating pace of 20th century cultural change, Native people have called Woody Island home. They maintained homes, gardens and banyas on Woody Island even as they embraced seasonal opportunities elsewhere such as commercial fishing, teaching and wage work in Kodiak and other towns. People often came back seasonally to live, to tend gardens, gather berries, or to visit - practices which continue to this day.

Woody Island has been the site of good times and bad; family reunions and family tragedies; house fires, drownings and natural disasters; marriages, births and deaths; World War II disruption and patriotic military service by Woody Islanders from World War I through Vietnam. The Leisnoi shareholders persist in their attachment to Woody Island and consider it home.

Woody Island is a microcosm of local Native history. Every major cultural change which occurred in the Kodiak region affected the Woody Island people. Somehow, they adapted and retain a sense of belonging to their island. Seen through the lens of history, anthropology, and the legal statutes most pertinent to the Woody Islanders, namely the Alaska Native Claims Settlement Act, the Alaska National Interest Lands Conservation Act, the Indian Self-Determination Act, and the Federally Recognized Indian Tribe List Act, Leisnoi's

legitimacy is clear.  The human history of the Woody Islanders is a remarkable story of endurance and adjustment.  The presence of such history on such a small parcel of land represents a unique cultural treasure.  That an argument against eligibility could persist in the face of the intensive Native use and occupancy of Woody Island is ironic, indeed.

The time has come for this Board to put an end to the unfounded challenge to the certification of the Native Village of Woody Island.  Leisnoi, Inc. has proven as false the allegation of the Protestant that Woody Island was some sort of a "phantom village."  The genealogical, anthropological, historical, archaeological, testimonial, photographic, and documentary evidence introduced by Leisnoi shows that Woody Island is a traditional native village that meets the eligibility requirements of ANCSA.  In the event this Board is of the view that not enough testimony was introduced during the brief two-week hearings in this case for it to make an informed determination in this matter, then it should grant the request Leisnoi made to the ALJ for an opportunity to call more witnesses to the stand.  The Board should also instruct the BIA to add to the list of enrollees those persons who timely submitted enrollment forms, are listed in the Family List, and have sufficient Native blood quantum, but were mistakenly not included in the enrollment list.

Woody Island, and its Native Village Corporation, Leisnoi, Inc., have displayed a tradition of endurance.  The village successfully met the initial BIA eligibility review.  It then successfully defended an eligibility challenge brought by Stratman's predecessors in interest, Phillip Holdsworth, the Sierra Club, and the Alaska Wildlife Federation and Sportsman's Council.  Next, Leisnoi successfully defended the land entitlement challenge brought by Omar Stratman.  Issues already decided in Leisnoi's favor years ago should not be relitigated herein.

-293-

ANCSA is supposed to have been implemented "rapidly, with certainty, in con[...] real economic and social needs of Natives, without litigation..." 43 U.S.C. [...] relitigation of settled issues at this late date would run contrary to stated Con[...] purposes in having adopted ANCSA.

Leisnoi was recognized as having a "right to conveyance" when Congress [...] Alaska National Interest Lands Conservation Act into law. Next, the BIA include[...] Island on its approved list of tribal entities and Alaska Native Villages recognized [...] Bureau of Indian Affairs as having a government-to-government relationship with [...] States. After reviewing all of the evidence and considering all of the testimony offer[...] hearings in this case in August of 1998, the Bureau of Indian Affairs joined in [...]'s Opening Brief that urged recertification of the Native Village of Woody Island.

The final chapter resolving Stratman's challenge that has festered for deca[...] in violation of the stated ANCSA policy that the Act be implemented "rapidly, with cert[...]... without litigation" should be the recertification of the Native Village of Woody Island.

WHEREFORE, for the reasons stated herein this Board should REJECT THE FLAWED DECERTIFICATION RECOMMENDATION. The challenge brought by Omar Stratman through his contingency fee lawyer should be DISMISSED. The September 24, 1974 Certificate of Eligibility of the Unlisted Village of Woody Island, BIA-6, should be CONFIRMED by this Board.

-294-

DATED this 31st day of January, 2000.

Respectfully submitted,

*John R. Fitzgerald*

JOHN R. FITZGERALD
McALPINE, PEULER & COZAD
701 S. Peters Street, Suite 300
New Orleans, LA 70130
Phone: (504) 561-0323; Fax: 528-9442
Attorneys for Leisnoi, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 31st day of January, 2000 I did cause to be mailed by certified mail,

postage pre-paid, RESPONDENT, LEISNOI, INC.'S, OBJECTIONS TO ALJ SWEITZER'S

RECOMMENDED DECISION to:

> Honorable James R. Mothershead
> Assistant Regional Solicitor
> Office of the Regional Solicitor - Alaska Region
> United States Department of the Interior
> 4230 University Drive, Suite 300
> Anchorage, Alaska  99508-4626

> Michael J. Schneider, Esquire
> 880 N Street, Suite 202
> Anchorage, Alaska  99501

> R. Collin Middleton, Esquire
> Middleton & Timme
> 421 West 1st Avenue, Suite 250
> Anchorage, Alaska  99501

*John R. Fitzgerald*

JOHN R. FITZGERALD

-296-