R. Collin Middleton, Esq.
Law Offices of R. Collin Middleton, P.C.
P.O. Box 113128
Anchorage, Alaska  99511
Ph:  907-222-0506
Fax:  907-279-7029
Email:  collinmiddleton@gci.net

Counsel for Defendant, Koniag, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| OMAR STRATMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. A02-0290 CV (JKS) |
| | ) | |
| LEISNOI, INC., KONIAG, INC., and | ) | |
| GALE A. NORTON, Secretary of the | ) | |
| Interior, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## REPLY TO OPPOSITION TO MOTION TO DISMISS FOR MOOTNESS UNDER ANILCA, SECTION 1427 AND THE SECRETARY OF INTERIOR'S DECISION

Stratman argues that Secretary Kempthorne's decision interpreting section 1427 of ANILCA was erroneous because the Secretary did not apply the correct rules of construction.  There are special rules, he argues, for implied repeals, and section 1427 should be analyzed as an implied repeal.  But section 1427 did not repeal ANCSA, it merely confirmed that Leisnoi had met ANCSA's requirements.  Furthermore, applying the rules of construction for implied repeals leads to the same ultimate conclusion.

Stratman also argues that some of the legislative history which Koniag offered in support of its arguments, such as news articles and letters, is not the sort of legislative history on which this court may rely. Koniag acknowledges, as discussed below, that in recent years, the courts have more narrowly defined what types of documents constitute "legislative history." But in addition to those documents which Stratman finds objectionable, there is much legislative history which supports Koniag's interpretation. More importantly, even in the absence of any legislative history, Congress' intent is clear when the statutory scheme is considered in its entirety. As the Secretary concluded, "[w]hen read as a whole, it is clear that section 1427 was intended to settle with finality and 'as soon as practicable' the land entitlements of Koniag Regional Corporation and its villages" and "[c]ertainty about the status of Leisnoi was a necessary predicate to achieving that finality."[1]

A.    The Canons of Construction for Implied Repeals Do Not Apply.

Stratman argues that Secretary Kempthorne applied the wrong rules of construction in his decision. He should have applied, Stratman contends, the rules of construction for implied repeals. "The issue here," he argues, "is whether Section 1427 modified or repealed Section 11(b)(3) [of ANCSA] as to exempt Leisnoi from having to satisfy its requirements."[2] Because implied repeals are disfavored and may be found only if the two statutes are in irreconcilable conflict, he contends that section 1427 did not "exempt" Leisnoi from the requirements of ANCSA.[3]

To support his argument, Stratman draws a distinction between "unauthorized" acts and "erroneous" acts.[4] Only "unauthorized" acts may be ratified, he argues, and the Secretary's certification of Leisnoi was "erroneous," not "unauthorized."[5] Thus, he seeks

---

[1] Docket 96-3, at 10.
[2] Docket 171, at 16.
[3] Docket 171, at 18-20.
[4] Docket 171, at 14.
[5] Id.

to distinguish those cases which Koniag and the other defendants cited in support of their argument that Congress ratified Leisnoi's eligibility to receive lands under ANCSA.

Stratman's arguments fail because section 1427 of ANILCA did not exempt Leisnoi from the eligibility requirements of ANCSA. It merely confirmed that Leisnoi had met those requirements. Furthermore, the distinction between "unauthorized" and "erroneous" acts is not meaningful because Congress can and has ratified both. And in any case, Leisnoi's certification raises the issue of an unauthorized act. The question is whether the Secretary had the authority to convey lands to Leisnoi under ANCSA.

1.    The Issue Is Whether the Secretary Had Authority to
       Convey Lands to Leisnoi under ANCSA.

Stratman urges the court to find a distinction between "erroneous" agency actions and "unauthorized" agency actions. He argues that while unauthorized acts can be ratified, erroneous acts cannot.[6] United States v. Creek Nation,[7] shows, to the contrary, that Congress can ratify either type of act. In that case, the court held that Congress had ratified an "erroneous" disposal of Creek Nation lands.[8]

But the issue, in any event, is whether the Secretary had the authority to convey lands to Leisnoi under ANCSA. As Stratman acknowledges, "ANCSA was itself an exercise of Congress' power to dispose of public lands, and the village eligibility requirements provided in Section 11(b)(3) were an express condition imposed by Congress to the entitlement and conveyance of those lands."[9] If Leisnoi met the eligibility criteria of ANCSA, then the Secretary had authority to convey lands to it; if Leisnoi did not meet the criteria, the Secretary did not have authority under ANCSA to

---

[6] Docket 171, at 13-14.
[7] 295 U.S. 103 (1935).
[8] Id. at 110-11. See also The Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana v. United States, 401 F.2d 785, 788-89 (Ct. Cl. 1969) (ratifying "erroneous" decision to include lands in national parks).
[9] Docket 171, at 14-15.

convey lands to it. Thus, section 1427 was, in every meaningful sense, a ratification of the Secretary's authority to convey lands to Leisnoi.

