FILED

ORIGINAL

PR 2 5 1995

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

1
2
3
4

OMAR STRATMAN, TONI BURTON,
JOHN MURRAY, and MICHAEL
DEVERS,

                    Plaintiffs,

          vs.

BRUCE BABBITT, Secretary of
the Interior; ANTON LARSEN,
INC.; LEISNOI, INC.; and
KONIAG, INC., Regional Native
Corporation,

                  Defendants.

Case No. A76-0132-CV (JAV)

Anchorage, Alaska
Friday, April 14, 1995
9:32 o'clock a.m.

**ORAL ARGUMENT ON PLAINTIFF
STRATMAN'S MOTION FOR PRE-
LIMINARY INJUNCTION**

**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE JAMES A. VON DER HEYDT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:
  Omar Stratman

                MICHAEL J. SCHNEIDER, ESQ.
                Law Offices of Michael Schneider
                880 N Street, Suite 202
                Anchorage, Alaska   99501
                (907) 277-9306

                ERIC R. COSSMAN, ESQ.
                Law Offices of Michael Schneider
                880 N Street, Suite 202
                Anchorage, Alaska   99501
                (907) 277-9306

For the Plaintiff:
  Toni Burton

                ALAN L. SCHMITT, ESQ.
                Jamin, Ebell, Bolger & Gentry
                323 Carolyn Street
                Kodiak, Alaska   99615
                (907) 486-6024

EXHIBIT

S

230

```
 1   APPEARANCES (continued):

 2   For the Defendant:              EDGAR PAUL BOYKO, ESQ.
       Leisnoi, Inc.                Edgar Paul Boyko & Associates
 3                                  711 H Street, Suite 510
                                    Anchorage, Alaska  99501
 4                                  (907) 279-1000

 5                                  JOHN R. FITZGERALD, ESQ.
                                    Edgar Paul Boyko & Associates
 6                                  711 H Street, Suite 510
                                    Anchorage, Alaska  99501
 7                                  (907) 279-1000

 8   For the Defendant:             R. COLLIN MIDDLETON, ESQ.
       Koniag, Inc.                 Middleton, Timme & Luke
 9                                  550 West 5th Avenue, Suite 1600
                                    Anchorage, Alaska  99501
10                                  (907) 276-3390

11   For the Defendant:             BRUCE M. LANDON, ESQ.
       United States               Department of Justice
12                                  801 B Street, Suite 504
                                    Anchorage, Alaska  99501-3657
13                                  (907) 271-5452

14   Court Recorder:                NATALIE DAY
                                    U.S. District Court
15                                  222 West 7th Avenue, #4
                                    Anchorage, Alaska  99513
16                                  (907) 271-3259

17   Transcription Service:         SECRETARIAL ASSISTANCE SERVICE
                                    7033 Henderson Loop
18                                  Anchorage, Alaska  99507
                                    (907) 349-5259
19
     Proceedings recorded by electronic sound recording.  Tran-
20   script produced by transcription service.

21

22

23

24

25
```

ANCHORAGE, ALASKA -- FRIDAY, APRIL 14, 1995

2          (On record -- 9:32 o'clock a.m.)

3          THE CLERK:  -- James von der Heydt presiding.

4  Please be seated.

5          THE COURT:  Good morning.  We've set this time to

6  hear arguments of counsel upon plaintiff's motion for a pre-

7  liminary injunction in civil cause A76-132 -- it's almost as

8  old as I am -- Stratman versus Babbitt.  I know that, Mr.

9  Schneider, you wish to be heard and Mr. Boyko.  Who else

10  wishes to be heard?

11          MR. BOYKO:  If it pleases the Court, I have with me

12  Mr. John Fitzgerald, my associate who did the laboring more

13  on our brief, and I would ask the Court's permission that he

14  be allowed to handle the response argument, saving me some-

15  where between five or seven minutes to address the public

16  interest issue only.

17          THE COURT:  Well, I -- you may divide your time as

18  you wish.  The plaintiff -- the moving party has the right --

19          MR. BOYKO:  Yes.

20          THE COURT:  -- to open and close the argument.

21          MR. BOYKO:  Yes, I understand that.  What I was

22  hoping is that Mr. Fitzgerald would address the Court in

23  response for about twenty-three to twenty-five minutes and

24  then leave me five to seven minutes to wind up.

25          THE COURT:  All right.  I'll trust Mr. Fitzgerald

has a watch.  Okay.

2    MR. BOYKO:  I'll be his timekeeper.

3    THE COURT:  Okay, fine.  It's your motion, I'll

4  hear you first, Mr. Schneider.

