Michael J. Schneider
Law Offices of Michael J. Schneider, P.C.
880 "N" Street, Suite 202
Anchorage, AK 99501
(907) 277-9306 - phone
(907) 274-8201 - fax

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| OMAR STRATMAN,<br><br>        Plaintiff,<br><br>v.<br><br>LEISNOI, INC., KONIAG, INC., and DIRK KEMPTHORNE, Secretary of the Interior,<br><br>        Defendants,<br>_____<br><br>KONIAG, INC.,<br><br>        Counter-claimant,<br><br>v.<br><br>OMAR STRATMAN,<br><br>        Counter-claimed Defendant.<br>_____ | Case No.: 3:02-cv-0290 (JKS) |

**<u>OMAR STRATMAN'S OPPOSITION TO LEISNOI'S MOTION FOR ATTORNEYS' FEES</u>**

-1-

**I.     Summary of Argument.**

Leisnoi cites to no rule, case, statute, or regulation that would authorize the award that it seeks. The "bad faith" exception to the American Rule against attorney fee awards has been employed only in the most outrageous cases and where there was virtually no merit in the litigation brought by the party against whom the fee award was sought. We can find no case where the "bad faith" exception has been applied against an APA litigant. Mr. Stratman's APA decertification claims are specifically authorized by statute, regulation, and common law. We can find no case where the "bad faith" exception has been applied against such a litigant. Because Mr. Stratman's litigation has been substantially successful, and his positions at all times were fairly debatable, Leisnoi's motion should be denied.

**II.    Authority cited by Leisnoi is of little help.**

In its quest to intimidate Mr. Stratman from the pursuit of its decertification, Leisnoi relies on <u>Alyeska Pipeline Co. V. Wilderness Society</u>, 421 U.S. 240 (1975). The case is of little help to Leisnoi because it does no more than state the "bad faith" exception to the "American Rule" against an award of attorney's fees, but immediately thereafter goes on to state:

> These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations unless forbidden by Congress, but none of the exceptions is involved here. (Footnote omitted.) The Court of Appeals expressly disclaimed reliance on any of them.[1]

If anything, <u>Alyeska Pipeline Co.</u> makes plain what a serious burden Leisnoi has to overcome to obtain the relief it now seeks:

---

[1] <u>Id</u>. at 259-60.

> Congress has not repudiated the judicially fashioned exceptions to the general rule against allowing substantial attorneys' fees; but neither has it retracted, repealed, or modified the limitations on taxable fees contained in the 1853 statute and its successors. (Footnote omitted.) Nor has it extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted. What Congress has done, however, while fully recognizing and accepting the general rule, is to make specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various Federal rights.[2]

The Court went on to point to antitrust cases, patent cases, and civil rights act cases as examples. APA claims were not on the list. The million dollar fee award sought by Leisnoi, if granted by the court, "would make major inroads in a policy matter that Congress has reserved for itself."[3] Alyeska Pipeline Co., therefore, is, in Mr. Stratman's view, a bigger impediment to Leisnoi's relief than Leisnoi suggests in its briefing.

The U.S. Supreme Court did, nevertheless, and despite the irrelevance of the "bad faith" exception to the matter at hand, recite the rule that where a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, attorneys' fees can be awarded.[4] The court cited cases in support of this exception to the American Rule. We wish to examine the cases cited so we can all see whether they support Leisnoi's position.

The first case mentioned is F.D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116,

---

[2] Id. at 260.

[3] Id. at 269.

[4] Id. at 258-59.

126-31 (1974). This case, too, is of little assistance to Leisnoi because it <u>reversed</u> a lower court award of attorneys' fees, that, like this motion brought by Leisnoi, lacked specific Federal statutory support. This is a Miller Act case. The Ninth Circuit Court of Appeals had looked to state law to justify an award to the successful party.[5] The Court, at the end of p. 129, did very little more than acknowledge the existence of the "bad faith" exception to the American Rule. That exception was not involved in <u>F.D. Rich Co.</u> and the reference to the exception is little more than dicta.

