

# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
139 East South Temple, Suite 600
Salt Lake City, Utah 84111
Phone: 801-524-5344

IN REPLY REFER TO:

October 13, 1999

| | |
|---|---|
| OMAR STRATMAN, | IBLA 96-152 |
| | No. A76-0132 CV (JKS) |
| Protestant | |
| | Challenge to the eligibility of Woody |
| v. | Island as a Native village under Section |
| | 11(b)(3) of the Alaska Native Claims |
| LEISNOI, INC., | Settlement Act, 43 U.S.C. §1610(b)(3) |
| | (1994) |
| Respondent | |
| KONIAG, INC., and BUREAU OF INDIAN AFFAIRS, | |
| Intervenors | |

## **RECOMMENDED DECISION**

Appearances:   Michael J. Schneider, Esq., Anchorage, Alaska
                        for Omar Stratman

   John R. Fitzgerald, Esq., New Orleans, Louisiana, and
   Robert L. Breckberg, Esq., Anchorage, Alaska
   for Leisnoi, Inc.

   R. Collin Middleton, Esq., Anchorage, Alaska
   for Koniag, Inc.

   James R. Mothershead, Esq., Anchorage, Alaska
   for the Bureau of Indian Affairs

Before:   Administrative Law Judge Sweitzer

EXHIBIT 1
Page 1 of 5 Pages

IBLA 96-152

doubt. First, no adequate investigation of the permanent residency of the Natives enrolled to the alleged Village had been made by the Department prior to the hearing in this matter.

Marie Redick Unger, one of the "enumerators" who worked under contract with the BIA to assist Natives in completing the enrollment applications, testified that the enumerators were instructed to accept the Natives' representations on the applications without challenging or investigating them (Ex. S-6L, pp. 6-7). The Enrollment Coordinator similarly testified that, in general, the enrollment of each Native to the alleged Village was not based on any investigation into the Native's permanent residency, but was based solely on the Native's own application statement of the place of permanent residency (Ex. S-6G, pp. 29-30, 34-35).

The resulting Native Roll was then cited by the Area Director to support his finding that the alleged Village had 25 or more residents as of April 1, 1970. He also referenced Mr. Fitzpatrick's similar finding, but that finding is not grounded upon an adequate investigation.

Mr. Fitzpatrick's report provides in pertinent part:

Woody Island village is listed in the 1970 census with a population of 41. * * *

\*   \*   \*   \*   \*   \*   \*

On my recent visit to Woody Island village site, I observed several Native dwellings, fish racks, smoke houses, and a storage shed. I interviewed residents of Woody Island village, and determined that the village does exist and that more than 13 Natives actually used the village before April 1970, on a seasonal and year-round basis.

(Ex. BIA-2B, p. 162). The 22 enrollees who submitted affidavits in support of the alleged Village's application are listed as persons who so used the alleged Village (id., p. 161).

Mr. Fitzpatrick also noted that the majority of residents were Native and that the number of non-Native residents as of April 1, 1970, was 40 (id., p. 161). He indicated that the alleged Village was in existence, as evidenced by attached photographs and "residences, storage buildings, schoolhouse, powerhouse, cold storage, fuel tank farm, water plant, garage, office bldg., community center (library), Camp Woody, dock facilities, and marina." (Id.). He concluded that the alleged Village had met all the eligibility requirements, including the 25-resident requirement (id., p. 162).

His 1978 deposition testimony (Ex. S-6M) shows the following:

(1) that his on-site field examination of Woody Island lasted only 3 or 4 hours (pp. 17, 100-02, 119);

(2) that, based upon the documentation that had been submitted in support of the

27

EXHIBIT 1
Page 2 of 5 Pages

alleged Village's application, he assumed that the alleged Village was eligible prior to his field examination (pp. 28-29);

(3) that his field examination focused primarily on the FAA complex and its facilities (pp. 30-31);

(4) that nearly all of the structures listed in the Village Check List as evidencing the village's physical location were the FAA's facilities (pp. 66-67);

(5) that the facilities and dwellings in the attached photographs were the FAA's facilities (pp. 60-61);

(6) that he regarded the FAA facilities and dwellings as relevant to the alleged Village's eligibility because the alleged Village was expecting to obtain use of them under a use permit (pp. 30-31, 61-65);

(7) that the statement in his report that he observed "several Native dwellings" was based upon only 1 house - Nick Pavloff's - determined to be occupied by a Native, another standing house which he saw from a distance, and the debris of several uninhabitable houses whose origins were unknown (pp. 31-33, 37-39, 52-53, 120-21);

(8) that if he had excluded the FAA facilities and dwellings, he would have reported that the alleged Village was not in existence (p. 121);

(9) that his interviews were limited to 10 to 15 enrollees of the alleged Village, each of whom stated that they camped at or otherwise used Woody Island in 1970, and that he could only identify 5 of them (pp. 54-59, 109-10, 119-20);

(10) that he interviewed only 4 of the 22 enrollees who submitted affidavits in support of the alleged Village's application and that he did not question any of them specifically about the content of their affidavits because, among other reasons, he had not seen the affidavits at the time of the interviews (pp. 71-72, 77-79, 109-10);

(11) that he only saw one Native, Nick Pavloff, on the island during his field examination (pp. 31-33, 37-39);

(12) that, consistent with his visual observations, the 1970 census figures provided to him by the BIA showed that only 1 of the 41 residents of the alleged Village was Native (pp. 67-70, 104-06); and

(13) that, in light of the census figures, it is unclear how he concluded that a majority of the residents were Native, but he apparently relied heavily upon the number of enrollees in concluding that the alleged Village met the residency requirements (see, e.g., pp. 34-37, 67-72).