This is similar to United States v. Alaska.[10] That case involved a dispute between the federal government and the state of Alaska over ownership of submerged lands located within the National Petroleum Reserve.[11] The Pickett Act gave the President authority to withdraw public lands from "settlement, location, sale or entry," and reserve the lands for public purposes.[12] Pursuant to this act, in 1923, President Harding created the National Petroleum Reserve by Executive Order.[13] The federal government argued that this Executive Order reserved all submerged lands within the boundaries of the Reserve for the federal government.[14] Alaska argued that the Pickett Act did not give the President the authority to do this.[15]

The court held that even if the President did not have authority under the Pickett Act, Congress ratified the terms of the 1923 Executive Order in the Alaska Statehood Act.[16] Section 11(b) of the Statehood Act provided that the United States had "power of exclusive legislation . . . over such tracts or parcels of land as, immediately prior to the admission of said State, are owned by the United States and held for military . . . purposes, including naval petroleum reserve numbered 4 [the National Petroleum Reserve]."[17] Although section 11(b) did not specifically mention submerged lands, the court concluded that this provision "reflect[ed] a clear congressional statement that the United States owned and would continue to own submerged lands included within the Reserve."[18] The court reasoned that the purpose of the Reserve was to "preserve the

---

[10] 521 U.S. 1 (1997).
[11] Id. at 32.
[12] Id. at 43.
[13] Id. at 36.
[14] Id. at 33.
[15] Id. at 43.
[16] Id.
[17] Id. at 41.
[18] Id. at 42.

Reply to Opposition to Motion to Dismiss For Mootness Under ANILCA                4
A02-0290 CV (JKS)

Government's ability to extract petroleum resources."[19]  Ownership of the submerged lands was "necessary to prevent the Reserve's petroleum resources from being drained from beneath submerged lands."[20]  Furthermore, the court reasoned, Section 11(b) on its face stated that the United States "owned" the Reserve.[21]  Thus, the court held that "Congress ratified the inclusion of submerged lands within the Reserve, whether or not it had intended the President's reservation authority under the Pickett Act to extend to such lands."[22]

Congress similarly ratified the Secretary's authority to convey lands to Leisnoi. As discussed in Koniag's opening brief and as discussed further below, section 1427, on its face, treated Leisnoi as an eligible village corporation.   Moreover, as Secretary Kempthorne concluded, the purpose of section 1427 was to "settle with finality and 'as soon as practicable' the land entitlements of Koniag Regional Corporation and its villages."[23]  "Certainty about the status of Leisnoi was a necessary predicate to achieving that finality."[24]  Section 1427 thus reflects a clear congressional statement that the Secretary had authority to convey lands to Leisnoi under ANCSA.  It accordingly ratified Leisnoi's status as an eligible village corporation.

> 2.    The Issue Is Whether Section 1427 Confirmed the Secretary's Decision Approving Leisnoi, not Whether It Created an Exemption for Leisnoi from the Requirements of ANCSA.

Stratman argues that the issue is not whether Congress ratified Leisnoi, but whether it granted Leisnoi an exemption from the requirements of ANCSA.[25]  Stratman made the same argument to the IBLA.[26]  Koniag responded.[27]  Secretary Kempthorne

---

[19] Id. at 42.
[20] Id.
[21] Id.
[22] Id. at 45.
[23] Docket 96-3, at 10.
[24] Id.
[25] Docket 171, at 16.
[26] Docket 171-6, at 5.

considered the parties' briefs to the IBLA and ultimately concluded that "the argument is not that Congress exempted Leisnoi from the eligibility requirements, but, rather, that it accepted the Secretary's determination that those requirements had been met."[28]

Stratman cites <u>Friends of the Earth, Inc. v. Weinberger</u>[29] in support of his argument, but that case actually illustrates this distinction.  The plaintiffs in that case brought suit alleging that a presidential proposal for a missile system violated NEPA because it did not include an environmental impact statement (EIS).[30]  The President had submitted a proposal to Congress in December 1982 without a formal EIS.[31]  Congress rejected the President's proposal, but established procedures for the President to submit a new proposal.[32]  Of particular significance, the legislation provided that the new proposal would not be subject to NEPA and did not need to include an EIS.[33]  The plaintiffs argued that while this created an exemption from NEPA for the President's new proposal, it did not excuse the President's failure to complete an EIS for his earlier proposal.[34]  "Given the general presumption against repeal by implication" and "noting the widely accepted policy favoring broad enforcement of NEPA's provisions, the plaintiffs argue[d] that the amendment should not be interpreted as an immunization or erasure of prior NEPA violations."[35]

The court observed that "NEPA's 'deliberate command' that federal agencies comply with the Act's requirements . . . assures that courts will not regard congressional

---

[27] Docket 175-3, at 6-7; Docket 175-4, at 1-7.  In his Opposition (Docket 171, at 10-11), Stratman has incorporated and relied on the earlier briefing to the IBLA, and Koniag does the same.
[28] Docket 96-3, at 11 n.7.
[29] 562 F.Supp. 265 (D.C.D.C. 1983).
[30] <u>Id</u>. at 266.
[31] <u>Id</u>. at 268.
[32] <u>Id</u>. at 269.
[33] <u>Id</u>.
[34] <u>Id</u>. at 270.
[35] <u>Id</u>.

action as exemptive without strong supporting evidence."[36]  Further, the court stated,

"[g]iven Congress' clearly expressed desire to ensure that all government actions are

taken in accordance with NEPA, . . . repeal by implication should be found only in the

rarest of circumstances."[37]  Thus, the court concluded, "[a]bsent very strong evidence in

the legislative history demonstrating a congressional desire to repeal NEPA, or a direct

contradiction between that Act and the new legislation, claims under NEPA should be

reviewed."[38]

     In contrast to NEPA's "deliberate command" that federal agencies comply,

ANCSA contains a declaration that "the settlement should be accomplished rapidly, with

certainty, in conformity with the real economic and social needs of Natives, without

litigation, [and] with maximum participation by Natives in decisions affecting their rights

and property."[39]  Congress thus expressed its desire that the requirements of ANCSA not

be applied strictly, but rather in a manner which accomplishes its fundamental purposes.