5    MR. SCHNEIDER:  Thank you, Your Honor.  Before --

6    THE COURT:  May I say this?  I'm familiar with the

7  briefs, so I urge you not just to repeat all that, but I do

8  want to hear what you have to say, and I urge you to keep

9  track of your time.

10    MR. SCHNEIDER:  Very well, sir.

11    THE COURT:  All right.

12    MR. SCHNEIDER:  My only housekeeping question be-

13  fore we begin, Your Honor, is am I to address the issues in

14  the motion to dismiss this morning as well, or simply the

15  preliminary injunction matter?

16    THE COURT:  Well, primarily I'm interested in the

17  preliminary injunction.  If you want to just spend a few

18  minutes on the other, I'd hear you.

19    MR. SCHNEIDER:  Then I'm -- I'm ready if Your Honor

20  is.

21    THE COURT:  Yes.

22           **PLAINTIFF STRATMAN'S ARGUMENT**

23    MR. SCHNEIDER:  Okay.  On the motion to dismi -- to

24  dismiss -- very briefly, Your Honor -- the Burtons have ob-

25  jected.  I'm not sure what it is they want.  If what they

really want is continuing copies of the pleadings, I think

the -- the answer here is dismiss them from the case, tell us

all to give them courtesy copies, that solves that problem.

The Burtons have settled with Leisnoi, they cannot proceed

with a claim against Leisnoi, they didn't join in the request

to reopen, and they ought to be out.

As to Koniag, Koniag ought to be out, they've set-

tled with us, their Rule 19 status as a partner is history,

they claim in the most -- in my favorite affidavit in this

entire pile -- that one of the major purposes of the 1990

agreement was to prevent the reopening of this very case.

They claim that they knew this case was going to be reopened,

that they thought that they would be successful and that the

State Supreme Court saw it would go on, yet in this agree-

ment, claims against Leisnoi are not mentioned anywhere,

nowhere, not at all.  We have settled with them.  Once again

-- consistently, I might add -- they want the benefit of the

settlement without paying the burdens of the settlement

agreement; they ought to be out of here.  These parties are

entitled to be (indiscernible) to each other and they should

be out of the case and off the caption.

With that, allow me to go on, if I can, to our --

to the issues in the injunction matter that we brought.

Allow me to repeat, I guess, the standard just very briefly,

and I'll try to key my -- my comments off of that.

1    We got a couple of tests, the traditional test and

2 the alternative test, Your Honor's familiar with them.  Under

3 the traditional test, we have to show irreparable injury --

4 I'm not going to spend any time on irreparable injury except

5 to say how do you not get irreparable injury when you're

6 cutting down a forest that's two hundred to four hundred

7 years old?  How do you not get irreparable injury?  How do

8 you not get irreparable injury when the party doing the cut-

9 ting is insolvent?  Your Honor will note that in our brief,

10 we cite a bunch of stuff about if you're insolvent, that

11 simply can be grounds for showing irreparable harm.  No one

12 has come back -- there is nothing in the record suggesting

13 other than what we have asserted; to wit, that they are cut-

14 ting down the only assets they have.  It's like -- it's like

15 letting a bank robber spend all the loot while he's out on

16 bail pending trial.  I mean, if -- if we've got anything in

17 this case, we've got irreparable injury.

18    The -- we have to show probabil -- under the tradi-

19 tional test, we have to show probability of success on the

20 merits.  I think we've got that in spades, and I will address

21 that in more detail in just a minute or two.  In balancing

22 the equities, there has to be -- you have to look at the harm

23 to Leisnoi versus the harm to the public, and here the harm

24 to Leisnoi is they can plunder later, but they can't plunder

25 today if they're so fortunate as to win this case.  But if

2   penalized because he's the only citizen with the stubbornness
3   and the guts to hang in there this long.  He's been abandoned
    by the rest of the citizens, but he's still in there.  If
4   anything, he should be applauded for his courage and his
5   tenacity and not castigated for it.  There is no -- and we're
6   not happy with our role here.  We wish we had a few indi-
7   vidual claims.  We'd like to prosecute them.  We don't have
8   any.  That just -- that's the spot we're in.  So I would sug-
9   gest to Your Honor that under the traditional test, we're
10  home free.
11          Let's take a look at the alternative test, the test
12  that is most typically discussed by the Ninth Circuit and
13  most typically employed there.  We have to show one or the
14  other, not both.  Number one, "probable success on the merits
15  and possible irreparable harm."  Well, again, we've got the
16  success on the merits, we got all kinds of irreparable harm.
17          Let's go to the second prong or the second ap-
18  proach:
19          "Sufficiently serious questions going to the merits to
20          make them a fair ground for litigation,"
21  and, Your Honor, I'd suggest that's legalese for horse race,
22  and not any kind of horse race.  Two horses, four legs
23  apiece, that's it.  If we have a prima facie case under the
24  second prong here, we're in there; that's all we need, that's
25  what the cases say.  We -- and -- and again, I'll address

1    this in a moment -- we are in much better shape than that.