Cited at p. 129, n. 17, of <u>F.D. Rich</u> are four cases. The first is <u>Vaughan v. Atkinson</u>, 369 U.S. 527 (1962). <u>Vaughan</u> is also cited in support of the "bad faith" exception in <u>Alyeska Pipeline Co.</u>, <u>supra</u>, p. 259. <u>Vaughan</u> is a case where bad faith conduct actually did result in affirmance of an award of attorneys' fees. Vaughan was a seaman whose maritime employer refused, without any basis whatsoever, to pay maintenance and cure that was clearly owed. Because a claim for maintenance and cure encompassed damages foreseeably caused by the refusal to pay maintenance and cure, the Supreme Court affirmed the attorney fee award.[6] The Supreme Court had this to say about the conduct of the party against whom fees were imposed:

> In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under the laws that are centuries old. The default was willful and persistent. It is difficult to

---

[5] <u>Id</u>. at 117, 128.

[6] <u>Id</u>. at 530.

> imagine a clearer case of damages suffered for failure to pay maintenance than this one.[7]

We will easily distinguished Mr. Stratman's conduct in the matter before the court below. But, here, we only point out that Vaughan involved a situation where there was no excuse for respondent's behavior and where that behavior lead to damages cognizable in admiralty in a maintenance and cure setting. Leisnoi has no cause of action for damages in the form of attorneys' fees under the Administrative Procedures Act or any other provision of law Mr. Stratman is aware of or that Leisnoi has directed us to.

The next case referred to at n. 17 of F.D. Rich is McEnteggart v. Caltaldo, 451 F.2d 1109 (1st Cir. 1971). This professor-denied-tenure case does not speak of attorneys' fees and its inclusion within the footnote is a mystery to the undersigned.

Next cited in support of the "bad faith" exception to the American Rule against an award of attorneys' fees is Bell v. School Bd. Of Powhatan County, 321 F.2d 494 (4th Cir. 1963). This case involved Black students' effort to obtain an integrated education in a decidedly segregated school district.[8] The Court concluded:

> Finally, we consider the District Court's denial of counsel fees to the plaintiffs. The general rule is that the award of counsel fees lies within the sound discretion of the trial court, but, like other exercises of judicial discretion, it is subject to review. The matter must be judged in the perspective of all the surrounding circumstances. (Citations omitted.) Here we must take into account the long continued pattern of evasion and obstruction which included not only the defendants' unyielding refusal to take any

---

[7] Id. at 530-31.

[8] Id. at 495-99.

> initiative, thus casting a heavy burden on the children and their parents, but their interposing a variety of administrative obstacles to thwart the valid wishes of the plaintiffs for a desegregated education. To put it plainly, such tactics would in any other context be instantly recognized as discreditable. The equitable remedy would be far from complete, and justice would not be attained, if reasonable counsel fees were not awarded in a case so extreme. (Citations omitted.)[9]

Unlike this APA decertification action, Bell falls within the recognized "civil rights" exception to the "American Rule" against awarding attorney fees. And, because Mr. Stratman has, as we will show more fully elsewhere, prevailed on the merits of his claim that Woody Island/Leisnoi never met the village eligibility requirements of ANCSA, Bell provides precious little authority for the relief Leisnoi seeks here.

The final case found at n. 17 of F.D. Rich is Rolax v. Atlantic Coastline R. Co., 186 F.2d 473 (4th Cir. 1963). Rolax was also cited approvingly in Bell at p. 500 of that decision. Rolax is a civil rights case involving the locomotive firemen employed by Atlantic Coastline Railroad Company. The claim was brought against the railroad company and the union representing the locomotive firemen. Plaintiffs obtained an injunction and the district court taxed fees against defendants, in plaintiffs' favor, through the acquisition of that injunction.[10] On the matter of taxing costs, the Circuit Court observed at p. 481:

> The defendant Brotherhood challenged the taxation of attorney's fees against it in favor of plaintiffs Rolax and McGowan. Inasmuch as the whole matter of taxation of costs will be before

---

[9] Id. at 500.

[10] Id. at 474-75.