In other cases where Mr. Fitzpatrick prepared similar eligibility reports for other villages under similar circumstances, the tribunals have found his investigations cursory and his reports misleading and of little probative value. See Alaska Conservation Society v. Village of Ayakulik, ANCAB VE 74-95, VE 74-104, VE 74-108 (Sept. 26, 1974), ALJ's Recommended Decision, at 10; U.S. Forest Service v. Anton Larsen, Inc., ANCAB VE 74-20, VE 74-21, VE 74-36, VE 74-57, VE 74-62, VE 74-112 (October 3, 1974), ALJ's Recommended Decision, at 16; Village of Litnik, supra, ALJ's Recommended Decision, at 33-34; Natives of Afognak, Inc., supra, at 17-18; Alexander Creek, Inc., supra, ALJ's Recommended Decision, at 32. Likewise, in the instant case, his investigation was cursory and his report is misleading and of little probative value.

Second, based upon the testimony presented by Protestant, if Mr. Fitzpatrick had interviewed the 22 affiants and non-enrollee residents of Woody Island or Kodiak, he would have discovered that many of the statements contained in the affidavits are misleading or false, that nearly all of the Natives enrolled to Woody Island were not residents in 1970, and that, as of April 1, 1970, the island lacked a Native village, contained only a few habitable, non-FAA houses, and had far fewer than 25 Native residents. That testimony came from more than a dozen witnesses, including long-time Woody Island residents, Yule and Darrel Chaffin, and several Native residents of Kodiak (see, e.g., Exs. S-6A through S-6F, S-6I, S-6L, S-6N, S-6O; Tr. 93-106, 240-284, 291-325, 401-23, 451-573, 627-36, 643-676).

For example, the form affidavits of Woody Island enrollees Karl Armstrong, Christina Hoen, and her daughters, Chrislyn Hoen and Cien Marie Hoen, all indicate that Woody Island was their "usual place of residence as of April, 1970." They further state that Karl, Christina, Chrislyn, and Cien have lived there since 1963, 1948, 1969, and 1963, respectively. In fact, according to Christina Hoen's own testimony, the Hoen's, since 1956, merely lived there for weeks each summer, but resided in Kodiak for the vast majority of time each year, except 1964 (Ex. S-6F, pp. 15-27). Mr. Armstrong never lived or stayed overnight on Woody Island, according to the Chaffins (Exs. S-6A, p. 33; S-6B, p. 17).[2]

Similarly, the 15 identical form affidavits of Mary Chya and her family and Marie Redick and her family were shown to be false and misleading by the evidence adduced by Protestant. Each of those affidavits states the affiant lived on Woody Island for periods of time each year where "my residence consists of a 5 room house * * *." (Ex. BIA-2A, pp. 101-87, 84-82). Contrary to the content thereof, Mary Chya admitted that neither she nor her family had a house on Woody Island or lived there for periods of time each year (Ex. S-6N, pp. 13-26). In fact, they lived in Kodiak and stayed overnight on Woody Island only two or three times over the many years they visited there (id., pp. 31-32). Marie Redick likewise

---

[2] Mr. Armstrong's 1978 Deposition was admitted by stipulation. His own testimony shows that Woody Island was not his usual place of residence as of April 1, 1970, and that he did not live there since 1963. Rather, he lived in Kodiak, did not visit Woody Island from 1963 to 1967, and spent approximately 35 days there in 1970.

EXHIBIT 1
Page 4 of 5 Pages

admitted that she and her family lived in Kodiak and did not have a house on Woody Island, but she did allege that they stayed overnight on Woody Island every summer for periods lasting up to a week or two (Ex. S-6L, pp. 13-17, 23-24).

By itself, the testimony from persons living on or frequenting Woody Island and Kodiak Island creates substantial doubt. That testimony presented by Protestant consists of the following:

Yule Chaffin, Darrell Chaffin, and Patricia Hampton

Yule and Darrell Chaffin were a married couple that lived on Woody Island full-time from 1945 until 1967, when they acquired a retirement home in California. Patricia is their daughter who lived with them from her birth in 1948 until she graduated from high school in 1966.

From 1967 onward, with the exception of 1970, Yule and Darrell lived on Woody Island each year from mid-August to early May and in California during the rest of the year. In 1970 they lived on the island the whole year, except for the period of March 2nd through May 7th, when they were vacationing in Hawaii.

From 1967 onward Patricia lived on Woody Island each summer for approximately 3 to 4 months. In 1970 she was there for the months of July, August, and possibly September. Each year from 1969 through 1971 she also visited her parents on the island at Christmas time.

Because Darrell worked at the FAA facility on Woody Island, eventually becoming the Station Manager, he and his family lived in FAA housing until 1967, when Darrel retired and he and Yule moved into a cabin they had built above Una Lake on the west side of the island. They also had a large garden near Camp Woody on the west side.

They could not see the dock from their cabin, but Darrell frequented the area near the dock to tend their garden and crab pots which he stored for crabbers for a fee. He also made daily trips to the dock while working for the FAA. He testified by deposition that he knew and had regular contact with all the Native residents of Woody Island.

Yule has researched and authored numerous books and articles regarding the history of Woody Island and the Kodiak region. Her research included interviewing Ella Chabitnoy, who was a good friend whose family regularly interacted with the Chaffins. The Chaffins were also good friends with the Simeonoffs. Beginning in the 1950's, Yule made daily entries in a diary detailing the activities on the island and the persons living there. Both Yule and Patricia testified by deposition that they regularly hiked all around the island and knew everyone who lived on Woody Island while they were living there.

Patricia testified that there was no Native village, store, or church on Woody Island,