Since the passage of ANCSA, Congress has allowed numerous exceptions to the strict

requirements of ANCSA.  In section 1432(a) of ANILCA, Congress granted Salamatoff

Native Association, which the Secretary had previously determined to be ineligible, an

exemption from the eligibility requirements of ANCSA.[40]  Congress has granted Cook

Inlet regional and village corporations additional time to select land, despite ANCSA's

explicit statutory deadlines.[41]  It has granted Ahtna shareholders additional time to

request conveyances as primary places of residence under ANCSA.[42]  It authorized a land

exchange with Kootznoowoo Village Corporation to resolve pending litigation.[43]  And,

---

[36] Id. at 271-72.
[37] Id. at 272.
[38] Id.
[39] 43 U.S.C. § 1601(b).
[40] ANILCA § 1432(a).
[41] P.L. 94-204, § 12(h), 89 Stat. 1145, 1154 (1976); P.L. 96-311, 94 Stat. 947 (1980).
[42] P.L. 102-415, 106 Stat. 2112, 2125-26 (1992).
[43] P.L. 101-378, 104 Stat. 468 (1990).

of course, it granted exemptions to the seven uncertified villages in the Koniag region.[44]
Thus, applying a presumption against the finding of implied exemptions would not
further Congress' "clearly expressed desire" in the context of ANCSA.

Moreover, unlike Friends of the Earth, the instant case does not concern an
"exemption."  The issue in Friends of the Earth was whether the new legislation had
changed the law so that the requirements of NEPA did not apply to the President's
proposal.  In contrast, as Secretary Kempthorne concluded, the argument here "is not that
Congress exempted Leisnoi from the eligibility requirements, but, rather, that it accepted
the Secretary's determination that those requirements had been met."[45]

The manner in which Congress dealt with the seven uncertified villages in the
Koniag region further illustrates this distinction.  Subsection (e) of 1427 expressly
exempted the seven uncertified villages from ANCSA's village eligibility requirements.
These villages required an exemption because the Secretary had determined them to be
ineligible under ANCSA.[46]

Leisnoi, in contrast, needed no exemption because it had been certified by the
Secretary.  It is not surprising that Congress treated Leisnoi as an eligible village because
that is what the Secretary had determined it to be.  What would have been surprising is if
Congress had treated Leisnoi, which had been certified, less generously than the seven
Koniag villages which had not been certified.  But that is precisely the result that
Stratman argues for here.

Other cases cited by Stratman further highlight this distinction between implied
repeal and ratification.  For example, the issue in Lujan-Armendariz v. Immigration and
Naturalization Service[47] was whether a series of changes to the immigration laws

---

[44] ANILCA § 1427(e).

[45] Docket 96-3, at 11 n.7.

[46] As mentioned above, Salamatoff, another village which the Secretary had determined to be
ineligible, also received an exemption.  ANILCA § 1432(a).

[47] 222 F.3d 728 (9th Cir. 2000).

impliedly repealed a provision under the First Offender Act that non-serious first time drug offenses could not be used as a basis for deportation.[48]  In <u>United States v. United Continental Tuna Corporation</u>[49] the issue was whether changes to the Suits in Admiralty Act impliedly repealed provisions in the Public Vessels Act which restricted foreign nationals from bringing suit for damages caused by a public vessel unless his government had reciprocity with the United States.[50]  Both of these cases quite clearly concerned significant changes in the law.

These two cases also illustrate the rationale underlying the judicial disfavor toward implied repeals:  Congress would not make such a significant change in the law without clearly manifesting its intent to do so.  As this court bluntly stated in <u>Colonial Insurance Company of California v. Tumbleson</u>,[51] a repeal by implication may be found "[i]n such a case, and in only such a case, where the only possible conclusion is that the legislature did in fact agree to repeal the earlier statute but through ignorance, incompetence, or if we sugar coat with euphemism, an oversight, failed to carry its clear intention into effect by expressly repealing the offending statute."[52]  Thus, a repeal by implication delivers a "stunning rebuke" to the legislature that it "cannot effectively legislate."[53]

Here, it is not so surprising that Congress used the legislative scheme that it did to confirm Leisnoi's eligibility to receive benefits under ANCSA.  It did not create an "exemption" for Leisnoi or otherwise cause a significant change in the law, but merely accepted as final the Secretary's determination that Leisnoi had met the requirements of ANCSA.  The court need not conclude that through ignorance or incompetence, Congress

---

[48] <u>Id</u>. at 742-43.
[49] 425 U.S. 164 (1976).
[50] <u>Id</u>. at 166-69.
[51] 889 F.Supp. 1136 (D. Alaska 1995).
[52] <u>Id</u>. at 1142.
[53] <u>Id</u>.

failed to carry its clear intention into effect.  Nor need it deliver any sort of rebuke to Congress that it cannot effectively legislate.  This simply is not a case of implied repeal.