2    And -- so we need, you know, two live horses and

3              "a balance of hardships tipping decidedly toward

4              the party requesting preliminary relief."

5    Well, we're the party requesting it, but quite obviously

6    we're not requesting it in our own name.  And once again, how

7    is it that if this injunction issues, Leisnoi is harmed?

8    They can lop these trees down at the end of this case.  On

9    the other hand, if they're -- if -- if the trees are cut, if

10   the money's spent, then there will be no basis -- no possi-

11   bility of recovery for the United States of America, for any

12   entitled Native village, or anyone else who be -- falls heir

13   to these properties.

14             Now I'm going to use up a few more minutes of my

15   time and I'm going to try to reserve a good bit of time, but

16   I'm going to use up a few more minutes of my time focusing

17   specifically on the merits part of the case because I think

18   it is the most right -- it may be the most interesting part

19   of the case, and there are some things about the merits argu-

20   ments and the facts in the record that I hope to be able to

21   specifically draw to Your Honor's attention.

22             First of all, as Your Honor reads through these

23   affidavits, I'm sure the Court's wondering why don't these

24   people tell me where -- this is Woody Island, Judge -- where

25   on Woody Island this village is?  Why in all this -- you

they tell me where this village is? Well, I'll tell you why

3  they don't tell you where this village is because they're

4  between a rock and a hard place under the law and the regu-

5  lations.  If they say, hey, this village is right here, then

6  they're in the deep weeds because although there's probably a

7  few Native people there, there are nowhere close to twenty-

8  five, they'll never be able to get close to twenty-five; they

9  just can't come anywhere close.  If they say -- this is the

10  mission area down here -- if they say, hey, the village is

11  here, then people are going to say you've got to be joking,

12  this is the FAA facility and while you'll get over twenty-

13  five, you will never get a majority of Natives.

14        So only if they use this fuzzy description, this vi

15  -- only if they talk about the whole island can they keep

16  this phoney ball in the air at all.  Otherwise, they're dead

17  in the water right out of the shoot; they just can't get

18  there.

19        And I think that here, Your Honor, note that in

20  ANCSA law, you don't go down the Yukon River and every time

21  you can draw a circle around twenty-five Native -- Native

22  inhabitants, say, hey, that's a village; you don't do that.

23  You've got to have a village.  When they come and put their

24  finger on the map and say the village is here, then, of

25  course, the photographic evidence kills them.  They are just

11

2  ... the water on their merits argument.

3        This is not -- we have some affidavits about large

families.  I mean, it's almost as if Leisnoi is asserting

4  that this is a pre-Newt Gingrich, anti-family planning act

5  that under ANCSA if you have mom and dad and twenty-three

6  Native children, you get the -- you can be called a village.

7  I -- you know, that's a -- that would be an interesting con-

8  clusion of law to reach.  I don't think that's a conclusion

9  law this Court is going to reach.

10        I think if we look at some of the merits affida-

11  vits, the one that I found most impressive and most inter-

12  esting was the merits affidavit submitted by Judge Madsen --

13  Judge Madsen.  Good judge, good lawyer, been in Kodiak since

14  Captain Cook turned around in the inlet.  He has access poli-

15  tically, socially, culturally to the people who claim to have

16  supposedly occupied an established village in 1971 on this

17  island.

18        Now Judge Madsen knows about affidavits, he knows

19  about regulations and statutes, he understands that there has

20  to be a harmony between these requirements and the facts to

21  get what you want, and if you can't generate that harmony,

22  you lose your case.  That's not lost on him, that's not lost

23  on Your Honor.

24        Judge Madsen, having spent a lifetime developing a

25  reputation of candor and honor, and knowing what's at stake

2   his affidavit.  And what's he tell us?  He submits eighteen

3   names to Leisnoi to research -- eighteen; not twenty-five,

4   eighteen.

5        Now I don't know if we got the results of the re-

6   search in this pile of stuff or not, but as you look through

7   these affidavits, what you see is evidence of a consistent

8   historical use of the island, not a use of the established

9   village, and what you see is no twenty-five people.  I mean,

10  I -- I get worried.  I read those things, paragraph comes

11  along, you see something about a whole bunch of people, and

12  the next paragraph they say but I don't know when they left.

13  Or There's folks there in seventy-five, but we don't know if

14  they were there in seventy-one.