> the lower court when final judgment shall be entered herein, we think it unnecessary to discuss the matter at this time, except to say that under circumstances here we think that the allowance of attorneys' fees as a part of the costs is a matter resting in the sound discretion of the trial judge. Ordinarily, of course attorneys' fees, except as fixed by statute, should not be taxed as part of the costs recovered by the prevailing party; but in a suit in equity where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases. The justification here is that the plaintiffs of small means have been subjected to discriminatory and oppressive conduct by a powerful labor organization which was required, as bargaining agent, to protect their interests. The vindication of their rights necessarily involves greater expense in the employment of counsel to institute and carry on extended and important litigation than the amount involved to the individual plaintiffs would justify their paying. In such situation, we think that the allowance of counsel fees in a reasonable amount as a part of the recoverable costs of the case is a matter resting on the sound discretion of the trial judge.

This case would appear to assist Leisnoi very little. Again, Rolax falls within the recognized "civil rights" exception to the "American Rule." Mr. Stratman is the little guy, like Mr. Rolax, and entirely unlike the railroad and the union, against whom fees were awarded. As the very exhibits to Leisnoi's motion make obvious, he has been besieged by litigation in an effort to crush his decertification case and discourage him from going forward. The policy goals sought to be advanced by the court in Rolax cannot, given the factual juxtaposition of Mr. Stratman versus Leisnoi, be reached by sanctioning Stratman with a million dollar fee award in Leisnoi's favor. Unlike the railroad and the union whose positions were patently meritless, Mr. Stratman's position has been judicially established to be accurate,

albeit moot per this Court's recent holding. Rolax would appear to provide no authority for the relief Leisnoi seeks.

**III.    Litigation brought by Mr. Stratman cannot be found to be in bad faith, vexatious, or harassing under Ninth Circuit precedent.**

DeLong v. Hennessey, 912 F.2d 1144 (9th Cir. 1990) is a case dealing with a pre-filing injunction. Mr. DeLong, a *pro se* litigant, was enjoined by the trial court from filing further actions or papers without specific leave of the court. The Ninth Circuit reversed. It observed that the district court must look at both the number and content of filings as indicia of frivolousness.[11]  In its conclusion, it stated:

> Flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Nonetheless, orders restricting a person's access to the courts must be based on adequate justification supported in the record and narrowly tailored to address the abuse perceived. We find such care is demanded in order to protect access to the courts, which serves as the final safeguard for constitutional rights.
>
> We find that the district court abused its discretion in entering the vexatious litigant order. We vacate the present order and remand so the district court can apply the procedures that we have set forth above.[12]

DeLong employed four separate factors that the Ninth Circuit used in detail in Molski v. Evergreen Dynasty Corp., 05-56452 (9th Cir. 8-31-2007).  Molski was another vexatious

---

[11] Id. at 1148.

[12] Id. at 1148-49.

litigant/pre-filing injunction case. The Ninth Circuit compared and contrasted the standard employed by the Second Circuit and that employed by the Ninth Circuit following DeLong. The court analyzed the four factors demanded by DeLong in light of the Molski facts at pp. 1073-78 of the opinion. But, the "frivolous litigation factor", the one most important to the issue raised by Leisnoi in its request for attorneys' fees, is discussed on p. 11076. Molski had filed over 400 cases but had tried only one on the merits. Here is what the Ninth Circuit had to say on the topic:

> Frivolous litigation is not limited to cases in which a legal claim is entirely without merit. It is also frivolous for a claimant who has some measure of a legitimate claim to make false factual assertions just as bringing a completely baseless claim is frivolous, so too a person with a measured legitimate claim may cross the line into frivolous litigation by asserting facts that are grossly exaggerated or totally false. In an adversary system, we do not fault counsel or client for putting their best arguments forward, and it is likely the unusual case in which a finding of frivolous litigation follows in the train of a legitimate legal claim. It is a question of degree where the line falls between aggressive advocacy of legitimate claims and the frivolous assertion of false allegations. In this case, the district court, looking at the allegations of hundreds of lawsuits, made a decision that Molski's baseless and exaggerated claims of injuries exceeded any legitimacy and were made for the purpose of coercing settlement. We cannot on this record conclude that the district court's factual determinations were clearly erroneous or that the district court erroneously reached the legal conclusion that Molski's litigation was vexatious.[13]

---

[13] Id. at 11076-77.