      B.    <u>If the Issue Is Whether or Not Section 1427 Created an Exemption, Then It Did</u>.

      <u>Friends of the Earth</u> is instructive for an additional reason.  As discussed above, the court applied the rules of construction for implied repeals to interpret legislation which, the defendant argued, created an exemption to the requirements of NEPA. However, it ultimately held that the new legislation did, in fact, create an exemption.[54] The court stated:

> In conclusion, Congress can suspend NEPA obligations and it has done so here.  The manner in which it has responded to the President's November 1982 CSB proposal indicates its desire to redefine the process by which the President will develop and submit a proposal for the MX basing mode. That newly defined process effectively moots any claim that the plaintiffs may have had as to prior NEPA violations by the defendant since those transgressions, if they occurred, were engaged in with regard to matters which are no longer pending before Congress in their prior form.  Congress has dictated the manner in which the MX basing proposal will be devised and considered and that process is exempt from NEPA.[55]

In reaching its decision, the court focused on Congress' overarching purpose in creating its comprehensive legislative scheme.  The court reasoned, "[t]o read the amendment in any other manner [than as an exemption] would thwart Congress' intent in rejecting the November 1982 CSB proposal as presented and imposing a particular decision-making scheme upon the Executive Branch in its selection of a new basing proposal for the MX."[56]  Further, the court stated, "[t]he clear import of that comprehensive legislative package is that Congress has refused all prior basing proposals and determined that it will

---

[54] 562 F.Supp., at 273.
[55] <u>Id</u>.
[56] <u>Id</u>. at 270.

not consider the matter until the President submits his report and indicates his preference therein."[57]

Secretary Kempthorne, although he did not apply an implied repeal analysis in his decision, did focus on the import of the comprehensive legislative package. He thus concluded that "section 1427 constructs an elaborate scheme" in which "certainty about the eligibility of Leisnoi is a necessary predicate to the final and timely settlement of the claims" of Koniag and its villages.[58] Consequently, applying an implied repeal analysis ultimately leads to the same conclusion.

The manner in which Congress structured the land exchange with Koniag and its villages further underscores its intent to confirm Leisnoi's eligibility. Stratman argues that patent of the Afognak Island lands which were to be conveyed under Section 1427, "like the patent for the lands originally withdrawn for selection and conveyance to the Koniag-region villages, remained subject to the express condition, provided in Section 14(a), that the villages satisfy the eligibility requirements provided in Section 11(b)."[59] But if Congress had intended to so condition the receipt of the Afognak lands, it clearly would not have structured the land exchange in the manner it chose. Section 1427 provided for the conveyance of specific, identified lands, and it required the conveyance of those lands to be made to a joint venture rather than to individual corporations.[60] Were Leisnoi decertified, this would present the obvious question of which lands Koniag and its villages were entitled to receive. This is, of course, precisely the question that Congress set out to answer in section 1427. Indeed, the entire statutory scheme would unravel under Stratman's interpretation. As Secretary Kempthorne concluded, "leaving

---

[57] Id. at 272.
[58] Docket 96-3, at 7.
[59] Docket 171, at 28.
[60] ANILCA § 1427(b) and (c).

Reply to Opposition to Motion to Dismiss For Mootness Under ANILCA        11
A02-0290 CV (JKS)

the status of Leisnoi unresolved ran the risk of seriously disrupting the implementation of the many interconnected provisions in Section 1427."[61]

C.    The Secretary's Decision Is Entitled to Deference under Chevron or, alternatively, Skidmore.

Stratman argues that Secretary Kempthorne's decision is not entitled to deference under Chevron or Skidmore because if the rules of construction for implied repeal are applied, section 1427 is not ambiguous. As discussed above, the rules of construction for implied repeals do not apply. But even if they did, section 1427 is at the very least ambiguous. This case is different from Lujan-Armendariz v. Immigration and Naturalization Service, where the court held that "application of the normal principles of statutory construction dictate a clear and unequivocal answer" that there was no implied repeal.[62] In light of the overarching purpose of section 1427 to settle the entitlements of Koniag and its villages and the mechanism that Congress chose to accomplish that purpose, the rules of construction cannot dictate the same "clear and unequivocal" result here. The Secretary's decision, therefore, is entitled to deference under Chevron or, alternatively, Skidmore.