15       There's no evidence that the population -- the

16  Native population of this island changed at all in response

17  to the earthquake in the record; no credible evidence.  In

18  fact, the affidavits and the deposition of Ewell Chafin (ph)

19  are quite consistent that there were very total -- if you

20  look at the whole island, there are very few Native inhabit-

21  ants of that island, certainly less than twenty-five, before

22  the earthquake, after the earthquake, in seventy-one, or in

23  sixty.  The census data says -- well, I can't remember, it

24  was either forty or forty-one people in sixty-one Native.

25  They've got to have twenty-five and that's got to be a ma-

2        The biggest number in any of this pile of malarkey

3  is this hand-transcribed, uncertified, uncross-examined,

4  unverified newspaper clipping from the time of the earthquake

5  when someone at the FAA place says, hey, big tidal wave,

6  folks from the other end of the island show up, Natives,

7  think there might -- you know, about twenty.  And how would

8  we like to base a finding of fact giving these people fifty-

9  thousand-plus acres of Kodiak Island and other ANCSA benefits

10  on that?  And, of course, it's a smaller number than twenty-

11  five.

12        The regulations, admittedly more lenient than Leis-

13  noi argues so much in favor of, Your Honor, were, of course,

14  knocked out; they were knocked out in the two cases we cite

15  to the Court.  District Court said, hey, these regs are in-

16  valid, D.C. Court of Appeals said right on, they clearly --

17  they -- they clearly broaden the possibilities that were

18  intended under ANCSA and, of course, when you broaden the

19  claims possibilities in a fixed pie, what do you do?  You

20  take away from those Congress specifically intended to bene-

21  fit.  And, you know, using very conventional legal reasoning,

22  the court said no way, you're out of here.

23        I think it is interesting, Your Honor, that Leisnoi

24  has known that this motion is on its way, this fight on the

25  merits is coming for a long time, but certainly, certainly

since December

2  there isn't an affidavit in front of this Court that says

3  there's an established village, it's here, there or anywhere

4  there were twenty-five Native inhabitants, and they consti-

5  tuted a majority of the population of that established vil-

6  lage.  It is not in the record.

7      If this was a motion for summary judgment, I would

8  contend that Your Honor would have a tough time saying no to

9  us on the record before it.  If you look at their own sub-

10  missions, the field report of which they profess such pride

11  lists Leisnoi in a 1968 document as being, quote, abandoned.

12  Why?  'Cause it was.  It wasn't there.

13      If you look at the reason that Gail Fitzpatrick,

14  investigating -- using the word in its broadest context --

15  for the Department of Interior, certified this village.  Had

16  nothing to do with all this smoke about traditional use.  He

17  -- he believed the people that gave him affidavits that said

18  there was an established village in a definable place and

19  those people have recanted those affidavits and that recanta-

20  tion is under oath.

21      They are dead meat on the merits.  We have strong

22  proof on the merits, we have strong evidence of irreparable

23  injury, and under those circumstances I contend that the

24  Court is -- should be compelled, we hope it is compelled, to

25  grant our request for an injunction.

2    I believe, Your Honor, that I have an end of the

     fifteen minutes?

3              THE COURT:  That's about right.

4              MR. SCHNEIDER:  And unless Your Honor has ques-

5    tions, I'll be seated.

6              THE COURT:  Do you wish to address the question of

7    security --

8              MR. SCHNEIDER:  Yes.

9              THE COURT:  -- Rule 65(c)?

10             MR. SCHNEIDER:  I do.  We don't have, in this pile

11   of stuff in front of Your Honor, one affidavit, one anything

12   explaining to the Court what Leisnoi's losses will be --

13   nothing, zero, it isn't there.  We don't have so much as

14   something from a logger saying I just can't feed Martha if

15   they stop the saws.  We don't have that.  We don't have any

16   indication that Leisnoi will lose a nickel in the record, not

17   there.  We have some smoke and some argument -- and by the

18   way, Your Honor, if -- if it is not clear from our pleadings,

19   we object, naturally, to every uncertified, unverified, un --

20   facially unacceptable piece of stuff that's been attempted to

21   be submitted for the record in this fight.  It is just not

22   there.

23             Mr. -- if Mr. Stratman had individual claims, then

24   I think we've got a -- you know, we're in a tough spot here,

25   just like we'd be in a tough spot if the trigger date in

ANCSA was 1930, you know? We -- but it's not 1930 and he

2   doesn't have individual claims. He is standing here as a

3   member of the public asserting public claims, public inter-

4   est, and in those settings, there should not be a bond re-

5   quirement.