The district court found that Molski had a pattern and practice of lying (exaggerating) about his personal injury claims in the hundreds of suits that he had filed. If conduct is to be labeled "bad faith, vexatious, or frivolous" in the Ninth Circuit, it is that degree of conduct that is required. As we will show below, Mr. Stratman has committed no fraud upon the Court and has brought two substantially meritorious matters against Leisnoi.

### IV. The contract action described in Leisnoi, Inc. v. Stratman, 835 P.2d 1202 (Alaska 1992) cannot be found to have been brought in bad faith.

This case, as we all know, was Mr. Stratman's damage and specific performance case against Leisnoi. Mr. Stratman initiated his 1976 APA decertification litigation before this Court. When it became apparent that the merits of Leisnoi's certification would be reached, the parties settled. Leisnoi was merged with Koniag at the time. Leisnoi and Koniag later de-merged and, when they received their land entitlements, Stratman demanded performance by both. Leisnoi refused to perform. Stratman sued both Koniag and Leisnoi in Superior Court. Leisnoi was sued for specific performance and damages. Koniag, having conveyed its sand and gravel per the agreement, was sued for damages because it had produced or promoted Leisnoi's breach of the agreement.

Leisnoi's argument that this litigation was in bad faith, frivolous, or vexatious is easily dispensed with on three grounds. They are:

> (1) Superior Court Judge Karen Hunt ruled in Mr. Stratman's favor. Id. at 1203.
>
> (2) The Alaska Supreme Court, in order to dismiss Mr. Stratman's claims for legal and equitable relief, as it did, Id. at 1211, was required to take the "ancient doctrine of Lis

pendens" to places it had not seen before or since.

(3) Justice Moore, making point number two (2) above, among others, would have affirmed Judge Hunt and ruled in Mr. Stratman's favor. Id. at 1211-15.

In the face of this procedural and legal history, it is difficult to imagine that Mr. Stratman, who sought no more in this state court litigation than he was promised in his contract with Koniag, can be accused, in the words of the Ninth Circuit, of bringing "a legal claim [that] is entirely without merit[,]" or asserting "a legitimate claim" through "false factual assertions." Mr. Stratman won on the merits and lost on a legal hypertechnicality before a divided court.

**V.     Stratman has proved that Leisnoi and Koniag acquired Federal resources through fraud and purjury: His APA action seeks to correct this wrong.**

This action, recently dismissed by this Court, seeks to reverse the fraudulent[14]

---

[14] The ALJ held (see n. 17, infra) that many Leisnoi shareholders lied under oath about material facts and circumstances in affidavits provided to the Secretary as part of a scheme to obtain land and money to which Koniag and Leisnoi were not entitled. Given that those perjured statements were relied upon, and that land and money were conveyed to Leisnoi and Koniag as a result thereof, there is little doubt that fraud has been committed. Fraud is both defined and criminalized at 18 U.S.C. Section 1001. This section, "Statements or Entries Generally," provides as follows:

> (a) Accept as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States, knowingly and willfully – (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, [and] imprisoned not more than five years . . ..

acquisition of approximately 78 square miles of surface and sub-surface resources in the Kodiak Archipelago.[15] The land in question is the most scenic and valuable in the vicinity of the City of Kodiak and is amongst the most scenic land in America.[16]

Of equal importance, Mr. Stratman's APA decertification action seeks to restore public confidence in its government and courts, that have, to date, somehow allowed Leisnoi and Koniag to steal this public wealth through a thus-far-successful scheme that employed perjured[17] affidavits and a legal theory long ago rendered a nullity by the Ninth

---

[15] See A76-0132 CV (JKS), "Federal Defendant's Opposition to Motion to Vacate Dismissal and Reopen Case", Docket No. 132, attached Declaration of Terry R. Hassett, ¶¶ 3, 5, and 6.

[16] In Leisnoi, Inc. v. Omar Stratman, 3AN-96-502 CI (Leisnoi State Court Quiet Title Action), Leisnoi described just a small fraction of its land holdings as "famous for its exceptional wildlife, wondrous beauty, and tremendous forests." See "Memorandum in Support of Motion for Summary Judgment", March 22, 1996, p. 1. See enclosed CD containing color images of the surface estate and corresponding maps. (CD will be attached to hard copies sent to all parties and filed with the Court.)