As a second reason for not applying Chevron deference, Stratman argues that whether section 1427 ratified Leisnoi's eligibility is not the type of issue that Congress would have implicitly delegated to the Secretary to decide.[63] Stratman cites Food and Drug Administration v. Brown & Williamson Tobacco Corp.[64] in support of his argument.[65] In that case, the FDA had asserted jurisdiction under the Food, Drug, and Cosmetic Act to regulate tobacco products.[66] The FDA had concluded that nicotine was a "drug" within the meaning of the Act and that cigarettes and smokeless tobacco

---

[61] Docket 96-3, at 13.
[62] 222 F.3d 728, 749 (9th Cir. 2000).
[63] Docket 171, at 64-65.
[64] 529 U.S. 120 (2000).
[65] Docket 171, at 64-65.
[66] Id. at 125.

products were "combination products" that deliver nicotine to the body.[67]  In considering whether <u>Chevron</u> deference applied to the FDA's interpretation, the court recognized that in certain "extraordinary cases . . . there may be reason to hesitate before concluding that Congress has intended such an implicit delegation."[68]  The court found that this was "hardly an ordinary case."[69]  The FDA had interpreted a statute to give it jurisdiction to regulate "an industry constituting a significant portion of the American economy."[70]  The court concluded that it was "highly unlikely" that Congress would leave determination of an issue of such great "economic and political significance" to the agency.[71]

The issue in this case is much more humble.  While it is certainly an issue of great importance to the parties, it does not have the same far reaching economic and political implications as the issue in <u>FDA v. Brown & Williamson</u>.  In fact, it has much less economic or political significance than <u>Alaska Department of Health and Social Services v. Centers</u>,[72] which Koniag discussed in its initial brief.[73]  In that case, the court found that <u>Chevron</u> deference applied to a determination by the Administrator of the Centers of Medicare and Medicaid Services that the State of Alaska's Medicaid plan did not comply with the Medicaid Act.[74]  If Congress would leave such a determination to a federal agency, it is not so hard to believe that Congress would leave the implementation of section 1427 to the Secretary as well.[75]

---

[67] <u>Id.</u>
[68] <u>Id</u>. at 159.
[69] <u>Id</u>.
[70] <u>Id</u>.
[71] <u>Id</u>. at 160.
[72] 424 F.3d 931 (9th Cir. 2005).
[73] Docket 145, at 12-13.
[74] 424 F.3d, at 934.
[75] The Ninth Circuit has found the Secretary of the Interior to have principal responsibility for administering ANCSA.  <u>Seldovia Native Assoc. v. Lujan</u>, 904 F.2d 1335, 1342 (9th Cir. 1990). The purpose of section 1427 was to implement ANCSA.

D.    Legislative History.

      1.   Plain Language of the Statute.

In Artichoke Joe's California Grand Casino v. Norton,[76] the Ninth Circuit set forth the procedure for interpreting a federal statute:

> We interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will. We begin, as always, with the language of the statute. When the words of a statute are unambiguous, ... judicial inquiry is complete. Where the language is not dispositive, we look to the congressional intent revealed in the history and purposes of the statutory scheme.[77]

Secretary Kempthorne concluded that the provisions in section 1427, "while complex, are, with arguably two exceptions quite clear."[78] Since there was "arguably" some ambiguity in the statute, the Secretary went on to consider the history and purpose of the statutory scheme.[79]

      In its opening brief, Koniag argued that the plain language of section 1427 of ANILCA ratifies Leisnoi's status as an eligible village.[80] Because it also supports the Secretary's resolution of the "arguably" ambiguous two provisions, Koniag summarizes that argument here. As it previously stated, subsection 1427(a)(4) lists Leisnoi as a "Koniag deficiency corporation." Subsection 1427(b)(1) then recognizes the rights of Koniag deficiency village corporations and Koniag 12(b) village corporations to benefits under ANCSA and describes the land that will be conveyed to the Koniag villages in exchange for such rights. Section 1427 does not condition the right of any Koniag village to receive these benefits except for those villages listed in subsection (e)(2). Thus, the

---

[76] 353 F.3d 712 (9th Cir. 2003).
[77] Id. at 720 (citations and internal quotation marks omitted).
[72] Docket 145, at 18-19.
[78] Docket 96-3, at 9.
[79] Id. at 10-11.
[80] Docket 145, at 18-20. Koniag's initial motion occasionally referenced section 1427(c). All of those references should have been to section 1427.

plain language of Section 1427 states that Leisnoi is both a Koniag deficiency corporation and a Koniag 12(b) village corporation and, thereby, ratifies and confirms Leisnoi's status as an eligible village corporation.[81]

Stratman notes that section 1427(f) makes "[a]ll conveyances…subject to the terms and conditions of the Alaska Native Claims Settlement Act." Thus, argues Stratman, section 1427 is subject to the eligibility requirements set forth in 43 U.S.C. Section 1610(b)(3).[82]

Stratman's reading of section 1427(f) is overbroad. Village eligibility and terms and conditions of conveyance are two distinct requirements under ANCSA. Section

---

[81] The plain language of other subsections of ANCSA, itself, supports this interpretation. Leisnoi is a Koniag village corporation. See ANILCA section 1427(a)(4), (a)(5). Section 1427 contemplates two distinct types of Koniag village corporations. Section 1427(a)(8) states:

> "Koniag Village Corporation" means a corporation formed under Section 8 of the Alaska Native Claims Settlement Act to represent the Natives of a Koniag village and any Village Corporation listed in subsection (e)(2) of this section which has filed a release as provided in subsection (e)(1) of this section.