6           There's -- there's no case just like this out

7   there, Judge. We haven't found one supporting our position

8   and they haven't found one against us 'cause this is the only

9   one there is. But what's the analogy here? Mr. Stratman

10  doesn't have individual claims. He's submitting public

11  rights as an -- anticipated by various -- by -- within ANCSA

12  and in other statutes we have not yet pursued yet, like the

13  Federal False Claims Act. In either instance, no bond should

14  be required, this Court has no record upon which it could

15  quantify a bond. The -- the security requirement says:

16          "For payment of such costs and damages as may be

17          incurred or suffered by any party."

18  Okay. Where's the record on that? It isn't here. So based

19  on no record, there should be no bond. Based on Mr. Strat-

20  man's unfortunate unwilling status as a public interest liti-

21  gant, there should be only a nominal bond. He can't post

22  anything other than a nominal bond.

23          Does the Court have other questions?

24      THE COURT:  Thank you.

25      MR. SCHNEIDER:  Thank you.

THE COURT:  Mr. Boyko -- or Mr. Fitzgerald?  Excuse

2  me.

3                        (Pause)

4              DEFENDANT LEISNOI, INC.'S ARGUMENT

5         MR. FITZGERALD:  May it please the Court.  Most of

6  the analysis that was in our opposition to the motion for

7  preliminary injunction still has not been addressed by Mr.

8  Stratman.  I notice that he stated that he didn't have time

9  to brief the issue because he had asked that this briefing

10  schedule be accelerated.  I guess sometimes you have to be

11  careful what you ask for because it may be granted.  Having

12  succeeded in obtaining --

13         THE COURT:  Well, I don't know that it was much he

14  -- much accelerated, counsel.  I believe by the time every-

15  thing got in so I could rule on it, it -- the normal times

16  were pretty well -- had pretty well gone by, but --

17         MR. FITZGERALD:  We -- we had expected that he

18  would have addressed our arguments at oral argument.  I think

19  that's what he had indicated in his brief.  But most of --

20  most of the arguments have gone unrebutted at this point.  We

21  don't have a problem with his statement of the governing

22  standards for preliminary injunction.  It's how he attempts

23  to apply them to this case we're -- he's in error.

24         Turning first to the balance of harm analysis.  One

25  of the elements for a preliminary injunc -- injunction, of

10

1  course, is that the defendant must not be harmed more than

2  the plaintiff is helped by the injunction. The William

3  Engels and Sons Baking case from the Ninth Circuit stands for

4  that proposition.  None of the cases cited by Stratman in-

5  volved a recreational user trying to stop a private landowner

6  from using the fruits of his land.

7       At page twenty-four of his brief, Stratman argues,

8  and I quote:

9            "The overriding public interest in preserving gov-

10           ernmental control of public lands well outweighs

11           any harm that Leisnoi will suffer from the issuance

12           of the injuction."

13  The flaw in Mr. Stratman's balancing test is that these are

14  not public lands.  The United States Supreme Court in the

15  Northern Lumber Company versus O'Brien case, 204 U.S. 190,

16  defined the term public lands as being lands open to sale or

17  other disposition under general laws which specifically do

18  not include lands, quote "to which any claims or rights of

19  others have attached," close quote.

20       Here, the land has been conveyed by the government

21  to Leisnoi, Inc., so rights of others have attached -- the

22  rights of Leisnoi to this land has attached.  Therefore,

23  these are not public lands.  Therefore the cases cited by

24  Stratman in his brief in the connection of the balance of

25  harm analysis are all unpersuasive.  I refer now to the Down-

1  state Stone Company, Bales versus Roosche (ph), U.S. versus

2  Barrows, Sierra Club versus U.S. Forest Service.  None of

3  those cases apply, they all dealt with public lands; these

4  are not public lands.

5       On his public interest analysis, again, this error

6  permeates his brief.  For example, in his analysis of whether

7  the public interest would be advanced or impaired by the

8  issuance of an injunction, he states as follows:

9       "The primary interest at stake here is the public

10      interest in maintaining governmental management and

11      control of public lands during the pendency of

12      actions involving their rights."

13 Here again, Stratman erroneously refers to Leisnoi's property

14 as being public lands, although the Supreme Court defines

15 that term as excluding lands to which rights of others have

16 attached.  So again, in this section of his brief, the cases

17 cited by Stratman dealing with his public interest analysis

18 are not applicable.

19      In assessing the public interest, this Court should

20 focus upon the need for stability and repose under ANCSA.

21 This has been legislatively recognized by Congress.  ANCSA is

22 in the public interest because it resolves land claims that

23 had clouded title throughout Alaska.  In the event that

24 Stratman were successful in his relief, the government would

25 have to convey another hundred and fifteen thousand acres out

20

2   inventory of public lands in order to comply with
    ANCSA.  So Stratman's not in the public interest, he's suing
3   the government, and the result of his suit would be that the
4   government would have to take additional lands that could now
5   be used by berry pickers, wildlife photographers, and turn
6   them over to a corporation which has to act in the interest
7   of its shareholders.