[17] Willfully false material statements, whether sworn or unsworn, are made felonious under 18 U.S.C. § 1621, and 28 USC § 1746, respectively. Part of Koniag's fraudulent scheme to acquire land and money relied upon the execution of affidavits by alleged Woody Island "permanent residents."

"For example, the form affidavits of Woody Island enrollees Karl Armstrong, Christina Hoen, and her daughters, Chrislyn Hoen and Cien Marie Hoen, all indicate that Woody Island was their 'usual place of residence as of April, 1970.' They further state that Karl, Christina, Chrislyn, and Cien have lived there since 1963, 1948, 1969, and 1963, respectively. In fact, according to Christina Hoen's own testimony, the Hoen's, since 1956, merely lived there for weeks each summer, but resided in Kodiak for the vast majority of the time each year, except 1964 (Ex. S-6 F, pp. 15-27). Mr. Armstrong never lived or stayed over night on Woody Island, according to the Chaffins (Exs. S-6,A, p.33; S-6, B, p. 17)[2] "[Footnote 2 of ALJ's Recommended Decision reads as follows] "Mr. Armstrong's 1978 deposition was admitted by stipulation. His own testimony shows that Woody Island was not his usual place of residence as of April 1, 1970, and that he did not live there since 1963. Rather, he lived in Kodiak, did not visit Woody Island from 1963 to 1967, and spent approximately 35 days there in 1970."

Circuit Court of Appeals.[18]

Because Koniag publicized its fraudulent scheme[19] and because the location of the "Native Village of Woody Island" (the place where it was not . . .) could easily be seen from downtown Kodiak[20], the Secretary's initial 1974 certification of the village[21], not unlike the

---

"Similarly, the 15 identical form affidavits of Mary Chya and her family and Marie Redick and her family were shown to be false and misleading by the evidence adduced by Protestant. Each of those affidavits states the affiant lived on Woody Island for periods of time each year where 'my residence consists of a five-room house * * *.' (Ex. BIA-2A, pp. 101-87, 84-82.) Contrary to the content thereof, Mary Chya admitted that neither she nor her family had a house on Woody Island or lived there for periods of time each year (Ex. S-6, N, pp. 13-26). In fact, they lived in Kodiak and stayed overnight on Woody Island only two or three times over the many years they visited there (Id. at pp. 31-32). Mary Redick likewise admitted that she and her family lived in Kodiak and did not have a house on Woody Island, but she did allege that they stayed overnight on Woody Island every summer for periods lasting up to a week or two (Ex. S-6, L, pp. 13-17, 23-24)." Docket No. 150, AR, Tab E, pp. 29-30.

[18]See n. 23, infra.

[19]Koniag actually had the audacity to publish its illegal scheme to defraud the government out of land and money in the *Kodiak Daily Mirror*. See Protestant Omar Stratman's Exhibit 30g, introduced into evidence during the trial conducted before the ALJ, and attached hereto under the same exhibit designation.

[20]Where the Village of Woody Island was not on April 1, 1970, is clearly visible from Rezanof Drive, and a variety of other locations smack in the middle of the City of Kodiak. At AR Tab E, ALJ Recommended Decision at p. 6, it is observed that, "Woody Island is located approximately one mile east of Kodiak, Alaska, which is situated on the east shore of Kodiak Island (Exs. L-CHART-26; L-DOC A2; L-BOOK-77, p. 47). A short boat ride from Kodiak to Woody Island takes only five to 30 minutes (Armstrong depo.), p. 109-10; Exs. S-6, D, p.28; S-6, J, p. 10; Tr. 264 (.)" "In approximately 1941, the Civil Aeronautics Administration (later, the FAA) established an airways communication station on the east side of Wood Island." See Docket No. 150, AR, Tab E, p. 12. We ask the Court to take judicial notice of FAA charts and regulations to the effect that one could not shoot an instrument approach into Kodiak in the approximately 29 years before April 1, 1970, without flying directly over Woody Island, thus having an opportunity to directly observe where the village wasn't.