Thus, a Koniag Village Corporation is either a Koniag village or a village corporation listed in subsection (e)(2). Leisnoi is not a village listed in subsection (e)(2) and, therefore, it must be a "Koniag village." Section 1427(a)(7) then defines a "Koniag village."

> "Koniag village" means a *Native village* under the Alaska Native Claims Settlement Act which is within the Koniag region. (emphasis added).

A "Native village" under the Alaska Native Claims Settlement Act is

> any…village…listed in section 1610 and 1615 of this title, or which meets the requirements of this chapter and which the Secretary determines was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives.

43 U.S.C. § 1602(c). In other words, a "Native village" is an eligible village. See 43 U.S.C. § 1610(b). *Cf*. id. at § 1602(d) (defining "Native group"). Thus, a literal reading of Section 1427(a) leads to the conclusion that Leisnoi is an eligible ANCSA village.

[82] Docket 171, at 29-30. On the contrary, as previously discussed, supra, note 81, a "Koniag village" has by definition met the requirements of Section 1610.

11(b)(3) of ANCSA sets forth the eligibility requirements for unlisted villages such as Leisnoi.[83]  If a village corporation is determined to be eligible it may select lands in accordance with section 12.[84]  Those lands selected by an eligible village are then conveyed to the village pursuant to section 14.[85]  Such conveyances are subject to certain terms and conditions.  For example, all conveyances are "subject to valid existing rights."[86]  Section 1427(f) of ANILCA makes it clear that these terms and conditions which ANCSA imposed on all conveyances still apply, but it does not speak to the issue of eligibility.[87]  Thus, section 1427, on its face, treats Leisnoi as an eligible village corporation.

Because the words of ANILCA section 1427 plainly define Leisnoi as both a Koniag deficiency corporation and a Koniag 12(b) village corporation, "judicial inquiry is complete."[88]  Both the legislative history and purpose of ANILCA further indicate Congress' intent to ratify Leisnoi as an eligible village corporation, as discussed next.

2.     ANILCA's Legislative History Indicates Congressional Intent to Ratify Leisnoi as an Eligible Village Corporation.

As the Secretary states, "[w]hen read as a whole, it is clear that section 1427 was intended to settle with finality and 'as soon as practicable' the land entitlements of Koniag Regional Corporation and its villages."[89]  The legislative history contains additional evidence of this purpose.[90]  Documents 173-3 through 173-6 contain portions

---

[83] 43 U.S.C. § 1610(b)(3).

[84] Id. at Section 1611.

[85] Id. at Section 1613.

[86] Id. at Section 1613(g).

[87] The legislative history with regard to subsection (f) supports this interpretation.  See Docket 173-6, at 2 (5268) (stating that "[t]he intent of this subsection" is to insure that the terms ANCSA imposes on all conveyances still apply).

[88] Artichoke Joe's, 353 F.3d at 720.

[89] Docket 96-3, at 10.

[90] Stratman argues that the legislative history lacks "clear and manifest" evidence of "congressional intent to repeal" ANCSA's village eligibility requirements with regard to Leisnoi.  Docket 171, at 39.  Of course, Congressional ratification of a Secretary's decision does not require "clear and manifest" evidence in the legislative history.  Indeed, so long as the plain

of Senate Report No. 96-413, which is the "official Senate Report issued on H.R. 39…."[91]  Section 1427 is located in Title XIV of ANILCA, which is titled Amendments to the Alaska Native Claims Settlement Act and Related Provisions.[92]  Congress expressed its intent in Title XIV to resolve village eligibility disputes and to facilitate land exchanges:

> These Native land selection exchange amendments were adopted in order to further and fulfill the purposes of the Settlement Act; in addition the exchanges would…resolve or obviate the need for litigation.[93]

Congress also made it abundantly clear that an immediate and final resolution to the disputes over village eligibility and entitlements to land was critical:

> H.R. 39 … will virtually complete the public land allocation process….
> ***
> Alaska's greatest problem now is uncertainty, concerning the status of its vast lands and related natural resources.  This is the uncertainty which H.R. 39 (as amended) addresses, and which it resolves…. [94]

Thus, the legislative history clearly shows that one of the principal purposes of ANILCA was to achieve certainty and finality.

The legislative history also shows that in a very real sense, section 1427 was a settlement.  The Senate Report for P.L. 96-487 refers to "the provisions of settlement of Koniag Village and Regional Corporation entitlements under ANCSA" contained in section 1427.[95]  This "settlement" was the culmination of eight months of extensive negotiations among Koniag, the Interior Department, the Alaska Coalition, the State of

---

language of the statute is clear, Congress need not include a single word in the legislative history. Consequently, in the present matter, "clear and manifest" evidence is not the applicable standard to evaluate the legislative history.  Rather, the Court must "look to the congressional intent revealed in the history and purposes of the statutory scheme."  Artichoke Joe's, 353 F.3d at 720.

[91] Docket 171-6, at 7 (Stratman's Consolidated Response Brief, at 14).

[92] Docket 173-3, at 7 (5073).

[93] Docket 173-4, at 7 (5200).

[94] Docket 173-3, at 8 (5074).

[95] Docket 173-4, at 4.