8       Turning to the flaws in Mr. Stratman's irreparable
9   injury analysis.  Stratman claims at page twelve of his brief
10  that, quote:

11      "The risk that the government may be unable to
12      collect a judgment from Leisnoi for damages caused
13      by its timber cutting constitutes irreparable in-
14      jury."

15  The problem with this theory, of course, is that the govern-
16  ment has already stated, quote:  "No monetary damages are
17  available to the United States," citing 28 U.S.C., Section
18  2415, subsection (b), which is a three-year statute of li-
19  mitations from tort or fraud claims, and the government has
20  further stated in this case, quote:

21      "The United States could not annul the conveyances
22      already made,"

23  close quote, citing 43 U.S.C., Section 1166, which has a six-
24  year statute of limitations on suits to annul patents issued
25  by the United States.

21

2   This suit brought by Stratman does not seek mone-

3   tary damages, nor has a claim for prejudgment attachment been

    filed.  Indeed, the com -- complaint does not seek to enjoin

4   logging.  The pending motion is outside the scope of the

5   pleadings and we decline voluntarily to litigate the issue.

6   There is nothing in the complaint that seeks the relief

7   sought here today, this is well outside of the scope of the

8   complaint in terms of the remedy sought, it is also outside

9   the scope of the complaint because Stratman himself conceded

10  that the only lands at issue in this Stratman One case are

11  the lands to which he once held a BLM grazing lease.  All the

12  other land was at issue in Stratman Two, which Your Honor

13  already dismissed, and Mr. Stratman failed to take an appeal

14  from that dismissal.

15      His claim that the harm is that the government

16  would be unable to collect a judgment from Leisnoi for dam-

17  ages caused by its timber cutting reveals that, in essence,

18  what we have here today is not a motion for preliminary in-

19  junction, but rather a motion for a prejudgment writ of at-

20  tachment; that's the -- that's the real relief sought here.

21  And accordingly, this Court should analyze this under Rule 64

22  and not under under Rule 65.

23      The leading case on this point is the 1994 decision

24  from the Eleventh Circuit, 14 Fed. Third 1507, Mitsubishi

25  International versus Cardinal Textile Sales.  They state:

1       "It is plain that attachment is the relief sought

2       by the plaintiff notwithstanding its labeling as a

3       preliminary injunction."

4  And the court goes on to hold that:

5       "The standards of Rule 64 rather than Rule 65

6       therefore govern the analysis."

7       Of course, under Federal Rule of Civil Procedure

8  64, it directs this Court to look to applicable state law and

9  that, of course, is Alaska Rule of Civil Procedure 89, which

10  states quite plainly that:

11       "A writ of prejudgment attachment is only available

12       in cases on a contract for a sum certain then due."

13  This is not a claim for a breach of contract between Leisnoi

14  and Stratman.  The relief sought is a prejudgment attachment,

15  it's merely labeled as a preliminary injunction.  This Court

16  should focus on Rule 64, not Rule 65, and he's not entitled

17  to the re -- that relief under the standards of Rule 64.

18       On the bond requirement.  Stratman is trying to

19  shut down a village Native corporation.  He's trying to

20  strangle it so as to con -- coerce this village Native cor-

21  poration into paying him money and giving him land.  His

22  newspaper article, which has been authenticated in the affi-

23  davit that we filed yesterday, makes it quite explicit; what

24  Stratman really wants is land and he wants cash, he wants to

25  line his pockets, he is not a public interest litigant.

1   Public interest litigants don't hire attorneys on a contin-
2   gency fee.  It's quite apparent from the history of this case
3   what it is that Stratman wants.  He sued to enforce a settle-
4   ment agreement that Leisnoi never entered into; took that all
5   the way up to the Alaska Supreme Court where he lost.  His
6   arguments that he should be excused from posting a bond are
7   frivolous.
8       The primary case he relies upon, of course, is the
9   People versus Tahoe Regional Planning Agency, Ninth Circuit,
10  1985, for the proposition that his bond should be nominal-
11  ized.  No bond was required in that case because the inter-
12  state compact at issue therein stated that a state need not
13  post a bond to enforce the compact.  Next, Stratman cites to
14  People, Ex Rel, Vandekamp (ph) versus Tahoe Regional Plan, a
15  ninth -- another Ninth Circuit, 1985 case, for the proposi-
16  tion that his bond should be nominalized.
17      Again, we're dealing with statutes not applicable
18  here.  The NEPA statute has a private enforcement mechanism,
19  and the Ninth Circuit has stated that:
20          "Special precautions to ensure access to the courts
21          must be taken where Congress has provided for pri-
22          vate enforcement of a statute."
23  Totally different purpose to NEPA as there is to ANCSA.
24  Friends of Earth versus Brinager (ph) was another NEPA case
25  that he cites and so was City of Tenaki Springs versus Clow

24

1  (ph). So these cases on the bond requirement are not appli-

2  cable. Mr. Boyko is going to address the bond issue further

3  in his comments.