[21]The Secretary's certification relied, in great measure, on the "investigation" of Mr. Fitzpatrick. The ALJ's description of this evidence can be found at IBLA 96-152, pp.

Secretary's recent pronouncements, have left many doubting their government and doubting the judicial process.

While conduct of a similar quality resulting in comparatively trivial losses is often harshly punished by the courts, Mr. Stratman, in this APA decertification action, seeks only to "undo" the harm.  Sadly, his efforts are too late to save the beauty that once was Cape Chiniak from Leisnoi's rapacious effort to turn its unparalleled beauty and timber resources into attorney fees.

We hasten to point out as well that this was not a close case,[22] and the Ninth Circuit has already put a stake in the heart of any Leisnoi and Koniag arguments to the effect that a Native person living in Kodiak or Washington State can claim "residency" for ANCSA

---

27-30.  Same is attached hereto as Exhibit 1.  It makes fascinating reading.

[22]Before this matter was tried to the ALJ, no one with knowledge of the underlying facts believed Leisnoi had much of a chance. Dan Hensley, currently a retired Anchorage Superior Court Judge, but counsel for Leisnoi before its merger with Koniag, and counsel for Koniag at the time of the 1982 "Stratman Agreement" that purportedly settled the decertification litigation, "believed that there was a 90% chance that Leisnoi would be decertified if the action was heard on the merits."  See Leisnoi, Inc. v. Stratman, 835 P.2d 1202, 1205, n.10 (Alaska 1992).  Hensley's assessment was prophetic.  Beyond Koniag and Leisnoi's "bury my heart at Wounded Knee" theory of residency, the proof put on by Leisnoi and Koniag at the two-week administrative trial showed, at most, three actual "permanent residents" of Woody Island on April 1, 1970. "This vague evidence is juxtaposed against the voluminous evidence that the only Natives who lived in the alleged Village with any frequency or continuity after 1966 were William Wilfred Pavloff until he died in 1967, Johnny Maliknak, Nicholas Pavloff, and, possibly, Rudy Sundberg, Jr. and Christina Hoen."  Docket No. 150, AR, Tab E, p. 55. The ALJ concluded that the Hoen "possib[ility]" was meritless (see discussion, n. 17, supra.), just as Pavloff's 1967 demise precluded his residency on the magic date.  We will not burden the Court with further quotations, but the ALJ's summary of Leisnoi's frivolous positions is found on pp. 42-44 and makes fascinating reading.  Leisnoi and Koniag were not attempting to skate on thin ice; they were attempting to walk on water in asserting Leisnoi's right to "village" status under ANCSA.

purposes on Woody Island because of some real or imagined "historical ties," coupled with a real or imagined desire to return.[23]

Mr. Stratman has always argued that Leisnoi did not meet the ANCSA village eligibility requirements. He has won on the merits. The Secretary of Interior, and, more recently, this Court, have concluded that his challenge to Leisnoi's eligibility is moot because §1427 of ANILCA either impliedly repealed ANCSA's village eligibility requirements or ratified the Secretary's 1974 village eligibility decision. Mr. Stratman respectfully disagrees. He will succeed or he will fail on appeal. However, no matter what the outcome, it can hardly be argued that his effort to unseat Leisnoi, correct on the merits, <u>and filed before the passage of ANILCA</u>, is somehow brought in bad faith or is vexatious or frivolous or harassing in nature. Mr. Stratman is simply another citizen attempting to