Alaska, and the Kodiak Island Borough.[96]  Though Stratman was not a part of this

settlement, the participation of the Alaska Coalition insured that the public interest was

promoted.  Indeed, Koniag gave up more land than it received under the agreement, a fact

Congress deemed significant:

> The Committee agreed to a land exchange proposal by Koniag, Region, Inc.
> which provides for the relinquishment of native selection rights to almost
> 300,000 acres of surface and subsurface estates and to an additional
> approximately 40,000 acres of surface estate on the Alaska Peninsula…in
> exchange for some 280,000 acres . . . on Afognak Island….  The
> Committee believes that this exchange will be beneficial to state and
> national interests as well as to the natives….[97]

Congress, of course, looked with favor upon agreements supported by the various

interested parties.[98]

Congress' treatment of the seven uncertified villages in section 1427(e) further

shows its desire to resolve uncertainties.  Congress had persuasive evidence that these

uncertified villages were not in fact villages.  Indeed, the Interior Secretary had

determined each of them to be ineligible.[99]  Nonetheless, Congress deemed these entities

to be eligible under ANCSA, and provided them with a portion of the Afognak Joint

Venture.  Such an action demonstrates Congress's preference for prompt resolution rather

than protracted litigation.  By granting these villages eligibility under ANCSA, Congress

effectively resolved the Koniag v. Kleppe lawsuit.

As discussed next, the additional legislative history relied on by Secretary

Kempthorne establishes Congress's knowledge of the controversy surrounding Leisnoi's

eligibility for ANCSA benefits prior to the enactment of ANILCA section 1427.

---

[96] Docket 174-2, at 6 (1218).

[97] Docket 173-5, at 2-3 (5205-06).

[98] Docket 173-4, at 7 (5200) ("[t]he Committee adopted those provisions supported by at least three of the four parties primarily affected by or concerned with the Settlement Act- the Natives, the State of Alaska, the Administration, and the Alaska Coalition.").

[99] Koniag, Inc. v. Kleppe, 405 F.Supp. 1360, 1364 (D.D.C. 1975).

3.  <u>Legislative History Relied on by the Secretary</u>.

The Secretary examined the legislative history preceding the enactment of ANILCA Section 1427 "for indications of congressional intent."[100]  Thus, the Secretary employed precisely the analysis required under <u>Artichoke Joe's</u>.  The Secretary noted that when considering Section 1427, Congress was aware that questions had been raised about Leisnoi's eligibility, as demonstrated by the following testimony by the Sierra Club:

> The Koniag amendment is . . . premature because of the uncertainty surrounding the amount of subsurface estate Koniag is entitled to.  Its entitlement is based in part on the certification by Interior of [Leisnoi] … as [an] eligible village[] despite clear Congressional intent to the contrary. [Leisnoi] is a former FAA installation. . . .  Accordingly, we recommend the Committee defer consideration of the Koniag Amendment pending a Committee investigation of the certification of [Leisnoi] and a final determination of subsurface entitlement.[101]

The Secretary further noted the letter submitted to Congress from the President of the Kodiak-Aleutian Chapter of the Alaska Conservation Society (Conservation Society), which stated the Interior Department "'should not have certified' Leisnoi" and requested that the "'Interior Committee direct a full and open investigation of the circumstances of the improper certification' of Leisnoi."[102]

In fact, Congress investigated the certification of village eligibility determinations, as discussed in <u>Koniag, Inc. v. Kleppe</u>.[103]  In that case, the court addressed challenges by eleven native villages, including seven villages in the Koniag region, to the Secretary's determination that the villages were ineligible to receive benefits under ANCSA.  The court discussed congressional hearings held by Congressman John Dingell, Chairman of the House Subcommittee on Fisheries and Wildlife Conservation and the Environment of

---

[100] Docket 96-3, at 11.
[101] <u>Id.</u>, quoting <u>Amendments to Alaska Native Claims Settlement Act: Hearing Before the Comm. On Interior and Insular Affairs U.S. Senate</u>, 94th Cong. at 392 (Docket 176-4, at 21).
[102] <u>Id.</u>
[103] 405 F.Supp. 1360, 1371-72 (D.D.C. 1975).

the House Committee on Merchant Marine and Fisheries, which "probed deeply into details of contested cases then under consideration . . . ."[104]  As noted by the court:

> The entire rule-making process was re-examined, travel vouchers and other information were sought to probe the adequacy of the investigations made, all papers in the pending proceedings were demanded, the accuracy of data and procedures followed was questioned, and constantly the Committee interjected itself into aspects of the decision-making process. While representatives of Interior indicated they were very concerned about prejudice to the quasi-judicial administrative process, and the chair on several occasions denied that it was his purpose to pressure the agencies involved, Representative Dingell stated that he was obliged to confess that he had doubts as to whether the law was being properly carried out.[105]

The court further explained that Congressman Dingell undertook:

> [a] strenuous effort … to encourage protest and appeals, … coupled with comments indicating his clear impression that all that could be done was not being done and that some of the results being reached were contrary to congressional intent.[106]

Although not addressed in <u>Koniag v. Kleppe</u>, Congressman Dingell specifically inquired about the circumstances surrounding Leisnoi's certification, as discussed in a memorandum from the BIA's Area Director to the Commissioner of Indian Affairs.[107]  In short, Secretary Kempthorne's assertion that Congress was aware of the controversy surrounding Leisnoi's eligibility prior to the enactment of ANILCA section 1427 is well-supported.