4        Stratman sat on his rights by not seeking a prelim-

5  inary injunction for nineteen years. Equity holds that a

6  person that sits on his rights is not entitled to equitable

7  relief. I already mentioned, this relief is not even pled in

8  the complaint. I don't know why he has the right to seek

9  this relief. It's well outside the scope of Rule 8. We

10  cited the Court to the _Conley_ versus _Gibson_ case. He can't

11  do what he has attempted to do here.

12        Moreover, in his oral arguments, Mr. Schneider just

13  mentioned that he's planning on amending to add a key town

14  (ph) claim. He said it's not yet been done -- not yet --

15  indicating he intends to do it. He intends to amend to seek

16  monetary damages. Obviously, there is no equitable relief

17  available to a party that claims to have a remedy at law. He

18  didn't respond to any of these arguments that we've briefed.

19        A third principle of equitable relief is that one

20  who has unclean hands is not entitled to equitable relief.

21  Here, Omar Stratman has lied repeatedly throughout this liti-

22  gation and throughout the litigation in the Stratman Two case

23  as well. His -- his initial complaint in this case stated

24  that he owns a BLM grazing lease, which is false and fraud-

25  ulent and misleading. He sold that years ago. He sold that

2  in 1976 before he ever brought this suit.  He does not own a

3  BLM grazing lease.  He amended his complaint in 1977 to de-

   lete allegations of fraud.  In the amended complaint, he

4  repeated his lie.  He again stated that he is the holder of a

5  BLM grazing lease, which obviously influenced the Court of

6  Appeals of the Ninth Circuit, which stated in its ruling that

7  he was the holder of a BLM grazing lease at the time suit was

8  filed and, therefore, they put him into a separate category.

9        And in preparing for oral arguments, I notice that

10 Stratman repeated this lie also before the Alaska Native

11 Claims Appeal Board.  Before them he also stated that he

12 owned this lease.  So Stratman has terribly unclean hands

13 here.  He's not entitled to any equitable relief.

14       The relief sought herein is barred.  Stratman al-

15 ready had a full and fair administrative hearing before the

16 Alaska Native Claims Appeal Board.  They entered its decision

17 adverse to Mr. Stratman, and what did he do based upon that

18 adverse decision?  Absolutely nothing.  Didn't bother taking

19 an appeal from it.  The Ninth Circuit Court of Appeals re-

20 manded this decision -- its deci -- this case, excuse me, to

21 Your Honor for a determination of whether or not this Court

22 should excuse Stratman from having failed to exhaust his

23 administrative remedies.

24       I submit to the Court that it should find that

25 Stratman not be excused from that requirement.  Obviously,

the fact that Stratman pursued his administrative

1977, after the filing of this 1976 case, shows that he

failed to exhaust his administrative remedies before filing

the case.  The 1979 litigation, Stratman Two, that was filed

after the ANCAB, ruled against Omar Stratman.  In that case,

he could have appealed from the ANCAB decision, but he didn't

bother doing that, just like he didn't bother appealing from

Your Honor's dismissal with prejudice of the Stratman Two

case.

Res judicata bars the instant action.  We have a

final judgment, we are entitled to rely on that final judg-

ment.  He cannot continue to harass this Native village cor-

poration with perpetual litigation.  There must be an end to

all litigation, and the end came when Your Honor issued a

final judgment and he failed to appeal from it.

Yesterday we supplied the Court with numerous U.S.

Supreme Court citations for the proposition that it doesn't

matter which case was filed first, a final judgment can pre-

clude litigation of a suit that was already pending at the

time that the second suit was filed.  The --

THE COURT:  Just a minute.  Say that again.

MR. FITZGERALD:  A final judgment in suit number

two can bar proceedings in suit number one because suit num-

ber one has not yet gone to a final judgment.  So we are

entitled to assert the doctrine of res judicata to preclude

the instant 1976 suit because we have a final judgment.

2  We supplied the Court with several citations to

3  this effect.  Irrespec -- this is U.S. Supreme Court, Chicago

4  Rock Island:

5      "Irrespective of which action or proceeding was

6      first brought, it is the first final judgment ren-

7      dered which becomes conclusive in the other as to

8      res judicata."