---

[23]When this matter was sent by this Court to IBLA, it was Koniag and Leisnoi's hope-over-experience contention that virtually any tie of any nature to Woody Island by a Native person, coupled with the desire to someday return to Woody Island, magically transformed that Native person into a "permanent resident" of Woody Island. The ALJ summarizes these contentions at Docket No. 150, AR Tab E, pp. 40-42, but concludes at p. 42 that, "The problem with the approach of Respondents and their experts is that it deviates from the statutory, regulatory, and precedential guidance as to what constitutes a Native village and a permanent resident thereof." The "precedential guidance" was offered by the Ninth Circuit in litigation between these very parties. See Leisnoi, Inc. v. Stratman, 154 F.3d 1062, 1068-71 (9th Cir. 1998) ("This conclusion, however, does not end our inquiry. We must still determine exactly where the boundaries [of the Native village] lie. Are the boundaries marked by the Native village's historical use, as Leisnoi contends, or occupancy of the land, as Stratman contends? * * * Thus, in the Secretary's view, the "boundaries of a[ ] Native village" are defined by reference to this physical evidence of occupancy. * * * [W]e do not hold the Secretary's interpretation unreasonable. The "boundaries of a[ ] Native village" are defined by occupancy, not historical use.").

vindicate some rights he enjoys under the Administrative Procedures Act.[24] Mr. Stratman's standing was established in Stratman, et al. v. Watt, 656 F.2d 1321 (9th Cir. 1981). Two "standing" cases involving Koniag "phantom villages" announce the public policy in favor of accurate determinations of village eligibility:

> Basically, the Services argue that since Congress did not intend for an unqualified village to be awarded land from a wildlife refuge or a national forest they have standing as the agencies responsible for these refuges and forests to challenge the eligibility of the village which either will be required or may choose to take some land from their repective domains.
>
> It is true, as plaintiffs argue, that Congress put careful safeguards in the statute designed to minimize the possible adverse effects of such takings.[25]

And, in the same opinion, it was observed by the District Court that:

> The Court is particularly reluctant to deny standing to those most likely in fact to have a legitimate concern about these lands and to come forward to protect the public interest, especially where the effect of finding standing is simply to allow adversary proceedings to be held which, if properly conducted, could contribute to

---

[24]In this regard, we are reminded by Leisnoi of our failure to obtain an injunction of Leisnoi's logging activity. It should be noted that Judge Von der Heydt, as Leisnoi concedes in its memorandum, failed to grant the injunction because he doubted Stratman's ability to succeed on the merits. We can only speculate what Judge Von der Heydt may have done had he known that the Secretary certified a village with three inhabitants and that Stratman would later prove that point before an ALJ, and have that finding affirmed by IBLA.

[25]Koniag, Inc. v. Kleppe, 405 F. Supp. 1360, 1368 (D.C. Cir. 1975).

fair and informed decision making.[26]

As challenges to Koniag's many phantom villages persisted, the D.C. Circuit agreed:

> A necessary corollary to this scheme is that the term "party aggrieved" must be construed generously to achieve the Congressional objective that determinations <u>be careful</u> as well as quick. We conclude, therefore, that grafting strict judicial standing requirements onto these regulations would be inconsistent with the Act and the Secretary's plan to implement it. (Emphasis added.)[27]

Both the Congress and the courts have specifically authorized and encouraged the decades-long effort that Mr. Stratman has engaged in. The "bad faith" exception to the "American Rule" has no application under these circumstances.

**VI.   Conclusion.**

Stratman has only brought two suits against Leisnoi. Both were won on the merits. Congress and the courts have specifically authorized good faith challenges to administrative village eligibility decisions. The "American Rule" precludes an award of attorneys fees. The "bad faith" exception to that rule has no application on the circumstances now before the Court. Leisnoi's motion should be denied.

RESPECTFULLY submitted this 22nd day of October, 2007.

---

[26] <u>Id</u>. at p. 1369.

[27] <u>Koniag, Inc., Village of Uyak v. Andrus</u>, 580 F.2d 601, 606 (D.C. Cir. 1978).

> s/Michael J. Schneider
> Law Offices of Michael J. Schneider, P.C.
> 880 "N" Street, Suite 202
> Anchorage, AK 99501
> Phone: (907) 277-9306
> Fax: (907) 274-8201
> E-mail: mjspc@gci.net
> Alaska Bar No. 7510088

**CERTIFICATE OF SERVICE**
I hereby certify that **OMAR STRATMAN'S OPPOSITION TO LEISNOI'S MOTION FOR ATTORNEYS' FEES** was served electronically and via U.S. Mail on the 22nd day of October, 2007, on Dean Dunsmore, R. Collin Middleton, and John R. Fitzgerald.
s/Michael J. Schneider