Stratman attempts to downplay the legislative history relied upon by the Secretary, arguing that "[t]here is no evidence that this previous legislative history and public

---

[104] <u>Id</u>. at 1371.

[105] <u>Id</u>.

[106] <u>Id</u>.; <u>see also</u> Docket 171 at 12 continuation of n.7 (stating "[t]he Committee was also extremely critical of the Department of Interior's investigation and procedures for determining the eligibility of [seven of the Koniag-area] villages.").

[107] <u>See</u> Exhibit 6 (excerpted from BIA Exhibit 1A in the administrative record, at 498) (stating "[t]his will confirm the telephone conversation … relative to Congressman Dingell's inquiry of the eligibility of [Leisnoi]).

testimony was disseminated" to the members of Congress whom subsequently enacted ANILCA section 1427.[108]  But Congress undoubtedly remained aware of the unresolved controversies surrounding the village eligibility determinations.  Indeed, Stratman acknowledges that after the D.C. Circuit Court of Appeals remanded to the Secretary for a redetermination of the villages' eligibility in 1978,[109] Congress "interceded" to "settle" the lawsuit:

> The Court remanded their cases back to IBLA for a redetermination of their eligibility.  It was at this point that Congress interceded, and enacted a special provision in ANILCA to settle these villages' claims of eligibility….[110]

As discussed above, by defining Leisnoi as an ANCSA corporation in ANILCA section 1427, Congress similarly "interceded" and "settled" the issue of Leisnoi's eligibility.[111] The legislative history relied upon by the Secretary demonstrates Congress's knowledge of the controversy surrounding Leisnoi's eligibility prior to the enactment of ANILCA section 1427, which both "resolve[d] … the need for litigation"[112] and redressed "Alaska's greatest problem … uncertainty."[113]

### 4.  "Additional" Legislative History Provided by Koniag.

Koniag attached to its underlying motion four exhibits which were created contemporaneous with Congress' consideration of ANILCA section 1427 in 1979.  These materials show the wide-spread knowledge of the controversy surrounding Leisnoi's eligibility during the enactment of ANILCA.

---

[108] Docket 171, at 45.

[109] Koniag, Inc., Village of Uyak v. Andrus, 580 F.2d 601 (D.C. Cir. 1978).

[110] Docket 171, at 12 continuation of n.7.

[111] It bears mention that Congressman Dingell was still in Congress during the enactment of ANILCA, and he is still in Congress today.  See www.house.gov/dingell/bio.htm.

[112] Docket 173-4, at 7 (5200).

[113] Docket 173-3, at 8 (5074).

Stratman argues that the materials cannot be regarded as legislative history, relying primarily on <u>Gustafson v. Alloyd Co., Inc.</u>,[114] <u>Kelly v. Robinson</u>,[115] and <u>Western Air Lines v. Board of Equalization of South Dakota</u>.[116]  Koniag distinguished those decisions in the administrative briefing on ANILCA section 1427 in 1999, and it incorporates that briefing here.[117]  However, Koniag acknowledges that during the eight years since the prior briefing on legislative history, both the United States Supreme Court and the Ninth Circuit have more narrowly defined what documents constitute legislative history.

In any event, as discussed in Section D.2. above, the "official" legislative history from ANILCA located in Senate Report 96-413 makes clear that Congress intended to ratify Leisnoi as an eligible village corporation.

E.    <u>Conclusion</u>.

The remainder of Stratman's arguments are adequately addressed in Koniag's opening brief, the briefs of the other defendants, and, most significantly, in Secretary Kempthorne's decision.

---

[114] 513 U.S. 561 (1995).

[115] 479 U.S. 36, 50 n.13 (1986).

[116] 480 U.S. 123, 130 n.* (1987).

[117] Docket 175-2, at 13-15, and Docekt 175-3, at 1-9.

Reply to Opposition to Motion to Dismiss For Mootness Under ANILCA      22
A02-0290 CV (JKS)

DATED at Anchorage, Alaska this 17th day of July, 2007.

LAW OFFICES OF R. COLLIN MIDDLETON
Attorneys for Defendant
Koniag, Inc.

By /s/ R. Collin Middleton_____
    R. Collin Middleton
    ABA #6803015
    Law Offices of R. Collin Middleton, P.C.
    P.O. Box 113128
    Anchorage, AK  99511
    907-222-0506
    907-279-7029 – Fax
    collinmiddleton@gci.net

Certificate of Service

The undersigned certifies that the
foregoing document was served
by mail on this 17th day of
July, 2007.

Bruce M. Landon
Department of Justice
Environment & Natural Resources Division
801 "B" Street, Suite 504
Anchorage, Alaska  99501-3657

John R. Fitzgerald, Esq.
Morrison Mahoney LLP
250 Summer Street
Boston, MA  02210-1181

Michael Schneider, Esq.
880 "N" Street, Suite 202
Anchorage, Alaska  99501

/s/ R. Collin Middleton

Reply to Opposition to Motion to Dismiss For Mootness Under ANILCA    23
A02-0290 CV (JKS)