9  We sup -- we've cited a -- a number of cases:

10      "Although it is rendered after the initiation of

11      proceedings in which the bar is then asserted, res

12      judicata still applies."

13  It is familial law that goes back many years in front of the

14  U.S. Supreme Court.

15  An interesting U.S. Supreme Court case that I would

16  urge Your Honor to review is the Butler versus Eaton case,

17  and that -- that was cited within the Reid versus Allen case

18  that we provided to the Court.  In the Butler versus Eaton

19  case, there was one judgment rendered and based upon that

20  judgment, a second decision followed it.  The first judgment

21  was appealed and reversed; the second judgment was also ap-

22  pealed.  Based upon the reversal of the first judgment, the

23  Supreme Court was able then to reverse the second judgment.

24  In the Reid versus Allen case, the party failed to

25  appeal from the second judgment.  The court said he really

1  should have done the procedure that we set forth in the But-

2  ler versus Eaton case, he should have appealed the second

3  judgment so as to prevent the doctrine of res judicata from

4  kicking in.  But when you fail to appeal from a final judg-

5  ment, it is res judicata.

6      So the mere act of taking an appeal in the 1976

7  case does not get Stratman out of the woods here from his

8  failure to appeal from the 1979 case:

9          "Where a judgment in one case has successfully been

10         made the basis for a judgment in a second case, the

11         second judgment will stand as res judicata although

12         the first judgment may be subsequently reversed."

13 That's the holding of the U.S. Supreme Court, that's a quote

14 from the Reid versus Allen case, 236 U.S. 191.

15     Stratman leaves these corpses lying around.  He

16 didn't bother appealing from the Alaska Native Claims Appeal

17 Board case, he didn't bother appealing from Your Honor's

18 decision in Stratman Two.  Doctrine of res judicata precludes

19 him from seeking relief here.

20     Finally, Your Honor -- I see I'm starting to run

21 out of time -- the Koniag versus Cleppe (ph) case did not

22 address the portion of the CFR -- 43 C.F.R. 2651.2(b), which

23 contains the important -- provided that we're excused from

24 meeting other requirements of the statute if we can show that

25 the village was temporarily unoccupied by virtue of an act of

2  ten years.  The court specifically confined its holding to

3  listed villages.  Woody Island, of course, was an unlisted

4  village and was not affected by the ruling.  What the court

5  in the Koniag versus Cleppe (ph) decision held is that the

6  Secretary cannot impose additional hurdles that the parties

7  -- the villages would have to comply with other than were set

8  out in the statute.  They cannot make it more difficult than

9  Congress envisioned by adding a number of additional require-

10 ments.

11         They didn't say anything about unlisted villages --

12 the regs do not impose any additional requirements on un-

13 listed villages.  The court's holding was specifically lim-

14 ited to that and the statement -- he's trying to broaden the

15 holding by saying they threw out all the regs.  Well, that's

16 simply not the case.  If Your Honor wants to take a look at

17 the ru -- the rulings in that case, you'll see it's quite

18 apparent.

19         The -- at page six of his reply, Stratman claims

20 that, quote:

21         "There were never twenty-five Natives on Woody

22         Island during the period immediately preceding the

23         sixty-four quake."

24 No citations were given for that bald assertion of fact.

25 Here's the field report, Your Honor.  This is -- this is what

2              of preparing the ANCSA statute.  At page
two forty-eight, it contains the official census data for

3   Woody Island, and it states that the figures represent Na-

4   tives primarily.  Hundred and eleven in 1950, seventy-eight

5   in 1960.  Stratman claims that there was only one or two left

6   by 1970, so that means, if he were correct, that seventy-six

7   people left between 1960 and 1970.  So obviously, something

8   happened between 1960 and 1970, and we all know what that

9   was, it was the 1964 earthquake and the tidal wave that wiped

10   out Woody Island.  We submitted the affidavits indicating

11   just how important it was that that FAA ferry service pro-

12   vided a means of transportation to and from the island.  When

13   they shut down the FAA, they ceased the FAA ferry, and they

14   shut down the schools.  We have the tremendous damage in-

15   flicted by the quake.

16           So we complied with the regulations.  Stratman has

17   long since missed the statute of limitations to seek to nul-

18   lify those regulations.  It would have been a six-year stat-

19   ute of limitations under 28 U.S.C., Section 2401, and again,

20   there's no allegation in the complaint that he seeks to nul-

21   lify an administrative regulation; this is the first time

22   we're hearing of it.

23           Finally -- and again, this is something he didn't

24   even bother mentioning in his brief, didn't address at oral

25   arguments.  Congress has statutorily ratified the certifica-